D. Lee Roberts, Jr., Esq.
Nevada Bar No. 8877
*lroberts@wwhgd.com*
WEINBERG, WHEELER, HUDGINS,
  GUNN & DIAL, LLC
6385 South Rainbow Blvd., Suite 400
Las Vegas, Nevada  89118
Telephone:(702) 938-3838
Facsimile: (702) 938-3864

Neal Kumar Katyal (pro hac vice pending)
Joshua B. Sterling (pro hac vice pending)
William E. Havemann (pro hac vice pending)
Milbank LLP
1850 K Street, Suite 1100
Washington D.C. 20006
Telephone: 202-835-7505
Facsimile: 213-629-5063

Mackenzie Austin (pro hac vice pending)
Milbank LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Telephone: 424-386-4000
Facsimile: 213-629-5063
ATTORNEYS FOR PLAINTIFF

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| KALSHIEX, LLC, | Case No.: |
| Plaintiff, | **COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF** |
| vs. | |
| KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in his official capacity as a Member of the Nevada Gaming Control Board; CHANDENI K. SENDALL, in her official capacity as a Member of the Nevada Gaming Control Board; NEVADA GAMING CONTROL BOARD; JENNIFER TOGLIATTI, in her official capacity as Chair of the Nevada Gaming Commission; ROSA SOLIS-RAINEY, in her official capacity as a Member of the Nevada Gaming Commission; | |

BRIAN KROLICKI, in his official capacity as a Member of the Nevada Gaming Commission; GEORGE MARKANTONIS, in his official capacity as a Member of the Nevada Gaming Commission; ABBI SILVER, in her official capacity as a Member of the Nevada Gaming Commission; NEVADA GAMING COMMISSION; AARON D. FORD, in his official capacity as Attorney General of Nevada,

      Defendants.

## INTRODUCTION

1. This action challenges the state of Nevada's intrusion into the federal government's "exclusive" authority to regulate futures derivatives trading on exchanges overseen by the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a)(1)(A). Two Nevada agencies are seeking to prevent Plaintiff KalshiEX LLC ("Kalshi") from offering certain event contracts for trading on its federally-regulated exchange. Nevada's attempt to regulate Kalshi intrudes upon the federal regulatory framework that Congress established for regulating futures derivatives on designated exchanges. Nevada law is both field-preempted and conflict-preempted. This Court should therefore issue both a preliminary and a permanent injunction, as well as declaratory relief to that effect.

2. Commodity futures regulation has long been under the exclusive purview of the federal government. In 1936, Congress passed the Commodity Exchange Act ("CEA"), which enacted a federal regulatory framework for derivatives. In 1974, Congress established a federal agency called the CFTC to oversee it.

3. The text, purposes, and statutory history of the CEA leave no question that Congress sought to preempt state regulation of futures derivatives on exchanges overseen by the CFTC. The text of the statute gives the CFTC "exclusive jurisdiction" over federally-regulated exchanges. 7 U.S.C. § 2(a)(1)(A). During the CEA's drafting process, Congress deleted a provision that would have granted states concurrent jurisdiction over futures derivatives. *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge). One of Congress's avowed goals in creating the CFTC was to avoid the "chaos" that would result from subjecting

exchanges to a patchwork of 51 different—and potentially conflicting—state laws. *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry,* 93d Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark). And the statute gives the CFTC comprehensive authority over regulated exchanges, including the authority to approve or reject event contracts as against the public interest.

4. For that reason, courts have easily found state laws preempted in similar contexts. *See, e.g., Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995). The CFTC itself agrees. It informed the U.S. Court of Appeals for the D.C. Circuit just a few months ago that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a [designated contract market]" like Kalshi. CFTC Brief at *27, *KalshiEx LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).

5. Two Nevada agencies—the Nevada Gaming Control Board and the Nevada Gaming Commission—are threatening to intrude on the comprehensive federal scheme for regulating designated exchanges. Kalshi is a federally-designated and approved derivatives exchange, subject to the CFTC's exclusive jurisdiction. It offers consumers the chance to invest in many types of event contracts, including, as relevant here, political-outcome contracts and sports-outcome contracts. These contracts are subject to extensive oversight by the CFTC, and—critically—they are *lawful* under federal law. Two months ago, the CFTC allowed Kalshi's sports-outcome contracts to take effect without review, and a federal court held that its political-outcome contracts were entirely permissible under federal law just last year.

