D. Lee Roberts, Jr., Esq.
Nevada Bar No. 8877
*lroberts@wwhgd.com*
WEINBERG, WHEELER, HUDGINS,
   GUNN & DIAL, LLC
6385 South Rainbow Blvd., Suite 400
Las Vegas, Nevada  89118
Telephone:(702) 938-3838
Facsimile: (702) 938-3864

Neal Kumar Katyal (pro hac vice pending)
Joshua B. Sterling (pro hac vice pending)
William E. Havemann (pro hac vice pending)
Milbank LLP
1850 K Street, Suite 1100
Washington D.C. 20006
Telephone: 202-835-7505
Facsimile: 213-629-5063

Mackenzie Austin (pro hac vice pending)
Milbank LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Telephone: 424-386-4000
Facsimile: 213-629-5063
ATTORNEYS FOR PLAINTIFF

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| KALSHIEX, LLC, | Case No.: |
| Plaintiff, | **PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AN IMMEDIATE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| vs. | |
| KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in his official capacity as a Member of the Nevada Gaming Control Board; CHANDENI K. SENDALL, in her official capacity as a Member of the Nevada Gaming Control Board; NEVADA GAMING CONTROL BOARD; JENNIFER TOGLIATTI, in her official capacity as Chair of the Nevada Gaming Commission; ROSA SOLIS-RAINEY, in her official capacity as a Member of the Nevada Gaming Commission; BRIAN KROLICKI, in his official capacity as a Member of the Nevada Gaming Commission; GEORGE MARKANTONIS, in his official | **(ORAL ARGUMENT REQUESTED)** |

capacity as a Member of the Nevada Gaming
Commission; ABBI SILVER, in her official
capacity as a Member of the Nevada Gaming
Commission; NEVADA GAMING
COMMISSION; AARON D. FORD, in his
official capacity as Attorney General of Nevada,

Defendants.

Plaintiff Kalshi moves this Court for an immediate temporary restraining order and preliminary injunction against Defendants Kirk D. Hendrick, George Assad, Chandeni K. Sendall, the Nevada Gaming Control Board, Jennifer Togliatti, Rosa Solis-Rainey, Brian Krolicki, George Markantonis, Abbi Silver, the Nevada Gaming Commission, and Aaron D. Ford. This Motion is based upon the pleadings on file herein, including Plaintiff's Complaint, the memorandum of points and authorities contained in this document, all documents on file in this action including exhibits and declarations, and any further arguments presented.

## **INTRODUCTION**

The Nevada Gaming Control Board (the "Board") is unconstitutionally threatening to prohibit all trading of Plaintiff KalshiEX LLC's event-based contracts in Nevada, even though those contracts have been authorized by the Commodity Futures Trading Commission ("CFTC"), the federal agency that Congress endowed with "exclusive jurisdiction" to regulate trading on federally-designated exchanges like Kalshi.  7 U.S.C. § 2(a)(1)(A).  The Board's actions threaten irreparable harm to Kalshi and its users, and unless these actions are enjoined, will result in the sort of state-by-state patchwork of regulation that Congress sought to prevent when it subjected CFTC-regulated exchanges to exclusive federal regulation.  A temporary restraining order and preliminary injunction are warranted—and desperately needed now.

The Commodity Exchange Act ("CEA") establishes a comprehensive federal framework for regulating commodity futures trading.  The CEA explicitly and unambiguously delegates the "exclusive" power to oversee, approve, and regulate futures trading on registered exchanges to a federal agency—the CFTC.  7 U.S.C. § 2(a)(1)(A).  In establishing a comprehensive federal

framework for regulating commodity futures trading, Congress sought to prevent the "chaos" that would result from subjecting futures trading to a patchwork of conflicting state laws.   7 U.S.C. § 2(a)(1)(A); *see also Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry,* 93d Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark).

Kalshi is a CFTC-designated contract market that offers political-event and sports-event contracts among many others on its federally-registered exchange. These event contracts are valid under federal law. A federal court last year held that federal law authorizes Kalshi's political-event contracts, and the CFTC earlier this year permitted Kalshi to offer sports-event contracts. Nonetheless, Nevada authorities a few weeks ago issued a letter threatening Kalshi and its representatives with criminal and civil penalties unless Kalshi immediately halts access to these contracts for users in Nevada.

The Board's attempt to regulate trading on a federally regulated exchange is preempted by federal law.   As the CFTC informed the U.S. Court of Appeals for the D.C. Circuit just a few months ago, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a [designated contract market]" like Kalshi. CFTC Brief at *27, *KalshiEx LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).   Kalshi therefore filed this action seeking declaratory and injunctive relief to prevent Defendants—the Board, the Nevada Gaming Commission, and their members—from enforcing preempted state laws against Kalshi.

But immediate action is required to avoid irreparable harm to Kalshi, its representatives, and its users. As described in more detail in the attached declaration, without immediate relief, Kalshi will incur irreparable harm no matter how it chooses to respond to the Board's unconstitutional demand.  If Kalshi chooses not to comply, the company and its representatives face the prospect of civil and criminal liability.  But if Kalshi bows to the Board and attempts to comply, it will incur massive and irrevocable economic costs, impose significant harms on users with investments on the platform, imperil its federal registration, and undermine the public's confidence in the integrity of its platform.  Accordingly, Kalshi respectfully requests that this Court issue a temporary restraining

order ("TRO") and preliminary injunction enjoining Defendants from enforcing preempted state laws against Kalshi. This emergency relief is needed to prevent irreparable harm and allow Kalshi to litigate its preemption claim free from the threat of criminal and civil liability and without incurring the extraordinary harms that would result from even temporary compliance with the Board's unconstitutional demand.

