D. Lee Roberts, Jr., Esq.
Nevada Bar No. 8877
*lroberts@wwhgd.com*
WEINBERG, WHEELER, HUDGINS,
 GUNN & DIAL, LLC
6385 South Rainbow Blvd., Suite 400
Las Vegas, Nevada 89118
Telephone:(702) 938-3838
Facsimile: (702) 938-3864

Neal Kumar Katyal (pro hac vice pending)
Joshua B. Sterling (pro hac vice pending)
William E. Havemann (pro hac vice pending)
Milbank LLP
1850 K Street, Suite 1100
Washington D.C. 20006
Telephone: 202-835-7505
Facsimile: 213-629-5063

Mackenzie Austin (pro hac vice pending)
Milbank LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Telephone: 424-386-4000
Facsimile: 213-629-5063

ATTORNEYS FOR PLAINTIFF

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| KALSHIEX, LLC,<br><br>    Plaintiff,<br><br>    vs.<br><br>KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in his official capacity as a Member of the Nevada Gaming Control Board; CHANDENI K. SENDALL, in her official capacity as a Member of the Nevada Gaming Control Board; NEVADA GAMING CONTROL BOARD; JENNIFER TOGLIATTI, in her official capacity as Chair of the Nevada Gaming Commission; ROSA SOLIS-RAINEY, in her official capacity as a Member of the Nevada Gaming Commission; BRIAN KROLICKI, in his official capacity as a Member of the Nevada Gaming Commission; | Case No.:<br><br>**DECLARATION OF XAVIER SOTTILE** |

1

GEORGE MARKANTONIS, in his official capacity as a Member of the Nevada Gaming Commission; ABBI SILVER, in her official capacity as a Member of the Nevada Gaming Commission; NEVADA GAMING COMMISSION; AARON D. FORD, in his official capacity as Attorney General of Nevada,

    Defendants.

## DECLARATION OF XAVIER SOTTILE

1. I am the Head of Markets at KalshiEX, LLC. In that role, I am responsible for the generation of new markets. I received an undergraduate degree in Economics from Yale University in 2020. Before joining Kalshi, I worked at the U.S. House of Representatives, Bridgewater Associates, and the Yale Program on Financial Stability.

2. My duties include devising proposed new contracts and shepherding those proposals from inception to completion. I also facilitate the process by which our markets undergo the regulatory review cycle under the purview of the Commodity Futures Trading Commission (CFTC). This involves everything from personally notifying the CFTC of contracts that Kalshi has self-certified under Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the CFTC regulations, to maintaining records pursuant to their requirements, certifying that Kalshi's contracts comply with the Act, and communicating with Commission staff over the substance of contract filings.

3. The facts set forth herein are within my personal knowledge, and if called as a witness, I could and would competently testify to them.

4. I offer this declaration to describe the extraordinary harm that Kalshi and its users will incur unless the court immediately prevents the Board from enforcing its demand that Kalshi "immediately cease and desist from offering any event-based contracts in Nevada." Exhibit 1, at 2. Without an injunction, Kalshi will be forced into an impossible choice. It must either decline to comply with the letter, subjecting itself and its representatives to the risk of criminal and civil liability. Or it must attempt to comply with the letter, thereby subjecting itself and its

users to a host of harms that could not be repaired even if Kalshi ultimately succeeds in this case. This declaration reflects my preliminary analysis of Kalshi's harms, and other unanticipated harms are possible, or even likely, given the unprecedented nature of the Board's letter and the uncharted territory it would lead to.

**I.      Harms Resulting from Noncompliance**

5.  If Kalshi declines to comply with the letter and continues to offer event contracts in the state of Nevada, the company and its representatives risk criminal and civil jeopardy in Nevada.

6.  Nevada authorities have threatened Kalshi and its representatives with "criminal and civil" liability for its operations in the state. The Nevada Gaming Control Board has expressed that it believes that Kalshi's operations in Nevada are in violation of several Nevada statutes that would constitute a "category B felony" and carry a prison sentence of between one and ten years, as well as a fine of up to $50,000. Exhibit 1, at 2.

