1  AARON D. FORD
     Attorney General
2  Jessica E. Whelan (Bar No. 14781)
     Chief Deputy Solicitor General – Litigation
3  Sabrena K. Clinton (Bar No. 6499)
     Senior Deputy Attorney General
4  Devin A. Oliver (Bar No. 16773C)
     Deputy Attorney General
5  State of Nevada
   Office of the Attorney General
6  1 State of Nevada Way, Suite 100
   Las Vegas, NV 89119
7  (702) 486-3420 (phone)
   (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
   sclinton@ag.nv.gov
9  doliver@ag.nv.gov

10 *Attorneys for Kirk D. Hendrick, in his Official*
   *Capacity as Chairman of the Nevada Gaming*
11 *Board; George Assad, in his official capacity as*
   *A Member of the Nevada Gaming Control Board;*
12 *Chandeli K. Sendal, in her official capacity as a*
   *Member of the Nevada Gaming Control Board;*
13 *Nevada Gaming Control Board; Jennifer Togliatti,*
   *In her official capacity as Chair of the Nevada Gaming*
14 *Commission; Rosa Solis-Rainey, in her official capacity*
   *As a Member of the Nevada Commission; Brian Krolicki,*
15 *In his official capacity as a Member of the Nevada Gaming*
   *Commission; George Markantonis, in his official capacity*
16 *As a Member of the Nevada Gaming Commission; Abbi*
   *Silver, in her office capacity as a Member of the Nevada*
17 *Gaming Commission; Nevada Gaming Commission;*
   *Aaron D. Ford, in his official Capacity as Attorney*
18 *General of Nevada*

19            **UNITED STATES DISTRICT COURT**

20               **DISTRICT OF NEVADA**

21 KALSHIEX, LLC,                    | Case No. 2:25-cv-00575-GMN-BNW

22         Plaintiff,                | **DEFENDANTS' OPPOSITION TO
                                     | PLAINTIFF'S MOTION AND
23 vs.                               | MEMORANDUM OF POINTS AND
                                     | AUTHORITIES IN SUPPORT OF AN
24 KIRK D. HENDRICK, in his official | IMMEDIATE TEMPORARY
   capacity as Chairman of the Nevada| RESTRAINING ORDER AND
25 Gaming Control Board; GEORGE ASSAD,| PRELIMINARY INJUNCTION AND
   in his official capacity as a Member of the | DEFENDANTS' COUNTERMOTION
26 Nevada Gaming Control Board;       | FOR AN IMMEDIATE TEMPORARY
   CHANDENI K. SENDALL, in her official| RESTRAINING ORDER AND
27 capacity as a Member of the        | PRELIMINARY INJUNCTION
   Nevada Gaming Control Board; NEVADA|
28 GAMING CONTROL BOARD; JENNIFER     |

1   TOGLIATTI, in her official capacity as
    Chair of the Nevada Gaming Commission;
2   ROSA SOLIS-RAINEY, in her official
    capacity as a Member of the Nevada
3   Gaming Commission; BRIAN KROLICKI,
    in his official capacity as a Member of the
4   Nevada Gaming Commission; GEORGE
    MARKANTONIS, in his official capacity as
5   a Member of the Nevada Gaming
    Commission; ABBI SILVER, in her official
6   capacity as a Member of the Nevada
    Gaming Commission; NEVADA GAMING
7   COMMISSION; AARON D. FORD, in his
    official capacity as Attorney General of
8   Nevada,

9          Defendant(s).

10

11          Defendants Kirk D. Hendrick, in his Official Capacity as Chairman of the Nevada

12   Gaming Control Board; George Assad, in his official capacity as a Member of the Nevada

13   Gaming Control Board; Chandeli K. Sendal, in her official capacity as a Member of the

14   Nevada Gaming Control Board; Nevada Gaming Control Board;[1] Jennifer Togliatti, in her

15   official capacity as Chair of the Nevada Gaming Commission; Rosa Solis-Rainey, in her

16   official capacity as a Member of the Nevada Gaming Commission; Brian Krolicki, in his

17   official capacity as a Member of the Nevada Gaming Commission; George Markantonis, in

18   his official capacity as a Member of the Nevada Gaming Commission; Abbi Silver, in her

19   official capacity as a Member of the Nevada Gaming Commission; Nevada Gaming

20   Commission[2]; Aaron D. Ford, in his official capacity as Attorney General of Nevada

21   (collectively "State Defendants'), by and through counsel, make this special appearance[3] to

22   oppose Plaintiff KalshiEX LLC's motion and memorandum of points and authorities in

23   support of an immediate temporary restraining order and preliminary injunction (ECF No.

24   18) and to file a countermotion for an immediate temporary restraining order and

25   _____

26   [1] The Nevada Gaming Control Board was incorrectly named pursuant to NRS
    41.031(2).
27   [2] The Nevada Gaming Commission was incorrectly named pursuant to NRS
    41.031(2).
28   [3] None of the State Defendants have been properly served with a summons and
    complaint.

preliminary injunction to enjoin Kalshi from offering event-based contracts related to gaming, sports pools, and race books in Nevada unless and until approved as licensed gaming by the Nevada Gaming Commission and to enjoin Kalshi from offering event-based contracts on election outcomes in Nevada.

This opposition and countermotion are based on the following memorandum of points and authorities, the pleadings and papers on file herein, and any oral argument before the Court.

## MEMORANDUM OF POINTS AND AUTHORITY

### INTRODUCTION

The Court should deny Plaintiff KalshiEX LLC's (Kalshi) request for the equitable relief of a temporary restraining order and a preliminary injunction. Kalshi failed to demonstrate that Congress, by the enactment of the Commodity Exchange Act, intended to preempt Nevada gaming laws under the Supremacy Clause. Nor do the actions of State Defendants' in attempting to prohibit unlawful conduct by enforcing gaming laws constitute irreparable harm. The balance of the equities and the public interest in maintaining the integrity of the Nevada gaming industry warrant the denial of Kalshi's motion.

