D. Lee Roberts, Jr., Esq.
Nevada Bar No. 8877
*lroberts@wwhgd.com*
WEINBERG, WHEELER, HUDGINS,
  GUNN & DIAL, LLC
6385 South Rainbow Blvd., Suite 400
Las Vegas, Nevada 89118
Telephone: (702) 938-3838
Facsimile: (702) 938-3864

Neal Kumar Katyal, Esq.
(admitted *pro hac vice*)
Joshua B. Sterling, Esq.
(admitted *pro hac vice*)
William E. Havemann, Esq.
(admitted *pro hac vice*)
MILBANK LLP
1850 K Street, Suite 1100
Washington, D.C. 20006
(202) 835-7505
(213) 629-5063 FAX

Mackenzie Austin, Esq.
(admitted *pro hac vice*)
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
(424) 386-4000
(213) 629-5063 FAX

*Attorneys for Plaintiff KalshiEX LLC*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| KALSHIEX, LLC, | Case No.:2:25-cv-00575-APG-BNW |
| Plaintiff, | |
| vs. | |
| KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in his official capacity as a Member of the Nevada Gaming Control Board; CHANDENI K. SENDALL, in her official capacity as a Member of the Nevada Gaming Control Board; NEVADA GAMING CONTROL BOARD; JENNIFER TOGLIATTI, in her official capacity as Chair of the Nevada Gaming Commission; ROSA SOLIS-RAINEY, in her official capacity as a Member of the Nevada Gaming Commission; BRIAN | **PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR AN IMMEDIATE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

KROLICKI, in his official capacity as a Member of the Nevada Gaming Commission GEORGE MARKANTONIS, in his official capacity as a Member of the Nevada Gaming Commission; ABBI SILVER, in her official capacity as a Member of the Nevada Gaming Commission;    NEVADA    GAMING COMMISSION; AARON D. FORD, in his official capacity as Attorney General of Nevada,

Defendants.

## INTRODUCTION

Defendants' Opposition underscores that a temporary restraining order ("TRO") and preliminary injunction are needed. Defendants barely address Kalshi's political-event contracts, thus forfeiting the issue. And Defendants rest their case as to sports-event contracts on a basic misunderstanding of Kalshi's position. Kalshi does not contend, as Defendants claim, that Congress in the Commodity Exchange Act ("CEA") preempted the *entire field of state gaming laws*. Instead, Congress preempted the field of *trading on CFTC-regulated exchanges like Kalshi*. State gaming laws as to all other entities are untouched. Defendants cannot overcome the statutory text showing that the CFTC has "exclusive jurisdiction" over trading on CFTC-regulated exchanges—indeed, Defendants conspicuously do not try. Nor do Defendants have any answer to Congress's purpose in the 1974 CEA amendments, which, as many courts have concluded, was to subject futures markets to a comprehensive federal regulatory scheme and avoid the chaos that would result from inconsistent state-level enforcement. Defendants muddy the waters by citing Kalshi's D.C. Circuit brief, but Kalshi's position in the D.C. litigation is the same as here—that Congress left it to the CFTC, not 50 separate states, to decide whether Kalshi's sports-event contracts should be authorized as comporting with the public interest. The CFTC has not attempted to bar Kalshi's contracts, and allowing states to step in to prohibit the very same contracts would present a clear conflict and a prototypical case for preemption.

Defendants fare just as poorly on the remaining equitable factors. Defendants fail to overcome the powerful evidence of irreparable harm outlined in the declaration filed by Kalshi's Head of Markets—which includes the harm of being subject to imminent criminal prosecution; the extraordinary harm Kalshi's users would suffer if their positions were suddenly paused or

WEINBERG WHEELER HUDGINS GUNN & DIAL

liquidated; the imperiling of Kalshi's CFTC designation; and the millions of dollars and untold reputational harm that Kalshi would incur absent an preliminary relief.  While Defendants claim that monetary harms are generally reparable, that is not true where Defendants are state officials insulated by the Eleventh Amendment from retrospective damages liability.  Without an injunction, Kalshi would have no apparent way to recoup the millions it would incur in damages even if it ultimately prevailed in this case.  And while Defendants claim that the public interest favors them given the protections afforded by its gaming laws, Kalshi already implements robust programs to ensure that its participants are covered by all of the protections they tout—including the Anti-Money-Laundering and Know-Your-Customer requirements.  A TRO and preliminary injunction are clearly warranted.[1]

