UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| KALSHIEX, LLC, | Case No.: 2:25-cv-00575-APG-BNW |
| Plaintiff | **Order (1) Denying Defendants' Motion for Temporary Restraining Order and (2) Granting Plaintiff's Motion for Preliminary Injunction** |
| v. | |
| KIRK D. HENDRICK, et al., | [ECF Nos. 18, 35] |
| Defendants | |

Plaintiff KalshiEX, LLC (Kalshi) moves to enjoin the Nevada Gaming Commission, the Nevada Gaming Control Board, and their members in their official capacities, from pursuing civil or criminal enforcement against Kalshi for offering event contracts in Nevada. ECF No. 18. Kalshi contends that its contracts are currently legal under federal law and that Nevada law is preempted due to the Commodity Futures Trading Commission's exclusive jurisdiction. The defendants oppose and move for an injunction to preclude Kalshi from offering event contracts in Nevada. I held a hearing on April 8, 2025, at which I orally denied the defendants' motion and granted Kalshi's motion, with this written order to follow. ECF No. 43.

**I. BACKGROUND**

Kalshi "operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts." ECF No. 1 at 5. Kalshi's exchange market is designated as a contract market regulated by the Commodity Futures Trading Commission (CFTC) under the Commodity Exchange Act (CEA), 7 U.S.C. § 1, *et seq*. ECF No. 18-1 at 2-3. On its exchange, which is available to users nationwide, Kalshi offers traders the ability to enter

event-based contracts including, for example, who will win a sporting event or which party will have control over the House of Representatives. *Id.* at 3; ECF No. 1 at 12-13 ¶¶ 47, 53.

On March 4, 2025, the Nevada Gaming Control Board (Board) sent Kalshi a cease-and-desist letter advising Kalshi that "offering event-based contracts is unlawful in Nevada" unless the Nevada Gaming Commission approves it. ECF No. 1-2 at 2. The Board advised Kalshi that anyone who operates a sports pool in Nevada must be licensed under Nevada Revised Statutes (NRS) § 463.160. *Id.* at 3. Section 463.0193 defines a sports pool as "the business of accepting wagers on sporting events or other events by any system or method of wagering." According to the Board's letter, an election counts as an "other event." ECF No. 1-2 at 2; *see also* Nev. Gaming Comm'n reg. 26B.020(8) (defining "other event" to mean "an event other than . . . [a] horse race, . . . greyhound race, or . . . athletic sporting event sanctioned by a governing body"). The Board advised that "Kalshi's event-based contracts allow a person to place money on the outcome of an uncertain event," so Kalshi is operating an unlicensed sports pool in violation of Nevada law, and that doing so is a category B felony. *Id.* at 3 (citing NRS § 463.360). The letter advised that even if Kalshi had a license to operate a sports pool, Nevada public policy prohibits wagering on elections. *Id.*; *see also* NRS § 293.830 (making it a misdemeanor to make, offer, or accept a bet or wager on election results, the success or failure of any candidate, the number of votes cast, etc.). The Board's letter stated that Kalshi has been violating Nevada law and "any offenses by Kalshi after receipt of this letter shall be considered willful violations of Nevada law." ECF No. 1-2 at 3. The Board ordered Kalshi to cease and desist, and to confirm Kalshi would do so by March 14, 2025. *Id.*

Kalshi sues the Board, the Nevada Gaming Commission, and their members in their official capacities for declaratory and injunctive relief. Kalshi argues that its exchange is subject

to the CFTC's exclusive jurisdiction, so Nevada law is preempted, and Nevada regulatory authorities cannot subject Kalshi to different standards than those imposed by the CFTC. Kalshi contends that its operation is legal under federal law because (1) earlier this year, the CFTC permitted Kalshi to offer sports event contracts and (2) last year, a federal district court authorized Kalshi's political event contracts. Kalshi contends that it needs immediate injunctive relief because the defendants are threatening civil and criminal liability if Kalshi does not stop offering these contracts in Nevada, but Kalshi cannot do so without incurring substantial economic and reputational harm and imposing harm on the users who have invested in these contracts. Kalshi asked the Board to defer action on civil and criminal liability until a court could resolve Kalshi's anticipated motion for injunctive relief. The Board declined, and its counsel indicated that the Board might initiate proceedings against Kalshi as early as April 2, 2025. The defendants move to enjoin Kalshi from offering its sports and election contracts in Nevada.

