**1**

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4  KALSHIEX, L.L.C.,                )
                                    )  Case No. 2:25-cv-0575-APG-BNW
5           Plaintiff,              )
                                    )  Las Vegas, Nevada
6      vs.                          )  APRIL 8, 2025
                                    )  10:30 A.M.
7  KIRK D. HENDRICK, et al.,        )  Courtroom 6C
                                    )
8         Defendant.                )  MOTION HEARING
                                    )
9                                   )
                                    )  C E R T I F I E D   C O P Y
10 _____  )

11

12

13

14             REPORTER'S TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE ANDREW P. GORDON
15                UNITED STATES DISTRICT JUDGE

16

17

18

19

20 COURT REPORTER:    Judy K. Moore, CRR, RMR
                      United States District Court
21                    333 Las Vegas Boulevard South, Room 1334
                      Las Vegas, Nevada  89101
22                    Judy_Moore@nvd.uscourts.gov

23

24 Proceedings reported by machine shorthand, transcript produced
   by computer-aided transcription.
25

2:25-cv-0575-APG-BNw   *MOTION HEARING   4/8/25*

2

1                        <u>**APPEARANCES**</u>

2    For the Plaintiff:

3        **MR. D. LEE ROBERTS, JR., ESQ.**
         WEINBERG, WHEELER, HUDGINGS, GUNN & DIAL, L.L.C.
4        6385 South Rainbow Boulevard, Suite 400
         Las Vegas, Nevada 89118

5

6        **MR. WILLIAM HAVEMANN, ESQ.**
         **MR. JOSHUA BROOKS STERLING, ESQ.**
7        MILBANK, L.L.P.
         1850 K Street, N.W.
8        Washington, D.C. 20006

         **MR. RICHARD HEASLIP, ESQ.**
9        In-house counsel for KalshiEX

10
     For the Defendants:
11
         **MS. JESSICA WHELAN, ESQ.**
12       **MS. SABFRENA CLINTON, ESQ.**
         **MS. DARLENE CARUSO, ESQ.**
13       NEVADA ATTORNEY GENERAL'S OFFICE
         1 State of Nevada Way, Suite 100
14       Las Vegas, Nevada 89119

15

16

17                              *  *  *

18

19

20

21

22

23

24

25

                   UNITED STATES DISTRICT COURT
                   Judy K. Moore, RMR, CRR

1     LAS VEGAS, NEVADA; APRIL 8, 2025

2                    --oOo--

3         P R O C E E D I N G S

4     (Proceedings commenced at 10:45 a.m.)

5         COURTROOM ADMINISTRATOR:  KalshiEX, L.L.C., versus

6  Kirk D. Hendrick, et al., 2:25-civil-575-APG-BNW.

7              Counsel, please make your appearances, starting with

8  plaintiffs.

9              MR. ROBERTS:  Good morning, Your Honor.  Lee

10  Roberts, representing KalshiEX.  With me here at counsel table

11  is Richard Heaslip, who is in-house counsel for Kalshi and is

12  here as the corporate representative.  And with the Court's

13  indulgence, I will let my co-counsel introduce himself.  He is

14  now admitted pro hac vice.  And we'll start with Will.

15              MR. HAVEMANN:  Good morning, Your Honor.  Will

16  Havemann on behalf of Kalshi, and I'm joined by my colleague

17  Josh Sterling as well.

18              THE COURT:  Good morning to all of you.

19              MS. WHELAN:  Good morning, Your Honor.  Jessica

20  Whelan, Chief Deputy Solicitor General for the State of Nevada.

21  With me is Sabrena Clinton, Senior Deputy Attorney General; and

22  Darlene Caruso, Chief Deputy Attorney General.

23              THE COURT:  Good morning to all of you.

24              This is the hearing I set on the plaintiff's motion

25  for temporary restraining order and preliminary injunction.

2:25-cv-575-APG-BNW   *MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!*

**4**

1  First, let me note, we do have some people watching in on Zoom.

2  I received a request from the public to participate by Zoom

3  under our court rules.  I've reviewed the application and

4  allowed the person to watch.  I've also received a request from

5  the Attorney General's Office to allow some of their personnel

6  to watch as well.  They're parties, so they didn't have to file

7  that separate request.  So I've granted access by Zoom to those

8  folks.  Does either side have any objection to our -- to the

9  folks watching on Zoom, we'll put it that way?

10           MR. HAVEMANN:  No objection.

11           MS. WHELAN:  No objection, Your Honor.

12           THE COURT:  All right.  Let me remind the folks that

13  are Zooming in that you are not allowed to record any of these

14  proceedings, either audio or visual.  You are not allowed to

15  take any screen shots or other reproductions of these

16  proceedings.  If you do, it would be in violation of the Court

17  order, and you would subject yourself to all kinds of bad

18  things, so please don't do that.

19           All right.  Turning to the motions themselves, I

20  have read the papers, including the reply that was filed either

21  late last night or early this morning.  I read it this morning

22  before coming in.  I don't need speechifying.  I've read your

23  papers.  You don't need to repeat what's in there.  Rather, I

24  have lots of questions that I need answered.

25           So what I'm going to do is start in with Kalshi's

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 5 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**5**

 1    counsel and ask a bunch of questions and see where we go.

 2              So, Mr. Havemann, is that how it's pronounced?

 3              MR. HAVEMANN:  Yes.

 4              THE COURT:  Come on up to the podium, if you would,

 5    and let me first make sure I understand a little bit of the

 6    background of how your client's business works and the

 7    regulatory scheme that you're saying applies.

 8              So under 7 U.S.C. 2(a)(1)(A), the Commission, CFTC,

 9    has, in your opinion, exclusive jurisdiction with respect to

10    agreements -- and I'm paraphrasing -- and transactions

11    involving swaps or contracts of sale of a commodity for the

12    future delivery of certain things that are traded on a

13    registered exchange.  So the exclusivity applies to swaps and

14    commodities on a registered exchange, correct?

15              MR. HAVEMANN:  That's correct.

16              THE COURT:  So are sports contracts or election

17    contracts swaps or commodities, or both?

18              MR. HAVEMANN:  They are swaps, Your Honor.  And I

19    can point you to the statutory language that makes that clear.

20              THE COURT:  Is that 7 U.S.C. 1a(47)(A)(ii)?

21              MR. HAVEMANN:  That's right, Your Honor.

22              THE COURT:  All right.  Let's walk through that.  So

23    that statute defines a swap as any agreement that provides for

24    any purchase, sale, payment, or delivery that is dependent on

25    the occurrence, non-occurrence, or the extent of the occurrence

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 6 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**6**

1  of an event or contingency associated with a potential

2  financial, economic, or commercial consequence.

3          So how would a sports contract have a financial,

4  economic, or commercial consequence?

5          MR. HAVEMANN:  So I think the easiest way to answer

6  that question is by an example.  So Kalshi offered sports

7  contracts on the Final 4 games and the Final last night.  These

8  are sporting events that have massive --

9          THE REPORTER:  Can you step closer to the mic?

10          MR. HAVEMANN:  Sure.

11          THE COURT:  Our acoustics are real bad here.

12          MR. HAVEMANN:  These are events that have massive

13  financial consequences, not just for the schools at issue, but

14  for sponsors, for the University community, for all sorts of

15  stakeholders, tens of millions or hundreds of millions of

16  dollars at stake in some cases, and all of the contracts that

17  Kalshi offers, whether it be sports contracts, political event

18  contracts or otherwise, fit that definition.  So Kalshi is

19  careful to offer contracts that have financial consequences in

20  the real world rather than the sort of prop bets that you might

21  see at a sportsbook or something like that.

22          THE COURT:  Okay.  Let's explore that a little bit

23  because I want to make sure the -- in a sense, the exception

24  doesn't swallow the rule.  Or maybe that's the wrong

25  phraseology, but the Final 4 clearly has economic impacts upon

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 7 of 90

2:25-cv-575-APG-BNw   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

7

1    the players, it has economic impacts on advertisers and the

2    like.  Wouldn't anything have some economic consequence, as

3    long as two people are willing to put money on it?  So why --

4    what would not be a swap?

5          MR. HAVEMANN:  So the answer is, it has economic

6    consequences outside of the transaction at issue and so, of

7    course, if someone puts a bet on, you know, the coin flip, for

8    example, they would have economic consequences on the coin

9    flip, but the coin flip would not have independent real-world

10   consequences in the world at the start of a football game in

11   the way that the winner of the Final 4 Men's Basketball or

12   Women's Basketball Championship clearly has real-world

13   financial consequences for the schools, the sponsors, et

14   cetera.  So that's how Kalshi draws the line.

15         I do want to make --

16         THE COURT:  So the coin flip would not be a swap?

17         MR. HAVEMANN:  That's correct.

18         THE COURT:  Even though many, many people in Nevada

19   bet on the results of the coin flip at the Superbowl?  That has

20   economic consequences.

21         MR. HAVEMANN:  That's right, and I think that that

22   helps distinguish, you know, sportsbooks and the sort of

23   entities that the Board claims Kalshi is from Kalshi.  That is,

24   sportsbooks offer all sorts of bets on events within

25   sporting -- occurrences within sporting events that at least,

1  in Kalshi's perspective, would not have independent

2  consequences pursuant to Federal law and, therefore, would not

3  properly be the basis for a swap.

4         And I want to step back and make sure that Your

5  Honor understands our principle point, which is, the CFTC, of

6  course, has authority to review all of these contracts, and it

7  is the authority of the -- the CFTC could look at these

8  contracts and say, you know, we don't think that they properly

9  qualify as swaps because we don't think that sporting events

10 have economic consequences, or any number of other reasons.

11 And that's the job that Congress gave to the CFTC, not to 50

12 individual States and the District of Columbia.

13         So our principle point is, there's a comprehensive

14 regulatory scheme that Congress set up that allows the CFTC to

15 both designate Kalshi and others as a contract market --

16         THE COURT:  I get all that.

17         MR. HAVEMANN:  -- and to exercise back-end review.

18         THE COURT:  I get all that, believe me, but I want

19 to focus in on swaps because what you're saying just now is

20 that the CFTC can determine whether it's a swap, but you've

21 just, I thought, described that Kalshi decides it's a swap or

22 not because you're not taking wagers, contracts, on the coin

23 flip because you think it's not a swap.  Somebody else might

24 think it is a swap.

25         And if I'm looking at the definition of a swap, in a

 1   sense, anything could be a swap.  If the coin flip of the

 2   Superbowl, hundreds of people bet money in Las Vegas at a

 3   casino on the coin flip, by statutory definition, that's a

 4   swap.

 5          MR. HAVEMANN:  I don't want to fight with Your

 6   Honor's premise.  I mean, Kalshi has, I guess, taken a

 7   conservative view of what qualifies as a swap.  It does not

 8   offer bets on things like the coin flip and the like for the

 9   reason that it is concerned about a suggestion that would not

10   have --

11          THE COURT:  Okay.  So pause here -- pause here for a

12   second.  So Kalshi decides it's not going to bet -- take wagers

13   or take contracts -- I'll use the terminology take contracts on

14   the flip of the coin at the Superbowl because it's not a swap.

15   If it does, then the Gaming Control Board could, in a sense,

16   regulate you because it's no longer -- it's not a swap, so it

17   doesn't fall under the statute?

18          MR. HAVEMANN:  No, Your Honor, that's not our

19   position.  Our position is it's up to the CFTC to decide

20   whether or not, you know, any contract has been placed online

21   in a way that violates the statute, and the CFTC has all sorts

22   of statutory mechanisms and regulatory mechanisms for

23   correcting any problems.  And that is clear from the statutory

24   text, exclusive jurisdiction over these contracts --

25          THE COURT:  Over swaps?

1          MR. HAVEMANN:  Traded on designated contract

2   markets.

3          THE COURT:  Correct.  But the interpretation, or the

4   definition, of swap is statutory, and so who decides whether

5   a -- the coin flip of the Superbowl falls within the statute?

6   Is that CFTC's exclusive jurisdiction to determine whether the

7   definition of swap is met?

8          MR. HAVEMANN:  Yes.

9          THE COURT:  Do Courts have a role in that?

10          MR. HAVEMANN:  Certainly Courts have a role in it,

11   and Federal Courts exercising review of any CFTC determination

12   on the question could, of course, interpret the language of the

13   statute, determining whether the CFTC was right or wrong to

14   conclude that something was a swap.  But the exclusive

15   jurisdiction provision was designed to give the CFTC the

16   discretion to determine this rather than 50 different States

17   and the District of Columbia to decide, hey, I don't think this

18   is a swap, or I think this is actually gaming, or I think it's

19   actually a sportsbook.  That's precisely what Congress did not

20   want when making these amendments.

21          THE COURT:  Again I get that argument.  You don't

22   have to -- I completely understand that.  I'm just sort of

23   focusing in on, if the coin flip of the Superbowl is or is not

24   a swap and the CFTC has not said one way or the other what it

25   is -- let me make sure I understand your argument.  You propose

Case 2:25-cv-00575-APG-BNW    Document 46    Filed 04/14/25    Page 11 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

11

1  a contract to the CFTC, we're going to take a wager on the coin

2  flip of the Superbowl, we're going to take contracts on the

3  coin flip of the Superbowl, no one in any -- the Nevada Gaming

4  Control Board cannot do anything about that unless the CFTC

5  says, no, you can't?

6          MR. HAVEMANN:  I'm not sure that's quite right.  I

7  think that States have some authority under the CEA.  There's a

8  provision that dictates or details what authority States have

9  to enforce Federal law.  And there's always the APA.  So if a

10  State believes that the CFTC has made the wrong decision with

11  respect to permitting a particular contract or designating a

12  particular contract market under the CEA, they may have

13  opportunities under the APA to challenge agency action as

14  arbitrary, capricious, or not in accordance with the law, but

15  our submission is that, again, it's the job of the CFTC under

16  the plain text of the statute that Congress enacted to make

17  that determination with the sort of back-end judicial review

18  that you would always expect from a Government agency

19  determination.

20          THE COURT:  Okay.  So the Gaming Control Board

21  decides it disagrees with the CFTC's decision on Kalshi's

22  listing of elections or who's going to win the Texas Valero

23  Open last week and so it can now challenge that under the APA

24  because, as you just said, it disagrees with the CFTC's

25  finding, so there is jurisdiction for the Gaming Control Board

**12**

1  to challenge that decision?

2          MR. HAVEMANN:  But the key point is that that would

3  be a challenge under Federal law to a decision of a Federal

4  agency.  It would not be the Board attempting to enforce State

5  law against an entity that is a designated contract market

6  because that is what is preempted.

7          THE COURT:  Okay.

8          MR. HAVEMANN:  And just to back out and broaden the

9  scope of what we're looking at, the statute, as you noted, 7

10  U.S.C. Section 2(a)(1), says that the Commission shall have

11  exclusive jurisdiction with respect to these agreements, with

12  respect to swaps, contracts for sale, on designated contract

13  markets.  So Congress is clear that with respect -- once the

14  CFTC made the decision to designate a particular exchange as a

15  contract market, that's what subjects the contracts on that

16  exchange to the exclusive jurisdiction of the CFTC.  If it's

17  not designated as a contract market, then it is still left to

18  the enforcement mechanisms of the different states.

19          That is the line that Congress drew in the 1974

20  amendments between what would be subject to Federal authority

21  and what would be subject to State authority.  And I know Your

22  Honor indicated that it read our reply, but I think that maybe

23  a basic misunderstanding between us and the defendants in this

24  case is, I think the defendants understand Kalshi to be arguing

25  that the CEA preempts all State gaming laws, and that's not

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 13 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**13**

 1  correct.

 2          THE COURT:  You don't need to go there.  I agree

 3  with you on that.  I think their brief didn't address -- your

 4  reply picked up the comments I was going to make, frankly, so

 5  you're fine there.

 6          But you said something that bothered me.

 7          MR. HAVEMANN:  I try not to do that, Your Honor, so

 8  I'd love the opportunity --

 9          THE COURT:  Bothered me in a good way.  Let's put it

10  that way.  Raised a question for me, and I've lost my train of

11  thought.  Give me a second here and let me look at my

12  transcript.

13          Awe.  It's sort of a minor point, but you said once

14  the CFTC makes a determination that this swap is, in a sense,

15  permitted under the CEA, but really, that's not quite right.

16  What happens is you self-certify, we're going forward with

17  this, and if the CFTC doesn't say anything about it, then it's

18  deemed to be okay?

19          MR. HAVEMANN:  That's correct, yes.  They have an

20  opportunity to review at the back end, and if they choose not

21  to exercise that review, that reflects a judgment, too.

22          THE COURT:  And slightly contrary to what was said

23  in the motion, it's not a ten-day review period; it's a 90-day

24  review period, correct?

25          MR. HAVEMANN:  I think -- I'm sorry if we were

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**14**

 1  unclear.  I think they have ten days to decide whether to

 2  initiate review, and then once they initiate review, it's a

 3  90-day review period.  I'll confirm with co-counsel, but I

 4  believe that's correct.

 5            THE COURT:  I won't split hairs with you, but my

 6  understanding reading the statute is that that 10-day review

 7  period applies to rules that are proposed.  There's a 90-day

 8  provision that's set forth in 7 U.S.C. 7a-2(c)(5)(C)(iv) that

 9  gives 90 days once they commence their review proceeding.

10            MR. HAVEMANN:  I will get clarity on that, yes.

11            THE COURT:  And that's confirmed in 17 CFR 40.11(c).

12  Regardless, you're not -- switching gears slightly, you're

13  saying this -- you're not saying this is a commodity, correct?

14            MR. HAVEMANN:  So I want to make sure that I am

15  precise in my answer.  I think one of the definitions of

16  "commodity" in the CEA is as follows:  It is -- one type of

17  commodity is an occurrence, extent of an occurrence, or

18  contingency that is beyond the control of the parties to the

19  relevant contract, agreement, or transaction and associated

20  with a financial, commercial, or economic consequence.  That's

21  7 U.S.C. 1a(19).  And so I think that I want to make sure we

22  preserve all arguments, and I think that there is certainly an

23  argument that that qualifies as a commodity, but as I

24  understand it, the easiest way to think about these contracts

25  is as swaps.

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 15 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**15**

1    THE COURT:  Commodities defined in 7 U.S.C. 1a(9) --

2    MR. HAVEMANN:  19.

3    THE COURT:  I'm sorry.  19.  I've got 9 on my paper,

4    but you're probably right.  It means wheat, cotton, rice, et

5    cetera.  And setting aside the movie references, which I'm not

6    quite sure why a motion picture box office, but whatever.

7    -- all services, rights, and interests in which contracts for

8    future delivery are presently or in the future dealt in.

9         What does that mean in Kalshi's understanding?

10    MR. HAVEMANN:  I'm sorry.  I didn't follow the --

11    THE COURT:  At the end of that definition, the word

12    "commodity" means all services, rights, and interests, except

13    motion picture box offices, in which contracts for future

14    delivery are presently or in the future dealt in.  That's the

15    statutory language.  I'm at a loss to understand what that

16    means.  It, in a sense, almost swallows the rule because it

17    says a commodity is anything in which there's a contract for

18    future delivery that exists now or might be dealt with in the

19    future.

20    MR. HAVEMANN:  I have not focused on that specific

21    language.  I have a lot of colleagues at the table who I'm sure

22    will have a good answer to that question, but I don't want to

23    get over my skis here, so why don't I confer with them, and

24    when I get up on reply, I'd be happy to talk about that.

25    THE COURT:  Well, I don't want to spend too much

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 16 of 90

2:25-cv-575-APG-BNw   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**16**

1  time on it because it really just gets to whether or not,

2  again, this falls within the definition of a swap or a

3  commodity, so I'm going to set that aside temporarily.

4  　　　　We talked about the coin flip.  Could you or your

5  clients or me bet on the outcome of the D.C. Circuit Court of

6  Appeals' decision on your client's appeal there?

7  　　　　MR. HAVEMANN:  I don't -- I certainly don't believe

8  that Kalshi has a contract on that, so --

9  　　　　THE COURT:  But it could?  There's certainly

10  economic decision as a result, economic consequences.  The

11  purpose of a commodity, as you describe in your papers, is

12  somebody wants to hedge their bets.  In case corn futures drop,

13  I want a protection on the back end.

14  　　　　Certainly Kalshi could want to hedge its bet that it

15  loses in the D.C. Circuit, so it could, theoretically, create a

16  market and buy and sell contracts on the results of its appeal

17  of the D.C. Court of Appeals.

18  　　　　MR. HAVEMANN:  Yeah.  So the reason I'm hesitant to

19  answer the question is just because I know that there are

20  people within the company who sort of make these decisions and

21  may have made decisions with respect to any particular example

22  that you give, so I want to make sure that I'm giving Your

23  Honor an answer that's consistent with my client's views.  So,

24  again, I'm happy to confer and answer that question when I get

25  back up, but I think --

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 17 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

17

1          THE COURT:  Not that they would, but from a legal

2    standpoint, that would fall within the definition of a swap or

3    a commodity, correct?

4          MR. HAVEMANN:  I can see the argument that that

5    would be true because as long as it, you know, has financial

6    consequences, which often court cases will, so yes.

7          And, of course, there are protections that Kalshi

8    offers.  I mean, this gets to one of their arguments about the

9    public interest, and they say, well, you know, when we regulate

10   a sportsbook, we make sure that there's no self-dealing.  I

11   want to be clear, you know, to the extent the Court has

12   questions about that, I'm happy to answer them, but with

13   respect to basically everything that they lay out as a

14   protection that they would provide if Kalshi were subject to

15   State regulation, there are Federal analogs.  So know your

16   customer, anti-money laundering, making sure that there's no

17   self dealing, all of that is already required by Kalshi and

18   it's required by -- you know, the CEA imposes 23 core

19   principles -- you know this from our briefing, but this is

20   extensively regulated.  So to the extent that the State is

21   saying, you know, these are unregulated sportsbooks, that is

22   simply not correct.  They are heavily regulated by a Federal

23   authority.

24          THE COURT:  Let's focus on that, because you raised

25   the issue.  I noted that in your client's contracts for the

1  Final 4, who qualifies for the Final 4, there are rules that

2  Kalshi sets up, including you can't engage in this market if

3  you're a coach or a participant or an alum or something like

4  that.  But what I don't know is, what's the enforcement

5  mechanism?

6          For instance, the Nevada Gaming Control Board has

7  investigators, it goes out and looks for point shaving.  They

8  look at oddities in the sports betting, and that helps them

9  identify when there's problems.  And that's one of the great

10  facilities and services that the Gaming Control Board provides

11  to ensure legitimate betting.  I see rules that Kalshi puts in

12  place, but how does it monitor?  How does it do anything to

13  make sure those rules are followed and not broken?

14          MR. HAVEMANN:  So I can give Your Honor a high-level

15  answer, and then I think I can be able to give a more specific

16  answer, but the high-level answer is that the CEA requires, so

17  one of the core principles requires any designated contract

18  market to have the ability to make sure that its rules are

19  being followed.  So Kalshi has compliance officers and the like

20  that look into this very thing.

21          So if Your Honor needs a more specific answer, I'm

22  happy to provide it, but the high-level answer is, as required

23  by the CEA, one of, or I think actually more than one of, the

24  core principles deal with precisely this issue, that is, making

25  sure that designated contract markets have mechanisms in place

1    to make sure that their rules are complied with.  And that's

2    certainly true of Kalshi.

3            And that's why it's, frankly, quite difficult to

4    obtain designation as a contract market.  It is a very, very --

5    it is a comprehensive and difficult-to-meet statutory scheme,

6    and that's why it is so important to Kalshi that it maintain

7    its designation under the CEA.  And one of the things we note

8    is, you know, part of our worry in this case is that if, you

9    know, Nevada, let alone not just Nevada but many other States,

10   can exercise authority over Kalshi and say, well, you know, we

11   think that you're really a sportsbook and, therefore, we think

12   you have to cease your operations in the state, that is really

13   in conflict with core principles to which Kalshi is subject.

14           THE COURT:  I get that.  I get that.  On that point,

15   though, you say in your reply at Page 7 that preemption would

16   simply prohibit Nevada from subjecting Kalshi to State laws

17   that conflict with Federal law.  But what about State laws that

18   are complementary to the CEA?  For instance, as we just talked

19   about, the Nevada Gaming Control Board has rules and

20   regulations to catch point shaving.  They have investigators

21   and things like that to catch cheats, which certainly furthers

22   the purposes of the CEA and furthers the purposes that Kalshi

23   would like to uphold.  So is there room in the CEA and this

24   regulatory scheme for Nevada gaming laws that complement CEA's

25   purposes?

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 20 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

20

1          For instance, regulations that say, just like the

2     Federal law, we need to see disclosures, we need to see

3     enforcement, we're going to look at cheats and things like

4     that?

5          MR. HAVEMANN:  Yeah.

6          THE COURT:  Or is that preempted completely, too?

7          MR. HAVEMANN:  So the answer is it's preempted

8     completely, and that derives from the language of the statute.

9     It derives from that exclusive jurisdiction provision.

10          THE COURT:  But it's not a conflict; it's a

11     complement.  It's a complementary law.

12          MR. HAVEMANN:  Right.  But, of course, there are two

13     types of preemption at issue here.  One is field preemption

14     which preempts the field.  It even preempts, you know, State

15     regulation that is perceived to be complementary.  And then

16     there is conflict preemption which deals with actual conflicts.

17          So with respect to field preemption, it would be

18     preempted even if it were correct that State law is

19     complementary.

20          With conflict preemption, it is true that as a

21     matter of -- as a theoretical matter, complementary State laws

22     are not conflicted, but the problem here is that the scheme to

23     which Nevada is threatening to subject Kalshi is not, in fact,

24     complementary.  Even if there are particular provisions that

25     one could look at and say, well, I sort of think that's the

1  same as what the CFTC is trying to do, when you look at the

2  scheme as a whole, the threat of criminal penalties, the threat

3  of massive civil liability, the -- you know, all of the

4  respects in which what they are requiring Kalshi to do would

5  imperil Kalshi's Federal regulatory authority.  All of that

6  shows that there is an actual conflict here.

7            THE COURT:  All right.  Let me back up again

8  factually and make sure I understand how your client operates.

9            Kalshi is a facilitator.  It's the platform, the --

10  well, it creates the markets, but let's say it's the platform

11  that hosts these various markets for contracts.  So it creates,

12  I'm presuming -- it creates the question or the contract that

13  someone is then going to buy or sell, correct?

14            So Kalshi says, we're going to create the question

15  "Who's going to qualify for the Final 4?"  That's a

16  Kalshi-created question that, in a sense, sits on the platform,

17  and then buyers and sellers come in and out of that?

18            MR. HAVEMANN:  That is correct.

19            THE COURT:  Who sets the initial price?  The first

20  person who comes in and says, I'll buy that for a dollar?  Or

21  somebody says, I'll sell that for a dollar?  Or does Kalshi set

22  the initial price?

23            MR. HAVEMANN:  Kalshi does not set the initial

24  price, and I don't know -- with respect to the initial price, I

25  would want to confer with Mr. Heaslip, but I suspect that there

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 22 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**22**

1  is sort of sufficient demand for a contract before it goes

2  online so that there's a sense of what the contract -- starting

3  contract price would be and then it fluctuates, depending on

4  how facts on the ground play out, how traders view the

5  contract.

6         THE COURT:  Okay.  So presume for a second it's like

7  an auction.  I'm going to auction the question of "Who's going

8  to qualify for the Final 4?  Is there an opening bid?"  And

9  somebody then -- that way -- because the point is Kalshi

10 doesn't set the price?

11        MR. HAVEMANN:  I -- yes, that is true.  And I want

12 to make sure I have a precise answer to Your Honor's question

13 on the more specific point, but yes.

14        THE COURT:  I appreciate it.  But the point you've

15 made in your papers is, that's why it's not the house like a

16 sportsbook, because you're not setting the price that everybody

17 has to to bid at, correct?

18        MR. HAVEMANN:  Yes, that is correct.

19        THE COURT:  How does Kalshi make its money on these

20 contracts?

21        MR. HAVEMANN:  It takes a small percentage fee of

22 each, like other exchanges.  So -- or like a stock change, it

23 takes a small percentage fee of the contract price.  And it

24 does not benefit depending on someone winning or losing.  And

25 that is, again, one of the big differences between Kalshi and

1  the types of entities that I think the Board may be concerned

2  with because, there, sportsbooks, or the house, they set a

3  line, they set a line in a way that they believe is

4  advantageous to them.  They stand to benefit from setting the

5  line in a particular way.  The same incentives, the same

6  opportunities for abuse, do not apply to Kalshi, and that is,

7  in part, what justifies the very different regulatory treatment

8  that the exchanges get --

9          THE COURT:  Although sportsbooks in Nevada usually

10  charge what's called a vig or a vigorish, whereby we'll take

11  the money and try to get the bets on either side, so we

12  ultimately at least prevail on the vig.  That doesn't always

13  work, so in a sense, there's a similarity there because we've

14  got a commission, in a sense, on what's bet.

15          Regardless, if I pick the Vegas Golden Knights to

16  win the Stanley Cup, that's a contract that's, say, on the

17  market, and I say, yes, VGK is going to win the Stanley Cup and

18  I succeed in that bet -- that contract, I apologize -- and it's

19  $100, who do I collect my $100 from?

20          MR. HAVEMANN:  From the counterparty.  From your

21  counterparty to the contract.

22          THE COURT:  Does that money go through Kalshi to me,

23  or is it I've gotta contact them and collect from them

24  directly?

25          MR. HAVEMANN:  This gets very technical.  I know

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 24 of 90

2:25-cv-575-APG-BNw   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

24

 1  that there is a clearinghouse that Kalshi uses.  I know that

 2  that is subject to Federal regulation and Federal oversight and

 3  obligation, so I would need to again confer just to make

 4  sure -- I want to make sure I'm being very precise and not

 5  saying anything wrong --

 6          THE COURT:  Of course.

 7          MR. HAVEMANN:  -- but you collect from a

 8  counterparty.  It may go through an intermediary.  The

 9  intermediary itself is heavily Federally regulated.  And then

10  it comes to the person who prevails or who, you know --

11          THE COURT:  So if I don't get paid, I send my

12  kneecappers to the person who made the offer?  The person

13  that -- my counterparty on the wager, on the contract, is who I

14  ultimately get my money from?

15          MR. HAVEMANN:  Is who you ultimately get your money

16  from, that's correct.

17          THE COURT:  So that person is the person who, in a

18  sense, sets the price of the contract, right?  Because they

19  say, I'll bet -- I'll contract for $100, I'll take that

20  contract, and so then they're my opposing counterparty?

21          MR. HAVEMANN:  Yes.  That's right.

22          THE COURT:  In a sense, the other market participant

23  is more like the house and the sportsbook because they're

24  setting the price?

25          MR. HAVEMANN:  That's right.  And that creates the

**25**

1  different incentives that, you know, distinguish the way -- and

2  I want to be careful to say because it distinguishes the way

3  that Kalshi is regulated because, of course, it is heavily

4  regulated, but it distinguishes it from --

5  THE COURT:  Right.  So that's why Kalshi is not the

6  house, it's not the sportsbook.  In a sense, the other market

7  participant is the house or the sportsbook because they're

8  setting the price.  And they're not a regulated market

9  participant like Kalshi is, so the Gaming Control Board could

10  regulate the market participants because they're not regulated

11  market participants, but they're like the house setting the

12  price.

13  MR. HAVEMANN:  I'm not sure.  I want to make sure

14  I'm understanding Your Honor's question.

15  THE COURT:  Let me try to explain it better because

16  I did a bad job.

17  Your argument in your papers is that the CFTC

18  governs market -- governs those participants who are approved

19  by the CFTC.

20  MR. HAVEMANN:  Designated contract markets, that's

21  right.

22  THE COURT:  Yes.  Okay.  So the market

23  participants -- Kalshi's an approved CFTC market participant.

24  The people who are buying and selling the contracts are not

25  CFTC approved or regulated, so they're subject to Gaming

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 26 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

26

1    Control Board regulation because they're not approved by CFTC.

2    They're more like the house setting the bet price, so the

3    Nevada Gaming Control Board can go and regulate the market

4    participants because they fall outside of the CEA by

5    definition?

6            MR. HAVEMANN:  I'm not sure what authority the

7    Gaming Control Board would have --

8            THE COURT:  Because here's their authority:  You say

9    that the CFTC has exclusive jurisdiction over people, entities,

10   whatever, that are approved by the CFTC.  Mom and Pop, Joe and

11   Fred dealing with contracts are not approved by the CFTC.

12   They're the buyer and seller of the contracts.  So they're not,

13   by definition, subject to the exclusive jurisdiction of the

14   CEA.  So, therefore, because they are not registered with the

15   CFTC, Gaming Control Board can regulate them.

16           MR. HAVEMANN:  I think I follow Your Honor's

17   question.  I think -- and I want to be very precise in the

18   answer.  What the Gaming Control Board is trying to do here is

19   to take Kalshi's contracts off the market.  So that is a clear,

20   in our view --

21           THE COURT:  I get that.  I'm going a little far --

22           MR. HAVEMANN:  So to the extent it's regulating

23   Kalshi, we think there's a serious problem here.  If the Board

24   thinks it has some other authority to not regulate Kalshi but

25   to regulate others, I mean, I would still think that you would

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 27 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

27

 1  have a big problem there because you'd just be sort of

 2  circumventing the plain language of the statute by saying,

 3  well, we're -- you know, I don't even know -- exactly know how

 4  they would do it because in order to regulate the market

 5  participants, I would think that you would have to regulate the

 6  exchange.  But then you could have a fight about -- I mean, I

 7  can imagine arguments on both sides of that question --

 8            THE COURT:  Sure.

 9            MR. HAVEMANN:  -- but that is very different from

10  what, you know, the Board sent a cease and desist letter to our

11  client threatening criminal and civil liability to --

12            THE COURT:  Let me stop you.  I agree.  I'm getting

13  far afield here, but I'm trying to sort of understand the

14  parameters of the argument you're making sort of with pushing

15  the envelope on certain examples to test this exclusive

16  jurisdiction argument.  That's why I'm sort of playing around

17  with it a little bit.

18            MR. HAVEMANN:  Sure.  And maybe one, if I may, one

19  helpful articulation of the standard that we think applies

20  comes from the 7th Circuit, which addressed an argument I think

21  much like the one that the Board is making here.  And what the

22  7th Circuit said in addressing the very same statutory language

23  we have here is, if a State law would directly affect trading

24  on or the operation of a futures market, it is preempted.  And

25  that's from the *American Agriculture Movement* case from 1992.

Case 2:25-cv-00575-APG-BNW    Document 46    Filed 04/14/25    Page 28 of 90

2:25-cv-575-APG-BNw    MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

28

1    And we think that that is right.

2            And so Courts have sort of -- you know, there's a

3    line between what would directly affect trading on a market and

4    what would not, and so Courts have found that if you're

5    bringing a fiduciary breach claim against your broker maybe

6    that's not preempted, but here, I think the -- I don't really

7    see any argument that's not a direct regulation of the market

8    itself.

9            THE COURT:  Well, let's test that for a second.  I

10   don't disagree that's what the 7th Circuit said, but let's talk

11   how broad that language goes, because if the State law would

12   directly affect trading on the operation of your market, so

13   your market is who wins the Final 4 -- and that's clearly

14   within the CFTC is what you're arguing, that's one of your

15   contracts -- sportsbooks here in Nevada take a whole bunch of

16   bets on who makes the Final 4.  The Nevada Gaming Control Board

17   and Gaming Commission regulate all of that through sportsbooks.

18   The competition between a sportsbook and your client's

19   contracts on the Final 4 directly affect each other.  So if you

20   take that 7th Circuit language that anything that directly

21   affects your operations would be barred or preempted, that

22   would suggest that Nevada cannot regulate gaming, betting on

23   the Final 4, because they're going to take away market

24   participants from your market because people want to bet in a

25   sportsbook.  So where's the cutoff there?

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 29 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**29**

1    MR. HAVEMANN:  So that's certainly not our argument

2  and that's not how Courts have interpreted the 7th Circuit's

3  language, and I think it's a question of attenuation.  So, you

4  know, if what you're saying is there's a, you know, act on the

5  part of a third-party that affects a third-party that affects

6  the trading on a DCM, or designated contract market, maybe

7  that's sufficiently attenuated from a State law that affects

8  the designated contract market itself that a Court would say,

9  it's not direct -- it does not directly regulate the DCM and,

10  therefore, it's subject to regulation by a State, but I don't

11  think the Court needs to touch any example like that to rule in

12  our favor in this case because we are, I think, in the

13  heartland of what the 7th Circuit's language clearly

14  contemplates.

15    And I would add, it's not just the 7th Circuit's

16  language; it's the D.C. Circuit's language, it's Judge

17  Friendly's language in the 2nd Circuit --

18    THE COURT:  Yeah, I read your brief.

19    MR. HAVEMANN:  -- it's what the CFTC said in its

20  D.C. Circuit brief just a few months ago about how State laws

21  are preempted here, so --

22    THE COURT:  But, again, you know, what's the breadth

23  of that preemption?  If you take that language on its face that

24  you just read to me, the fact that Nevada gaming laws allow

25  sportsbooks to operate, that's in direct competition with your

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 30 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

30

1  client's business.  That's a direct effect on your client,

2  because someone could bet on the Final 4 with a sportsbook or

3  someone could place a contract offer on the same thing with

4  your client.  That's not attenuated three parties around;

5  that's direct competition.

6         And so taking your argument to its next logical

7  conclusion, there is no space for the Nevada gaming laws

8  whatsoever if they compete with your client.

9         MR. HAVEMANN:  So that's -- again, that's certainly

10  not our argument.  And I --

11         THE COURT:  Where's the line drawn, then?  What

12  happens tomorrow when the gaming -- when somebody else tries to

13  do something in that regard?  You can't touch it?

14         MR. HAVEMANN:  The question is whether it's direct,

15  and I respectfully think, in response to your hypothetical, I

16  would argue that that is not a direct regulation of the market

17  itself.  It's -- it directly -- it's an indirect regulation

18  because you have an effect on one party, and the effect on that

19  party affects the designated contract market.

20         And so I think that -- I mean, you know, you would

21  have briefing and you would have arguments about whether the

22  effect is direct or not, but for present purposes, I don't see

23  any -- I did not see any argument in the State's opposition

24  that this is not a direct effect.  I don't -- I cannot come up

25  with such an argument myself.  And I think that -- so I think

Case 2:25-cv-00575-APG-BNW    Document 46    Filed 04/14/25    Page 31 of 90

2:25-cv-575-APG-BNW    MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**31**

1  that, you know, the Court can leave those hard questions to the

2  side about where exactly the line is with respect to preemption

3  because I think we are in the heartland of it.

4         And particularly -- I mean, I know the Court read

5  our brief, so I don't want to recapitulate things that we've

6  already said and you already know, but I do want to state for

7  the record, we are here on a TRO and so the question is

8  likelihood of success on the merits.  We have clear statutory

9  language.  We have all this weight of authority.  We have the

10 purpose of the 1974 amendments.  We have a conference report.

11 We have all of these indicia of Congressional intent that

12 suggest that Congress did not want States to do exactly what

13 the Gaming Control Board is doing here.

14        And what we are asking this Court to do today is not

15 to rule for us at the end of the day but to prevent the State

16 from subjecting us to irreparable harm in the meantime.  And I

17 do want to emphasize that irreparable harm in the meantime.

18        THE COURT:  You read my mind.  I'm getting there

19 right now.  Let's talk about irreparable harm.

20        Why do you need an injunction against enforcement?

21 Can't you just defend when -- and I'll use "when," not "if" --

22 but when the State of Nevada comes after your client, can't you

23 defend and simply say, these laws are preempted, Nevada Court

24 is going to follow the law, presumably?  Why do you need it now

25 ahead of time?

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 32 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

32

1    MR. HAVEMANN:  Because we are in an impossible

2  choice in the meantime.  And this is exactly what Justice

3  Scalia noted for the Court in the *Morales* case that we cite in

4  our opening memorandum and in our reply.  It's a Hobson's

5  choice, right?  You either have to subject yourself to the risk

6  of potentially massive liability if it turns out that a Court

7  disagrees with you on the law, or you have to undergo all of

8  the irreparable costs of compliance during the time it takes

9  this Court to resolve the question and any appeal.  And what

10  Justice Scalia said for the Court in *Morales* is it is Hobson's

11  choice.  That is a classic case for injunctive relief, and

12  there are many other cases that say the same.

13    And I'll note that the State says that, well, these

14  are monetary harms and you can normally recoup monetary harms.

15  The key point for present purposes is, this is an *Ex Parte*

16  *Young* case, it's against State officials, so the availability

17  of damages is far from clear and probably --

18    THE COURT:  But isn't this a self-created harm?  I

19  mean, you -- your client put out these election contracts even

20  after the CFTC took the appeal to the Court of Appeals, even

21  after the CFTC said you shouldn't do it, so in a sense, you've

22  created your own Hobson's choice.  You've created your own

23  harm.

24    MR. HAVEMANN:  Oh, no, Your Honor.  I mean, in any

25  case in which a State law is, you know, alleged to be

1  preempted, presumably there is an entity that is violating the

2  State law, and the question is, they're entitled -- the State

3  law does not operate against them because Federal law operates

4  on them, and what Kalshi is doing is entirely permissible under

5  Federal law.  And so it's not, you know, a self-inflicted

6  injury because, you know, Kalshi, just like the Chicago

7  Mercantile Exchange, just like every other designated contract

8  market, had every reason to look at the statutory scheme that

9  applied to them and think, we are entitled to offer these

10  contracts as long as, you know, the CFTC says we are.

11       THE COURT:  And it could have sought pre-approval

12  from the CFTC under the statutes and avoided significant

13  questions here.  It can submit this for pre-approval, and it

14  didn't.

15       MR. HAVEMANN:  It can, but it does not have to.  And

16  the key -- but, you know, Your Honor referenced the political

17  event contracts.  I mean, the key point I would emphasize to

18  Your Honor is that Kalshi prevailed.  So, you know, talking

19  about conflict preemption --

20       THE COURT:  In one Court.

21       MR. HAVEMANN:  -- we have a judgment from the

22  Federal Court that says these contracts are permissible under

23  Federal law.

24       THE COURT:  And the CFTC's challenging that.

25       MR. HAVEMANN:  And the CFTC is challenging that, but

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

34

1   we have a final judgment.  But the point is that regardless of

2   whether the CFTC prevails on appeal or not, the key point

3   stands, which is that this is a job for the CFTC.  This is a

4   judgment that Congress gave to the CFTC.  It is not a judgment

5   that Congress wanted 50 States and the District of Columbia to

6   be able to make because, in the view of the sponsor of the act,

7   that would lead to total chaos.  That was the point of the 1974

8   amendments, to protect subjecting exchanges like Kalshi to 51

9   different potentially conflicting regulatory schemes, which

10  would be just untenable in practice.

11        THE COURT:  All right.  Let's focus a little more on

12  the damages.  You describe the geofencing, or the lack of the

13  need to do it at this point.  No doubt it's, I'm guessing,

14  expensive to install geofencing, but I don't have any evidence

15  in front of me that says it's so expensive that it would

16  essentially run Kalshi out of business.

17        MR. HAVEMANN:  There is evidence in the declaration

18  that it would cost to the tune of tens of millions of dollars a

19  year.

20        THE COURT:  Right, but I don't know if your client's

21  making billions or if it's making hundreds of millions or if

22  it's making tens of millions, in which case then there is that.

23  But it's one thing to say it costs X, but $10 million to IBM is

24  different than $10 million to Joe's Taco Shop.

25        MR. HAVEMANN:  So I can certainly represent to you

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 35 of 90

2:25-cv-575-APG-BNw   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**35**

1   that this would be extraordinarily expensive for the company.

2   And I can also point Your Honor to the -- it's the *Simula* case,

3   which is actually cited in the defendants' opposition, which

4   makes clear that irreparable harm does not require, you know,

5   catastrophic out-of-business harm.  The question is irreparable

6   harm, and so the key point for these purposes is that this is

7   tens of millions of dollars, it's months of negotiation that

8   Kalshi could not get back even if it prevailed in this lawsuit.

9   And that is all we need to show for purposes of irreparable

10  harm.

11          And, of course, we show far more because, separate

12  and apart from the significant monetary harm that Kalshi would

13  suffer from trying to comply -- and, again, I emphasize trying

14  to comply because it's not clear that it really could comply in

15  the short-term or immediately as the Board requires.  And in

16  the meantime, of course, it is incurring potential liability.

17  But separate and apart from the monetary harm, there are other

18  harms that we identify in the declaration --

19          THE COURT:  Yeah.  You brought up the Robinhood

20  deal.  Again, why isn't that compensable?  It's a monetary

21  loss.  You lose the Robinhood deal, you either sue Robinhood

22  for improperly backing away from the deal, or there's some

23  other monetary remedy.  How is that irreparable harm?

24          MR. HAVEMANN:  Because I'm not sure -- I want to be

25  quite clear in my answer, but I'm not sure that there would be

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 36 of 90

2:25-cv-575-APG-BNw   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

36

1  a remedy against Robinhood.  Robinhood may well have been

2  within its rights to do this, but the reason it did it was

3  because of the threat by Nevada and other states.  And so we

4  may not have a remedy against Robinhood.  And the wrongdoer, in

5  our view, or the person who caused this injury is the State,

6  and we don't have a remedy against the State officials sued in

7  their official capacity.

8          THE COURT:  Okay.  Switch gears.  You state in your

9  papers that you've got 10,000 Nevada users with millions

10  invested, but I guess the question is, how many of those

11  contracts are sports or election-related that the Government

12  seeks -- that the Nevada Government seeks to stop you from

13  doing?

14          MR. HAVEMANN:  Well, I want to be very clear about

15  the language of the cease and desist order.  The language of

16  the cease and desist order refers to all event contracts in

17  Nevada, not just sports or elections.

18          THE COURT:  Fair enough.

19          MR. HAVEMANN:  So that's why the declaration is

20  written that way, because, you know, we would want to take an

21  abundance of caution.  We have a letter from the State that

22  says all of your contracts are unlawful, and so we take that

23  very seriously.

24          THE COURT:  So if you stopped all of the

25  Nevada-based market participants, how many is that?  How big of

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 37 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

37

1  a percentage of your client's business?  Again, how is that

2  irreparable in the sense what's the impact on your client's

3  business?  Is it a drop in the bucket?  Is it a huge amount?

4          MR. HAVEMANN:  Well, it's the same answer.  It's

5  irreparable in the sense that we can't get it back.  And it is

6  significant.  It's not de minimis or anything like that.  It is

7  significant and it's irreparable in the sense that you can't

8  get it back, and that's what the law requires.  It does not

9  require it to, you know, be so catastrophic that it puts the

10  company out of business.

11          But I also note -- and this is also in the

12  declaration -- that, you know, because these are contracts

13  between counterparties, you have Nevada users who have open

14  positions on the platform, and they are not necessarily, or

15  even probably, in contracts with other people in Nevada, so

16  this has spillover effects not just in Nevada but outside of

17  Nevada.  And no matter how we understand the Board's cease and

18  desist letter, there would be harm to users.

19          THE COURT:  Okay.  What standing do you have to

20  raise the harm to the users?  That's their damage, not yours.

21  They're the ones that lose the millions of dollars, not you.

22          MR. HAVEMANN:  Oh.  So for purposes of Article III

23  standing, I mean, the State has not disputed our Article III

24  standing here and so we are not relying --

25          THE COURT:  I always have to look at it.

**38**

1   MR. HAVEMANN:  -- we are not relying on harm to

2  users for purposes of establishing standards --

3   THE COURT:  It's in your papers, significantly.

4   MR. HAVEMANN:  But not for purposes of establishing

5  standing, Your Honor.  And I want to be clear about that.  For

6  purposes of the equitable factors that this Court --

7   THE COURT:  Let me pause you.  I'm interrupting you.

8  I apologize.

9   You refer in your papers to the damages that your

10  market participants will suffer as if that's a damage that I

11  should consider in irreparable harm, but you don't have

12  standing to raise that damage because that's a harm to your

13  investors.  They're the ones that suffer the millions because

14  they're the ones that make the -- make the contract wagers.

15  You lose your vig, your commission.

16   MR. HAVEMANN:  So we do not rely on harm to users

17  for purposes of establishing standing, but it is entirely

18  appropriate for this Court to consider harm, not just to

19  Kalshi, but to third-parties in weighing the equitable factors

20  that the Court considers in deciding whether to issue

21  injunctive relief.

22   In *Stormans v. Selecky*, which is a case that we

23  cite, I believe in our opening memorandum, it makes clear that

24  you can consider harm to non-parties in evaluating especially

25  the public interest, which is the last of the factors the Court

1  considers.  And if complying, you know, because complying with

2  the Board's demands here would impose substantial harm on

3  third-parties, that is certainly appropriate for the Court to

4  consider in evaluating injunctive relief.

5          THE COURT:  Okay.  You assert in your papers that

6  Kalshi could lose its CFT designation as part of your

7  irreparable harm, the core principles argument, but Kalshi has

8  to show a likelihood of irreparable harm, not a mere

9  possibility.  So what evidence do you have that the CFTC is

10  likely to pull your registration or designation as a result of

11  the Nevada Gaming Authority's prohibiting you from taking

12  Nevada-based wagers?

13          MR. HAVEMANN:  Well, the...  Of course, anytime a

14  party comes to the Court seeking a TRO, it's because they are

15  predicting future consequences, so in that sense, the harm has

16  not occurred.  We can't say for 100 percent certainty --

17          THE COURT:  I get it.  What's the likelihood that

18  it's going to happen?

19          MR. HAVEMANN:  But the likelihood is, if you look

20  at the -- you know, the plain text of the core principles, the

21  two that we focused on, but there are others, are you have to

22  offer impartial access to your platform and you have to do --

23  take best efforts to avoid market disruptions.  And if Kalshi

24  were to voluntarily comply with the State's demand while this

25  case were litigated, they're -- you know, it is very difficult

**40**

1   to reconcile cutting off access to contracts, even open

2   contracts, to members of one state with the obligation to

3   make -- to offer impartial access and to avoid market

4   disruptions because the market disruption from that would be

5   significant.

6           THE COURT:  Let me pause at the solution to that.

7   Under the statute, you can seek pre-approval.  And so you go to

8   the CFTC and say, Nevada's not allowing us to take Nevada bets.

9   We propose setting up this contract to exclude Nevada bets,

10  wagers, acceptances on the contracts.  CFTC blessed this, if

11  you would, it's not our fault, we're trying to be across the

12  board, open to everybody, but we're prohibited by State law, so

13  bless this.

14          They bless it or they don't, but that absolves you

15  from a problem of a core principle violation.  Isn't that a

16  solution to your problem so it's no longer irreparable harm.

17          MR. HAVEMANN:  I don't think so, Your Honor, because

18  that still leaves the problem of open positions.

19          THE COURT:  The open positions, maybe, going

20  forward.  Okay.

21          MR. HAVEMANN:  And going forward, I think there

22  would be other issues with that.  And if the Commission says

23  no, the Commission says --

24          THE COURT:  Then you don't do it.

25          MR. HAVEMANN:  And then you incur the irreparable

Case 2:25-cv-00575-APG-BNW    Document 46    Filed 04/14/25    Page 41 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**41**

1  harm of complying in the meantime.  And all of this is so

2  uncertain.  I mean, all of this is so uncertain that this is

3  really the point of coming to a Court and seeking a temporary

4  restraining order is you have the certainty of massive

5  financial harm, you have the risk of imperilling your CFTC

6  designation, which would be catastrophic.  It would be

7  existential to Kalshi.  You have the harm to users and you have

8  the reputational risk.  And the reputational risk is a

9  certainty.

10        I mean, the analogy here is if the Chicago

11 Mercantile Exchange said, hey, sorry, I know you have open

12 contracts with us, but we are cutting them off in a particular

13 state.  That is unfathomable and that is what we are -- that is

14 what the Board is contemplating here.  And the next time a

15 trader wants to place a position, are they really going to do

16 it on a platform that is subject to that kind of volatility,

17 that kind of uncertainty, not just in Nevada, but other states?

18 And that is something that cannot be regained even if we

19 prevail at the end of this lawsuit.  And that is another

20 independent irreparable harm.

21        THE COURT:  Shifting gears, should I ask the CFTC to

22 chime in on its position on preemption and the legality of

23 sports-based contracts?

24        MR. HAVEMANN:  We would welcome the CFTC's

25 participation and feel confident that they would support us.

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

42

1    THE COURT:  If I decide I need an evidentiary

2 hearing on irreparable harm, how long -- think about this.  You

3 don't have to answer now.  I'm going to throw this out to the

4 other side, too, but how long would it take for you all to get

5 ready for that?

6    MR. HAVEMANN:  I'll think about that, Your Honor,

7 and I can represent that we would do it as quickly as possible.

8    THE COURT:  Okay.  Let's turn to bond, as required

9 by the rule.  You say a de minimis bond, but I need to

10 anticipate potential damages that could arise as a result of an

11 improperly imposed restraining order.  So what are the damages

12 to the defendants if I improperly restrain it, in your mind,

13 that would lead to a bond amount?

14    MR. HAVEMANN:  I'm not sure I can represent the

15 defendant's harm.  I mean --

16    THE COURT:  I'm just guessing, if you've got any

17 thoughts.  Here's the thought that came to me:  The State of

18 Nevada contends it's here to protect the Nevada public from

19 illegal improper sports betting.  Accepting that as true for a

20 second for purposes of the bond amount, the injury would be to

21 all Nevadans who invested in these allegedly illegal sports

22 contracts.  So that would suggest the bond amount would be

23 equal to whatever contracts, wagers, bets, whatever you want to

24 call them, that Kalshi accepts from Nevada people.  Why is that

25 not an appropriate bond amount?

Case 2:25-cv-00575-APG-BNW    Document 46    Filed 04/14/25    Page 43 of 90
2:25-cv-575-APG-BNw   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

43

1        MR. HAVEMANN:  I'm not sure even the State would --

2  or the Board would argue that the entire amount of --

3        THE COURT:  They're probably going to now, but go

4  ahead.

5        MR. HAVEMANN:  Now that you've floated that

6  proposition.  They certainly didn't argue it in their

7  opposition.

8        I don't know that it is a tenable argument to say

9  that the full value of the contracts is the amount that the

10  State would lose.  And, remember, this is the monetary value

11  that the State would lose in the event that an injunction is

12  issued and they ultimately prevail.  So I don't think that they

13  stand to lose anything because their position is these

14  contracts are unlawful.

15        So if they're claiming they're worried about, you

16  know, missed tax revenue, they wouldn't get that tax revenue

17  under their interpretation of the law because these contracts

18  would not be permitted under law.  So that is sort of the

19  argument that I expected to see in the opposition and didn't.

20        So I don't know that they have really made any

21  argument from which I could make a determination about what the

22  appropriate bond is, and for that reason I don't think that a

23  bond is necessary.  And there are cases that say that in this

24  sort of case it's not necessary for the Court to issue a bond,

25  but if you do, I think a de minimis bond is appropriate.  And,

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 44 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**44**

1   of course, should the Court disagree or be persuaded, you know,

2   we do not want the size of the bond to be the hold-up here and

3   so we would do our -- obviously do our best to comply.

4           THE COURT:  All right.  Let me go beyond that and

5   say -- or ask you, what do you see as the future to this case

6   after today?  If an injunction is entered or an injunction is

7   denied and we have an evidentiary hearing, is this purely a

8   legal question going forward?  Do you see the need for an

9   evidentiary trial?  Is it just we'll do briefs later, cross

10  briefs on summary judgment or something, or how do you see --

11          MR. HAVEMANN:  I have given some thought to that

12  question, Your Honor, but I would want to make sure that I

13  confer with the client before I stake a position on that.  But

14  my high-level answer is, I think this is largely a legal

15  question and I hope that it can be resolved promptly.

16          THE COURT:  That was my initial thought, too.

17          All right, I've beaten up on you enough.  Anything I

18  didn't cover that you want to make sure I know?  I'll call you

19  back up for rebuttal because you get the last word, but

20  anything else?

21          MR. HAVEMANN:  No.  Thank you very much, Your Honor.

22          THE COURT:  Thank you for suffering my questions.

23  Well-done.

24          Ms. Whelan?

25          MS. WHELAN:  Good morning, Your Honor.

*2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!*

**45**

1      THE COURT:  Let me begin by asking if you agree that

2  Kalshi's exchange is registered designated by the CFTC.  You

3  don't dispute that, correct?

4      MS. WHELAN:  Correct.

5      THE COURT:  And why doesn't the CFTC have exclusive

6  jurisdiction over that exchange?

7      MS. WHELAN:  Well, they do have exclusive

8  jurisdiction over the exchange itself.  Nevada does not want to

9  come in and regulate the exchange.  It wants to leave that to

10  the Feds, believe me.

11      What Nevada wants to do is protect Nevada consumers

12  and the perception of the gaming industry in Nevada, which as

13  Your Honor knows, is one of the preeminent gaming industries in

14  the country.  So we're here to protect the integrity of the

15  industry, we're here to protect Nevada consumers, and we're

16  here to protect against the Federal Government's encroachment

17  on the State's -- the State's police power, you know, the 10th

18  Amendment traditional realm of regulation that the State itself

19  reserves.

20      THE COURT:  All well and good, but the argument made

21  in the reply is -- their argument is that CFTC has exclusive

22  jurisdiction over regulated registered markets like this and

23  whatever they do.  And you're trying to say, no, the preemption

24  doesn't apply to the field of gaming.  They're not arguing

25  that.  They're arguing that it's over regulated markets and if

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 46 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

46

1   that happens to intrude upon gaming, sobeit, just like if it

2   happens to intrude upon agriculture, some States' agriculture

3   law or something like that, it still says the statute says

4   exclusive jurisdiction.  How do you get beyond the language in

5   the statute that gives the CFTC exclusive jurisdiction?

6           MS. WHELAN:  Well, I think that the two regimes can

7   exist in a complementary fashion.  And I understand the

8   language of the statute, but then when you look at the CFTC's

9   definition of what is a swap or what is an event-based contract

10  or -- you know, that falls under there, we talk about the

11  economic consequences.

12          And you had this colloquy with my friend on the

13  other side.  There are economic consequences to virtually

14  everything, I would say even the coin flip.  I would say a prop

15  bet where, will Maxx Crosby have more than one and a half

16  sacks, still economic consequences, for Mr. Crosby, for the

17  Raiders who probably have a better record when Maxx Crosby has,

18  you know, more than one and a half sacks and so forth.  So I

19  think you have to look at how -- you know, how much are we

20  going to allow this preemption?

21          Kalshi argues that it is any State law that

22  interferes is going to be preempted.  The legislature is in

23  session right now.  Let's say they pass a law that 18 is no

24  longer the age for contracting; it's 19.  Is that law preempted

25  by the Federal -- the Federal field preemption?  And can

Case 2:25-cv-00575-APG-BNW    Document 46    Filed 04/14/25    Page 47 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

47

1  18-year-olds in Nevada enter into these contracts but not any

2  other contract in Nevada?

3          It's a similar situation to that hypothetical where

4  we have, in the state of Nevada, 21 is our age to gamble, to

5  place bets, to place wagers, but 18 is the contracting age.

6  And so you have 18, 19, and 20-year-olds in Nevada who are able

7  to place bets, for lack of a better term, on Kalshi's exchange

8  without regulation, without dispute resolution mechanisms and

9  things of that nature.

10         THE COURT:  I get the argument and I get the concern

11 wholly and the purposes behind the Nevada gaming rules, and the

12 purposes that the Gaming Control Board and Gaming Commission

13 are trying to enforce are good ones, but I'm getting hung up on

14 the express language of the statute that says the exclusive

15 jurisdiction is vested in the CFTC.  And I'm charged with

16 following the express language of statutes unless they don't

17 apply.  And that's what I'm trying to figure out is, how does

18 the exclusive jurisdiction not apply here when it says, over

19 swaps, over commodities?  It seems to give the CFTC

20 jurisdiction to decide, is this a swap?  And if it's a -- comes

21 in under a regulated market participant, that's the way it

22 works.

23         MS. WHELAN:  Well, I think Kalshi itself in its

24 motion mentioned that, you know, in field preemption, we really

25 look at the intent of Congress.  So the CEA was first passed in

1  1936, amended significantly in 1974.  When you look at the

2  landscape of what was happening in America in those two time

3  periods, Nevada was the only State where gaming was legal, the

4  only State where you could place sports bets, so it's hard to

5  see how sports betting as a commodity was in the contemplation

6  of Congress at the time it passed these statutes.

7          Since 2018, obviously, and the U.S. Supreme Court

8  case that allowed States to legalize sports betting, 39

9  jurisdictions -- or sorry -- 41 jurisdictions, 39 States and

10  then Washington D.C. and Puerto Rico, have legalized sports

11  betting.  That means, though, that in 11 other State

12  jurisdictions sports betting is not legal.  And so to say that

13  states can't come in and regulate gaming means that Kalshi can

14  go to California, Alaska, places where sports betting is not

15  legal, and allow de facto sports bets.

16          THE COURT:  How do I deal with, though, the language

17  in 7 U.S.C. 7a-2(c)(5)(C)(v) that says -- that's the gaming

18  reference -- that the CFTC can review contracts and may or may

19  not determine that contracts involving gaming are valid or not?

20  That seems to be a direct Congressional delegation of the

21  regulation of gaming under this kind of market to the CFTC.

22  How do you get around that?

23          MS. WHELAN:  Well, that's a permissive delegation.

24          THE COURT:  Yeah.  Well, it's a delegation that says

25  they may determine whether it's good or not.

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 49 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

49

1          MS. WHELAN:  Yes.  And I think looking at the

2   specifics in this case is really important here because

3   Kalshi's Complaint alleges that it began offering these

4   sports-related event contracts on January 29 -- or sorry --

5   January 24, 2025.  What was happening then?  We had this

6   massive transition in Federal Government from President Biden

7   to President Trump.  I suspect it's no coincidence that they

8   waited until January 24 to offer these.

9          And then taking counsel at his word that there's a

10   ten-day period for the CFTC to step in and say, we want to look

11   at this or we don't, you know, that's during a time of massive

12   upheaval in Washington.  And so could this have just skirted

13   under the radar?  Possibly.  But to say that if the CFTC misses

14   that ten-day window to come in and regulate means that no State

15   can come in and say, hey, this is contrary to our -- you know,

16   our gaming laws, our long and storied gaming laws that protect

17   the consumers and protect the integrity, it just -- it seems to

18   be an absurd result.

19          THE COURT:  So if the CFTC had said, yes, we're

20   going to allow it in that ten-day period, or looked at it and

21   said, yes, we're going to allow it, that would take away your

22   jurisdiction, then?

23          MS. WHELAN:  I don't think so.  I'd have a harder

24   case arguing this, but I think we'd still have the 10th

25   Amendment argument that the CFTC is overstepping into a realm

Case 2:25-cv-00575-APG-BNW    Document 46    Filed 04/14/25    Page 50 of 90

2:25-cv-575-APG-BNW    MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**50**

1    that is traditionally regulated by the States and it's

2    something that wasn't within the contemplation of Congress at

3    the time.

4            And as you know, *Chevron deference* has fallen by the

5    wayside with the *Loper Bright* opinion, and so this Court is the

6    body that has to interpret the statute and determine what the

7    statute means.  And so there's no -- there's really no

8    deference to CFTC.

9            THE COURT:  So the statute that I just read said

10   that the Commission may determine that such contracts are

11   contrary to the public interest if they involve gaming, we

12   talked about, or sub i, any activity that's unlawful under any

13   Federal or State law, which suggests that they could look to

14   Nevada law and say, we don't allow 18-year-olds to gamble on

15   sports betting.  But if the CFTC looks at that under its

16   authority and says it's not contrary to the public interest,

17   we're allowing it, isn't that a delegation by Congress to the

18   CFTC to make that determination and therefore takes it away?

19   Because, otherwise, if Nevada tries to say, no, you can't do

20   that, now we've got a conflict.

21           MS. WHELAN:  Sure.  And that's a conflict preemption

22   question that, you know, would make my job here today a little

23   more difficult if --

24           THE COURT:  That's where we're at.  I mean, that's

25   exactly where we're at, because although the CFTC didn't say,

Case 2:25-cv-00575-APG-BNW    Document 46    Filed 04/14/25    Page 51 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

51

 1    we officially bless this, they haven't yet said, it's bad, and

 2    the way Congress wrote the statute, Kalshi just has to

 3    self-certify.  So, in a sense, from a practical standpoint,

 4    that's the same thing.  That's the grapple I've got.

 5              MS. WHELAN:  Certainly.  And I will note that the

 6    CFTC has -- did initiate review of a different exchange.  Now,

 7    I don't fully understand what happened there because it's not

 8    what's before us, but it's my understanding that the CFTC may

 9    have some concerns about it, and like my friend on the other

10    side, I would welcome the CFTC to weigh in here, but I don't

11    think it's necessary.  And I want to explain why.  Because I

12    think Kalshi has set up a bit of a false dichotomy.  They're

13    saying we either have to comply with what the Board is saying

14    and suffer all this harm or we have to violate Nevada law

15    according to what the Board says and face the consequences.

16              There's a third option, though.  They can apply for

17    licensure with the NGCB.  That's the avenue that the NGCB left

18    open for them, and it's what numerous entities have done.  Any

19    entity -- FanDuel, DraftKings, MGM, they are all licensed with

20    Nevada.  They have submitted to the jurisdiction of Nevada.

21    They offer sports betting in Nevada.  And Kalshi could do the

22    same.  And there should be, really, no conflict between being

23    regulated by a State entity and regulated on the exchange side

24    by the CFTC.  You look at other industries, semi-trucks, for

25    example, are licensed by U.S. DOT and many States also have

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 52 of 90

2:25-cv-575-APG-BNw   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**52**

1  licensing programs as well.  So there's a way for these two

2  regimes to exist in tandem that Kalshi has basically ignored,

3  and they've set up the straw man argument that we're going to

4  be very harmed.  But they can avoid the harm simply by applying

5  for licensure.  No guarantee they'll meet the requirements,

6  but --

7           THE COURT:  Well, that's the rub is if they apply

8  for licensing and say, we want to allow contracts on election

9  outcomes, the Nevada Gaming Control Board and Gaming Commission

10  are going to say, no way Jose, and so we're not going to grant

11  you that license.  The CFTC says, sure, go ahead, Nevada now

12  says no, and we're back to square one with the conflict, aren't

13  we?

14           MS. WHELAN:  Well, respectfully, the CFTC said no

15  and they're appealing the decision that said otherwise, but --

16  so Nevada and the CFTC seem to be on the same page on that one.

17  And, sure, we may end up here, but insofar as the sports

18  betting side, certainly that's something that could be

19  ameliorated.

20           THE COURT:  Well, because you're going to say no to

21  18 and 19-year-olds betting and CFTC says, go for it.  So again

22  we've got a conflict between Nevada and the Feds, so don't we

23  still have that same problem, there's still a conflict here?

24           MS. WHELAN:  There would still be a conflict with

25  respect to the 18 through 20-year-olds, certainly.

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 53 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**53**

1    THE COURT:  And so you're going to deny the license,

2  and so that doesn't really help us, that option, Door Number 3.

3  Applying for a license doesn't get Kalshi anywhere because it

4  seems to be preordained, not in a pejorative or derogatory

5  sense, that you're not going to let them do what the CFTC

6  allows them to do.

7    MS. WHELAN:  Well, if they want to participate in

8  the Nevada market, they can tailer their contracts to exclude

9  18, 19 and 20-year-olds.  I haven't seen any evidence about

10  what percentage of their contracts is that age group on these

11  two specific areas of contracts, so, you know, I can't speak to

12  that.

13    THE COURT:  Let me switch gears slightly.  Just in

14  the general sense of regulating gaming in Nevada, I'm often

15  intrigued by how sports betting or election betting is

16  different from the stock market.  The Gaming Control Board, the

17  Gaming Commission regulate betting on sports.  It doesn't

18  regulate betting on stocks, right?  You don't regulate the Amex

19  or the NASDAQ or the Chicago Mercantile, and yet they seem to

20  be very similar.  Someone can study stocks and say, I see

21  trends, I see good profitability, just like someone could study

22  the Raiders and say, Maxx Crosby is in for a career year, he's

23  got his contract up, whatever it may be, and so similar

24  studying, similar financial impacts on people, similar exposure

25  to risks unforeseen or foreseen, like somebody tears an

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 54 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**54**

1  Achilles or the President imposes tariffs.  You don't and can't

2  regulate stock exchange, but you can regulate the betting on

3  sports and elections.

4          MS. WHELAN:  Sure.  Well, there's the statutory

5  basis for that that our legislature have given us.  I'm not

6  aware, though, that there's any -- I'm trying to take this to

7  its logical conclusion.  If a local sportsbook started

8  offering, you know, odds on will the Dow drop today or rise

9  today, I think that that would be something that the NGCB could

10 regulate.

11         THE COURT:  So why allow sports betting but not

12 election betting?

13         MS. WHELAN:  So that's simply a -- I can't speak to

14 the legislature's policy decisions, but it is NRS 293.830 that

15 a bet or wager on elections is illegal.  It's a gross

16 misdemeanor under State law, and that's the elections

17 provision, which is obviously governed by the Secretary of

18 State.  We also have NRS 463.0193, which is under the gaming

19 provisions, that wagering on elections is essentially wagering

20 on an *other event* and an entity that takes wagers on *other*

21 *events* is deemed a sports pool.  And so the Nevada gaming

22 regulations say that election wagering by -- through sports

23 pools is prohibited.  And I imagine it is probably based on

24 that --

25         THE COURT:  So the legislature has decided as a

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 55 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**55**

1  matter of public policy --

2         MS. WHELAN:  Exactly.

3         THE COURT:  -- we're not letting --

4         MS. WHELAN:  Exactly.

5         THE COURT:  Okay.  I get it.

6         Switch gears again.  When did the defendants first

7  learn of Kalshi's conduct in this regard?

8         MS. WHELAN:  I am not exactly sure.  I can check

9  with the client on that, but as I stated, it was January 24th

10  that these contracts came about.  I believe the letter that was

11  sent was March 4th.  So somewhere in that roughly six-week

12  period.

13         THE COURT:  And it gets to sort of the question of

14  the urgency of the situation now and when did your client find

15  out?  When did they act?  Did they sit on their hands for a

16  while?  You're now moving for a temporary restraining order, so

17  obviously that factors into the request for injunctive relief.

18  Kalshi offered sort of a standstill, don't come after us, we'll

19  let the Court decide on a TRO, and your clients refused that.

20  Why?

21         MS. WHELAN:  My client didn't want to waive any of

22  its rights, and it sees the urgency here in protecting Nevada

23  consumers, especially -- I mean, we're in sort of NCAA, March

24  Madness territory just ended last night, we've got Master's

25  coming up, there's sporting events.  There are no elections on

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 56 of 90
2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**56**

1    the horizon, fortunately, but, you know, we do see urgency and

2    we didn't want to forego any of the rights should the situation

3    become even more pressing, more dire than it already is.

4                THE COURT:  So there wasn't a rush until Kalshi

5    filed its motion?

6                MS. WHELAN:  Well, prior to Kalshi filing its

7    motion, the parties were attempting to work together and

8    negotiate some sort of solution, and when that -- and when it

9    became apparent that that was not going to work, they filed

10   their motion and we determined it was appropriate to file a

11   counter-motion in response.

12               THE COURT:  If Kalshi is in violation, the

13   defendants can still go after it --

14               MS. WHELAN:  Certainly.

15               THE COURT:  -- if I don't block it with a TRO.

16               I guess I'm trying to figure out, what's the

17   difference in tomorrow versus next week versus next month, the

18   need for speed to stop them right now when we haven't stopped

19   them in the last six weeks or whenever your client found out

20   about it.

21               MS. WHELAN:  Sure.  Well, I mean, one of the things

22   that counsel has argued here today is the harm that would

23   happen in -- for basically pressing pause on options that are

24   outstanding right now, the contracts that have been entered and

25   not yet closed out.  And so the longer that it goes on without

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 57 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**57**

1   resolution, one way or the other, the more Nevada consumers are

2   going to enter into these contracts.

3          And we agree, there would be some level of harm.  We

4   don't feel it's irreparable harm, but there would be harm to

5   Nevada consumers that have entered into these contracts if the

6   contracts, you know, get pulled.  We understand that.  They

7   have money invested in them.  And we also think that there

8   would be harm to the State in that circumstance because then

9   those consumers who may feel that they've been unfairly treated

10  or, hey, these contracts were illegal, how can I get my money

11  back, they're going to be coming to the State for recourse.

12  And so the longer that these contracts continue, the more

13  consumers are involved, the more the potential harm to the

14  State builds.

15          THE COURT:  If the -- if Kalshi agrees,

16  hypothetically, not to create any new contracts while this --

17  these issues are being litigated, setting aside what's been

18  done in the past, would your client agree not to press for

19  prosecution right now so the Court's got time to weigh these

20  arguments and make a final decision, at least stem the bleeding

21  from your perspective, we're not going to have any contracts

22  going forward, and they're not exposed to the risk going

23  forward, but at least we've got our arms around the alleged

24  damage?

25          MS. WHELAN:  Certainly.  You know, that's something

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 58 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**58**

1  I would have to check with my client about.  I think it's

2  something they could potentially be open to, at least while

3  this issue is being resolved in the very short-term, but I

4  can't speak for my client at this moment without checking with

5  them.

6           THE COURT:  You argued in your papers that the Board

7  only sent a cease and desist letter and so Kalshi has not shown

8  that enforcement is imminent and, therefore, no irreparable

9  harm.  It seems to sort of fly in the face of, we're not

10 agreeing to stay anything while you seek a TRO and, oh, by the

11 way, we're going to seek a TRO.  Doesn't that kind of

12 contradict the notion that harm is not imminent?  You're here

13 right now trying to stop them from doing what they want to do.

14          MS. WHELAN:  Sure.  You know, certainly the threat

15 of prosecution can constitute imminent harm, so I would agree,

16 as things have developed, there is -- there is some threat of

17 harm.  Again, I don't think it's irreparable and I don't -- and

18 I think that it's of Kalshi's own doing, as, you know, Your

19 Honor's dialogue with counsel previously had gone into.  They

20 could have sought pre-approval and kind of stopped this at the

21 get-go.  Instead, they seemed to kind of take advantage of the

22 political transition that was going on in Washington to try and

23 self-certify these contracts and get them out in Nevada before

24 really getting the approval that could have helped avoid some

25 of these harms.

**59**

1    THE COURT:  Let me go off the record for just one

2  second.

3    (Off-the-record discussion.)

4    THE COURT:  We're going to take a short five-minute

5  break so my court reporter can loosen her fingers and put them

6  in a bowl of ice or something.  All right.  Take a break for

7  about five minutes.  Thanks.

8    (Recess from 12:05 to 12:19 p.m.)

9    THE COURT:  All right.  Thank you, Ms. Whelan.  Let

10  me pick up with a question I asked Kalshi's counsel.  Is there

11  room here, should I invite the CFTC to come in and participate

12  and ask them how they feel about preemption and sports betting

13  and things like that?

14    MS. WHELAN:  It certainly, I think, as I said

15  before, we could do that.  I don't think that it's necessary.

16  It would be interesting to see where they weighed in.  I know

17  that we also have a lot of other States that are kind of tuning

18  in and paying attention to what's happening here.  I think it's

19  Ohio, Illinois, and New Jersey have sent similar cease and

20  desist letters to Kalshi on similar grounds as Nevada has, so,

21  you know, I'm sure Your Honor is aware this is an issue that's

22  going to affect other jurisdictions and people are paying

23  attention.  So the CFTC's input would certainly be welcome.

24    THE COURT:  The CFTC stated in its brief before the

25  D.C. Circuit that a CFTC-designated contract maker's contracts

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 60 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**60**

 1  can never be illegal under State law.  How do you respond to

 2  that?

 3            MS. WHELAN:  I think that's an incredibly bold

 4  statement that perhaps wasn't completely thought out.  I think

 5  that there are numerous times when a contract might be void for

 6  public policy under a State's law.  One example was the

 7  hypothetical that I posited that if a State were to say that

 8  18-year-olds no longer have capacity to contract and an

 9  18-year-old entered into an events contract through Kalshi, I

10  think there's no question that that contract would be void for

11  public policy in that State.  And I think it's a similar

12  reasoning here under Nevada's gaming laws.

13            THE COURT:  Let's turn to irreparable harm.  You

14  argue that the harms that Kalshi has identified are compensable

15  with monetary damages.  Kalshi points out there's an 11th

16  Amendment bar to suing the State for money.  Is there a

17  financial remedy against the defendants if Kalshi has ended up

18  losing millions of dollars?  How do they recover that against

19  your clients?

20            MS. WHELAN:  Sure.  So this raises a point that I

21  was hoping to make regarding 11th Amendment immunity because --

22            THE COURT:  Here's your chance.

23            MS. WHELAN:  -- later this week the State will be

24  filing its responsive pleading to the Complaint and we will be

25  filing a motion to dismiss on multiple grounds, one of which

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 61 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**61**

 1  being 11th Amendment immunity against the State, the NGCB, and

 2  the NGC.

 3          THE COURT:  Say that again.  Against the State --

 4          MS. WHELAN:  The State; the NGC, the Commission; and

 5  the NGCB.  There are also various State law immunities that

 6  we'll be asserting on behalf of the individual members and

 7  Attorney General Ford, as well as a 12(b)(6) motion for failure

 8  to state a claim based on the fact that there really are no

 9  allegations in the Complaint talking about the participation of

10  the individuals and AG Ford.

11          We've got some jurisdictional defects in that the

12  State wasn't properly named pursuant to Nevada law.  We also

13  have a service issue that no dual service has been effected.

14  So we have kind of multiple grounds on which we're going to be

15  moving to dismiss.  And I've previewed them to you and now

16  opposing counsel, but that's going to be coming shortly.

17          So that doesn't leave, however, Kalshi without a

18  remedy.  If it wishes to seek monetary damages against the

19  State, the State has waived sovereign immunity in State Court

20  under certain circumstances, and it could certainly pursue that

21  avenue of relief.

22          THE COURT:  Is this one of those circumstances?

23          MS. WHELAN:  I believe it is.  I believe it is, yes.

24          THE COURT:  Okay.  So they could sue the defendants

25  in State Court for monetary remedies if, in fact, they're able

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 62 of 90

2:25-cv-575-APG-BNw   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**62**

 1 | to prevail on a claim?

 2 |          MS. WHELAN:  If they -- yeah, if they properly met

 3 | the prerequisites for waiver of sovereign immunity in NRS

 4 | Chapter 41, certainly.

 5 |          THE COURT:  My foggy brain reminds me there used to

 6 | be a cap on damages against the State in certain cases.

 7 |          MS. WHELAN:  In tort cases.

 8 |          THE COURT:  Tort cases.

 9 |          MS. WHELAN:  Sure.  Yeah.

10 |          THE COURT:  Does that cap still exist under State

11 | law?  Would it apply here?

12 |          MS. WHELAN:  That cap does exist.  I haven't

13 | honestly given thought to whether that cap applies.  I don't

14 | think this is really a tort case.  It would depend on what

15 | their allegations were.  I can't really answer that at this

16 | time.

17 |          THE COURT:  Okay.  So there is still a cap on -- so

18 | if this is deemed a tort, as opposed to a contract-based claim,

19 | is the cap somewhere around 300 grand or something like that?

20 |          MS. WHELAN:  Something like that, yeah.

21 |          THE COURT:  So if they have millions of dollars of

22 | damages and are limited to 300,000, doesn't that make the

23 | remainder irreparable harm?  Because it's not compensable.

24 |          MS. WHELAN:  It wouldn't be compensable in full if

25 | it were that amount.  I would just say that there's really no

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 63 of 90

2:25-cv-575-APG-BNw   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**63**

 1    evidence of what that amount is, short of the vague statement

 2    of tens of millions of dollars in a self-serving affidavit from

 3    one of, you know, Kalshi's officers or executives.

 4            THE COURT:  Presumably, all affidavits are

 5    self-serving, or they would never be submitted.  That's my

 6    little bugaboo I often hear when I hear "self-serving

 7    affidavits."  That's why we submit them.

 8            MS. WHELAN:  No argument here.  However, an

 9    affidavit supported by evidence is going to be much more

10    persuasive.

11            THE COURT:  Much more to the point.  Thank you.  I

12    agree with that.

13            All right.  There is a discussion in the papers

14    about geofencing.  From a technical standpoint, you may or may

15    not know the answer to this, but I don't know if these betting

16    apps that we see, MGM Bets, whatever they are, do they have

17    geofencing that preclude people from betting outside of the

18    jurisdictions of Nevada, do you know?

19            MS. WHELAN:  They do.

20            THE COURT:  I'm getting a nod from your co-counsel.

21            MS. WHELAN:  Yes.  Yeah, they do.  I'm not as

22    familiar as Chief Caruso with the particulars, but I do know

23    that it uses some combination of WiFi networks, IP addresses,

24    and cell towers to triangulate your location to show that you

25    are either within or outside the state of Nevada, and if you

1  are outside the state of Nevada, you can't place bets.  It's

2  technology that's readily available.

3            THE COURT:  Okay.

4            MS. WHELAN:  And I think the -- you know, the harm

5  and burden in implementing that is probably a little

6  exaggerated.

7            THE COURT:  And that's what I'm getting to, I guess.

8  Even assuming for sake of argument that it's expensive, as

9  Kalshi claims, their argument is that we can't get that

10  technology in place immediately; it's going to take some time

11  and, therefore, we've got this irreparable harm because your

12  clients are going to come after Kalshi even if they attempt to

13  try and put up this geofencing.

14            MS. WHELAN:  Yeah, it certainly would take some

15  time.  I know that Robinhood, which is a similar type of

16  exchange to Kalshi, has implemented this type of technology, so

17  it is certainly possible.

18            With respect to the expense, I guess I would say,

19  you know, it either makes good business sense or it doesn't.

20  You either have enough contract business in Nevada to make it

21  worth your while to comply with this or you don't and you stop

22  offering those contracts.

23            I do have an answer to you -- for you on the, you

24  know, sort of temporary pause button suggestion.  The State

25  would be fine with a stay where Kalshi was not offering new

1   contracts.  We would agree to not pursue criminal prosecution

2   during the time -- for the short time that it would take Your

3   Honor to make a decision in this case.  We certainly couldn't

4   agree to an indefinite sort of stay for the time it would take

5   to get all the way through appeal, but we could agree to sort

6   of a limited agreed time.

7           THE COURT:  If they didn't offer new contracts in

8   Nevada, you would withhold prosecution for past violations --

9           MS. WHELAN:  Correct.

10          THE COURT:  -- while this case litigates here in

11  this Court, until we get a resolution?

12          MS. WHELAN:  Yeah, to stop -- to just sort of, as

13  Your Honor put it, stop the bleeding.

14          THE COURT:  All right.  I appreciate that.  Thank

15  you.

16          MS. WHELAN:  I also have an answer to your question

17  about why it took so long to send the cease and desist letter.

18  That's because the Board was undertaking an investigation,

19  collecting evidence, placing bets, trying to figure out the

20  extent of Kalshi's offerings in Nevada.  So there was some time

21  taken for the Board's investigation before deciding to send the

22  cease and desist letter.

23          THE COURT:  Thank you for those responses.  Kalshi

24  argues that even if it can geofence around Nevada, doing so

25  would put it in violation of the core principles of the CFTC

1  because they can't offer these contracts to everyone.  They're

2  now prohibited from servicing, in a sense, Nevada customers and

3  that would force them to lose their designation by the CFTC

4  because they're violating core principles and that's an

5  irreparable harm.  How do you respond to that?

6         MS. WHELAN:  I think that's a pretty speculative

7  harm that they're putting forward.  I didn't see any support or

8  evidence for that proposition.  I think, again, as Your Honor

9  suggested, they could go to the CFTC and say, listen, here's

10 what we're dealing with.  This is our proposed solution.  Can

11 you please pre-approve or bless this solution?  And then

12 depending on what the CFTC said would determine whether there

13 actually was going to be some type of irreparable harm or not.

14        THE COURT:  So if the CFTC says, no, our principles

15 are, you have to make it available to everybody on an equal

16 basis, now we have a conflict between what the CFTC says it has

17 to do and Nevada prohibiting it from.

18        MS. WHELAN:  Potentially, yeah.  I can't see the

19 CFTC going that route, but, again, without their participation,

20 I just don't know.

21        THE COURT:  Okay.  Let me catch my notes up for a

22 second.

23        Let's turn to the issue of the bond.  You don't

24 address that in your papers.  If I grant Kalshi's motion, how

25 much of a bond should they put up and why?

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 67 of 90

2:25-cv-575-APG-BNw   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

67

 1          MS. WHELAN:  I think it should be more than

 2   de minimis.  We don't have kind of the evidence of the volume

 3   of contracts that they're doing in Nevada, so it's hard for me

 4   to give a number.  I think that the most concrete loss that

 5   Nevada is suffering throughout all of this has to do with tax

 6   revenue.

 7          So we're losing out on tax revenue on two fronts,

 8   first, the tax revenue that we would collect from Kalshi if it

 9   were a licensed sportsbook; and, second, the tax revenue we're

10   missing out on from Nevada licensed sportsbooks due to the

11   wagers that are not being placed there that are instead on

12   Kalshi's exchange.

13          THE COURT:  The competitors, in a sense?

14          MS. WHELAN:  Exactly.  And so, you know, that's

15   actual harm that Nevada is suffering.  If Kalshi were to apply

16   for licensure and become licensed, then Nevada would have the

17   benefit of that tax revenue.  And, of course, I'd be remiss if

18   I didn't mention what Your Honor stated, which was the injury

19   to all Nevadans, that, you know, Nevadans are suffering from

20   the lack of the disputes/resolution process; if Nevadans come

21   back to the State and start seeking, you know, restitution or

22   something for the harm that they've -- that they claim to have

23   suffered.  So it should be more than de minimis, definitely.

24          THE COURT:  Conversely, if I grant your motion for

25   an injunction, what should the bond be that I require the State

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 68 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**68**

1    to put up?

2            MS. WHELAN:  I think that would require Kalshi to --

3    well, actually, I don't know, is the State required to put up a

4    bond?

5            THE COURT:  Federal Government is not under Federal

6    Rules, but I don't know --

7            MS. WHELAN:  Okay.  So in State Court we wouldn't

8    be, yeah.

9            I think Kalshi would have to present some type of

10   evidence about the volume of contracts that they would be, you

11   know, missing out on in the interim and we would have to argue

12   against that, probably.

13           THE COURT:  I don't know if you've had a chance to

14   think about this, but if I -- I asked this question of counsel

15   for Kalshi, but if I decide to have an evidentiary hearing,

16   primarily on irreparable harm seems to be the factual issue

17   that floats around, how much time would you need to prepare for

18   that, what kind of discovery?  What do you anticipate that

19   hearing looks like?

20           MS. WHELAN:  I'd probably have to give that some

21   contemplation, talk with the client.  We're obviously quite

22   busy at the AG's Office at the moment, so I'd have to get back

23   with the Court on that.

24           THE COURT:  That's fair.

25           What do you see as the future of this case going

Case 2:25-cv-00575-APG-BNW    Document 46    Filed 04/14/25    Page 69 of 90

2:25-cv-575-APG-BNW    MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

69

 1  forward after today if I grant or deny an injunction?  Is this

 2  purely a legal issue that needs to be resolved on briefs?  Are

 3  there factual issues?  Do I need to have discovery?

 4          MS. WHELAN:  I mean, I see it as largely a legal

 5  issue.  I see it as an issue of statutory interpretation.  The

 6  CEA gives the CFTC exclusive jurisdiction, but over what

 7  exactly?  How far does that reach?  What's the interplay of the

 8  10th Amendment and the Supremacy Clause, which is something

 9  Courts often grapple with?  So I do see it as primarily a legal

10  question.

11          THE COURT:  For today's purposes, I'm required to

12  sort of decide whether either side can show a likelihood of

13  success on the merits, that legal issue.  I'm loathe,

14  L-O-A-T-H-E, as opposed to love, I'm loathe to make a final

15  definitive ruling on these legal issues today beyond just

16  likelihood of success because it is an emergency-type basis.

17  You especially have had shortened time to respond, although

18  Kalshi had a narrow time between the time it was -- felt it had

19  to go forward and put a brief.  So I think additional briefing

20  on the legal issues would be helpful to me on a final

21  resolution of the legal issues.  And we can talk about that

22  going forward a little bit.  But I suppose that would -- you'd

23  like that, to have some more time to really contemplate and put

24  some legal arguments on paper?

25          MS. WHELAN:  Yes.  Absolutely, I think additional

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 70 of 90

2:25-cv-575-APG-BNw   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

70

 1   time to really dig into the issues would be a benefit, given

 2   the importance of this issue.

 3           THE COURT:  I don't dispute that at all.

 4           Let me see if you've answered all of my questions.

 5           Are there additional things I haven't asked you

 6   about that I should have?  Are there additional points you want

 7   to make that you haven't had a chance to yet, before I turn it

 8   back to Kalshi?

 9           MS. WHELAN:  I don't think so.  I think we've

10   covered it.

11           THE COURT:  Thank you.

12           MS. WHELAN:  All right.  Thank you, Your Honor.

13           THE COURT:  Mr. Havemann, you get the last word.

14           MR. HAVEMANN:  Thank you, Your Honor.

15           THE COURT:  Since this is your motion.  Although

16   there is a counter-motion, I'm going to give you the last word

17   here.

18           MR. HAVEMANN:  Thank you.  So just a few

19   clarifications --

20           THE COURT:  Please.

21           MR. HAVEMANN:  -- from my opening remarks.  The

22   first is, Your Honor asked about who sets the initial price of

23   these contracts.  Kalshi never sets the price, and there is no

24   initial price.  The contract goes live, and it's sort of the

25   same as with a stock offering.  There's offers and bids, and a

1  bid is accepted, and that's how parties enter into a contract.

2  It's what someone is willing to pay and if they find a

3  counterparty who's willing to enter into that deal.

4          THE COURT:  So you -- Kalshi sets up "Duke's going

5  to win the Final 4," and then parties decide, I'll bet 100

6  against or I'll -- I'll have a contract for 100 or I'll have a

7  contract against for a 100?

8          MR. HAVEMANN:  That's right.

9          THE COURT:  Okay.  Thank you.

10          MR. HAVEMANN:  With respect to your questions about,

11  you know, who do you send the kneecapper after, there is a

12  clearinghouse.  These contracts are fully collateralized.

13  There is a clearinghouse that holds the money during the

14  pendency of the contract, and when the event occurs, the winner

15  is paid out.

16          THE COURT:  Okay.  So it takes the money from one

17  side of an agreement and disburses it back or to the next one?

18          MR. HAVEMANN:  That's correct.  So if I may, I'm

19  happy to, of course, answer questions that came up in my

20  friend's argument.  I have a couple of points that I would like

21  to raise.

22          THE COURT:  Yeah, there was.  And then I'll let you

23  make your closing.  Let me get my questions answered first.

24  And before I do...

25          And let me pause and ask Ms. Whelan, though, because

1 I meant to ask you this:  You had raised the issue about an

2 upcoming motion and you mentioned there's a service problem.

3 Kalshi points out in Footnote 1 to its reply that you accepted

4 service on behalf of all the defendants on April 3rd and waived

5 personal service of paper copies.

6       MS. WHELAN:  Yes.  So under NRS 41.031 sub 2, for

7 whenever the State is sued, it must be -- the Complaint and

8 summons must be served on both the Attorney General's Office in

9 Carson City, as well as the named defendants.  So I accepted

10 service on behalf of the named defendants, but as of this

11 morning, our Carson City office has not received -- has not

12 been served on behalf of the Attorney General's Office.

13       THE COURT:  So the waiver -- I haven't seen it, but

14 whatever waiver you filed didn't completely waive all the

15 service requirements; it was simply an acceptance on behalf of

16 your clients, that portion of the statute?

17       MS. WHELAN:  Correct.  Yeah, our practice is that

18 we -- if the client authorizes, we can accept service on behalf

19 of the client, but typically we still require the service in

20 Carson City.

21       THE COURT:  Thank you.

22       Okay.  I don't know if that clarified the point for

23 you in Footnote 1.  You don't have to agree or disagree right

24 now, but you understand their position, at least?

25       MR. HAVEMANN:  I understand the position, yes.

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 73 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

73

1        THE COURT:  Thank you.  Ms. Whelan raised the issue

2   at the end here that, in a sense, CFTC can say, we're going to

3   allow 18-year-olds to engage in sports betting and that's in

4   direct violation of several States' public policy; or, more

5   importantly, to your client's, I guess, taking it out of the

6   sports betting, Nevada has a law that says, for instance -- or

7   some States may say, if you're under the age of 21, you can't

8   legally enter into contracts, but your contracts allow

9   18-year-olds, so there's a conflict directly with the public

10  policy of the State.

11        Is the answer "Too bad, so sad, that's what the CFTC

12  says and that's the way it is"?

13        MR. HAVEMANN:  The answer is, there is a conflict,

14  and when there is a conflict between State law and Federal law,

15  under the Supremacy Clause, Federal law wins out.  So the CFTC

16  authorizes positions to be placed by adults, so people 18 and

17  over.  And if a particular State says, no, I want it to be 21

18  or 25 or 30, that is a conflict with the CFTC's scheme, and

19  that is exactly what Congress sought to avoid when it subjected

20  designated contract markets to the exclusive jurisdiction of

21  the CFTC.  It was designed to avoid a patchwork of regulation

22  where contracts that were permissible in one State are

23  impermissible in another State, different ages, different

24  conflicting State laws that would make it impossible for these

25  exchanges to operate a nationwide exchange, which is what

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 74 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**74**

1  Congress intended.

2  So, you know, that gets to one of the points that I

3  hoped to make to Your Honor in response, which is, you know,

4  they indicated that Kalshi could avoid the harm by seeking a

5  license from the State.  And then I believe I heard her, Ms.

6  Whelan, say that if we applied for a license from the State, it

7  would be denied and it would be denied on the basis of what

8  they perceive to be a conflict between Federal law and State

9  law.

10  THE COURT:  That was more my presumption, but yeah.

11  You heard, yeah.

12  MR. HAVEMANN:  Yes.  In any event, I shouldn't put

13  words in her mouth, but that is what I took from her answer,

14  and that is a clean articulation of one of the respects in

15  which the State regime here conflicts with the CFTC's authority

16  in this case.

17  THE COURT:  So the short answer to my question is,

18  yes, "Too bad, so sad, that's the way it works with

19  preemption"?

20  MR. HAVEMANN:  That's the way that preemption works.

21  And I do want to emphasize, Your Honor started your

22  colloquy with Ms. Whelan with the statutory text.  You know, I

23  did not hear a response to the plain text of the statute which

24  gives exclusive jurisdiction to the CFTC with respect to

25  accounts, agreements, and transactions involving swaps or

Case 2:25-cv-00575-APG-BNW    Document 46    Filed 04/14/25    Page 75 of 90

2:25-cv-575-APG-BNW    MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

75

1    contracts of sale traded on a DCM.  That's the language of the

2    statute.  I did not hear an articulation of how what the Board

3    is attempting to do in this case does not squarely fall within

4    the category of transactions, agreements, accounts that Federal

5    law places in the authority -- with the authority of the CFTC.

6            I also heard Ms. Whelan say -- I think that this is

7    a direct quote.  I think I got it right.  "It is hard to see

8    how sports betting was contemplated by Congress," and that was

9    a reason why she thought there might be some room for State law

10   to co-exist with Federal law.  I would just point Your Honor to

11   the special rule which we outlined in our brief and which you

12   can find at 7 section -- 7 U.S.C. Section 7a-2, and that is a

13   special rule with respect to event contracts and it says --

14   event contracts based on an occurrence or contingency, so

15   exactly what we're talking about here, and one of the

16   categories of cases that Congress said the CFTC can take a look

17   at for compliance with the public interest is gaming.

18           So it is not correct that Congress didn't

19   contemplate this.  Congress contemplated it, and the answer

20   that Congress gave was not to let 51 different States regulate

21   this.  It was to recognize that there are particular public

22   policy concerns with respect to gaming contracts and allow the

23   CFTC to make a decision based on its evaluation of the public

24   interest and not subject these exchanges to the conflicting

25   laws of 51 different States.

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 76 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

76

1              And so that -- and, you know, one of the respects in

2    which -- this is in the Arizona case, this is in the 9th

3    Circuit's *Valle Del Sol* case -- one of the ways that conflict

4    preemption can arise is if Congress has left discretion to a

5    particular Federal decisionmaker and a State imposes penalties

6    that interfere with the exercise of that discretion, and that

7    is exactly what we have here.

8              Congress gave discretion to the CFTC to make a

9    public interest determination about whether certain types of

10   event contracts comport with the public interest.  And the

11   CFTC, by not acting on these contracts, made that public policy

12   decision, and it is not up to the States to interfere because

13   they disagree with the CFTC's public policy judgments on that

14   question.  That is a question that Congress wanted the CFTC to

15   answer, and it did.

16             I also want to emphasize, Ms. Whelan referred to NRS

17   463.0193, which is the provision relating to sports pools, and

18   she noted that sports pools under Nevada law mean the business

19   of accepting wagers on sporting events or other events by a

20   system or method of wagering.  And she indicated the State's

21   belief that, you know, the sporting event contracts were

22   sporting events and that political events were *other events*.

23   And if that's true and if the State's position is actually that

24   *other events* encompass any other event, even not related to

25   sports, then their argument about gaming and sportsbooks is

1    much, much, much broader than their briefing suggests because,

2    really, what they're saying is that they have authority to

3    regulate all event contracts, even though there is a

4    comprehensive regulatory scheme, detailed statute after

5    detailed statute, that specifies exactly how Congress wanted

6    the CFTC to regulate event contracts.  And if the State is --

7    if Ms. Whelan is correct that this State law is not preempted,

8    that would really be a radical, radical change from the way

9    that Congress thought that event contracts should be regulated,

10   and it has always been understood that these can be

11   regulated -- that these are regulated by the CFTC, not 51

12   different States.  And so that is a much, much, much broader

13   argument than I think we appreciated.  And I do want to

14   emphasize that point because I think that that gets to, really,

15   the scope of what they are claiming the State has authority to

16   do here.

17            THE COURT:  Well, she did point out that Nevada has

18   a specific statute that outlaws betting on elections, not just

19   necessarily *other events*.  Am I correct on that, Ms. Whelan?

20            MS. WHELAN:  Yes, Your Honor.  And to be clear, the

21   NGCB is not and has never tried to take the position that we're

22   going to prevent all contracts on Kalshi's exchanges.  We are

23   limiting it to sports-related and election-related.

24            THE COURT:  That was my understanding as well, but I

25   appreciate the clarification.

Case 2:25-cv-00575-APG-BNW    Document 46    Filed 04/14/25    Page 78 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

78

1          MR. HAVEMANN:  I take that point and I take the

2    clarification.  That is clarification from counsel.  The legal

3    theory that they are pressing here is much broader than counsel

4    indicates.

5          And with respect to political events, you know, the

6    argument that the CFTC made in the District Court in D.C. and

7    has made before the D.C. Circuit is precisely this argument,

8    that they have authority to regulate political event contracts

9    because in some States betting on political events is unlawful,

10   and that is the argument that the District Court in D.C.

11   rejected.  So again you have a conflict between what Federal

12   law permits as determined by final judgment of a Federal

13   District Court in Washington D.C. and what they are saying the

14   State has authority to do.  That would present another direct

15   conflict.

16          THE COURT:  The D.C. Circuit -- obviously, we're

17   waiting -- your client is waiting for a decision from the D.C.

18   Circuit.  That case only involves election contracts, correct?

19          MR. HAVEMANN:  That case only involves -- is a

20   challenge to the election contracts, not a challenge to sport

21   event contracts, that's correct.

22          THE COURT:  So in the event the D.C. Circuit says,

23   we agree with the CFTC and overturn the District Court and

24   we're not going to allow election-type contracts, I presume

25   it's your client's intent to continue going forward on sports

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 79 of 90

2:25-cv-575-APG-BNw   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**79**

1    contracts?  Or are these so analogous that that's going to --

2    I'm just trying to get a feel for how that's going to impact

3    this case.  I can sit and wait for a decision from the D.C.

4    Circuit Court, but I don't know that it resolves the entire

5    issue here.

6            MR. HAVEMANN:  It's hard to imagine the D.C. Circuit

7    saying anything that would bear on the provision of sport event

8    contracts, and the CFTC did not challenge Kalshi's sport event

9    contracts, so yes, my -- you know, we would have to cross that

10    bridge if we came to it, and hopefully we don't come to it, but

11    I assume that unless there was anything in the opinion to the

12    contrary that, yes, our position would be the sport event

13    contracts remain valid.

14            And I do want -- you know, now that the D.C. Circuit

15    case has come up, I want to emphasize, you know, that is --

16    obviously, Kalshi disagrees with the CFTC's position in that

17    case, but that case exemplifies the way that this sort of

18    question should get hashed out, that is, the CFTC comes in and

19    says, I think that these contracts fall within one of the

20    enumerated categories and that it's against the public

21    interest, they make that determination, they hear from relevant

22    parties, they hear input from the public, and then there's

23    judicial review.

24            That is -- the question is, who decides?  And the

25    answer is, the CFTC decides with judicial review in Federal

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 80 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

80

 1   Court.  The answer is not 50 different States and the District

 2   of Columbia decide.  That's a recipe for chaos.

 3            THE COURT:  I get that.  And for purposes of this

 4   case, just so I can start to think about the future of this

 5   case, if the D.C. Circuit says, we're going to overturn the

 6   District Court and agree with the CFTC, then Kalshi would be

 7   prohibited from offering contracts on elections, correct?

 8            MR. HAVEMANN:  Subject to further review --

 9            THE COURT:  Of course.

10            MR. HAVEMANN:  -- yes.  You know, after all review

11   is exhausted and assuming that was the final judgment, then

12   yes.  And that would be nationwide.

13            THE COURT:  So that takes out that portion of this

14   case, and then, here, we'd only be focusing on the

15   sports-related contracts, correct?

16            MR. HAVEMANN:  Yes, that is what would happen if the

17   issue were still teed up before this Court.  And, of course, my

18   point is that the D.C. Circuit litigation sort of exemplifies

19   how this sort of dispute should get hashed out and it shows

20   that even with respect to sport event contracts, that's how

21   this should play out, not in Federal Court for a TRO, trying to

22   prevent many different States from subjecting my client to

23   criminal penalties.

24            THE COURT:  Don't take this the wrong way:  You have

25   sufficiently beaten that horse.  I get it.  I get it.

**81**

1    MR. HAVEMANN:  So the last -- I'm happy to answer

2  any other questions.  The final thing I would say is just, you

3  know, the Court is aware of the posture of this case.  We're at

4  a TRO.  The question is not, as you indicated, whether we will

5  ultimately succeed; it is whether we have shown a likelihood of

6  success and irreparable harm and the public interest is in our

7  favor.

8    I respectfully submit, the statutory language, it

9  doesn't get much clearer than this.  The precedent doesn't get

10  much clearer than this.  There is at least a likelihood of

11  success, such that it would not be equitable to subject Kalshi

12  to the truly extreme harm that it would suffer if it had to

13  comply during the pendency of the litigation over this matter,

14  so we urge the Court to grant the motion.

15    THE COURT:  Thank you.  Anything further?

16    MR. HAVEMANN:  No.  Thank you, Your Honor.

17    THE COURT:  All right.  Thank you.  Let me go off

18  the record for just a second.

19    (Off-the-record discussion.)

20    THE COURT:  As the parties all know, the test for

21  qualifying for preliminary injunction is the four factor test

22  under *Winter vs. Natural Resources Defense Counsel*.  The party

23  must demonstrate a likelihood of success on the merits, a

24  likelihood of irreparable harm, that the balance of hardships

25  favors the movant, and an injunction is in the public interest.

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 82 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

82

1           Spoiler alert, I'm going to grant a limited
2  injunction, minor limited injunction.  First, Kalshi has shown
3  a likelihood of success on the merits at this stage because
4  under 7 U.S.C., Section 2(a)(1)(A), the CFTC has exclusive
5  jurisdiction over accounts, agreements and the like involving
6  swaps or contracts for the sale of a commodity.  Kalshi is a
7  CFTC-designated market under Section 7, and through that
8  exclusive jurisdiction provision, Congress has occupied the
9  field of regulating CFTC-designated markets like Kalshi's.
10 It's not field preemption of gaming; it's field preemption of
11 regulating CFTC-designated markets.

12          I agree with the 2nd Circuit which held that Section
13 2(a)(1)'s *exclusive jurisdiction* language preempts the
14 application of State law to CFTC-designated markets.  That
15 comes from the case of *Leist*, L-E-I-S-T, *vs. Simplot*,
16 S-I-M-P-L-O-T, 638 F.2d 283 at 322, 2nd Circuit, 1980, affirmed
17 by the U.S. Supreme Court later.

18          Similarly, the D.C. Circuit has recognized that
19 Congress intended the CFTC to have exclusive jurisdiction,
20 quote, with regard to the trading of futures on organized
21 contract markets.  That's *FTC vs. Ken Roberts Company*, 276 F.3d
22 583 at 590.

23          The CFTC has also stated that, quote, Due to Federal
24 preemption, event contracts never violate State law when they
25 are traded on a DCM, closed quote, meaning that the

Case 2:25-cv-00575-APG-BNW    Document 46    Filed 04/14/25    Page 83 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

83

1   CFTC-designated market is what the DCM is referring to.  That's

2   from the *KalshiEX vs. U.S. Commodity Futures Trading*

3   *Commission*, 2024 Westlaw 4512583 at Page 27.  That's CFTC's

4   brief to the Circuit Court of Appeals.

5          At least at this moment in time, Kalshi's sports and

6   election contracts are legal under Federal law.  That may

7   change at least with regard to the election contracts,

8   depending upon what the D.C. Circuit does in the pending

9   appeal; or it could change if CFTC decides to do something

10  about Kalshi's sports-based contracts, which seem to me still

11  may be under the potential for review under the 90-day period

12  of the relevant statute I cited to earlier, but I don't know.

13  That's a fact beyond my purview right now, but that's a

14  potential that CFTC could come back still and say, we're not

15  going to allow it.

16         But at least as of right now in the short-term,

17  Kalshi's contracts are legal under Federal law, State law is

18  preempted, so Kalshi has shown a likelihood of success on the

19  merits.

20         And because State law is preempted, the defendants

21  here have not shown a likelihood of success on the merits of

22  their motion, so I'm going to deny their counter-motion for an

23  injunction that's filed at ECF Number 35.

24         With regard to likelihood of irreparable injury,

25  Kalshi has presented enough evidence at this stage to show

Case 2:25-cv-00575-APG-BNW    Document 46    Filed 04/14/25    Page 84 of 90

2:25-cv-575-APG-BNW    MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

84

1  that, at least in the short-term, there's evidence that it

2  faces a Hobson's choice like the one the 9th Circuit found

3  sufficient to support a likelihood of irreparable harm in the

4  case of *American Trucking Associations vs. City of Los Angeles*,

5  559 F.3d 1046 at 1057.  Kalshi can choose to comply with

6  Nevada's likely unconstitutional demand that it comply with

7  Nevada gaming law and hope to recoup millions in damages,

8  suffer harm to its good will and reputation, and potentially

9  lose its CFTC designation; or it can keep going with what it

10  believes to be lawful conduct and be prosecuted civilly and

11  criminally in Nevada.  Kalshi has presented credible evidence

12  that even if it could implement geofencing at great expense, it

13  could not do so immediately and thereby avoid prosecution.  So,

14  again, in the short-term, there seems to be irreparable harm in

15  that regard.

16            It's unclear right now whether or not Kalshi could,

17  in fact, recover its losses in State Court.  They appear to be

18  barred by the 11th Amendment monetary damages in this Court,

19  but I'm not opining on whether or not it could recover and how

20  much it could recover in State Court outside of the 11th

21  Amendment.  But that further suggests irreparable harm right

22  now.

23            And although the defendants contend that no

24  prosecution is imminent, the demand letter that was sent

25  ordered that they -- Kalshi immediately cease and desist, gave

Case 2:25-cv-00575-APG-BNW    Document 46    Filed 04/14/25    Page 85 of 90

2:25-cv-575-APG-BNW    MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**85**

 1   it a deadline to comply.  The defendants refused to extend the

 2   briefing in this case, and now they've asked me to enjoin

 3   Kalshi from doing anything further.  That creates a credible

 4   threat of imminent prosecution for a State law violation that

 5   appears to conflict with Federal law, and that can constitute

 6   irreparable harm under the case of *Valle Del Sol, Inc., vs.*

 7   *Whiting*, 732 F.3d 1006 at 1029.

 8             Yes, Kalshi is, in some sense, proceeding at its own

 9   risk and creating its own harms.  Things might turn out

10   differently with the election contracts if the D.C. Circuit

11   rules against it or if the CFTC takes actions on the sports

12   contracts, but, again, right now I'm going to preserve the

13   status quo, which is that these contracts are legal under

14   Federal law, so requiring Kalshi to stop altogether and lose

15   the good will or damage its reputation and to spend millions of

16   dollars that may not be recoverable and potentially lose its

17   designation as a CFTC-approved market, again, is enough for a

18   short-term injunction, in my mind, based upon the irreparable

19   harm it would face.

20             In terms of the balance of hardships, those tip in

21   Kalshi's favor, given that it's facing substantial monetary

22   expenditures, reputational damage, and civil or criminal

23   prosecution based upon demands that defendants likely cannot

24   make because they're preempted.

25             In contrast, the defendants are not facing much harm

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 86 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

**86**

1   in the short-term because I believe they're preempted, and if

2   I'm wrong, the defendants can prosecute Kalshi later for

3   conduct that turns out to be illegal if the defendants are

4   correct.  There doesn't appear to be a rush to do it

5   immediately right now.

6           Finally, the public interest weighs in favor of a

7   short-term injunction for the same reasons I talked about with

8   the other factors.  Congress designated the CFTC to have

9   exclusive jurisdiction over Kalshi's conduct, and right now

10  that's legal.  Additionally, third-parties' contracts and

11  investment expectations would be disrupted if Kalshi were

12  forced to cease its existing contracts for Nevada-based users,

13  and that may impact counterparties to those contracts who are

14  neither in Nevada nor signed event contracts in Nevada.

15          So I'm going to grant the motion for an injunction.

16  The defendants are hereby enjoined from enforcing preempted

17  State laws against Kalshi.  Specifically, the defendants may

18  not pursue civil or criminal prosecutions against Kalshi for

19  offering event-based contracts on a CFTC-designated market.

20  Injunction takes effect immediately.  I will issue a written

21  order just so we don't have any confusion like occurred in D.C.

22  over the last month or two.  The injunction goes into effect

23  now.  The written order will confirm what I've said here.

24          I'm going to require Kalshi to post a bond in the

25  amount of $10,000 by noon Pacific Time tomorrow.  If there's a

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 87 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

87

1  need to extend that deadline, you need to pick up the phone and

2  call defense counsel and tell them, here's what we're doing,

3  here's the problem we're facing, but we're in the process.  See

4  if the parties can reach an agreement on an extension of the

5  bond deadline.  If not, file a motion for an extension of the

6  bond deadline.

7           If either side thinks that bond amount is too high

8  or too low, they can file a motion properly supported to

9  explain why the new number should be used.  But, in my mind, at

10  this point, $10,000 seems to be not too oppressive to get in

11  place pretty quick, and we can talk about adjusting that going

12  forward.

13           The next question is, what happens next?  We've

14  talked a little bit about that.  It seems like we might need an

15  evidentiary hearing on a longer injunction.  Now, I'm issuing a

16  preliminary injunction, not a temporary retraining order, so

17  the 14-day limit of a TRO doesn't apply.  The parties have had

18  notice, we've had a hearing, so I'm imposing an injunction that

19  will go on until I modify it or wipe it out.  So we don't have

20  to do anything in the next two weeks.

21           But I know these are important issues for both

22  sides, and we need to get some resolution to these interim

23  issues.  I also recognize that the briefing, while very good --

24  thank you both, good briefing, great arguments today, by the

25  way.  This has been very helpful to illuminate me, so I

Case 2:25-cv-00575-APG-BNW   Document 46   Filed 04/14/25   Page 88 of 90

2:25-cv-575-APG-BNW   MOTION HEARING - ROUGH DRAFT - DO NOT CITE!!!

88

 1  congratulate both counsel for your oral arguments and suffering

 2  my questions.  They're meant for purposes.  You may not see the

 3  purposes, but they work up here.

 4          In any event, I want to give you opportunities to

 5  file some more detailed lengthy briefs, if you feel the need

 6  to, to address these legal issues before I make a final

 7  determination on the legal issues.

 8          It seems to me that an evidentiary hearing might be

 9  worthwhile on the irreparable harm issue, like some of the

10  issues I raised.  What's the real impact financially if we keep

11  out -- we geofence Nevada contracts?  What's that compared to

12  the overall financial viability of the company?  One may argue

13  that's irrelevant, as plaintiff's counsel has done.  There are

14  arguments that, yes, it does matter.

15          That may require some brief discovery on sort of how

16  much money we have, Kalshi makes, what percentage are the

17  Nevada entities compared -- or the Nevada participants compared

18  to the overall value of the company, what other damages Kalshi

19  would suffer, and potentially briefing on, are any of those

20  damages recoverable in Nevada State Court?  And does someone

21  have to go to State Court to recover damages?  How does that

22  impact irreparable harm in a Federal Court?  I don't know.  It

23  may or may not impact.  It just kind of occurred to me as we're

24  talking, if a party has to subject itself to State Court to

25  recover damages that are unavailable in Federal Court, does

 1  that still say they're recoverable and therefore compensable?

 2  Or do we just look at the Federal law as to whether or not it's

 3  compensable or not?  I don't know.

 4          Those are kind of the issues that are running around

 5  in my head going forward.  I've thrown a lot at you.  I don't

 6  expect an answer right now in terms of how much time and when

 7  we need to schedule things and what kind of briefing schedules.

 8  And you all have productive things to do besides just this

 9  case.  So my inclination is to give you all some time to digest

10  what I've done, think of it amongst yourselves, talk with each

11  other about where we go from here and what's the best way for

12  the Court to be available to help resolve the parties'

13  decisions, or disputes.

14          Cases settle.  Every case settles.  Either the

15  parties do it or I do it, or the jury does it.  So if you can

16  control the landing, it's better off if you all do it

17  yourselves.  If not, that's what we're here for.  So let's go

18  off the record for a second and talk scheduling.

19          (Off-the-record discussion.)

20          THE COURT:  To bring the record current, I've had a

21  discussion with the parties.  I'm going to set a status check

22  on this case for April 30, 2025, at 10:30 a.m.  The parties,

23  anyone, counsel may appear by Zoom to save travel expenses if

24  they desire.  Contact my courtroom administrator for the

25  details for that.  I will issue a minute order or put in the

1   minutes that the cash -- that the bond to be posted by Kalshi

2   can be a cash bond as permitted under Rule 67-1.

3         Anything else I can address for the parties?  From

4   the plaintiff?

5         MR. HAVEMANN:  Nothing for plaintiff, Your Honor.

6         THE COURT:  From the defense?

7         MS. WHELAN:  Nothing, Your Honor.  Thank you.

8         THE COURT:  Thank you all.  Well-argued,

9   well-briefed.  Appreciate it.  We're in recess.

10         (Proceedings concluded at 1:20 p.m.)

11                * * *

12         COURT REPORTER'S CERTIFICATE

13     I, Judy K. Moore, Official Court Reporter, United States

14   District Court, District of Nevada, Las Vegas, Nevada, do

15   certify that pursuant to 28 U.S.C. § 753, the foregoing is a

16   true, complete, and correct transcript of the proceedings had

17   in connection with the above-entitled matter.

18

19   DATED:  April 14, 2025

20

21              /s/ Judy K. Moore_____
                Judy K. Moore, CRR, RMR

22                 Official Court Reporter
                United States District Court

23                 District of Nevada

24

25