AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General – Litigation
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3773 (fax)
jwhelan@ag.nv.gov
sclinton@ag.nv.gov

*Attorneys for Defendants*

### UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| KALSHIEX, LLC,<br><br>       Plaintiff,<br><br>vs.<br><br>KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in his official capacity as a Member of the Nevada Gaming Control Board; CHANDENI K. SENDALL, in her capacity as a Member of the Nevada Gaming Control Board; NEVADA GAMING CONTROL BOARD; JENNIFER TOGLIATTI, in her official capacity as Chair of the Nevada Gaming Commission; ROSA SOLIS-RAINEY, in her official capacity as a Member of the Nevada Gaming Commission; BRIAN KROLICKI, in his official capacity as a Member of the Nevada Gaming Commission; GEORGE MARKANTONIS, in his official capacity as a Member of the Nevada Gaming Commission; ABBI SILVER, in her official capacity as a Member of the Nevada Gaming Commission; NEVADA GAMING COMMISSION; AARON D. FORD, in his official capacity as Attorney General of Nevada,<br><br>       Defendant(s). | Case No. 2:25-cv-00575-APG-BNW<br><br><br>**DEFENDANTS' MOTION TO DISMISS COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF PURSUANT TO FRCP 12(b)(1), 12(b)(5) AND 12(b)(6)** |

/ / /

/ / /

## INTRODUCTION

Plaintiff KalshiEx, LLC ("Kalshi") attempts to sue the State of Nevada for acts of the Nevada Gaming Commission ("NGC"), Nevada Gaming Control Board ("NGCB") and their members via its Complaint for Permanent Injunction and Declaratory Relief ("Complaint"). However, the Complaint suffers from numerous defects that render it subject to dismissal in toto. **First**, the Complaint fails to properly name the State of Nevada pursuant to NRS 41.031. By failing to invoke the State's waiver of sovereign immunity, Kalshi's complaint is void ab initio. **Second**, notwithstanding this failure, Kalshi failed to effectuate proper service on the Defendants. **Third**, even if Kalshi were to cure these defects by filing a new action,[1] its claim is barred by immunity—Eleventh Amendment, official act, and/or discretionary act. **Fourth**, the individual defendants should be dismissed because the complaint is bereft of allegations of misconduct on their part. **Fifth**, the passage of other federal laws—Wire Act, Indian Gaming Regulatory Act, and Professional and Amateur Sports Protection Act—show that Congress did not intend for the CEA to preempt state gaming laws. And neither the text nor the legislative history of the Commodity Exchange Act support Kalshi's allegation of preemption—not field or conflict. **Sixth**, Kalshi's claim should be barred under the Tenth Amendment because it seeks to supersede historic police powers. **Seventh**, Kalshi's inconsistent legal positions should judicially estop it from arguing that its sporting event-based contracts do not constitute "gaming." **Finally**, none of Defendants' defenses should be waived because of the emergent circumstance that brought the matter before the Court and the absence of surprise or prejudice.

## STATEMENT OF FACTS

Kalshi offers consumers the opportunity to wager through contracts that are contingent on the outcome of events like political elections and sports. ECF No. 1 ¶ 5 . Kalshi alleges that the event-based contracts are subject to oversight by the Commodity Futures Trading Commission. *Id.*

The NGC, along with the NGCB, have authority for the following: (1) promulgating rules and regulations for the licensing and operation of gaming in Nevada; (2) establishing rules and regulations for tax reports of gaming licensees; and (3) enforcing state laws and regulations governing gaming. *Id.,*

---

[1] A complaint that fails to properly invoke the State's waiver of sovereign immunity is void ab initio. *See Washoe Med. Ctr.*, 122 Nev. 1298, 1304, 148 P.3d 790, 794 (2006). A complaint that is void ab initio cannot be amended, as it never existed in the first instance. *Id.*

¶ 17. The NGC, upon recommendation from the NGCB, has final authority on all gaming licensing matters. *Id.* ¶ 23.

On March 4, 2025, the NGCB sent a cease-and-desist letter to Kalshi, informing Kalshi that the NGCB was aware that Kalshi offers "event-based contracts in Nevada on sporting events and on election outcomes." *Id.*, ¶ 55. The NGCB stated in its letter that offering "event-based contracts" is unlawful in Nevada "unless and until approved as licensed gaming by the Nevada Gaming Commission." *Id.* (citing ECF No. 1-2, at 1).

Instead of responding to the NGCB's letter or ceasing all illegal activities, Kalshi filed the instant action, alleging a single count for federal preemption under the Supremacy Clause by the Commodity Exchange Act ("CEA"). ECF No. 1, ¶¶ 64–70. Kalshi requested a judgment declaring that any "Nevada law that is used in a manner to effectively regulate Plaintiff's designated futures market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff," and a declaratory judgment to the same effect. *Id.*, p. 16. Kalshi further requested entry of both a preliminary and permanent injunction prohibiting Defendants from enforcing Nevada's gaming laws "to effectively regulate Plaintiff's futures market, against Plaintiff." *Id.*, p. 17. At the same time, Kalshi filed a Motion for Temporary Restraining Order and Preliminary Injunction ("TRO Motion") seeking to enjoin Defendants from enforcing Nevada gaming laws against Kalshi. *See* ECF No. 18.

Under an expedited briefing schedule, Defendants opposed Kalshi's motion and sought to restore the status quo as it existed prior to Kalshi's violation of Nevada gaming laws. ECF No. 35. Kalshi improperly filed a reply brief the day before the hearing. ECF No. 40.

After considering the oral arguments of counsel, the Court issued an order granting Kalshi's motion for preliminary injunction and denying Defendants' request for a temporary restraining order. ECF No. 45. The order enjoined the NGCB, NGC and their members in their official capacities from enforcing Nevada gaming laws against Kalshi concerning their event-based contracts. *Id.* Kalshi subsequently posted a cash bond in the amount of $10,000. ECF No. 44.

## LEGAL STANDARD

Under Rule 12(b)(1), a complaint is subject to dismissal for lack of subject matter jurisdiction. "When subject matter jurisdiction is challenged, the burden of proof is placed on the party asserting that

jurisdiction exists." *Switch, Ltd. v. Uptime Institute, LLC*, 426 F.Supp.3d 636, 642 (D. Nev. 2019). Thus, the court must "presume lack of subject matter jurisdiction until the plaintiff proves otherwise in response to the motion to dismiss." *Id.* (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L.Ed.2d 391 (1994)).

Dismissal is also proper under Rule 12(b)(5) when a plaintiff fails to effectuate proper service of the summons and complaint. Fed. R. Civ. P. 12(b)(5).

Finally, the Court may dismiss a plaintiff's complaint for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a party must plead "enough facts to state a claim for relief that is plausible on its face. *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007). This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Though a plaintiff's factual allegations are accepted as true in evaluating a motion to dismiss, a court will not assume the truth of legal conclusions merely because the plaintiff casts them in the form of factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT[2]

### I.    Kalshi's Complaint is Void ab Initio for Failing to Properly Invoke the State's Waiver of Sovereign Immunity.

Sovereign immunity is a limitation on the courts' subject matter jurisdiction over states and other government entities. When an action is brought against the State, however, "the action **must** be brought **in the name of the State of Nevada on relation of the particular** department, **commission**, **board**, or other agency of the State whose actions are the basis for the suit." NRS 41.031(2) (emphasis added). *See also Craig v. Donnelly*, 135 Nev. 37, 39, 439 P.3d 413, 415 (Nev. App. 2019) (NRS 41.031 requires a plaintiff to name the State of Nevada to pursue a claim against the state or a state employee). Dismissal is required when a plaintiff fails to satisfy Nevada's naming convention because the failure results in a court's loss of subject matter jurisdiction. *Id; See also* NRS 41.031(2). Waivers of immunity must be "construed strictly in favor of the sovereign," underscoring the necessity that these limited exceptions are

---

[2] Pursuant to F.R.E. 201, Defendants request that the Court take judicial notice of facts referenced in support of their motion that are not subject to reasonable dispute.

strictly followed. *See In re Operation of Mo. River Sys. Litig.*, 418 F.3d 915, 917 (8th Cir. 2005) (citing *U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992)).

A complaint that fails to properly name the State is void ab initio, meaning it is of no force and effect from the beginning. *See Washoe Med. Ctr.*, 122 Nev. 1298, 1304, 148 P.3d 790, 794 (2006).Complaints that are void ab initio do not legally exist and thus cannot be amended. *See Id*. Indeed, the Nevada Supreme Court has stated that "NRCP 15(a)'s amendment provisions, whether allowing amendment as a matter of course or leave to amend, are inapplicable" when claims are void ab initio. *Id*. Therefore, claims that fail to properly name the State of Nevada and invoke the waiver of sovereign immunity must be dismissed. *See Craig*, 135 Nev. at 41, 439 P.3d at 416.

Here, Kalshi's Complaint does not name the State of Nevada on relation of the NGC or NGCB; it simply names the NGC and NGCB as freestanding defendants. The Complaint therefore fails to follow the naming convention set forth in NRS 41.031(2) and fails to properly invoke the State's waiver of sovereign immunity. As a result, the Complaint is void ab initio and must be dismissed for lack of subject matter jurisdiction.

## II.    Kalshi did not satisfy Nevada's dual service requirements for NGCB, NGC or the individual defendants.

As already discussed, when suing a state entity, the action must be brought in the name of the State of Nevada on relation of the particular department, commission, board or agency. NRS 41.031(2). Further, the summons and complaint must be served on the Attorney General or a person designated by him at the Office of the Attorney General in Carson City and to the person serving as the administrative head of the named entity. *Id.*

A similar process applies for individual defendants sued in their official capacity. A suit against an individual in his official capacity is a suit against the office, not the individual. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989). "As such, it is no different from a suit against the State itself." *Id.* (internal citations omitted). A state official sued in his official capacity for an act or omission relating to his public duties or employment must be served by delivering a copy of the summons and complaint to the Attorney General at the Office of the Attorney General in Carson City and to the state official or an agent designated by him.  NRCP 4.2(d)(2). Counsel

for defendants accepted service of the complaint on behalf of the defendants, *See* NRS 41.031(2)(b), but did not accept service on behalf of the Attorney General,[3] *See* NRS 41.031(2)(a). Kalshi failed to serve a copy of the summons and complaint on the Attorney General in the Office of the Attorney General in Carson City. Should the Court determine that Kalshi's complaint is not void ad initio, then due to Kalshi's failure to satisfy Nevada's dual service requirements, its complaint must be dismissed for insufficient service of process.

### III. Even if Plaintiff had properly named and served Defendants, the State, NGC, and NGCB have Eleventh Amendment immunity.

The Eleventh Amendment prohibits "federal suits against unconsenting states, their agencies, and their officers 'regardless of the nature of the relief sought.'" *See Crowe v. Oregon State Bar*, 989 F.3d 714, 730 (9th Cir. 2021) (per curiam) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)); U.S. Const. amend. XI. This immunity is not just from liability but extends to immunity from suit. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S. Ct. 684, 689, 121 L. Ed. 2d 605 (1993).

NGC and the NGCB are political subdivisions created by the Nevada Legislature (NRS 463.022 and .030) to regulate gaming within the State of Nevada (*See* NRS Chapter 463). As previously discussed, Nevada has not waived its immunity. *See* NRS 41.031(3). And "[t]he Constitution, by delegating to Congress the power to establish the supreme law of the land when acting within its enumerated powers, does not foreclose a State from asserting immunity to claims arising under federal law merely because that law derives not from the State itself but from the national power." *See Alden v. Maine*, 527 U.S. 706, 732 (1999). Put another way, "[w]hen a State asserts its immunity to suit, the question is not the primacy of federal law but the implementation of the law in a manner consistent with the constitutional sovereignty of the States." *Id.* The enactment of the Commodity Exchange Act does not evidence an intent to usurp Nevada's exercise of its police powers to impose gaming laws for the public health, safety

---

[3] Because the Attorney General, in his official capacity, is named as a defendant, the Attorney General must, in effect be served twice. First, under NRS 41.031(2)(a) at the Office of the Attorney General in Carson City, and second, under NRS 41.031(2)(b), as the "administrative head" of the Office of the Attorney General.

and welfare. Accordingly, Kalshi's claim against the State, the NGC and the NGCB is barred by Eleventh Amendment immunity.[4]

## IV.    The Individual Defendants are entitled to official act immunity and discretionary act immunity.

Section 41.032 of the Nevada Revised Statutes provides two types of immunity where claims are brought for acts or omissions of officers, employees, and immune contractors of the State. That statute provides that "no action may be brought under NRS 41.031 or against an immune contractor or an officer or employee of the State or any of its agencies or political subdivisions" in two different scenarios. First, no action may be brought if the action is "[b]ased upon an act or omission of an officer, employee or immune contractor, exercising due care, in the execution of a statute or regulation." NRS 41.032(1). Second, no action may be brought if the action is "[b]ased upon the exercise or performance . . . [of] a discretionary function or duty . . . [by] any officer, employee or immune contractor" of the State or any of its agencies or political subdivisions. NRS 41.032(2).

Here, Defendants Hendrick, Assad, Sendall, Togliatti, Solis-Rainey, Krolicki, Markantonis, and Silver (collectively, the "Individual Defendants") are all entitled to official act immunity under NRS 41.032(1) and discretionary act immunity under NRS 41.032(2). *See Austin v. State Indus. Ins. Sys.,* 741 F. Supp. 1466, 1468–69 (D. Nev. 1990), *aff'd,* 930 F.2d 26 (9th Cir. 1991), *opinion withdrawn and superseded on reh'g,* 939 F.2d 676 (9th Cir. 1991), and *aff'd,* 939 F.2d 676 (9th Cir. 1991) (state employee sued for actions taken in official capacity had immunity under the Eleventh Amendment and NRS 41.032 in a section 1983 action).

### A.    The Individual Defendants are entitled to official act immunity under NRS 41.032(1).

As noted above, NRS 41.032(1) provides that "no action may be brought under NRS 41.031 or against an immune contractor or an officer or employee of the State or any of its agencies or political subdivisions which is . . . "[b]ased upon an act or omission of an officer, employee or immune contractor, exercising due care, in the execution of a statute or regulation[.]" So long as no court has declared the

---

[4] Kalshi's claim is not saved by *Ex parte Young.* 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908); *See Puerto Rico Aqueduct & Sewer Auth.*, 506 U.S. at 146 (explaining that the doctrine of *Ex parte Young* is narrow and "has no application in suits against the States and their agencies, which are barred regardless of the relief sought").

relevant statute or regulation invalid, the employee, officer, or contractor acting pursuant thereto is entitled to immunity. *See* NRS 41.032(1).

Here, the Individual Defendants, to the extent they each had personal participation in the acts alleged in the Complaint, were acting pursuant to statutes that grant the NGC and NGCB the authority to investigate and enforce gaming statutes in the State of Nevada. *See* NRS 463.310 (requiring the NGCB, among other things, to make appropriate investigations to determine violations of gaming statutes and conduct further proceedings). The March 4, 2025, letter from the NGCB to Kalshi, which is attached to the Complaint and serves as the primary basis for Kalshi's allegations, is the result of the NGCB's duly authorized investigation and seeks to enforce a number of Nevada gaming statutes and regulations. Specifically, that letter notifies Kalshi that Kalshi is violating NRS 463.160(1) and NRS 463.245(2) by operating an unlicensed sports pool. ECF No. 1-2, p. 2. It further notifies Kalshi that Kalshi's event-based contracts violate NRS 465.086 and NRS 465.092. *Id.* The letter explains that "[e]ven if Kalshi were to possess a Nevada nonrestricted gaming license with sports pool approval, the company's offering of event-based contracts on election outcomes" would violate Nevada Gaming Commission Regulation 22.1205(3) and NRS 293.830. *Id.*

No court of competent jurisdiction has declared invalid any of the statutes pursuant to which the Individual Defendants were acting when participating in the drafting or sending of the March 4, 2025, letter, to the extent they did participate,[5] and therefore the Individual Defendants are entitled to official act immunity pursuant to NRS 41.032(1).

**B.    The Individual Defendants Are Entitled to Discretionary Act Immunity Under NRS 41.032(2).**

Similar to NRS 41.032(1)'s provision of official act immunity, NRS 41.032(2) provides that no action may be brought if the action is "[b]ased upon the exercise or performance . . . [of] a discretionary function or duty . . . [by] any officer, employee or immune contractor" of the State or any of its agencies or political subdivisions. NRS 41.032(2). The Nevada Supreme Court has held that discretionary act immunity applies when a government decision (1) involves an element of individual judgment or choice;

---

[5] The Complaint is devoid of any allegations as to any Individual Defendant's personal participation in the drafting of the letter, a pleading deficiency that is addressed infra.

and (2) is based on considerations of social, economic, or political policy. *Martinez v. Maruszczak*, 123 Nev. 433, 446–47, 168 P.3d 720, 729 (2007). "[D]iscretionary decisions that fail to meet the second criterion of this test remain unprotected by NRS 41.032's discretionary-act immunity." *Id.*, 123 Nev. at 447, 168 P.3d at 729.

Here, NRS 463.140(4) allows the NGCB to "investigate, for the purpose of prosecution, any suspected criminal violation of the provisions of" NRS Chapter 463 and 465, among other Chapters. NRS 463.143 allows the NGC to "exercise any proper power and authority necessary to perform the duties assigned to it by the Legislature," including bringing civil actions against those violating the gaming laws. These are discretionary functions. *See* NRS 463.104(4) ("The Board **may** investigate . . . .") (emphasis added); NRS 463.143 ("The Commission **may** exercise . . . .") (emphasis added); *State v. American Bankers Ins. Co.*, 106 Nev. 880, 882, 802 P.2d 1276, 1278 (1990) ("In construing statutes, 'shall' is presumptively mandatory and 'may' is construed as permissive unless legislative intent demands another construction.").

With respect to the two-pronged *Martinez* test, first, the decision to investigate potential criminal violations of Nevada's gaming statutes clearly involves an element of individual judgment or choice. The NGCB had the discretion to investigate Kalshi pursuant to NRS 463.104(4), and it chose to do so. *See* ECF No. 1-2, p. 2 (describing violation of NRS 463.160 as a category B felony and reserving the NGCB's right to pursue criminal and civil actions against Kalshi). Second, the decision to investigate Kalshi was informed by serious social and economic policy implications, as "Nevada has a long and storied history of strictly regulating gaming activity." ECF No. 1-2, p. 1. *See also Brown v. Eddie World, Inc.*, 131 Nev. 150, 348 P.3d 1002 (2015) ("enforcing gaming laws is a fundamental public policy in Nevada[.]"); *Shrader v. State*, 101 Nev. 499, 706 P.2d 834 (1985) (overruled in part on other grounds) ("a tourist-oriented economy requires Nevada to maintain honest legal gaming[.]") (Gunderson, J., concurring). Accordingly, the Individual Defendants should be dismissed because any role they had in the investigation into Kalshi and/or the sending of the March 4, 2025, letter was done pursuant to their discretionary functions as members of the NGC/NGCB for which they are immune.

/ / /

/ / /

**V.    The Complaint fails to state a claim upon which relief can be granted as to the  Individual Defendants and Attorney General Ford.**

Although Kalshi names the Individual Defendants and Attorney General Ford in the caption of its Complaint and includes them in the "Parties" section of the Complaint, Kalshi does not include any factual allegations regarding how these Defendants' actions violate the Supremacy Clause. *See generally*, ECF No. 1. Because Kalshi's only mention of the Individual Defendants and Attorney General Ford is in the "Parties" section of the Complaint, Kalshi fails to state a claim for relief against them and they should be dismissed from this case. *See Melnek v. Las Vegas Metropolitan Police Dep't*, Case No. 2:23-cv-01303-GMN-MDC, 2024 WL 2115935 at *4 (D. Nev. May 10, 2024) (dismissing claims against state employees where plaintiff included them only in "Parties" section of Complaint and included no additional factual allegations showing their involvement in alleged harm).

**VI.    Nevada gaming laws are not preempted by the Commodity Exchange Act under the Supremacy Clause.[6]**

While the Supremacy Clause provides that the laws and treaties made pursuant to the authority of the United States constitute the supreme law of the land (*See* U.S. Const. art. VI), it is not the "source of any federal rights." *See Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107, (1989) (quoting *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 613, (1979)). The Supremacy Clause simply raises the question of whether a law is a valid exercise of federal power. Thus, while federal law is the supreme law of the land, preemption cases must still assume that the historic police powers of the states were not superseded unless that was the clear and manifest purpose of Congress. *See Wyeth v. Levine,* 555 U.S. 555, 565 (2009). Other federal laws enacted to regulate gaming support this premise.

Conversely, the text and legislative history of the CEA do not support Kalshi's overbroad theory of field preemption. Nor does Kalshi allege facts establishing that NGCB's attempt to enforce its gaming laws create an impenetrable obstacle that warrants a finding of conflict preemption. For these reasons and those discussed below, Kalshi has not demonstrated that Nevada gaming laws are preempted by the CEA.

---

[6] Defendants anticipate briefing these and related issues including, but not limited to, wagering excise tax and other federal laws, canons against implied repeal, federalism, and various subsections of the CEA more extensively in upcoming motions but would be happy to provide more in-depth supplemental briefing if the Court would find it helpful.

A.    **Federal laws demonstrate that Congress did not intend for the CEA to preempt Nevada gaming laws.**

Adopting the view that the CEA preempts state gaming laws is inconsistent with Congress' regulation of sports wagering and would make the federal laws regulating those activities superfluous.

1.    **The Wire Act of 1961 prohibits Kalshi's event-based sports gaming contracts.**

The Wire Act of 1961 criminalizes the interstate transmission of bets or wagers or information assisting in the placing of bets or wagers on sporting events using a wire communication facility.[7] *See* 18 U.S.C. 1084(a). A wager is "1. [m]oney or other consideration risked on an uncertain event; a bet or gamble. 2. A promise to pay money or other consideration on the occurrence of an uncertain event." WAGER, Black's Law Dictionary (12th ed. 2024). A bet is "[s]omething (esp. money) staked or pledged as a wager." BET, Black's Law Dictionary (12th ed. 2024). It is undisputed that Kalshi offers traders across the United States the ability to enter sports related event contracts to decide who will win or lose the event in exchange for value. *See* ECF No. 45 at 2. These acts constitute the interstate transmission of bets or wagers in violation of the Wire Act. This view is consistent with numerous circuit courts who have held or otherwise recognized that the prohibition of the Wire Act applies to interstate transmissions of wire communication relating to any sporting events or contests.[8] Based on the Wire Act alone, Kalshi's event-based contracts concerning sporting events are unlawful and its complaint should be dismissed.

2.    **The Indian Gaming Regulatory Act authorizes tribes to regulate gaming on tribal land.**

"Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *See Maverick Gaming LLC v. United States*, 123 F.4th 960, 978 (9th Cir. 2024) (internal citations omitted). The Indian Gaming Regulatory Act was enacted by Congress on October 17, 1988, after the CEA amendment. It gives Indian tribes the exclusive right to regulate gaming

---

[7] "The term 'wire communication facility' means any and all instrumentalities, personnel, and services (among other things, the receipt, forwarding, or delivery of communications) used or useful in the transmission of writings, signs, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission." 18 U.S.C. 1081.

[8] *See New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38 (1st Cir. 2021); *New Hampshire Lottery Comm'n v. Barr*, 386 F. Supp. 3d 132, 160 (D.N.H. 2019), *aff'd in part, vacated in part sub nom. New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38 (1st Cir. 2021); *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1069 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 2671, 219 L. Ed. 2d 1292 (2024); *United States v. $6,976,934.65, Plus Int. Deposited into Royal Bank of Scotland Int'l, Acct. No. 2029-56141070, Held in Name of Soulbury Ltd.*, 554 F.3d 123, 131 (D.C. Cir. 2009).

activity on Indian lands subject to specified limitations that did not include the CEA. *See* 25 USC 2701 et. seq. Adopting Kalshi's position would make this Act superfluous concerning event-based contracts that engage participants on tribal land. *See* 25 USC §§ 2703 and 2710.

### 3. The Professional and Amateur Sports Protection Act of 1992 provides an example of when Congress *intends* to preempt a field.

The Professional and Amateur Sports Protection Act ("PASPA") was enacted in October 1992. It outlawed sports wagering with limited exceptions including Nevada's licensed gaming activity. *See* 28 USC §§ 3701 and 3704. Had Congress intended the exclusive jurisdiction provision of the CEA to preempt state gaming laws as Kalshi insists, the subsequent enactment of the PASPA would have been superfluous. Not until almost twenty-six years later, did the U.S. Supreme Court hold that PASPA violated the anticommandeering doctrine because it made it unlawful for a state to authorize sports gambling. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 138 S. Ct. 1461, 200 L. Ed. 2d 854 (2018).

The preceding federal laws support Defendants' theory that if Congress intended for the CEA to preempt state gaming laws it would have made that intention clear and manifest.

### B. Neither the text nor legislative history of the Commodity Exchange Act evidence a clear and manifest Congressional intent to preempt Nevada gaming laws.

When statutory interpretation is at issue, courts begin their analysis by construing the text of the statute. *See Bartenwerfer v. Buckley*, 598 U.S. 69, 74, 143 S. Ct. 665, 671, 214 L. Ed. 2d 434 (2023). Where the language is ambiguous, courts are charged with resolving the ambiguity and finding "the interpretation that is 'more consistent with the broader context' and 'primary purpose' of the statute." *See Connell v. Lima Corp.,* 988 F.3d 1089, 1097 (9th Cir. 2021) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 345-46, 117 S. Ct. 843, 136 L.Ed.2d 808 (1997). But even when a provision is unambiguous, a court resorts to legislative history "where the legislative history clearly indicates that Congress meant something other than what it said." *See Amalgamated Transit Union Loc. 1309, AFL-CIO v. Laidlaw Transit Servs., Inc.,* 448 F.3d 1092, 1094 (9th Cir. 2006) (internal citations omitted).

/ / /

/ / /

### 1.    Statutory text

Kalshi posits that the CEA "occupies the entire field of regulating futures trading on regulated markets." ECF No. 1, ¶ 68. But the text in addition to court rulings concerning the text demonstrates the fallacy of Kalshi's position.

Section 2(a)(1)(A) of the CEA provides in relevant part that the CFTC shall have exclusive jurisdiction with respect to accounts, agreements and transactions involving swaps or contracts of sale of a commodity for future delivery  traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b–3 of this title or any other board of trade, exchange, or market. *See* 7 U.S.C. 2(a)(1)(A). Kalshi describes its contracts as "event contracts." ECF No. 1 at 6-7. However, section 2(a)(1)(A) does not use that term. 7 U.S.C. 2(a)(1)(A). The provision applies to swaps or contracts of sale of a commodity for future delivery, but Kalshi failed to allege facts demonstrating that its contracts fit within either category.

A plain reading of the text does not demonstrate that it preempts all regulations that might touch contracts on a CFTC designated exchange. For example, regulations that do not target: (1) actual contracts listed on the exchanges, or (2) contracts on the exchanges other than those constituting swaps or contracts of sale of a commodity for future delivery are not preempted by the CEA. *See Dan's City Used Cars, Inc. v. Pelkey*,  569 U.S. 251 (2013) (even with an express preemption clause, the FAAA did not preempt state law claims because they were not sufficiently connected).

Moreover, section 2(a)(1)(A) expressly preserves state laws and the authority of the Securities and Exchange Commission to regulate.[9] A savings clause generally "negates the inference that Congress left no room for state causes of action." *See Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 492 (1987). This savings clause makes it clear that other agencies still retain jurisdiction over matters beyond the confines of the exclusive jurisdiction provision. *See F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001).

Courts have similarly recognized the regulatory limitations of section 2(a)(1)(A) as it concerns the CFTC. For example, the FTC retained jurisdiction over marketing of investor-education courses for

---

[9] "Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws." 7 USC 2(A)(1)(a).

future commodities traders because the CFTC's jurisdiction is limited to accounts, agreements, and transactions for commodities futures which does not encompass the marketing of such courses. *See F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 592 (D.C. Cir. 2001). And before section 2(a)(1)(A)'s more recent amendment, the Ninth Circuit held that it did not give the CFTC exclusive jurisdiction over certain accounts that used pooled investors' funds to purchase commodity futures. *See Lopez v. Dean Witter Reynolds, Inc.* 805 F.2d 880, 883-84 (9th Cir. 1986).[10] Nor was section 2(a)(1)(A) found to preempt a common law fraud action by investors against brokers. *See Kerr v. First Commodity Corp. of Bos.*, 735 F.2d 281, 288 (8th Cir. 1984).  In *Kerr*, the court reasoned:

> The establishment of a wide-ranging scheme of federal regulation, however, does not result in the abolition of common law rights unless Congress plainly intended to abolish them or unless their continued existence would render the regulatory scheme ineffective. *Nothing in the Act deals expressly with the preemption question*. Moreover, the continued existence of common law fraud actions permitting punitive damage awards does not conflict with the regulatory scheme established by the Act. Congress recognized this by including a savings clause in the Act which reads: "[n]othing in this section shall supersede or limit the jurisdiction conferred on Courts of the United States or any State." 7 U.S.C. § 2 . . . We agree with the Ninth Circuit[11] in holding that the Act does not preempt punitive damage awards

*Id.*

This passage communicates that federal law does not occupy the entire field of regulating futures trading on regulated markets contrary to Kalshi's allegations.  ECF No. 1, ¶ 68.

Further, the express purpose of the CEA provides additional support that the CEA does not preempt Nevada gaming law.  Section 5(b) states:

> [T]he purpose of this chapter is to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to this chapter and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants.

*See* 7 U.S.C. 5(b).

---

[10] The Court stated that "while we recognize that the speculative commodities market requires strict regulation, we do not find the [Commodity Guided Account Program] CGAP to be the type of account which Congress intended to constitute a commodity pool subject to the registration, reporting requirements of the Commodity Futures Exchange Act." *Lopez*, 805 F.2d at 884.

[11] *Kotz v. Bache Halsey Stuart, Inc.,* 685 F.2d 1204, 1207–08 (9th Cir.1982).

Nothing in the text of the CEA signals an intent to preempt Nevada's carefully crafted gaming laws. These laws are a longstanding manifestation of Nevada's police powers to protect the integrity of the gaming industry while contemporaneously protecting the welfare of its residents and visitors. Conversely, Nevada's gaming laws do not constrain Kalshi's ability to participate in the commodities futures market. Nor do they interfere with the CEA's ability to oversee commodities participants; to "prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to this chapter and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; or to promote responsible innovation and fair competition among boards of trade, other markets and market participants." 7 U.S.C. 5(b); *also See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251 (2013) (even with an express preemption clause, the FAAA did not preempt state law claims because they were not sufficiently connected).

Finally, Kalshi failed to allege facts demonstrating how CFTC's comprehensive regulatory scheme is negated by NGCB's enforcement of laws that require a license to orchestrate the pledging of wagers or bets within its jurisdiction. ECF No. 18 at 16. Certainly, eighty-nine years of the CEA not infringing on states' rights to regulate, or even completely ban, gaming activity proves that Congress did not intend for the Act to do so. For these reasons, Kalshi's field preemption claim fails.

### 2.    Legislative history

The Commodity Exchange Act was enacted in 1936 and overseen by the Commodity Exchange Commission ("CEC"), a division within the U.S. Department of Agriculture. The CEA replaced the Grain Futures Act which applied to agriculture and natural resources. All references to "grain" were replaced with the term "commodities" and the Grain Futures Commission became the CEC. Notwithstanding these changes, the CEA is codified under Title 7 of the United States Code—Agriculture.

Despite the Act's clear text, Kalshi scours the legislative record for any statement that might, at first blush, show Congress intended for the CEA's preemption of states' historic police power over gaming laws. *See* ECF No. 18 at 13-16. But there is no such extra-textual evidence. To the extent Kalshi relies on legislative history, the Court should not be swayed by isolated excerpts. Rather, it should

consider the circumstances necessitating the enactment and the context in which the statements were made.

To start, the Court need not consider remarks by individual legislators—namely, the statements of Senators Clark, Curtis, and Talmadge—that Kalshi takes out of context because "the views of a single legislator, even a bill's sponsor, are not controlling." *Mims v. Arrow Fin. Serv., LLC,* 565 U.S. 368, 385 (2012); *See also Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) ("[E]ven those of us who believe that clear legislative history can 'illuminate ambiguous text' won't allow 'ambiguous legislative history to muddy clear statutory language.'" (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011)). For example, Kalshi cites remarks by Senator Dick Clark, one of the Act's sponsors, to assert that "Congress sought to prevent the 'chaos' that would result from subjecting futures trading to a patchwork of conflicting state laws."[12] While "floor statements by individual legislators rank among the least illuminating forms of legislative history"[13] Senator Clark's statement, when considered in its proper context—whether the Act should "deprive the Federal courts of their jurisdiction under the *antitrust* laws and [ ] deprive Federal and State courts of jurisdiction to enforce *contract and commercial law* rights"[14]—sheds no light on the issues presently before the Court.[15]

Here, Defendants are seeking to enforce Nevada's gaming laws under Title 41 of the NRS. Kalshi cannot identify any legislative history supporting its position that legislators sought to preempt state gaming and election laws through the CEA.[16] Of note is the fact that when the 1974 amendments added the exclusive jurisdiction language, the CEA did not use the term "swap." If anything, the legislative history shows that Congress did not foresee or possibly even understand that subsequently adding "swaps" to the CFTC's jurisdiction would displace the states' longstanding authority over traditional

---

[12] ECF No. 18 at 2; *See also Id.* at 4, 14.

[13] *SW Gen., Inc.,* 580 U.S. at 307 (citation omitted).

[14] *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry,* 93d Cong., 2d Sess. 663 (May 21, 1974) (statement of Deputy Asst. Atty. Gen. Clearwaters) (emphases added).

[15] At best, the legislative record shows brief instances where legislators conceptually distinguished futures markets from gaming, in that one's risk analysis differs fundamentally between the contexts of poker (impulsive, self-created risk) and speculation in commodity markets (empirically grounded in economic trends). *See, e.g., Id.* at 326 (statement of Carlos Bradley) ("Speculation thus differs fundamentally from gambling in this important particular: . . ."), 373 (statement of Sen. Humphrey) (stating that the Act's "establishment of a futures contract market must . . . not permit the legalization of sort of a 'crap game,' a gambling game").

[16] *See* ECF No. 18 at 13-15.

forms of gambling. *See* 124 Stat. at 1672; *DTCC Data Repository (U.S.) LLC v. CFTC,* 25 F. Supp. 3d 9, 11 (D.D.C. 2014).

Based on the preceding considerations, neither the language nor legislative history of the CEA demonstrate a congressional intent to preempt Nevada gaming law or election laws.

### C. Conflict preemption is inapplicable because enforcement of Nevada gaming laws does not create an obstacle to the purpose and objective of the Commodity Exchange Act.

Obstacle, or conflict, preemption is a subset of implied preemption. In assessing whether obstacle preemption has occurred, courts "employ [their] 'judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.'" *United States v. California*, 921 F.3d 865, 879 (9th Cir. 2019) (internal citations omitted) (internal citations omitted). An "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives' . . ." *Id.* (internal citations omitted). Rather "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal act." *Id.* (internal citations omitted). In other words, obstacle preemption will only attach if the state laws impose an obstructive, not insignificant burden on federal activities. *United States v. California*, 921 F.3d 865, 880 (9th Cir. 2019).

Kalshi identifies four reasons in its motion for preliminary injunction that purportedly undermines the purpose of the CEA but none of those reasons justify the application of conflict preemption. ECF No. 18, 18-21.

First, Kalshi asserts that Congress enacted the CEA to bring futures markets under a uniform regulatory scheme. ECF No. 18 at 18. It also asserts that a contract market could not operate efficiently if varying or contradictory legal standards governed its duties to investors. *Id.* This assertion describes an inconvenience, not an insurmountable obstacle warranting application of conflict preemption to Nevada gaming laws. And while Congress has the power to regulate individuals, it does not have the power to regulate states. *See Murphy v. NCAA*, 584 U.S. 453, 471, 138 S. Ct. 1461, 1476, 200 L.Ed.2d 854 (2018). This is consistent with the Tenth Amendment which reserves to the States "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States . . ." U.S. Const. amend. X. Put another way, Congress cannot commandeer the states by issuing orders to compel

facilitation or adoption of preferred federal regulatory programs. *See New York v. United States,* 505 U.S. 144, 161-62 (1992).

The NGCB was created by the Nevada legislature in 1955, and Congress created the CFTC in 1974. The NGCB is not aware of any instance when the CFTC, or its predecessor, ever claimed that Nevada's gaming laws were preventing compliance with the CEA. Consequently, Kalshi cannot be permitted to create this scenario and then allege that Nevada's gaming laws preclude Kalshi's compliance with CEA's regulatory scheme. Indeed, the CFTC still requires applications to determine who is qualified to operate as a designated exchange. It still imposes recordkeeping requirements, reporting obligations, and penalties for non-compliance. Simply put, enforcement of Nevada gaming laws on Kalshi does not disrupt the actions of the CFTC.

Second, Kalshi contends that when states adopt a method of enforcement that differs from the enforcement method adopted by Congress to achieve its goals, preemption is required to avoid conflicts with the federal scheme. ECF No. 18, 18-19. Kalshi's premise is flawed. It equates the imposition of state penalties to the displacement of federal penalties. But these are not mutually exclusive. Enforcement of Nevada gaming law does not preclude the CFTC from continuing to regulate commodity futures. Similarly, Nevada gaming laws do not preclude Kalshi from complying with the CFTC, except when Kalshi attempts to disguise state-regulated gaming activity as commodities. Eighty-nine years of the CEA, seventy years of the NGCB, and fifty-one years of the CFTC provide ample historical proof of those facts.

Third, Kalshi concludes that since its political events contracts and sports related contracts are authorized, a preemptive conflict would arise if Nevada prohibited them. ECF No. 18 at 20. Kalshi continues to conflate commodity futures regulations with gaming regulations. The CFTC has no authority to authorize Kalshi to engage in unlicensed gaming activity in the State of Nevada. Nor does the fact that Kalshi's event contracts are overseen by CFTC pursuant to a commodity futures regulatory scheme negate NGCB's authority pursuant to the state's police power to regulate entities conducting business within its jurisdiction.

Finally, Kalshi asserts that CFTC's Core Principles require it to provide its members with impartial access to its markets and services. ECF No. 18 at 20 citing 17 C.F.R.§§38.150, 38.151(b).

Kalshi does not contend that compliance with Nevada gaming laws will violate those principles. And how the CFTC interprets the Core Principles is not relevant because the Court must exercise its own judgment in interpreting the provisions. *See Loper Bright,* 603 U.S. at 412.

For the preceding reasons, enforcement of Nevada gaming laws do not impose an obstacle to the purpose or objectives of CEA.

**VII.    Kalshi's construction of the CEA violates the Tenth Amendment.**

The Tenth Amendment provides that any powers not explicitly delegated to the federal government by the Constitution, nor prohibited to the states, are reserved to the respective states or to the people. U.S. Const. amend. X. State police powers are the type of powers protected by the Tenth Amendment.

"In all preemption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . [courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *See Wyeth v. Levine,* 555 U.S. 555, 129 S. Ct. 1187, 1194–95, 173 L.Ed.2d 51 (2009) (internal quotation marks and citations omitted) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S. Ct. 2240, 135 L.Ed.2d 700 (1996)). "'[I]intangible rights of allocation, exclusion, and control'—[a State's] prerogatives over who should get a benefit and who should not . . . 'amount to no more and no less than' [its] 'sovereign power to regulate.'" *See Kelly v. United States*, 590 U.S. 391, 400–01, 140 S. Ct. 1565, 1572, 206 L. Ed. 2d 882 (2020)(internal citations omitted); *also see Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (noting that "the regulation of gambling lies at the heart of the state's police power" (cleaned up)); *Ottenheimer v. Real Est. Div. of Nevada Dep't of Com.,* 91 Nev. 338, 341–42, 535 P.2d 1284, 1285 (1975) ("[T]he State through its police powers may regulate business activities for the protection of the public.") (internal citations omitted).

Gaming became legal in Nevada in the 1930s. Recognizing that gaming is a potentially harmful vice, Nevada took deliberate steps to maintain the integrity of the gaming industry creating the Gaming Control Board in 1955 followed by the enactment of the Gaming Control Act in 1959 which established

the Nevada Gaming Commission.[17] By managing the potential societal costs associated with gaming through its sovereign powers to regulate, Nevada promotes the welfare, safety, and morals of its residents. Its regulatory system continues to serve as a model for other jurisdictions, both national and foreign. For the reasons discussed, without an explicit expression by Congress, the CEA cannot reasonably be construed as usurping Nevada's police powers to regulate gaming in its jurisdiction simply because of an incidental contact with an activity that is also subject to federal regulations.

**VII.    Kalshi should be judicially estopped from arguing that its sporting event- based contracts do not constitute "gaming."**

The doctrine of judicial estoppel should bar Kalshi from arguing that "gaming" does not specifically encompass sporting event-based contracts. As previously argued, judicial estoppel "not only bars inconsistent positions taken in the same litigation, but 'bar[s] litigants from making incompatible statements in two different cases." *United Nat. Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 778–79 (9th Cir. 2009) (internal citation omitted). Defendants respectfully posit that the Court's initial assessment of judicial estoppel in this matter did not fully take account of Defendants' underlying premise—that the CEA did not preempt Nevada gaming law in the first place.

There is no dispute that Kalshi previously asserted before the Court of Appeals for the D.C. Circuit that:

> An event contract thus involves "gaming" if it is contingent on a game or a game-related event. . The classic example is a contract on the outcome of a sporting event; **as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets.** Elections, by contrast, are not games or related to games. They are not staged for entertainment, diversion, or sport. The Congressional Control Contracts are thus not subject to public-interest review under the "gaming" exception.

Appellee Brief, 2024 WL 4802698, *17 (D.C. Cir. Nov. 15, 2024) (emphasis added) (internal citation omitted). This admission not only substantiates Defendants' contention but illuminates the discrepancies in Kalshi's own position. Put another way, if "Congress did not want sports betting to be conducted on derivatives markets," surely it did not intend to preempt the state laws that regulate that activity.

---

[17]    Nevada    Resort    Association,    History    1950s, https://www.nevadaresorts.org/history/index.php?d=1950.

Kalshi's incongruities do not end here. Attempting to distinguish itself from gaming which is predicated on the placement of wagers and bets, Kalshi describes itself as "specializ[ing] in event contract trading . . . where . . . participants can hedge their risks on event-based outcomes." ECF No. 1 at 11. However, Kalshi's marketing describes its products or services as "sports betting" or "bet on sports."[18]

Defendants explain (*infra.* Section VIII) why the term "gaming" should encompass Kalshi's event-based contracts notwithstanding the D.C. District Court's narrow construction of the term. Defendants also illustrated the contradiction created by construing the CEA as preempting gaming laws despite the absence of an explicit statement from Congress to that effect. Further, the subsequent passage of federal laws that also regulate gaming, like PASPA and IGRA, and federal laws which prohibit sports wagering across state lines, like the Wire Act, negate Kalshi's position. Simply put, the fact that the CEA provides the CFTC with exclusive jurisdiction over derivative markets is not synonymous with a Congressional intent to preempt Nevada gaming law. Adopting Kalshi's premise that event-based contracts on its exchange are immune from any challenge external to the CFTC is inconsistent with the CEA's legislative history and purpose, and Congress' demonstrated intent.

**VIII. The decision of the U.S. District Court, District of Columbia is not binding on this Court.**

Kalshi's reliance on the D.C. District Court's opinion is misplaced for several reasons.

First, the underlying lawsuit in the D.C. Circuit Court was brought by Kalshi to challenge CFTC's interpretation of the special rule, a subsection of the CEA, not the purported supremacy of the CEA over gaming laws.

Further, while this Court may consider the district court's decision as persuasive authority, neither its decision nor a potential decision from the D.C. Circuit Court is controlling. To the extent Kalshi intends to rely on excerpts from CFTC's brief suggesting that event contracts do not violate state law (ECF No. 45 at 12) (quoting KalshiEX, 2024 WL 4512583, at *27), similar principles dictate that the Court give it no legal weight. *See Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 412 (2024) (overruled the Chevron doctrine; courts should not defer to agency's interpretation of ambiguous statute, they must exercise their own independent judgment). The district court found that the CFTC exceeded its statutory

---

[18] *See* Dustin Gouker, Ten Times Kalshi Said People Could Bet on Things, Event Horizon, Substack (Apr. 3, 2025), https://nexteventhorizon.substack.com/p/ten-times-kalshi-said-people-could?utm_source=substack&utm_campaign=post_embed&utm_medium=web

authority.  Since the term "gaming" was undefined in the CEA, the district court purported to construe the term according to an ordinary meaning of playing a game but not adopting the ordinary cross-reference to gambling which includes betting. *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694, at *8 (D.D.C. Sept. 12, 2024) .

In Nevada, the state with the longest history of legal, regulated gaming, "gaming" has a specific definition and encompasses wagering or betting. The term "gaming" is used interchangeably with gambling. Specifically, "gaming" and "gambling" mean to deal, operate, carry on, conduct, maintain or expose for play in game as defined in NRS 463.0152.[19] *See* NRS 463.0153. Another example of the ordinary meaning of "gaming" in this district concerns G2E which stands for Global Gaming Expo and is the preeminent gambling industry tradeshow presented by the American Gaming Association ("AGA").[20] A featured policy of the AGA is combating illegal gambling.[21] The University of Nevada Las Vegas' International Center for Gaming Regulation is the "only academic institute in the world dedicated to the study of highly regulated industries with an emphasis on casino and online gaming."[22] So the D.C. District Court's narrow construction of "gaming" under the special rule should be discounted if not totally disregarded in assessing whether Congress intended the CEA to preempt Nevada gaming law.

**IX.    The Court should not construe Defendants as having waived any defenses or arguments.**

The preliminary injunction order stated that Defendants had not disputed the Court's jurisdiction. ECF No. 45 at 4. The order also stated that Defendants previewed their intention to move for dismissal on Eleventh Amendment immunity and other grounds. *Id.* at 5. But since Eleventh Amendment immunity deprives federal courts of jurisdiction over suits by private parties against unconsenting states,[23] Defendants respectfully assert that they have disputed jurisdiction. Irrespective of this argument, even if

---

[19] "Game" or "gambling game" means any game played with cards, dice, equipment or any mechanical or electronic device or machine for money, property, checks, credit or any representative of value, including, without limiting the generality of the foregoing, . . . any banking or percentage game or any other game or device approved by the Commission, upon the recommendation of the Board, pursuant to NRS 463.164.  NRS 463.0152(1).

[20] *See* https://www.americangaming.org/events/g2e/

[21] AGA is committed to stopping illegal gambling by partnering with law enforcement and lawmakers to develop national, state, and local opportunities for action and engagement. *See* https://www.americangaming.org/advocacy/

[22] *See* https://www.unlv.edu/sites/default/files/page_files/27/ICGR-AboutUs.pdf.

[23] *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 952 (9th Cir. 2008)

first raised in pretrial dispositive motions, defenses are not waived if the plaintiff is not unfairly surprised or prejudiced. *See Camarillo v. McCarthy,* 998 F.2d 638, 639 (9th Cir.1993). Moreover, "subject matter jurisdiction can never be forfeited or waived, and federal courts have a continuing, independent obligation to determine whether [it] exists." *See Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1031 (9th Cir. 2013); *See also Hansen v. Dep't of Treasury*, 528 F.3d 597, 600 (9th Cir. 2007). And a purported waiver of immunity will be strictly construed in favor of the sovereign. *Harger v. Dep't of Lab.,* 569 F.3d 898, 903–04 (9th Cir. 2009).

Defendants did not waive any defenses or arguments in opposing Kalshi's emergency motion for TRO and preliminary injunction or seeking injunctive relief to reinstate the status quo that existed prior to Kalshi's violation of Nevada gaming laws. Because there is no unfair surprise or prejudice to Kalshi and for the reasons that follow, the Court should not deny consideration of any of Defendants' defenses and arguments.

First, not until the evening of April 1, 2025, did Kalshi's counsel forward a copy of the Court's order directing a response by noon on April 4, 2025 giving Defendants little more than two days to prepare a response to a twenty-six-page motion (ECF No. 18) and fourteen-page declaration (ECF No. 18-1). The order noted Kalshi's failure to comply with LR 7-4 which sets forth prerequisites for filing emergency motions.[24] ECF No. 26.

Second, for the reasons previously discussed, not all the Defendants were properly served with a summons and complaint consistent with Nevada's dual service requirement. Despite this failure, Defendants made a special appearance to respond and to reserve their rights to assert additional arguments and defenses against Kalshi. ECF No. 35 at 2 and 22, n. 20.

Third, due to the extreme time limitations, Defendants response was targeted to Kalshi's claim and arguments—the Supremacy Clause and preemption.

Fourth, during the hearing on Kalshi's motion, Defendants notified the Court and Kalshi of their intention to move for dismissal based on immunity and other grounds. ECF No. 26 at 5; *See also Mills v. United States*, 742 F.3d 400, 404 (9th Cir. 2014) (discussing that unless a government expressly and

---

[24] Local Rule 7-4 requires, among other things, a declaration identifying the office addresses and telephone numbers of all affected parties, and a statement certifying participation in a meet and confer or why it was impractical. LR 7-4(a).

unequivocally waives its sovereign immunity, suits are barred for lack of subject matter jurisdiction).

Finally, Defendants' request for equitable relief to restore the status quo existing before Kalshi's violation of Nevada gaming laws is not a waiver. *See In re Axton*, 641 F.2d 1262, 1273 (9th Cir. 1981) (recognizing that assertion of affirmative relief in complaint to terminate automatic stay does not standing alone constitute a forfeiture of the right to object to summary jurisdiction). Defendants did not file a complaint against Kalshi. Moreover, during oral argument, Defendants notified the Court of immunity defenses and their intent to file a motion to dismiss. *See Hines v. Stamos*, 111 F.4th 551, 562–63 (5th Cir. 2024) (discussing that although a motion to compel arbitration is a request for "affirmative relief," by itself, it is insufficient for personal jurisdiction when a defendant objects to jurisdiction).

For all of the preceding reasons, the Court should not find a waiver of any of Defendants' defenses or arguments.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Complaint for Permanent Injunction and Declaratory Relief be dismissed in its entirety. Should the Court reject the NGC and the NGCB's Eleventh Amendment immunity, then the dismissal should be without prejudice to Kalshi bringing a new complaint properly naming these entities pursuant to NRS 41.031(2). With respect to the Individual Defendants and Attorney General Ford, the dismissal should be with prejudice.

DATED this 4th day of April, 2025.

AARON D. FORD
Attorney General

By: */s/ Sabrena K. Clinton*
    Jessica E. Whelan (Bar No. 14781)
     Chief Deputy Solicitor General 0 Litigation
    Sabrena K. Clinton (Bar No. 6499)
     Senior Deputy Attorney General

*Attorneys for Kirk D. Hendrick, George Assad, Chandeni K. Sendall, Nevada Gaming Control Board, Jennifer Togliatti, Rosa Solis-Rainey, Brian Krolicki, George Markantonis, Abbi Silver, Nevada Gaming Control Commission and Aaron D. Ford.*