D. Lee Roberts, Jr., Esq.
Nevada Bar No. 8877
*lroberts@wwhgd.com*
WEINBERG, WHEELER, HUDGINS,
   GUNN & DIAL, LLC
6385 South Rainbow Blvd., Suite 400
Las Vegas, Nevada 89118
Telephone: (702) 938-3838
Facsimile:  (702) 938-3864

Neal Kumar Katyal, Esq.
(admitted *pro hac vice*)
Joshua B. Sterling, Esq.
(admitted *pro hac vice*)
William E. Havemann, Esq.
(admitted *pro hac vice*)
MILBANK LLP
1850 K Street, Suite 1100
Washington, D.C. 20006
(202) 835-7505
(213) 629-5063 FAX

Mackenzie Austin, Esq.
(admitted *pro hac vice*)
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
(424) 386-4000
(213) 629-5063 FAX

*Attorneys for Plaintiff KalshiEX LLC*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| KALSHIEX, LLC,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in his official capacity as a Member of the Nevada Gaming Control Board; CHANDENI K. SENDALL, in her official capacity as a Member of the Nevada Gaming Control Board; NEVADA GAMING CONTROL BOARD; JENNIFER TOGLIATTI, in her official capacity as Chair of the Nevada Gaming Commission; ROSA SOLIS-RAINEY, in her official capacity as a Member of the Nevada Gaming Commission; BRIAN | Case No.:2:25-cv-00575-APG-BNW<br><br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS** |

WEINBERG WHEELER
HUDGINS GUNN & DIAL

KROLICKI, in his official capacity as a Member of the Nevada Gaming Commission GEORGE MARKANTONIS, in his official capacity as a Member of the Nevada Gaming Commission; ABBI SILVER, in her official capacity as a Member of the Nevada Gaming Commission; NEVADA GAMING COMMISSION; AARON D. FORD, in his official capacity as Attorney General of Nevada,

Defendants.

## INTRODUCTION

Just a few weeks ago, this Court issued a preliminary injunction against Defendants, concluding that "because Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted." *KalshiEX, LLC v. Hendrick*, No. 25-CV-575, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025). Defendants' motion to dismiss barely acknowledges this decision and instead repackages many of the same arguments this Court already rejected at the preliminary-injunction stage. The main difference here is the standard of review. Kalshi succeeded on the more demanding preliminary-injunction standard, and it follows *a fortiori* that Kalshi's complaint states a plausible claim for declaratory and injunctive relief at the motion-to-dismiss stage. Accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of Kalshi, the complaint sets forth facts sufficient to find that the Commodity Exchange Act ("CEA") preempts Nevada state gambling laws as applied to Kalshi's event contracts.

Overwhelming evidence establishes that Congress in the CEA sought to preempt state regulation of trading on designated contract markets ("DCMs") like Kalshi. Indeed, this was the principal purpose of the 1974 amendments, as confirmed by every marker of legislative intent— text, context, purpose, history, and precedent interpreting the CEA dating back decades. This Court accordingly held that the CEA's "plain and unambiguous language grants the CFTC exclusive jurisdiction over" Kalshi's event contracts. *Id*. at *5. Just ten days ago, the U.S. District Court for the District of New Jersey agreed, holding that "Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction." *KalshiEX LLC, v. Flaherty*, No. 25-CV-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025). These well-reasoned decisions

WEINBERG WHEELER HUDGINS GUNN & DIAL

foreclose Defendants' arguments that Kalshi has failed to state a plausible preemption claim. They also foreclose the Defendants' Tenth Amendment and estoppel arguments, both of which this Court rejected at the preliminary-injunction stage.

Perhaps because their substantive arguments are foreclosed, Defendants argue that Kalshi's complaint suffers from a series of procedural defects. Many of these arguments are internally contradictory, and all can be readily rejected. Defendants' principal argument is that Nevada law required Kalshi to name the State as a defendant. But the very state statute on which Defendants rely makes clear that Nevada preserves its Eleventh Amendment immunity. *See* NRS 41.031(3). Defendants offer no reason why Kalshi should have been required to undertake the futile gesture of naming a party that Defendants agree would be immune. The two state agencies named as defendants waived any immunity they would otherwise possess by affirmatively asking this Court to enter injunctive relief in their favor. And, under *Ex parte Young*, state officials are not immune from suits like this one seeking prospective relief to prevent violations of federal law. The State's argument that these officials nonetheless retain immunity under state law is the very same argument the Supreme Court rejected in *Ex parte Young* itself. Finally, Defendants' argument that Kalshi failed to serve the Nevada Attorney General is difficult to understand given that counsel for Defendants expressly waived service on behalf of all Defendants—including the Nevada Attorney General.

Having succeeded at the preliminary-injunction phase, Kalshi's complaint satisfies the more permissive motion-to-dismiss standard. This court should deny Defendants' motion.

<u>**BACKGROUND**</u>

Because the relevant background is set forth in detail in Kalshi's complaint and motion for a preliminary injunction, we summarize that background only briefly here.

**A. The Exclusive Federal Framework For Regulating Futures Markets On Regulated Exchanges**

Derivative contracts are financial tools that traders use to mitigate risk. *See KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 23-CV-3257, 2024 WL 4164694, at *1-2 (D.D.C. Sept. 12, 2024). Event contracts are a type of derivative contract—they are financial

instruments that identify a future event with multiple possible outcomes, a payment schedule for the outcomes, and an expiration date. *Id.* at *2. Event contracts are typically traded on an exchange, and their value is determined by market forces. *Id.*

Congress passed the Commodity Exchange Act ("CEA") in 1934 to regulate the derivatives market. In 1974, Congress created the Commodity Futures Trading Commission ("CFTC") to serve as the federal agency empowered to oversee and regulate exchanges under the CEA. Compl. ¶ 33. The centralization of authority in the CFTC was borne of Congress's fear that subjecting exchanges to different regulatory regimes would wreak havoc in the futures market. *Id.* Congress was particularly concerned that "states . . . might step in to regulate the futures markets themselves." *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 (7th Cir. 1995). Applying different State laws to futures trading "would just lead to total chaos." *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

The CFTC's regulatory framework is extensive, comprehensive, and exclusive. To obtain approval from the CFTC, an exchange must first apply for and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. §§ 38.100, 39.3. Once the CFTC designates an entity as a contract market, the CFTC has "exclusive jurisdiction" over derivatives traded on the market, including "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to event contracts. *See id.* §§ 1a(47)(A)(ii), (iv), (vi). Exchanges under the CFTC's jurisdiction are subject to the CFTC's extensive regulatory framework as set out in Part 38 of Title 17 of the U.S. Code and in CFTC regulations. If an exchange violates any of the provisions of the CEA or the CFTC's regulations, the CFTC is authorized to "suspend" or "revoke" the market's "designation or registration." 7 U.S.C. § 8(b).

Congress in 2010 enacted a "Special Rule" addressing event contracts. The Special Rule

authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CEA provides that the CFTC "may"—but need not—deem event contracts contrary to the public interest if they "involve":

(I)     activity that is unlawful under any Federal or State law;
(II)    terrorism;
(III)   assassination;
(IV)    war;
(V)     gaming; or
(VI)    other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Id.*; *see also* 17 C.F.R. § 40.11(a)(1)–(2) (implementing Special Rule). The decision to prohibit an event contract that falls within any of these categories is subject to the CFTC's evaluation of the "public interest."

**B.  Kalshi's Registration As A CFTC-Designated Contract Market Under Federal Law**

In 2020, the CFTC unanimously certified Kalshi as a DCM, affirming that Kalshi's platform complied with the CEA's regulatory requirements. *See KalshiEX LLC*, 2024 WL 4164694, at *4. Because Kalshi is a DCM, its event contracts are subject to the "exclusive jurisdiction" of the CFTC. 7 U.S.C. § 2(a)(1). The company offers a user-friendly and accessible platform where individual, retail, and institutional participants can hedge their risks on event-based outcomes. Compl. ¶ 13. Kalshi offers many kinds of event contracts on its exchange including those related to political events and sports.

*Political-event contracts*:  Kalshi first listed its political-event contracts in 2023, self-certifying a congressional control contract where users could trade on which political party would control the House of Representatives or the Senate following the 2024 federal elections. Compl. ¶ 47. Pursuant to the CFTC's power under the CEA, the CFTC initiated a review of Kalshi's congressional control contracts. Compl. ¶ 48. The CFTC ultimately issued an order purporting to prohibit Kalshi from listing these contracts, finding that they "involve[d]" "gaming" and "unlawful" activity in violation of 7 U.S.C. § 7a-2(c)(5)(C)(i). Compl. ¶ 49.

Kalshi challenged this ruling in federal court, and the U.S. District Court for the District

WEINBERG WHEELER
HUDGINS GUNN & DIAL

of Columbia agreed with Kalshi. The court held that elections "do not involve unlawful activity under any Federal or State law" or "bear any relation to any game." *See KalshiEX LLC*, 2024 WL 4164694, at *13. Thus, it found that Kalshi's congressional control contracts—which depend on the outcome of elections—do not violate the Special Rule. *See id.* The court accordingly vacated the CFTC's order, holding that federal law required the CFTC to permit the contracts. *Id.* The CFTC initially appealed the judgment to the D.C. Circuit, which denied a stay pending appeal in a published opinion in October 2024. *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58 (D.C. Cir. 2024). But just a few days ago, on May 5, 2025, the CFTC moved to voluntarily dismiss its appeal, and on May 7 the D.C. Circuit dismissed the appeal, making the D.D.C.'s decision final. *See Order, KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 24-5205 (D.C. Cir. May 7, 2025).

<u>*Sports-related contracts*</u>: Kalshi self-certified and listed sports-related contracts on its exchange on January 24, 2025, allowing users to place positions on, for example, which teams would advance in certain rounds of the NCAA College Basketball Championship or who would win the U.S. Open Golf Tournament. Unlike with Kalshi's political-event contracts, the CFTC declined to review Kalshi's sports-related contracts, and they were immediately effective upon self-certification. Compl. ¶ 53. Kalshi's sports-event contracts are thus legal under federal law. *Id.* While federal law gives the CFTC discretion to prohibit contracts it considers "gaming" and believes to be contrary to the public interest, the CFTC has declined to do so for Kalshi's contracts.

**C. Nevada Authorities' Attempt To Regulate Kalshi's Designated Contract Market**

On March 4, 2025, the Nevada Gaming Control Board ("NGCB") sent a cease-and-desist letter to Tarek Mansour, Kalshi's Chief Executive Officer, and Eliezer Mishory, its then-Chief Regulatory Officer and General Counsel, claiming that Kalshi's "event-based contracts in Nevada on sporting events and on election outcomes" were unlawful under Nevada law. Compl. Ex. 1 at 2. The letter demanded that Kalshi "immediately cease and desist from offering any event-based contracts in Nevada" within 10 days. *Id.* at 3. Because the NGCB lacks authority to intrude on the CFTC's exclusive jurisdiction to regulate Kalshi's event contracts, Kalshi brought

WEINBERG WHEELER
HUDGINS GUNN & DIAL

suit seeking declaratory and injunctive relief.

On April 9, 2025, this Court granted Kalshi's motion for a preliminary injunction to prevent Defendants from enforcing preempted state laws against Kalshi. This Court found that the CEA establishes a comprehensive federal framework for regulating commodity futures trading. As a DCM that offers event contracts on its exchange, Kalshi "is subject to the CFTC's exclusive jurisdiction and state law is field preempted." *Hendrick*, 2025 WL 1073495 at *6. The U.S. District Court for the District of New Jersey recently agreed, granting a preliminary injunction against New Jersey authorities who threatened similar civil and criminal action under New Jersey law against Kalshi. *Flaherty*, 2025 WL 1218313, at *8. Like this Court, the *Flaherty* court found that "Kalshi has demonstrated a reasonable chance of prevailing" because "at the very least field preemption applies." *Id.* And like this Court, Flaherty court additionally found that Kalshi satisfied all the other requirements for obtaining preliminary injunctive relief. *Id.* at *6-8.

**LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When evaluating a complaint under Rule 12(b)(6), the court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

**ARGUMENT**

In support of their motion to dismiss Defendants raise a slew of procedural arguments, all of which this Court can readily reject. Defendants' pervasive error is to assume that *state* statutes governing actions under *state* law in *state* court apply to this action that is governed by *federal* law and was brought in this Court. Defendants' substantive arguments that Kalshi's complaint does not state a claim for relief are likewise unpersuasive. This Court already rejected these arguments, and should do so again under the more lenient motion-to-dismiss standard.

### I. Kalshi Was Not Required To Sue The State Of Nevada.

Defendants first fault Kalshi for failing to follow a state law "naming convention" to

WEINBERG WHEELER HUDGINS GUNN & DIAL

"invoke the State's waiver of sovereign immunity" by naming the State of Nevada as a Defendant.  Mot. at 5.  For many reasons, however, nothing in Nevada law required Kalshi to name Nevada in this suit seeking relief against state officials and agencies in federal court.

Defendants rely (at 4) on NRS 41.031.  But that statute is "Nevada's statute generally waiving sovereign immunity *for state tort actions* in *state court*."  *Smith v. Dep't of Motor Vehicle Off.*, No. 23-CV-1559, 2024 WL 3498233, at *3 (D. Nev. July 19, 2024) (citing *Craig v. Donnelly*, 439 P.3d 413, 415 (Nev. 2019)).  This case being neither a state tort action nor one filed in state court, NRS 41.031 does not apply.

A closer look at NRS 41.031 only underscores its inapplicability.  NRS 41.031(3) provides that "the State of Nevada does not waive its immunity from suit conferred by Amendment XI of the Constitution of the United States."  The Eleventh Amendment immunizes States from private suits like this one filed in federal court.  U.S. Const. amend. XI. Defendants offer no reason to conclude that Nevada law required Kalshi to name the State of Nevada as a defendant even though the State of Nevada has retained its immunity.

Defendants claim (at 4) that this suit is in effect a suit "against the State," and that NRS 41.031(2) therefore required Kalshi to name the State as a defendant.  But NRS 41.031(2) provides that "[a]n action may be brought under this section against the State of Nevada *or* any political subdivision of the State."  NRS 41.031(2) (emphasis added).  If a plaintiff chooses to proceed "*against the State of Nevada*, the action must be brought in the name of the State of Nevada on relation of the particular department, commission, board or other agency of the State."  *Id.* (emphasis added).  But that requirement does not apply where, as here, the plaintiff proceeds against state agencies.  Another court in this District has rejected the same argument Defendants press here, noting that a contrary holding would transform compliance with the statute into a "children's game."  *Pappas v. Nevada Dep't of Pub. Safety*, No. 18-CV-98, 2018 WL 5724439, at *1 (D. Nev. Oct. 30, 2018) (quoting *Barsten v. Dep't of Interior,* 896 F.2d 422, 423 (9th Cir. 1990)).  A plaintiff fulfills its obligations under NRS 41.031(2) so long as it names the Nevada state agencies "in such terms that every intelligent person understands who is meant"; "courts should not put themselves in the position of failing to recognize what is apparent

WEINBERG WHEELER HUDGINS GUNN & DIAL

to everyone else." *Id.* Kalshi's complaint easily satisfies that requirement, even if it applies.

Defendants err in arguing that Kalshi's supposed failure to comply with NRS 41.031 renders its complaint *void ab initio*. The authority Defendants cite requires plaintiffs to attach an affidavit or report to complaints in medical-malpractice suits. *See* Mot. at 5 (citing *Washoe Med. Ctr. v. Second Jud. Dist. Ct.*, 122 Nev. 1298, 1304 (2006)). "Such a requirement is completely distinct from" any state-law mandate to sue the State of Nevada in conjunction with other state entities. *Weidner v. Nevada*, No. 16-CV-02301, 2017 WL 5985563, at *2 (D. Nev. Nov. 30, 2017). Courts have allowed plaintiffs to amend their complaints to comply with NRS 41.031(2), even where it applies. *See, e.g.*, *id.*; *Perez v. State of Nevada*, No. 15-CV-1572, 2016 WL 4744134, at *4 (D. Nev. Sept. 12, 2016).

## II.    Kalshi Properly Served Defendants.

Defendants contend that Kalshi failed to perfect service of process by failing to serve the Attorney General in Carson City. That argument derives from Defendants' erroneous premise that this case is, in fact, a suit against the State. *See* NRS 41.031(2) ("*In an action against the State of Nevada*, the summons and a copy of the complaint must be served upon . . . [t]he Attorney General, or a person designated by the Attorney General, at the Office of the Attorney General in Carson City" (emphasis added)). As already explained, this is not a suit against the State, and the service requirements for such suits therefore do not apply.

In any event, as Defendants acknowledge (at 6), counsel for Kalshi emailed counsel for Defendants on March 31, 2025, asking whether "the Attorney General will accept service on behalf of the other defendants" in lieu of "formal service." ECF 31-3. Defendants' Counsel responded on April 2, 2025, that she was "able to accept service on behalf of defendants." ECF 31-5. That same day, Defendants' counsel signed and Kalshi docketed Defendants' "Acceptance of Service," in which counsel "accept[ed] and acknowledge[d] service" and "waive[d] personal service of paper copies" on behalf of all Defendants, including "Aaron D. Ford," the Nevada Attorney General. ECF 39. Defendants' contention that they "did not accept service on behalf of the Attorney General" (at 6) is therefore difficult to understand: The Attorney General was one of the Defendants for whom Defendants' counsel expressly accepted service.

Defendants claim (at 6 n.3) that Kalshi was required to serve the Attorney General "twice."  But Defendants are—not surprisingly—unable to cite any precedent requiring such empty formalism.  Even if the statute could otherwise be understood to require double service, Defendants waived that requirement when they unconditionally accepted service on behalf of the Attorney General.  In any event, if this Court deems double service necessary, Kalshi would be amenable to serving the Attorney General for a second time.

## III.    The State Agencies Waived Eleventh Amendment Immunity.

Defendants argue (at 6) that the State, the NGCB, and the NGC "have Eleventh Amendment immunity."  The State, however, is not a Defendant, and its immunity is therefore immaterial.  Nor do the NGCB and the NGC possess Eleventh Amendment immunity.  Both agencies consented to this Court's jurisdiction and thereby waived their immunity when they sought a preliminary injunction from this Court.

A state agency waives its immunity when it engages in conduct that "clearly manifests acceptance of the federal court's jurisdiction or is otherwise incompatible with an assertion of Eleventh Amendment immunity."  *Hill v. Blind Indus. & Servs. of Md.,* 179 F.3d 754, 758-59 (9th Cir. 1999); *Lapides v. Bd. of Regents of Univ. Sys. of Georgia,* 535 U.S. 613, 619-20 (2002) (state waives its Eleventh Amendment immunity by "voluntarily invok[ing] the federal court's jurisdiction").  A state agency may manifest acceptance of federal court jurisdiction by, among other things, seeking affirmative relief in federal court.  *See Gardner v. New Jersey*, 329 U.S. 565, 574 (1947).  Here, Defendants—including the NGCB and the NGC—filed a countermotion seeking a preliminary injunction along with their opposition to Kalshi's motion for preliminary injunctive relief.  ECF 35.  Defendants' countermotion asked this Court to "enter an immediate temporary restraining order and preliminary injunction to enjoin Kalshi from offering event-based contracts" related to sports "and to enjoin Kalshi from offering event-based contracts on election outcomes in Nevada."  ECF 34 at 24.  As this Court's order granting Kalshi a preliminary injunction suggested without deciding, *see* ECF 45 at 5 n.1, Defendants' countermotion constitutes a "litigation act" that evinces a "clear" intent to waive Eleventh Amendment immunity, because it acknowledged this Court's power to adjudicate claims on

WEINBERG WHEELER
HUDGINS GUNN & DIAL

WEINBERG WHEELER
HUDGINS GUNN & DIAL

1  Defendants' behalf. *Lapides*, 535 U.S. at 620.

2  Defendants' arguments for excusing the waiver are unconvincing. Defendants argue (at

3  24) that they did not waive immunity because they "did not file a complaint against Kalshi." But

4  that is of no moment. By filing a countermotion seeking affirmative injunctive relief against

5  Kalshi, Defendants quite plainly "voluntarily invoked" this court's jurisdiction for purposes of

6  waiving immunity. *Lapides*, 535 U.S. at 619; *see Gunter v. Atlantic Coast Line R. Co*., 200 U.S.

7  273, 284 (1906) (where a state voluntarily "submits its rights for judicial determination, it will be

8  bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions

9  of the 11th Amendment"). In *Lapides*, for example, the Supreme Court held that the state's

10 removal of a state-court action to federal court constituted waiver of sovereign immunity. 535

11 U.S. at 619-20. As the Supreme Court recognized, it would be "anomalous or inconsistent for a

12 State both (1) to invoke federal jurisdiction, thereby contending that the 'Judicial power of the

13 United States' extends to the case at hand, and (2) to claim Eleventh Amendment immunity,

14 thereby denying that the 'Judicial power of the United States' extends to the case at hand." *Id.* at

15 619. The same logic fully applies here.

16 Defendants refer to cases holding that a State does not waive immunity by raising

17 "defensive" arguments, *In re Axton*, 641 F.2d 1262, 1272 (9th Cir. 1981), or asserting

18 counterclaims that are "contingent on a claim asserted against" them, such as indemnification or

19 contribution, *see Aholelei v. Dep't of Pub. Safety*, 488 F.3d 1144, 1148-49 (9th Cir. 2007). But

20 here, Defendants did not merely defend against Kalshi's request for a preliminary injunction, nor

21 did Defendants raise a defensive, contingent counterclaim. Defendants instead invoked this

22 Court's jurisdiction by asking it to enter a judgment awarding it injunctive relief. Defendants

23 cite no case decided by any court at any level holding that affirmatively requesting an injunction

24 does not waive immunity.

25 Defendants next seek to withdraw their waiver of immunity on the ground that their

26 motion seeking affirmative relief was prepared in haste. But the suggestion (at 23) that they had

27 "little more than two days to prepare a response" is incorrect. Kalshi "provide[d] advance

28 notice" to Defendants' counsel that Kalshi intended to file suit and seek preliminary relief on

March 28, 2025.  ECF 31 ¶ 2.  Immediately after completing the filings later that day, Kalshi emailed the complaint, motion, and accompanying declaration to Defendants' counsel and asked if any other counsel should receive service.  *Id.* ¶ 4.  Defendants' counsel therefore had a full week—from March 28 to April 4—to prepare their response.  While Defendants suggest (at 23) that Kalshi delayed notifying them of this Court's order requesting a response by failing to forward the order "until the evening of April 1," the order itself was issued the evening of April 1; Kalshi forwarded it less than one hour after it appeared on the docket.  And while Defendants blame their waiver on failure of proper service, the very same counsel who prepared the brief waiving immunity received actual service of the complaint a full week earlier and waived formal service on behalf of all Defendants, including the Nevada Attorney General.  Defendants offer no conceivable basis to conclude that their decision to waive immunity could be the result of improper service.

Defendants claim (at 23) that sovereign immunity deprives this Court of subject-matter jurisdiction, such that it cannot be waived.  But immunity claims "do[] not implicate a federal court's subject matter jurisdiction in any ordinary sense," *ITSI TV Prods., Inc. v. Agric. Ass'ns,* 3 F.3d 1289, 1291 (9th Cir. 1993), and may be "waive[d]," *Wisconsin Dept. of Corrections v. Schacht*, 524 U.S. 381, 389 (1998).

Kalshi sued the agencies in an abundance of caution to ensure that it could obtain effectual relief.  Kalshi is amenable to amending the complaint should this Court find amendment necessary.  But, as this Court recognized in its preliminary injunction order, the "net effect" would be "the same":  The NGCB and NGC "can operate only through their employees or members," which remain named Defendants.  *Hendrick*, 2025 WL 1073495, at *2.

**IV.    Individual Defendants Lack Immunity Under State Law.**

As this Court has already ruled, the individual defendants are not entitled to Eleventh Amendment immunity because they "fall within the *Ex parte Young* exception" whereby a "party may seek prospective injunctive relief against an individual state officer in her official capacity." *Id*. at *2 (citing *Doe v. Regents of the Univ. of Cal.*, 891 F.3d 1147, 1153 (9th Cir. 2018)). Because Kalshi seeks injunctive relief against the state officers who are charged with enforcing

1     Nevada's gambling laws, Kalshi's suit falls comfortably within the exception.

2         Defendants nonetheless maintain (at 7) that individual defendants "are entitled to official

3 act and discretionary act immunity" under state law, citing state laws that confer immunity for

4 discretionary acts and acts taken pursuant to state statutes. The Supreme Court rejected the same

5 argument in *Ex parte Young* itself. "The state has no power to impart to [a state official] any

6 immunity from responsibility to the supreme authority of the United States." 209 U.S. 123, 160

7 (1908). Because a "state can not authorize a state officer to violate the Constitution and laws of

8 the United States," "an action by a state officer that violates federal law is not considered an

9 action of the state and, therefore, is not shielded from suit by the state's sovereign immunity."

10 *NRDC v. California Dep't of Transp.*, 96 F.3d 420, 422 (9th Cir. 1996). If States had the power

11 to use state law to insulate their officers from liability for acts taken in violation of federal law, it

12 would render the *Ex parte Young* exception to the Eleventh Amendment a nullity. The entire

13 purpose of *Ex parte Young* is to prevent States from shielding their officers from suit for actions

14 that violate federal law.

15      **V.**     **Kalshi's Complaint Contains Sufficient Factual Allegations To Grant Relief**
16           **As To The Individual Defendants.**

17        In an action seeking an injunction against enforcement of an unconstitutional act, the

18 proper defendants are those "who would be responsible for implementing any injunctive relief."

19 *Hendrick*, 2025 WL 1073495, at *2 (citing *R. W. v. Columbia Basin Coll.*, 77 F.4th 1214, 1223

20 (9th Cir. 2023)). As the Supreme Court has explained, an official-capacity suit "is *not* a suit

21 against the official personally" but instead the office that the individual holds. *Kentucky v.*

22 *Graham*, 473 U.S. 159, 165-66 (1985) (emphasis in original). To determine whether an

23 individual is properly named, courts ask whether the office of the named individuals "can

24 implement injunctive relief to remedy the alleged ongoing violation of federal law." *Columbia*

25 *Basin Coll.*, 77 F.4th at 1223.

26        Kalshi alleges sufficient facts to state a plausible claim for relief against the individual

27 defendants. Defendants Kirk D. Hendrick, George Assad, and Chandeni K. Sendall are sued in

28 their "official capacit[ies]" as members of the "Nevada Gaming Control Board." Compl. ¶¶ 14,

WEINBERG WHEELER HUDGINS GUNN & DIAL

15, 16. In turn, Kalshi alleges that the NGCB "promulgates rules and regulations for the licensing and operation of gaming in the state of Nevada, (2) establishes the rules and regulations for all tax reports that gaming licensees submit to the state, and (3) enforces state laws and regulations governing gaming." Compl. ¶ 17 *see also* NRS 463.142 (authorizing "civil action" by the Board). Likewise, Jennifer Togliatti, Rosa Solis-Rainey, Brian Krolicki, and George Markantonis are sued in their "official capacit[ies]" as members of the "Nevada Gaming Commission." Compl. ¶¶ 18-22. The NGC "acts on the recommendations of the Nevada Gaming Control Board on issues of licensing." Compl. ¶ 23. Finally, Defendant Aaron D. Ford is sued in his official capacity as "Attorney General of Nevada." Compl. ¶ 24. The Attorney General is Nevada's chief law enforcement officer who broadly exercises power over "all district attorneys" in their duties, NRS 228.120(1), and Nevada law specifically identifies "the Attorney General" and the "district attorney[s]" under his control as the officials who would "prosecute any public offense" in violation of state gaming laws. NRS 463.141.

Kalshi's suit seeks a permanent injunction barring the Defendants from implementing Nevada gaming laws "to effectively regulate Plaintiff's futures market, against Plaintiff." Compl. at 17. As this Court recognized, the NGCB and NGC "can operate only through their employees or members." *Hendrick*, 2025 WL 1073495, at *2. The Individual Defendants, being the members of the Agency Defendants and the official charged with enforcing Nevada's gaming laws criminally, are thus properly named as persons who would carry out Nevada's gaming laws against Kalshi, and have the power to implement the injunctive relief ordered by this Court.[1] Indeed, it was some of those Individual Defendants who signed the cease and desist letter on behalf of the NGCB, expressly reserving the rights of the NGCB, "state and local law enforcement," and "regulatory agencies" to "pursue criminal and civil actions" against Kalshi. ECF 1-2 at 3.

---

[1] To the extent Defendants' position is that *no* named Defendant is proper, the Court should direct the Attorney General's Office to "identify the proper defendant" and grant Kalshi leave to amend. *See Olson v. State Capitol*, No. 23-CV-00513, 2024 WL 3445242, at *2 (D. Nev. July 17, 2024) (ordering this relief where Attorney General "acted in th[e] case by accepting service" and "filing [a] Motion to Dismiss").

WEINBERG WHEELER HUDGINS GUNN & DIAL

Defendants' citation (at 10) to *Melnek v. Las Vegas Metropolitan Police Department*, No. 23-CV-01303, 2024 WL 2115935 (D. Nev. May 10, 2024), is inapposite. *Melnek* involved a suit for damages under Section 1983, *see id.*—a context where courts routinely require individualized allegations of liability. *See Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (distinguishing "the causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed to damages"). But Kalshi sues the Individual Defendants, including Ford, solely in their official capacities for injunctive relief, a context where courts routinely adopt a "broad" approach. *Id.* (quoting *Williams v. Bennett*, 689 F.2d 1370, 1383 (11th Cir. 1982) (discussing "injunction against all officials with any responsibility" in alleged unconstitutional acts)). Kalshi need only plausibly allege that Individual Defendants have "*some* connection with the enforcement of the act." *Culinary Workers Union, Local 226 v. Del Papa*, 200 F.3d 614, 619 (9th Cir. 1999) (quoting *Ex parte Young*, 209 U.S. at 157) (emphasis added). That standard is plainly satisfied here, where the law "specifically grants the defendant[s] [the] enforcement authority" they threatened to exercise. *See Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1309 (D. Ariz. 2015).

## VI.    The Commodity Exchange Act Preempts Nevada Gaming Laws.

Defendants largely reprise the preemption arguments that they raised at the preliminary-injunction stage, which this Court already rejected in finding that Kalshi was likely to prevail on its preemption arguments. Since then, another court has weighed in and agreed with Kalshi that the CEA likely preempts similar New Jersey gaming statutes. *Flaherty*, 2025 WL 1218313, at *6 (granting preliminary injunction). Under the more relaxed motion-to-dismiss standard, Defendants' arguments also fall short.

### 1.    *The Text Of The CEA Confirms That State Laws Are Preempted As Applied To Futures Trading On Designated Contract Markets.*

The CEA's text grants the CFTC "exclusive jurisdiction" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A). As this Court noted, the "plain and unambiguous language" of this provision

grants the CFTC "exclusive jurisdiction" to regulate Kalshi's sports-event contracts. *Hendrick*, 2025 WL 1073495, at *5. Kalshi's contracts are "agreements" and "transactions" involving "swaps or contracts of sale of a commodity for future delivery" traded on a designated contract market. *See* 7 U.S.C. § 1a(19)(iv)(I) (a "commodity" includes "an occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties" and associated with economic consequences); *id*. § 1a(47)(A)(ii) (a "swap" includes "any agreement, contract, or transaction. . . that provides for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" associated with potential economic consequences).

While Defendants at the preliminary-injunction stage did not meaningfully dispute that this text encompasses Kalshi's event contracts, Defendants now claim that Kalshi's event contracts are not "swaps" for purposes of Section 2. The CEA's Special Rule disproves that contention. The Special Rule provides that "event contracts" may involve "gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i)(V); and event contracts, in turn, are a type of "swap," *id*. § 1a(47)(A)(ii). These provisions establish that Congress understood that swaps may encompass event contracts involving the outcomes of sport events. Indeed, that is "the only workable interpretation of the [S]pecial [R]ule." *Flaherty*, 2025 WL 1218313, at *5. Defendants' suggestion that sport events do not have economic consequences is, in any case, mistaken. The events for which Kalshi offers contracts—like the Masters Golf Tournament or the NBA Championship—have significant economic implications for stakeholders, including advertisers, sponsors, local communities, and many others. Defendants' confusion over what qualifies as a swap helps explain why Congress granted the CFTC exclusive jurisdiction to regulate in this area rather than allowing a patchwork of self-interested determinations by states.

Next, Defendants argue (at 13) that the text does not preempt "all regulations that might touch contracts on a CFTC designated exchange" like "regulations that do not target: (1) actual contracts listed on the exchanges, or (2) contracts on the exchanges other than those constituting swaps or contracts of sale of a commodity for future delivery [] not preempted by the CEA." Kalshi of course agrees that the CEA does not preempt regulations that target off-exchange

trading or contracts that fall within the "exclusive jurisdiction" provision. *See* 7 U.S.C. § 16(e); H.R. Rep. No. 97-565, pt. 1, at 43 (1982) (state authorities may police "transactions outside those preserved exclusively for the jurisdiction of the CFTC"). But the point here is that Nevada's gambling laws *do* target contracts that are listed on Kalshi's CFTC-designated exchange, and Kalshi's contracts *do* constitute swaps that fall comfortably within the exclusive-jurisdiction provision. Nevada's laws are thus preempted.

Next, Defendants gesture (at 13) to the two savings clauses in Section 2, but neither supports them. One provides that "nothing contained in this section" supersedes "the laws of . . . any State." 7 U.S.C. § 2(a)(1)(A). Critically, the prefatory clause begins with the phrase "except as hereinabove provided." *Id.* As this Court has already noted, the prefatory clause makes clear that the CEA does not preempt state law *except* as to transactions traded on designated contract markets. *Hendrick*, 2025 WL 1073495, at *5. The second savings clause preserves "the jurisdiction conferred on courts of the United States or any State." 7 U.S.C. § 2(a)(1)(A). But this provision speaks to state courts' *jurisdiction*; it does not speak to which substantive law— federal or state—applies in those courts, and thus does not bear on preemption. *See Flaherty*, 2025 WL 1218313, at *5 (agreeing that this clause "says little about preemption of state regulation of designated contract markets").

Defendants next cite several cases (at 13-14) in which courts have found that the CFTC does not retain jurisdiction over "marketing of investor-education courses" or "common law fraud claims." But these cases are inapposite. As Kalshi has made clear from the beginning, the CEA preempts state law that regulates futures *trading* on designated exchanges. Neither marketing requirements nor common law fraud claims "directly affect trading on or the operation of a futures market" regulated by the CFTC. *Am. Agric. Movement*, 977 F.2d at 1156-57. Nevada's gaming laws, by contrast, do because they prohibit Kalshi, a CFTC-designated exchange, from offering event contracts that federal law has authorized. Compl. ¶¶ 56-57. Finally, Defendants cite (at 14) to *Lopez v. Dean Witter Reynolds, Inc.*, 805 F.2d 880 (9th Cir. 1986), where the court found that a group of investors' accounts was not a "commodity pool subject to the requirements of the Commodity Exchange Act." *Id.* at 883-84. But that case is not

WEINBERG WHEELER
HUDGINS GUNN & DIAL

1    relevant because Kalshi is a DCM subject to the requirements of the CEA.

2         As at the preliminary injunction stage, Defendants have no answer to the uniform

3    precedent supporting Kalshi.  The Seventh Circuit has held that a state law that "would directly

4    affect trading on or the operation of a futures market" regulated by the CFTC "is preempted."

5    *Am. Agric. Movement*, 977 F.2d at 1156-57.  The D.C. Circuit similarly recognized that "the

6    CFTC's jurisdiction was to be exclusive with regard to the trading of futures *on organized*

7    *contract markets*."  *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) (emphasis in

8    original) (quoting S. Rep. No. 93-1131, at 23 (1974)).  Writing for the Second Circuit, Judge

9    Friendly likewise noted that the CEA "preempts the application of state law" for DCMs.  *Leist v.*

10   *Simplot*, 638 F.2d 283, 322 (2d Cir. 1980).  The CFTC itself recently agreed that "*due to federal*

11   *preemption*, event contracts *never violate state law* when they are traded on a DCM."  CFTC

12   Brief at *27, *KalshiEx LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis

13   added).  And just 10 days ago, the court in *Flaherty* confirmed that Kalshi would likely succeed

14   in "proving that at the very least field preemption applies" in this circumstance.  2025 WL

15   1218313, at *6.  The one case that Defendants cite (at 14) as supporting their contrary position in

16   fact confirms that the CEA "establishes" a "wide-ranging scheme of federal regulation" for "the

17   regulation of commodities trading."  *Kerr v. First Commodity Corp. of Bos.*, 735 F.2d 281, 288

18   (8th Cir. 1984).

19        Citing Section 5 of the CEA, Defendants claim (at 14) that the "express purpose of the

20   CEA provides additional support that the CEA does not preempt Nevada gaming law[s]."  But

21   the quoted provision only further supports a finding of preemption.  Section 5 states that the

22   purpose of the CEA is to prevent price manipulation and market disruptions, ensure financial

23   integrity of all transactions on CFTC exchanges, protect market participants, and promote

24   responsible innovation and fair competition.  To accomplish those purposes, the CEA details "a

25   comprehensive regulatory structure" to oversee futures trading markets.  *Merrill Lynch*, 456 U.S.

26   at 356; *see also Hendrick*, 2025 WL 1073495, at *6-8.  Congress set out a reticulated scheme for

27   exchanges to obtain DCM status; for subjecting DCMs to a framework of "exclusive" CFTC

28   oversight; for authorizing review of contracts offered by DCMs; for the CFTC to exercise

discretion in policing violations; and for states to enforce the CEA in certain circumstances *but not against DCMs*. Allowing states to interfere with this comprehensive scheme by subjecting DCMs to shifting state laws risks the very kind of market disruptions that, per Section 5, the CEA was enacted to avoid. As Kalshi has explained in detail, cutting off access to its markets to entire States, including with respect to open contracts, would undermine the CEA's core purpose.

### 2. The Legislative History Supports Preemption Of State Laws As Applied To Designated Contract Markets.

Defendants claim (at 15) that this Court "should not be swayed" by the legislative history of the 1974 Act. Kalshi agrees that this Court may resolve this case without considering the legislative history given the clear statutory text and purpose. But should the Court conclude that this text and purpose leave some ambiguity, the legislative history would eliminate it. *See Haro v. City of Los Angeles*, 745 F.3d 1249, 1257 (9th Cir. 2014) (courts may consider legislative history "when a statute is ambiguous"). As this court acknowledged in its preliminary injunction order, the Senate *deleted* a provision that would have left states free to regulate DCMs, thereby raising a "compelling" inference that Congress did "not intend *sub silentio* to enact statutory language" that it had earlier discarded. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987); *see also* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge). Defendants cite absolutely zero legislative history to the contrary.

Defendants accuse Kalshi of selectively quoting individual members of Congress, but still fail to address the "*joint* explanatory statement" on the 1974 Amendments in the conference report: "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act . . . would *preempt the field insofar as futures regulation is concerned*." Senate Comm. on Agriculture, Nutrition and Forestry, 93d Cong., 2d Sess., Commodity Futures Trading Comm'n Act of 1974, at 11 (Comm. Print 1974) (emphasis added); *see Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 686–87 (9th Cir. 2006) (noting that a "committee report is entitled to considerably greater weight than comments made during floor debate"). And should the Court consider the floor debate, the sponsors of the 1974 Act likewise sought to prevent the "total chaos" that would result from subjecting DCMs to 50 different state

WEINBERG WHEELER
HUDGINS GUNN & DIAL

laws.  Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).  Defendants suggest (at 16) that these statements were concerned only with state "*antitrust*" and "*commercial*" law, but even if that were correct, it would not help Defendants; state laws regulating the gaming industry *are* commercial laws.

Finally, Defendants argue (at 16-17) that "the legislative history shows that Congress did not foresee or possibly even understand that subsequently adding 'swaps' to the CFTC's jurisdiction would displace the states' longstanding authority over traditional forms of gambling."  But the legislative record indicates that Congress considered just that.  In 2010, Congress amended the CEA to add the Special Rule governing event contracts.  That provision specifically lists "gaming" as a grounds on which the CFTC may prohibit a contract if it finds that such a contract is "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i)(V).  Debate over the Special Rule likewise clearly contemplates that the "CFTC [will] have the power" to approve contracts involving "gaming."  *See* Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Senator Dianne Feinstein and Senator Blanche Lincoln).[2]  Thus, the legislative history demonstrates that Congress contemplated event contracts that would be based on sport events.  And instead of prohibiting those contracts outright or allowing States to regulate these contracts, Congress delegated the power to determine the contract's permissibility to the CFTC.

### 3. Nevada Gaming Laws Are Conflict-Preempted.

Defendants have no answer to the fact that subjecting Kalshi to Nevada state gambling laws would conflict with the CEA's comprehensive regulatory scheme.  Defendants' efforts to enforce state law against Kalshi would conflict with Congress's intent to create uniform regulations for futures trading on federal exchanges.  As the Seventh Circuit held, a state law that "would directly affect trading on or the operation of a futures market" regulated by the CFTC "is preempted."  *Am. Agric. Movement*, 977 F.2d at 1156-57.  If Nevada can impose its own laws on Kalshi, nothing stops the 49 other states and D.C. from doing the same.  As this Court observed, "[p]reventing the difficulties that would create is the reason Congress granted the CFTC

---

[2] Available at: https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf.

exclusive jurisdiction over CFTC-designated exchanges." *Hendrick*, 2025 WL 1073495, at *7.

Defendants claim (at 18) that Nevada's and the CEA's differing enforcement mechanisms are "not mutually exclusive" because "[e]nforcement of Nevada gaming law does not preclude the CFTC from continuing to regulate commodity futures."  The Ninth Circuit rejected a similar argument in *Valle del Sol*:  Where Congress reserves "prosecutorial power" and "discretion" to federal authorities, a state regime that allows for state prosecutions of the same actions "conflicts with the federal scheme."  732 F.3d. at 1027.  The Supreme Court likewise rejected a similar argument in *Arizona v. United States*, 567 U.S. 387 (2012).  There, the Supreme Court found that federal law preempted a state statute granting state officials authority to arrest undocumented immigrants.  Even though the state insisted that its statute was consistent with the goals of federal immigration law at a high level of generality, the Supreme Court found that allowing state officials to interfere with federal enforcement discretion would "frustrate federal policies."  *Id.* at 402.  Here, Congress granted the CFTC discretion to decide whether gaming event contracts are "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i)(VI).  Much as in *Arizona*, allowing Nevada—not to mention the other 49 states and D.C.—to substitute their understanding of the public interest for the CFTC's would create a direct conflict.

Defendants, moreover, hardly dispute that cutting off Kalshi's event contracts in Nevada would conflict with CFTC regulations.  The CFTC's Core Principles require DCMs to offer "impartial access" to markets, 17 C.F.R. §§ 38.150, 38.151(b), and prevent "market disruptions," 17 C.F.R. § 38.255.  DCMs may restrict access based on neutral principles like the "financial and operational soundness" of the market participant—but not based on the happenstance of geography.  *See, e.g.*, Statement of Commissioner Dan M. Berkovitz (Apr. 7, 2021) (DCM's proposal to limit trading on certain sports event contracts "is the very kind of discrimination based on net worth that the Commission has prohibited.").[3]  Compliance with Nevada law would require Kalshi to do just that.

/ / /

---

[3] Available at: https://www.cftc.gov/PressRoom/SpeechesTestimony/berkovitzstatement040721.

WEINBERG WHEELER
HUDGINS GUNN & DIAL

4. *Federal Laws Regulating Gaming Have No Bearing On The CFTC's Exclusive Jurisdiction Over Futures Trading On Designated Contract Markets.*

Defendants contend (at 11-12) that other federal laws that regulate gaming demonstrate that the Congress did not intend for the "CEA to preempt state gaming laws." But, as in their response to Kalshi's motion for a preliminary injunction, Defendants' argument is premised on a flawed understanding of Kalshi's position. Kalshi has never contended that the CEA preempts all state gaming laws; it has instead always maintained that the CEA preempts the field of regulating *trading on DCMs. See e.g.*, PI Motion at 13 ("The statutory text, legislative history, and comprehensive regulatory framework of the CEA clearly evince Congress's intent to occupy *the field of futures trading on CFTC-regulated exchanges*.") (emphasis added). Other federal laws that generally regulate gaming and gambling have no bearing on whether the CEA preempts the field of trading on DCMs.

Defendants suggest (at 11-12) that Kalshi's position renders other federal gaming laws "superfluous." Not at all. The statutes Defendants cite—the Wire Act and the Indian Gaming Regulatory Act (IGRA)—regulate significant swaths of activity federally, just outside the context of event contracts listed on licensed DCMs. Defendants identify no authority holding that Kalshi's event contracts violate these laws, and the authority they do cite confirms the opposite. Their cases (at 11 n.8) explain that the Wire Act contains a "safe harbor" for "betting or wagering" "to and from states" where that activity "is lawful." *See W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1069 (D.C. Cir. 2023) (quoting 18 U.S.C. §§ 1084(a), (b)). That safe harbor applies here because Nevada's state laws are preempted, meaning that Kalshi's contracts are lawful in Nevada. And IGRA's regulation of gaming "on Indian lands," 25 U.S.C § 2701 *et seq.*, easily coexists with CFTC jurisdiction over event contracts "traded or executed on a [designated] contract market," 7 U.S.C. § 2(a)(1)(A). IGRA's definition of "gaming" does not extend to sports event contracts. 25 U.S.C §§ 2703(7)-(8). But even if it did, the CEA's exclusive jurisdiction provision would displace any attempt by tribes to regulate those contracts. Rather, "if the CFTC has jurisdiction, its power is exclusive." *See Chicago Mercantile Exch. v. S.E.C.*, 883 F.2d 537, 548 (7th Cir. 1989) (setting aside SEC orders regarding futures contracts).

1      Defendants' reference (at 12) to the now-defunct Professional and Amateur Sports

2  Protection Act (PASPA) is not to the contrary. A statute that broadly outlawed sports betting,

3  *see* 28 U.S.C. § 3702(1), is entirely consistent with a provision preempting state attempts to

4  regulate commodities listed on designated exchanges. In any event, the Special Rule postdates

5  all of the statutes that Defendants identify. Had Congress understood sport event contracts to be

6  covered by existing federal gaming laws, then a Special Rule governing gaming-related event

7  contracts would have been unnecessary. And had Congress wanted to prohibit gaming-related

8  contracts entirely, then it would have done so. But it did not. Instead, it delegated "exclusive

9  jurisdiction" to make that determination to the CFTC. 7 U.S.C. §§ 2(a)(1)(A); 7a-2(c)(5)(C)(i).

## VII.    There Is No Conflict With The Tenth Amendment.

11      Defendants err in suggesting that the Tenth Amendment bars Kalshi's interpretation of

12  the CEA. The Tenth Amendment is a "tautology": It preserves state law where Congress has

13  not legislated but supplants state law where Congress has, so long as Congress has lawfully

14  legislated pursuant to its authority under the Constitution. *New York*, 505 U.S. at 156-57. The

15  limits that the Constitution imposes on Congress "may, in a given instance, reserve power to the

16  states." *Id.* But those limits are "determin[ed]" by reference to Congress's powers under

17  "Article I." *Id.* Defendants make no argument that the CEA exceeds the limits of Congress's

18  Article I powers, nor could they. Congress passed the CEA pursuant to the interstate commerce

19  clause—a "power[] . . . delegated to the United States by the Constitution." 7 U.S.C. § 2(b);

20  U.S. Const. amend. X. The Tenth Amendment's clause "reserv[ing]" all other powers "to the

21  States" thus does not apply. U.S. Const. amend. X.

22      Defendants argue (at 19) that Kalshi's "construction of the CEA" would "violate[] the

23  Tenth Amendment." But a "fundamental principle of the Constitution" is that "Congress has the

24  power to preempt state law." *Valle del Sol*, 732 F.3d at 1022 (quoting *Crosby*, 530 U.S. at 372)

25  (quotations omitted). Indeed, the Supreme Court has explained that, if it wanted to, "Congress

26  c[ould] regulate sports gaming directly." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S.

27  453, 486 (2018). If a state's historic police powers determined the breadth of Congress's power,

28  then Congress could never preempt state law in an area that could be characterized as touching

WEINBERG WHEELER
HUDGINS GUNN & DIAL

on traditional state powers—an outcome that is clearly incompatible with the Supremacy Clause.

Defendants also argue (at 17) that finding preemption here would "commandeer states" by requiring them to facilitate or adopt "federal regulatory programs." But nothing about finding preemption here would require Nevada to enact or administer a federal regulatory program. *See New York v. United States*, 505 U.S. 144, 159-60 (1992). It would simply prohibit Nevada from subjecting Kalshi to preempted state laws—a result that is not only permitted, but required, by the Supremacy Clause.

**VIII.    Judicial Estoppel Does Not Apply.**

This Court already rejected Defendants' estoppel argument, and should do so again. As at the preliminary injunction stage, Defendants appear to believe (at 20) that Kalshi's position is that its sports-event contracts do not involve "gaming" under the CEA's Special Rule for event contracts, 7 U.S.C. § 7a-2(c)(5)(C), and that this position would be inconsistent with Kalshi's position in the D.C. Circuit. But Defendants again misunderstand Kalshi's position. As this Court already noted, the key point is that "even if Kalshi's sports contracts involve 'gaming,' that would not subject Kalshi to state gaming laws," but would instead "subject Kalshi to the special rule that allows the CFTC to conduct a public interest review." *Hendrick*, 2025 WL 1073495, at *6; *see* 7 U.S.C. § 7a-2(c)(5)(C) ("the Commission *may* determine" that event contracts "are contrary to the public interest" if they involve one of the enumerated categories) (emphasis added).

Defendants claim (at 20) that if "'Congress did not want sports betting to be conducted on derivatives markets,' surely it did not intend to preempt the state laws that regulate that activity." But Congress adopted the Special Rule precisely to give the CFTC—not 50 separate states and D.C.—authority to determine whether event contracts involving gaming offered on DCMs are contrary to the public interest and should be prohibited. Defendants also note that certain Kalshi materials occasionally refer to "bets," but this is hardly surprising and certainly not grounds for estoppel. Companies and commentators routinely refer to investments in financial markets in betting terms. *See* Alan Rappaport, *Bessent Pitches Skittish Investors to Bet*

/ / /

*on Trump's Economic Plan*, N.Y. TIMES, May 5, 2025[4]; Michael Novinson, *Cybersecurity Investors Bet Big on Early-Stage Startups,* BANK INFO SECURITY, May 6, 2025; Soumya Eswaran, *What Makes Helios Technologies (HLIO) an Investment Bet?*, YAHOO! FINANCE, May 6, 2025.[5] That shorthand does not mean that all these markets are subject to state gambling laws.

**IX.    Neither This Court Nor Kalshi Has Ever Treated The D.C. District Court's Decision In *KalshiEx LLC v. CFTC* As Binding.**

Contrary to Defendants' position, neither this Court nor Kalshi has relied on the D.C. District Court's decision in Kalshi's suit against the CFTC as binding authority.  While the D.D.C. determined the legality of Kalshi's political event contracts under federal law, this Court is charged with determining whether the CEA preempts state law.  This Court appropriately considered as persuasive the D.D.C.'s determination that "Kalshi's election-based contracts are also currently legal under federal law" in reaching its conclusion that "Nevada regulatory agencies . . . have no jurisdiction to decide that Kalshi's conduct violates state law where, at least at present, those activities are legal under federal law." *Hendrick*, 2025 WL 1073495, at *6. That determination, moreover, has become a final judgment now that the D.C. Circuit has granted the CFTC's pending motion to dismiss its appeal.

Defendants attempt (at 21-22) to distinguish the D.D.C. decision only underscores the misunderstanding underlying many of their arguments.  In their view, the Special Rule's reference to "gaming" should take on the "specific definition" that term has in Nevada state law. Mot. 22.  But Defendants cannot use the very law that a federal statute preempts to carve out an exception to the federal statute's scope.  The plain meaning of the CEA is clear and preempts state regulation of event contracts listed on licensed DCMs.  Nevada is free to define and regulate "gaming" however it likes—just not in that context.

/ / /

/ / /

---

[4] Available at: https://www.nytimes.com/2025/05/05/us/politics/bessent-trump-trade-economy.html

[5]    Available    at:    https://finance.yahoo.com/news/makes-helios-technologies-hlio-investment-133827895.html

WEINBERG WHEELER
HUDGINS GUNN & DIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**WEINBERG WHEELER HUDGINS GUNN & DIAL**

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss (ECF 50).

Dated this 7th day of May, 2025.

_/s/ D. Lee Roberts, Jr._
D. Lee Roberts, Jr., Esq.
Nevada Bar No. 8877
_lroberts@wwhgd.com_
WEINBERG, WHEELER, HUDGINS,
   GUNN & DIAL, LLC
6385 South Rainbow Blvd., Suite 400
Las Vegas, Nevada  89118
Telephone:    (702) 938-3838
Facsimile:    (702) 938-3864

Neal Kumar Katyal, Esq.
(admitted _pro hac vice_)
Joshua B. Sterling, Esq.
(admitted _pro hac vice_)
William E. Havemann, Esq.
(admitted _pro hac vice_)
MILBANK LLP
1850 K Street, Suite 1100
Washington, D.C. 20006

Mackenzie Austin, Esq.
(admitted _pro hac vice_)
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067

_Attorneys for Plaintiff KalshiEX LLC_

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee of Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC, and that on the 7th day of May, 2025, I served a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS** by e-service, in accordance with the Electronic Filing Procedures of the United States District Court, to the following:

Jessica E. Whelan, Esq.
jwhelan@ag.nv.gov
Sabrena K. Clinton, Esq.
sclinton@ag.nv.gov
Devin A. Oliver, Esq.
doliver@ag.nv.gov
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420
(702) 486-3773 FAX
*Attorneys for Kirk D. Hendrick, George Assad, Chandeni K. Sendall, Nevada Gaming Control Board, Jennifer Togliatti, Rosa Solis-Rainey, Brian Krolicki, George Markantonis, Abbi Silver, Nevada Gaming Control Commission, and Aaron D. Ford*

Additional email contacts:
jbeesley@ag.nv.gov
advansickle@ag.nv.gov

*/s/ Kelly L. Pierce*
An employee of WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC