AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General – Litigation
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
Devin A. Oliver (Bar No. 16773C)
  Deputy Solicitor General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3773 (fax)
jwhelan@ag.nv.gov
sclinton@ag.nv.gov
doliver@ag.nv.gov
*Attorneys for State Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| KALSHIEX, LLC, | Case No. 2:25-cv-00575-APG-BNW |
| Plaintiff, | |
| vs. | **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS** |
| KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in his official capacity as a Member of the Nevada Gaming Control Board; CHANDENI K. SENDALL, in her official capacity as a Member of the Nevada Gaming Control Board; NEVADA GAMING CONTROL BOARD; JENNIFER TOGLIATTI, in her official capacity as Chair of the Nevada Gaming Commission; ROSA SOLIS-RAINEY, in her official capacity as a Member of the Nevada Gaming Commission; BRIAN KROLICKI, in his official capacity as a Member of the Nevada Gaming Commission; GEORGE MARKANTONIS, in his official capacity as a Member of the Nevada Gaming Commission; ABBI SILVER, in her official capacity as a Member of the Nevada Gaming Commission; NEVADA GAMING COMMISSION; AARON D. FORD, in his official capacity as Attorney General of Nevada, | |
| Defendant(s). | |

Page **1** of 13

# INTRODUCTION

In its Opposition to Defendants' Motion to Dismiss, Plaintiff KalshiEX, LLC ("Kalshi") takes umbrage at the fact that the Motion "barely acknowledges" this Court's decision granting in part Kalshi's Motion for Preliminary Injunction. ECF No. 55, p. 2. While Kalshi acknowledges the different standards of review for preliminary injunctions and motions to dismiss, *id.*, it fails to appreciate that this Court's preliminary injunction ruling does not bind this Court moving forward, as the Court may reconsider, rescind, or modify any of its prior interlocutory rulings at any time as part of its inherent authority. *See City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001). Accordingly, Defendants' substantive arguments are not "foreclosed," as Kalshi posits. *See* ECF No. 55, p. 3.

Moreover, Defendants' procedural arguments are not a mere afterthought raised in the absence of viable substantive arguments, as Kalshi suggests. ECF No. 55, p. 3. Rather, Defendants informed Kalshi and this Court of each of the procedural grounds for dismissal they subsequently raised in the Motion to Dismiss. Yet, in the fifteen days between the preliminary injunction hearing and the filing of the Motion to Dismiss, Kalshi took no action to cure any of the procedural defects raised. Instead, Kalshi's Opposition amounts to the argument that, because this Court and the New Jersey court decided on an expedited basis that Kalshi has a likelihood of success on the merits, that the Court necessarily must find that Kalshi's Complaint has stated a claim upon which relief may be granted. Not so. This Court must consider the Motion to Dismiss on its own merits, and, with the benefit of additional time, research and analysis, should find that Kalshi's Complaint either fails on procedural grounds or fails to state a claim upon which relief may be granted.

The majority of Kalshi's substantive arguments rest on the faulty premise and conclusory allegation that its contracts are "swaps" or "contracts for sale of a commodity for future delivery." *See* ECF No. 55, pp. 15–23. However, other than the self-serving and conclusory allegation that Kalshi has self-certified its contracts as such, there is no plausible allegation or explanation of how Kalshi's contracts so qualify. This Court can and should determine as a matter of law that Kalshi's sport and political events contracts are not contracts governed by the Commodity Exchange Act ("CEA"), based on the text, history, and purpose of that statute, informed by other federal laws prohibiting and regulating interstate

gaming. Were this Court to give credence to Kalshi's position, it would be endorsing the double delegation of power by Congress: first from Congress to the CFTC and second from the CFTC to regulated entities with minimal oversight by the CFTC. Allowing Kalshi to unilaterally determine that it may offer a platform for de facto sports betting across state lines with no oversight by Nevada or any other state gaming authority would be an absurd result clearly not within the contemplation of Congress. Kalshi's Complaint must be dismissed.

## ARGUMENT

### I. The Nevada Gaming Control Board and Nevada Gaming Commission Must Be Dismissed.

There are two separate, independent reasons on which this Court must dismiss the Nevada Gaming Control Board ("NGCB") and Nevada Gaming Commission ("NGC"). First, Eleventh Amendment immunity bars claims against them, as arms of the State, in federal court. Second, if Eleventh Amendment immunity does not apply, they have not been properly named or served under state law.

#### A. Eleventh Amendment Immunity Applies to Bar Claims Against the NGCB and NGC in Federal Court.

As a threshold matter, Kalshi does not dispute that the NGCB and NGC ordinarily have Eleventh Amendment immunity from suit in federal court. *See generally* ECF No. 55, pp. 10–12. They argue instead that the NGCB and NGC waived Eleventh Amendment immunity by filing a countermotion for a temporary restraining order and preliminary injunction in connection with their opposition to Kalshi's motion requesting the same. And while Kalshi is correct that, generally, "[a] state agency waives its immunity when it engages in conduct that 'clearly manifests acceptance of the federal court's jurisdiction or is otherwise incompatible with an assertion of Eleventh Amendment immunity,'" ECF No. 55, p. 10 (citing *Hill v. Blind Indus. & Servs of Md.*, 179 F.3d 754, 758–59 (9th Cir. 1999)), its superficial analysis of Defendants' conduct is unavailing.

First, although no longer expressly required, *see Republic Intern. Corp. v. Amco Engineers, Inc.*, 516 F.2d 161, 165 (9th Cir. 1975), counsel for Defendants filed limited, or special, appearances specifically noting that they were appearing "for the purpose of responding to Plaintiff's Motion and Memorandum of Points and Authorities in Support of an Immediate Temporary Restraining order and Preliminary Injunction, . . . and establishing whether this Honorable Court has jurisdiction over the

Nevada Gaming Commission and Nevada Gaming Control Board only." *See* ECF Nos. 33, 37, and 38. These limited appearances reserved all defenses and objections. *Id.* This conduct did not "clearly manifest[] acceptance of the federal court's jurisdiction" and was not "otherwise incompatible with an assertion of Eleventh Amendment immunity." *See Hill*, 179 F.3d at 759. On the contrary, Defendants put Kalshi and the Court on notice from their very first appearance that they would be contesting jurisdiction of the Court.

Second, at the April 8, 2025, motion hearing, counsel for Defendants apprised Kalshi and the Court that Defendants would be filing a motion to dismiss on, inter alia, Eleventh Amendment immunity grounds. Again, this conduct belies any argument that Defendants' conduct was incompatible with an assertion of Eleventh Amendment immunity.

Indeed, the only conduct identified by Kalshi as inconsistent with an assertion of Eleventh Amendment immunity is Defendants' filing of a countermotion for temporary restraining order or preliminary injunction in the very early, pre-responsive pleading stage of the litigation. Although Defendants have been unable to find case law expressly holding that the filing of a countermotion for preliminary relief does not waive Eleventh Amendment immunity[1], sister courts have held that filing a counterclaim and third-party complaint in connection with an answer asserting Eleventh Amendment immunity does not waive Eleventh Amendment immunity. *See Skelton v. Henry*, 390 F.3d 614, 618 (8th Cir. 2004). There, the Eighth Circuit reasoned that "[a] state is not required to give up other valid defenses in order to preserve its immunity defense." *Id.*

The *Skelton* court's reasoning is particularly salient when viewed in the context of a pre-responsive pleading request for emergency relief. The relief requested in Defendants' countermotion was quite appropriately the inverse of the relief requested in Kalshi's motion, making it precisely the type of "defensive" argument found to not waive Eleventh Amendment immunity. *Contra* ECF No. 55, p. 11. This is much different than the traditional instances in which a state's voluntary invocation of federal jurisdiction is found to waive Eleventh Amendment immunity. *See Skelton*, 390 F.3d at 618 (noting that

---

[1] Kalshi is quick to point out this lack of authority, ECF No. 55, p. 11, but does not itself cite to any authority that the filing of a pre-responsive pleading countermotion waives Eleventh Amendment immunity where other conduct is consistent with immunity.

state voluntarily invokes federal court jurisdiction by filing suit in federal court, removing suit to federal court, or defending case on the merits through final judgment and appeals).

In sum, Defendants took every precaution to preserve their Eleventh Amendment immunity defense and raised it at the appropriate time in their responsive pleading. At the same time, given Kalshi's immediate filing of a motion for emergency relief for which briefing and hearing concluded before Defendants' responsive pleading deadline, Defendants asserted other arguments to protect their rights and to protect the people of Nevada, should the Court exercise its jurisdiction. A state entity should not have to choose between counter moving for emergency relief or asserting its Eleventh Amendment immunity based purely on the timing of when a plaintiff seeks emergency relief. This Court should dismiss the NGCB and NGC from this suit on Eleventh Amendment immunity grounds.

**B.    The NGCB and NGC Were Not Properly Named or Served.**

Kalshi's argument that NRS 41.031's naming convention applies only to state tort actions in state court is directly contradicted by case law later cited where this Court required plaintiffs to comply with the naming convention. *See* ECF No. 55, p. 9 (citing *Perez v. State of Nevada*, No. 15-CV-1572, 2016 WL 4744134, at *4 (D. Nev. Sept. 12, 2016) (allowing leave to amend to add additional factual allegations to support claims and requiring compliance with NRS 41.031(2) and *Weidner v. Nevada*, No. 2:16-cv-02301, 2017 WL 5985563, at *2 (D. Nev. Nov. 30, 2017) (allowing leave to amend to cure naming convention deficiency)).[2] While these two cases were removed from state court, if Kalshi's logic were correct and the naming convention applied only in state court, the federal courts in *Perez* and *Weidner* should have been wholly unconcerned with compliance with NRS 41.031. The fact that they allowed amendment shows that compliance is required in federal court as well as state court when suing the State.

Kalshi further misapprehends Defendants' argument by trying to draw an artificial line between suing "the State" and suing a state agency. When suing a state agency, a plaintiff is, for all intents and purposes, suing "the State." Therefore, while Kalshi reads NRS 41.031 to require only the naming of the agency when "the State" is sued, it is equally reasonable to read the statute to require naming "the State"

---

[2] Defendants maintain their position that NRS 41.031's naming convention is a jurisdictional requirement and, therefore, a complaint that fails to satisfy the naming convention is void *ab initio*.

when an agency is sued. Indeed, even a suit against a state employee or official, which is one step further removed from a state agency, is considered a suit against "the State." *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." (internal citations omitted)).

This misapprehension likewise informs the issue with Kalshi's failure to effectuate dual service in accordance with NRS 41.031(2)(a)–(b). Again, Kalshi artificially delineates suits against state agencies and suits against "the State" and fails to recognize that a suit against a state agency **is in fact** a suit against "the State." Should there be any doubt, Rule 4.2(d) of the Nevada Rules of Civil Procedure ("NRCP") clarifies that "[t]he State and any public entity of the State must be served by delivering a copy of the summons and complaint to" both "the Attorney General, or a person designated by the Attorney General to receive service of process, at the Office of the Attorney General in Carson City" and "the person serving in the office of administrative head of the named public entity, or an agent designated by the administrative head to receive service of process."

As noted in the Motion to Dismiss, counsel for Defendants agreed to accept service on behalf of the defendants themselves but did not agree to accept service on behalf of the Attorney General. ECF No. 50, pp. 5–6. It is the policy and practice of the Nevada Attorney General's Office to not waive or accept service on the Attorney General's Office in Carson City; indeed, it is questionable whether, given the strictures of NRCP 4.2(d) and NRS 41.031(2)(a), requiring service "at the Office of the Attorney General in Carson City," attorneys in the office could legally waive or accept such service.

If there were any misunderstanding as to on whose behalf counsel was accepting service, Kalshi's counsel could have and should have reached out to clarify. At a minimum, Kalshi was put on notice at the time of the hearing on Kalshi's motion for temporary restraining order or preliminary injunction that Defendants contested service. Yet Kalshi took no steps to ameliorate the deficiency in service, instead doubling down on the mistaken belief that they need not serve the Attorney General's Office in Carson City. The Complaint should be dismissed for insufficient service of process.

**II.     The Individual Defendants Must Be Dismissed.**

Unlike the NGCB and NGC, individual state employees and officials may be sued for prospective injunctive relief under the *Ex parte Young* doctrine. *See R.W. v. Columbia Basin College*, 77 F.4th 1214, 1220–21 (9th Cir. 2023). "For a suit to proceed under *Ex parte Young*, a plaintiff must show that an injunction against a particular official would significantly increase the likelihood of relief, not that relief is a guarantee." *Id.* at 1227 (cleaned up). The doctrine requires that a plaintiff allege that a state official has "a relevant role that goes beyond a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision." *Mecinas v. Hobbs*, 30 F.4th 890, 903–04 (9th Cir. 2022) (cleaned up).

Here, Kalshi's allegations against Attorney General Ford—that he is the "chief law enforcement officer who broadly exercises power over 'all district attorneys' in their duties," ECF No. 55, p. 14—are precisely the type of allegations that *Mecinas* instructs are insufficient to sue a state official under *Ex parte Young*. Likewise, Kalshi's allegations against the individual members of the NGCB and the NGC are limited to the fact that each is a member of the NGCB or NGC, respectively. ECF No. 1, ¶¶ 14–16, 18–22. None of these individuals are mentioned, either explicitly or implicitly, in the remainder of the Complaint. The Complaint is therefore devoid of any allegation of each individual defendant's "relevant role" or "connection" to the allegedly unconstitutional enforcement of Nevada's gaming laws.

Kalshi now argues that "[t]he Individual Defendants, being the members of the Agency Defendants **and the official [sic] charged with enforcing Nevada's gaming laws criminally**, are thus properly named as persons who would carry out Nevada's gaming laws against Kalshi and have the power to implement the injunctive relief ordered by this Court." ECF No. 55, p. 14 (emphasis added). Yet, all Kalshi alleges in the Complaint is that the individual defendants are members of the agency defendants. Kalshi nowhere alleges that the individual defendants are the officials charged with enforcing Nevada's gaming laws criminally. *See generally* ECF No. 55. Nor does it allege that "some of those Individual Defendants . . . signed the cease-and-desist letter on behalf of the NGCB," ECF No. 55, p. 14. *See generally* ECF No. 55. These pleading deficiencies do not plausibly allege that the individual defendants are the proper parties who can effectuate the relief requested.

Notwithstanding these facts, just one day after filing its response to Defendants' motion to dismiss in this case, Kalshi filed a notice of voluntary dismissal in *KalshiEX, LLC v. Mary Jo Flaherty et al.* dismissing every individual defendant except Mary Jo Flaherty, the Director of the New Jersey Division of Gaming Enforcement, and Matthew Platkin, the Attorney General of New Jersey.[3] The individual defendants in this case whom Kalshi insists are proper parties, ECF No. 55, p. 14, are the counterparts of the New Jersey defendants it just voluntarily dismissed. This inconsistency underscores the fallacy of Kalshi's argument.

Based on the lack of allegations directed toward individual defendants in the complaint, the cease-and-desist letter, and Kalshi's own actions in the New Jersey litigation, the Court should dismiss the individual defendants from this suit.

### III. Kalshi's Failure to Meaningfully Respond to the Argument that Its Contracts Do Not Fall Under the CEA Represents Consent to Granting the Motion.

When a party fails to meaningfully respond to arguments, that failure constitutes consent to the granting of the motion. *Knickmeyer v. Nevada ex rel. Eighth Jud. Dist. Ct.*, 173 F. Supp. 3d 1034, 1044 (D. Nev. 2016), *aff'd sub nom. Knickmeyer v. Nevada ex rel. Eighth Jud. Dist. Ct.*, 716 F. App'x 597 (9th Cir. 2017). Defendants asserted that Kalshi failed to allege facts demonstrating that its contracts were swaps or contracts of sale of a commodity for future delivery under the CEA. *See* ECF No. 50, p. 13. Rather than address it head on, Kalshi glosses over the assertion, citing partial definitions of a "commodity" and a "swap," and then concludes that the "Special Rule provides that 'event contracts' may involve 'gaming,' and event contracts, in turn, are a type of 'swap.'" ECF No. 55, p. 16 (internal citations omitted). These conclusory assertions do not negate Kalshi's failure to allege facts asserting that its contracts are swaps or contracts of sale of a commodity under the CEA. Nor does the CFTC's classification of Kalshi as a designated contract market mean that it satisfied the requirements of the CEA or was otherwise excused from satisfying pleading standards. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) (overruling the Chevron Doctrine and holding that courts need not defer to an

---

[3] Pursuant to F.R.E. 201, Defendants request that the court take judicial notice of the notice of voluntary dismissal, Case No. 25-cv-2152-ESK-MJS, ECF No. 25, (D.N.J.). The following defendants were dismissed pursuant to the notice: James T. Plousis, Chairman of the New Jersey Casino Control Commission (NJCCC), Alisa Cooper, Vice Chair NJCCC, and Joyce Mollineaux, Commissioner NJCCC.

agency's interpretation of a law). Until Kalshi alleges facts establishing the threshold requirement that its contracts are swaps or contracts of sale of a commodity for future delivery subject to the CEA, the Court need not consider the issue of preemption.

### A.   Kalshi's Contracts Are Not Swaps.

Even if the Court finds that Kalshi has plausibly alleged that its sports and political events contracts are swaps, the Court retains the obligation to independently interpret the CEA to determine whether Kalshi's own interpretation is correct as a matter of law. Here, it is not.

Under the CEA, a swap is an "agreement, contract, or transaction—(i) that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. 1a (47)(A)(ii). Statutes are interpreted according to their ordinary meaning. *See Perrin v. United States*, 444 U.S. 37, 42, 100 S. Ct. 311, 314, 62 L. Ed. 2d 199 (1979).

Sports games and election results are not events or contingencies associated with a potential "financial, economic, or commercial consequences." Kalshi suggests that sports games have significant economic implications for stakeholders—advertisers, sponsors, and local communities. ECF No. 55, p. 16. The fact that a vendor may sell souvenirs or popcorn, or that a network broadcasts a sports game has no correlation to the outcome of the event. The **outcome** of sports games or elections do not have financial, economic, or commercial consequences independent of the participants. In other words, the game will still take place even absent the "stakeholders." Moreover, in its Complaint, Kalshi alleges that "[d]erivatives contracts are financial tools used to mitigate risk. ECF No. 1, ¶ 25. Yet, Kalshi nowhere alleges what "risk" a sports event contract seeks to mitigate for the individuals entering the contracts. *See generally id.* Unlike a scenario where a grain farmer may enter a weather event contract to mitigate the potential loss of crop that would come from a drought, those betting on Kalshi's exchange are simply betting on the outcome of a sporting event or an election in violation of state law, and in certain cases, other federal law.

B. **To the Extent Kalshi Contends Its Contracts Are Contracts for Sale of a Commodity for Future Delivery, it Has Failed to Allege Facts Stating a Claim for Relief.**

Section 2(a)(1)(A) applies to "contracts of sale of a commodity for future delivery." 7 U.S.C. 2(a)(1)(A). Commodities are goods, articles, services, rights and interests "in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. 1a(9). A futures contract is "[a]n agreement to buy or sell a standardized asset . . . at a fixed price at a future time . . . ." FUTURES CONTRACT, Black's Law Dictionary (12th ed. 2024); *see also United States v. Lettiere,* 640 F.3d 1271, 1275 (9th Cir. 2011) (in the absence of statutory definition, court may look to ordinary meaning or dictionary definitions of term). An asset is "[a]n item that is owned and has value. ASSET, Black's Law Dictionary (12th ed. 2024). An election or a sports game is not an item that is owned or an item that has value. Nor is an election or a sports game a good, article, service, right or interest that can be delivered. Kalshi has not alleged non-conclusory facts to show how its contracts satisfy these criteria.

**IV. Section 2(a)(1)(A)'s "Exclusive Jurisdiction" Language Does Not Evince a Congressional Intent for the CEA to Occupy the Entire Field of Futures Markets.**

A Court should go beyond the literal language of a statute if reliance on that language would undercut the purpose of the statute. *See Albertson's, Inc. v. C.I.R,* 42 F.3d 537, 545 (9th Cir. 1994). The overriding purpose of the CEA was to prevent price manipulation and to protect market participants from fraudulent or other abusive practices. *See* 7 U.S.C. 5(b). Application of Nevada gaming laws to Kalshi effectuates that purpose.

The Court should consider the cases cited by Defendants in their Motion to Dismiss, ECF No. 50, pp. 13–14, as further indicia of the lack of an unequivocal intent by Congress to preempt the entire field of CFTC-designated exchanges, ECF No. 45, p. 12. Kalshi attempts to dismiss *Lopez v. Dean Witt* as irrelevant because it concerned commodity pools as opposed to designated contract markets. ECF No. 55, p. 18. *Lopez*'s relevance does not hinge on which instrument is being assessed, but rather on the authority of the Court to determine whether the instrument is subject to the CEA and whether the CEA is preemptive in a particular context. There, the Ninth Circuit declined the CFTC's invitation to find that section 2(a)(1)(A) of the CEA preempted federal securities laws finding instead that the Commodity Guided Account Program did not constitute a commodity pool subject to the provisions of the CEA. *Lopez v. Dean Witter Reynolds, Inc.*, 805 F.2d 880, 884, n. 6 (9th Cir. 1986).

A court in this district found that state and federal antitrust laws and the CEA were reconcilable. *See In re W. States Wholesale Nat. Gas Antitrust Litig.*, 661 F. Supp. 2d 1172, 1183 (D. Nev. 2009). The court reasoned that "permitting an antitrust action based on price manipulation in the commodities markets compliments [sic], rather than conflicts with, the CEA." *Id.* Harmonizing state and federal law whenever possible promotes the principles of federalism which acknowledge a state's right to govern in ways that best suit its residents. This premise is consistent with the Supreme Court's assumption that historic police powers were not to be superseded by federal legislation unless that was the "clear and manifest purposes of Congress." *Rice v. Santa Fe Elevator Commission*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947).

    **A.**    **Nevada Gaming Laws Do Not Create an Obstacle or Conflict with the CEA.**

Kalshi summarily concludes that enforcement of Nevada gaming laws would conflict with the CEA's comprehensive regulatory scheme. ECF No. 55, p. 20. Relying on *American Agriculture Movement, Inc. v. Board of Trade of City of Chicago,* Kalshi conflates the impact of state laws aimed at gaming regulation to suggest that state laws would create an insurmountable obstacle to the CFTC's regulations of futures markets. 977 F.2d 1147 (7th Cir. 1992). But revisiting the historical backdrop of the CEA before the creation of the CFTC reveals that Kalshi's conclusion is unsupported.

The precursor to futures markets began in the 1800s as cash markets for grain before graduating to include other tangible agricultural goods and transiting to futures markets. "Futures markets allow[ed] commodities producers and consumers to engage in 'hedging' in order to limit the risk of losing money as commodity prices change."[4] "Hedging helped the economy function by allowing commodities producers (such as farmers) and consumers (such as millers) to conduct their businesses with greater certainty over how much they can expect to earn and pay for commodities."[5] "Futures contracts allow hedging without contract negotiations."[6]

Fast forward to the present, the purpose of the CEA is to "deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to

---

[4] https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/economicpurpose.html#:~:text=Futures%20markets%20allow%20commodities%20producers,
[5] *Id.*
[6] *Id.*

[the CEA] and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition . . . ." 7 U.S.C. 5. Nevada gaming laws further those purposes.

The cases cited by Kalshi, ECF No. 55, p. 21, are inapposite because Nevada is not attempting to regulate commodity futures. Nor are the CFTC's Core Principles in jeopardy, *see* ECF No. 55, p. 21, because Kalshi will not be restricting access based on non-neutral criteria, but rather pursuant to Nevada gaming laws which apply to anyone accepting wagers in Nevada without a gaming license. The argument that by being subject to multiple jurisdictions' gaming laws is unpersuasive—dozens of operators of legal sports books manage to operate under dozens of different states' laws every day. The bottom line is that Kalshi has not plausibly alleged, beyond conclusory allegations, that its sports and political events contracts are swaps or contracts for the sale of a commodity that fall under the purview of the CEA in the first instance. If these contracts do not fall under the CEA's "exclusive jurisdiction," then any argument about preemption necessarily fails. The Court should therefore dismiss the Complaint for failure to state a claim.

**V.     Tenth Amendment, Judicial Estoppel, and Other Federal Laws.**

Defendants remain steadfast in their positions concerning the Tenth Amendment, judicial estoppel, and other federal laws regulating gaming as discussed in their motion to dismiss but would be remiss not to respond as follows.

First, the authority pursuant to which the CEA was enacted by Congress is not presently at issue in this Motion. *See* ECF No. 55, p. 23. The issue is whether the CEA as enacted precludes enforcement of Nevada gaming laws against entities accepting wagers in its jurisdiction. It does not.

Second, judicial estoppel should apply to Kalshi. Kalshi posits that even if its contracts involve gaming, the contracts would be subject to the Special Rule, not Nevada gaming law. ECF No. 55, p. 24. But since the CEA does not occupy the entire field of futures markets for the reasons previously discussed, Kalshi is subject to Nevada gaming laws and the Special Rule. Should Kalshi apply for and receive a gaming license, the CFTC may still determine that its contracts are against public policy under the Special Rule.

Finally, the federal laws regulating gaming have bearing on this matter. They support Defendants' premise that, as a threshold matter, the CEA was never intended to and does not permit interstate gaming in the first instance, such that sports and political events contracts fall outside the exclusive jurisdiction of the CFTC and within the states' traditional police powers. However, even if sports and political events contracts are permissible, the CFTC's jurisdiction of futures markets runs parallel to and not through Nevada's gaming laws. The CEA does not preempt the field of futures markets as concerning other federal laws for some of the same reasons that it does not preempt Nevada gaming laws. Defendants reserve further comment on these issues for oral argument.

## CONCLUSION

For the preceding reasons, Kalshi's complaint should be dismissed.

DATED this 14th day of May, 2025.

> AARON D. FORD
> Attorney General
>
> By: /s/ Jessica E. Whelan
>     Jessica E. Whelan (Bar No. 14781)
>      Chief Deputy Solicitor General 0 Litigation
>     Sabrena K. Clinton (Bar No. 6499)
>      Senior Deputy Attorney General
>     Devin A. Oliver (Bar No. 16773C)
>      Deputy Solicitor General
>
> *Attorneys for Defendants*