Adam Hosmer-Henner (NSBN 12779)
A.G. Burnett (NSBN 5895)
Jane Susskind (NSBN 15099)
Katrina Weil (NSBN 16152)
Cassin Brown (NSBN 15877)
**McDONALD CARANO LLP**
100 West Liberty Street, 10th Floor
Reno, NV 89501
Telephone: (775) 788-2000
ahosmerhenner@mcdonaldcarano.com
agburnett@mcdonaldcarano.com
jsusskind@mcdonaldcarano.com
kweil@mcdonaldcarano.com
cbrown@mcdonaldcarano.com

*Attorneys for Nevada Resort Association*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| KALSHIEX, LLC,<br><br>                  Plaintiff,<br><br>v.<br><br>KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in his official capacity as a Member of the Nevada Gaming Control Board; CHANDENI K. SENDALL, in her official capacity as a Member of the Nevada Gaming Control Board; NEVADA GAMING CONTROL BOARD; JENNIFER TOGLIATTI, in her official capacity as Chair of the Nevada Gaming Commission; ROSA SOLIS-RAINEY, in her official capacity as a Member of the Nevada Gaming Commission; BRIAN KROLICKI, in his official capacity as a Member of the Nevada Gaming Commission; GEORGE MARKANTONIS, in his official capacity as a Member of the Nevada Gaming Commission; NEVADA GAMING COMMISSION; AARON D. FORD, in his official capacity as Attorney General of Nevada,<br><br>                  Defendants.<br><br>     vs.<br><br>NEVADA RESORT ASSOCIATION, proposed Intervenor-Defendant. | Case No.: 2:25-CV-00575-APG-BNW<br><br>**NEVADA RESORT ASSOCIATION'S EMERGENCY MOTION TO INTERVENE** |

*(Left margin, vertical text):* McDONALD CARANO  100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501  PHONE 775.788.2000 • FAX 775.788.2020

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

1    Proposed Intervenor-Defendant Nevada Resort Association ("NRA"), by and through its

2    attorneys of record, moves pursuant to Rule 24 of the Federal Rules of Civil Procedure to intervene

3    as a defendant in this matter. This Motion is supported by the following memorandum of points

4    and authorities, the declaration of Adam Hosmer-Henner attached as Exhibit 1, the declaration of

5    Virginia Valentine attached as Exhibit 2, the proposed Joinder to Defendants' Motion to Dismiss

6    attached as Exhibit 3, all of the pleadings and papers on file in this action, and any oral argument

7    presented by counsel.

8    **MEMORANDUM OF POINTS AND AUTHORITIES**

9    **I.    INTRODUCTION**

10    Plaintiff KalshiEX, LLC's ("Kalshi") arguments in this lawsuit would result in the

11    complete upheaval of Nevada's gaming regulations, reversing over one hundred and fifty years of

12    state control over this area and over seventy-five years of regulated sports betting. According to

13    Kalshi, this seismic change did not occur due to a recent change in statute or regulation, but due

14    to an event contract that Kalshi self-certified as compliant to the Commodity Futures Trading

15    Commission ("CFTC"). But Congress does not "hide elephants in mouseholes." *Whitman v. Am.*

16    *Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001). Such a transformative change cannot and should

17    not be based on the tenuous inferences offered by Kalshi and certainly not based on Kalshi's

18    outright misrepresentations as to its products and their legality. The NRA represents Nevada's

19    gaming and resort industry and seeks to intervene in this lawsuit to protect Nevada's largest

20    industry and the dependent jobs, capital investment, tax revenue, and economic future of the state.

21    While the NRA shares some of the same interests as the Nevada Gaming Control Board

22    ("NGCB") and the other government defendants in this case (collectively the "State Defendants"),

23    the NRA offers a unique perspective and set of arguments in this action. Crucially, the NRA's

24    intervention is warranted to ensure that this action can be resolved on its merits rather than as a

25    result of any short-term political compromise or other expediency. In the election contests case

26    that was pending in the D.C. Circuit Court of Appeals, the CFTC and Kalshi reached an agreement

27    to dismiss the pending appeal rather than have the appellate court reach the merits of the legality

28    of Kalshi's election event contracts. *KalshiEX LLC v. CFTC*, Case No. 24-5205 (D.C. Cir.)

1   (CFTC's Unopposed Motion for Voluntary Dismissal). Absent the direct intervention of the NRA

2   as a party, this litigation could stop short of resolution on the merits with an unacceptable result

3   for the NRA and its members.

4       First, the NRA should be permitted to intervene as of right under Federal Rule of Civil

5   Procedure 24(a)(2). Many of the NRA's members hold Nevada state-law licenses to operate in-

6   state sportsbooks. Acquiring and maintaining these licenses requires a significant investment of

7   time and resources to ensure compliance with Nevada's comprehensive regulatory regime. The

8   value and interests in those licenses will be impaired by Kalshi's preemption theory, by which it

9   seeks to evade state regulations and pose a direct competitive threat. While there is some overlap

10  in the arguments that will be raised by the NRA and by the NGCB, the NGCB's arguments do not

11  fully and adequately represent the NRA's economic and other interests. For example, the NRA is

12  best suited to provide the Court with factual and legal arguments as to why the sports bets offered

13  by Kalshi do not constitute "swaps" and are not "associated with a potential financial, economic,

14  or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Additionally, many of the NRA members

15  operate in multiple jurisdictions and can offer the Court additional perspective on multi-

16  jurisdictional compliance as well as the federal laws, such as the Wire Act, that outright bar

17  Kalshi's offerings. 18 U.S.C. § 1084(a)-(b).

18      Alternatively, the Court should exercise its discretion to permit the NRA to intervene under

19  Federal Rule of Civil Procedure 24(b)(1)(B). Since the NRA raises no new claims but merely

20  seeks to defend against Kalshi's lawsuit, no independent jurisdictional ground is needed, and its

21  intervention shares a common question of law with this action. Given the important issues at stake

22  in this lawsuit, the Court should permit intervention in order to ensure a thorough presentation of

23  the law and facts. The current preliminary injunction permits an unlicensed and effectively

24  unregulated company to offer sports betting to Nevada residents without complying with any of

25  the requirements that have been established by the Nevada legislature and the NGCB over the

26  years. As the representative of the many participants in the multi-billion-dollar Nevada gaming

27  industry, the NRA is compelled to intervene to protect its interests and provide the Court with the

28

full picture necessary to reach the correct outcome in this case. Intervention is timely and will not unduly delay or prejudice the disposition of this case.

For these reasons, the NRA respectfully submits that the Court should grant its motion to intervene.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  The NRA.

The NRA was established in 1965 and is the primary advocacy voice for Nevada's largest industry, the gaming and resort industry. Ex. 1, Declaration of Virginia Valentine ("Valentine Decl.") ¶ 3. This industry supports over 436,000 jobs (28% of Nevada's total employment) and generates $98 billion in total economic impact (37% of Nevada's GDP). *Id.* at ¶ 4. Indeed, the resort industry's tax contributions in 2024 accounted for 34% of Nevada's general fund. *Id.* The NRA represents the state's largest industry and provides information, perspective and industry insight for decision makers throughout the state. *Id.* at ¶ 5. This includes advocating and adopting policies related to state gaming issues, monitoring government and regulatory activities in Nevada that affect the gaming and resort sector, and providing economic data and industry insights to support the industry's interests and inform public policy. *Id.* One of the NRA's most important objectives is championing Nevada's gaming regulatory system, which is an integral part of Nevada's success and the standard upon which almost all other national and international gaming regulatory agencies have followed. *Id.* at ¶ 6.

The NRA's membership includes over 70 gaming and resort establishments located throughout the State, including companies that operate sportsbooks licensed under Nevada law. Ex. 1, Valentine Decl., ¶ 7. In 2024, over $7.8 billion dollars were wagered on sports through Nevada's regulated and licensed sports books, generating significant tax revenue to the State of Nevada. UNLV Center for Gaming Research, Nevada Sports Betting Totals: 1984-2024, *available at* https://gaming.library.unlv.edu/reports/NV_sportsbetting.pdf. Over the years, the NRA has successfully intervened in numerous cases in federal and state court affecting the interests of its members and the broader gaming and resort industry. Ex. 1, Valentine Decl., ¶ 8; *see also, e.g.*, *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1141 (9th Cir. 1998); *Marijuana Pol'y Project v.*

1   *Miller*, 578 F.Supp.2d 1290, 1295 (D. Nev. 2008); *Fair Maps Nevada v. Cegavske*, No. 3:20-cv-

2   271-MMD-WGC, 2020 WL 8188427 (D. Nev. May 20, 2020); *Cegavske v. Hollowood*, 512 P.3d

3   284 (Nev. 2022); *People's Legislature v. Miller*, 131 Nev. 1332 (Nev. 2015) (unpublished).

4       **B.  Procedural History.**

5       Kalshi filed its complaint and concurrently moved for a temporary restraining order and

6   injunctive relief on March 28, 2025, less than two months ago. ECF Nos. 1, 18. Kalshi asserted a

7   novel legal theory relying on the Commodity Exchange Act ("CEA") to preempt Nevada's

8   longstanding regulation of sports betting. ECF Nos. 1, 18. Kalshi represented that its sports event

9   contracts had been authorized by the CFTC. ECF No. 18 at 2.

10      The State Defendants responded to Kalshi's motion for injunctive relief on April 4, and

11  counter-moved for a competing temporary restraining order on that same date. ECF No. 34, 35.

12  The State Defendants' arguments, understandably given the short timeframe created by Kalshi,

13  did not cover the length and breadth of argumentation that has since been presented in similar

14  cases brought by Kalshi throughout the country. The Court held oral arguments on April 8. ECF

15  No. 43. Relying in part on Kalshi's arguments and representations, this Court granted Kalshi's

16  motion for preliminary injunction eleven days after Kalshi filed it. *See* ECF Nos. 43, 45.

17      Since then, the Court has not issued any further substantive rulings. The State Defendants

18  filed a motion to dismiss Kalshi's complaint on April 23. ECF No. 50. A week ago, Kalshi filed a

19  response to the motion to dismiss on May 7. ECF No. 55. The State Defendants filed a reply on

20  May 14. ECF No. 56. On April 29, this Court issued a minute order granting the parties' request

21  to continue the status hearing until May 15, 2025. ECF No. 54. The NRA files this Motion in

22  advance of that hearing to allow the parties and court to discuss the NRA's potential involvement.

23  Further, in order to eliminate any prejudice to the parties, the NRA intends to attend the hearing

24  to ensure that it can be part of any scheduling conversation should the Court so permit.

25      The Court has noted that "additional briefing on the legal issues would be helpful to me

26  on a final resolution of the legal issues." Hr'g Tr. (Rough), Apr. 8, 2025, 69:19-22. To the extent

27  that the State Defendants' motion to dismiss does not resolve this case, the NRA submits that its

28

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

substantive intervention, at one or more of the subsequent rounds of briefing in this matter, would be helpful to the Court for the final resolution of the important issues presented in this litigation.

**III.   ARGUMENT**

      **A.   The Consequences from this Litigation for the NRA's Members Are Seismic.**

      As a result of the Court's preliminary injunction order, today a Nevada citizen can open a Kalshi account and place $100 on the Vegas Golden Knights to win Game 5 of the Playoff Series against the Edmonton Oilers, returning a $180 prize if the Golden Knights prevail. The same Nevada citizen can go to a licensed and regulated sportsbook in Nevada and place $100 on the Vegas Golden Knights, returning the same prize of $180.[1] And while Nevada receives tax revenue in the latter scenario, it receives nothing from the wager placed with Kalshi. There is no question that the event contracts offered by Kalshi are functionally identical to the sports bets offered by the members of the NRA. Any argument to the contrary is mere sophistry. As the CEO of Sporttrade, another sports prediction market platform operating with state gaming licenses that has sought approval for event contracts from the CFTC remarked: "You're not going to hear me say this isn't sports betting . . . That's a ridiculous comment." Dan Bernstein, *Sporttrade seeks CFTC Green Light to Avoid 'Irreparable Harm,'* SPORTICO (Apr. 30, 2025), https://tinyurl.com/3eyurfhc.

      Kalshi has repeatedly advertised itself on social media as offering "sports betting." Sample tags include: "The First Nationwide Legal Sports Betting Platform"; "Betting on Kalshi, the first app for legal sports betting in all 50 states"; and "Sports Betting Legal in all 50 States on Kalshi." Daniel Wallach, *Kalshi's Nevada Court Win May Be Short-Lived Due To Federal Wire Act Ban On Sports Betting*, FORBES (Apr. 15, 2025), https://tinyurl.com/5kyw6n9e. Kalshi concedes that it has referred to its offerings as bets, but notes that this is "hardly surprising and certainly not grounds for estoppel" because companies and commentators "routinely refer to investments in financial markets in betting terms." ECF No. 55 at 24. Kalshi's argument is entirely disingenuous

---

[1] Current odds varied between -120 and -130 for the Golden Knights depending on the sports book, but the exact same prize amount is potentially identical between Kalshi and the offerings presented by the NRA members.

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

as it is offering odds on the outcome of sporting events and not offering shares in publicly traded companies. There is, or at least there should be, no dispute that Kalshi's offerings would constitute gaming under Nevada law and so federal preemption is Kalshi's only remaining argument.

Kalshi, however, has not presented the Court with the full story as to CFTC's supposed preemption of state gaming laws. In 2020, the CFTC initiated a review of "RSBIX NFL futures contracts" that had been "self-certified by Eris Exchange, LLC." Press Release, CFTC, CFTC Announces Review of RSBIX NFL Futures Contracts Proposed by Eris Exchange, LLC (Dec. 23, 2020), https://tinyurl.com/5n8ckbta. ErisX proposed to offer futures contracts with "one based on the moneyline; the second on the point spread; and the third on total points for individual NFL games." *Id.* The CFTC determined that the "RSBIX NFL futures contracts 'may involve, relate to, or reference' an activity enumerated in Regulation 40.11(a)(1), including but not limited to "gaming, or an activity that is unlawful under any State or Federal law.' Accordingly, and pursuant to Regulation 40.11(c)(1), the Commission has requested that ErisX refrain from listing and trading its proposed RSBIX NFL futures contracts during the pendency of the review period." *Id.* Consequently, ErisX withdrew its proposal to offer these contracts. Then again, in 2025, the CFTC also initiated a review of "two sports contracts" proposed to be offered by Crypto.com and again requested that these contracts be suspended during the review. Press Release, CFTC, CFTC's Review of Nadex Sports Contract Submissions (Jan. 14, 2025), https://tinyurl.com/6vm3yp6h. Whether the CFTC chooses to initiate a review in its discretion does not mean that the entire field of sports gaming is preempted. The plain language and legislative history of the relevant statutes and regulations—coupled with other federal laws delegating control over sports betting to the states—establish that there was no intent to preempt Nevada's ability to regulate sports betting.

Where a particular transaction does not fall within the CFTC's exclusive jurisdiction, the CEA expressly preserves state law: "Except as [provided in the exclusive-jurisdiction provision], nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred … under the laws of … any State, or (II) restrict … such other authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A). As courts have recognized, this clause "makes clear that other agencies" still "retain their jurisdiction over all

matters beyond the confines of" the exclusive-jurisdiction provision. *FTC v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001). Further, Section 40.11(a) categorically excludes those contracts relating to "terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law." Kalshi's arguments render this provision meaningless, because any State law would be preempted as a result of the self-certification of the event contract to the CFTC, meaning that there could never be a situation where a contract related to activity that is "unlawful under any State law."

For the NRA members, the above situation is untenable. The CFTC initiated a review and suspended trading for some, but not all, potential competitors seeking to offer sports betting. For companies like ErisX and Crypto.com, Nevada's gaming regulations still apply in full force, but these same regulations are preempted with respect to Kalshi? For the NRA members, their Nevada gaming licenses would somehow become simultaneously required, obsolete, mandatory, and irrelevant when it comes to offering sports betting.

**B.    The NRA Is Entitled to Intervene as a Matter of Right.**

Rule 24(a)(2) provides, in relevant part, that "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Consistent with this language, the Ninth Circuit identified four requirements for non-statutory intervention of right: "(1) [the applicant] has a significant protectable interest as to the property or transaction that is the subject of the action; (2) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; (3) the application is timely; and (4) the existing parties may not adequately meet the applicant's interest." *Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1086 (9th Cir. 2022). Associations and similar representative groups may intervene on behalf of their individual members' interests. *See, e.g.*, *United States v. Carpenter*, 526 F.3d 1237, 1240 (9th Cir. 2008); *Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula*, 41 F.4th 767, 771 (6th Cir. 2022); *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994).

Courts construe Rule 24(a)(2) "liberally in favor of potential intervenors," *California ex rel. Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir. 2006), and are "guided primarily by practical considerations, not technical distinctions," *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001) (quotation omitted). For "[a] liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *United States v. City of Los Angeles*, 288 F.3d 391, 397-98 (9th Cir. 2002) (quotation omitted); *see also id.* ("By allowing parties with a *practical* interest in the outcome of a particular case to intervene, we often prevent or simplify future litigation involving related issues; at the same time, we allow an additional interested party to express its views before the court.") (quotation omitted).

The NRA meets all of the four requirements for intervention as of right under Rule 24(a)(2). The NRA's members have significant protectable interests through their Nevada gaming licenses, the value of which will be impaired by a final judgment in favor of Kalshi's theory of federal preemption, and by their economic interests in preventing an unlicensed and unregulated sports book operator to compete in Nevada. The NRA's motion to intervene is timely and will not prejudice the parties or occasion delay. The NRA's intervention is necessary to protect its interests and avoid being permanently subject to short-term political decisions, and the existing parties will not adequately represent the interests of the NRA's members. Under the liberal standards allowing for as-of-right intervention, the NRA should be permitted to intervene.

### i. The NRA's Members Have Significant Protectable Interests That Are Related to Kalshi's Lawsuit.

The first Rule 24(a)(2) requirement is "a significant protectable interest as to the property or transaction that is the subject of the action." *Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1086. This requirement serves as a "practical, threshold inquiry." *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 837 (9th Cir. 1996) (quotation omitted). Rule 24(a)(2) does not mandate "a specific legal or equitable interest." *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011). Rather, it merely requires that the asserted interest be "protectable under some law" and that there exist "a relationship between the legally protected interest and the claims at

1    issue." *Id.* (quotation omitted). Either federal or state law may protect the asserted interest. *See*

2    *Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1088-89.

3        Here, the NRA asserts the interests of its members that are protected under Nevada state

4    law and would be significantly affected by the claims at issue in this case. Since at least the 1959

5    Nevada Gaming Control Act, the regulatory framework for gaming in Nevada has been

6    instrumental in the growth and expansion of the industry. The gold standard regulatory

7    environment and the compliance by the NRA members fosters public confidence in the industry

8    and promotes the reputation of the NRA members and the industry as a whole. Gaming plays a

9    "vital role" in the economy of Nevada, the State "regulate[s] and control[s] the gaming industry

10   consonant with the health, safety and welfare of the public." *State v. Glusman*, 651 P.2d 639, 646

11   (Nev. 1982). The State thus requires all "sports pool" or sports betting operators to procure a

12   license from the Nevada Gaming Commission. *See* NRS 463.193 (defining "sports pool"),

13   463.160(1)(a) (requiring gaming license), 463.220(2) (authority of Commission to grant license).

14   As of April 28, 2025, the Commission had licensed 60 sports betting operators in Nevada. *See*

15   *Location Name and Address List: Nonrestricted Sports Pool*, Nevada Gaming Commission and

16   the Nevada Gaming Control Board, https://tinyurl.com/sncjvh5d/ (last accessed May 14, 2025).

17       Many of these licensees are NRA members, *see id.* (listing, *inter alia*, Aria, Bellagio,

18   Caesars, Hard Rock, Mandalay Bay, MGM, Venetian, and Wynn), which obtained their licenses

19   in accordance with Nevada law, *see* NRS 463.200 (application requirements), 463.210

20   (application review and investigation), and paid (and continue to pay) annual fees, *see, e.g.*, NRS

21   463.380 (annual fees based on number of games operated). Nevada law also establishes uniform

22   and comprehensive regulations for license holders, so the NRA's members not only have a

23   property interest in the licenses themselves, but they have a property interest in using those

24   licenses in a well-regulated market. The NRA's members accordingly possess interests (through

25   licenses and a well-regulated market in which to operate those licenses) that are "protectable under

26   some law"—Nevada law—and satisfy Rule 24(a)(2). *Wilderness Soc.*, 630 F.3d at 1179; *see also*

27   *People's Legislature v. Miller*, No. 2:12-cv-272-MMD-VCF, 2012 WL 3536767, at *4 (D. Nev.

28   Aug. 15, 2012) (recognizing Nevada state law sufficient to provide Rule 24(a)(2) interest).

Further, the protected interests of the NRA's members would be affected by the "claims at issue." *Wilderness Soc.*, 630 F.3d at 1179. Kalshi's complaint brings a single claim—that Nevada's state laws regulating in-state sports betting are preempted by the CEA. ECF No. 1 at 15-16. That claim affects the gaming licenses currently held by NRA members in at least three ways.

*First*, Kalshi's legal position, if accepted, would enable it to offer sports betting products to Nevada residents without complying with the State's comprehensive regulatory scheme or paying taxes to the State of Nevada. Nevada's regulations ensure that the gaming establishments continue to operate honestly and competitively and contribute to Nevadans quality of life, rather than unduly impact it. *See* NRS 463.0129(1)(a) (recognizing the vital importance of gaming to Nevada and the general welfare of Nevadans), 463.0129(1)(b) (finding its continued growth dependent on "public confidence and trust" that gaming establishments operate "honestly and competitively"). For example, to protect young adults, Nevada restricts sports betting to adults aged 21 and older. NRS 463.350(1). To preserve the integrity of sports leagues, Nevada prohibits sportsbooks from knowingly accepting wagers by athletes, coaches, game managers, and owners on their own sporting contests. Nev. Gam. Reg. § 22.1205(2). To promote customer confidence, Nevada requires sportsbooks to hold sufficient reserves to cover outstanding wagers. *See id.* § 22.40. To facilitate law enforcement, sports betting operators must report all "suspicious transactions" over $5,000 that would violate federal, state, or local law, would allow athletes or coaches to make prohibited wagers, or have no business or apparent lawful purpose. *Id.* § 22.121(1)-(2). To protect problem gamblers, Nevada requires sportsbooks to provide to customers "written materials concerning the nature and symptoms of problem gambling," train employees to flag potential problem gambling, and limit problem gamblers' access to cash. *See id.* § 5.170(2)-(4). And to support the State's public services, Nevada sportsbooks are subject to a progressive tax on gross gaming revenue, with large operators paying 6.75% of their gross gaming revenue. *See* NRS 463.370(1).

To maintain their state gaming licenses, *see* Nev. Gam Reg. 5.011(h), the NRA's members spend substantial amounts of time and money complying with the above rules and many more

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

(especially by paying gaming taxes[2]). By framing its "sports bet by another name" products as outside of Nevada's purview, Kalshi wants an exemption from those rules—*i.e.*, it intends to compete for the same sports betting customers with fewer regulatory requirements and without paying gaming taxes. That places NRA members at a potential competitive disadvantage, diminishing the attendant value of their gaming licenses.

Courts have recognized that the competitive disadvantage in the market (and specifically the gaming industry) establishes "a legally protected interest in the action that may be impaired if intervention is denied." *Connecticut v. United States Dep't of the Interior*, 344 F. Supp. 3d 279, 298 (D.D.C. 2018). In *Connecticut*, the Court addressed whether MGM, a casino operator, had an interest in a case involving amendments to federally imposed procedures authorizing gambling within Connecticut. *See generally id.* There, the plaintiff, the state of Connecticut, sought "to overturn the Secretary's failure to approve a compact amendment that would give the Tribes an advantage in the state commercial casino market over private casino developers like MGM." *Id.* at 298. The Court concluded that MGM, as a competitor at risk of suffering a competitive disadvantage, had "competitor standing" to intervene and in turn demonstrated a legally protected interest in the action sufficient to satisfy Rule 24. *Id.* at 299; *see also id.* at 304 (concluding that for "the same reasons MGM has standing to intervene," including that the federal decision "would immediately diminish MGM's chances of securing state approval" for its casino over a tribal casino and "would create imminent competition" for MGM, MGM "demonstrated a legally protected interest in the action that may be impaired if intervention is denied.").

*Second,* the NRA's members have a protectable interest in operating under their licenses in a well-regulated market. Kalshi's circumvention of the above regulatory scheme threatens to allow unregulated gaming establishments to operate in Nevada's gaming market, or at least those that the CFTC lets slip through via self-certification. This will erode public confidence and trust in the industry, which "can only be maintained by strict regulation of all persons, locations,

---

[2]  The Nevada Gaming Control Board reported $482 million in sports betting revenue in 2024, most of which was from large operators, meaning that the State took in tens of millions in tax revenues from sports betting. *Monthly Revenue Report*, Nevada Gaming Control Board at 1-2 (December 2024), https://tinyurl.com/4w2artsf.

practices, associations and activities related to the operation of licensed gaming establishments and the manufacture, sale or distribution of gaming devices and associated equipment." NRS 463.0129(1)(c). While the NGCB has similar interests in upholding the integrity of the gaming market, the NRA members will suffer a distinct and specific harm if patrons lose confidence in the integrity of their products based on operations by Kalshi.

*Third*, Kalshi's preemption argument could even result in a bizarre result that the CFTC has authority over some types of state sports betting, not currently traded on a CFTC exchange. The CEA gives the CFTC exclusive jurisdiction over "[1] accounts, agreements . . . , and transactions involving [2] swaps or contracts of sale of a commodity for future delivery . . . traded or executed on [3] a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b–3 of this title or any other board of trade, exchange, or market." 7 U.S.C. § 2(a)(1)(A). Moreover, the CEA correspondingly prohibits "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery" *unless they take place on CFTC-regulated exchanges*. 7 U.S.C. § 2(e) makes it generally unlawful to "enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title," and 7 U.S.C. § 6d(a)(1) "prohibits anyone from soliciting or accepting orders for swaps or options contracts if they are not registered with the CFTC as a futures commission merchant." *CFTC v. Yukom Commc'ns Ltd.*, No. 19-cv-5416, 2021 WL 4477874, at *1 (N.D. Ill. Sept. 30, 2021). To the extent that the sports bets offered by Kalshi are considered to be swaps and so the CFTC has exclusive jurisdiction over such swaps, then this could even require other types of sports bets to be only offered on a CFTC exchange.

The acceptance of Kalshi's claim could create a potential competitive threat to many of the NRA's members, could require them to wholly restructure their current sports betting operations, and could devalue the regulatory infrastructure that the NRA members have invested in. Since resolution of Kalshi's claim "actually will affect" the NRA's members' value and use of their state gaming licenses, *Arakaki v. Cayetano*, 324 F.3d 1078, 1084 (9th Cir. 2003) (quotation

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

omitted), there is a sufficient relationship between the NRA's asserted interests and the claims in this case.

### ii.    Disposition Of This Case May Impair the Ability of the NRA's Members to Protect Their Interests.

The second Rule 24(a)(2) requirement is whether "the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest." *Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1086. Where an intervening party has already demonstrated a significant protectable interest, "courts have 'little difficulty concluding' that the disposition of the case may affect such interest." *TCutima, Inc. v. Bua Grp., LLC*, No. 2:24-cv-1130-JCM-NJK, 2025 WL 587041, at *6 (D. Nev. Feb. 24, 2025) (quoting *Lockyer*, 450 F.3d at 442); *see also Ctr. for Biological Diversity v. Haaland*, No. 2:24-cv-2043-CDS-NJK, 2025 WL 777528, at *2 (D. Nev. Jan. 14, 2025) (this requirement "often follows as a matter of course" where a protectable interest has been shown) (quotation omitted). Considerations of stare decisis can prove practical impairment. *See Greene v. United States*, 996 F.2d 973, 977 (9th Cir. 1993); 7C Wright & Miller, *Federal Practice and Procedure* § 1908.2 (3d ed., April 2025 update).

As explained, Kalshi's lawsuit seeks to upend the longstanding authority of Nevada state agencies to regulate in-state sportsbooks. The Court's decision already impairs the NRA's members' ability to protect their gaming licenses in future litigation, as it endorses Kalshi's theory about the CFTC's exclusive jurisdiction over the same sports betting products that NRA members currently offer. Accordingly, the NRA's members could "lose" the property interests "afforded to them by [Nevada] statute[]." *People's Legislature*, 2012 WL 3536767, at *4. That plainly constitutes practical impairment under Rule 24(a)(2).

### iii.    The NRA's Motion is Timely.

The third Rule 24(a)(2) requirement is timeliness. *Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1086. "Timeliness is determined by the totality of the circumstances facing would-be intervenors, with a focus on three primary factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 854 (9th Cir. 2016) (quotation

omitted). Prejudice is the most important factor, *id.* at 857, but all three are analyzed by reference to the "crucial date . . . when proposed intervenors should have been aware that their interests would not be adequately protected by the existing parties," *id.* at 854 (quotation omitted). The procedural history is therefore critical to this Court's analysis of timeliness.

Kalshi filed its complaint and concurrently moved for a temporary restraining order and injunctive relief on March 28, 2025, less than two months ago. ECF No. 1, 18. The State Defendants responded to Kalshi's motion for injunctive relief on April 4, and counter-moved for a competing temporary restraining order on that same date. ECF No. 34, 35. The Court held oral arguments on April 8. ECF No. 43. The Court orally granted Kalshi's motion and denied the State Defendants' countermotion, *id*. The State Defendants filed their motion to dismiss on April 23, just 21 days ago. ECF No. 50. Since then, there have been only limited docket entries, only two of which (Kalshi's response to the State Defendants' Motion to Dismiss and the State Defendants' Reply) were substantive. ECF Nos. 55, 56. The Court has not yet ordered oral argument or made a dispositive ruling on the motion to dismiss.

As this procedural history shows, this case is still in the pleading stage with a pending (but not yet fully briefed) motion to dismiss and no answer on file. Discovery has not opened, and thus there are no pending discovery deadlines or a trial date. Courts routinely find that motions to intervene at such an early stage (or even later) are timely. *See, e.g.*, *Nev. Ass'n of Ctys. v. U.S. Dep't of the Interior*, No. 3:13-cv-712-MMD-WGC, 2014 WL 1338736, at *2 (D. Nev. Apr. 2, 2014) (within two months of complaint and before answer); *Nevada v. United States*, No. 3:18-cv-569-MMD-CBC, 2019 WL 718825, at *2 (D. Nev. Jan. 14, 2019) (within two months of complaint and before answer); *see also PEST Comm. v. Miller*, 648 F. Supp. 2d 1202, 1212 (D. Nev. 2009), *aff'd*, 626 F.3d 1097 (9th Cir. 2010) (two months after answer); *Pershing Cnty. v. Jewell*, No. 3:14-cv-466-MMD-WGC, 2015 WL 3658074, at *3 (D. Nev. June 12, 2015) (one month after answer). And while the Court has ruled on the preliminary-injunction motions, *see* ECF Nos. 43, 45, that does not alter the timeliness of this intervention. *See, e.g.*, *SFR Invs. Pool 1, LLC v. Newrez LLC*, No. 2:22-cv-626-GMN-EJY, 2023 WL 3341918, at *2 (D. Nev. May 10, 2023) (early stage even after court had ruled on motions for preliminary injunction and to dismiss).

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

The Court already indicated that it intends to receive further briefing on the merits, and the NRA is seeking to intervene before that substantive briefing has even begun. This factor overwhelmingly supports intervention.

The second factor requires the Court to analyze prejudice. Prejudice is measured comparatively as the impact of the intervenor's failure to seek intervention earlier, or "after he knew, or reasonably should have known, that his interests were not being adequately represented." *Kalbers v. United States Dep't of Just.*, 22 F.4th 816, 825 (9th Cir. 2021) (quotation omitted). It "must be connected in some way to the timing of the intervention motion" and does not arise simply because a would-be intervenor's involvement in a case "might make resolution more difficult." *Id.* (cleaned up). So, the only relevant question is whether any delay in filing this motion causes prejudice to the parties. It will not. Neither party suffered any prejudice by any delay in filing this motion and it would be unreasonable to expect parties who are not named in the initial proceedings to seek to intervene much sooner. The NRA contacted the parties about intervention and purposefully filed this Motion before the continued status check to allow the parties and Court time to incorporate the NRA's potential involvement into its discussion. And while the State Defendants filed a motion to dismiss, the NRA does not seek to interfere with this briefing schedule. Due to the procedural posture, the NRA seeks to file a joinder to the State Defendants' Motion to Dismiss. The NRA also does not seek to add its own claims, which further cuts against any potential prejudice. *Republican Nat'l Comm. v. Aguilar*, No. 2:24-cv-518-CDS-MDC, 2024 WL 3721198, at *4 (D. Nev. May 24, 2024), *report and recommendation adopted*, 2024 WL 3409860 (D. Nev. July 12, 2024). This factor therefore also weighs in favor of intervention.

As to the third factor, any delay in the NRA's intervention was minimal. *See Kalbers*, 22 F.4th at 825 (delay of a few weeks "weighs in favor of timeliness, rather than against it"); *Smith*, 830 F.3d at 859-60 (intervention timely when sought "only weeks after definitively learning that their interests were not adequately represented by the existing parties"). Because all three factors weigh in favor of timeliness, the NRA's motion is timely.

### iv.    The Existing Parties Do Not Adequately Represent the Interests of the NRA's Members.

The fourth and final requirement is whether "the existing parties may not adequately meet the applicant's interest." *Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1086. A prospective intervenor must show that that the present parties' representation *may* be inadequate. *Sw. Ctr. for Biological Diversity*, 268 F.3d at 822; *see also Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538-39 n.10 (1972). The burden for the prospective intervenor is "minimal." *Sw. Ctr. for Biological Diversity*, 268 F.3d at 823. It is sufficient for an applicant to show that, because of the difference in their interests, it is likely that the existing parties will not advance the same arguments as applicants. *Id*. at 823-24.

When determining the adequacy of representation, the Ninth Circuit considers three factors:

> (1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect.

*Id.* at 822. All three of these factors weigh in favor of inadequate representation here and satisfy the NRA's "minimal" burden here.

*First*, the briefing up to this point forecloses the idea that any of the existing parties will undoubtedly make all of the NRA's arguments. *Arakaki*, 324 F.3d at 1086; Hr'g Tr. (Rough), Apr. 8, 2025, 69:19-22. Among the most important arguments in this case that the NRA will present in its substantive filings are that (1) the CEA does not field preempt state regulation of sports betting and the intent of all of the laws and regulations cited by Kalshi were to prohibit gaming contracts, not to permit them; (2) Kalshi's "sports-related event contracts" are not "swaps" within the meaning of the CEA; and (3) the CFTC has not authorized and cannot legally authorize Kalshi to offer the relevant contracts. These issues have not been fully and comprehensively briefed by the parties and not with the additional perspective of the NRA's members. Much of the State Defendants' current briefing and oral argument has been taken up by other issues and arguments, including the Eleventh Amendment and official immunity, *see* ECF No. 50 at 4-9, Nevada public

policy, *see* ECF No. 34 at 15-17, and the Tenth Amendment, *see* ECF No. 50 at 19-20. These arguments do not apply to the NRA members and do not protect the competitive interests of the NRA members or the gaming industry in Nevada.

There have been additional arguments and issues that have not yet been fully briefed. For example, Kalshi represented that "the CFTC earlier this year permitted Kalshi to offer sports-event contracts." ECF No. 18 at 2. But binding regulations specifically prohibit CFTC-registered entities—like Kalshi—from offering event contracts that "involve[], relate[] to, or reference[] . . . gaming," 17 C.F.R. § 40.11(a), and allow the CFTC to conduct a review of such contracts, *see id.* § 40.11(c). As Kalshi recently argued, contracts that reference "gaming" include sports bets and sports event contracts, like the ones at issue here. *See* Brief of Appellee at 17, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024), 2024 WL 4802698 (contracts contingent on game or game-related events like the Kentucky Derby, Super Bowl, or Masters). Kalshi has recently argued in its Opposition to the State Defendants' Motion to Dismiss that the "[d]ebate over the Special Rule likewise clearly contemplates that the 'CFTC [will] have the power' to approve contracts involving 'gaming.'" ECF No. 55 at 20 (citing Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Senator Dianne Feinstein and Senator Blanche Lincoln)). This representation is staggeringly misleading. The legislative history confirms the intent to "enable the CFTC to prohibit the trading of derivative contracts based on sporting events" as confirmed by a Commissioner of the CFTC. Public Statements & Remarks, CFTC, Statement of Commissioner Dan M. Berkovitz Related to Review of ErisX Certification of NFL Futures Contracts (April 7, 2021), https://tinyurl.com/3nsf8tzh.

> *Mrs. Feinstein: . . . Will the CFTC have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative as opposed to hedging or economic use?*
>
> *Mrs. Lincoln: That is our intent. The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed event contracts. It would be quite easy to construct an "event contract"*

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

> *around sporting events such as the Super Bowl, the Kentucky Derby, and*
> *Masters Golf Tournament. These types of contracts would not serve any*
> *real commercial purpose. Rather, they would be used solely for gambling.*

Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Senator Dianne Feinstein and Senator Blanche Lincoln)). Reliance on Kalshi's argumentation, without the NRA's intervention, could reach a result that is diametrically opposite of what was intended by Congress.

As to the definition of swaps, this Court properly and first examined at the April 8 hearing, *see* Hr'g Tr. (Rough), Apr. 8, 2025 at 5:4-13:1—whether Kalshi's sports event contracts are "swaps" as defined by the CEA. *See* ECF No. 34 (not mentioning the word "swap"); ECF No. 50 at 13 (merely arguing that "Kalshi failed to allege facts demonstrating that its contracts fit within" the definition of a swap). There are multiple independent reasons why Kalshi's sports event contracts are not swaps within the meaning of the CEA. As a textual matter, the outcome of a sports game is generally not "associated with potential financial, economic, or commercial consequence[s]," *see* 7 U.S.C. § 1a(47)(A)(ii), nor is a sports event contract commonly known as a "swap," *see id.* § 1a(47)(A)(iv), or a "combination or permutation of, or option on" ordinary swaps, *see id.* § 1a(47)(A)(vi). Kalshi's overbroad definition of "swap"—as the Court noted, "anything could be a swap," Hr'g Tr. (Rough), Apr. 8, 2025 at 8:18-9:4— simply belies the limited scope of the CEA's statutory definition, focused as it is on financial and economic instruments and measures, *see* 7 U.S.C. § 1a(47)(i), (iii), (v); *see also Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). Kalshi continues to mistake the economic consequences of the sporting event itself with the economic consequences of the "outcome" of the sporting event, which is the subject of the event contract. The NRA is uniquely situated to explain to the Court the details and significance of the various wagers offered by Kalshi and the NRA members, and how these wagers are not associated with financial, economic, or commercial consequences.

Substantive canons of construction additionally militate against Kalshi's categorization of sports event contracts as swaps. By permitting unregulated sports betting that is specifically

McDONALD CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

prohibited by Nevada state law, *see* NRS 463.160(1), Kalshi's theory of CEA preemption obliquely repeals the Wire Act, *see* 18 U.S.C. § 1084(a)-(b), notwithstanding the canon against implied repeal, *see Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018). Kalshi's theory also uses a minor subsection of the CEA (defining the word "swap") to effect a massive transformation in the federal approach to gambling, which "respect[s] the policy choices of the people of each State on the controversial issue of gambling." *Murphy v. NCAA*, 584 U.S. 453, 484 (2018). This despite the requirement of a clear statement before "significantly alter[ing] the balance between federal and state power," *Sackett v. EPA*, 598 U.S. 651, 679 (2023) (citation omitted).

Finally, the relevant legislative history makes clear that sports event contracts are not swaps. Kalshi repeatedly relies on the legislative history of the Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389, which added the preemptive, "exclusive jurisdiction" language to Section 2(a)(1)(A) for the first time. *See* ECF No. 1 ¶ 33; ECF No. 18 at 4, 13-16; ECF No. 40 at 6-7. But the 1974 Act did not use the term "swap"— Congress did not give the CFTC "exclusive jurisdiction" over transactions involving "swaps" until Dodd-Frank in 2010. *See Dodd-Frank Wall Street Reform and Consumer Protection Act*, Pub. L. No. 111-203, Title VII, Part II, § 722, 124 Stat. 1376, 1658-754; *DTCC Data Repository (U.S.) LLC v. CFTC*, 25 F. Supp. 3d 9, 11 (D.D.C. 2014). And there is no evidence that anyone in Congress understood that adding "swaps" to the CFTC's jurisdiction would displace state or tribal authority over traditional forms of gambling, including sports betting. If anything, the Special Rule now codified at 7 U.S.C. § 7a-2(c)(5)(C)(i) proves just the opposite. *See* 156 Cong. Rec. S5902, S5906-7 (daily ed. July 15, 2010) (the Special Rule's author expressing explicit concern about event contracts being used for sports betting).

*Second*, the NRA's intervention would add necessary elements to the proceeding. *See Arakaki*, 324 F.3d at 1086. The NRA members operate throughout the nation and will discuss how the multi-state regulatory approach works in practice. The NRA members have daily familiarity with issues of federal and state law, and the NRA advocates for the interests of its many members who operate Nevada sportsbooks. Accordingly, it is "uniquely well-positioned," *Kalbers*, 22 F.4th at 828, and is indeed the only party in this case to discuss the full impact of Kalshi's theory on

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

Nevada gaming operators or explain why sports event contracts cannot be categorized as federally-regulated swaps. *See Sw. Ctr. for Biological Diversity*, 268 F.3d at 823-24 (inadequate representation where intervenors would "express their own unique private perspectives"); *Defs. of Wildlife v. United States Fish & Wildlife Serv.*, No. 21-16382, 2022 WL 3656444, at *1 (9th Cir. Aug. 24, 2022) (emphasizing the importance of "specialized knowledge" and "expertise"). Put simply, it would be unreasonable for this Court to decide the future of Nevada's sports betting industry without that industry's participation.

For this reason, the NRA overcomes any presumption of adequate representation by the State Defendants. *See Arakaki*, 324 F.3d at 1086. As the Ninth Circuit has explained, "[t]he government's representation of the public interest may not be identical to the individual parochial interest of a particular group just because both entities occupy the same posture in the litigation." *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 899 (9th Cir. 2011) (cleaned up). Just so here, the State Defendants' objectives lie in ensuring that Nevada laws remain enforceable and that its officials cannot be sued. *See* ECF No. 34, 50. The NRA's objectives, by contrast, are to preserve its members' valuable property and protect the industry as a whole. *See, e.g.*, *Californians For Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1190 (9th Cir. 1998) (inadequate representation where economic interests of intervenor's members were "potentially more narrow and parochial than the interests of the public at large"); *Fund for Animals*, 322 F.3d 728, 736 (9th Cir. 2003) (concluding that often "governmental entities do not adequately represent the interests of aspiring intervenors"); *Sw. Ctr. for Biological Diversity*, 268 F.3d at 823 (noting that a federal agency cannot be expected to protect private interests). Indeed, as demonstrated by other litigation across the country, the government often has its own interests and political motives, which may not align with the NRA's. *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025) (order granting CFTC's voluntarily dismissal of appeal in separate litigation concerning Kalshi). Accordingly, the NRA satisfies the minimal showing that representation of its interests may be inadequate, *see Sw. Ctr. for Biological Diversity*, 268 F.3d at 823, and must be permitted to intervene as of right.

### C.    Alternatively, the NRA Should Be Permitted to Intervene.

In the alternative, the NRA moves for permissive intervention under Rule 24(b)(1)(B), which provides that the court may, "[o]n timely motion," permit anyone to intervene who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). The Ninth Circuit recognizes three requirements for permissive intervention: (1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law or fact with the main action. *Cooper v. Newsom*, 13 F.4th 857, 868 (9th Cir. 2021). Permissive intervention should also not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

As already explained, *supra* Section III(B)(iii), the NRA's motion to intervene filed less than two months after Kalshi's complaint is timely. The NRA also satisfies the remaining two requirements for permissive intervention, and intervention will not unduly delay or prejudice the Court's adjudication of the existing parties' rights.

### i.    No Independent Ground for Jurisdiction Is Required.

Rule 24(b)(1)(B) generally requires the court to have "an independent basis for jurisdiction over the applicant's claims." *Glickman*, 159 F.3d at 412. But when a "proposed intervenor in a federal-question case brings no new claims," the requirement of an independent jurisdictional ground "drops away." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011); *cf. Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439-40 (2017) (intervenor needs additional jurisdictional ground when pursuing relief different from existing party). Here, the NRA brings no new claims; rather, it seeks to defend the State's authority to regulate sports betting in Nevada against Kalshi's preemption argument. *See supra* Sections III(A), III(B)(i) and (iv). Since this is a federal-question case based on Kalshi's preemption argument, *see* ECF No. 45 at 4, and the NRA "do[es] not raise new claims," an independent jurisdictional ground "is not required here." *Republican Nat'l Comm.*, 2024 WL 3409860, at *1.

**ii.    The NRA's Defense Shares a Common Question of Law with the Current Case.**

Rule 24(b)(1)(B) also requires the applicant to show that its claim or defense "shares a common question of law or fact with the main action." *Glickman*, 159 F.3d at 412. The reasons provided in support of intervention by right also support permissive intervention because they demonstrate the commonality between the NRA's legal arguments and those existing in the current case. The NRA seeks to intervene to defend Nevada's state law authority to regulate in-state sports betting operators—including Kalshi—against Kalshi's preemption argument based on the CEA. "Because this is the precise claim at issue" in Kalshi's complaint (and motion for preliminary injunction), *PEST Comm.*, 648 F. Supp. 2d at 1214; *see* ECF No. 1 at 15-16; ECF No. 18 at 12-21, and the NRA "raises arguments in response to" Kalshi's lawsuit, *Paher v. Cegavske*, 3:20-cv-243-MMD-WGC, 2020 WL 2042365, at *3 (D. Nev. Apr. 28, 2020), there is a common question of law between the NRA's defense and the current case.

Further, the NRA has significant and unique interests that directly relate to the questions raised in this case and the NRA should therefore be permitted to represent those interests before this Court. As explained *supra* Sections III(A) and III(B)(i), the NRA's members, through their investments in licensure, have an interest in a well and uniformly regulated market in which to operate through their licenses. Anything less will erode public confidence and trust in Nevada's gaming industry, which is vital to Nevada's economy and the welfare of its residents. *See* NRS 463.0129(1)(a)-(c). Not only does the NRA seek to protect the Nevada gaming industry and the general welfare of the state, it also has an interest in protecting its own members. Those members, including some of the larging gaming establishments in the state, have worked for decades to earn the public's trust and build their reputation in an industry that, absent regulation, is susceptible to potential fraud and scandal. Kalshi's circumvention of Nevada's regulatory scheme risks an increase in sports betting scandals, which will come at the costs of both Nevada residents and the NRA's members well-earned reputations.

### iii.    The NRA's Intervention Will Not Cause Undue Delay or Prejudice.

Finally, Rule 24(b)(3) requires the court to consider whether "intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Here, intervention will do neither. The NRA has sought to intervene at an early stage in the litigation while the case is still in the pleading stage with a pending motion to dismiss and no answer on file. Discovery has not opened and neither party will suffer prejudice from the NRA's intervention at this early stage. *See Hudson Ins. Co. v. Miller*, 2:15-cv-349-GMN-CWH, 2015 WL 5286884, at *3 (D. Nev. Sept. 9, 2015) ("Because this case is still in its infancy, Colonial's intervention would not unduly delay the litigation, and plaintiff has not presented any evidence showing it would be prejudiced by the intervention."); *SFR Invs. Pool 1*, 2023 WL 3341918, at *2 (characterizing the proceeding as in an early stage even after court had ruled on motions for preliminary injunction and to dismiss).

Further, the NRA does not seek to alter the case schedule or assert any new claims. Instead, it raises purely legal arguments that require no discovery or resolution of factual questions. *See Roberts v. Nye County*, 2:22-cv-398-RFB-EJY, 2023 WL 2844963, at *5 (D. Nev. Feb. 28, 2023) (finding "no practical prejudice" where permissive intervention was "neither going to materially change the breadth of discovery that will occur in the instant litigation nor prejudice the Officer Defendants through delay"); *supra* Sections III(A), III(B). Further, because those arguments relate to the issues already presented to the Court, intervention will not complicate the case. As explained above, the NRA's motion comes shortly after it became aware of its need to intervene and two months after the initiation of this legal action. *Supra* Section III(B)(iii). Any delay is minimal and was necessary to ensure that this Court was provided with a full account of the relevant facts from the NRA's unique and invaluable perspective.

Moreover, intervention will not prejudice the adjudication of the existing parties' rights. With respect to Kalshi, there can be no possible prejudice—the Court already has granted Kalshi's motion for preliminary injunction, *see* ECF No. 45, and nothing about the NRA's motion will impede Kalshi's ability to argue in support of further relief. And with respect to the State Defendants, the NRA's participation will, if anything, assist in responding to Kalshi's misleading

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

and incomplete arguments about the CEA (which will accrue to the State Defendants' benefit). For this reason and others, if the Court holds that the NRA cannot intervene as of right, it should nonetheless permit the NRA to intervene.

**IV.    <u>CONCLUSION</u>**

The Court should grant the NRA's motion to intervene and allow the NRA to file the proposed Joinder, Exhibit 3.

Dated: May 14, 2025.

McDONALD CARANO LLP

By: */s/Adam Hosmer-Henner*
    Adam Hosmer-Henner (NSBN 12779)
    AG Burnett (NSBN 5895)
    Jane Susskind (NSBN 15099)
    Katrina Weil (NSBN 16152)
    Cassin Brown (NSBN 15877)
    100 West Liberty Street, 10th Floor
    Reno, NV 89501

    *Attorneys for Nevada Resort Association*