DENNIS L. KENNEDY
Nevada Bar No. 1462
PAUL C. WILLIAMS
Nevada Bar No. 12524
**BAILEY❖KENNEDY**
8984 Spanish Ridge Avenue
Las Vegas, Nevada 89148-1302
Telephone: 702.562.8820
Facsimile: 702.562.8821
DKennedy@BaileyKennedy.com
PWilliams@BaileyKennedy.com

NEAL KUMAR KATYAL
(Admitted *pro hac vice*)
JOSHUA B. STERLING
(Admitted *pro hac vice*)
WILLIAM E. HAVEMANN
(Admitted *pro hac vice*)
**MILBANK LLP**
1850 K Street, Suite 1100
Washington, D.C. 20006
Telephone: 202.835.7500
Facsimile: 202.263.7586

GRANT R. MAINLAND
(Admitted *pro hac vice*)
NOLA B. HELLER
(Admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212.530.5000
Facsimile: 212.530.5219

*Attorneys for Plaintiff KalshiEX, LLC*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| KALSHIEX, LLC, | Case No.  2:25-cv-00575-APG-BNW |
| Plaintiff, | |
| vs. | |
| KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board, et al., | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| Defendants, | |
| vs. | ORAL ARGUMENT REQUESTED |
| NEVADA RESORT ASSOCIATION, | |
| Intervenor-Defendant. | |

Plaintiff KalshiEX LLC ("Kalshi") hereby moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 and respectfully requests that the Court enter declaratory relief and a permanent injunction in its favor. This Motion for Summary Judgment is made and based on the papers and pleadings on file, the following Memorandum of Points and Authorities, and any oral argument as may be heard by this Court.

## INTRODUCTION

This Court granted Kalshi a preliminary injunction on the ground that the "plain and unambiguous language" of the Commodity Exchange Act ("CEA") "reflects congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges." *KalshiEX, LLC v. Hendrick* ("*Hendrick I*"), No. 25-cv-00575, ECF No. 45 at 12 (D. Nev. Apr. 9, 2025). Since then, the U.S. District Court for the District of New Jersey agreed, reasoning that "at the very least field preemption applies" to prevent states from regulating trading on designated contract markets ("DCMs") like Kalshi. *See KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025).

The Court's conclusion that Kalshi was likely to prevail on the merits was correct, and the Court's rationale in granting preliminary relief compels summary judgment in Kalshi's favor. Federal law preempts state regulation of trading on Kalshi, as confirmed by every conceivable marker of legislative intent. The CEA's text grants the Commodity Futures Trading Commission ("CFTC") "exclusive jurisdiction" over trading on DCMs. 7 U.S.C.§2(a). Congress deleted a provision that would have preserved concurrent state jurisdiction, noting its intent to "preempt the field." H.R. Conf. Rep. No. 93-1383, at 35 (1974). Congress repeatedly reenacted—indeed, expanded—the exclusive-jurisdiction provision after courts uniformly concluded that it preempts state regulation. Every court to consider the question since 1974 has concluded that states are preempted from regulating trading on DCMs. And the CFTC agrees that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM." CFTC Br. at *27, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024).

Federal law therefore bars Nevada from regulating Kalshi's event contracts under straightforward principles of both field preemption and conflict preemption. Holding otherwise

1   would contravene Congress's judgment that a "contract market could not operate efficiently, and

2   perhaps not at all," if subject to "varying and potentially contradictory legal standards." *Am. Agric.*

3   *Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992).  If Nevada could enforce

4   its gambling laws against Kalshi, so could 49 other states, subjecting Kalshi to a patchwork of

5   contradictory regulation, interfering with the CFTC's uniform oversight, and conflicting with

6   Kalshi's federally imposed obligation to provide impartial access to its exchange.

7           Kalshi is entitled to judgment as a matter of law, and no discovery is warranted.  The question

8   whether federal law " ' occupies the field' and thereby preempts state law is 'purely legal.' "  *Hawaii*

9   *Newspaper Agency v. Bronster*, 103 F.3d 742, 746 (9th Cir. 1996).  Accordingly, no factual

10  development is needed to resolve the merits of Kalshi's preemption claim.  And while the Court

11  alluded to the possibility of limited factfinding to address the other requirements for injunctive relief,

12  there is no genuine dispute that Kalshi will face irreparable harm absent an injunction and that the

13  public interest favors injunctive relief.  Unlike at the preliminary-injunction stage—where Kalshi

14  bore the burden of proving that it would suffer irreparable harm during the pendency of the

15  litigation—the question at summary judgment is whether Kalshi will suffer irreparable harm if it

16  proves that Nevada law is preempted but nonetheless is denied an injunction.  As to that question,

17  Kalshi's only means of preventing Defendants from enforcing preempted state laws is injunctive

18  relief.  And the record otherwise establishes that Kalshi will suffer irreparable harms absent an

19  injunction, especially given that Defendants are immune from damages liability under the Eleventh

20  Amendment.  The Ninth Circuit has easily concluded that a party suffers irreparable harm in cases

21  like this one where immunity insulates the defendant from damages liability.  Kalshi's harms are

22  therefore irreparable as a matter of law.  As for the other injunction factors, it "is always in the public

23  interest to prevent the violation of a party's constitutional rights."  *Riley's Am. Heritage Farms v.*

24  *Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022).  Kalshi is entitled to summary judgment and a permanent

25  injunction.

26

27

28

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

### FACTUAL AND LEGAL BACKGROUND

**I.    Legal Background**

Congress passed the CEA in 1936 to bring a measure of federal regulation to derivatives markets.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 362 (1982).  Congress initially stopped short of comprehensive regulation.  It preserved "any State law applicable" to "transactions" regulated by the Act.  7 U.S.C. § 6c (1940).  The drafters' "intention" in 1936 was "not to occupy the field."  H.R. Rep. No. 74-421, at 5 (1935).  As markets matured, however, that decision produced a patchwork of regulations, leading exchanges to recommend that "federal policy . . . be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions."  *Hearings Before the House Comm. on Agriculture* ("*House Hearings*"), 93d Cong., 1st Sess., at 121 (1973).

Congress responded in 1974 with seminal legislation designed to "[b]ring all futures trading under federal regulation."  *Hearings Before the Senate Comm. on Agriculture & Forestry* ("*Senate Hearings*"), 93d Cong., 2d Sess., at 847–48 (1974).  Most relevant here, Congress created the CFTC to oversee trading on federally designated "contract market[s]."  7 U.S.C. § 2(a)(1)(A).  Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction."  *House Hearings* at 128.  Subjecting exchanges to "different State laws would just lead to total chaos."  *Senate Hearings* at 685 (statement of Sen. Clark).  Congress in Section 2(a) of the amended statute therefore explicitly vested the CFTC with "exclusive jurisdiction" over trading on federal exchanges.  7 U.S.C. § 2(a)(1)(A).

Congress also deliberately reinforced the CFTC's exclusive jurisdiction.  After House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC.  S. Rep. No. 93-1131, at 31 (1974).  The language ensured that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies."  *Id*. at 6.  The Senate also "struck" the existing provision preserving state laws applicable to derivatives "transactions."  H.R. Conf. Rep. No. 93-1383 at 35.  As the conference report explained, the amendments were designed "preempt the field insofar as futures regulation is concerned."  *Id*.  These changes "wholly and unequivocally eliminated" each of

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1  the grounds on which the original CEA had been found not to preempt state law.  Kevin T. Van Wart,

2  *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692–93 (1982).

3      Courts immediately understood the preemptive effect of the amendments.  *See, e.g.*, *Int'l*

4  *Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (Ark. 1977) (exclusive-jurisdiction clause "is a clear

5  indication that Congress intended no regulation in this field except under the authority of the act").

6  Judge Friendly, for example, explained that the CEA "preempts the application of state law"

7  regarding trading on federal exchanges.  *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980).

8      The 1974 amendments did not preempt all state regulation.  They provide that "[n]othing in this

9  chapter shall supersede or preempt" the application of state statutes to a transaction "that is *not*

10  conducted on or subject to the rules" of a federally licensed exchange or to "any person required to

11  be registered" who fails to do so.  7 U.S.C. § 16(e)(1) (emphasis added).  Congress thus granted the

12  CFTC exclusive power to regulate trading on exchanges it oversees, while permitting state authorities

13  to police "fraudulent off-exchange investments" and other "transactions outside those preserved

14  exclusively for the jurisdiction of the CFTC."  H.R. Rep. No. 97-565, pt. 1, at 44 (1982).

15      The amendments to the CEA enacted by the Dodd-Frank Act of 2010 ("Dodd-Frank") revised

16  the CEA in two respects relevant here.  First, Congress added a new class of agreements known as

17  "swaps" to the CFTC's exclusive jurisdiction.  *See* Pub. L. 111–203, 124 Stat. 1376, 1666 (July 21,

18  2010).  Section 2(a) now provides that the CFTC "shall have exclusive jurisdiction . . . with respect

19  to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for

20  future delivery . . . traded or executed on a contract market designated" by the CFTC.  7 U.S.C.

21  § 2(a)(1)(A).  Congress defined "swap" to encompass, among other things, contracts "dependent on

22  the occurrence . . . of an event or contingency associated with a potential financial, economic, or

23  commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).  Congress's addition of "swaps" confirmed that

24  the CFTC's exclusive jurisdiction extended to event contracts after the CFTC had raised questions

25  on that topic.  *See Concept Release*, 73 Fed. Reg. 25669, 25673 (May 7, 2008) (seeking comments

26  on "the implications of possibly preempting state gaming laws with respect to event contracts").

27      Second, Congress created a "Special Rule" addressing event contracts.  The Special Rule

28  authorizes the CFTC to review and prohibit certain event contracts that it determines to be "contrary

BAILEY✥KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).  The CEA provides that the CFTC "may"—but need not—deem event contracts contrary to the public interest if they "involve" certain categories, including "gaming."  *Id.*; *see also* 17 C.F.R. §§ 40.11.  The decision to prohibit an event contract that falls within one of the enumerated categories is subject to the CFTC's evaluation of the "public interest."  When Congress enacted the Special Rule, a federal statute prohibited sports betting in most states, but in 2018, the Supreme Court invalidated this statute on anticommandeering grounds.  *See Murphy v. NCAA*, 584 U.S. 453, 486 (2018).  Sports betting is now lawful in most states and has become an important national industry.

Today, the CFTC's regulatory framework is extensive, comprehensive, and exclusive.  To obtain approval from the CFTC, an exchange must first apply for and receive the CFTC's designation as a contract market, known as a "DCM."  7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100.  Once the CFTC designates an entity as a DCM, the CFTC has "exclusive jurisdiction" over swaps and futures contracts traded on the exchange, 7 U.S.C. § 2(a)(1)(A), including "event" contracts, *id.* § 1a(47)(A).  Exchanges under the CFTC's jurisdiction are subject to an extensive federal regulatory framework, including 23 "core principles" identified in the CEA.  *See* 7 U.S.C. § 7(d); 17 C.F.R. § 38, *et seq*.  If an exchange violates the CEA or CFTC regulations, the CFTC has recourse to a comprehensive array of enforcement mechanisms all committed to the agency's discretion, including penalties, suspension or revocation of the exchange's designation, and referral to DOJ for criminal enforcement.  7 U.S.C. §§ 8(b), 12c, 13.

## II.    Statement of Undisputed Facts.

Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts.  *See* ECF No. 18-1 (Decl. of Xavier Sottile) ¶¶ 8, 27, 37.

In November 2020, the CFTC certified Kalshi as a DCM.  ECF No. 18-1 ¶ 8; Ex. A-1 (CFTC Order of Designation).  Kalshi offers many kinds of event contracts related to climate, technology, health, popular culture, and economics.  Exs. A-7–A-10 (Kalshi CFTC Regulation 40.2(a) Notifications dated February 2, 2022; September 13, 2023; January 5, 2024; and December 3, 2024).

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

As relevant here, Kalshi also offers contracts on the outcomes of certain political elections and sporting events. ECF No. 18-1 ¶ 8.

Kalshi first listed its political-event contracts in June 2023, self-certifying a congressional control contract where users could trade on which political party would control the House of Representatives or the Senate after the 2024 elections. Ex. A-2 (Kalshi CFTC Regulation 40.2(a) Notification dated June 12, 2023). Pursuant to the CEA, the CFTC initiated a public-interest review of these contracts on the theory that they "potentially involved, related to, or referenced an activity enumerated" in the Special Rule. Ex. A-3 (Notification of CFTC Review dated June 23, 2023). The CFTC held a public comment period during its 90-day review process. *Id.* At the conclusion of the review period, the CFTC issued an order purporting to prohibit Kalshi from listing these contracts, finding that they "involve[d]" "gaming" and "unlawful" activity and were contrary to the public interest. Ex. A-4 at 23 (Order, *In the Matter of the Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the United States Senate and United States House of Representatives*, CFTC (Sept. 22, 2023)).

Kalshi challenged this ruling in the U.S. District Court for the District of Columbia, which agreed with Kalshi and rejected the CFTC's position as a matter of law. *KalshiEX LLC v. CFTC*, No. CV 23-3257 (JMC), 2024 WL 4164694, at *13 (D.D.C. Sept. 12, 2024). The court held that Kalshi's congressional control contracts "do not involve activity that is unlawful under any Federal or State law" or "involve gaming," and thus do not fall within any category in the Special Rule. *Id.* The court accordingly vacated the CFTC's order, holding that federal law required the CFTC to permit the contracts. *Id.*

The CFTC initially appealed to the D.C. Circuit, which denied a stay pending appeal. *KalshiEX LLC v. CFTC*, 119 F.4th 58, 67 (D.C. Cir. 2024). After the stay denial, the CFTC dismissed its appeal, making the district court's decision final. *See* Order, *KalshiEX LLC v. CFTC*, No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025).

Kalshi first self-certified and listed sports-event contracts in January 2025. Ex. A-5 (Kalshi CFTC Regulation 40.2(a) Notification dated Jan. 22, 2025). It did so after one of its competitors

began offering sports-event contracts a month earlier. *See* Ex. A-6 (Nadex Notification of CFTC Review dated January 14, 2025).

Unlike with Kalshi's political-event contracts, the CFTC has not subjected Kalshi's sports-event contracts to public-interest review. ECF No. 18-1 ¶¶ 38–49. Thus, upon self-certification, these contracts were approved under federal law. 17 C.F.R. § 40.2(a). The CFTC has discretion to prohibit contracts it considers "gaming" that it determines to be contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(i). But the CFTC has taken no action to prohibit Kalshi's sports-event contracts.

Notwithstanding that Kalshi's event contracts are traded on a DCM, on March 4, 2025, the Nevada Gaming Control Board sent a cease-and-desist letter to Kalshi claiming that its "event-based contracts in Nevada on sporting events and on election outcomes" were unlawful under Nevada law. ECF No. 1-2 at 2. The letter demanded that Kalshi "immediately cease and desist from offering any event-based contracts in Nevada." *Id.* at 3.

Kalshi brought suit against the relevant state officials and agencies on the ground that the CEA preempts state regulation of trading on DCMs. On April 9, 2025, this Court granted Kalshi's motion for a preliminary injunction. This Court found that the CEA establishes a comprehensive federal framework for regulating derivatives trading. As a DCM that offers event contracts on its exchange, Kalshi "is subject to the CFTC's exclusive jurisdiction and state law is field preempted." *Hendrick I*, ECF No. 45 at 13. The Court further found that Kalshi was likely to suffer irreparable harm absent an injunction and that the equities favored Kalshi. *Id.*

Defendants did not appeal the preliminary injunction. Instead, they moved to dismiss on a variety of grounds. After granting a motion to intervene brought by the Nevada Resort Association, *see* ECF No. 70, the Court denied Defendants' motion to dismiss. *KalshiEX, LLC v. Hendrick* ("*Hendrick II*"), No. 25-cv-00575, ECF No. 72 (D. Nev. June 3, 2025). The Court rejected Defendants' argument that Kalshi failed to state a claim because the CEA does not preempt Nevada's gaming laws under either field or conflict preemption. *Id.* at 13. The Court explained that "by granting Kalshi's motion for preliminary injunction, I found that Kalshi has demonstrated a likelihood of success on the merits of its claim that the CEA preempts Nevada gaming laws with respect to

Kalshi" and thus Kalshi "has plausibly alleged preemption." *Id.* Kalshi now moves for summary judgment.

## LEGAL STANDARD

Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *In re O'Gorman*, 115 F.4th 1047, 1057–58 (9th Cir. 2024) (quoting Fed. R. Civ. P. 56(a)). A plaintiff seeking a permanent injunction must demonstrate: (1) irreparable harm; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; and (3) that the balance of hardships and public interest favor an injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

## ARGUMENT

**I.    The CEA Preempts Nevada's Gambling Laws As Applied To Kalshi's Event Contracts.**

The Supremacy Clause sets out a "fundamental principle" that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); U.S. Const., art. VI, cl. 2. Federal law has preemptive effect no matter how "clearly within a State's" power the state law resides. *Free v. Bland*, 369 U.S. 663, 666 (1962). "Even without an express provision," Congress may displace state law "in at least two circumstances." *Crosby*, 530 U.S. at 372. First, federal law may occupy a field, leaving "no room for state regulation." *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010) (quoting *Tocher v. City of Santa Ana*, 219 F.3d 1040, 1045 (9th Cir. 2000)). Second, state laws yield where they conflict with a federal statute, such that compliance with both is "impossible" or state law stands as an "obstacle" to Congress's objectives. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quoting *California v. ARC America Corp.*, 490 U.S. 93, 100, 101 (1989)).

Ever since Congress created the CFTC and granted it "exclusive jurisdiction" over trading on DCMs, "courts have held that [Section] 2(a)(1) of the CEA preempts the application of state law." *Leist*, 638 F.2d at 322. Application of Nevada's gambling laws to Kalshi's event contracts is both field and conflict preempted.

**A.      Nevada Gambling Laws Are Field Preempted As Applied To Kalshi.**

As this Court recognized, the CEA "reflects congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges." *Hendrick I*, ECF No. 45 at 12.  That is evident from both the "language of the pre-emption statute and the statutory framework surrounding it."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (quotation marks omitted).  Every indicator of congressional intent confirms that the CEA preempts the field.

1. Start with the text.  The CEA grants the CFTC "*exclusive jurisdiction*" over all "transactions involving swaps" or "future delivery" contracts that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A) (emphasis added).  The "plain meaning of 'exclusive' " "necessarily denies jurisdiction" to other entities not named in that provision. *Mississippi v. Louisiana*, 506 U.S. 73, 77–78 (1992); *see also Exclusive*, American Heritage Dictionary (2d ed. 1980) ("Not divided or shared with others"; "sole . . . separate; incompatible"). Kalshi's political- and sports-event contracts are "swaps" or "future delivery" contracts traded on a "contract market designated" by the CFTC, which necessarily denies jurisdiction to other regulators. Courts routinely recognize the preemptive effect of similar language.  *See, e.g.*, *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 760 (9th Cir. 2018) (federal statute granting a federal agency "exclusive jurisdiction over" "transportation by rail carriers" preempts "*state* regulatory authority over railroad operations").  The CFTC's exclusive jurisdiction over trading on DCMs is no different.

Other features of Section 2's text underscore that CFTC jurisdiction is exclusive as to state authorities.  Section 2 contains a savings clause preserving the jurisdiction of "other regulatory authorities" under the laws "of any State."  7 U.S.C. § 2(a)(1)(A).  Crucially, the clause applies "*[e]xcept as hereinabove provided*" by the grant of exclusive jurisdiction to the CFTC.  *Id*. (emphasis added).  That language enables a "logical inference" of preemption as to matters within the CFTC's jurisdiction.  *See Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 195–96 (9th Cir. 2013) (interpreting savings clause with an "*[e]xcept* as provided" proviso) (emphasis added).  It

also confirms that the CFTC's exclusive jurisdiction precludes concurrent state and federal regulation alike.

2. The CEA's context and structure confirm that Congress intended to preempt state laws as applied to transactions executed on DCMs. Congress enacted other provisions relevant to the states, but each one *excludes* from states' carefully delineated authority the right to regulate DCM trading. Section 16 makes clear that the statute shall *not* "supersede or preempt" the application of state law to transactions "*not* conducted on" a DCM or to entities who are "required to be registered" as a DCM but "fail or refuse" to do so. 7 U.S.C. §§ 16(e)(B)(i), (C) (emphasis added). The logical inference of specifying no preemption as to off-DCM transactions is that Congress *did* intend preemption as to on-DCM transactions. In addition, Section 13a-2(1) authorizes state officials to sue over "any act or practice constituting a violation of any provision of this chapter or any [CFTC] rule." *Id.* § 13a-2(1). But states may *only* enforce the CEA against parties "*other than a [designated] contract market*." *Id.* (emphasis added); *see* Van Wart, *supra*, at 708 (Congress in this provision "wanted the power to enforce the CEA *with respect to organized exchanges* to remain solely in the CFTC"). Congress's decision to authorize a role for states, yet repeatedly *exclude* regulating DCMs, reinforces that it intended to preempt the field *on* DCMs. These clauses would "hardly have seemed necessary" if States could nonetheless enforce their gambling laws against DCMs. *See Frank v. Delta Airlines Inc.*, 314 F.3d 195, 199 (5th Cir. 2002).

3. Precedent further reinforces this conclusion. By the time Congress revisited the CEA in Dodd-Frank, courts of appeals had repeatedly and uniformly held that "the CEA preempts the application of state law" to trading on DCMs. *Leist*, 638 F.2d at 322; *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590–91 (D.C. Cir. 2001) (the CFTC's jurisdiction is "exclusive with regard to the trading of futures *on organized contract markets*") (quotation marks omitted); *Am. Agric. Movement*, 977 F.2d at 1157 (holding state-law claims "are preempted by the CEA" as applied to "the operation of a contract market"); *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (where "the CFTC has jurisdiction, its power is exclusive"). District courts and state courts of last resort agreed. *E.g.*, *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) ("It is now established . . . that state regulatory agencies are likewise preempted by the 'exclusive jurisdiction' of the CFTC.");

*Bell*, 556 S.W.2d at 423 (Section 2 "express[es] a clear intention . . . to supersede the jurisdiction of all state and federal agencies."). Commentators similarly recognized that the CEA "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976).

"Congress is presumed to know the federal courts' interpretation of a statute that it intends to amend." *Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 187 (3d Cir. 2006); *Rodriguez v. Sony Computer Entm't Am., LLC*, 801 F.3d 1045, 1053 (9th Cir. 2015) ("we presume that Congress acts with awareness of relevant judicial decisions") (quoting *United States v. Alvarez-Hernandez*, 478 F.3d 1060, 1065 (9th Cir. 2007)). When it returned to the CEA in 2010, Congress would have been aware of the uniform interpretation of every court that had addressed preemption. And Congress would have understood that confirming the CFTC's jurisdiction over event contracts preempted state law as applied to those instruments.

The CFTC shares this view. In the litigation involving the CFTC's authority to regulate Kalshi's political-event contracts, the CFTC recently acknowledged that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM." CFTC Br. at *27, *KalshiEX*, 2024 WL 4512583 (emphases added); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) (courts may account for agency's "body of experience and informed judgment" in interpreting a statute).

4. Drafting history eliminates any doubt about preemption. When Congress considered the 1974 amendments, the CEA preserved state law as to "transactions" regulated by the Act. 7 U.S.C. § 6c (1940). The Supreme Court had explained that *without* this language, the CEA would "almost certainly conflict with state laws," but that this proviso "serve[d] the function of preventing supersedure and preserving state control." *Rice v. Bd. of Trade of Chicago*, 331 U.S. 247, 255 (1947). Senate drafters accordingly "deleted" this clause "to assure that Federal preemption is complete." 120 Cong. Rec. 30464 (Sept. 9, 1974) (statement of Sen. Curtis). Deletion of the clause would have made no sense if Congress intended to preserve state authority to regulate trading on DCMs. *See INS*

1  *v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) ("Congress does not intend *sub silentio* to enact

2  statutory language that it has earlier discarded in favor of other language.").

3      5.  While this Court need not consider the legislative history given Congress's clear intent,

4  this history further supports preemption.  "[P]reemption was a central issue in the proceedings which

5  culminated in the 1974 amendments."  Van Wart, *supra*, at 692.  Congress emphasized during the

6  legislative process that one of its goals was to "avoid unnecessary, overlapping, and duplicative

7  regulation" in the derivatives markets.  *Ken Roberts*, 276 F.3d at 588.  The Senate Agriculture

8  Committee understood that the proposed amendments would bring "the futures markets" "under

9  federal regulation."  *Senate Hearings* at 249.  One House sponsor added that "different State laws

10  would just lead to total chaos."  *Senate Hearings* at 685 (statement of Sen. Clark).  Drafters later

11  reiterated that regulation should be uniform with "all exchanges . . . under the *same* set of rules."  H.R.

12  Rep. No. 93-975, at 79 (1974) (emphasis added).  The conference report to the 1974 amendments

13  stated Congress's desire to "preempt the field insofar as futures regulation is concerned."  H.R. Conf.

14  Rep. 93-1383 at 35; *see Garcia v. United States,* 469 U.S. 70, 76 (1984) (when resort to legislative

15  history is warranted, committee reports are the "authoritative source").  The legislative history of

16  Dodd-Frank similarly reveals that the Special Rule's drafters understood that the CFTC would

17  possess jurisdiction over event contracts and would have "the power to determine" whether contracts

18  in certain categories were contrary to the public interest.  156 Cong. Rec. S5902, S5906 (daily ed.

19  July 15, 2010) (statements of Sens. Feinstein and Lincoln).

20      6.  Finally, the "pervasive" regulatory framework for regulating trading on DCMs confirms

21  that Congress preempted the field.  *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

22  Congress in the CEA created "a comprehensive regulatory structure" to oversee the "futures trading

23  complex."  *Merrill Lynch*, 456 U.S. at 356.  That scheme leaves no room for parallel state regulation.

24      CFTC regulation covers the lifecycle of an exchange.  To list derivatives contracts, an

25  exchange must receive CFTC designation.  *See* 7 U.S.C. § 7(a).  That process requires an application

26  demonstrating myriad capabilities, including the capacity to detect and investigate actors who violate

27  CFTC rules, 17 C.F.R. § 38.150(b), to retain adequate compliance staff, *id.* § 38.155(a), to surveil

28  trades executed on its platform, *id.* § 38.156, and more.  Once the market becomes a DCM, it is

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1  subject to exclusive oversight, including recordkeeping requirements, *id*. § 38.950, reporting

2  obligations, *id.* §§ 38.450, 16.00 *et seq*., liquidity standards, *id.* § 38.1101(a)(2), and penalties for

3  noncompliance, *see, e.g.*, 7 U.S.C. §§ 9a, 12c.

4      CFTC regulation also covers transactions *on* a DCM.  The CEA sets out comprehensive rules

5  governing DCM transactions, including restrictions on transactions in foreign currency, prohibitions

6  on insider trading, and rules regarding fraudulent transactions.  7 U.S.C. § 6, *et seq.*  DCMs may self-

7  certify contracts they believe comply with these rules, with the CFTC retaining back-end authority to

8  review contracts for compliance.  *See id.* § 7a-2(c)(1); 17 C.F.R. § 40.2(c).  In the case of certain

9  event contracts, the CFTC has discretion to determine whether they are "contrary to the public

10  interest."  7 U.S.C. § 7a-2(c)(5)(C)(i).  The CEA rounds out the scheme by authorizing an array of

11  sanctions, including civil penalties, revocation of licensing, and referral for criminal enforcement.  *Id.*

12  §§ 9a, 12c, 13.  That "comprehensive" regime leaves "no room for the States to supplement it."

13  *Arizona v. United States*, 567 U.S. 387, 399, 401 (2012).

14      **B.**    **Nevada Gambling Laws Are Conflict Preempted As Applied To Kalshi.**

15      If this Court reaffirms its conclusion that Congress preempted the field, it need not address

16  conflict preemption.  But conflict preemption serves as an alternative basis for summary judgment.

17  In at least three respects, subjecting Kalshi's contracts to state laws would "undermine[] the intended

18  purpose and 'natural effect' " of the federal scheme for regulating CFTC-designated exchanges.

19  *Crosby*, 530 U.S. at 373.

20      *First*, Nevada's application of its gambling laws to Kalshi's contracts subverts Congress's

21  aim of bringing futures markets "under a uniform set of regulations."  *Am. Agric. Movement*, 977

22  F.2d at 1156.  Congress specifically worried that states "might step in to regulate the futures markets

23  themselves."  *Id.*  State regulation brings with it the specter of "varying and potentially contradictory

24  legal standards" which would not only hamper DCMs' operations, but potentially prevent them from

25  operating "at all."  *Id.*  The Seventh Circuit has accordingly held that "[w]hen application of state law

26  would directly affect trading on or the operation of a [DCM], it would stand 'as an obstacle to the

27  accomplishment and execution of the full purposes and objectives of Congress,' and hence is

28  preempted."  *Id.* at 1156–57 (citation omitted).

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1    The potential for disuniformity is plain in Defendants' demand that Kalshi cease listing

2  political- and sports-event contracts. ECF No. 1-2 at 3. Kalshi is subject to no such demands in the

3  vast majority of the country, and compliance would interfere with Congress's objective of bringing

4  "all exchanges . . . in the industry under the same set of rules." H.R. Rep. No. 93-975, at 79. The

5  conflict is even clearer given that, if Nevada is permitted to proceed here, 49 other states could equally

6  attempt to subject Kalshi to their own regimes purporting to dictate which contracts are and are not

7  permissible. Fifty different regimes for licensing, permissible contracts, age limits, and liquidity

8  standards would grind a national DCM to a halt.

9    *Second*, Nevada's attempt to prohibit Kalshi's event contracts conflicts with Congress's

10  chosen "method of enforcement." *Arizona*, 567 U.S. at 406. Where Congress reserves enforcement

11  "discretion" for federal authorities, a regime allowing for state enforcement regarding the same

12  actions "violates" the federal scheme. *Id.* at 409.

13    As to Kalshi's political-event contracts, allowing Defendants to prohibit these contracts under

14  state law would run headlong into federal law. The CFTC last year attempted to prohibit Kalshi from

15  listing political-event contracts on the theory that they "involve[d]" both "gaming" and "unlawful"

16  activity. ECF No. 1 ¶ 49. But the D.D.C. held that Congress *required* these contracts to be authorized

17  as a matter of federal law. *See KalshiEX LLC*, 2024 WL 4164694, at *13. That judgment is now

18  final, which means that Kalshi has the right pursuant to a federal court judgment to list political-event

19  contracts across the country. Allowing Nevada to prohibit the very same contracts that a federal court

20  held the CFTC obligated to approve would be an extreme affront to federal authority.

21    As to Kalshi's sports-event contracts, once Kalshi self-certified the contracts, the CFTC had

22  authority to "determine" whether the contracts involved "gaming" and, if so, if they were "contrary

23  to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). "Congress' use of the permissive 'may,' " in

24  contrast with the "use of a mandatory 'shall' in the very same section," underscores Congress's intent

25  to grant the CFTC discretion. *See Lopez v. Davis*, 531 U.S. 230, 241 (2001). Exercising its discretion,

26  the CFTC allowed Kalshi's sports-event contracts to take effect. As the District of New Jersey

27  recognized, "Kalshi's sports-related event contracts evidence—by their very existence—the CFTC's

28  exercise of its discretion and implicit decision to permit them." *Flaherty*, 2025 WL 1218313, at *6.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1   Allowing Nevada—not to mention 49 other states—to substitute its own view about the public

2   interest for the CFTC's would directly interfere with that discretion.

3        In addition to attempting to override Congress's judgment about how to regulate event

4   contracts, Nevada threatens to seek criminal penalties for conduct well beyond what the CEA would

5   authorize.  Nevada authorities threatened Kalshi with a violation that "shall be punished by

6   imprisonment" from one to ten years, "by a fine of not more than $50,000, or by both fine and

7   imprisonment."  NRS 463.360(3).  Absent preemption, the carefully calibrated federal enforcement

8   scheme would be displaced by a blunt application of mandatory state criminal penalties.  *See Crosby*,

9   530 U.S. at 373–74 (finding conflict preemption where state regulatory scheme "undermin[ed]"

10  congressional "delegation of effective discretion" to the executive).  If 50 different jurisdictions can

11  impose criminal sanctions for contracts authorized under federal law, the CFTC's judgment would

12  be meaningless.  *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1027 (9th Cir. 2013) (state law

13  "conflicts with the federal scheme by divesting federal authorities of the exclusive power to" enforce

14  the law).

15       *Third*, compliance with both the CFTC's and Nevada's requirements would be impossible.  If

16  Kalshi attempted to comply with the cease-and-desist letter, it would fall out of compliance with the

17  Core Principles on which its federal designation depends.  Core Principle 2 requires Kalshi to provide

18  its users "with impartial access to its markets and services."  17 C.F.R. § 38.151(b).  Offering event

19  contracts everywhere except Nevada would violate that requirement.  Pulling these contracts would

20  also risk market disruption and facilitate manipulation.  *See id*. § 38.255 (DCMs must establish

21  mechanisms to prevent "market disruptions"); *id*. § 38.200 (DCMs must ensure contracts "are not

22  readily susceptible to manipulation").  To Kalshi's knowledge, it would be unprecedented for a DCM

23  to attempt to offer contracts in some states but not in others, and the CFTC has not definitively held

24  as much only because it has never confronted a DCM that tried.

25       Consider what would happen if Kalshi complied with Defendants' demands in Nevada alone:

26  It would mean prohibiting users in Nevada, but not elsewhere, from entering into contracts concerning

27  the very same political and sports events, making impartial access "impossible."  *See Crosby*, 530

28  U.S. at 372.  Preserving impartial access would thus require Kalshi to comply with Defendants'

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

demands not just in Nevada, but *nationwide*. *But see Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (a state "statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority"). Still worse, every other state would have a reciprocal right to dictate which contracts are and are not permitted—not just in their state, but everywhere else. "Preventing the difficulties that would create is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges." *Hendrick I*, ECF No. 45 at 14.

### C.    Defendants' Arguments Against Preemption Lack Merit.

Defendants have advanced several arguments against preemption. This Court correctly rejected them at the preliminary-injunction and motion-to-dismiss stages. ECF Nos. 45, 72. It should do so again on the merits.

*First*, Defendants argued that political-event and sports-event event contracts are not "swaps" and therefore do not fall within the CFTC's jurisdiction because the "outcome" of sports events or elections lack "potential financial, economic, or commercial consequence." ECF No. 56 at 8–10 (quoting 7 U.S.C. § 1a(47)(A)(ii)). Defendants are mistaken.

The suggestion that elections have no potential economic consequences is self-evidently incorrect. The outcomes of elections have significant consequences for the global economy. The day after the 2024 U.S. presidential election, for example, the major U.S. stock indexes skyrocketed.[1]

Major sports events like those for which Kalshi offers contracts similarly have significant financial consequences for a host of stakeholders, including team sponsors and advertisers. *Flaherty*, 2025 WL 1218313, at *6 (rejecting similar argument by state regulators). When Las Vegas hosted Super Bowl LVIII in 2024, the economic impact of visitor spending for that event alone totaled $1 *billion*.[2] When a favorite exits the tournament early, a range of stakeholders, from sponsors to

---

[1] João da Silva & Charlotte Edwards, *US shares and Bitcoin hit record highs on Trump win*, BBC (Nov. 6, 2024), available at https://www.bbc.com/news/articles/c6246e3w935o.

[2] *2024 Raiders Impact Playbook*, Las Vegas Raiders (Jan. 3, 2025), at 39, available at https://online.flippingbook.com/view/332410981/38/#zoom=true.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1   advertisers, face unexpected losses.[3]  These are *actual* and *significant* financial consequences; they

2   easily qualify as *potential* financial consequences.

3       The Special Rule confirms that "an event" in the swap definition includes a sports event.  The

4   Special Rule identifies contracts involving "gaming" among the "swaps" subject to CFTC "review

5   and approval."  7 U.S.C. § 7a-2(c)(5)(C)(i)(IV).  "Gaming," in turn, commonly refers to the "playing

6   of games," *Gaming*, American Heritage Dictionary (5th ed. 2011), including sports games like a

7   "football match."  *Gaming contract*, Chambers Dictionary (13th ed. 2014).  The CEA therefore

8   contemplates that sports-event contracts are among the contracts "associated with" potential financial

9   consequences subject to the CFTC's exclusive jurisdiction.  No doubt for that reason, the CFTC has

10  taken no action to bar Kalshi's contracts on the ground that they are not swaps.  *See* 7 U.S.C. § 9(4)

11  (authorizing the CFTC to enforce CEA violations).

12      *Second*, Defendants suggested that field preemption does not apply based on the savings

13  clause in Section 2(a), which preserves state law in certain contexts.  ECF No. 50 at 13.  But, as this

14  Court already noted, this clause "does not give states regulatory authority over CFTC-designated

15  exchanges because that language is limited by the phrase except as hereinabove provided."  *Hendrick*

16  *I*, ECF No. 45 at 11 (alteration omitted).  Congress introduced that limiting phrase to reject the precise

17  construction Defendants ask this Court to adopt.  H.R. Conf. Rep. 93-1383 at 5897.  A narrowly

18  worded savings clause does not "preclude pre-emption of state law by other [aspects] of the Act" in

19  any event.  *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 493 (1987); *see Flaherty*, 2025 WL 1218313,

20  at *5.

21      Defendants cited cases relying on the savings clause to hold that the CEA does not preempt

22  the entire field of commodity futures regulation, and, for example, would not bar state common law

23  claims against brokers.  *See Kerr v. First Commodity Corp. of Bos.*, 735 F.2d 281, 288 (8th Cir. 1984).

24  These decisions are correct:  The CEA does not preempt state-regulation of off-exchange transactions

25  of any kind.  7 U.S.C. § 16(e)(1)(B).  The CEA also expressly excludes from preemption "antifraud

26  provisions of general applicability" that do not regulate trading on DCMs.  *Id.* § 16(e)(2); *id.* § 13a-

27

28  ---
[3] Shaofeng Yuan & Ying Gao, *When Sports Sponsorship Incurs Brand Risk: The Roles of Team Performance, Brand Familiarity, and Team Identification*, 23 Int'l J. of Sports Marketing and Sponsorship 767, 779–780 (2022).

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

2(8)(A).  But courts universally agree that the CEA does preempt the "application of state law" to "the operation of a futures market."  *Am. Agric. Movement*, 977 F.2d at 1156 (distinguishing *Kerr* because suits "by futures investors against their brokers" have "no bearing upon the actual operation of the commodity futures markets"); *Leist*, 638 F.2d at 322; *Ken Roberts*, 276 F.3d at 590–91.  By contrast, where "the CFTC has jurisdiction, its power is exclusive."  *Chicago Mercantile Exch.*, 883 F.2d at 548.

*Third*, Defendants cited federal gambling statutes that they claimed would be rendered "superfluous" by Kalshi's position.  ECF No. 50 at 11–12.  To start, these statutes do not define "betting" or "wagering" to include trading on DCMs.  Indeed, the most recent federal statute on the subject—the Unlawful Internet Gaming Enforcement Act of 2006 ("UIGEA")—specifies that the term "bet or wager" "*does not include*" "any transaction conducted on or subject to the rules of a [DCM] under the Commodity Exchange Act."  31 U.S.C. § 5362(1)(E)(ii) (emphasis added).  This exclusion underscores Congress's recognition of the CFTC's exclusive jurisdiction, and is entitled "to great weight in resolving any ambiguities and doubts" about how similar terms in "earlier act[s]" should be understood.  *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972) (quotation marks omitted).  Reading a broader definition of wagering into the prior federal statutes would effectively nullify UIGEA's exclusion by subjecting the CFTC-regulated transactions to criminal penalties, a result Congress in the UIGEA is highly unlikely to have intended.  And Congress would have been aware of the UIGEA when it subjected event contracts to the CFTC's exclusive jurisdiction in Dodd-Frank, enacted just four years after the UIGEA.

Far from resulting in any implied repeal, the CEA leaves each of the statutes Defendants cite intact in the vast majority of applications.  The Wire Act continues to prohibit betting between states where it is illegal—just not trading on DCMs, which, given preemption, is not illegal in any state.  *See W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1069 (D.C. Cir. 2023) (Wire Act contains a "safe harbor" for "wagering" "to and from states" where that activity "is lawful").  IGRA continues to give Native American tribes the authority to regulate gaming "on Indian lands," 25 U.S.C § 2701— just not as to trading on DCMs.  Only in the narrow context of trading on DCMs does the CEA take precedence.  That is appropriate: The CEA is the "more specific" statute given that the general

prohibitions in other federal gambling statutes do "not mention [DCMs] at all." *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 524 (2018). In keeping with the obligation to harmonize federal laws, this interpretation leaves federal gambling statutes generally operative while giving the CEA precedence on the "narrow, precise, and specific subject" where it governs. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976).

*Fourth*, Defendants claimed that conflict preemption was inapplicable because its laws are not "mutually exclusive" with the CEA. ECF Nos. 50 at 17–19; 35 at 13–14. But courts have repeatedly rejected this familiar gambit—to describe a federal statute's purpose at a high level of generality and cherry-pick aspects of state laws that share the same objectives. *See Valle del Sol*, 732 F.3d at 1026 (state law preempted "although it shares some similar goals" with federal law because it upsets "the careful balance struck by Congress"); *Arizona*, 567 U.S. at 406 (though state law "attempts to achieve one of the same goals as federal law . . . it involves a conflict in the method of enforcement"). Defendants appeared to admit at the preliminary-injunction stage that enforcement of Nevada gambling laws would conflict with the CEA, arguing that its laws would not "preclude Kalshi from complying with [ ] CFTC [regulation], *except when* Kalshi attempts to disguise state-regulated gaming activity as commodities." ECF No. 35 at 14 (emphasis added). But the status of Kalshi's contracts as federally regulated derivatives is an issue for the CFTC, not 50 different states.

*Fifth*, Defendants argued that public policy concerns cut against preemption. ECF No. 35 at 15–17. But "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest." *Bostock v. Clayton County*, 590 U.S. 644, 653 (2020). And the policy objections here are notably thin. Many of the consumer protections Defendants touted follow from the fact that casinos and sportsbooks are typically counterparties to wagers, with incentives to stack the odds in their own favor. But Kalshi's exchange is not the "house" or the counterparty to any trade, and it does not set any line. Instead, it facilitates transactions between traders, with the price set by the market and with Kalshi having neither the ability nor the incentive to structure transactions to favor itself. The federal laws to which Kalshi is subject instead protect consumers by imposing extensive obligations to ensure the integrity of the exchange and prevent market manipulation and disruption. *See, e.g.*, 17 C.F.R. § 38.251(a) (requiring DCMs to evaluate

"individual traders' market activity on an ongoing basis in order to detect and prevent manipulation"). Kalshi has also implemented federal anti-money-laundering protections. *See* KalshiEX LLC Rulebook at 3.5(a), 3.4(c), 3.6(g). And Kalshi works with a CFTC-regulated clearinghouse that fully collateralizes every open position on its exchange, making additional state-imposed liquidity requirements both superfluous and prohibitive. The question is not whether trading on Kalshi should be regulated, but by whom. Congress's clear answer is the CFTC.

*Finally*, Defendants contended that Kalshi is judicially estopped from arguing that its sports-event contracts do not constitute "gaming." ECF No. 50 at 20–21. The Court properly rejected this argument at the preliminary-injunction stage, and it should do so again here. *Hendrick I*, ECF No. 45 at 14 ("even if Kalshi's sports contracts involve 'gaming,' that would not subject Kalshi to state gaming laws," but "would subject Kalshi to the special rule that allows the CFTC to conduct a public interest review"). Kalshi has never disputed whether its contracts involve gaming. Instead, its position is that even if these contracts involve gaming, that would simply subject them to CFTC review. That is the same position Kalshi espoused in the D.C. litigation. *See* D.C. Cir. Br., *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698, at *45 (D.C. Cir. Nov. 15, 2024) (it was "sensible for Congress to empower the CFTC to at least *review* the category of game-based contracts"). While Kalshi in the D.C. litigation noted that Congress subjected gaming contracts to the Special Rule because they may not be used for bona fide hedging purposes, Kalshi made clear that Congress reserved this public-interest judgment for the CFTC, not the 50 different states, explaining that "the CFTC's 'exclusive jurisdiction' over the derivatives markets preempts any state law that purports to prohibit the trading of a contract on a regulated exchange." *Id.* at *31. Kalshi also made clear that there may be "games that do have extrinsic consequences." D.C. Cir. Stay Oral Arg. Tr. 74. Defendants certainly cannot meet the criteria for judicial estoppel, which requires a "clearly inconsistent" position in prior litigation, court "accept[ance]" of the earlier position, and "an unfair advantage as a result." *United States v. Marshall*, No. 10-CR-236, 2017 WL 3812894, at *2–3 (D. Nev. Aug. 30, 2017) (quoting *United States v. Ibrahim*, 522 F.3d 1003, 1009 (9th Cir. 2008)). Kalshi's positions in this case and the D.C. litigation are consistent; the D.C. courts did not "accept" any position that could be characterized as inconsistent with Kalshi's position here; and there is no

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

evidence that Kalshi acted "in bad faith or was playing fast and loose with the courts." *See Johnson v. State, Oregon Dep't of Hum. Res., Rehab. Div*., 141 F.3d 1361, 1370 (9th Cir. 1998); *see also KalshiEX*, 2024 WL 4164694, at *10.

## II.    There Are No Triable Issues Of Fact Concerning The Other Requirements For Injunctive Relief.

### A.    As a matter of law, Kalshi will suffer irreparable harm absent an injunction, and legal remedies are inadequate.

*First*, where, as here, a plaintiff establishes likelihood of success on the merits, it "almost always" shows irreparable harm, and "the merged third and fourth factors [tip] decisively in [its] favor." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023).  The harm inquiry at the summary-judgment stage differs from the harm inquiry at the preliminary-injunction stage:  The question is no longer whether Kalshi will suffer irreparable harm during the course of the litigation, but whether Kalshi will suffer irreparable harm if it proves preemption but nonetheless cannot enjoin Defendants from enforcing their preempted laws.  Here, Kalshi will plainly suffer irreparable harm absent an injunction, because an injunction is the only way to effectuate a judgment preventing Defendants from enforcing their laws against Kalshi.  Kalshi is aware of no preemption action brought under *Ex Parte Young* to prevent an imminent state enforcement proceeding where a plaintiff proved preemption but was nonetheless denied an injunction.

*Second*, even if more were needed, the record establishes nonmonetary harms that are not subject to genuine dispute.  As this Court recognized, "[a] credible threat of imminent prosecution for a state violation that conflicts with federal law can establish a likelihood of irreparable harm." *Hendrick I*, ECF No. 45 at 15 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)); *see also Valle del Sol*, 732 F.3d at 1029.  The same reasoning applies on the merits.  Kalshi faces a "Hobson's choice," as it must either refuse to comply with Defendants' unconstitutional demands and face civil and criminal liability, or comply and incur "reputational harm as well as the potential existential threat of the CFTC taking action against it for violating the CFTC's Core Principles if Kalshi disrupts contracts or geographically limits who can enter contracts on what is supposed to be a national exchange." *Hendrick I*, ECF No. 45 at 15; *id.* at 16 ("requiring Kalshi to stop" offering event contracts "altogether and lose goodwill or damage its reputation" or "face civil

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

and criminal liability in Nevada" establishes "a likelihood of irreparable harm"). Absent an injunction, Kalshi would be placed in the same impossible position that justified preliminary relief— suffering either the irrevocable harm of potential criminal liability or the harm of cutting off Nevada users' access to their trades, the possibility of being deemed out of compliance with federal impartial-access requirements, and the strong likelihood of copycat enforcement in other states. *See* ECF No. 18-1 ¶¶ 29–37, 41, 43, 50. The resulting harm to Kalshi's "goodwill" alone justifies an injunction. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

*Third*, Kalshi has also shown other irreparable harms. It is not subject to genuine dispute that Kalshi would incur some costs to implement geolocation and cut off all contracts in Nevada. *See* ECF No. 18-1 ¶ 21 ("a partnership with a geolocation service provider would cost Kalshi up to tens of millions of dollars annually"); *Hendrick I*, ECF No. 45 at 15 ("Kalshi presents credible evidence that even if it could implement geofencing at great expense, it could not do so immediately."). That is enough to show irreparable harm here, because Kalshi would be unable to recoup these costs in a suit for damages. *See Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (finding irreparable harm where "sovereign immunity likely would bar [the plaintiff] from recovering monetary damages").

## B. Kalshi has established that the balance of harms and public interest favor a permanent injunction.

The balance of harms and public interest likewise favor an injunction. It "is always in the public interest to prevent the violation of a party's constitutional rights." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (quotation omitted). And Defendants face no harm from an injunction preventing them from enforcing state laws that federal law does not entitle them to enforce in any event. *See Arizona*, 567 U.S. at 400–01; *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024) ("[T]he government has no interest in enforcing unconstitutional laws."). If this Court finds that Kalshi succeeds on the merits, the balance of harms and public interest cannot possibly favor Defendants.

The failure to issue an injunction here, moreover, would "reach[] beyond the parties, carrying with it a potential for public consequences." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir.

2009). Just as Kalshi will be irreparably harmed absent an injunction, Kalshi's users in Nevada will also be harmed because their "contracts and investment expectations would be disrupted if Kalshi were forced to terminate its existing contracts." *Hendrick I*, ECF No. 45 at 16. Abruptly voiding existing contracts in Nevada would risk cutting off users' access to their investments on Kalshi's exchange, which "may impact counterparties to those contracts who are neither based in Nevada nor signed the event contracts while in Nevada." *Id.*

## III. DISCOVERY IS UNNECESSARY TO RESOLVE THIS MOTION.

Summary judgment without discovery is appropriate where the motion raises "purely legal issues that can be resolved without discovery." *Bank of Am., N.A. v. Terraces at Rose Lake Homeowners Ass'n*, No. 16-cv-01106, 2017 WL 7037740, at *1 (D. Nev. Oct. 26, 2017); *see Celano v. Marriott Int'l, Inc.*, No. C 05-4004, 2007 WL 2318947, at *1 (N.D. Cal. Aug. 13, 2007) (noting court had allowed "early motion for summary judgment on purely legal issues" ). A party can oppose summary judgment by demonstrating "by affidavit or declaration" that "it cannot present facts essential to justify its opposition." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 661 (9th Cir. 2020) (quoting Fed. R. Civ. P. 56(d)). The proponent of discovery bears the burden of providing "sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1091 n.5 (9th Cir. 2009) (quotation omitted). Defendants cannot meet that burden here. The merits of Kalshi's preemption claim present a purely legal question, and Kalshi has established the other prerequisites for injunctive relief as a matter of law.

### A. Preemption presents a question of law.

As the Supreme Court and Ninth Circuit have repeatedly held, "the issue of whether a federal law 'occupies the field' and thereby preempts state law is 'purely legal.' " *Hawaii Newspaper*, 103 F.3d at 746 (quotation marks omitted); *see In re Bard IVC Filters Prod. Liab. Litig.*, 969 F.3d 1067, 1073 (9th Cir. 2020) ("the preemption issue here presents a purely legal question"); *Atay v. County of Maui*, 842 F.3d 688, 698 (9th Cir. 2016) ("[p]reemption is predominantly a legal question"); *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 761 (9th Cir. 2014) ("Preemption is almost always a legal question."); *Sayles Hydro Assocs. v. Maughan*, 985 F.2d 451, 454 (9th Cir.

1993) (field preemption is "purely legal"); *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 201 (1983) ("The question of preemption is predominantly legal."). That is why appellate courts review preemption decisions "de novo." *Hawaii Newspaper*, 103 F.3d at 748. It is also why preemption is "for a judge to decide, not a jury." *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 303 (2019).

Kalshi's preemption claims are no exception. They turn on pure questions of law—i.e., the scope of the CEA's exclusive jurisdiction, whether that jurisdiction preempts state regulation of trading on DCMs, and whether application of Nevada's gambling laws would conflict with the CEA. These are all, at bottom, questions of statutory interpretation—quintessential questions of law. *See Smith v. Anastasia Inc*., No. 14-cv-1685, 2014 WL 12577598, at *2 (S.D. Cal. Sept. 15, 2014) ("[d]etermining the scope of a preemption clause is a matter of statutory interpretation"); *see also* ECF No. 46 at 69 (counsel for Defendants agreeing at the preliminary-injunction hearing that she viewed the case "as primarily a legal question" presenting "an issue of statutory interpretation").

For that reason, the Ninth Circuit has repeatedly rejected arguments that additional factfinding is necessary to resolve preemption claims. On appeal from one court's finding that state law was preempted, the Ninth Circuit rejected the contention that the district court erred in refusing to allow discovery, explaining that "[p]reemption is predominantly a legal question, resolution of which would not be aided greatly by development of a more complete factual record," and that the issues "can be resolved without further development of background facts." *Atay*, 842 F.3d at 698. In another appeal addressing whether a preemption claim was ripe, the Ninth Circuit found it could decide the preemption "claim without further factual development." *Hawaii Newspaper*, 103 F.3d at 746; *see also Pacific Gas & Elec.*, 461 U.S. at 201 (resolution of preemption claim need not await factual development).

Preemption cases therefore regularly proceed to summary judgment without discovery. To take one example in the Ninth Circuit, in *ConocoPhillips Alaska, Inc. v. Alaska Oil and Gas Conservation Commission*, 660 F. Supp. 3d 822, 829 (D. Alaska 2023), the court addressed whether federal law preempted a state agency from releasing certain information regarding the plaintiff's oil drilling operations. Relying on an affidavit of harm, the plaintiff sought summary judgment on

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

preemption grounds before any discovery occurred. The court granted summary judgment, and denied the defendant's request for a Rule 56(d) continuance to conduct discovery given that preemption is a legal issue. *Id.* at 840. Similarly, in *Robert Ito Farm, Inc. v. County of Maui*, 111 F. Supp. 3d 1088, 1098 (D. Haw. 2015), the court addressed a state's imposition of standards for genetically engineered organisms that conflicted with federal law. The court entered summary judgment for the plaintiffs notwithstanding the defendants' request for discovery, reasoning that discovery regarding the plaintiffs' operations and the environmental impacts associated with plaintiffs' practices had "no bearing on whether the Ordinance is preempted." *Id.* (noting that "the issues for which discovery is allegedly required are largely, if not completely, irrelevant to [defendant's] opposition"). The Ninth Circuit affirmed that decision in *Atay. See* 842 F.3d at 698. In *R.J. Reynolds Tobacco Co. v. McKenna*, 445 F. Supp. 2d 1252, 1254–59 (W.D. Wash. 2006), the court likewise granted summary judgment on preemption grounds without discovery. And courts routinely proceed to summary judgment without discovery where the parties agree that preemption presents "questions of law and do not require additional discovery." *Segal v. Lefebvre*, No. 13-cv-1511, 2013 WL 12130553, at *2 (D. Nev. Nov. 14, 2013).

The Court should follow the same approach here. The broad discovery Defendants seek—ranging from Kalshi's statements on the nature of its event contracts, its marketing and advertising, and its customer protection efforts—"have no bearing" on the dispositive legal question whether the CEA preempts Nevada gambling laws as applied to Kalshi. *Robert Ito Farm,* 111 F. Supp. 3d at 1098.

**B.    Kalshi has established that legal remedies are inadequate as a matter of law.**

Discovery is unnecessary to establish the remaining prerequisites for injunctive relief. While the Court alluded to the possibility that limited factfinding may be needed to establish Kalshi's irreparable harm, *see* ECF No. 46 at 88, the existing record demonstrates that Kalshi will suffer irreparable harm absent an injunction. No further factual development is warranted.

Kalshi has established that it faces irreparable harm from the credible threat of imminent prosecution under preempted Nevada laws. No facts identified in discovery could bear on the legal question whether an injunction is needed to protect Kalshi from enforcement of preempted state laws.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

While Defendants have argued that enforcement would not subject Kalshi to irreparable harm because they seek "to prevent illegal acts," ECF No. 34 at 18–20, that argument simply assumes the conclusion that Kalshi's acts in Nevada are illegal.  Nor could any facts adduced through discovery bear on the reputational harms that would follow if Kalshi were labeled a violator of Nevada law, if Kalshi were forced immediately to void existing contracts for Nevada users, or if Kalshi were forced to jeopardize its CFTC designation by abandoning its impartial-access obligations.

Given that Kalshi has otherwise established irreparable harm, this Court need not address whether the monetary harm Kalshi would incur from attempting to comply with Defendants' cease-and-desist letter is also irreparable.  But if the Court addresses the question, the record establishes that Kalshi will suffer irreparable harm absent an injunction.  While it is true that "[e]conomic harm is not normally considered irreparable," the Ninth Circuit has squarely held that "such harm is irreparable" where a plaintiff "will not be able to recover monetary damages."  *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018); *see also Coeur d'Alene*, 794 F.3d at 1046 (finding irreparable harm where "sovereign immunity likely would bar [the plaintiff] from recovering monetary damages"); *Grand River Enters. Six Nations, Ltd. v. Knudsen*, No. 23-35494, 2024 WL 2992503, at *2 (9th Cir. June 14, 2024) (monetary harm "*is* irreparable when the plaintiff cannot sue the defendant to recover money damages").

The quantum of Kalshi's harm does not bear on the question whether the harm is irreparable.  The Ninth Circuit has repeatedly made clear that "[t]he analysis focuses on irreparability, 'irrespective of the magnitude of the injury.' " *Azar*, 911 F.3d at 581 (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)).  An injury of only a few dollars can amount to irreparable harm if the injury cannot be redressed through damages.  *Id.* at 572.  Kalshi's declaration establishes that implementing geolocation would "cost Kalshi up to tens of millions of dollars annually."  ECF No. 18-1 ¶ 21.  While Defendants may attempt to dispute the quantum of harm, Defendants cannot reasonably dispute that Kalshi does not currently geolocate users or that doing so would cost money that Kalshi could not recoup even if it were to prevail.

At the preliminary injunction hearing, the Court noted that factual development may be needed to evaluate "the real impact financially if we . . . geofence Nevada contracts" and what that

would amount to "compared to the overall financial viability of the company." *See* ECF No. 46 at 88. It is true that courts look to the magnitude of monetary harm to establish irreparability in cases where damages would ultimately be available. In these cases, the magnitude of monetary harm is relevant because it bears on whether the plaintiff would be unable to weather the financial hardship before recovering damages. *See, e.g.*, *Am. Passage Media Corp. v. Cass Commc'ns*, Inc., 750 F.2d 1470, 1473–74 (9th Cir. 1985) ("[m]onetary damages are not usually sufficient to establish irreparable harm," but "[t]he threat of being driven out of business is sufficient to establish irreparable harm"). But the magnitude of Kalshi's harm and Kalshi's viability are not relevant in the different posture of this case, where Kalshi will be unable to obtain damages and where the magnitude of its harm does not bear on the question of irreparability.

During the preliminary injunction hearing, counsel for Defendants indicated that if Kalshi "wishes to seek monetary damages against the State, the State has waived sovereign immunity in State Court under certain circumstances" and suggested that this case presented one such circumstance. ECF No. 46 at 61–62. But in their motion to dismiss, Defendants reversed course, arguing that Individual Defendants "are entitled to official act immunity and discretionary act immunity" and that Agency Defendants "have Eleventh Amendment immunity" in state court. ECF No. 50 at 6–9; *see also* NRS § 41.031(3) (the "State of Nevada does not waive its immunity from suit conferred by Amendment XI of the Constitution of the United States"); NRS § 41.032(1) ("no action may be brought . . . against . . . an officer or employee of the State or any of its agencies or political subdivisions which is . . . [b]ased upon an act or omission of an officer, employee or immune contractor, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation is valid, if the statute or regulation has not been declared invalid by a court of competent jurisdiction"). Thus, Defendants now agree that Kalshi could not seek damages against them in a state court proceeding. In addition, a damages cap would limit damages in a state court proceeding to a maximum of $200,000. *See* NRS § 41.035(1). Harm is irreparable even if there is some highly doubtful prospect of money damages in a different proceeding in state court. *See Coeur d'Alene*, 794 F.3d at 1046 (finding irreparable harm where immunity "likely" would bar damages); *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1251 (10th Cir. 2001) (finding irreparable harm

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

where relief "might not be available to the tribe because of the state's sovereign immunity").

Accordingly, no further factfinding is needed to establish Kalshi's irreparable harm.

## CONCLUSION

For the foregoing reasons, the Court should grant Kalshi's motion for summary judgment and enter a permanent injunction.

DATED this 1st day of August, 2025.

BAILEY❖KENNEDY

By: /s/ Paul C. Williams

DENNIS L. KENNEDY
PAUL C. WILLIAMS

MILBANK LLP
NEAL KUMAR KATYAL (Admitted *pro hac vice*)
JOSHUA B. STERLING (Admitted *pro hac vice*)
WILLIAM E. HAVEMANN (Admitted *pro hac vice*)
GRANT R. MAINLAND (Admitted *pro hac vice*
NOLA B. HELLER (Admitted *pro hac vice*)
*Attorneys for Plaintiff KalshiEX, LLC*

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

## CERTIFICATE OF SERVICE

I certify that I am an employee of BAILEY❖KENNEDY and that on the 1st day of August, 2025, service of the foregoing was made by mandatory electronic service through the United States District Court's electronic filing system and/or by depositing a true and correct copy in the U.S. Mail, first class postage prepaid, and addressed to the following at their last known address:

| | |
|---|---|
| JESSICA E. WHELAN<br>SABRENA K. CLINTON<br>DEVIN A. OLIVER<br>**STATE OF NEVADA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br>1 State of Nevada Way, Suite 100<br>Las Vegas, NV 89119 | Email:  jwhelan@ag.nv.gov<br>sclinton@ag.nv.gov<br>doliver@ag.nv.gov<br><br>*Attorneys for Defendants* |
| ADAM HOSMER-HENNER<br>A.G. BURNETT<br>JANE SUSSKIND<br>KATRINA WEIL<br>CASSIN BROWN<br>**McDONALD CARANO LLP**<br>100 West Liberty Street, 10th Floor<br>Reno, NV 89501 | Email:<br>ahosmerhenner@mcdonaldcarrano.com<br>agburnett@mcdonaldcarano.com<br>jsusskind@mcdonaldcarano.com<br>kweil@mcdonaldcarano.com<br>cbrown@mcdonaldcarano.com<br><br>*Attorneys for Intervenor*<br>*Nevada Resort Association* |



_____/s/ Sharon Murnane_____
Employee of BAILEY❖KENNEDY