6. Even though Kalshi's contracts are lawful under federal law, Defendants are threatening to shut down these contracts in Nevada *as early as today*. Defendants' actions would subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent, and would interfere with the CFTC's exclusive authority to regulate futures derivatives contracts in the exchanges it oversees. For that reason, Defendants' actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has occupied the entire field of regulating

futures derivatives on CFTC-approved exchanges, and because Defendants' acts would squarely conflict with federal policy.

7. Defendants' actions would be unprecedented. Kalshi is aware of no other exchange regulated by the CFTC subject to state law in Nevada or any other state.

8. Kalshi is entitled to declaratory and injunctive relief to prevent Nevada authorities from enforcing their preempted state laws against Kalshi.

9. The Nevada authorities' actions threaten immediate and irreparable harm, not just to Kalshi but to its customers. Shutting down its event contracts in Nevada would threaten Kalshi's viability and require devising complex technological solutions whose feasibility is entirely untested and unclear. Defendants' acts would also impair Kalshi's existing contracts with consumers, subject Kalshi's users to uncertainty and loss, and undermine confidence in the integrity of Kalshi's platform. For that reason, concurrently with the filing of this complaint, Kalshi seeks an emergency temporary restraining order and preliminary injunction to avoid immediate and irreparable harm that would result from Defendants' unlawful acts.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution. The federal question presented is whether Nevada gambling laws are preempted by the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

11. The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. The "Eleventh Amendment does not bar actions seeking only prospective declaratory or injunctive relief against state officers in their official capacities." *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).

12. Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). The Individual Defendants perform their duties and thus reside in this District. The Nevada Gaming Control Board and Nevada Gaming Commission are entities are subject to this Court's personal jurisdiction and thus reside in this district. A substantial part of the events giving rise to the claim occurred in this District.

**PARTIES**

13. Plaintiff Kalshi is a financial services company with its principal place of business in New York. Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts. Its exchange market is federally regulated by the Commodity Futures Trading Commission pursuant to the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*

14. Defendant Kirk D. Hendrick is sued in his official capacity as the Chairman of the Nevada Gaming Control Board.

15. Defendant George Assad is sued in his official capacity as a Member of the Nevada Gaming Control Board.

16. Defendant Chandeni K. Sendall is sued in her official capacity as a Member of the Nevada Gaming Control Board.

17. Defendant Nevada Gaming Control Board is sued as the independent state agency that (1) promulgates rules and regulations for the licensing and operation of gaming in the state of Nevada, (2) establishes the rules and regulations for all tax reports that gaming licensees submit to the state, and (3) enforces state laws and regulations governing gaming through its six divisions, namely Administration, Audit, Enforcement, Investigations, Tax and License, and Technology.

18. Jennifer Togliatti is sued in her official capacity as Chair of the Nevada Gaming Commission.

19. Rosa Solis-Rainey is sued in her official capacity as a Member of the Nevada Gaming Commission.

20. Brian Krolicki is sued in his official capacity as a Member of the Nevada Gaming Commission.

21. George Markantonis is sued in his official capacity as a Member of the Nevada Gaming Commission.

22. Abbi Silver is sued in her official capacity as a Member of the Nevada Gaming Commission.

23. The Nevada Gaming Commission is sued as the independent state agency that acts on the recommendations of the Nevada Gaming Control Board on issues of licensing and work permit appeals. The Board has final authority on all licensing matters, retaining the power to approve, restrict, limit, condition, deny, revoke, or suspend any gaming license.

24. Defendant Aaron D. Ford is sued in his official capacity as Attorney General of Nevada.

## FACTUAL ALLEGATIONS

**A. An Event Contract—Like Other Derivatives—Is A Recognized Financial Tool To Mitigate Risk.**

25. Derivatives contracts are financial tools used to mitigate risk. Event contracts are a quintessential example of a derivatives contract—they are a type of option. This form of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2025. A purchaser may trade on either the "yes" or the "no" position on the Los Angeles earthquake contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

26. Event contracts are traded on an exchange. Traders exchange positions with other traders in the marketplace. Importantly, event contracts do not reflect a "bet" against the "house."

27. The value of an event contract is determined by market forces. An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence. During that period, individuals can buy and sell the contract at its fluctuating prices. The ultimate value of an event contract is determined at its expiration date. If the underlying event occurs, the holder of the "yes" position is entitled to its full value. But if the underlying event does not occur, the holder of the "no" position gets the payment.

28. Traders price event contracts by reference to available information at any given time. If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase. The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur. Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year. The 30% figure can be informed by datapoints the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

29. Event contracts are a valuable means to hedge risk against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely-tuned opportunity for traders to mitigate their exposure on real-world events in an uncertain market. There is no other financial instrument with the unique capability to capture the risks of an event with economic consequences. A property owner in Los Angeles County might purchase an earthquake event contract because the payoff would offset economic losses in the event an earthquake occurs.

30. Event contracts should not be mistaken for insurance. While insurance covers property losses, event contracts can cover a wider range of possible economic fallout like temporary shelter, a decline in rental income, or short-term cost increases for basic needs due to shortages generated by an earthquake.

31. Event contracts are also valuable means of communicating information to the general public because contract prices reflect prevailing market opinions and conditions. Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions. The data that is generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event.

///

///

///

### B. Congress Delegated The Power To Regulate Event Contracts That Are Offered By A Regulated Exchange To The Commodity Futures Trading Commission.

32. Futures contracts have long been regulated by the federal government. In 1936, Congress passed the CEA which provides for federal regulation of all commodities and futures trading activities and requires that all futures and commodity options are traded on organized, regulated exchanges.

33. In 1974, Congress established the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA. Proponents of the 1974 Act were concerned that the "states . . . might step in to regulate the futures markets themselves" which would lead to the undesired outcome that national futures exchanges might be subject to "conflicting regulatory demands." *Am. Agric. Movement*, 977 F.2d at 1156. One Senator remarked that "different State laws would just lead to total chaos." Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). As a solution, the House Committee on Agriculture put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974). The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the states' authority over futures trading. *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge).

34. To offer derivatives for public trading, an entity must seek and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). An entity must first submit an application to the CFTC detailing how the entity complies with the core principles of the CEA. 17 C.F.R. § 38.3(a)(2). Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300. Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA. 17 C.F.R. § 38.3(a)(2). The CFTC

1  then reviews the application and renders a decision on the purported market's designation within
2  180 days of submission. 17 C.F.R. § 38.3(a)(2).

3  35. Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive jurisdiction" over the derivatives that are traded on those regulated markets. Those derivatives include "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to "event contracts." See id. § 1a(47)(A)(ii), (iv), (vi).

36. Once an exchange is designated as a CEA-compliant contract market, the market is subject to an extensive framework for CFTC oversight. Part 38 of Title 17, Chapter 1 of the U.S. Code comprehensively regulates designated contract markets, ensuring that these markets continue to comply with the CEA. Exchanges must meet detailed requirements to maintain good standing as designated contract markets. 17 C.F.R. pt. 38. Among other things, designated contract markets must abide by recordkeeping requirements that specify the form, manner, and duration of retention. 17 C.F.R. §§ 38.950, 1.31. Designated contract markets must meet reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC. 17 C.F.R. § 38.450, pt. 16. Specific liquidity standards, disciplinary procedures, dispute resolution mechanisms, board of directors requirements, auditing demands, and more are also detailed in Part 38. A designated contract market must comply with all these requirements to comply with the CEA and remain in good standing before the CFTC. 7 U.S.C. § 7(d); 17 C.F.R. pt. 38.

37. As long as the designated contract market abides by the requirements set forth in the CEA, it may list contracts on its exchange without pre-approval from the CFTC. Instead, the exchange may self-certify that the contract complies with applicable law by filing a "written certification" with the CFTC at the time of listing. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). Within 10 days, the CFTC reviews the reports and may initiate review of any contract under its purview. See 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). If the CFTC does not take action within

the ten-day probationary period, the contract automatically becomes "effective." *See* 7 U.S.C. § 7a-2(c)(2).

38. Alternatively, exchanges may submit contracts to the CFTC for approval prior to listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c).  The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA.  7 U.S.C. § 7a-2(c)(5)(B).

39. The CEA's enforcement process rounds out the comprehensive federal framework that regulates futures derivatives sold on designated contract markets.  The CEA gives the CFTC discretion as to how to police and enforce violations of the CEA for designated contract markets. The CFTC includes an Enforcement Division, which may initiate investigations and, with the approval of a majority of the CFTC, pursue enforcement actions in federal court or administrative proceedings. If the Division concludes that there has been a violation of the CEA, it may recommend to the Commission that it seek a wide range of enforcement measures including civil monetary penalties, restitution, disgorgement, the suspension, denial, revocation, or restriction of registration and trading privileges, and injunctions or cease-and-desist orders. *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 3.3.  If the Division suspects that an entity has engaged in criminal violations, the Division may also refer the matter to the Department of Justice or the appropriate state authority for prosecution.  *Id.*

40. The CFTC regulates derivatives in products like "wheat, cotton, rice, corn, oats," as well as "excluded commodities" like interest rates, certain financial instruments, economic indices, risk metrics, and events. 7 U.S.C. § 1a(9), (19)(i)–(iv). The CFTC regulates event contracts as a type of derivative referencing an "excluded commodity."  *See id.* § 1a(47)(A)(ii), (iv), (vi); *see KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 23-3257 (JMC), 2024 WL 4164694, at *2-3 (D.D.C. Sept. 12, 2024).  "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i).  Events themselves constitute "excluded commodities" under the CEA and are defined as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *Id.* § 1a(19)(iv).

41. In 2010, Congress amended the CEA to address event contracts specifically. Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

### C. After An Extensive Regulatory Process, The CFTC Registered Kalshi As A Contract Market That Operates Under Federal Law.

42. Kalshi is a regulated exchange and prediction market where users can buy and sell event contracts. In 2020, the CFTC unanimously certified Kalshi as a designated contract market, affirming that its platform complied with the CEA. Since then, Kalshi has been fully regulated as a financial exchange under federal law alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

43. Kalshi specializes in event contract trading, offering a secure and federally-approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

44. Kalshi offers many kinds of events contracts related to an array of substantive areas like climate, technology, health, crypto, popular culture, and economics. For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030. Kalshi offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

45. Among its menu of event contracts, Kalshi offers political-outcome contracts and sports-outcome contracts.

46. Kalshi's political-outcome contracts involve questions related to federal and state politics. For example, users can place positions on whether there will be a government shutdown this year, or whether President Trump will impose large tariffs during his first year in office.

47. In 2023, Kalshi listed its congressional control contracts, whereby users could trade on which political party would control the House of Representatives or the Senate following the 2024 federal elections. In accordance with 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. §§ 40.2(a), Kalshi self-certified that the political-outcome contracts complied with the CEA and CFTC regulations on June 12, 2023.

48. Pursuant to the CFTC's power under the CEA, the CFTC initiated a review of Kalshi's congressional control contracts on June 23, 2023. The CFTC cited Regulation 40.11, expressing that the political-outcome contract may "involve, relate to, or reference" an activity enumerated in the event-contract-specific provision of the CEA, 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC held a public comment period during its 90-day review process, accepting comments from academics, industry participants, and former CFTC officials who opined on the federal permissibility of the congressional control contracts.

49. On September 22, 2023, the CFTC issued an order purporting to prohibit Kalshi from listing these contracts. It found that the congressional control contracts were event contracts that "involve[d]" both "gaming" and "unlawful" activity in violation of 7 U.S.C. § 7a-2(c)(5)(C)(i).

50. Kalshi filed suit against the CFTC in the United States District Court for the District of Columbia on November 1, 2023, challenging the CFTC's order as arbitrary, capricious, and otherwise not in accordance with federal law.

51. The District Court granted Kalshi's motion for summary judgment on September 12, 2024. It held that the CEA governs the listing of event contracts on CFTC-approved and regulated exchanges and found that the CFTC authorized Kalshi to list event contracts for public trading as a designated contract market. *See KalshiEx*, 2024 WL 4164694, at *3-4. Meticulously analyzing the text of the CEA, it went on to hold that Kalshi's congressional control contracts did not "involve" either "activity that is unlawful under any Federal or State law" or "gaming." *Id.* at *7. It expressly rejected the CFTC's conflation of "gaming" and "gambling" and accepted Kalshi's interpretation that the term "gaming" does not encompass political elections. *Id.* at *7-9. The court also held that Kalshi's congressional control contracts did not "involve" "unlawful activity under Federal or State law" because elections are not illegal. *Id.* at *10-11. The District Court vacated

the CFTC's order prohibiting Kalshi from listing its congressional control contracts for trading. The District Court thus found that political-event contracts were entirely permissible under federal law.

52. The CFTC appealed the District Court's ruling to the D.C. Circuit, which denied the CFTC's request for a stay pending appeal. *See KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 67 (D.C. Cir. 2024). The D.C. Circuit heard oral argument on the merits of the appeal in January, and a decision is expected in the coming months. Unless and until the D.C. Circuit says otherwise, controlling law is that the CFTC must allow Kalshi "to offer event contracts that would allow participants to take positions and trade on the outcome" of political events. *KalshiEX*, 2024 WL 4164694, at *1.

53. Kalshi self-certified and began listing sports-related contracts on its exchange on January 24, 2025. Kalshi's sports-related contracts allow users to place positions on which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship. In contrast to the action it took with regard to congressional control contracts, the CFTC declined to review Kalshi's sports-related contracts. Unless and until the CFTC takes action on Kalshi's sports-related contracts, they remain authorized under federal law.

54. Several other federally-regulated exchanges began listing sports-related event contracts around the same time period. In response, the CFTC exercised its power to commence review of a sports-related event contract offered by NADEX/crypto.com—a designated contract market that the CFTC certified under the name HedgeStreet in 2004. The CFTC initiated its 90-day review period of the sports-related contracts on January 14, 2025. The Commission requested that NADEX/crypto.com suspend its sports-related contracts during the pendency of the review. But the CFTC never made a similar request to Kalshi.

**D. The Nevada Gaming Control Board Threatened Kalshi With State Criminal Action With Regard To Its Election- And Sports-Related Event Contracts.**

55. On March 4, 2025, the Nevada Gaming Control Board (the "Board") sent a cease and desist letter to Tarek Mansour, Kalshi's Chief Executive Officer, and Eliezer Mishory, its

13

Chief Regulatory Officer and General Counsel. The Board informed Kalshi that it was aware that Kalshi offers "event-based contracts in Nevada on sporting events and on election outcomes." It claimed that offering "event -based contracts" is unlawful in Nevada "unless and until approved as licensed gaming by the Nevada Gaming Commission." Exhibit 1, at 1.

56. The Board described its "strict" requirement that a "person must be licensed to operate a sports pool in Nevada," defined as a "business of accepting wagers on sporting events or other events by any system or method of wagering" under NRS 463.0193. Exhibit 1, at 1. The Board found that Kalshi's event-based contracts fell within its prohibition of "sports pools," so "by offering event-based contracts in Nevada, Kalshi is operating as an unlicensed sports pool in violation of NRS 463.160(1)(a) and NRS 463.245(2)." Exhibit 1, at 2. The violation would result in both criminal and civil liability under Nevada law. According to the Board, offering event-based contracts without a license constitutes a category B felony under NRS 463.360(3) and violates NRS 465.086 and NRS 465.092. Exhibit 1, at 2.

57. Furthermore, the Board declared that even if Kalshi possessed a "nonrestricted gaming license with sports pool approval" under Nevada law, its event-based contracts "would still violate Nevada public policy" because "wagering on election outcomes" assertedly violates Nevada Gaming Regulation 22.1205(3) and NRS 293.830. Exhibit 1, at 2.

58. The Board demanded that Kalshi halt its event-based contracts operation in Nevada by March 14, 2025 and that failure to do so would be considered "willful intention to violate Nevada law." Exhibit 1, at 2. The "NGCB, as well as all state and local law enforcement and regulatory agencies in Nevada, expressly reserve[d] all rights to pursue criminal and civil actions based on Kalshi's past and future conduct within the state." Exhibit 1, at 2.

59. On March 13, 2025, the Nevada authorities agreed to extend the deadline by two weeks, until March 28, 2025.

60. On March 28, 2025, Kalshi and the Nevada authorities failed to reach an agreement regarding the legality of Kalshi's event contracts. Kalshi filed this complaint later the same day.

**REQUISITES FOR RELIEF**

61. As a result of Defendants' threatened conduct described above, there is an imminent likelihood that Defendants' forthcoming actions will violate the Supremacy Clause of the U.S. Constitution and subject Kalshi and its customers to irreparable harm.

62. An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct alleged herein will result in irreparable injury to Plaintiffs, including but not limited to criminal liability, economic hardship, and impairment of existing contractual relationships.

63. Plaintiff has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Plaintiffs therefore seek declaratory and injunctive relief restraining Defendants from enforcing Nevada law that interferes with the operation and function of Plaintiff's futures market described herein.

**COUNT I**

**(Supremacy Clause—Preemption By Commodity Exchange Act)**

64. Plaintiff incorporates all prior paragraphs by reference.

65. The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:
> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.

66. The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

67. Congress explicitly gave the CFTC the "exclusive jurisdiction" to regulate futures trading on approved exchanges. 7 U.S.C. § 2(a)(1)(A). Without a unified approach to futures regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos." Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in futures trading on CFTC-regulated exchanges. *See, e.g., Am.*

*Agric. Movement*, 977 F.2d at 1156; *Jones v. B.C. Christopher & Co.,* 466 F.Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.,* 459 F.Supp. 733, 737 (N.D. Cal. 1978).

68. In threatening to enforce NRS 463.0193, 463.01962, 463.160, 463.245, 463.360, 465.086, 465.092, 293.830 and Nevada Gaming Commission Regulation 22.1205(3) against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated exchanges. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "against the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same subject matter. Because federal law occupies the entire field of regulating futures trading on regulated markets, the threatened actions are field-preempted under the Supremacy Clause.

69. Nevada authorities likewise threatened to deploy Nevada law in a manner that conflicts with federal law and policy. Defendants seek to ban event contracts that federal law and the CFTC have authorized, which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

70. Defendants may therefore not enforce Nevada's gambling laws against Kalshi because Kalshi is a federally-regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 et seq.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1. Enter a judgment declaring that NRS 463.0193, 463.01962, 463.160, 463.245, 463.360, 465.086, 465.092, 293.830, Nevada Gaming Regulation 22.1205(3), and any other Nevada law that is used in a manner to effectively regulate Plaintiff's designated futures market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2. Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing NRS 463.0193, 463.01962, 463.160, 463.245, 463.360, 465.086, 465.092, 293.830, Nevada Gaming Regulation 22.1205(3), or any other Nevada law that attempts to effectively regulate Plaintiff's futures market, against Plaintiff;

3. Any other relief within this Court's discretion that it deems just and proper.

Dated this 28th day of March, 2025.

                               s/     *D. Lee Roberts, Jr., Esq.*
                               D. Lee Roberts, Jr., Esq.
                               WEINBERG, WHEELER, HUDGINS,
                                  GUNN & DIAL, LLC
                               6385 South Rainbow Blvd., Suite 400
                               Las Vegas, Nevada  89118

                               Neal Katyal (pro hac vice pending)
                               Joshua B. Sterling (pro hac vice pending)
                               William E. Havemann (pro hac vice pending)
                               Milbank LLP
                               1850 K Street, Suite 1100
                               Washington D.C. 20006
                               Telephone: 202-835-7505
                               Facsimile: 213-629-5063

                               Mackenzie Austin (pro hac vice pending)
                               Milbank LLP
                               2029 Century Park East, 33rd Floor
                               Los Angeles, California 90067
                               Telephone: 424-386-4000
                               Facsimile: 213-629-5063

                               *Attorneys for Plaintiff*