Kalshi has endeavored in good faith to reach an accommodation with the Board. Earlier on the date of this filing, the Board declined to provide Kalshi's counsel with assurances that it will not carry out its threat of criminal and civil liability. We have accordingly informed counsel for the Board of our intent to file this suit and to seek a TRO and preliminary injunction. Counsel for the Board declined to agree to hold Kalshi harmless even for the short period necessary for this Court to resolve Kalshi's request for a preliminary injunction. Counsel for the Board further indicated that it could initiate proceedings against Kalshi <u>as early as Wednesday, April 2, 2025</u>—five days from the date of this filing. Kalshi therefore respectfully requests that this Court issue a TRO immediately for the maximum 14 days allowed by Rule 65(b)(2), and schedule a preliminary injunction hearing as soon as is practicable. Should the Court wish to hear from Kalshi before ruling on the request for a TRO, Kalshi asks that the hearing be held as soon as possible and no later than April 2. Kalshi is prepared to appear in person for a hearing any time after March 31, and could appear remotely for a hearing before then at the Court's convenience.

## **BACKGROUND**

### **A. The Exclusive Federal Scheme For Regulating Futures Markets On Regulated Exchanges**

Derivative contracts are financial tools that traders use to mitigate risk. *See KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694, at *1-2 (D.D.C. Sept. 12, 2024). Event contracts are a type of derivative contract—they are financial instruments that identify a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. *Id.* at *2. Event contracts are typically traded on an exchange, and their value is determined by market forces. *Id.* This means that the price of an event contract fluctuates

from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a uniquely sensitive financial instrument that tracks real-world market perceptions. *Id.* During the period of a contract, individuals can buy and sell the contract at its changing prices; no user is locked into a contract and may trade her contract in accordance with her desire to hedge economic risk. Compl. ¶ 27.  The ultimate value of an event contract is determined at its expiration date—most commonly, the event's occurrence or a set date upon which the contract terminates. *See KalshiEx*, 2024 WL 4164694, at *2.  For example, a property owner on the Gulf Coast may place a position on whether a hurricane will strike the area around his property within the 2025 calendar year. *Id.* If a hurricane strikes, the property owner will receive the ultimate value of the contract, and can thereby hedge risk by offsetting losses incurred as a result of the hurricane. *Id.*

Congress passed the CEA in 1936 to regulate the derivatives market.  In 1974, Congress passed a series of amendments to update the regulatory framework for commodities futures given rapid developments in the market.  Compl. ¶ 33.  A key part of this modernization effort was the establishment of the CFTC, which Congress established as the federal agency empowered to oversee and regulate exchanges under the CEA.  *Id.*  The centralization of authority in the CFTC was borne of Congress's fear that subjecting exchanges to different regulatory regimes would wreak havoc in the futures market.  *Id.*  Congress was particularly concerned that "states . . . might step in to regulate the futures markets themselves." *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 (7th Cir. 1995)). Applying different State laws to futures trading "would just lead to total chaos." Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

During the runup to passage of the 1974 amendments, the Senate deleted a provision of the CEA that would have preserved states' authority over futures trading—eliminating any doubt as to the CFTC's exclusive power to regulate futures trading. *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge). Congress, however, limited the CFTC's power to

contract markets that are *registered* and *designated* with the CFTC. Unregistered futures markets remain subject to state regulation.

The CFTC's regulatory framework is extensive, comprehensive, and exclusive. To obtain approval from the CFTC, an exchange must first apply and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. §§ 38.3(a). The exchange's application must detail its capacity to comply with all CFTC rules and regulations through a series of written submissions and exhibits. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the exchange's designation. *Id.*

Once the CFTC designates an entity as a contract market, the CFTC has "exclusive jurisdiction" over derivatives traded on the market, including "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to "event contracts." *See id.* § 1a(47)(A)(ii), (iv), (vi).

Exchanges under the CFTC's jurisdiction are subject to the CFTC's extensive regulatory framework as set out in Part 38 of Title 17 of the U.S. Code and in CFTC regulations. Together, these provisions establish a comprehensive scheme for regulating designated contract markets. The CEA imposes a series of detailed requirements for exchanges to maintain good standing as designated contract markets, requiring exchanges to comply with 23 separate "Core Principles." 17 C.F.R. pt. 38. Among others things, exchanges must abide by recordkeeping requirements that specify the form, manner, and duration of retention of documents. 17 C.F.R. §§ 38.950, 1.31. Exchanges must meet reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC. 17 C.F.R. § 38.450, pt. 16. Exchanges are further subject to liquidity standards, disciplinary procedures, dispute-resolution mechanisms, board-of-directors requirements, auditing demands, and many other regulations all set by federal law. *See* 17 C.F.R. pt. 38. Exchanges must comply with all these requirements to remain in good standing before the CFTC. 7

U.S.C. § 7(d); 17 C.F.R. pt. 38. If an exchange violates any of the provisions of the CEA or the CFTC's regulations, the CFTC is authorized to "suspend" or "revoke" the market's "designation or registration." 7 U.S.C. § 8(b). Suspension or revocation of an exchange's license is "final and conclusive" and appealable only to a federal court of appeals. *Id.*

The CEA prescribes a specific method by which the CFTC may approve new contracts on regulated exchanges. A designated contract market that abides by the requirements set forth in the CEA may list contracts on its exchange without pre-approval from the CFTC by self-certifying that the contracts comply with CFTC requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC reviews proposed contracts and may initiate review of any contract within 10 days of receiving notice. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. §40.11(c). Alternatively, exchanges may submit contracts to the CFTC for approval prior to listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B). If an entity offers a contract in violation of the CEA or CFTC regulations, the CFTC has an array of enforcement mechanisms, including but not limited to revocation of licensing, civil penalties, and criminal enforcement.

The CEA contains a "Special Rule" addressing event contracts. The Special Rule authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CEA provides that the CFTC "may"—but need not—deem event contracts contrary to the public interest if they "involve":

    (I)      activity that is unlawful under any Federal or State law;
    (II)     terrorism;
    (III)    assassination;
    (IV)    war;
    (V)     gaming; or
    (VI)    other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest."

*Id.*; *see also* 17 C.F.R. § 40.11(a)(1)–(2) (implementing Special Rule). The decision to prohibit an event contract that falls within any of these categories is discretionary, subject to the CFTC's evaluation of the "public interest."

**B. Kalshi's Registration As A CFTC-Designated Contract Market Under Federal Law**

In 2020, the CFTC unanimously certified Kalshi as a designated contract market, affirming that its platform complied with the CEA's regulatory requirements. *See KalshiEX LLC*, 2024 WL 4164694, at *4. Since then, Kalshi has been fully regulated as a derivatives exchange under federal law alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange. Compl. ¶ 42. The company offers a user-friendly and accessible platform where individual, retail, and institutional participants can hedge their risks on event-based outcomes. Compl. ¶¶ 42-44.

Because Kalshi is a CFTC-designated contract market, its event contracts are subject to the "exclusive jurisdiction" of the CFTC. 7 U.S.C. § 2(a)(1)(A). As a result of being a CFTC-designated contract market, Kalshi is required by federal law to comply with a host of federal requirements designed to ensure market integrity. An exchange's status as a CFTC-designated contract market "imposes upon it a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement, Inc.*, 977 F.2d at 1150–51. Among other things, Kalshi must "make public daily information on settlement prices, volume, open interest, and opening and closing ranges for actively traded contracts on the contract market," 17 C.F.R. § 38.450, pt. 16; it must keep records of most transactions for at least 5 years, *id.* §§ 38.950, 1.31(b)(1); it must offer "impartial access" to its platform, *id.* § 38.151(b); it must prevent price manipulation, *id.* § 38.200; it must make its records "open to inspection by any representative of the [CFTC] or the United States Department of Justice," *id.* § 1.31(d)(1); and it must maintain financial resources "at least equal to a total amount that would enable the designated contract market" to "cover its operating costs for a period of at least one year," *id.* § 38.1101(a)(2).

Kalshi offers many kinds of event contracts related to climate, technology, health, crypto, popular culture, and economics. Compl. ¶ 44. For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the market share for

electric vehicles will be above 50% in 2030. Kalshi also offers political-event contracts and sports-related contracts, which are the subject of the present suit.  *Id.* ¶¶ 46, 53.

*Political-event contracts*:  Kalshi first listed its political-event contracts in 2023, self-certifying a congressional control contract where users could trade on which political party would control the House of Representatives or the Senate following the 2024 federal elections.  *Id.* ¶ 47.  Pursuant to the CFTC's power under the CEA, the CFTC initiated a review of Kalshi's congressional control contracts.  *Id.* ¶ 48.  The CFTC held a public comment period during its 90-day review process, accepting input from academics, industry participants, and former CFTC officials. *Id.* At the conclusion of the review period, the CFTC issued an order purporting to prohibit Kalshi from listing these contracts, finding that they "involve[d]" "gaming" and "unlawful" activity in violation of 7 U.S.C. § 7a-2(c)(5)(C)(i). *Id.* ¶ 49.

Kalshi challenged this ruling in federal court, and the U.S. District Court for the District of Columbia agreed with Kalshi and rejected the CFTC's position as a matter of law.  *Id.* ¶ 50.  The court held that elections "do not involve unlawful activity under any Federal or State law" or "bear any relation to any game."  *See KalshiEX LLC*, 2024 WL 4164694, at *13.  Thus, it found that Kalshi's congressional control contracts—which depend on the outcome of elections—do not violate the Special Rule.  *See id.*  The court accordingly vacated the CFTC's order, holding that federal law required the CFTC to permit the contracts. *Id.* The CFTC appealed the judgment to the D.C. Circuit, which denied a stay pending appeal in a published opinion in October 2024.  *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 67 (D.C. Cir. 2024).  Kalshi's political-event events contracts were therefore live for the 2024 election, and Kalshi received more than 200 million visits on Election Night.  After denying a stay, the D.C. Circuit heard oral argument on the CFTC's appeal in January 2025, and its decision is pending.

*Sports-related contracts*:  Kalshi self-certified and listed sports-related contracts on its exchange on January 24, 2025, allowing users to place positions on, for example, which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Tournament. Compl. ¶ 53.  Unlike with Kalshi's political-event contracts, the CFTC

declined to review Kalshi's sports-related contracts.  *Id.*  Thus, upon the expiration of the 10-day probationary period under 7 U.S.C. § 7a-2(c)(2), Kalshi's sports-related contracts were approved by the CFTC and remain legal under federal law.  *Id.*  While federal law gives the CFTC discretion to prohibit contracts it considers "gaming" that it believes to be contrary to the public interest, the CFTC has declined to do so for Kalshi's contracts.

Kalshi's sports-related contracts involve the outcomes of sporting events, but there are crucial differences between Kalshi's exchange and a sportsbook that justify the very different regulatory models under which they function.  A financial exchange is an investment marketplace where traders enter into contracts with other traders—not with a casino or "house."   In financial exchanges for event contracts, moreover, the market sets the contract price rather than the price being set by the house.  New facts on the ground and other trading activity can cause the price of the contract to fluctuate over the pendency of the contract, and traders can enter and exit whenever they want according to movements in the market.  For sportsbooks, by contrast, gamblers take a position against the house, and the house sets the line with the odds in its own favor. Declaration of Xavier Sottile ¶ 26.  Betting against the house thus stacks the odds in the house's favor, whereas entering into event contracts with other sophisticated traders will ultimately net out.   Longitudinal studies bear out this difference: Speaking broadly, the house profits on sports bets in the long-term whereas tailored investment strategies on financial markets result in positive returns for all traders. Xuesong Shang, Hebing Duan, & Jingyi Lu, *Gambling versus Investment: Lay Theory and Loss Aversion*, 84 Journal of Economic Psychology 1, 2 (2021) (summarizing the literature).

These differences result in different modes of regulation.  Given the power imbalance between the house and the gambler, and the potential for abuse that can result from this imbalance, gambling falls within the traditional police powers of the state and is regulated by state law to protect against exploitative activity within its jurisdiction.  *See Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003).  By contrast, an exchange like Kalshi operates a marketplace that facilitates complex interstate transactions between traders. Federal law focuses on preventing market manipulation and disruption and ensuring market efficiency nationwide. *See*

17 C.F.R. §§ 38.250, 38.151. For that reason, the CFTC polices transactions on federally-regulated exchanges like Kalshi under federal law. *See Am. Agric. Movement*, 977 F.2d at 1156.

## C.  The Nevada Regulatory Scheme For Gaming And Gambling

Nevada deploys a two-tiered system of regulatory oversight for gaming and gambling within the state.  Compl. ¶¶ 17, 23.  The Nevada Gaming Control Board serves as the enforcement and investigative body for the state's gaming industry.  *Id.* ¶ 17.  The Nevada Gaming Commission, by contrast, acts on recommendations from the Board to license entities who wish to offer gaming services in the state and serves as the final authority on licensing matters.  *Id.* ¶ 23.  Together, these entities administer and enforce the laws regulating gaming and gambling throughout Nevada.

Particularly relevant to the present dispute are the Board's regulations regarding sports pools and other events.  Under Nevada law, "a person must be licensed to operate a sports pool," defined as a "business of accepting wagers on sporting events or other events by any system or method of wagering" under NRS 463.0193 and 463.01962.  Exhibit 1, at 1.  Offering a sports pool without a license yields both criminal and civil liability under Nevada law.  Exhibit 1, at 2.

Until this case, the Board had never attempted to require a state license from a CFTC-designated contract market. On March 4, 2025, however, the Board sent a cease-and-desist letter to Tarek Mansour, Kalshi's Chief Executive Officer, and Eliezer Mishory, its Chief Regulatory Officer and General Counsel, claiming that Kalshi's "event-based contracts in Nevada on sporting events and on election outcomes" were unlawful under Nevada law. Exhibit 1, at 1. The Board demanded that Kalshi seek a license from the Nevada Gaming Commission for its sports-related contracts.  Exhibit 1, at 2.  The letter further claimed that "even if Kalshi were to obtain a gaming license for its sports-related contracts, the company's "event-based contracts on election outcomes would still violate Nevada public policy."  Exhibit 1, at 2.  The letter demanded that Kalshi "immediately cease and desist from offering any event-based contracts in Nevada" within 10 days. *Id.*  Nevada authorities stated that they would consider a failure to comply as "willful intention to violate Nevada law." *Id.*  And the Board "expressly reserve[d] all rights to pursue criminal and civil

actions based on Kalshi's past and future conduct within the state." *Id.* The Board later extended cease-and-desist order's deadline to March 28—the date of this filing. Compl. ¶ 59.

The Board's threat that Kalshi cease its event-based contracts or face criminal and civil liability subjects Kalshi and its users to immediate harm. It requires Kalshi to either subject itself to the possibility of criminal liability, or else cut off Nevada from its contracts on a dime. Cutting off contact to users in Nevada would create massive technical challenges for Kalshi—which, as a federally-regulated exchange, has never had any reason to comprehensively geolocate its users on a state-by-state basis, and which would face substantial obstacles to determining a permissible and fair method for cutting an entire state off from exchanges where residents already have assets invested. Cutting off contact to Nevada would also risk serious harm to Kalshi's users, who would be forced to liquidate their positions immediately or otherwise lose access to their capital and assets on the platform.

Because the Board lacks authority to intrude on the CFTC's exclusive jurisdiction to regulate Kalshi's event contracts, Kalshi brought suit seeking declaratory and injunctive relief. Kalshi now respectfully seeks a TRO and preliminary injunction to prevent the irreparable and immediate harm created by the Board's actions.

## ARGUMENT

Kalshi is entitled to a TRO and a preliminary injunction. Federal Rule of Civil Procedure 65 governs the issuance of both forms of relief, and the legal standards for a temporary restraining order and preliminary injunction are "substantially identical." *LIT Ventures, LLC v. Carranza*, 457 F. Supp. 3d 906, 908 (D. Nev. 2020). In both instances, the moving party must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Kalshi meets each element of the inquiry.

1

2

**A.  Kalshi Is Likely To Succeed Because Nevada's Gambling Laws Are Preempted By The CEA And Its Implementing Regulations.**

3

4

5

6

7

8

9

10

11

A "fundamental principle of the Constitution" is that "Congress has the power to preempt state law." *Valle del Sol v. Whiting, Inc.*, 732 F.3d 1006, 1022 (9th Cir. 2013) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)). Federal law can preempt state law either expressly or impliedly. One manner of implied preemption is known as field preemption, which occurs where Congress manifests an intent to exclusively occupy an entire field of regulation. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  Alternatively, federal law can preempt state law where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," known as conflict preemption. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

12

13

14

15

16

It is well-settled that the CEA and its implementing regulations have "resulted in the preemption of all other would-be regulators at every level of government."  Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976).  Nevada state gambling law is no exception. The CEA and the CFTC's regulations preempt Nevada law as applied to Kalshi.

17

1.  Nevada Laws Are Field-Preempted As Applied To Kalshi.

18

19

20

21

22

23

24

25

26

Field preemption exists where a federal regulatory scheme is "so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it." *de la Cuesta*, 458 U.S. at 153 (quotation omitted). "[T]he ultimate touchstone of pre-emption analysis" is the "purpose of Congress."  *Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 724 (9th Cir. 2016) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)).  Congress's intent to occupy a field can be apparent in the statutory text and legislative history.  *See, e.g., Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-13 (1983). Courts can also infer field preemption from a scheme of "federal statutory directives" that "provide a full set of standards . . . designed [to function] as a 'harmonious whole.'"  *Arizona v. United States*, 567 U.S. 387, 401

27

28

(2012) (quoting *Hines*, 312 U.S. at 72).  "Where Congress occupies an entire field . . . even *complementary* state regulation is impermissible." *Id.* (emphasis added).

The statutory text, legislative history, and comprehensive regulatory framework of the CEA clearly evince Congress's intent to occupy the field of futures trading on CFTC-regulated exchanges.  For that reason, the Board's effort to subject Kalshi to criminal and civil liability based on its event contracts is preempted.

*Statutory Text*:  Congress initially passed the CEA in 1936, then overhauled it in a series of amendments known as the 1974 Act.  The text of the 1974 Act could hardly be clearer.  Congress established the CFTC and granted it "*exclusive jurisdiction*" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A) (emphasis added).  Kalshi's event contracts are traded on contract market designated by the CFTC, and the CFTC therefore has "exclusive jurisdiction" to regulate these contracts.

Congress in the 1974 Act did not preempt regulation of *all* derivatives contracts.  Instead, Congress cabined federal preemption to contracts traded *on CFTC-approved exchanges*.  The statute preserves concurrent state regulation for commodities and futures contracts traded *outside* of CFTC-approved exchanges.  For example, 7 U.S.C. § 16(e) notes that the chapter does not "supersede or preempt" the application of federal or state statutes to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so.  In other words, Congress granted the CFTC exclusive power to regulate contracts traded on the exchanges it oversees, but permitted federal and state agencies to police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC."  H.R. Rep. No. 97-565, pt. 1, at 43 (1982) (emphasis added).  Thus, federal preemption of the Nevada law as to Kalshi does not call into question the state's regulation of casinos or other gambling establishments, none of which are CFTC-designated exchanges and are fundamentally different businesses than those exchanges.

For CFTC-designated exchanges like Kalshi, however, the CFTC has "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). Courts have easily found that statutes containing similar language preempt parallel state regulation. *See Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-95 (7th Cir. 2001) (holding that statute's "exclusive jurisdiction" provision preempts state law claims); *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 765 (9th Cir. 2018) (statute's "exclusive" jurisdiction provision had "very broad[]" preemptive reach). As the CFTC itself recently explained to the D.C. Circuit, "due to federal preemption, event contracts *never violate state law when they are traded on a [designated contract market].*" CFTC Brief at *27, *KalshiEx LLC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).

*Statutory Purpose*: Congress in the 1974 Act sought to regulate the rapidly growing commodity futures market, and also sought to prevent exchanges from being subjected to fragmented regulatory demands that could differ from one jurisdiction to the next. One "aim" of the 1974 Act was to "avoid unnecessary, overlapping and duplicative regulation." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001). In addition to fears about overlapping demands with the Securities and Exchange Commission, Congress worried that "the states . . . might step in to regulate the futures markets themselves." *Am. Agric. Movement*, 977 F.2d at 1156. As one sponsor of the 1974 Act explained, "different State laws would just lead to total chaos." Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

Congress's solution was to place "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974); *see also* Graham Purcell & Abelardo Lopez Valdez, *The Commodity Futures Trading Commission Act of 1974: Regulatory Legislation for Commodity Futures Trading in a Market–Oriented Economy,* 21 S.D. L. Rev. 555, 573–74 (1976). The Conference Report confirmed Congress's intent to preempt the field: "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) *would preempt the field insofar as futures regulation is concerned*." Senate Comm.

on Agriculture, Nutrition and Forestry, 93d Cong., 2d Sess., *Commodity Futures Trading Comm'n Act of 1974*, at 11 (Comm. Print 1974) (emphasis added).

Courts agree that Congress intended to preclude states from exercising parallel authority over commodity futures trading in exchanges designated by the CFTC. *See, e.g., FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) ("the statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets*'") (quoting S. Rep. No. 93-1131, at 23 (1974) (emphasis in original)); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) ("It is now established, however, that the SEC and other federal agencies are 'stripped' of authority to regulate commodities transactions, and that state regulatory agencies are likewise preempted by the 'exclusive jurisdiction' of the CFTC.") (citations omitted); *Hofmayer v. Dean Witter & Co., Inc.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978) ("In the light of Congress' plainly stated intent to have the Commodity Exchange Act, as amended, preempt the field of regulation of commodity futures trading, any claim under federal or state securities statutes is barred."); *Bartels v. Int'l Commodities Corp.*, 435 F.Supp. 865, 868-69 (D. Conn. 1977); *Int'l Trading Ltd. v. Bell*, 262 Ark. 244, 250-51 (1977); *Taylor v. Bear Stearns & Co.*, 572 F. Supp. 667, 673 (N.D. Ga. 1983) (noting that "the primary concern of Congress was preemption of federal and state regulatory schemes"). The Board's effort to regulate Kalshi's event contracts cannot be reconciled with that clear congressional purpose.

*Drafting history*: The drafting history of the 1974 Act eliminates all doubt as to Congress's intent to preempt state laws like those Defendants have threatened to enforce against Kalshi. During consideration of the amendments, the Senate deleted a provision which would have preserved the states' authority over futures trading. *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 687-88 (1982); *see also* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge). The Senate accompanied the deletion with an unequivocal statement as to the supremacy of federal law in the field: "[W]here the jurisdiction of the Commodity Futures Trading Commission is applicable, it supersedes State as

well as Federal agencies." S. Rep. No. 93-1131, at 23 (1974).  "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987).  The Senate's decision to delete the provision allowing concurrent state jurisdiction is yet further proof of Congress's intent to preempt parallel state regulation.

*Comprehensive regulatory scheme*:  The comprehensive nature of the regulatory scheme Congress created for CFTC-authorized exchanges is further evidence that Congress intended to foreclose concurrent state jurisdiction. *See Arizona*, 567 U.S. at 401 ("comprehensive" nature of federal scheme indicates field preemption); *La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368-69 (1986) (preemption required "where Congress has legislated comprehensively," thus "leaving no room for the States to supplement federal law"); *Indep. Energy Producers Ass'n, Inc. v. Calif. Pub. Utilities Comm'n*, 36 F.3d 848, 853 (9th Cir. 1994) (same).

As the Supreme Court has noted, the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974).  An exchange may only offer futures contracts after receiving the CFTC's designation as a regulated exchange. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100.  To receive a CFTC designation, an exchange must first submit a detailed application to the CFTC explaining how the exchange has the capacity to comply with the CFTC's myriad regulations.  17 C.F.R. § 38.3(a).  The CFTC then undergoes a comprehensive review of the entity's application to determine whether it meets the CFTC's standards.  17 C.F.R. § 38.3(a)(2).

Once an entity receives the CFTC's designation as a federally-regulated contract market, Congress gave the CFTC "exclusive jurisdiction" over the derivatives traded on the market.  7 U.S.C. § 2(a)(1)(A).  Designated contract markets are subject to an extensive framework of CFTC oversight, involving recordkeeping requirements, 17 C.F.R. §§ 38.950, 1.31, reporting obligations, *id.* § 38.450, pt. 16, liquidity standards, *id.* § 38.1101(a)(2), and penalties for noncompliance, *id.* pt.

38.  And Congress elected to allow CFTC-designated exchanges to list contracts—including event contracts—by self-certifying that the contract complies with the CEA's requirements.  Congress then gave the CFTC the back-end authority to conduct a review of the contract if it believes the contract may run afoul of any statute or regulation. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). Failure to abide by the CFTC's contract determinations can result in civil and criminal penalties, which the CFTC may pursue at its discretion.

Of particular relevance here, the CEA specifically authorizes the CFTC to reject event contracts if the Commission deems them to be "contrary to the public interest" and if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i).  The statute is not mandatory—the CFTC "may" conclude that the contract is against the public interest if it falls within one of the enumerated categories.  *Id.*  Congress left the decision about the public interest to one federal authority—not 50 separate states.

This comprehensive regulatory scheme for regulating futures contracts traded on licensed exchanges evinces a strong congressional intent to preempt the field. Congress's framework strikes a careful balance between regulating futures contracts and allowing for economic growth and flexibility.  The Board's attempt to subject Kalshi to Nevada state law short-circuits that careful balance and usurps authority Congress granted the CFTC.

2.  <u>Nevada Laws Are Conflict-Preempted As Applied To Kalshi.</u>

Nevada's gambling laws are also conflict-preempted as applied to Kalshi because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as evidenced in the CEA. *Hines*, 312 U.S. at 67. Conflicts may exist with respect to "the practical result of the state law" as well as "the means that a state utilizes to accomplish the goal." *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012). "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress

within the sphere of its delegated power." *Crosby*, 530 U.S. at 373–74 (citing *Savage v. Jones*, 225 U.S. 501, 533 (1912)).

In at least four respects, subjecting Kalshi's contracts to Nevada law would "undermine[] the intended purpose and 'natural effect'" of the federal scheme for regulating CFTC-designated exchanges. *Id.* at 373; *see also Nation v. City of Glendale*, 804 F.3d 1292, 1298 (9th Cir. 2015).

*First*, Congress passed the 1974 Amendments to the CEA to bring futures markets regulation "under a uniform set of regulations." *Am. Agric. Movement, Inc.*, 977 F.2d at 1156. "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.* In holding a state common-law claim preempted by the CEA, the Seventh Circuit explained that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation omitted).

The Board's actions clearly conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes. As explained in the Board's cease-and-desist letter, there can be no doubt that the Board intends to deploy state laws to regulate Kalshi's contract market—exactly what Congress did not want states to regulate. The conflict is even clearer when considering the possibility that, if the Board is permitted to proceed here, 49 other states and the District of Columbia could equally attempt to subject Kalshi to their own state laws. Applying state laws to designated contract markets would plainly erect "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines,* 312 U.S. at 67. These laws are preempted.

*Second*, "a conflict in the method of enforcement" likewise leads to preemption. *Arizona*, 567 U.S. at 406. A state law stands as "obstacle" to a federal regulatory scheme if Congress chooses a specific enforcement method to achieve federal goals and a state law adopts a different method of enforcement that hampers "the careful balance struck by Congress." *Knox v. Brnovich*, 907 F.3d 1167, 1175 (9th Cir. 2018) (citation and internal quotations omitted). In particular, where Congress

reserves "prosecutorial power" and "discretion" over violations for federal authorities, a state regime that allows for state prosecutions of the same actions "conflicts with the federal scheme." *Valle del Sol*, 732 F.3d at 1027.  Otherwise, a state could bring charges against an individual "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona,* 567 U.S. at 402.

That is exactly the risk posed by the Board's actions here.  Under federal law, once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts for trading by self-certifying that these contracts comported with federal law.  The CFTC had the authority to review that self-certification on the ground that these contacts were "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i), but chose not to do so.  The CFTC's enforcement division has authority to investigate and, with the approval of the Commission, initiate enforcement actions seeking an array of penalties in federal court or administrative proceedings before the CFTC if it concluded that Kalshi violated any federal law—but, again, it chose not to do so.  *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 3.3.  Congress thus gave the CFTC a variety of tools for enforcing federal law against federally designated contract markets and entrusted the CFTC with discretion to pursue the penalties it deems most appropriate.

Subjecting federally-regulated exchanges to state laws like Nevada's would "disrupt 'the congressional calibration of force.'"  *Valle del Sol*, 732 F.3d at 1027 (quoting *Crosby*, 530 U.S. at 380).  Nevada criminal law imposes penalties that would substantially interfere with the CFTC's discretion.  For example, Nevada authorities threatened Kalshi with violation of NRS 463.160—a category B penalty which "*shall* be punished by imprisonment in the state prison for a minimum term of not less than 1 year and a maximum term of not more than 10 years, by a fine of not more than $50,000, or by both fine and imprisonment."  NRS 463.360(3) (emphasis added). Absent a finding of preemption, the carefully calibrated federal enforcement scheme would be displaced by a blunt application of mandatory state criminal penalties. *See Crosby*, 530 U.S. at 373–74 (finding conflict preemption where state regulatory scheme "undermin[ed]" congressional "delegation of effective discretion" to the executive).

*Third*, the CFTC has already considered Kalshi's political-events contracts and sports-related contracts, and both are now authorized.  Allowing Nevada to prohibit those contracts would squarely conflict with how those contracts are regulated at the federal level.

As to political-event contracts, the CFTC in 2024 attempted to ban Kalshi from listing these contracts on the ground that they "involve[d]" both "gaming" and "unlawful" activity in violation of 7 U.S.C. § 7a-2(c)(5)(C)(i).  Compl. ¶ 49. But the District Court for the District of Columbia held that while federal law gave the CFTC the authority to engage in regulatory oversight, *these event contracts were authorized by federal law*.  *See KalshiEX LLC*, 2024 WL 4164694, at *13.  The D.C. Circuit allowed that holding to take effect pending appeal, which means that Kalshi now has the right pursuant to a federal court judgment to list these political-event contracts across the country. Allowing Nevada to prohibit the very same political-event contracts that a federal court held the CFTC obligated to approve would be an extreme affront to federal authority.

As to sports-related contracts, Kalshi self-certified and began listing these contracts on its exchange earlier this year.  Pursuant to 7 U.S.C. § 7a-2(c)(2), the CFTC was authorized to "stay[] the certification" of the sports-related contracts to allow for CFTC review if it concluded that the contracts were contrary to the public interest. The CFTC chose not to exercise that discretion, however, and thereby authorized these contracts on February 7, 2025. *KalshiEX LLC*, 119 F.4th at 67.  To this day, sports-related contracts on Kalshi's exchange are legal under federal law, and unless and until the CFTC attempts to regulate those contracts, they will remain so. But the Board now claims the authority to regulate Kalshi based on its assessment of the Nevada public policy that is in direct conflict with the CFTC's evaluation of the public interest.  Allowing Nevada—not to mention the other 49 states—to substitute the CFTC's judgment about the public interest with its own state law would create a direct conflict.

*Fourth*, the Board's demands conflict with the CFTC Core Principles on which Kalshi's designation as a CFTC-approved market depends.  The CFTC's Core Principle 2 requires Kalshi to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services."  17 C.F.R. §§ 38.150, 38.151(b) (emphasis added).

Cutting off Nevada residents from Kalshi's platform—including residents with ongoing investments—would be in considerable tension with that principle. In addition, Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of *price distortions and market disruptions*." 17 C.F.R. § 38.255 (emphasis added). Again, abruptly closing Kalshi's political-event and sports-related contracts to anyone located in Nevada could constitute exactly the sort of market disruption the CFTC has directed Kalshi to prevent. Depending on the CFTC's interpretation of its Core Principles, it could well be "impossible for [Kalshi] to comply with both state and federal law"—the paradigmatic case for preemption. *Valle del Sol*, 732 F.3d at 1023 (citing *Crosby*, 530 U.S. at 372).

**B.  Kalshi Will Suffer Irreparable Harm Without A TRO And Preliminary Injunction.**

The Board's acts threaten Kalshi with existential harm. In the absence of a TRO and preliminary injunction, Kalshi will suffer irreparable harm along several dimensions.

*First*, if Kalshi chooses not to comply with the Board's unconstitutional threats, Kalshi and its officers face the extraordinary harms associated with the threat of civil liability and criminal prosecution. As the Ninth Circuit has recognized, a plaintiff establishes a likelihood of irreparable harm when it demonstrates a "credible threat of prosecution" under a preempted state statute. *See Valle del Sol*, 732 F.3d at 1029; *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). In Kalshi's case, the threat of prosecution is actual and imminent. The Board "expressly" threatened Kalshi and its representatives with "criminal and civil penalties" if it failed to cease offering its "event-based contracts" in Nevada. Exhibit 1, at 1-2. The broad wording of this threat suggests that Kalshi could be liable for offering *any* event-based contract in Nevada, even contracts that do not involve sports or political events.

The Board's threat not only subjects Kalshi's officers to the prospect of criminal liability but also generates uncertainty that is already causing Kalshi harm. One of Kalshi's partners, for example, has already declined to roll out a partnership with Kalshi in Nevada as a direct response to the Board's cease-and-desist letter. Declaration of Xavier Sottile ¶ 48. Thus, the cease-and-desist letter alone suffices to prove irreparable harm.

- 21 -

*Second*, attempting to comply with the Board's unconstitutional threat would subject Kalshi to extensive harms that could not be remedied even if it ultimately prevailed in this litigation. Kalshi has more than 10,000 users in Nevada, many of whom have open investments on the platform. *Id*. ¶ 47. If Kalshi complied with the Board's unconstitutional threat during the pendency of this litigation, it would forego business in this important market, without any prospect of recouping its losses even if it ultimately prevails. Moreover, it is not at all clear that Kalshi has the capacity to comply with the threat to cease "immediately" as the Board demands, and any attempt at comply would subject Kalshi to extraordinary technological challenges and costs. As explained in detail in the accompanying declaration, Kalshi has no need currently to comprehensively geolocate its users on a state-by-state basis because it is regulated federally rather than state-by-state. *Id.* ¶ 18. Attempting to implement geolocation capabilities would take months and cost tens of millions of dollars annually, *Id.* ¶ 21—again, with no prospect of recouping these losses if Kalshi ultimately prevails.

*Third*, a TRO and preliminary injunction are needed not just to protect Kalshi, but also Kalshi's users. Users who trade on Kalshi's platform enter into event contracts with other users. Immediately shuttering access to these contracts for Nevada users could require Kalshi unilaterally to terminate users' contracts, or to pause trading on these contracts pending the outcome of litigation months or more in the future. *Id.* ¶ 29. Under either scenario, this would be an extraordinary and disruptive act. Either scenario, moreover, would harm not just users in Nevada, but nationwide, because shuttering access to users in one state would substantially distort the markets even for users in other states. Such an "impair[ment of] existing contractual obligations" for Kalshi's users easily constitutes irreparable harm. *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1051–52 (S.D. Cal. 2006) (internal quotations marks omitted); *see FTC v. Qualcomm, Inc.*, 935 F.3d 752, 756 (9th Cir. 2019) (requiring defendant to "renegotiate existing [contracts] on a large scale" is irreparable harm).

*Fourth*, no matter how Kalshi responds to the Board's unconstitutional threat, it will face irreparable reputational harm if no injunction is granted. If Kalshi chooses not to comply on the

ground that Nevada law is plainly preempted, the threat of prosecution—not to mention being labelled a willful violator of Nevada law—would undermine the sterling reputation that Kalshi has cultivated over many years and that resulted in Kalshi being the first event market designated by the CFTC.  But bowing to the Board's threat by abruptly ending its business in Nevada would yield exceptionally damaging corresponding harm.  It would undermine users' confidence in the Kalshi's exchange and make them fear that their own investments were at risk, particularly given the prospect of copycat enforcement in other states.  This loss of "goodwill" could not easily be regained even if Kalshi ultimately prevails, and constitutes a distinct form of irreparable harm. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (loss of goodwill cannot readily be remedied with damages).

*Fifth*, the Board's demands jeopardize Kalshi's status as a CFTC-designated contract market—and thus pose an existential threat to Kalshi.  Abruptly terminating its event-based contracts in Nevada would be in considerable tension with the CFTC Core Principles to which Kalshi is subject, including the obligation to provide "impartial access" to its markets, 17 C.F.R. § 38.151(b), and the obligation to reduce the risk of "market disruptions," *id.* § 38.255.  Kalshi is unaware of any precedent for a CFTC-designated exchange simply closing its business to residents of a particular state, and doing so would create enormous regulatory risk and uncertainty.  Should the CFTC conclude that closing Kalshi's markets in Nevada violates federal law, it could respond by seeking to revoke Kalshi's designation.  7 U.S.C. § 8(b).  A TRO and preliminary injunction are needed to prevent Kalshi from suffering that irreparable harm during the pendency of this litigation.

## C. The Balance Of The Equities And Public Interest Favor A TRO And Preliminary Injunction.

"[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol*, 732 F.3d at 1029 (citation and internal quotation marks omitted). "In such circumstances, the interest of preserving the Supremacy Clause is paramount." *Cal. Pharmacists*

*Ass'n v. Maxwell–Jolly*, 563 F.3d 847, 852–53 (9th Cir. 2009). As an initial matter, the public has a first-order interest in ensuring that preempted Nevada laws are not enforced against federally-regulated entities. Nevada retains no reciprocal interest because it lacks any interest in enforcing a state law that is preempted. *See Arizona*, 567 U.S. at 401.

Beyond that, the failure to issue an injunction here would "reach[] beyond the parties, carrying with it a potential for public consequences." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009). Immediate compliance with Nevada law to avoid criminal penalties will harm Kalshi's users in Nevada. Winding down much of Kalshi's operations in Nevada would impose intractable technological difficulties on a very short timeframe and would create significant risks for Kalshi's users. Declaration of Xavier Sottile ¶¶ 12-28. An abrupt cessation would make it difficult to inform users in Nevada of their rights and obligations regarding ongoing event contracts, and would risk cutting off users' access to their investments on Kalshi's exchange. Declaration of Xavier Sottile ¶¶ 29-37. Given that the Nevada laws are clearly preempted by federal law as applied to Kalshi, the balance of the equities and consideration of the public interest firmly favor a TRO and preliminary injunction.

**D.  No Security—Or Only A *De Minimis* Security—Is Appropriate.**

Fed. R. Civ. P. 65(c) requires a party seeking a TRO or preliminary injunction to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Rule 65(c) invests this Court "with discretion as to the amount of security required, if any." *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999); *see also Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) ("The court has wide discretion in setting the amount of the bond.").

Defendants will suffer no nonspeculative damage by halting enforcement against Kalshi during the pendency of this litigation. Accordingly, no security is needed. *See Doctor's Associates, Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir.1996) (affirming decision not to require bond). Alternatively, should the Court require a security, only a de minimis security is warranted. Kalshi is prepared to obtain a security forthwith should the court deem one appropriate.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CONCLUSION**

For the foregoing reasons, the Court should grant a temporary restraining order and a preliminary injunction.

Dated this 28th day of March, 2025.

/s/      *D. Lee Roberts, Jr., Esq.*
D. Lee Roberts, Jr., Esq.
WEINBERG, WHEELER, HUDGINS,
    GUNN & DIAL, LLC
6385 South Rainbow Blvd., Suite 400
Las Vegas, Nevada  89118

Neal Katyal (pro hac vice pending)
Joshua B. Sterling (pro hac vice pending)
William E. Havemann (pro hac vice pending)
Milbank LLP
1850 K Street, Suite 1100
Washington D.C. 20006
Telephone: 202-835-7505
Facsimile: 213-629-5063

Mackenzie Austin (pro hac vice pending)
Milbank LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Telephone: 424-386-4000
Facsimile: 213-629-5063

*Attorneys for Plaintiff*