7.  In its cease and desist letter, Nevada authorities "expressly reserve[d] all rights to pursue criminal and civil actions based on Kalshi's past and future conduct within the state" based on the alleged failure to adhere to Nevada law. Exhibit 1, at 2. Further, Nevada authorities consider all contracts Kalshi has offered on its platform since Kalshi received the cease and desist letter on March 4, 2025 as "willful violations" of Nevada law. Exhibit 1, at 2.

8.  Since Kalshi's designation as a CFTC-regulated contract market in 2020, the company has offered event contracts nationwide. As Head of Markets, I have assiduously complied with federal regulations with regard to all our contracts, including the sports-related and politics-related contracts that Nevada authorities have targeted in their letter. We have done our best to run the company according to our understanding of the regulatory framework under which we have been governed for almost five years.

9.  Since receiving the cease-and-desist letter, Kalshi's operations that are lawful under federal laws risk exposing the company and representatives to criminal and civil liability. It is terrifying and stressful to attempt to operate the company while the risk of criminal and civil jeopardy looms. I am deeply concerned that Nevada will make good on its threat to file criminal

and civil charges against Kalshi and its representatives. That fear becomes all the more distressing given that Kalshi's only other alternative is compliance with the cease-and-desist letter, which would bring about a whole host of other harms to Kalshi and its users as I describe below.

## II. Harms Resulting From Attempted Compliance

10. Choosing to comply with the cease-and-desist letter would introduce a new set of barriers and challenges that themselves would subject Kalshi and its users to irreparable harm. Technical compliance with the cease and desist letter on short order will be exceedingly difficult. But even if Kalshi could implement a technical solution to comply with the letter, halting access to event contracts in Nevada will cause severe harm to Kalshi's existing userbase. Compliance would also risk Kalshi's status as a registered contract market under the CFTC, throwing away years of efforts to earn and maintain its federal designation. All of these harms would be avoided by this Court's entry of immediate injunctive relief.

11. Kalshi's harms from attempting compliance can be categorized as follows: (a) harms imposed by technical barriers to compliance, (b) harms to Kalshi's users from abruptly ceasing operations in Nevada, (c) risk that complying with Nevada law would jeopardize Kalshi's CFTC designation, and (d) economic and reputational harm to Kalshi from ceasing event-based contracts in Nevada. I describe each of these categories in more detail below.

   *a. Harms Resulting from Technical Barriers to Compliance*

12. The cease and desist letter requires Kalshi to undertake technological changes that would be either difficult or impossible for Kalshi to implement "immediately," as the letter demands. Exhibit 1, at 2. Attempting to undertake these extraordinary technological changes would impose substantial and irreparable costs that could not be recouped even if Kalshi ultimately prevails in this case.

13. The Board's letter requires Kalshi to "immediately cease and desist from offering any event-based contracts in Nevada." Exhibit 1, at 2. If Kalshi attempted to comply with this demand, it would be required, first, to undertake efforts to geolocate which of its users are in Nevada, and, second, to cease immediately all event-based contracts for those users. I have

engaged in internal discussions with our leadership and technical team to determine the feasibility of compliance at both of these steps. Compliance would be difficult to implement even under a relaxed timeline and nearly impossible to implement "immediately." Exhibit 1, at 2.

### i. Step One – Identifying Nevada Users

14. Because Kalshi is subject to uniform federal regulation rather than state-by-state laws, it currently lacks a mechanism to identify which of its users are located in any particular state at any particular time. Implementing such a mechanism would be incredibly costly and could not be done immediately.

15. Traditional web-based sports pools identify their users' whereabouts through a process called geolocation (or geo-positioning). Geolocation identifies and tracks an internet-connected device's location to provide real-time data as to the geographic position of the device. This technology is more sophisticated than merely identifying the device's IP address. Instead, geolocation uses a combination of location-identifiers like GPS coordinates, cell phone towers, WiFi access points, network connections, and Bluetooth beacons to triangulate location. While IP addresses can provide city-level location accuracy, geolocation is sensitive enough to track the exact moment that a device crosses state lines.

16. It is my understanding that geolocation is a multi-step and technically complex process even for stationary devices, and that the process is even more challenging when tracking real-time movement of devices.

17. The reason traditional sports pools deploy geolocation is to ensure that the bets and wagers that individuals place in their pools conform to state laws governing gaming and gambling. The precision of geolocation allows sports pools to make refined geographic determinations at the transaction-level rather than the user-level. Through geolocation, a company can allow and disallow certain transactions that take place in restricted areas rather than bluntly denying gamblers access to their platforms based on their residence irrespective of where they are located at the time of wager.

18. Kalshi is not a sports pool. As a CFTC-regulated contract market, Kalshi has never developed or implemented geolocation on its platform because it is subject to the CFTC's exclusive jurisdiction and is not subject to individual state laws governing gambling. Like the Chicago Mercantile Exchange and the Intercontinental Exchange, Kalshi does not distinguish between users or trades on the basis of geographic location. Instead, Kalshi is subject exclusively to federal law, which does not apply different standards to users of different states.

19. Federal law requires that Kalshi keep Know Your Customer (KYC) data on the traders that place positions on its platform. In compliance with that requirement, Kalshi knows the permanent residence and IP address of its users, but does not geolocate its users and therefore does not know where a user's device is located at any point in time. Kalshi maintains a database of its traders KYC data, which is available for CFTC inspection upon request.

20. Kalshi has no evident way to comply "immediately" with the cease-and-desist letter. If Kalshi sought to use its existing KYC data to identify Nevada-based users on its platform, this broad-brush approach would risk being deemed both under- and over-inclusive. KYC data would capture all users who claim their permanent residence as Nevada even if they place positions when they are located outside of Nevada. Conversely, the KYC data could fail to capture users whose permanent residence is outside of Nevada but travel to the state and place a position while there.

21. If, alternatively, Kalshi sought to implement geolocation services across its platform, this process would be incredibly costly and time-consuming. Kalshi lacks the capacity to implement this service in-house and would therefore need to contract with a cloud- or server-based geolocation platform. I estimate that a partnership with a geolocation service provider would cost Kalshi up to tens of millions of dollars annually. Thus, if it attempted compliance with the Board's letter, Kalshi would be forced to expend enormous financial resources on geolocating services, even if the court ultimately concludes that Nevada law does not apply to Kalshi.

22. Based on my prior negotiations with other key partners, moreover, I estimate that negotiating a complex contract with a geolocation service provider alone could take months.

6

Implementing and integrating the geolocation services into our existing platform would take longer still. Thus, attempting to comply with the Board's letter could not feasibly be done "immediately" as the Board demands and, even if it could, would subject Kalshi to massive irrevocable costs.

i. <u>Step Two - Geographical Cessation</u>

23. Only after identifying Kalshi users physically present in Nevada could Kalshi cease offering its event contracts to users in Nevada. It would be required to do so through a technical process called "geofencing." This process would involve creating a virtual geographic boundary, or geofence, around the state of Nevada. Again, this process would be technically challenging, time-consuming, and expensive.

24. While geofencing might block *newcomers* from trading on the platform from Nevada, geographical cessation presents a host of additional difficulties for *existing* Kalshi users. As of today, there are 14,030 accounts on Kalshi that have registered with a Nevada address and 10,812 of those accounts have passed Know Your Customer protocols and become full-fledged Kalshi members. While the precise numbers are not public, these accounts have millions of dollars in open interest on the Kalshi platform, meaning Nevada users have millions worth of open positions on Kalshi markets that have not yet been settled.

25. The Board's letter could be understood to require Kalshi to cease its contracts even with respect to these existing positions. But doing so would present intractable technical difficulties.

26. If the Board's letter is understood to require Kalshi to unilaterally liquidate all trades that originated in Nevada, compliance would either be impossible or irreparably harmful. To explain why, it is helpful to distinguish Kalshi's exchange from a sports pool or casino. A casino or sports pool operates by taking bets from gamblers on games where the house has a statistical advantage. In other words, gamblers bet against the "house," and when the house loses, it must pay the gambler on demand. Casinos and sports pools therefore maintain a high level of liquidity so that they can pay out those bets.

27. But Kalshi does not operate a casino or sports pool. Instead, it manages a federally-regulated exchange market. In contrast to a casino, an exchange facilitates trades between different users on the platform. Traders do not bet against the house, but rather enter into contracts with other traders on an exchange. To ensure compliance with the CFTC regulations, Kalshi operates a CFTC-approved derivatives clearinghouse that holds traders' funds during the pendency of an open contract. But Kalshi does not have access to immediate liquidity like a sports pool or casino that it could use to refund the cost basis of a trader's investment. Attempting to facilitate those exits using Kalshi's own funds would be exceptionally expensive and require technical capabilities that Kalshi does not now have.

28. Kalshi, moreover, would want to give its users reasonable notice to allow them to exit their positions voluntarily if they so choose. But the immediate threat of criminal and civil liability from Nevada state authorities raises serious questions about whether Kalshi could even engage in that basic diligence.

    b. *Irreparable Harms to Kalshi's Users*

29. Ceasing operations in Nevada would impose irreparable harm on Kalshi's existing userbase. Ceasing operations could be understood to require either pausing current trades pending the outcome of the event that is the subject of the contract, or else liquidating user positions. Either option would impose severe harms on users.

    i. Pausing Positions

30. Pausing current positions on Kalshi pending the outcome of the event at issue would deny traders access to their property and threaten their economic expectations.

31. Pausing positions pending the outcome of the event would deny Nevada users access to their property—millions of dollars' worth. Users' capital would be locked on the Kalshi platform and users with significant investments on the platform would be unable to retrieve it. If the event at issue is months or years in the future, users' assets would be locked up for the duration. Given current market conditions and uncertainty, this lack of access funds could result in substantial losses.

8

32. Pausing positions would also cause a massive disruption to users' investment-backed expectations. Financial traders on Kalshi, like investors in other markets, expect to be able to alter their investments as facts on the ground change. Due to the unique market-sensitivity of event contracts and the ease with which exchanges allow traders to place positions, traders capitalize on the opportunity to enter and exit their positions during the pendency of the contract. Traders also deploy well-recognized strategies like stop-loss orders and portfolio-wide loss mitigation strategies. Investors may invest in a contract expecting to sell if the contract price falls below a certain value, or expecting to reinvest more if the investment proves especially sound. And while some contracts operate on short timelines, many of the contracts that Kalshi offers are long-term. For example, one of Kalshi's event contracts allows traders to place positions on whether the electric vehicle market share will rise above 30% by 2030. Traders who have placed a position on this contract may be mitigating their risk on other investments by placing a position that effectively balances out the investment portfolio. As the market for electric vehicles changes so does the price of the event contract. A trader may make an investment at 45 cents on the electric-vehicle contract and institute a stop-loss order to sell the contract when the price dips below 30 cents because 30 cents is the breakeven point on the investment.

33. Traders are constantly engaged in the practice of ascertaining risk. As facts on the ground change so do traders' strategies. Indeed, traders often do not place a position on a contract with the intent of seeing that contract through to its expiration date and risking the full amount of the entry price. Instead, they monitor market fluctuations during the lifetime of the event contract to determine when to cash out. In other words, traders do not necessarily value event contracts based on the ultimate value of the contract at its expiration date. They also value the flexibility that event contracts provide as a financial tool to mitigate risk in real-time.

34. Hitting pause on all Nevada-based trades would completely upend this investment strategy and destroy traders' expectations. If Kalshi were to pause all trades in Nevada, traders would no longer be able to take action on their existing contracts in accordance with their investment models. The flexible investment opportunity on which Kalshi users relied when

entering into these contracts would be decimated. A Kalshi user that entered into a contract on whether President Trump would place tariffs on copper imports to the United States before January 1, 2026, for example, would not be able to exit that contract even if facts on the ground change dramatically in the meantime.[1] Traders would be forced either to leave the state to change positions or suffer whatever losses they may endure as a result of being locked out.

35. Pausing all Nevada-based trades would not solely affect Nevada-based users and transactions; it would wreak havoc on the entire Kalshi exchange ecosystem. Again, exchanges do not operate like casinos where gamblers bet against the house. Instead, exchanges facilitate contracts between individual traders on the market. Traders on either side of a contract are often from different states given that Kalshi does not distinguish between the geographic location of traders. If traders in Nevada are locked out of their positions, then their trading counterparts in other states will likewise be limited in whether and how often they can enter and exit their positions on the Kalshi exchange. Traders in California, for example, may expect to rely on traders in Nevada on contracts related to water availability in the American Southwest. But if the Nevada-based traders and transactions are all of a sudden restricted on the platform, that will have an equal and opposite effect on the market for traders in other states. Pausing transactions in Nevada would thus disrupt users positions on the exchange nationwide, which they placed in reliance on their ability to flexibly enter and exit.

ii.     <u>Liquidating Positions</u>

36. Liquidating Nevada-based positions on Kalshi would similarly subject users to irreparable harm. This would require Kalshi to refund either the current value of users' existing positions or the original cost of their existing positions on their respective open contracts. Unilaterally settling traders' positions based on current market conditions or the original cost of the positions could lead to significant losses for users. A trader, for example, may have entered a long-term event contract at 80 cents, but market conditions may have caused his position to decline in value to 30 cents. Rather than allowing the trader to ride out the market dip, immediate

---

[1] This is a current politics-based event contract that is currently offered through the Kalshi exchange. KalshiEX, *Will Trump Launch Tarriffs On Copper?*, https://kalshi.com/markets/kxtariffscopper/copper-tariffs.

10

liquidation at the market rate would force the trader to take a 50-cent loss on the contract through no fault of his own. Likewise, a trader who bought a contract during a market dip and is forced to exit at the original contract price would not be able to realize any gains that he earned over his holding period for the contract. And in either event, refunding users based either on the cost of their positions or the position's current value would be prohibitively expensive for Kalshi to execute.

37.     By the same token, immediately liquidating Nevada-based users' positions would disrupt the market for out-of-state users by causing a false signal in the market. Event contract markets respond to market fluctuations. The immediate exit of a large portion of investors on a particular contract would have a distorting effect on the value of the contract, impairing other investors' ability to predict market changes and act accordingly. If, for example, Nevada traders make up a plurality of the trades on a particular contract, the immediate liquidation of all Nevada positions would indicate to the market that the contract's value has changed, causing a price change in response. Remaining traders would suffer from the market distortion, resulting in substantial financial losses even for Kalshi's non-Nevada users.  Alternatively, Kalshi could liquidate the entire market for both Nevada and non-Nevada users by settling prices at either the current market price or the original contract price, but this would, again, be prohibitively expensive and likely occasion the end of our federally-regulated company simply to stave off potential criminal or civil liability.

        c.  *Harms to Kalshi Resulting from the Risk of CFTC Decertification*

38.     Compliance with Nevada state law would jeopardize Kalshi's status as a CFTC-designated contract market.  It is difficult to overstate how harmful this would be to Kalshi.

39.     As the Head of Markets at Kalshi, I oversee the entire regulatory review process for Kalshi's contract markets. In that role, I am responsible for ensuring that each of Kalshi's contracts complies with the nearly two dozen CFTC Core Principles that govern event contracts traded on CFTC-regulated exchanges. Complying with Nevada state law could be understood to put Kalshi out of compliance with these Core Principles, imperiling Kalshi's designation as a contract market under the CFTC's purview.

40. CFTC Core Principle 4 charges designated contract markets with the "responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement processes." 17 C.F.R. § 38.250. Immediately liquidating or pausing traders' positions could be understood to lead to the very sort of price distortion and market manipulation that the CFTC regulations guard against. Pausing trades could cause "disruption[] of the delivery or cash-settlement process" and immediate liquidation could cause "price distortion."

41. CFTC Core Principle 2 requires that designated contract markets provide their "members, persons with trading privileges, and independent software vendors with impartial access to its markets and services." 17 C.F.R. § 38.151(b). Pursuant to this regulation, "access criteria" must be "impartial, transparent, and applied in a non-discriminatory manner." *Id.* Discrimination based on geographic location would at least arguably conflict with this requirement, but that is exactly what Kalshi would have to do to comply with Nevada's cease and desist letter. Traders who execute positions in Nevada will be barred from accessing Kalshi's exchange and placing positions on Kalshi's contracts whereas traders in any other state will have unlimited access to the platform.

42. Violation of these core principles could subject Kalshi to the panoply of enforcement mechanisms that the CFTC has at its disposal. Those tools range from civil monetary penalties to restitution to criminal liability.

43. Violating these principles could even jeopardize Kalshi's federal-contract-market status with the CFTC. The CFTC is authorized to suspend or revoke Kalshi's designation if Kalshi fails to comply with federal regulations. Kalshi has spent the better part of the last decade working to gain federal registration as a contract market under the CFTC and has scrupulously endeavored to comply with CFTC regulations to maintain that registration. Losing our federal license would be catastrophic for the company, even if Kalshi were to ultimately succeed in this suit against the state authorities in the long-term.

44. CFTC enforcement is not a mere theoretical risk. Several years ago, a CFTC-regulated exchange was charged with offering contracts on a discriminatory basis because it only allowed sportsbooks to trade on its platform. Discriminating on the basis of state residence could

12

likewise subject Kalshi to federal repercussions. It is inconceivable, for example, to imagine a CFTC-designated contract market like the Chicago Mercantile Exchange abruptly closing its exchange to users in a particular state without serious federal repercussions.  Yet that is what compliance with the Board's letter would require Kalshi to do.

45. Compliance with Nevada law thus places Kalshi in a regulatory Catch-22:  Either it complies with Nevada law and risks CFTC sanctions or it continues operations in Nevada and subjects itself to state criminal and civil liability.

    d. *Economic and Reputational Harms To Kalshi*

46. Compliance with Nevada state law will also cause economic and reputational harm to Kalshi. Losses on both fronts will be irrevocable even if Kalshi ultimately wins this case.

47. Kalshi has more than 10,000 users in Nevada with millions of dollars invested on the exchange.  The market uncertainty created by abruptly closing its contracts in Nevada could lead many users to leave the platform—even users outside of Nevada. Traders must have confidence in the integrity of the market to invest in it, but market confidence would be deeply shaken by complying with the Board's order and the prospect that other states may to follow Nevada's lead.  Even if Kalshi were to prevail in this lawsuit, regaining that market confidence would be difficult. Kalshi has expended enormous resources to advertise its platform, onboard traders, and maintain their business. Losing those traders would mean that many of those efforts were for naught. Thus, compliance will impose significant and irrevocable economic harm on the company.

48. The threat of Nevada state litigation also endangers Kalshi's established partnerships and relationships. One of Kalshi's banner partners, Robinhood, has already chosen not to list Kalshi's event contracts in Nevada as a result of the cease-and-desist letter. This marks a massive disruption for Kalshi given that Robinhood had agreed to list Kalshi's contracts to its millions of active users, but chose to deviate from that plan in direct response to the Board's letter. Other partners that help us comply with CFTC regulations by facilitating our digital investment platform and helping to detect improper trading behavior may also seek to limit their exposure given the uncertainty of the application of Nevada state law to Kalshi.

49. The effects of Nevada's cease and desist letter are not limited to the state but instead threaten to open a pandora's box of regulation for the 49 other states that may wish to impose their local laws on Kalshi's exchange. In the absence of a temporary restraining order and preliminary injunction, partners and users alike will be hesitant to engage with Kalshi given this potential for state litigation.

* * *

50. The Board's cease-and-desist letter imposes irreparable harms that Kalshi cannot avoid no matter how it responds. If Kalshi does not comply with the Board's demands, the company faces civil and criminal liability and its representatives face nothing short of imprisonment. But if Kalshi attempts to comply with the Board's demands, it would incur massive costs, its users would be harmed, its federal registration would be imperiled, and user confidence in the integrity of its market would be shaken. All of these harms are compounded by the real risk that other states will be emboldened by the Board's demands to follow Nevada's lead. And there are serious questions about whether Kalshi could implement the technical solutions on an expedited timeline. Kalshi has spent years cultivating its reputation and developing its userbase. Compliance with the Board's demands to ward off Nevada criminal and civil liability will lead to economic and reputational harm that will be difficult to regain.

Dated this 28th day of March, 2025.    /s/ *Xavier Sottile*

                                                                     Xavier Sottile