### STATUTORY BACKGROUND

**I.    Commodity Exchange Act[4]**

The Commodity Exchange Act was enacted in 1936 and overseen by the Commodity Exchange Commission, a division within the U.S. Department of Agriculture.[5]

///

---

[4] Pursuant to FRE 201, State Defendants request that the Court take judicial notice concerning the enactment and evolution of the Commodity Exchange Act (CEA).

[5] The Commodity Exchange Act replaced the Grain Futures Act which applied to agriculture and natural resources. All references to "grain" were replaced with the term "commodities" and the Grain Futures Commission became the Commodity Exchange Commission. CFTC, History of the CFTC: US Futures Trading and Regulation Before the Creation of the CFTC, https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html#:~:text=June%2015% 2C%201936%20E2%80%93%20The%20Commodity,potatoes%2C%20as%20well%20as% 20grains (last visited April 2, 2025).

1    Over the next four decades, the CEA was amended to: (1) add additional products
2    (e.g., wool tops, fats, oils, peanuts etc.) to the list of regulated commodities; (2) enable the
3    Secretary of Agriculture to submit to Congress and make public the names, addresses, and
4    market positions of traders; and (3) allow the Commodity Exchange Commission to set the
5    level of registration and renewal fees for futures commission merchants and other
6    registrants.[6]

7    During this period, two major scandals concerning the manipulation of costs on
8    futures contracts and the use of phony receipts for non-existent commodities highlighted
9    the need for increased regulation of the commodity futures market.[7] As a result of incidents
10   like these, new financial requirements for futures commission merchants; enhanced
11   reporting requirements; and increased criminal penalties for manipulation were enacted.[8]

## II.    1974 amendments to the Commodity Exchange Act[9]

13   The 1974 Amendments overhauled the CEA and resulted in the establishment of the
14   Commodity Futures Trading Commission (CFTC). The CFTC was tasked with taking
15   enforcement actions against individuals and firms registered with the Commission, those
16   who were engaged in commodity futures and option trading on designated domestic
17   exchanges, and those who improperly issued market futures and options contracts.[10]

## PROCEDURAL BACKGROUND

19   On March 4, 2025, the Nevada Gaming Control Board (NGCB) issued Kalshi a letter
20   to Cease and Desist offering event-based contracts related to gaming, including sports
21   pools, in Nevada unless or until approved as licensed gaming by the Nevada Gaming
22   Commission and to Cease and Desist offering event-based contracts on election outcomes

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] Pursuant to FRE 201, State Defendants request that the Court take judicial notice concerning the amendment of the Commodity Exchange Act.
[10] CFTC, Law Regulation: Enforcement Actions, https://www.cftc.gov/LawRegulation/EnforcementActions/index.htm#:~:text=The%20CFTC%20takes%20enforcement%20actions,market%20futures%20and%20options%20contracts.&text=March%2012%20Order:%20Debiex%2C%20et,Order:%20Debiex%2C%20et%20al (last visited 4/2/25).

in Nevada. ECF No. 1-2 at 2. Kalshi was given ten days to provide confirmation of the cessation of all prohibited activity. *Id.* at 3. At the request of Kalshi's counsel, Kalshi was also given additional time to comply (ECF No. 18 at 12). However, following discussions on March 28, 2025 between Kalshi's counsel and the NGCB Chairman and his counsel, Kalshi filed a complaint for permanent injunctive and declaratory relief alleging that pursuant to the Supremacy Clause the Commodity Exchange Act preempts Nevada gaming laws. ECF No. 1. Contemporaneous with its complaint, Kalshi filed a motion and memorandum of points and authorities in support of an immediate temporary restraining order and preliminary injunction. ECF No. 18.

On April 1, 2025, the Court issued an order setting a response date for April 4, 2025 at 12:00 noon and a hearing on April 8, 2025 at 10:30 am.

## RELEVANT FACTS

Kalshi alleges that it is a federally designated and approved derivative exchange. ECF No. 1 §5. It offers consumers the opportunity to invest in contracts such as on wheat, cotton, rice, corn, and oats as well as interest rates, financial instruments, economic indices, and risk metrics that may be contingent on the outcome of events. Additionally, in the past few months, Kalshi began offering event based contracts that are contingent on the outcome of political elections and sports. *Id.* Kalshi contends that the event based contracts are only subject to oversight by the Commodity Futures Trading Commission (CFTC). *Id.*

Through Nevada's two-tiered regulatory structure, the NGCB and Nevada Gaming Commission (NGC) promulgate rules and regulations for the licensing and operation of gaming in Nevada and establish rules and regulations for tax reports of gaming licensees. *Id.,* §17. The NGCB enforces state laws and regulations governing gaming through its divisions, *Id.,* §17, while the NGC acts on the recommendations of the NGCB on issues of licensing and work permit appeals and has final authority on all gaming licensing matters. *Id.* §23.

/ / /

1     Kalshi alleges that by virtue of giving CFTC "exclusive jurisdiction" over federally

2  regulated exchanges, the Commodity Exchange Act (CEA) preempts Nevada gaming laws

3  precluding enforcement of laws that prohibit unlawful gaming in the State of Nevada. *Id.*

4  at 6.

5                              **LEGAL STANDARD**

6     A preliminary injunction is "an extraordinary remedy that may only be awarded

7  upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def.*

8  *Council, Inc.*, 555 U.S. 7, 22 (2008). The movant must show that: (1) he is likely to succeed

9  on the merits; (2) likely to suffer irreparable harm; (3) the balance of the equities tips in

10  his favor; and (4) the injunction is in the public interest. *Id.* at 21. "[T]he legal standards

11  applicable to TROs and preliminary injunctions are 'substantially identical.'" *Washington*

12  *v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (per curiam) (quoting *Stuhlbarg Int'l*

13  *Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)).

14     Where the party opposing injunctive relief is a government entity, the potential

15  hardship and the public interest considerations are merged. *See Nken v. Holder*, 556 U.S.

16  418, 435 (2009). Courts should pay particular attention to the public consequences when

17  considering a request for injunctive relief. *Winter,* 555 U.S. at 24. They must also consider

18  the effect on each party and balance the competing claims of harm. *Id.*

19                              **ARGUMENT**

20  **I.    Kalshi failed to demonstrate a likelihood of success**

21     Kalishi has not alleged facts demonstrating a likelihood of success on the merits.

22  While the Supremacy Clause provides that the laws and treaties made pursuant to the

23  authority of the United States constitute the supreme law of the land (*See* U.S. Const. art.

24  VI), it is not the "source of any federal rights." *See Golden State Transit Corp. v. Los*

25  *Angeles*, 493 U.S. 103, 107, (1989)(quoting *Chapman v. Houston Welfare Rights*

26  *Organization*, 441 U.S. 600, 613, (1979)). The Supremacy Clause simply raises the question

27  of whether a law is a valid exercise of federal power. Only where there is a direct conflict

28  with state laws does the clause establish the supremacy of laws made pursuant to the

Constitution. *See Gibbons v. Ogden*, 9 Wheat. 1, 210, 6 L. Ed. 23 (1824). "But it will not follow from this doctrine that acts of the larger society which are *not pursuant* to its constitutional powers, but which are invasions of the residuary authorities of the smaller societies, will become the supreme law of the land." *See Alden v. Maine*, 527 U.S. 706, 731, 119 S. Ct. 2240, 2255, 144 L. Ed. 2d 636 (1999)(quoting The Federalist No. 33, at 204 (A. Hamilton)).

By enacting the CEA, Congress did not manifest a clear intent to exclusively occupy the entire field of gaming laws. Nor did the NGCB's enforcement of its gaming laws create an impenetrable obstacle to securing the full purposes and objectives of Congress in enacting the CEA. For  these reasons and those discussed below, Kalshi has not demonstrated that Nevada gaming laws are preempted by the CEA.

### A.    The Commodity Exchange Act does not preempt Nevada gaming laws

#### 1.    The text of the Commodity Exchange Act does not evidence a clear and manifest Congressional intent to preempt Nevada gaming laws

The CEA provides that the CFTC has exclusive jurisdiction over accounts, agreements, and transactions involving commodity futures contracts traded on a designated contract market. 7 U.S.C. 2(a)(1)(A). Kalshi posits that the "exclusive jurisdiction" language preempts the enforcement of Nevada gaming laws. ECF No. 18 at 5, 13. This view ignores the purposes for which the CEA was enacted and is contradicted by Kalshi's own assertions.

When statutory interpretation is at issue, courts begin their analysis by construing the text of the statute. *See Bartenwerfer v. Buckley*, 598 U.S. 69, 74, 143 S. Ct. 665, 671, 214 L. Ed. 2d 434 (2023). Where the language is ambiguous, courts are charged with resolving the ambiguity and finding "the interpretation that is 'more consistent with the broader context' and 'primary purpose' of the statute." *See Connell v. Lima Corp.,* 988 F.3d 1089, 1097 (9th Cir. 2021) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 345-46, 117 S. Ct. 843, 136 L.Ed.2d 808 (1997). But even when a provision is unambiguous, a court resorts to legislative history "where the legislative history clearly indicates that Congress meant

something other than what it said." *See Amalgamated Transit Union Loc. 1309, AFL-CIO v. Laidlaw Transit Servs., Inc.,* 448 F.3d 1092, 1094 (9th Cir. 2006) (internal citations omitted). As will be discussed in greater detail in section 2 below, the legislative history of CEA does not support Kalshi's theories of preemption.

Congress' intention is further evidenced by the "Findings" and "Purpose" of the CEA which were to ensure fair and financially secure trading facilities and protect market participants from fraudulent or other abusive sales practices. *See* 7 U.S.C. 5(a)(b). And since courts must interpret statutes as a whole, every effort should be made not to construe a provision in a manner that renders the other provisions meaningless, inconsistent, or superfluous. *See Rodriguez v. Sony Computer Ent. Am., LLC*, 801 F.3d 1045, 1051 (9th Cir. 2015). Put simply, these subsections when read in conjunction with the "exclusive jurisdiction" provision fail to elucidate a clear and manifest Congressional intent to usurp the states' police power to impose gaming laws for public health, safety and welfare.

Further, in attempting to differentiate congressional control (election betting) contracts from "gaming" contracts that are subject to exclusion under the CEA's Special Rule (7 U.S.C. 7a-2(c)(5)(C)(i)), Kalshi argued to the D.C. District Court that "[t]he only relevant legislative history . . . confirms that contracts on 'sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament' were precisely what Congress had in mind as 'gaming' contracts." *KalshiEX, LLC v. Commodity Futures Trading Commission,*[11] Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, 2024 WL 397419, 12-13 (D.D.C. Jan. 25, 2024). Kalshi argued this point again before the Court of Appeals[12] (*See* ECF No. 18 at 2) stating "an event contract . . . involves 'gaming' if it is contingent on a game or a game-related event—like the Kentucky Derby, Super Bowl, or Masters golf tournament . . ." Appellee Brief, 2024 WL 4802698, *17 (D.C. Cir. Nov. 15, 2024).

/ / /

---

[11] No. CV 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024).
[12] 119 F.4th 58 (D.C. Cir. 2024).

Whether or not the Court construes the CEA as ambiguous, the legislative history sheds further light on Congress' purpose for enacting it.

### 2. The Commodity Exchange Act's legislative history shows no intent to preempt Nevada's gaming laws

Despite the Act's clear text, Kalshi scours the legislative record for any statement that might, at first blush, show Congress intended for the CEA's preemption of Nevada's *gaming* laws. *See* ECF No. 18 at 13-16. But there is no such extra-textual evidence. To the extent Kalshi relies on legislative history, the Court should disregard it completely.

To start, the Court need not consider remarks by individual legislators—namely, the statements of Senators Clark, Curtis, and Talmadge—that Kalshi plucks out of context. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) ("[E]ven those of who believe that clear legislative history can 'illuminate ambiguous text' won't allow 'ambiguous legislative history to muddy clear statutory language.'" (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011)). After all, "[w]hat Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators" in congressional debates or reports. *N.L.R.B. v. SW Gen., Inc.,* 580 U.S. 288, 306 (2017) (declining to consider extra-textual evidence (*i.e.*, legislative history) after concluding that disputed statutory text was "clear"); *See also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

For example, Kalshi cites remarks by Senator Dick Clark, one of the Act's sponsors, to assert that "Congress sought to prevent the 'chaos' that would result from subjecting futures trading to a patchwork of conflicting state laws."[13] Senator Clark's statement is not relevant to, much less controlling, on the issue of federal preemption of state *gaming* laws. Ultimately, "floor statements by individual legislators rank among the least illuminating forms of legislative history." *SW Gen., Inc.,* 580 U.S. at 307 (citation omitted); *See also*

---

[13] ECF No. 18 at 2; *See also Id.* at 4, 14.

*Weinberger v. Rossi*, 456 U.S. 25, 35 & n.15 (1982) ("The contemporaneous remarks of a sponsor of legislation are certainly not controlling in analyzing legislative history.").

In any event, Kalshi has plucked Senator Clark's statement about the regulatory "chaos" of "different State laws" out of context. In its proper context, this statement grappled with a narrower preemption debate: whether the Act should "deprive the Federal courts of their jurisdiction under the *antitrust* laws and [] deprive Federal and State courts of jurisdiction to enforce *contract and commercial law* rights."[14]  Senator Clark framed this statement as a leading question for Mr. Willett Clark, a securities law professor, who was testifying about the need for the Act to preempt state *securities* regulations: "The Constitution's majestic vision of this country as one country in matters of commerce, . . . is being clouded at the present time by . . . State attempts to regulate commodities markets under the guise of *securities* regulation."[15] And even then, one could read the Act's legislative history to cut both for and against preemption of state laws concerning securities, contracts, and corporate law.[16]

Defendants are seeking to enforce Nevada's gaming laws under Title 41 of the NRS. Kalshi does not point to any legislative history, including the congressional reports and law review articles cited in the Motion, supporting its position that legislators sought to preempt state gaming and election laws through the CEA.[17] At best, the legislative record shows brief instances where legislators conceptually distinguished futures markets from gaming, in that one's risk analysis differs fundamentally between the contexts of poker (impulsive, self-created risk) and speculation in commodity markets (empirically grounded

---

[14] *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry,* 93d Cong., 2d Sess. 663 (May 21, 1974) (statement of Deputy Asst. Atty. Gen. Clearwaters) (emphases added).

[15] *Id.* at 681 (statement of Mr. Willett Clark) (emphasis added), 685 (statement of Sen. Clark); *See also Id.* at 680 ("I am urging that to the extent that Federal and State securities statutes impinge on the same area as does the Commodity Exchange Act, the Commodity Exchange Act and its enforcement organ should be exclusive.").

[16] *See Id.* at 664 (statement of Chairman/Sen. Talmadge) ("I doubt that this committee, and I doubt the House had in mind depriving either Federal courts or jurisdictions in antitrust matters, or any other matter, and certainly not State courts.").

[17] *See* ECF No. 18 at 13-15.

in economic trends).[18]  Without plain-text references to states' police power over gaming or any legislative history to the contrary, Kalshi cannot conjure out of thin air additional areas of federal preemption. *See Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1054 (9th Cir. 2018) ("Further, the doctrine of *expressio unius est exclusio alterius* as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions." (citations and quotation marks omitted)).

Based on the preceding considerations, neither the language nor legislative history of the CEA demonstrate a congressional intent to preempt Nevada gaming law or election laws.

### 3.    Congress did not intend for the Commodity Exchange Act to occupy the field of gaming regulation

"In all preemption cases, and particularly in those in which Congress has legislated ... in a field which the States have traditionally occupied, ... [courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *See Wyeth v. Levine,* 555 U.S. 555, 129 S. Ct. 1187, 1194–95, 173 L.Ed.2d 51 (2009) (internal quotation marks and citations omitted) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S. Ct. 2240, 135 L.Ed.2d 700 (1996)). A state's "'intangible rights of allocation, exclusion, and control'—its prerogatives over who should get a benefit and who should not . . . 'amount to no more and no less than' the State's 'sovereign power to regulate.'" *See Kelly v. United States*, 590 U.S. 391, 400–01, 140 S. Ct. 1565, 1572, 206 L. Ed. 2d 882 (2020)(internal citations omitted); *also See Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (noting that "the regulation of gambling lies at the heart of the state's police power" (cleaned up)); *Ottenheimer v. Real Est. Div. of Nevada Dep't of Com.,* 91 Nev. 338,

---

[18] *See, e.g., Id.* at 326 (statement of Carlos Bradley) ("Speculation thus differs fundamentally from gambling in this important particular: . . ."), 373 (statement of Sen. Humphrey) (stating that the Act's "establishment of a futures contract market must . . . not permit the legalization of sort of a 'crap game,' a gambling game").

341–42, 535 P.2d 1284, 1285 (1975)("[T]he State through its police powers may regulate business activities for the protection of the public.")(internal citations omitted).

For the reasons previously discussed, neither the legislative history nor the text of the statute demonstrate a clear and manifest purpose of Congress to preempt the field of gaming regulation with the passage of the CEA. *See* ECF No. 18, 13-15. Nevada's gaming laws do not constrain Kalshi participation in the commodities futures market. Nor does it interfere with CEA's ability to oversee commodities participants; to "prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to this chapter and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants." 7 U.S.C. 5(b); *also See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251 (2013) (even with an express preemption clause, the FAAA did not preempt state law claims because they were not sufficiently connected).

Further, Kalshi failed to demonstrate how CFTC's comprehensive regulatory scheme concerning derivative markets is somehow negated by NGCB's enforcement of gaming laws. ECF No. 18 at 16. A more accurate depiction includes the two schemes working in tandem pursuant to the concept of dual federalism to create public confidence and trust in both spheres. Certainly, eighty-nine years of the CEA not infringing on states' rights to regulate, even completely ban, gaming activity proves that Congress did not intend for the Act to do so. For these reasons, Kalshi's field preemption claim fails.

### 4. Conflict preemption is inapplicable because enforcement of Nevada gaming laws does not create an obstacle to the purpose and objective of the Commodity Exchange Act

Obstacle preemption is a subset of implied preemption. In assessing whether obstacle preemption has occurred, courts "employ [their] 'judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.'" *United States v. California*, 921 F.3d 865, 879 (9th Cir. 2019) (internal citations

omitted)(internal citations omitted).  An "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives' . . ." *Id.* (internal citations omitted).  Rather "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal act." *Id.* (internal citations omitted).  In other words, obstacle preemption will only attach if the state laws impose an obstructive, not insignificant  burden on federal activities.  *United States v. California*, 921 F.3d 865, 880 (9th Cir. 2019).

Kalshi identifies four reasons that purportedly undermine the purpose of the CEA but none of those reasons justify the application of conflict preemption. ECF No. 18, 18-21.

First, Kalshi asserts that Congress enacted the CEA to bring futures markets under a uniform regulatory scheme. ECF No. 18 at 18.  It also asserts that a contract market could not operate efficiently if varying or contradictory legal standards governed its duties to investors. *Id.* The State of Nevada is not an investor. It is a sovereign entity. And while Congress has the power to regulate individuals, it does not have the power to regulate states. *See Murphy v. NCAA*, —— U.S. ——, 138 S. Ct. 1461, 1476, 200 L.Ed.2d 854 (2018). This is consistent with the Tenth Amendment which reserves to the States "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States..." U.S. Const. amend. X.  Put another way, Congress cannot commandeer the states by issuing orders to compel facilitation or adoption of preferred federal regulatory programs. *See New York v. United States,* 505 U.S. 144, 161-62 (1992). The NGCB was created by the Nevada legislature in 1955, and Congress created the CFTC in 1974. The NGCB is not aware of any instance when the CFTC, or its predecessor, ever claimed that Nevada's gaming laws were preventing compliance with the CEA. Consequently, Kalshi cannot be permitted to create this scenario and then allege that Nevada's gaming laws preclude Kalshi's compliance with CEA's regulatory scheme. Indeed, CFTC still requires applications to determine who is qualified to operate as a designated exchange. It still imposes recordkeeping requirements, reporting obligations, and penalties for non-compliance.

Simply put, enforcement of Nevada gaming laws on Kalshi does not disrupt the actions of the CFTC.

Second, Kalshi contends that when states adopt a method of enforcement that differs from the enforcement method adopted by Congress to achieve its goals, preemption is required to avoid conflicts with the federal scheme. ECF No. 18, 18-19. Kalshi's premise is flawed. It equates the imposition of state penalties to the displacement of federal penalties. They are not mutually exclusive. Enforcement of Nevada gaming law does not preclude CFTC from continuing to regulate commodity futures. Similarly, Nevada gaming laws do not preclude Kalshi from complying with the CFTC, except when Kalshi attempts to disguise state-regulated gaming activity as commodities. Eighty-nine years of the CEA, seventy years of the NGCB, and fifty-one years of the CFTC provide ample historical prove of those facts.

Third, Kalshi concludes that since its political events contracts and sports related contracts are authorized, it would create a preemptive conflict if Nevada prohibited them. ECF No. 18 at 20. Kalshi continues to conflate commodity futures regulations with gaming regulations. CFTC has no authority to authorize Kalshi to engage in unlicensed gaming activity in the State of Nevada. Nor does the fact that Kalshi's event contracts are overseen by CFTC pursuant to a commodity futures regulatory scheme negate NGCB's authority pursuant to the state's police power to regulate entities conducting business within its jurisdiction.

Finally, Kalshi asserts that CFTC's Core Principles require it to provide its members with impartial access to its markets and services. ECF No. 18 at 20 citing 17 C.F.R. §§38.150, 38.151(b). But absent a gaming license issued by the NGC, Kalshi does not have a market for event-based contracts related to gaming, sports pools, and race books, in Nevada. Furthermore, Nevada law does not allow a market for event-based contracts on election outcomes.

For the preceding reasons, enforcement of Nevada gaming laws do not impose an obstacle to the purpose or objectives of CEA.

**B.    Public policy mandates that Nevada continue strictly regulating the gaming industry**

There are many reasons why Nevada strictly regulates gaming and why it is important that activities related to gaming must be licensed.

If an entity, such as Kalshi, directly makes use of Nevada gaming, i.e., sports pools, in its business model without possessing a gaming license a big hole is created in Nevada's regulatory structure. Nevada's legislature has carefully crafted the law in this state to ensure that every aspect of gaming related activity is regulated and conducted with integrity and consumer protections.

For instance, Nevada has a structure in place to resolve patron disputes. NRS 463.362 *et seq.* Patrons of licensed gaming establishments may utilize a process with the Board to resolve disputes related to wagering activities. However, this structure is in place only for disputes between a Nevada licensee and its patron. NRS 463.362. The purchaser in a Kalshi transaction is not a patron of a Nevada licensed sports book and, thus, pursuant to the applicable statutes, has no recourse should there be a dispute. Protections are inherent in Nevada's all-encompassing Gaming Control Act and advance the public policy of protecting consumers. Any business model, including Kalshi's, that does not allow for protection of the consumer is clearly outside the statutory scheme intended for gaming in this State and is a threat to the public policy so vital to its operation.

In that same regard, both Nevada and the Fedal Government require casinos to have strong Anti-Money Laundering (AML) and Know Your Customer (KYC) protections. The requirements support the public policy of, inter alia, maintaining the integrity of gaming. Certainly, Congress would not have intentionally created a loophole for entities like Kalshi to skirt such essential legal protections.

For example, Nevada requires its licensed sports books to (1) obtain certain identification information from patrons who place wagers of a certain size, (2) prevent multiple wagers designed to circumvent the identification requirements for wagers of a certain size, and (3) prevent wagers structured to circumvent the identification

requirements. Nev. Gam'g Comm. Regs. 22.061, 22.062, and 22.063. Moreover, Nevada requires its licensed books to report suspicious activity. Nev. Gam'g Comm. Reg. 22.121. Licensed books are required to adhere to internal control procedures. Nev. Gam'g Comm. Regs. 6.090 and 6.100. A licensed book is prohibited from accepting wagers on an event from an official, owner, coach, or staff of a participant or team or participant in that event. Nev. Gam'g Comm. Reg. 22.1205. Currently, Kalshi: (1) does not require its patrons to be 21 years of age or older to place a wager in its markets (but see NRS 463.350); (2) does not prohibit wagers placed on an event from owners, coaches, players, or officials participating in the event (Nev. Gam'g Comm'n Reg. 22.1205); (3) does not pay taxes on gross gaming revenue derived from wagers made from Nevada; (4) has not undergone Nevada's rigorous licensing process for its wagering activities; (5) does not have a physical location in Nevada, unlike all other entities accepting wagers from Nevada; and (6) does not communicate about potential evidence of match fixing or point shaving to Nevada regulatory authorities. As an unlicensed entity, these important and necessary protections would not apply to Kalshi and the operation of Kalshi's business model is an effort to circumvent all of the protections that licensed gaming provides. Included in those protections is the NGCB requirement that licensed gaming entities and individuals must adhere to all federal, state and local laws.

In the Federal arena, casinos are defined as financial institutions under the Bank Secrecy Act (BSA) and regulated by the Financial Crimes Enforcement Network (FinCEN). *See* 31 U.S.C. §5311, *et seq*. Among many other requirements, casinos must make reports of suspicious activity (SARs). *See* 31 C.F.R. §1021.320. As an unlicensed entity, Kalshi is not subject to these AML and KYC requirements. Congress certainly did not intend for the CEA to create a loophole for entities like Kalshi to engage in gaming activity without proper KYC protocols and monitoring of customers' source of funds.

In short, the Board is charged by statute to strictly regulate gaming in Nevada to protect the reputation of the State of Nevada, to protect the reputation of gaming in Nevada, and to protect the public health, safety, morals, good order, and general welfare of

the inhabitants of Nevada. Kalshi's activities constitute wagering and, thus, gaming. These activities require licensure and regulatory oversight. Because Kalshi's activities carry a large risk to the strict regulation of gaming in Nevada and the welfare of Nevada's inhabitants, its request for extraordinary relief should be denied.

### C. Kalshi is judicially estopped from challenging the application of Nevada gaming law to some of its events based contracts

Kalshi is judicially estopped from arguing that gaming does not specifically encompass event based contracts on sports. "The doctrine of judicial estoppel is an equitable doctrine a court may invoke to protect the integrity of the judicial process." *United Nat. Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 778–79 (9th Cir. 2009) (internal citation omitted). It "not only bars inconsistent positions taken in the same litigation, but 'bar[s] litigants from making incompatible statements in two different cases." *Id.* (internal citations omitted).

When trying to argue that elections are not "gaming", Kalshi is on record to the D.C. Court of Appeals stating that:

> An event contract thus involves "gaming" if it is contingent on a game or a game-related event. App.107. The classic example is a contract on the outcome of a sporting event; as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets. Elections, by contrast, are not games or related to games. They are not staged for entertainment, diversion, or sport. The Congressional Control Contracts are thus not subject to public-interest review under the "gaming" exception.

Appellee Brief, 2024 WL 4802698, *17 (D.C. Cir. Nov. 15, 2024).

Based on these statements and those referenced in section I(A)(1) above, judicial estoppel should apply to Kalshi's claims.,

## II. Kalshi cannot clearly show it suffered irreparable harm

In seeking a TRO and preliminary injunction, Kalshi must make a "clear showing" that, absent injunctive relief, it suffers irreparable harm that is both likely and imminent. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) ("[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction.");

*Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999) (en banc) ("The Supreme Court has repeatedly cautioned that, absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to conduct its business in a particular way."). And because Kalshi "seeks to enjoin a government agency, '[its] case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs.'" *Midgett v. Tri-County Metro. Transp. Dist. of Or.*, 254 F.3d 846, 850 (9th Cir. 2001) (quoting *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976)). "This 'well-established rule' bars federal courts from interfering with non-federal government operations in the absence of facts showing an immediate threat of substantial injury." *Id.* (quoting *Hodgers-Durgin*, 199 F.3d at 1042-43).

Here, Kalshi chose to violate Nevada gaming laws. And after receiving the Board's cease-and-desist letter and even securing an extended response deadline, Kalshi did not timely comply with the NGCB's letter. Instead, Kalshi chose to continue its actions, and decided to ask this Court to issue a TRO and preliminary injunction—extraordinary equitable remedies—to facilitate Kalshi's illegal conduct. This foul play, alone, torpedoes Kalshi's ability to establish irreparable harm and enjoin the Board's "dispatch of its own internal affairs." *Midgett*, 254 F.3d at 850. Further still, preliminary injunctive relief is unwarranted here because Kalshi largely seeks relief for non-irreparable *monetary* and *reputational* harms; harms which Kalshi itself has created.

### A. The Board's lawful enforcement of Nevada gaming laws, designed to prevent illegal acts like Kalshi's does not create irreparable harm

Through its Motion, Kalshi effectively asks this Court to halt Nevada's lawful enforcement efforts in order to bless Kalshi's illegal activities as an unlicensed sports pool. *See Midgett*, 254 F.3d at 850. Kalshi asks the Court to preliminarily enjoin the Board from enforcing NRS 463.0193, 463.01962, 463.160, 463.245, 463.360, 465.086, 465.092, and 293.830, and Nevada Gaming Regulation 22.1205(3), or any other Nevada law that attempts to effectively regulate Plaintiff's futures market (ECF No. 1 at 17)—duly enacted gaming statutes and regs—in response to Kalshi's own statutory violations. Kalshi cannot

use this Court's inherent equitable powers to rubberstamp its own violations—an illegal status quo that Nevada's gaming laws were designed to prevent. *See John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 203-04 (D.D.C. 2017) (finding lack of irreparable harm in part because, even in "cases involving enforcement actions pursued in an unconstitutional manner or by an unconstitutional," "having to submit oneself to an enforcement proceeding typically does not constitute irreparable harm" (citing *Jarkesy v. SEC*, 803 F.3d 9, 26 (D.C. Cir. 2015)); *cf. Original Invs., LLC v State*, 542 F. Supp. 3d 1230, 1233-35 (W.D. Okla. 2021) (denying equitable relief because "[i]t is well-settled . . . that 'a court won't use its equitable power to facilitate illegal conduct.'"); *U.S. v. City of Los Angeles*, 595 F.2d 1386, 1391 (9th Cir. 1979) (suggesting preliminary injunctions are inappropriate to maintain an illegal status quo that a challenged "statute was designed to disrupt"). Conversely, any chance that Kalshi, as a result of NGCB action, will have to submit to federal (CFTC) enforcement actions—regulatory powers Kalshi does not challenge –do not constitute irreparable harm. *See* ECF No. 18 at 24; *John Doe Co.*, 235 F. Supp. 3d at 203-04; *Jarkesy*, 803 F.3d at 26, 28.

Even if Kalshi were not seeking injunctive relief to bless its own illegal acts, the Nevada gaming laws at issue are not preempted, and the Board's valid enforcement actions are not "unconstitutional." *See supra*, § _#_; ECF No. 18 at 21-22. The two cases that Kalshi cites are inapposite. First, in *Valle del Sol v. Whiting*, 732 F.3d 1006, 1012, 1022, 1029 (9th Cir. 2013), those plaintiffs seeking preliminary relief challenged a state law that *both* violated an independent constitutional provision *and* was preempted by federal law. *See* ECF No. 18 at 21; *Valle del Sol Inc.*, 732 F.3d at 1012, 1022, 1029 (affirming preliminary injunction after concluding that Arizona criminal statute was both void for vagueness under the Due Process Clause and preempted by federal criminal laws).

And second, the facts of this case materially differ from the more "imminent" enforcement threat at issue in *Morales*. In *Morales*, the plaintiff airline companies sought a preliminary injunction against states' enforcement actions, but did so only after the state attorneys general had sent them letters "serving 'as formal notice[s] of intent to sue'" based on preempted state fare-advertising laws that imposed additional liability for multiple

violations. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 380-81 (1992). Yet here, the Board merely issued a cease-and-desist letter informing Kalshi of its unlawful actions, and then agreed to grant Kalshi additional time to respond to the letter. *See* ECF No. 18 at 12. The Board did not formally notify Kalshi of its intent to immediately sue or criminally prosecute. *See Morales*, 504 U.S. at 380. Beyond the cease-and-desist letter, the Board has done nothing to escalate its enforcement actions anywhere near the inflection point in *Morales*, which led the Court to observe that the states' enforcement actions were "imminent." *Morales*, 504 U.S. at 381.

**B.** **Neither economic nor reputational losses establish irreparable harm**

Kalshi goes on to lament the purported loss of a commercial partnership with Robinhood, "forego[ne] business" generally, and "tens of millions of dollars annually" spent to "implement geolocation capabilities" to comply with Nevada law. ECF Nos. 18 at 22-24; 18-1 at 6, 13. Yet "such monetary injury is not normally considered irreparable." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football* League, 634 F.2d 1197, 1202 (9th Cir. 1980). Further, Kalshi provides no *factual* showing of *irreparable* monetary harms beyond the unsubstantiated statements of Mr. Xavier Sottile, Kalshi's Head of Markets. If anything, more questions than answers emerge from Mr. Sottile's statements. For example, would the purported "tens of millions of dollars annually" spent on geolocation implementation (for "10,000 Nevada users") torpedo Kalshi's entire existence, or is it a mere drop in Kalshi's revenue bucket? *See Doran v. Salem Inn, Inc.*, 472 U.S. 922, 932 (1975) (affirming preliminary injunction because "absent preliminary injunction [plaintiffs, who each operated a local topless dancing bar,] would suffer a substantial loss of business and perhaps even bankruptcy" by overbroad ordinance banning topless dancing). Similarly, what is the degree of monetary harm caused by the alleged loss of a partnership with Robinhood? Kalshi has not at all clarified the degree of alleged monetary harm. But even assuming "extensive" monetary harms would result from future Board enforcement action, ECF No. 18 at 23, Kalshi cannot avoid its burden to clearly demonstrate "a significant

threat of irreparable injury, irrespective of the magnitude of the injury," *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999) (citation omitted).[19]

Nor can Kalshi clearly show, through proffered evidence, that any loss of customer "goodwill" "constitutes a distinct form of irreparable harm." ECF No. 18 at 24. Kalshi's allegations of lost customer goodwill are not grounded in any evidence and thus speculative. One of the very cases Kalshi cites on this issue—*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013)—reveals just that. It may be that "[e]vidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm." 736 F.3d at 1250 (citation omitted). But a keyword in *Herb Reed* is "*evidence.*" In this case, like in *Herb Reed*, "missing from this record is any such evidence." *Id.* Offering only conclusory statements about reputational harm, ECF Nos. 18-1 at 13; 18 at 23-24, Kalshi simply cites as support two other cases with very different facts and claims (trademark and copyright infringement) to show that it has suffered irreparable reputation harm. *See generally Herb Reed*; *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017). By far, this is not a "clear showing" of likely irreparable harm. *Winter,* 555 U.S. at 22; *Midgett*, 254 F.3d at 850. "As with [Kalshi's] speculation on future harm, citation to a different case with a different record does not meet the standard of showing 'likely' irreparable harm." *Herb Reed*, 736 F.3d at 1250 (reversing preliminary injunction and remanding because plaintiff had failed to show likely irreparable harm); *but See Disney*, 869 F.3d at 854, 866 (finding irreparable harm given plaintiff's "substantial," "uncontroverted evidence" that plaintiff had improperly streamed defendant's copyrighted works).

/ / /

/ / /

/ / /

---

[19] Kalshi also cannot establish irreparable harm on behalf of its users, whose contracts, Kalshi alleges, would need to be either modified or unilaterally terminated. *See* ECF No. 18 at 23. Kalshi makes no argument that it has, as a prudential matter, third-party standing to sue on its customers' behalf.

### III.    Balancing of the equities and the public interest warrant denial of Kalshi's motion

As already discussed, it is vital that all gaming activity which takes place in Nevada or activity which is related to a licensed gaming establishment is strictly regulated and licensed.  "It is established beyond question that gaming is a matter of privilege conferred by the State rather than a matter of right." *State v. Rosenthal*, 93 Nev. 36, 40, 559 P.2d 830, 833 (1977). "Public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments…" NRS 463.0129(1)(c). "All establishments where gaming is conducted… must therefore be licensed, controlled and assisted to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State…" NRS 463.0129(1)(d). An activity which reflects "discredit upon the State of Nevada or the gaming industry…" may be deemed an unsuitable method of operation by the NGCB and Nevada Gaming Commission. Because Kalshi is not licensed and its business model facilitates illegal gaming activities, the Court should deny Kalshi's motion.

### IV.    State Defendants' countermotion for preliminary injunction should be granted[20]

For all of the reasons argued in response to Kalshi's motion, State Defendants have met the standards for injunctive relief.

First, State Defendants have shown a likelihood of success on the merits.  The text of the statute, its purpose, and the legislative history support State Defendants' contention that the CEA does not preempt Nevada gaming laws under the Supremacy Clause. Kalshi grounds its position on an untenable, ahistorical understanding of the regulation of the commodity futures market and fails to show a clear Congressional intent that the CEA preempt Nevada gaming law. *See supra* Argument Part I. Kalshi's activity constitutes gaming under Nevada law. At a minimum, the "event-based contracts" at issue here are

---

[20] State Defendants reserve all rights to assert additional arguments against Kalshi including other state and federal claims.

percentage games and/or sports pools that are subject to regulation under Nevada gaming law. *See* NRS 463.160; NRS. 463.0152; NRS 465.092. Moreover, those contracts also constitute wagers under NRS 463.01962. A wager is a sum of money risked on an occurrence—like the results of a sporting event or an election—for which the outcome is uncertain. NRS 463.01962; *See also* NRS 293.830; NRS 465.092. And it is undisputed that Kalshi does not possess a Nevada gaming license. State Defendants therefore are likely to prevail on the question whether Kalshi's conduct—offering event-based contracts pertaining to games, sports, pools, race books, and election outcomes in Nevada—is subject to Nevada's legal framework regulating gaming activity in Nevada.

Second, State Defendants have also shown irreparable harm. Nevada heavily regulates gaming industry in Nevada to preserve public trust and confidence and to protect the State's reputation. *See supra* Argument I(B). Absent the controls that the gaming laws impart, accountability and recourse for harms dissipate. For instance, Kalshi is apparently taking contracts on the outcome of elections and sporting events from persons in Nevada who are 18 through 20 years of age. Nevada law strictly prohibits gaming activity by persons under the age of 21. Consequently, allowing Kalshi to continue blatantly violating Nevada's public safety law while licensed regulated establishments in Nevada are forbidden from gaming activity from those 18 through 20 years of age is a clear example of immediate and irreparable harm to Nevada's licensed gaming industry and the protection of Nevada's citizens and visitors.

Allowing Kalshi to continue violating Nevada gaming law, thereby depriving Nevada of its authority to regulate gaming activity within its own borders, irreparably harms the sovereign interests of Nevada. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

Finally, balancing the equities in conjunction with the public interest in maintaining accountability in the gaming industry, the State Defendants' countermotion for preliminary injunction should be granted. As the State Defendants have argued above,

Kalshi fails to show that it will suffer irreparable harm if it is required to abide by Nevada gaming law. *See supra* Argument II. And allowing Kalshi to continue engaging in unlicensed gaming activity is against the public interest.

For those reasons, this Court should enter an immediate temporary restraining order and preliminary injunction to enjoin Kalshi from offering event-based contracts related to gaming, sports pools, and race books in Nevada unless and until approved as licensed gaming by the Nevada Gaming Commission and to enjoin Kalshi from offering event-based contracts on election outcomes in Nevada.

## CONCLUSION

For the preceding reasons, State Defendants request that Kalshi's motion be denied and their countermotion for injunctive relief be granted

DATED this 4th day of April, 2025.

AARON D. FORD
Attorney General

By: */s/ Sabrena K. Clinton*
    Jessica E. Whelan (Bar No. 14781)
      Chief Deputy Solicitor General  Litigation
    Sabrena K. Clinton (Bar No. 6499)
      Senior Deputy Attorney General
    Devin A. Oliver (Bar No. 16773C)
      Deputy Solicitor General
    State of Nevada
    Office of the Attorney General
    1 State of Nevada Way, Suite 100
    Las Vegas, NV 89119
    (702) 486-3420 (phone)
    (702) 486-3773 (fax)
    jwhelan@ag.nv.gov
    sclinton@ag.nv.gov
    doliver@ag.nv.gov

*Attorneys for Kirk D. Hendrick, George Assad, Chandeni K. Sendall, Nevada Gaming Control Board, Jennifer Togliatti, Rosa Solis-Rainey, Brian Krolicki, George Markantonis, Abbi Silver, Nevada Gaming Control Commission and Aaron D. Ford.*