## ARGUMENT

### A.  Defendants Fail To Make Any Argument Regarding Kalshi's Political-Event Contracts And Thus Forfeit Any Defense.

Kalshi's complaint and its motion for a TRO and preliminary injunction addressed in detail why the CEA preempts Nevada law with respect to Kalshi's political-event contracts. Kalshi explained that a federal district court last year held that the CFTC was *required* to approve these contracts under federal law, and that "[a]llowing Nevada to prohibit the very same political-event contracts that a federal court held the CFTC obligated to approve would be an extreme affront to federal authority."  Mot. 20.

Defendants entirely fail to respond to this argument.  While Defendants briefly mention political-event contracts in a handful of places scattered across their opposition, Defendants fail to join issue with Kalshi's preemption argument as applied to political-event contracts. Defendants never attempt to explain how allowing states to ban political-event contracts that a federal court approved could be consistent with the Supremacy Clause, and they never address the square conflict that would result from banning political-event contracts that the CEA permits.

---

[1] Defendants' contention that they have not been properly served is incorrect.  Ms. Jessica Whelan, one of the counsel listed on Defendants' Opposition, accepted service on behalf of all Defendants on April 3 and waived personal service of paper copies.

WEINBERG WHEELER HUDGINS GUNN & DIAL

For that reason, they have forfeited any argument that Nevada's laws are not preempted as applied to Kalshi's political-event contracts. *See Maciel v. Cate*, 731 F.3d 928, 932 n.4 (9th Cir. 2013) (party forfeits argument by failing to raise it in brief); *see also Doe v. Dickenson*, 615 F. Supp. 2d 1002, 1010 (D. Ariz. 2009) (party's failure to respond to arguments amounted to waiver). Kalshi is entitled to preliminary relief on that basis alone.

**B. Defendants' Arguments Underscore That Their Efforts To Regulate Kalshi's Sports-Event Contracts Are Preempted.**

*1. Nevada's laws are field-preempted as applied to Kalshi.* Defendants' argument regarding sports-event contracts is based on a fundamental misunderstanding of Kalshi's position. The State understands Kalshi to argue that Congress's grant of "exclusive jurisdiction" to the CFTC preempts the "entire field of *gaming laws*." Opp. 12 (emphasis added). Kalshi argues no such thing.

Instead, as Kalshi makes clear throughout its memorandum, the CEA preempts the field of *futures regulation on CFTC-designated contract markets*, known as DCMs. *See e.g.*, Motion at 13 ("The statutory text, legislative history, and comprehensive regulatory framework of the CEA clearly evince Congress's intent to occupy *the field of futures trading on CFTC-regulated exchanges*.") (emphasis added); *id*. at 15 (citing cases nationwide that hold that "Congress intended to preclude states from exercising parallel authority over *commodity futures trading in exchanges designated by the CFTC*.") (emphasis added)). This means that state attempts to regulate contracts traded on CFTC-regulated markets—whether via state gaming laws or otherwise—are preempted.

Defendants' misunderstanding of Kalshi's preemption claim dooms their analysis. *See, e.g.*, Opp. 11 ("Congress did not intend for the Commodity Exchange Act to occupy the field of gaming"). Kalshi *does not* contend that Nevada's or any other state's gaming laws are preempted as applied to entities that are not CFTC-regulated DCMs. Kalshi instead contends that state gaming laws *are* preempted as applied to exchanges like Kalshi subject to the CFTC's exclusive jurisdiction. As a result of their misunderstanding, Defendants make almost no effort to defend against Kalshi's actual argument. There is overwhelming evidence of Congress's intent to

WEINBERG WHEELER
HUDGINS GUNN & DIAL

preempt state attempts to regulate contracts traded on DCMs.

To begin, Defendants make no effort to grapple with the principal evidence of Congress's intent, the CEA's text, which grants the CFTC "exclusive jurisdiction" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A). This language could hardly be clearer as to Congress's intent to preempt state laws that would regulate Kalshi's sports-event contracts. Kalshi's contracts are "agreements" and "transactions" involving "swaps or contracts of sale of a commodity for future delivery" traded on a DCM. *See also* 7 U.S.C. § 1a(19)(iv)(I) (a "commodity" includes "an occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties" and associated with economic consequences); *id*. § 1a(47)(A)(ii) (a "swap" includes "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" associated with economic consequences). Defendants do not meaningfully dispute that this text encompasses Kalshi's event contracts.

Defendants likewise ignore the uniform precedent supporting Kalshi's position. The Seventh Circuit has held that a state law that "would directly affect trading on or the operation of a futures market" regulated by the CFTC "is preempted." *Am. Agric. Movement v. Board of Trade*, 977 F.2d 1147, 1156-57 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 (7th Cir. 1995). The D.C. Circuit similarly recognized that "the CFTC's jurisdiction was to be exclusive with regard to the trading of futures *on organized contract markets*." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) (emphasis in original). Writing for the Second Circuit, Judge Friendly likewise noted that the CEA "preempts the application of state law" for DCMs. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). Many other cases are in accord. *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co., Inc.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978); *Bartels v. Int'l Commodities Corp.*, 435 F.Supp. 865, 868-69 (D. Conn. 1977); *Int'l Trading Ltd. v. Bell*, 262 Ark. 244, 250-51 (1977); *Taylor v. Bear Stearns & Co.*, 572 F. Supp. 667, 673 (N.D.

WEINBERG WHEELER HUDGINS GUNN & DIAL

Ga. 1983). And the CFTC itself recently agreed that "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM." CFTC Brief at *27, *KalshiEx LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added). Defendants cite no authority suggesting the contrary.

Defendants lack a coherent response to the overwhelming evidence of Congress's purpose in enacting the 1974 Act. One "aim" of the 1974 Act was to "avoid unnecessary, overlapping and duplicative regulation" of DCMs. *Ken Roberts*, 276 F.3d at 588. In addition to fears about overlapping demands with the SEC, Congress worried that "the states . . . might step in to regulate the futures markets themselves." *Am. Agric. Movement*, 977 F.2d at 1156. This is not mere legislative history, as Defendants suggest. It is the obvious purpose of the 1974 Act as interpreted by federal courts in light of the statutory text.

The State claims (at 9) that this Court "should disregard" the legislative history of the 1974 Act. Kalshi agrees that this Court may resolve this case without considering the legislative history given the clear statutory text and purpose. But should the Court conclude that this text and purpose leave some ambiguity, the legislative history would eliminate it. *See Haro v. City of L.A.*, 745 F.3d 1249, 1257 (9th Cir. 2014) (courts may consider legislative history "when a statute is ambiguous"). The Senate *deleted* a provision that would have left states free to regulate DCMs, thereby raising a "compelling" inference that Congress did "not intend *sub silentio* to enact statutory language" that it had earlier discarded. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987); *see also* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge). Defendants accuse Kalshi of selectively quoting individual members of Congress, but fail to address the "*joint* explanatory statement" on the 1974 Amendments in the conference report: "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act … would *preempt the field insofar as futures regulation is concerned*." Senate Comm. On Agriculture, Nutrition and Forestry, 93d Cong., 2d Sess., Commodity Futures Trading Comm'n Act of 1974, at 11 (Comm. Print 1974) (emphasis added); *see Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 686–87 (9th Cir. 2006) (noting that a "committee report is entitled to considerably greater weight than comments made during floor

WEINBERG WHEELER HUDGINS GUNN & DIAL

debate"). And should the Court consider the floor debate, the sponsors of the 1974 Act likewise plainly sought to prevent the "total chaos" that would result from subjecting DCMs to 50 different state laws. Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). Defendants suggest (at 10) that these statements were concerned only with state "*antitrust*" and "*commercial*" law, but even if that were correct, it would not help Defendants; state laws regulating the gaming industry *are* commercial laws.

Defendants appear to suggest (at 10) that state laws regulating sports-event contracts on DCMs should be treated differently than other state laws that regulate trading on DCMs, conceding that the latter would be preempted but that the former should not be. That concession all but gives away the case. A statute that preempts state enforcement on DCMs preempts *all* state laws that affect trading on those markets. Defendants offer no coherent way to read the statute that would preempt most state laws regulating trading on DCMs but leave untouched state gaming laws regulating trading on DCMs.

*2. Nevada's laws are conflict-preempted as applied to Kalshi*. Defendants have no answer to the fact that subjecting Kalshi to Nevada state gambling laws would conflict with the CEA's comprehensive regulatory scheme. Defendants argue (at 13) that finding conflict preemption here would somehow "commandeer states by issuing orders to compel facilitation or adoption of preferred federal regulatory programs." That argument is difficult to understand. The Constitution's anticommandeering principle prohibits Congress from requiring states to enact or administer a federal regulatory program. *See New York v. United States*, 505 U.S. 144, 159-60 (1992). Preemption, by contrast, describes Congress's ability to supersede state law with federal law pursuant to the Supremacy Clause. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Finding preemption here would not force Nevada to enact or administer a federal regulatory scheme; it would simply prohibit Nevada from subjecting Kalshi to state laws that conflict with federal law. Congress's "power to preempt state law" is a "fundamental principle of the Constitution." *Valle del Sol v. Whiting, Inc.*, 732 F.3d 1006, 1022 (9th Cir. 2013). And, contrary to Defendants' assertion, nothing about Kalshi's position suggests that Nevada is "an investor" that Congress might be able to coerce as an "individual[]." Opp. 13.

Defendants claim that Nevada's and the CEA's differing enforcement mechanisms are "not mutually exclusive" because "[e]nforcement of Nevada gaming law does not preclude CFTC from continuing to regulate commodity futures." Opp. 14. The Ninth Circuit rejected this precise argument in *Valle del Sol*: Where Congress reserves "prosecutorial power" and "discretion" to federal authorities, a state regime that allows for state prosecutions of the same actions "conflicts with the federal scheme." 732 F.3d. at 1027. The Supreme Court likewise rejected this argument in *Arizona v. United States*, 567 U.S. 387 (2012). There, Congress granted federal authorities discretion with respect to arresting suspected undocumented aliens, which meant that state exercise of parallel arrest power "frustrate[d] federal policies." 567 U.S. at 402. Here, Congress granted the CFTC discretion to decide whether gaming event contracts are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i)(VI). Allowing Nevada—not to mention the other 49 states and D.C.—to substitute their understanding of the public interest for the CFTC's would create a direct conflict.

Defendants, moreover, hardly dispute that applying state law would create a conflict with CFTC regulations. The CFTC's core principles require DCMs to offer "impartial access" to markets, 17 C.F.R. §§ 38.150, 38.151(b), and prevent "market disruptions," 17 C.F.R. § 38.255. As Kalshi explained in detail in its opening memorandum, cutting off access to its markets to an entire state, including with respect to open contracts, would be hard to reconcile with these principles. Defendants' only response (at 14) is the non sequitur that, "absent a gaming license issued by the NGC, Kalshi does not have a market for event-based contracts related to gaming … in Nevada." But cutting off Kalshi's markets would conflict with the CFTC's core principles regardless of whether Kalshi has a state license; Defendants' contrary argument is unresponsive.

*3. The State's other arguments regarding sports-event contracts fail*. *First*, Defendants' estoppel argument can be easily rejected. Defendants appear to believe (at 17) that Kalshi's position is that its sports-event contracts do not involve "gaming" under the CEA's Special Rule for event contracts. 7 U.S.C. § 7a-2(c)(5)(C). Defendants then assert that this position would be inconsistent with Kalshi's position in the D.C. Circuit, where it acknowledged that sports-event contracts would involve "gaming." But Defendants misunderstand Kalshi's position in this case.

Kalshi does not contend that sports-event contracts do not involve "gaming" under the Special Rule.  Instead, even if these contracts involve gaming, that does not answer whether these contracts are federally authorized.  Instead, it triggers the CFTC's public-interest review.  *See id.* ("the Commission *may* determine" that event contracts "are contrary to the public interest" if they involve one of the enumerated categories) (emphasis added); *KalshiEX LLC v. CFTC*, No. CV 23-3257, 2024 WL 4164694, at *3 (D.D.C. Sept. 12, 2024) ("the CFTC may determine that an agreement, contract, or transaction is contrary to the public interest only if it involves" one of the enumerated categories).   Even assuming these contracts involve gaming, the CFTC nonetheless did not invoke its power to put the contracts under review to ascertain whether they were against the public interest.  *See* 17 C.F.R. § 40.11(c). The key point is that the decision whether these contracts comport with the public interest is a decision the CEA leaves to the policy judgment of the CFTC—not 50 different states.

*Second*, Defendants' real contention appears to be that Kalshi's sports-event contracts do not involve commodities, and that the CFTC therefore either should not have designated Kalshi as a DCM or should have prohibited Kalshi from offering sports-event contracts.  Defendants maintain, for example, that Kalshi is "disguis[ing] state-regulated gaming activity as commodities," Opp. 14, and that "Nevada's gaming laws do not constrain Kalshi participation in the commodities futures market," Opp. 12.

For one thing, the claim that sports-event contracts do not involve commodities as defined by the CEA is plainly wrong.  *See* 7 U.S.C. § 1a(19)(iv)(I) (a commodity includes "an occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties" and associated with economic consequences); *see also id.* § 1a(47)(A).  But, more important, Defendants' quibbles with the CFTC's decisions highlight why preemption applies here.  The question whether Kalshi's event contracts involve commodities under the CEA, or whether the CFTC should have approved Kalshi as a DCM, or whether the CFTC should have sought to bar Kalshi's sports-event contracts, are emphatically questions *for the CFTC to decide*.  Defendants' argument that sports-event contracts are not commodities under federal law underscores that Defendants are simply unsatisfied with the CFTC's decisions, and therefore wish to step in to

regulate Kalshi notwithstanding the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A).

*Third*, Defendants look to history for support, noting (at 13) that they are "not aware of any instance when the CFTC, or its predecessor, ever claimed that Nevada's gaming laws were preventing compliance with the CEA." *See also* Opp. 12 ("[E]ighty-nine years of the CEA not infringing on states' rights to regulate, even completely ban, gaming activity proves that Congress did not intend for the Act to do so."). But neither the Board nor any other state to Kalshi's knowledge has ever attempted to use state gaming laws to regulate contracts traded on DCMs in the 50 years since the CFTC was created. It is therefore completely unsurprising that this issue has not arisen before now.

*Fourth*, Defendants pluck portions of Kalshi's D.C. Circuit brief out of context to suggest that Kalshi believes sports-event contracts are unlawful. But Kalshi's position before the D.C. Circuit and this Court are the same. As Kalshi explained to the D.C. Circuit, "the CFTC's 'exclusive jurisdiction' over the derivatives markets preempts any state law that purports to prohibit the trading of a contract on a regulated exchange." Appellee Brief at *31, 2024 WL 4802698, (D.C. Cir. Nov. 15, 2024).

The D.C. Circuit appeal presents the question, among other things, whether Kalshi's political-event contracts involve "gaming" under the Special Rule. Kalshi argued—and the D.C. district court agreed—that these contracts do not involve gaming. In making that argument, Kalshi contrasted political-event contracts to sports-event contracts, which Kalshi acknowledged *do* involve gaming. Kalshi's brief noted that the legislative history indicated that Congress believed event contracts involving gaming may raise public-interest concerns. At the end of that discussion, however, Kalshi's brief made clear that the *consequence* of Congress's concern was that Congress "*empower[ed] the CFTC to at least review the category of game-based contracts*." Appellee Brief at *31, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024) (emphasis added). Congress did not ban gaming event contracts, but instead delegated the power to review those contracts to the CFTC based on the CFTC's discretionary judgment as to the public interest.

Kalshi noted in its brief that attitudes about gaming have changed dramatically since Congress enacted the Special Rule. As Kalshi's brief pointed out, "when Congress enacted the

Special Rule in 2010, sports betting was generally precluded by federal law; the landscape has since materially changed."  Appellee Brief at *45 n.13, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024).  The Supreme Court in 2018 allowed every state to legalize sports betting, a majority of states have done so, and sport betting is now a ubiquitous nationwide industry.  *See Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 486 (2018).  Thus, while Congress in 1974 or even 2010 may have expected the CFTC to conclude that gaming contracts do not serve the public interest, attitudes about gaming are far different today.  One of the reasons Congress granted the CFTC discretion to engage in public-interest review, rather than banning gaming contracts outright, was to allow the CFTC to account for precisely this kind of evolution.

## C.  Kalshi Faces Imminent Harm Based On The Fact Of The State's Cease-And-Desist Order And The State's Arguments To The Contrary Are A Farce.

Defendants cannot meaningfully dispute Kalshi's irreparable harm.  The Ninth Circuit has unequivocally held that "a credible threat of prosecution under" a preempted statute "establishe[s] a likelihood of irreparable harm."  *Valle del Sol*, 732 F.3d at 1029.  Contrary to Defendants' assertion, nothing about that reasoning turned on the fact that the state statute there was unconstitutional in two respects rather than one.  *See also Georgia Latino All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250, 1269 (11th Cir. 2012) (affirming irreparable harm where "plaintiffs are under the threat of state prosecution for crimes that conflict with federal law").

Likewise in *Morales*, the Supreme Court found relief warranted where plaintiffs were faced with "a Hobson's choice: continually violate the [state] law and expose themselves to potentially huge liability," or else "suffer the injury of obeying the law during the pendency of the proceedings and any further review."  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  Precisely the same reasoning applies here, and Defendants' efforts to distinguish *Morales* are conspicuously flimsy.  Defendants claim that this case differs from *Morales* because, there, the "attorneys general had sent [plaintiffs] letters serving as formal notices of intent to sue based on preempted state" laws.  Opp. 19 (cleaned up).  But the Board's cease-and-desist letter is, if anything, more threatening.  The letter declares that "all transgressions by Kalshi to date are in violation of Nevada law," that "any offenses by Kalshi after receipt of this

WEINBERG WHEELER HUDGINS GUNN & DIAL

letter shall be considered willful," and that "all state and local law enforcement and regulatory agencies in Nevada, expressly reserve all rights to pursue criminal and civil actions based on Kalshi's past and future conduct."  ECF 1-2.  Defendants' insistence that the letter is not "anywhere near" a threat of "imminent" enforcement (at 20) rings especially hollow given Defendants' express refusal to stay enforcement even for the short period needed for this Court to resolve Kalshi's motion for a preliminary injunction.  *See* ECF 31-5. Further, the continued availability of Kalshi's sports-event contracts in Nevada in the two weeks after receiving the letter is not "foul play." Opp. 18. It is, in fact, the result of the express "agree[ment]" that the parties made when trying to resolve the dispute before turning to this Court. Compl. ¶¶ 59-60.

Defendants claim that Kalshi has offered only "allegations" but no "evidence" of harm. Opp. 21.  To the contrary, Kalshi has submitted a detailed declaration from its Head of Markets detailing Kalshi's harm.  A declaration, unlike a complaint, is not a mere allegation; it is evidence. *See SEC v. Liu*, No. CV-16-974, 2016 WL 3679389, at *1 (C.D. Cal. July 11, 2016) (grating a TRO in light of "declarations and exhibits, and the other evidence").  Nor can Defendants defeat a TRO on the ground that the claimed harm is "speculative."  Opp. 21.  The declaration explains in detail why Kalshi will suffer irreparable harm no matter how it responds to the Board's threat.  The whole purpose of a TRO is to prevent "immediate and irreparable injury" from occurring *in the future*, Fed. R. Civ. P. 65(b)(1), so Defendants cannot defeat a TRO on the ground that Kalshi cannot show that the harm already occurred.

Defendants claim that Kalshi's harm is monetary, and they cite *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197 (9th Cir. 1980) for the proposition that "monetary injury is not normally considered irreparable." Opp. 20.  But, for one thing, the harm to Kalshi's reputation and to its users is not mere monetary harm.  And, for another, Defendants truncate the relevant discussion in *Los Angeles Memorial Coliseum*.  The case proceeds to explain that the reason monetary injuries are normally not irreparable is because they can "be remedied by a damage award."  634 F.2d at 1202.  Given that the Eleventh Amendment prohibits almost all actions against state officials for damages—unlike actions like this one seeking prospective relief—Defendants would surely contend that any action for

damages against them is barred. Thus, any monetary harm incurred by Kalshi during the pendency of this litigation would almost surely be irreparable, making a TRO and preliminary injunction all the more necessary.

**D. The Public Interest Supports Granting A TRO To Kalshi.**

Defendants claim that allowing Kalshi's event contracts in Nevada would offend the public interest as determined by Nevada authorities. Opp. 15-17. But Congress empowered the CFTC—not the states—to determine whether sports-event contracts are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i)(VI). The CFTC has already found that these contracts are not contrary to the public interest and therefore declined to initiate agency review. Compl. ¶ 53.

Defendants appeal to the public interest by touting the protections Nevada state law affords. But federal law imposes similar requirements on DCMs like Kalshi. Most notably, Kalshi proactively complies with the federal "Anti-Money Laundering (AML) and Know Your Customer (KYC) protections" that Defendants identify (at 16). *See KalshiEX LLC Rulebook*, KalshiEx, at 3.5(a), 3.4(c), 3.6(g), available at https://kalshi-public-docs.s3.amazonaws.com/ regulatory/rulebook/Kalshi%20Rulebook%20v1.16.pdf. The CFTC also imposes an arduous licensing regime on DCMs. *See* 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. §§ 38.3(a); 17 C.F.R. § 38.3(a)(2). DCMs must comply with structural requirements that operate much like Nevada's internal control procedures, like liquidity standards, disciplinary procedures, dispute-resolution mechanisms, and auditing demands, among other federal requirements. *See* 17 C.F.R. pt. 38. It must also maintain its own investigation mechanisms and reporting process, 17 CFR § 38.158, which address customer complaints much like Nevada's process. *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 4.2.1; *KalshiEX*, 119 F.4th 58, 66 (D.C. Cir. 2024) (finding no irreparable harm from allowing Kalshi political-event contracts to take effect where appellant "has not explained why traditional tools for regulating market manipulation will not work"). Further, Congress authorized states to bring suit to redress violations of the CEA— but expressly exempted from that authority the right to sue DCMs. *See* 7 U.S.C. § 13a-2(1) (allowing state suits against "any person" "other than a contract market …").

WEINBERG WHEELER HUDGINS GUNN & DIAL

**E.  The State's Countermotion For A Preliminary Injunction Is Unsupported.**

Defendants' counter-request for a TRO and preliminary injunction is highly unusual given the posture of this case, where Kalshi seeks to prevent an impending state enforcement action.  In any event, Defendants are not entitled to preliminary relief for a host of reasons—they are unlikely to succeed on the merits, they suffer no irreparable harm absent relief, and the public interest does not favor allowing them to enforce preempted state statutes against Kalshi.

## CONCLUSION

For the foregoing reasons, the Court should grant a temporary restraining order and a preliminary injunction in favor of Plaintiff.

Dated this 7th day of April, 2025.


<u>/s/      D. Lee Roberts, Jr.</u>
D. Lee Roberts, Jr., Esq.
Nevada Bar No. 8877
*lroberts@wwhgd.com*
WEINBERG, WHEELER, HUDGINS,
  GUNN & DIAL, LLC
6385 South Rainbow Blvd., Suite 400
Las Vegas, Nevada  89118
Telephone:    (702) 938-3838
Facsimile:    (702) 938-3864

Neal Kumar Katyal, Esq.
(admitted *pro hac vice*)
Joshua B. Sterling, Esq.
(admitted *pro hac vice*)
William E. Havemann, Esq.
(admitted *pro hac vice*)
MILBANK LLP
1850 K Street, Suite 1100
Washington, D.C. 20006

Mackenzie Austin, Esq.
(admitted *pro hac vice*)
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067

*Attorneys for Plaintiff KalshiEX LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC, and that on the 7th day of April, 2025, I served a true and correct copy of the foregoing **PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR AN IMMEDIATE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** by e-service, in accordance with the Electronic Filing Procedures of the United States District Court, to the following:

Aaron D. Ford, Esq.
Jessica E. Whelan, Esq.
Sabrena K. Clinton, Esq.
Devin A. Oliver, Esq.
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119

*Attorneys for :*
*Kirk D. Hendrick, in his Official Capacity as Chairman of the Nevada Gaming Board; George Assad, in his official capacity as A Member of the Nevada Gaming Control Board; Chandeli K. Sendal, in her official capacity as a Member of the Nevada Gaming Control Board; Nevada Gaming Control Board; Jennifer Togliatti, In her official capacity as Chair of the Nevada Gaming Commission; Rosa Solis-Rainey, in her official capacity As a Member of the Nevada Commission; Brian Krolicki, In his official capacity as a Member of the Nevada Gaming Commission; George Markantonis, in his official capacity As a Member of the Nevada Gaming Commission; Abbi Silver, in her office capacity as a Member of the Nevada Gaming Commission; Nevada Gaming Commission; Aaron D. Ford, in his official Capacity as Attorney General of Nevada*

*/s/ Audra R. Bonney*
An employee of WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC

WEINBERG WHEELER
HUDGINS GUNN & DIAL