To qualify for a preliminary injunction, a party must demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships favors the movant, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As discussed below and at the hearing, Kalshi has met its burden of showing these factors, so I grant its motion and enjoin the defendants from pursuing civil or criminal prosecutions of Kalshi for event contracts Kalshi offers on its CFTC-designated exchange.

/ / / /

/ / / /

/ / / /

## II. Likelihood of Success on the Merits

### A. Jurisdiction

Kalshi alleges in the complaint that this court has jurisdiction under 28 U.S.C. § 1331 because the action arises under the Supremacy Clause. Kalshi asserts the federal question is whether Nevada's gambling laws are preempted by the CEA as applied to Kalshi. ECF No. 1 at 4. The defendants have thus far not disputed jurisdiction in this court.

A "plaintiff may bring suit under the Supremacy Clause to enjoin implementation of a state law allegedly preempted by federal statute, regardless of whether the federal statute at issue confers an express 'right' or cause of action on the plaintiff." *Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1047, 1048-49 (9th Cir. 2008) (gathering cases); *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve."). Consequently, I have federal question subject matter jurisdiction.

### B. Eleventh Amendment, Service, and Related Issues

Kalshi asserts that the Eleventh Amendment does not bar suits for prospective declaratory or injunctive relief against state officers in their official capacities. ECF No. 1 at 4. In their response, the defendants did not raise an Eleventh Amendment defense and instead requested that I issue injunctive relief in their favor. In footnotes in their brief, the defendants assert that the Board and Commission were improperly named under NRS § 41.031(2), which states that when a subdivision of the state is sued, the action must be brought in the name of the State of Nevada on relation of the sued department or commission. At the injunction hearing, the

4

defendants previewed that they intend to move to dismiss Kalshi's complaint on the grounds that the Eleventh Amendment bars claims against the Board and Commission, there are no allegations of personal participation by the individual defendants, the State of Nevada should have been named as a defendant, and service has not been perfected because Kalshi has not served the Nevada Attorney General.

"Under the *Ex parte Young* exception to [the] Eleventh Amendment bar, a party may seek prospective injunctive relief against an individual state officer in her official capacity." *Doe v. Regents of the Univ. of Cal.*, 891 F.3d 1147, 1153 (9th Cir. 2018). In its complaint, Kalshi seeks prospective injunctive relief against individual Board and Commission members in their official capacities relating to enforcing Nevada laws and regulations against Kalshi. ECF No. 1 at 16-17. Those allegations fall within the *Ex parte Young* exception to the Eleventh Amendment, so Kalshi's claims against the individual defendants in their official capacities may proceed. With respect to the defendants' assertion that Kalshi has not alleged that the named individuals personally participated, I at least preliminarily conclude that the individual board and commission members were properly named as "persons who would be responsible for implementing any injunctive relief." *R. W. v. Columbia Basin Coll.*, 77 F.4th 1214, 1223 (9th Cir. 2023) (quotation omitted). This conclusion is without prejudice to the defendants raising the personal participation argument in a motion to dismiss. I reserve ruling on whether the Eleventh Amendment bars Kalshi from proceeding against the Board and Commission, but the net effect for purposes of Kalshi's injunction motion is the same, as the Board and Commission can operate only through their employees or members.[1]

---

[1] I leave for another day the question of whether the Board and Commission waived their Eleventh Amendment immunity by requesting that I issue an injunction in their favor.

As for the defendants' arguments that Kalshi did not comply with NRS § 41.031(2) and failed to fully complete service as of the date of the injunction hearing, these issues are easily resolved through amendment and service. There is no dispute the defendants received actual notice, accepted service by email,[2] filed a responsive brief and motion, appeared at the hearing, and requested that I grant injunctive relief in their favor. But even if the Board and Commission are not properly named, that would not undermine either subject matter jurisdiction or likelihood of success on the merits with respect to the individuals named in their official capacities, so I address Kalshi's and the defendants' motions for injunctive relief.

### C. Preemption Due to CFTC's Exclusive Jurisdiction

Kalshi contends that because it is a CFTC-designated exchange, it is subject only to the CFTC's exclusive jurisdiction. The defendants respond that neither the CEA's text nor its history suggests that Congress intended to preempt state gaming laws, so Kalshi is subject to Nevada's comprehensive gaming regulatory scheme.

The CFTC regulates financial derivative markets. "A derivative is a financial instrument or contract whose price is directly dependent upon (i.e.[,] derived from) the value of one or more underlying assets—for example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 23-3257 (JMC), 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024) (quotation omitted). Derivatives "provide a way to transfer market risk or credit risk between two counterparties." *Id.* (quotation omitted). Event contracts are a form of derivative in which the "payoff is based on a specified event, occurrence, or value." *Id.* at *2 (quotation omitted). "These contracts usually pose a yes-or-no question. The

---

[2] *See* ECF No. 31-5 at 2 (defense counsel Whelan stating that she was "able to accept service on behalf of defendants").

buyer of the event contract, for example, may take a 'yes' position on whether the underlying event will happen," and the "seller implicitly takes the opposite, or 'no,' position." *Id.* The contract prices fluctuate because they are based on the current probability that the relevant event will occur. *Id.* As Kalshi clarified at the hearing, Kalshi is not a party to the contracts and does not set the contract price. Rather, Kalshi is the exchange on which such contracts are entered into between the counterparties. A clearinghouse holds the contracting parties' funds until the specified event occurs, at which point the clearinghouse settles the contract according to the event's outcome.

Under the CEA, the CFTC has exclusive jurisdiction to regulate commodities and futures on designated exchanges. 7 U.S.C. § 2(a)(1)(A). An entity like Kalshi must apply to and receive designation from the CFTC to become a designated contract maker (DCM). 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. §§ 38.1, 38.3(a). Event contracts fall within the CFTC's sphere of regulation on designated exchanges as "excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i).

Until the year 2000, a DCM had to get the CFTC's preapproval to list contracts by convincing the CFTC that its contracts satisfied an economic purpose test and were not contrary to the public interest. *KalshiEX LLC*, 2024 WL 4164694, at *2. But Congress amended the CEA in 2000 to allow DCMs to self-certify that their contracts complied with the law and regulations with no prior CFTC review. *Id.*

In 2010, Congress amended the CEA again by enacting a special rule for event-based contracts. *Id.*; *see also* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2. Under this special rule, DCMs still self-certify and can immediately begin offering event contracts, or they can request preapproval from the CFTC. *KalshiEX LLC*, 2024 WL 4164694, at *3; *see also* 17 C.F.R. §§ 40.2, 40.3. But under the special rule, the CFTC can review and prohibit certain event

7

contracts if it determines those contracts are contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(i). Among the types of contracts that can be subject to this public interest review are contracts that "involve" certain categories like terrorism, war, or assassination. *Id.* As relevant to Kalshi's contracts at issue in this case, the special rule also covers event contracts that involve "activity that is unlawful under any Federal or State law" or "gaming." *Id.*

In 2020, the CFTC authorized Kalshi to list event contracts as a DCM. *Id.* at *4; *see also* ECF No. 18-1 at 3. Kalshi started offering congressional control contracts that ask which party will control the House or Senate on a specific date in the future. *KalshiEX LLC*, 2024 WL 4164694, at *4. As explained by the district court in *KalshiEX LLC*:

> The congressional control contracts are "yes"/"no" event contracts that pose the question: "Will <chamber of Congress> be controlled by <party> for <term>?" The contracts expire on February 1 of the year that the relevant term begins, and the payout is determined by the party affiliation of the leader of a specific chamber of Congress (i.e., the Speaker of the House for the House of Representatives or the President Pro Tempore for the Senate). Upon the contracts' expiration, buyers who correctly predicted the electoral outcome will receive one dollar per contract purchased, but purchasers who made an erroneous prediction about congressional control receive nothing in return for their investment.

*Id.* To avoid conflicts of interest, Kalshi identified categories of traders who were prohibited from entering the contracts, such as members of congress, congressional staff, political organizations, or polling organizations. *Id.*

Kalshi self-certified these election-based event contracts in June 2023. *Id.* The CFTC advised Kalshi that it was going to conduct a public interest review on these contracts because they involved two activities in the special rule: gaming (betting on elections) and unlawful activity (many states make it illegal to bet on elections). *Id.* After conducting that review, the CFTC issued an order prohibiting Kalshi from listing its congressional control contracts because

8

they are not in the public interest. *Id.* Kalshi sued the CFTC under the Administrative Procedure Act, asserting the decision was arbitrary, capricious, contrary to law, and exceeded the CFTC's statutory authority. *Id.* at *6. The district court ruled in Kalshi's favor. *Id.* at *13. The CFTC appealed to the D.C. Circuit and requested a stay of the lower court's judgment pending appeal, but the D.C. Circuit denied the stay because it concluded that the CFTC did not show irreparable harm. *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 60 (D.C. Cir. 2024). The D.C. Circuit held oral arguments in January 2025 and has not yet issued a decision.

As for Kalshi's sports-based event contracts, the parties represented at the hearing that Kalshi began offering those in late January 2025. Kalshi represents that the CFTC has allowed its sports-based contracts to proceed. ECF No. 1 at ¶ 53; *see also* 7 U.S.C. §§ 7a-2(c)(1), (5)(C)(i-iv) (providing that a registered entity may list a new contract by providing it to the CFTC and certifying it complies with the CEA and regulations, and that becomes effective unless the CFTC prohibits it). I have no evidence that (at least thus far) the CFTC has taken action to prevent Kalshi from offering sports-based event contracts. As a result, at this point in time, federal law allows Kalshi to offer both sports and election-based event contracts on its exchange.

That raises the question of whether Nevada regulatory authorities can nevertheless pursue Kalshi for violating Nevada law by listing these same contracts. Kalshi argues the defendants cannot because the CEA preempts state law due to the CFTC's exclusive jurisdiction over a DCM that the CFTC designates, which Kalshi is. The defendants contend that Congress did not manifest a clear intent under the CEA to occupy the field of gaming laws or to preempt traditional state police powers.

Under the Supremacy Clause, "state laws that conflict with federal law are without effect," meaning they are preempted by federal law. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (simplified). The "ultimate touchstone" in a preemption analysis is congressional purpose. *Id.* (quotation omitted). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Id.*

Absent an express preemption clause, federal law may preempt state law where Congress has occupied the field or where state laws conflict with federal law. Field preemption occurs when it "can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (simplified). Conflict preemption occurs when "compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quotation omitted).

I begin with the "plain meaning of [the CEA's] language." *United States v. Lillard*, 935 F.3d 827, 833 (9th Cir. 2019). Title 7 U.S.C. § 2(a)(1)(A) provides:

> The Commission [CFTC] shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the

    Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

Section 2's plain and unambiguous language grants the CFTC exclusive jurisdiction over accounts, agreements, and transactions involving swaps[3] or contracts of sale of a commodity[4] for future delivery that are traded or executed on exchanges that the CFTC has designated under section 7. The second sentence in section 2—which states that nothing in section 2 supersedes "other regulatory authorities" under state law—does not give states regulatory authority over CFTC-designated exchanges because that language is limited by the phrase "[e]xcept as hereinabove provided." Section 2's first sentence supersedes the SEC and state regulatory authorities' jurisdiction for contracts on a CFTC-designated exchange. The remainder of the second sentence preserves the SEC and states' regulatory authority over exchanges or transactions that are not covered by the CFTC's exclusive jurisdiction. For example, the defendants could pursue an entity that offered sports or election event contracts that were not listed on a CFTC-designated exchange.

---

[3] As relevant here, the CEA defines swaps as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

[4] As relevant here, the CEA defines a commodity as "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). The CEA defines an "excluded commodity" to include "an occurrence, extent of an occurrence, or contingency . . . that is . . . beyond the control of the parties to the relevant contract, agreement, or transaction; and . . . associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv).

Even if section 2's plain and unambiguous language does not amount to express preemption, it reflects congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges.[5] I agree with the Second Circuit that section 2's "exclusive jurisdiction" language "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982). That is consistent with "Congress' goal of conferring the CFTC with sole regulatory authority over futures contract markets or other exchanges." *F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 590 (D.C. Cir. 2001) (simplified); *see also Lillard*, 935 F.3d at 833 ("To determine plain meaning, [courts] examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy." (quotation omitted)). The CFTC also views its exclusive jurisdiction as preempting state law. In its brief on appeal in the D.C. Circuit, the CFTC stated that "due to federal preemption, event contracts never violate state law when they are traded on a DCM." *KalshiEX LLC v. U.S. Commodity Futures Trading Commission*, 2024 WL 4512583, at *27 (Appellant CFTC's Br.). The defendants have not cited any authority that the CFTC does not have exclusive jurisdiction over the exchanges it designates.

To the extent I would move beyond the CEA's plain and unambiguous language, legislative history supports the conclusion that Congress intended to occupy the field and preempt state law from applying to CFTC-designated exchanges. *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1155-56 (7th Cir. 1992) (describing the legislative history surrounding the 1974 amendments and preemption, noting that

---

[5] The defendants argue that Congress did not intend to occupy the field of gaming, but that designates the relevant field too broadly. Congress occupied the field of CFTC-designated exchanges.

12

"proponents were concerned that the states . . . might step in to regulate the futures markets themselves," which would subject "the national futures trading apparatus to conflicting regulatory demands," and the Senate Committee on Agriculture and Forestry "delet[ed] . . . a CEA provision which appeared to preserve the states' authority over futures trading"); *see also* The Commodity Futures Trading Commission Act of 1974 Committee Report by the U.S. Senate Committee on Agriculture and Forestry, 93rd Cong., 2d Sess., at 11 (Nov. 15, 1974) (stating that "[u]nder the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned").

In sum, if Kalshi were offering its contracts without CFTC designation, then the defendants could regulate it. But because Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted.[6] Nevada regulatory agencies thus have no jurisdiction to decide that Kalshi's conduct violates state law where, at least at present, those activities are legal under federal law. Because the CFTC has approved (or at least not yet disapproved) Kalshi's sports-related contracts, the defendants cannot pursue civil or criminal liability against Kalshi for offering those contracts. And because (1) the district court in *KalshiEX LLC* found in Kalshi's favor, (2) the D.C. Circuit denied the CFTC's request for a stay pending appeal, and (3) the D.C. Circuit has not overturned the district court's decision as of this date, Kalshi's election-based contracts are also currently legal under federal law.

The defendants argue that Kalshi is judicially estopped from challenging the application of Nevada gaming law to its sports contracts based on an argument that Kalshi made in its litigation against the CFTC. There, Kalshi argued its election contracts do not involve gaming

---

[6] I therefore need not address conflict preemption.

13

because an event contract involves gaming "if it is contingent on a game or game-related event" such as "the Kentucky Derby, Super Bowl, or Masters golf tournament." *KalshiEX LLC v Commodity Futures Trading Comm'n*, 2024 WL 4802698, at *17 (Appellee's Br.). But even if Kalshi's sports contracts involve "gaming," that would not subject Kalshi to state gaming laws. Rather, it would subject Kalshi to the special rule that allows the CFTC to conduct a public interest review. The CFTC at least so far has allowed Kalshi to offer its sports contracts.

At the hearing, the defendants noted that other States have taken an interest in Kalshi's contracts and have sent or intend to send Kalshi cease-and-desist letters. But that merely highlights the problem of allowing the States to regulate a national exchange. It raises the possibility that another State would have different rules than not only than the CFTC, but other States. Preventing the difficulties that would create is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges.

Thus, Kalshi has shown a likelihood of success on the merits. Conversely, the defendants have not shown a likelihood of success on their countermotion for injunctive relief, so I deny their motion.

## III. Likelihood of Irreparable Harm

Kalshi has met its burden of showing a likelihood of irreparable harm. The defendants have threatened Kalshi with imminent civil and criminal enforcement if it does not stop offering these contracts in Nevada. ECF No. 1-2. Although the defendants downplayed these threats in their opposition, the Board's letter ordered Kalshi to cease and desist and gave Kalshi a deadline to comply. *Id*. The defendants refused to extend briefing in this case to allow for the legal dispute to be resolved on a non-emergency basis, and the defendants requested that I enjoin Kalshi. Kalshi thus has shown the threat of prosecution is imminent.

A credible threat of imminent prosecution for a state violation that conflicts with federal law can establish a likelihood of irreparable harm. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are imminent . . . there is no adequate remedy at law."); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). Kalshi thus faces a "Hobson's choice": if it does not comply with the defendants' demand to cease it faces civil and criminal liability, but if it does comply it will incur substantial economic and reputational harm as well as the potential existential threat of the CFTC taking action against it for violating the CFTC's Core Principles if Kalshi disrupts contracts or geographically limits who can enter contracts on what is supposed to be a national exchange. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009); *see also* ECF No. 18-1.

Kalshi presents credible evidence that even if it could implement geofencing at great expense, it could not do so immediately as the defendants demanded. And, as discussed at the injunction hearing, there are questions about whether Kalshi could recover monetary damages against the defendants in either state or federal court and, even if it could, whether those damages would be capped such that Kalshi could not meaningfully be compensated for the millions of dollars it asserts it would have to spend to geofence out Nevada market participants.

**IV.  Balance of Hardships**

The balance of hardships tips in Kalshi's favor given that it is facing substantial monetary expenditures, reputational damage, or civil and criminal prosecution based on the defendants' demands that the defendants likely cannot make because they are preempted. In contrast, the defendants are not facing much harm in the short term because I believe they are preempted. And if I am wrong, the defendants can prosecute Kalshi later for its conduct. Although the defendants suggested at the hearing that Nevadans who enter into these contracts may be

harmed, there is no evidence before me that anyone, Nevada resident or otherwise, has complained of harm from entering into Kalshi's contracts.

## V. Public Interest

The public interest weighs in favor of a short-term injunction for the same reasons discussed with the other factors. Congress designated the CFTC to have exclusive jurisdiction over Kalshi's conduct and, right now, that conduct is legal under federal law. Additionally, third parties' contracts and investment expectations would be disrupted if Kalshi were forced to terminate its existing contracts for Nevada-based users. And that may impact counterparties to those contracts who are neither based in Nevada nor signed the event contracts while in Nevada. *See* ECF No. 18-1 at 8-11 (describing the potential negative economic consequences to the contractual parties if the contracts are terminated before the occurrence of the relevant event on which the contracts are based).

## VI. Summary

Kalshi is, in some sense, proceeding at its own risk and creating its own harms. Things might turn out differently with election contracts if the D.C. Circuit rules against Kalshi or if the CFTC takes action against Kalshi's sports contracts. But for now, I will preserve the status quo, which is that these contracts are legal under federal law. So requiring Kalshi to stop altogether and lose goodwill or damage its reputation; to spend millions to geofence, which might result in losing its CFTC designation; or to continue doing what it is doing and face civil and criminal liability in Nevada suffices to show a likelihood of irreparable harm for at least a short term injunction. To the extent the States or other interested parties object to Kalshi offering sports and election event contracts, they must take that up with the CFTC and Congress. Such policy issues are beyond the jurisdiction of this court.

## VII. Bond

Kalshi argues no bond or a de minimis bond should be ordered because the defendants will suffer no damages by halting enforcement against Kalshi while this case proceeds. The defendants did not address a bond in their opposition. Because Kalshi has shown a likelihood of success on the question of whether Nevada law is preempted, a de minimis $10,000 bond is appropriate. Either party may file a properly supported motion to increase or decrease the bond amount. As stated at the hearing, I grant Kalshi's request to post a cash bond. *See* ECF No. 43.

## VIII. Conclusion

I THEREFORE ORDER that the defendants' motion for a temporary restraining order **(ECF No. 35) is DENIED**.

I FURTHER ORDER that plaintiff KalshiEX LLC's motion for a preliminary injunction **(ECF No. 18) is GRANTED**.

**I FURTHER ORDER that the Nevada Gaming Control Board, Nevada Gaming Commission, and their members in their official capacities are hereby enjoined from enforcing preempted state laws against KalshiEX LLC. The defendants are enjoined from pursuing civil or criminal prosecutions against KalshiEX LLC for offering event-based contracts on a CFTC-designated market. This injunction took effect when I announced my ruling orally at the conclusion of the April 8, 2025 hearing.**

DATED this 9th day of April, 2025, *nunc pro tunc* April 8, 2025.

ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE