AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General—
  Litigation
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
State of Nevada,
  Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3773 (fax)
jwhelan@ag.nv.gov
sclinton@ag.nv.gov

Nicole A. Saharsky (*pro hac vice*)
Minh Nguyen-Dang (*pro hac vice*)
Mayer Brown LLP
1999 K Street, NW
Washington, D.C. 20006
(202) 263-3000 (phone)
nsaharsky@mayerbrown.com
mnguyen-dang@mayerbrown.com

Rory K. Schneider (*pro hac vice*)
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500 (phone)
rschneider@mayerbrown.com

*Attorneys for Mike Dreitzer, George Assad, Chandeni K. Sendall,*
*The Nevada Gaming Control Board, Jennifer Togliatti, Rosa Solis-Rainey, Brian Krolicki,*
*George Markantonis, Abbi Silver, The Nevada Gaming Commission, and Aaron D. Ford*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| KALSHIEX, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board, et al.,<br><br>    Defendants,<br><br>v.<br><br>NEVADA RESORT ASSOCIATION,<br><br>    Intervenor-Defendant. | Case No.: 2:25-cv-00575-APG-BNW<br><br>**STATE DEFENDANTS' EMERGENCY MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION ENTERED ON APRIL 9, 2025 (ECF No. 45)** |

Defendants Mike Dreitzer, George Assad, Chandeni K. Sendall, the Nevada Gaming Control Board, Jennifer Togliatti, Rosa Solis-Rainey, Brian Krolicki, George Markantonis, Abbi Silver, the Nevada Gaming Commission, and Aaron D. Ford (State Defendants) respectfully ask the Court to dissolve the preliminary injunction entered on April 9, 2025 (ECF No. 45), which prevents State Defendants from enforcing Nevada's gaming laws against Plaintiff KalshiEX, LLC (Kalshi).

Pursuant to LR 7-4, State Defendants seek to have this motion heard on an emergency basis. The Court's order denying a preliminary injunction in *North American Derivatives Exchange, Inc.*

*v. Nevada*, No. 25-cv-978 (D. Nev. Oct. 14, 2025) (ECF No. 105) (Order), now makes clear that Kalshi is not likely to succeed on the merits. Accordingly, every day that Kalshi continues to offer its event contracts to Nevada residents in violation of Nevada's gaming laws harms the State, its gaming industry, and its citizens. State Defendants propose that Kalshi file its response brief by October 27, 2025, and that State Defendants file their reply brief by November 3, 2025. Pursuant to LR 7-4(a), a declaration of Jessica E. Whelan, counsel for State Defendants, is attached.

This motion is based on the following memorandum of points and authorities, the referenced pleadings and exhibits, and any oral argument the Court may entertain.

## MEMORANDUM OF POINTS AND AUTHORITIES

Six months ago, the Court issued a preliminary injunction barring State Defendants from enforcing Nevada's gaming laws against the event contracts listed on Kalshi's designated contract market (DCM). The Court concluded that the Commodity Exchange Act (CEA) likely preempts state regulation of swaps on a DCM registered with the Commodity Futures Trading Commission (CFTC). The Court did not address whether Kalshi's event contracts are "swaps" under the CEA.

In the intervening months, matters have changed significantly in at least three ways. First, and most importantly, the Court concluded that the sports event contracts offered by Kalshi's competitor, Crypto.com, are *not* swaps under the CEA. The Court reasoned that the outcome of a sports event is not the type of "event or contingency associated with potential economic, financial, or commercial consequence" that can be the subject of a swap. 7 U.S.C. § 1a(47)(A)(ii). As Kalshi's allegations make clear—and as preliminary discovery has confirmed—Kalshi's event contracts have the same key features as Crypto.com's event contracts. They are wagers on the *outcomes* of sporting and other events—for example, whether a particular team will win a particular game.

Second, the district court for the District of Maryland, evaluating virtually identical claims brought by Kalshi against Maryland gaming regulators, has concluded that Kalshi does not have a likelihood of success on the merits. It held that the CEA does not preempt all of state gaming regulation, even if Kalshi's event contracts qualify as swaps. As the court's decision explains, the CEA simply does not show Congress's intent to preempt all state gaming law and turn the CFTC into the Nation's sole gaming regulator.

1   Third, in the time since the preliminary-injunction order, Kalshi has offered many new types
2   of sports event contracts that are indistinguishable from traditional sports betting. None of its event
3   contracts is a "swap" under the CEA, and so Kalshi's preemption argument fails at the outset.

4   In light of these developments in the law and the facts, the Court should dissolve the pre-
5   liminary injunction. Kalshi no longer can show a likelihood of success on the merits—either on the
6   question whether its event contracts are swaps under the CEA or on the question whether the CEA
7   preempts all state gaming law. Kalshi also cannot show irreparable harm; it is violating state law
8   by engaging in sports wagering without a license and so is not harmed if State Defendants seek to
9   enforce that state law. Finally, the balance of equities and the public interest decisively favor State
10  Defendants. Every day that they are unable to enforce Nevada's gaming laws, Kalshi's conduct
11  inflicts irreparable harms on the State, the other members of the gaming industry, and the public.

## BACKGROUND

### A.   Legal Background

#### 1.   Nevada Comprehensively Regulates Gaming

15  Nevada has regulated gaming within the State for over 160 years. Starting in 1869, the State
16  progressively legalized gaming, first by allowing local governments to determine what gaming ac-
17  tivities to permit. Nev. Resorts Ass'n, *History of Gaming in Nevada*, perma.cc/QGB3-FUYN (last
18  visited Oct. 17, 2025). Then, in 1949, the State enacted the Gaming Control Act to regulate gaming
19  state-wide. *Id.* The Act covers all forms of gaming in Nevada, including sports and other event
20  betting. *See* NRS § 463.160(1)(a), (4). Specifically, the Act regulates the operation of a "sports
21  pool" in the State, which is "the business of accepting wagers on sporting events or other events by
22  any system or method of wagering," *id.* § 463.0193; a "wager" is "a sum of money . . . that is risked
23  on an occurrence for which the outcome is uncertain," *id.* § 463.01962.

24  Nevada's gaming laws seek to ensure that gaming in the State is "conducted honestly and
25  competitively" and "is free from criminal and corruptive elements." NRS § 463.0129(1)(b). To that
26  end, the Act requires every gaming operator to obtain a license. *Id.* § 463.160(1). The State thor-
27  oughly investigates each applicant's background before issuing a license. *Id.* § 463.1405(1). For
28  corporate applicants, the State also individually investigates and licenses the directors and officers

1   and ensures that the corporation is fiscally sound. *Id.* §§ 463.490, 463.530. Licensees must pay

2   licensing fees and keep detailed records of their gaming operations. *Id.* §§ 463.370, 463.400.

3       Nevada's gaming laws protect the public welfare. For example, no person under the age of

4   21 may engage in gaming, including sports betting. NRS § 463.350(1)(a). The State maintains a

5   list of persons who may not participate in gaming. *Id.* § 463.151(2). The State's licensing require-

6   ments seek to ensure that gaming is free from organized crime. *See id.* § 463.170(2). And the State

7   funds services to help those suffering from problem gaming. *See id.* § 458A.010 *et seq.*

8                **2.    The CEA Regulates Swaps and Futures Markets**

9       In 1936, Congress enacted the CEA to regulate commerce in certain agricultural commod-

10  ities (such as wheat, cotton, rice, and corn), including futures contracts based on those commodities.

11  Pub. L. No. 74-675, § 3, 49 Stat. 1491, 1491 (1936). A futures contract is a contract to buy or sell

12  a specific amount of a commodity at a predetermined price on a specified date in the future. *CFTC*

13  *v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995). Businesses use futures to hedge against

14  price volatility. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 390 (1982).

15      In 1974, following major price-manipulation scandals, Congress amended the CEA to

16  strengthen federal regulation of the futures markets. *See* Pub. L. No. 93-463, 88 Stat. 1389 (1974).

17  Congress expanded the CEA to cover nearly all commodities, including non-agricultural commod-

18  ities. *Id.* § 201(b). Congress also created the CFTC to centralize federal oversight of futures mar-

19  kets; before then, that responsibility was shared by the Department of Agriculture and other agen-

20  cies. *Id.* § 101(a). Congress accordingly conferred "exclusive jurisdiction" over futures contracts

21  to the CFTC, *id.* § 201(b), "to consolidate federal regulation of commodity futures trading in the

22  Commission," *Merrill Lynch*, 456 U.S. at 386–87.

23      In 2010, Congress enacted the Dodd-Frank Act in response to the 2008–2009 financial cri-

24  sis. The Act amended the CEA to cover swaps. *See* Pub. L. No. 111-203, pt. II, 124 Stat. 1376,

25  1658–754 (2010). Generally speaking, a swap is an agreement between two parties to exchange (or

26  swap) financial obligations, such as obligations on interest payments, foreign currencies, or com-

27  modity prices. *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1042 (9th Cir.

28  2003). Like futures, companies use swaps to hedge risk. *Id.* at 1043. Before the Dodd-Frank Act,

1  swaps largely were unregulated. Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform*
2  *and Consumer Protection Act* 19 (2017). Congress added swaps to the CEA because certain swaps
3  (called "credit default swaps") had exacerbated the financial crisis. *Id.* at 3.

4        In the Dodd-Frank Act, Congress expanded the CFTC's remit to include "swaps." 7 U.S.C.
5  § 2(a). It provided a detailed, six-part definition of "swap" that reflects the many forms of swaps in
6  the market. *Id.* § 1a(47)(A). Each part describes a financial instrument involving a financial, eco-
7  nomic, or commercial event or measure that is understood in the industry to be a swap. As relevant
8  here, one part covers an agreement "that provides for any payment . . . that is dependent on the
9  occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated
10 with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii).

11       Congress specified that all trading in swaps must occur on CFTC-registered DCMs unless
12 both parties to a swap are regulated financial institutions, major corporations, or similar entities. 7
13 U.S.C. § 2(e); *see id.* § 1a(18). To offer a swap for trading, the operator of a DCM can self-certify
14 that the swap complies with the CEA. *Id.* § 7a-2(c)(1). The swap then immediately may be traded
15 without any further action by the CFTC. *Id.* § 7a-2(c)(2). The CFTC can choose to initiate a formal
16 review after self-certification. In particular, under the "special rule," the CFTC "may" disallow a
17 swap that involves "activity that is unlawful under any Federal or State law," "terrorism," "assas-
18 sination," "war," or "gaming." *Id.* § 7a-2(c)(5).

19       The CEA contains a number of provisions that address how the CFTC's authority relates to
20 state law. In addition to the special rule, the CEA includes a savings clause immediately after the
21 "exclusive jurisdiction" provision. That savings clause provides: "Except as hereinabove provided,
22 nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred
23 on . . . regulatory authorities under the laws of . . . any State." 7 U.S.C. § 2(a)(1)(A).

24       The CEA also contains express preemption clauses. Nothing in those clauses says that the
25 CFTC displaces the application of state gaming law generally. One clause addresses gaming, but
26 its scope is quite narrow; it specifies that the CEA "preempt[s] the application of any State . . . law
27 that prohibits or regulates gaming" as to transactions that are exempted from the CEA's require-
28 ments. 7 U.S.C. § 16(e)(2). Those exemptions are not at issue here. Another clause specifies that a

swap "may not be regulated as an insurance contract under the law of any State," *id.* § 16(h); this is noteworthy because Congress could have said the same for state gaming law, but did not.

The CFTC has initiated several rulemakings addressing its authority to regulate swaps. In 2011, the CFTC promulgated a regulation under the special rule. *See* 17 C.F.R. § 40.11. It "made [the] public interest determination on a blanket basis," that DCMs should not list any "swap based upon an excluded commodity . . . that 'involves, relates to, or references . . . gaming.'" Order at 19 (quoting 17 C.F.R. § 40.11(a)).

Next, in 2012, the CFTC promulgated a rule (jointly with the SEC) in which it stated that "swap" does not include insurance contracts or other "consumer and commercial arrangements that historically have not been considered swaps," such as mortgages. Further Definition of ''Swap,'' 77 Fed. Reg. 48208, 48246 (Aug. 13, 2012). The CFTC explained that although those contracts could come within a broad reading of "swap," they historically have not been understood to be swaps and have been regulated by the States. *Id.* at 48212 & n.29. The CFTC found no indication that Congress intended to change that. *Id.* Thus, the CFTC has recognized that DCMs should not be used for "gaming" and that the term "swaps" should be construed to avoid disturbing historic areas of state regulation.

Then, in 2024, the CFTC proposed a rule that would categorically bar DCMs from offering event contracts based on the outcomes of sports events. *See* Event Contracts, 89 Fed. Reg. 48968, 48976 (proposed June 10, 2024). The CFTC stated that it was *not* proposing to displace state gaming law, and specifically noted that it does not have "the statutory mandate nor specialized experience appropriate to oversee" gaming. *Id.* at 48982–83. Both dissenting Commissioners agreed on this point. *See id.* at 48997, 48999. Although this proposal was withdrawn, it reflects the CFTC's understanding that the CEA does not override state gaming law.

### B.    Factual Background

Kalshi alleges that it operates a CFTC-registered DCM. ECF No. 1 (Compl.) ¶ 42. It alleges that in 2023, it started offering a category of swaps called "political-outcome contracts" that allow users to wager on the outcome of elections. *Id.* ¶¶ 45–47. It further alleges that on January 24, 2025, it self-certified and started listing for trading a new category of swaps called "sports-outcome

contracts," that allow users to wager on the outcome of sporting and other events. *Id.* ¶¶ 45, 53.

Kalshi's complaint did not list the event contracts it offers on its DCM or provide any details about those contracts. All it said is that Kalshi offers contracts that "identif[y] a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date." Compl. ¶ 25. It gave as examples "sports-outcome contracts" on "which teams will advance in certain rounds of the NCAA College Basketball Championship" and "who will win the U.S. Open Golf Championship." *Id.* ¶¶ 45, 53. Kalshi nevertheless sought a broad ruling enjoining State Defendants from enforcing the State's gaming laws as to any event contract that it has listed or ever will list on its DCM. *Id.* ¶ 70. At the preliminary-injunction hearing, Kalshi stated that it offered sports event contracts based only on the ultimate win/loss outcome of an event, and not contracts based on secondary outcomes such as the numbers of points scored (*i.e.*, prop bets). ECF No. 46, at 6.

Since that time, Kalshi has dramatically expanded its offerings beyond the winners and losers of sports events, as explained below. Kalshi is profiting from all of this unlicensed sports betting: in October 2025, its annualized trading volume hit $50 billion (up from just $300 million for 2024). Michael J. de la Merced, *Kalshi, a Prediction Market, Raises Funds and Expands Overseas*, N.Y. Times (Oct. 10, 2025). Each day that Kalshi is allowed to continue operating in violation of Nevada law hurts the State, its gaming licensees, and its residents.

## C.   Procedural History

On March 4, 2025, the Nevada Gaming Control Board sent Kalshi a cease-and-desist letter, explaining that Kalshi is operating a sports pool without complying with Nevada's gaming laws. ECF No. 1-2, at 2. In response, Kalshi filed this lawsuit. Compl. ¶¶ 14–24. Kalshi asserts that the CEA prohibits State Defendants from enforcing Nevada's gaming laws against it with respect to any instrument it currently lists on its DCM or may ever list on its DCM in the future. *Id.* ¶ 70.

Kalshi moved for a preliminary injunction. *See* ECF No. 18. It asserted that its event contracts are swaps and argued that CEA preempts Nevada's gaming laws because only the CFTC can regulate swaps traded on a DCM. *Id.* at 12–21. It also argued that it would suffer irreparable injury if it had to comply with Nevada's laws because it would be costly to geolocate and geofence Nevada users to prevent them from trading on its platform. *Id.* at 22–23. Kalshi also asserted that the balance

1    of equities and public interest favored a preliminary injunction. *Id.* at 23–24.

2          On April 9, 2025, the Court granted Kalshi's motion. ECF No. 45. The Court did not address

3    whether Kalshi's event contracts are swaps; the Court instead determined that (assuming the con-

4    tracts are swaps) the CEA likely preempts Nevada's gaming laws. *Id.* at 13–14. The Court also

5    determined that Kalshi showed a likelihood of irreparable harm based on the threat of prosecution

6    and costs of geofencing. *Id.* at 14–15. And the Court determined that the balance of equities and

7    public interest favored an injunction, in large part based on its merits holding. *Id.* at 15–16.

8          In June 2025, Crypto.com—one of Kalshi's competitors—sued the Board, its members, and

9    the Attorney General. *See* Compl., *N. Am. Derivatives Exch.*, *supra* (June 3, 2025) (ECF No. 1).

10   Crypto.com alleged that it, like Kalshi, offers sports event contracts on a DCM that allow users to

11   wager on the outcomes of sports events, and that the CEA preempts all state regulation of those

12   contracts. *Id.* ¶¶ 64–66. Like Kalshi, Crypto.com sought a preliminary injunction to enjoin state

13   enforcement. *See* Mot., *N. Am. Derivatives Exch.*, *supra* (June 5, 2025) (ECF No. 15). Crypto.com

14   also filed a motion for judgment on the pleadings and a motion to strike certain denials and affirm-

15   ative defenses. *See* Mot., *N. Am. Derivatives Exch.*, *supra* (Aug. 4, 2025) (ECF Nos. 42–43).

16         On October 14, 2025, the Court denied Crypto.com's motions for a preliminary injunction

17   and for judgment on the pleadings and granted the motion to strike in part. The Court held that

18   Crypto.com had not shown a likelihood of success on the merits because its sports event contracts

19   are not "swaps" under the CEA. Order at 9–21. The Court explained that the outcome of a live

20   event (*e.g.*, who wins or loses a boxing match) is not an "occurrence, nonoccurrence, or the extent

21   of the occurrence of an event or contingency associated with a potential financial, economic, or

22   commercial consequence" and thus cannot be the subject of a swap under the CEA. *Id.* at 11–16

23   (quoting 7 U.S.C. § 1a(47)(A)(ii)). The Court also explained that Crypto.com's definition of

24   "swap" cannot be correct, because it would make other parts of the CEA superfluous and "would

25   sweep nearly all sports wagering into the CFTC's exclusive jurisdiction even though the states

26   historically have regulated gambling through their police power." *Id*. at 16–17.

27                                    **LEGAL STANDARD**

28         Under Rule 54(b), a district court may modify any interlocutory order at any time before

final judgment. *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005). In particular, a court that has issued a preliminary injunction may modify or dissolve that injunction in light of intervening developments in the facts or the law. *See Sys. Fed'n No. 91, Ry. Emps. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961). The moving party must show "a significant change in facts or law" that "warrants revision or dissolution of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000). Once the movant has established a significant change in facts or law, the court evaluates the "same criteria that govern the issuance of a preliminary injunction" to determine if the preliminary injunction continues to be warranted. *Karnoski v. Trump*, 926 F.3d 1180, 1198 & n.14 (9th Cir. 2019); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

## I.    There Have Been Significant Changes in the Law and Facts

There have been significant developments in the time since the Court issued the preliminary injunction. On the law, this Court now has determined that the event contracts offered by Kalshi's competitor Crypto.com are not swaps, and the federal district court for the District of Maryland has determined that even if some sports wagers are swaps, the CEA likely does not preempt all state gaming regulation with respect to them. On the facts, Kalshi's offerings have expanded well beyond the types of win/loss contracts it previously told the Court it offered to include the full panoply of sports wagers. The discovery produced to date shows that Kalshi's sports event contracts are not as limited as Kalshi originally claimed. Those products are indistinguishable from traditional sports wagers, and they (like Crypto.com's event contracts) are based on the outcomes of sports events, not the events themselves.

### A.    The Law Has Changed Significantly

When the Court issued its preliminary injunction, the Court presumed without addressing that Kalshi's event contracts are swaps under the CEA. *See* ECF No. 45, at 11. But as the Court explained in *Crypto.com*, whether event contracts are "swaps" is a threshold question before the Court can reach preemption. Order at 10–11. Kalshi's theory of preemption hinges on Section 2(a) of the CEA, which states that the CFTC has "exclusive jurisdiction" over "transactions . . . involving swaps" on a CFTC-registered DCM. 7 U.S.C. § 2(a). Under the plain language of that provision,

1  the CFTC has jurisdiction over Kalshi's event contracts only if they are "swaps."

2  The CEA defines "swap" to include a contract for which payment depends on the "occur-
3  rence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a
4  potential economic, financial, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The Court
5  concluded in *Crypto.com* that event contracts on the outcomes of sports events are not swaps under
6  this definition. Order at 14–16. The Court explained that the "ordinary meaning of event is a hap-
7  pening of some significance that took place or will take place" (*e.g.*, a particular sports event like
8  "the Kentucky Derby"), but does not include the outcome of the event (*i.e.*, "who wins it"). *Id.* at
9  14–15. The Court rejected Crypto.com's contrary interpretation because it lacked a "limiting prin-
10  ciple" and would mean that all sports wagers are swaps, which in turn "would mean that all sports
11  wagering must be done on a DCM, and not at casinos." *Id.* at 16–18 (citing 7 U.S.C. § 2(e)). The
12  Court explained that nothing in the CEA's "language and legislative history" shows that Congress
13  intended "such a sea change in the regulatory landscape." *Id.* at 18–19. The Court accordingly
14  concluded that Crypto.com had not shown a likelihood of success on the threshold question whether
15  its event contracts are swaps and therefore did not further address whether the CEA preempts state
16  gaming regulation of its event contracts. *Id.* at 21.

17  Also, since this Court's preliminary-injunction decision, the district court for the District of
18  Maryland, addressing materially identical claims, has held that Kalshi does not have a likelihood
19  of success on the merits of its preemption arguments. *KalshiEX LLC v. Martin*, 2025 WL 2194908,
20  at *7 (D. Md. Aug. 1, 2025). That court did not address whether Kalshi's event contracts are swaps,
21  although it cast significant doubt on Kalshi's position. *See id.* at *7 n.4. Instead, the court held that
22  although the CEA likely has some preemptive effect, there is no indication in the text, structure,
23  history, or purposes of the CEA that Congress intended to preempt all state gaming law. *Id.* at *7–
24  11. That decision provides another reason for this Court to revisit its prior ruling.

25  **B.   The Facts Have Changed Significantly**

26  Additional factual developments also warrant revisiting the preliminary injunction. Previ-
27  ously, all the Court and the parties had was the complaint, which did not list the contracts Kalshi
28  offered or intended to offer or provide any details about them. *See* Compl. ¶¶ 44, 53.

1    At the preliminary-injunction hearing, Kalshi argued that it is different from traditional
2 sportsbooks in two ways. First, it argued that it offered contracts only on the winner or loser of a
3 sports event, whereas sportsbooks offer "prop" bets (*e.g.*, on the score difference) as well as "par-
4 lays" (bets involving two or more outcomes). *See* ECF No. 46, at 6. Second, Kalshi argued that it
5 was not the counterparty to its event contracts and did not set the price for the contracts, whereas
6 sportsbooks are the counterparties to their wagers and set the lines or odds. *Id.* at 23–24.

7    Since the preliminary-injunction hearing, Kalshi has dramatically expanded its offerings.
8 Its sports offerings now are indistinguishable from those of traditional sportsbooks—it now offers
9 both props[1] and parlays.[2] Its non-sports offerings also are extensive; it offers contracts on topics as
10 diverse as who will win an Oscar[3] and whether a particular person will say a particular word on an
11 upcoming episode of a television show.[4] The breadth of its offerings has been confirmed by the
12 discovery to date. Kalshi has produced the certifications it submitted to the CFTC for the event
13 contracts it self-certified between January 1 and September 4, 2025. *See, e.g.*, ECF No. 138-11.
14 Those certifications describe each contract and provide Kalshi's asserted justification for why it
15 supposedly has commercial value beyond recreational gaming.[5]

16    Other factual developments call into question Kalshi's argument that it operates differently
17 from traditional sportsbooks. In particular, the Commonwealth of Massachusetts has alleged that a
18 Kalshi affiliate *is* the counterparty to many event contracts on its DCM. *See* Compl. ¶ 60, *Mass. v.*
19 *KalshiEX LLC*, No. 258CV0525 (Suffolk Cnty., Mass. Sup. Ct. Sept. 12, 2025). To investigate that
20 allegation, Intervenor-Defendant Nevada Resort Association has issued a third-party subpoena to
21 that affiliate in this case. *See* Ex. B.

22

23 ───────────────
[1]    *E.g.*, Kalshi, *Pittsburgh at Cincinnati*, perma.cc/KAD9-KVE7 (last visited Oct. 16, 2025).
24 [2]    *See* Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays for Monday Night Football Games*, Event Horizon (Sept. 30, 2025), perma.cc/8TA8-QCHN; ECF No. 138-12.
25 [3]    *E.g.*, Kalshi, *Oscar for Best Actor*, perma.cc/BW6D-ZGW8 (last visited Oct. 16, 2025).
26 [4]    *E.g.*, Kalshi, *What Will Jeff Probst Say During Survivor Episode 4?*, perma.cc/TD7C-Y4WY (last visited Oct. 17, 2025).
27 [5]    Concurrently with this motion, State Defendants are filing a declaration with a chart listing all of Kalshi's non-confidential certifications produced in discovery, as well as some certifications that
28 Kalshi designated as confidential. In accordance with the governing protective order, State Defendants will file the material Kalshi designated as confidential under seal. *See* ECF No. 131, ¶ 24.

1

**II.    The Changes in Law and Fact Warrant Dissolving the Preliminary Injunction**

2   If a defendant seeking to modify or dissolve a preliminary injunction shows that there have
3   been changes in either the law or the facts, the court then evaluates the traditional injunction factors
4   to determine whether it would be "inequitable" to maintain the injunction. *Horne v. Flores*, 557
5   U.S. 433, 457 (2009); *see Karnoski*, 926 F.3d at 1198. Those factors are (1) whether the plaintiff
6   "is likely to succeed on the merits"; (2) whether the plaintiff "is likely to suffer irreparable harm in
7   the absence of preliminary relief"; (3) whether the "balance of equities tips in [the plaintiff's] fa-
8   vor"; and (4) whether "an injunction is in the public interest." *Winter*, 555 U.S. at 20. Where (as
9   here) the party sought to be enjoined is a government entity, the balance of equities and public
10  interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The
11  defendant need only show that one of the injunction factors no longer is met. *See Lo v. Cnty. of*
12  *Siskiyou*, 2022 WL 1505909, at *7–8 (E.D. Cal. May 12, 2022).

13  Here, it would be inequitable to continue enjoining State Defendants from enforcing Ne-
14  vada's gaming laws against Kalshi—particularly because the Court has determined that State De-
15  fendants should not be enjoined from enforcing Nevada's gaming laws against one of Kalshi's main
16  competitors. None of the traditional injunction factors is satisfied: Kalshi is not likely to succeed
17  on the merits; Kalshi is unable to show irreparable harm; and the balance of equities and public
18  interest do not warrant continuing the preliminary injunction.

19

**A.    Kalshi Is Not Likely to Succeed on the Merits**

20  To succeed on its preemption argument, Kalshi must show both (1) that its event contracts
21  are "swaps" within the meaning of the CEA, and (2) that the CEA preempts state gaming law with
22  respect to swaps traded on Kalshi's DCM. Kalshi is not likely to succeed on either issue.

23  "In all pre-emption cases," courts start by presuming that Congress did not preempt state
24  law, "particularly" in cases involving "a field which the States have traditionally occupied." *Med-*
25  *tronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted). As this Court
26  recognized in *Crypto.com*, gaming is such a field; the regulation of gaming "lie[s] at the heart of
27  the state's police power." Order at 9 (quoting *Artichoke Joe's Cal. Grand Casino v. Norton*, 353
28  F.3d 712, 740 (9th Cir. 2003)); *accord Flynt v. Bonta*, 131 F.4th 918, 930 (9th Cir. 2025). The

1    Supreme Court has agreed that regulating gaming "is concededly within the police powers of a

2    state," *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905), and that federal law "defer[s] to, and even

3    promote[s], differing gambling policies in different States," *Greater New Orleans Broad. Ass'n,*

4    *Inc. v. United States*, 527 U.S. 173, 187 (1999); *see Murphy v. NCAA*, 584 U.S. 453, 458–61 (2018).

5    Thus, if the CEA "is susceptible of more than one plausible reading," this Court should "'accept

6    the reading that disfavors pre-emption.'" *Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008) (quot-

7    ing *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

8        According to Kalshi, Congress intended to preclude all state regulation of its event contracts

9    because they are swaps. Kalshi's reading of the CEA is breathtakingly broad. In its view, every

10    sports wager is a "swap" that can be traded only on a CFTC-registered market, subject solely to the

11    oversight of the CFTC. That means that every casino and racetrack across the nation must register

12    as a DCM, and no State may regulate them. *See* Order at 17–18. That position, if accepted, would

13    represent an extraordinary intrusion on the States' police powers and would work a complete over-

14    haul of decades of federal law on sports betting. It would mean that when Congress added the word

15    "swaps" to the CEA, it intended to legalize sports betting nationwide, and to make the CFTC the

16    sole regulator of sports betting, to the exclusion of the States and the Indian Tribes. The CEA's

17    text, history, and purposes do not support that result.

18                **1.    Kalshi's event contracts are not swaps under the CEA**

19        For the CEA to apply, Kalshi's event contracts must be "swaps" within the meaning of the

20    statute. As the Court's decision in *Crypto.com* makes clear, Kalshi's contracts are not swaps.

21        A swap is an agreement used by institutions to exchange financial obligations such as in-

22    terest payments, as a means of hedging volatility and managing risk. *See* p. 5, *supra*. Because many

23    different types of swaps are traded in the financial-services industry, the CEA provides a detailed,

24    six-part definition of "swap." *See* 7 U.S.C. § 1a(47)(A). Kalshi relies on the second part, which

25    covers any contract that provides for a payment "that is dependent on the occurrence, nonoccur-

26    rence, or the extent of the occurrence of an event or contingency associated with a potential finan-

27    cial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii); *see* ECF No. 40, at 5.[6]

28    ───────────────

[6]    Kalshi's view on this provision has shifted over time. At the hearing on the preliminary

1    Kalshi's event contracts are not swaps under that definition. As the Court explained, the

2    outcome of a live event such as a sports contest is not itself "an event or contingency associated

3    with a potential financial, economic, or commercial consequence." Order at 11–12 (quoting 7

4    U.S.C. § 1a(47)(A)(ii)). The Court reasoned that the ordinary meaning of the word "event" is dis-

5    tinct from the outcome of that event. *Id.* at 12–15. The Court explained that it was necessary to

6    limit the definition of swap in this way to avoid a reading under which "everything can be defined

7    as an event." *Id.* at 16. That broad reading, the Court explained, "would render superfluous other

8    portions of the CEA's definition of a swap." *Id.* For example, the broad reading would cover "credit

9    default swaps," even though those swaps are separately listed in Section 1a(47)(iii). *Id*. at 16–17.

10    Kalshi's website and certifications demonstrate that its event contracts are based on the

11    outcomes of sports and other events. *E.g*., ECF No. 138-12. Indeed, Kalshi actually calls them

12    "outcome" contracts. Compl. ¶ 45. Further, its props and parlays are not even based on the primary

13    outcomes of sports events, but on secondary outcomes such as the number of points scored (which

14    Kalshi again calls "outcomes"). ECF No. 138-12, at 8. No ordinary English speaker would describe

15    the points scored during a football game as an "event." *See* Order at 15.

16    The conclusion that sports event contracts are not swaps is reinforced by several other as-

17    pects of the definition of "swap." First, the event must be one that is "associated with" a potential

18    financial, economic, or commercial consequence. 7 U.S.C. § 1a(47)(A)(ii). "Associate" means to

19    "connect or join together" or to "connect in the mind." *Webster's New Collegiate Dictionary* 68

20    (1995). Events that are "associated with" potential financial, economic, or commercial conse-

21    quences are those that inherently are financial, economic, or commercial in nature—events that can

22    have direct economic consequences on businesses against which they would want to hedge. Events

23    that merely have some potential downstream consequence are not sufficient. The outcome of a

24    sports event generally is not inherently financial, economic, or commercial in nature and does not

25    have any direct economic consequence—except perhaps for the participants themselves, who

26    injunction, Kalshi conceded that an event contract on the outcome of a coin toss would not be a

27    swap, because that outcome generally would lack any sort of commercial consequence. ECF No.
46, at 6–7. But Kalshi also has taken a broader view of this provision; at the hearing on its motion

28    to stay discovery, Kalshi's counsel said he could not conceive of an occurrence that would not have
some potential commercial consequence. ECF No. 115, at 30–31.

1   cannot trade on that event contract. *See Martin*, 2025 WL 2194908, at *7 n.4; 7 U.S.C. § 9(a).

2   Notably, Kalshi has admitted that sports event contracts "are unlikely to serve any commercial or

3   hedging interest." Appellee Br. at 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15,

4   2024) (internal quotation marks omitted).

5       Second, the broader statutory context supports the Court's view of "swaps." Section

6   1a(47)(A)(ii) is one part of a six-part definition of "swap." *See* 7 U.S.C. § 1a(47)(A). When a def-

7   inition contains multiple parts, a court should look to the other parts to inform the meaning of the

8   part at issue. *Yates v. United States*, 574 U.S. 528, 543–44 (2015) (explaining the *noscitur a sociis*

9   canon of construction). If the other parts all share a common thread, then the court should interpret

10  the part at issue to also contain that thread. *See, e.g.*, *Beecham v. United States*, 511 U.S. 368, 371

11  (1994). Here, all other parts of the definition describe financial instruments based on inherently

12  financial, economic, or commercial events or measures that commonly are traded as swaps.[7] Sec-

13  tion 1a(47)(A)(ii) should be interpreted in the same way.

14      Third, the consequences of defining a contract as a "swap" counsel in favor of a narrower

15  definition. If a contract is a swap, then the CEA requires that it be traded only on a DCM, with

16  limited exceptions not at issue here. 7 U.S.C. § 2(e). Under Kalshi's view, "nearly every sports bet"

17  is a "swap," which means "that all sports wagering must be done on a DCM, and not at casinos."

18  Order at 17 & n.12. That outcome would represent a "sea change" in the regulatory landscape,

19  which counsels in favor of defining "swap" more narrowly. *Id.* at 18.

20      Fourth, the CFTC itself has rejected a broad reading of "swap" that would encompass gam-

21  ing. In the special rule, Congress authorized the CFTC to disallow event contracts that involve

22  "gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i)(V), and the CFTC promulgated a regulation which preemp-

23  tively prohibits any event contract that "involves, relates to, or references . . . gaming." 17 C.F.R.

---

7   *See* 7 U.S.C. § 1a(47)(A)(i) and (iii) (specific financial instruments: any contract "that is a put, call, cap, floor, collar or similar option" in any "financial or economic interests or property of any kind" or "that provides . . . for the exchange . . . of 1 or more payments based on the value or level of" any "financial or economic interests or property of any kind," including 22 named types); *id.* § 1a(47)(A)(iv) (any contract "that is, or in the future becomes, commonly known to the trade as a swap"); *id.* § 1a(47)(A)(v) (certain "security-based swap agreement[s]" in which "a material term is based on the price, yield, value, or volatility of any security"); *id.* § 1a(47)(A)(vi) (any contract "that is any combination or permutation" of contracts in the five previous parts).

1   § 40.11(a); *see* Order at 19. Moreover, in its regulation further defining "swap," the CFTC made

2   clear that Section 1a(47)(A)(ii) excludes "consumer and commercial arrangements that historically

3   have not been considered swaps" because a more expansive reading would sweep in "traditional

4   insurance products," "mortgages," "automobile loans," and "employment contracts." 77 Fed. Reg.

5   at 48246–48. The CFTC's reasoning applies equally to sports wagers, which traditionally have been

6   regulated by the States. *Artichoke Joe's*, 353 F.3d at 737. For all of these reasons, Kalshi is unlikely

7   to succeed in showing that its event contracts are swaps.

8         **2.**      **The CEA does not preempt Nevada's gaming laws**

9        Even if its event contracts qualified as swaps, Kalshi is wrong to say that the CEA preempts

10   all state gaming regulation. The Court did not address this argument in *Crypto.com* given its holding

11   on swaps, but the *Martin* decision provides an opportunity for the Court to revisit this issue here.

12             **a.**      **Express preemption does not apply**

13        Kalshi has not argued that the CEA expressly exempts Nevada's gaming laws, and the Court

14   did not so find in its prior preliminary-injunction order. *See* ECF No. 45, at 12 ("Even if Section

15   2's . . . language does not amount to express preemption . . . .").

16        The CEA contains express preemption provisions, but they do not generally preempt state

17   gaming law. One provision states that the CEA "shall supersede and preempt the application of any

18   State or local law that prohibits or regulates gaming" in limited circumstances not applicable here.

19   7 U.S.C. § 16(e)(2). Another provision states that a swap "may not be regulated as an insurance

20   contract under the law of any State." *Id.* § 16(h)(2). This shows that Congress knows how to

21   preempt state law when it wants to do so. That is, if Congress had intended to say that swaps cannot

22   be regulated under a State's gaming laws, it would have said so expressly. Thus, the CEA "does

23   not expressly preempt state law." *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th

24   Cir. 2019).

25             **b.**      **Field preemption does not apply**

26        Kalshi argues that the CEA field preempts Nevada's gaming laws. It relies almost entirely

27   on the exclusive jurisdiction provision, taking the most expansive view of that provision possible.

28   ECF No. 18, at 13. But courts do not read statutory provisions in isolation, *Sackett v. EPA*, 598 U.S.

651, 674 (2023), and they do not read preemptive provisions expansively, *Altria*, 555 U.S. at 77, especially in an area of traditional state regulation like gaming, *Medtronic*, 518 U.S. at 485. When read in context, it is clear that the exclusive jurisdiction provision has a more modest scope.

Field preemption occurs when "federal law so thoroughly occupies a legislative field" that there is "no room for the States to supplement it." *Nat'l Fed. of the Blind v. United Airlines Inc.*, 813 F.3d 718, 733 (9th Cir. 2016) (internal quotation marks omitted). As the district court in Maryland explained, "Congress did not clearly and manifestly intend to preempt state laws with respect to sports wagering" in the CEA. *Martin*, 2025 WL 2194908, at *8. The Court explained that although the CEA likely has some preemptive effect, nothing in the CEA's text, history, or purpose shows that Congress intended to preempt all state gaming law and make the CFTC the Nation's exclusive gaming regulator. *Id.* at *7–11.

**Statutory text**. The exclusive jurisdiction provision does not show a clear intent to preempt all state gaming law. It states that the CFTC "shall have exclusive jurisdiction . . . with respect to . . . transactions involving swaps . . . traded or executed on a [DCM] . . . or any other . . . market." 7 U.S.C. § 2(a)(1)(A). That provision does not even mention state law, let alone preempt all state gaming law. The point of the provision is to specify which federal agency oversees futures markets. *Merrill Lynch*, 456 U.S. at 387. Before 1974, that responsibility was allocated between "the Secretary of Agriculture, the Secretary of Commerce, and the Attorney General." *Id.* at 363. Congress enacted "the exclusive-jurisdiction provision . . . only to consolidate federal regulation of commodity futures trading in the Commission," *id.* at 386–87—not to preempt state gaming law.

Notably, the CEA contains express preemption provisions that would be superfluous if the exclusive-jurisdiction provision already preempted state gaming law. The first provision expressly preempts "State . . . law that prohibits or regulates gaming" as to a narrow category of transactions that are not alleged here. 7 U.S.C. § 16(e)(2)(B). This shows that Congress was aware that the CEA could overlap with state gaming law, and that Congress carefully chose the extent to which it wanted to preempt state gaming law. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 (1995) (express preemption provision supports an "inference" that Congress did not impliedly preempt state laws outside of that provision). The second provision, Section 16(h)(2), states that a swap

1  "may not be regulated as an insurance contract under the law of any State," thus preempting state

2  insurance law that might apply to swaps. 7 U.S.C. § 16(h)(2). This provision shows that Congress

3  was aware that some contracts regulated under state law could technically qualify as swaps, and

4  that Congress chose exactly how far the CEA would preempt that state law. *Martin*, 2025 WL

5  2194908, at *9. Kalshi's position would read into the CEA an equivalent provision for gaming—

6  which the CEA conspicuously does not contain.

7      The CEA also contains a savings clause that expressly preserves state authority. Section

8  2(a) states that the exclusive jurisdiction provision does not "supersede or limit the jurisdiction at

9  any time conferred on . . . regulatory authorities under the laws of . . . any State." 7 U.S.C.

10  § 2(a)(1)(A)(I). Under Kalshi's expansive view of the CEA's exclusive authority, there would be

11  little left of this clause, because if a transaction is a swap then no other entity may act at all.

12      Notably, the CEA does not contain a comprehensive regulatory scheme for gaming. Indeed,

13  it lacks the most basic features of such a scheme. Unlike Nevada's gaming laws, the CEA does not

14  contain any provisions relating to age restrictions, or any provisions addressing problem gaming or

15  organized crime. *See* 7 U.S.C. §§ 6a(a), 13. It simply is not plausible to think that Congress intended

16  for the CFTC to act as a gaming regulator—much less as the Nation's exclusive gaming regulator—

17  without giving the CFTC the basic tools of gaming regulation or any direction on how to regulate

18  gaming. That view of the CEA risks running afoul of the nondelegation doctrine, because the CEA

19  does not contain any intelligible principle to guide how the CFTC is supposed to regulate gaming.

20  *See FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2497 (2025).

21      The CEA thus does not come close to showing the type of unmistakably clear language

22  needed to preempt all state laws in an area of traditional state regulation. *See Altria*, 555 U.S. at 77.

23      ***Purpose***. Congress's purpose in enacting the CEA was to consolidate federal regulation of

24  futures and swap markets into the CFTC. *Merrill Lynch*, 456 U.S. at 387. There is no indication

25  that Congress had the additional purpose of preempting all state gaming law and designating the

26  CFTC as the sole regulator of sports gaming. "Had Congress intended such a sea change in the

27  regulatory landscape, it surely would have said so," because Congress does not "'hide elephants in

28  mousholes.'" Order at 18 (quoting *Whitman v. Am. Trucking Assn's*, 531 U.S. 457, 468 (2001)).

1    Federalizing sports betting would have massively upset the federal-state balance. Gaming

2    in general (and sports betting in particular) is a longstanding area of state regulation, and federal

3    law historically has respected state authority in this field. *Murphy*, 584 U.S. at 458–61. Yet the

4    "necessary implication" of Kalshi's position is that all sports wagers are swaps that can be solely

5    and exclusively regulated by the CFTC. Order at 18. Congress does not make major changes to the

6    "usual constitutional balance of federal and state powers" without clearly saying so. *Bond v. United*

7    *States*, 582 U.S. 844, 858–59 (2014) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

8    Similarly, courts "expect Congress to speak clearly if it wishes to assign to an agency deci-

9    sions of vast economic and political significance." *W. Va. v. EPA*, 597 U.S. 697, 716 (2022) (inter-

10   nal quotation marks omitted). Under Kalshi's view, by adding "swaps" to the CEA, Congress gave

11   the CFTC the sole authority to decide whether and to what extent to allow sports betting nationwide.

12   That is a matter of "vast economic and political significance": Sports betting is a $14-billion-a-year

13   industry that is both "controversial" and "immensely popular." *Murphy*, 584 U.S. at 460, 484; *see*

14   Am. Gaming Ass'n, *State of the States 2025*, at 10 (May 13, 2025), perma.cc/J27S-WLSB. There

15   thus would need to be "clear congressional authorization" for the CFTC to regulate in that manner,

16   *W. Va.*, 597 U.S. at 732 (internal quotation marks omitted), which is lacking here.

17   ***Other statutes***. Kalshi's view of the CEA would create irreconcilable conflicts with other

18   federal statutes. To start, at the time Congress enacted the Dodd-Frank Act, sports betting largely

19   was illegal at the federal level. Under the Professional and Amateur Sports Protection Act, sports

20   betting was illegal except in one State—Nevada. *See Murphy*, 584 U.S. at 461. It is implausible to

21   think that Congress *sub silentio* decided that it would allow sports betting nationwide and then gave

22   the CFTC the exclusive authority to regulate sports betting. Order at 18.

23   Further, Kalshi's view of the CEA would mean that Congress impliedly repealed several

24   other federal laws. There is a strong presumption against repeal by implication. *See, e.g.*, *Epic Sys.*

25   *Corp. v. Lewis*, 584 U.S. 497, 510 (2018). Kalshi's view would impliedly repeal at least parts of

26   the Indian Gaming Regulatory Act (IGRA) and the Wire Act. *Martin*, 2025 WL 2194908, at *10.

27   The IGRA gives Indian Tribes the "exclusive right" to determine whether and to what extent

28   to allow gaming that is permitted under federal and state law on tribal lands, 25 U.S.C. § 2701(5),

and it contains a comprehensive scheme for the regulation of gaming on tribal lands, *see id.* § 2710. Kalshi's view would completely override the Tribes' authority and disrupt that scheme, because under Kalshi's view, Congress gave the CFTC the exclusive authority to determine how much sports betting to allow nationwide, including on tribal land. *Martin*, 2025 WL 2194908, at *10.

Similarly, under Kalshi's view, the Dodd-Frank Act impliedly repealed the Wire Act's prohibition on using interstate wire communication facilities for placing bets or wagers on "any sporting event" except where such wagers are legal in both the sending and receiving State. 18 U.S.C. § 1084(a). Under that view, the CFTC would have the authority to allow exactly those communications nationwide. *Martin*, 2025 WL 2194908, at *10. This Court should not assume that Congress intended to override the IGRA and Wire Act without a clear and unambiguous indication of that intent.

### c.    *Conflict preemption does not apply*

Neither form of conflict preemption—impossibility preemption or obstacle preemption—applies here.

Impossibility preemption applies when it would be "impossible to comply with both federal and state law." *Am. Apparel & Footwear Ass'n v. Baden*, 107 F.4th 934, 943 (9th Cir. 2024). Kalshi does not identify a single provision of Nevada's gaming laws that would require it to violate federal law. It points only to the CFTC's "core principles," which are principles that DCMs must follow, and it argues only that withdrawing from the Nevada market would require it to violate those principles. ECF No. 18, at 20–21. But Nevada law *permits* sports betting if done in accordance with its gaming regulations. *See* p. 3, *supra*. Kalshi does not explain how conducting sports betting in accordance with Nevada law would require it to violate a core principle.

Obstacle preemption applies when the application of state law would "stand[] as an obstacle" to Congress's purposes in enacting a federal law. *Am. Apparel*, 107 F.4th at 943. As the Court explained, Congress has made clear that it did not want gaming on CFTC-registered DCMs. Order at 19–21. State gaming law thus cannot conflict with the CEA's purposes.

The only obstacle preemption argument that Kalshi makes is that Nevada's regulation of its sports event contracts would frustrate the CEA's supposed goal of "uniform" swap-market

1  regulation. ECF No. 18, at 18–19. But uniformity is a field preemption argument, not a conflict
2  preemption argument. *Martin*, 2025 WL 2194908, at \*12; *see, e.g.*, *Montalvo v. Spirit Airlines*, 508
3  F.3d 464, 471 (9th Cir. 2007). Conflict preemption presumes that States can regulate in the field,
4  and that they may do so differently, *see Wyeth v. Levine*, 555 U.S. 555, 575 (2009); the question is
5  whether a particular state regulation conflicts with federal law. Here, Congress did not intend to
6  occupy the field of gaming regulation, *see* pp. 16–20, *supra*, so individual States may regulate, and
7  they may do so non-uniformly. Conflict preemption thus does not apply here.

8       The bottom line is that Kalshi does not have a likelihood of success on the merits and so the
9  Court should dissolve the preliminary injunction. *Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935,
10  937 (9th Cir. 1987).

11              **B.    Kalshi Would Not Be Irreparably Harmed Without an Injunction**

12       Kalshi also cannot show irreparable harm. The Court's previous conclusion that Kalshi had
13  shown irreparable harm came only after the Court had concluded that Kalshi had shown a likelihood
14  of success on the merits. *See* ECF No. 45, at 14–15 ("A credible threat of imminent prosecution for
15  a state violation *that conflicts with federal law* can establish a likelihood of irreparable harm." (em-
16  phasis added)). But "the required degree of irreparable harm increases as the probability of success
17  decreases." *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 516–17 (9th Cir. 1993) (in-
18  ternal quotation marks omitted). Now that the Court has determined that sports event contracts
19  likely are not swaps, Kalshi faces a much higher burden to show irreparable harm.

20       Kalshi does not meet this burden. Kalshi identified the threat of enforcement as a potential
21  harm. ECF No. 18, at 21. But being required to follow the law is not a harm. *See Goldman v.*
22  *Newage Lake Las Vegas, LLC*, 2019 WL 13254890, at \*1 (D. Nev. Oct. 23, 2019). Even if Kalshi
23  ultimately prevails on the merits, "having to submit oneself to an enforcement proceeding typically
24  does not constitute irreparable harm," *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 203 (D.D.C.
25  2017), because the regulated entity could make all of its merits arguments in those proceedings,
26  *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974). Thus, any harm from the enforcement of Nevada
27  law is not irreparable.

28       Kalshi also identified the cost of having to exclude Nevada residents. ECF No. 18, at 22.

But it has not shown why that cost would be insurmountable. Indeed, Kalshi's partner Robinhood has explained that it was able to block access to Kalshi's sports event contracts in Nevada. *See* Mackenzie Decl. ¶¶ 11–12, *Robinhood Derivatives LLC v. Dreitzer*, No. 25-cv-01541 (D. Nev. Aug. 19, 2025) (ECF No. 8). Kalshi itself already prevents users from certain countries from accessing its platform, and its privacy policy expressly states that it collects location information about its users.[8]

Anyway, any purported harm here is self-inflicted: Kalshi chose to self-certify sports event contracts and offer them to Nevada residents, without complying with Nevada law and contrary to the CFTC's on-point regulation. A party that "has dirtied [its] hands in acquiring the right presently asserted" cannot obtain injunctive relief. *EEOC v. Wedco, Inc.*, 65 F. Supp. 3d 993, 1010 (D. Nev. 2014). Kalshi therefore cannot establish irreparable injury.

### C.    The Balance of Hardships and Public Interest Weigh in Favor of Dissolving the Preliminary Injunction

The balance of hardships and the public interest weigh strongly in favor of dissolving the preliminary injunction. When the Court issued its preliminary injunction, it concluded that the balance of hardships and public interest favored Kalshi because State Defendants do not face harm from being enjoined from enforcing preempted laws, and that the public does not have an interest in the enforcement of preempted laws. *See* ECF No. 45, at 15–16. But, as the Court explained in *Crypto.com*, the analysis is different when the plaintiff does not have a likelihood of success on the merits. Order at 21. In that situation, the balance of hardships and the public interest strongly favor enforcement of state gaming law. *See id.*

As a general matter, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 656 (9th Cir. 2025) (internal quotation marks omitted); *see Trump v. CASA, Inc.*, 606 U.S. 831, 860–61 (2025); *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 394 (9th Cir. 2016). That injury is heightened here, because of the importance of Nevada's gaming laws to the well-being of Nevada residents and to the State. Those laws ensure that

---

[8]    *See* Kalshi, *Member Agreement* § VI (Oct. 12, 2025), perma.cc/PAF8-8WLD; Kalshi, *Privacy Policy* § 1(a) (Dec. 20, 2023), perma.cc/5J26-354R.

gaming serves legitimate economic and social purposes while preserving public confidence in its integrity. *See* NRS § 463.0129(1); *Sports Form, Inc. v. Leroy's Horse & Sports Place*, 108 Nev. 37, 41 (1992).

Continuing to enjoin State Defendants would disrupt Nevada's gaming industry. Nevada's gaming laws are designed to ensure that all licensees compete on fair and equal terms. *See, e.g.*, *Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1509 (9th Cir. 1993); NRS § 463.0129(1)(d). Licensees are comprehensively regulated—they must undergo suitability investigations, submit to ongoing audits, and remit license fees. *See generally* NRS chs. 463–465; Nev. Gaming Regs. 5.010–.240. The preliminary injunction prevents State Defendants from applying those regulations to Kalshi, which gives it a massive and unfair competitive advantage over all other licensed gaming operators in Nevada—as well as over Crypto.com, one of its key competitors. *See* Howard Stutz, *Prediction Markets Weren't at G2E. Here's Why They Dominated Gaming Industry Discussions*, Nev. Indep. (Oct. 13, 2025), perma.cc/5XX7-URX8 (describing the disruption to the industry). Kalshi currently is able to offer essentially the same products as licensed sportsbooks (and Crypto.com), just without complying with Nevada law.

Further, continuing to enjoin State Defendants from enforcing Nevada's gaming laws would harm Nevada residents. Nevada's gaming laws protect minors: Nevada law prohibits persons under 21 from engaging in sports betting, NRS § 463.350(1)(a), and it gives teeth to that prohibition by requiring licensees to "verif[y]" a patron's "date of birth" before the patron may place a wager, Nev. Gaming Regs. 5.225(2), (5)(a); *see id.* 22.061 (know-your-customer requirements). State regulators investigate licensees to ensure compliance with these provisions. *See* NRS § 463.310; *see also, e.g.*, Howard Stutz, *Caesars Fined for Under-21 Gambling*, L.V. Rev.-J. (July 26, 2012), bit.ly/4oebEFY. Kalshi, in contrast, allows anyone over the age of eighteen to create an account and trade on its platform. Kalshi Help Center, *Signing Up as an Individual*, perma.cc/2F8Y-REBP (last visited Oct. 15, 2025).

Nevada law also protects against the harms of problem gaming. For example, Nevada law requires licensees to let patrons to set deposit limits, which helps prevent impulsive or excessive wagering. *See* Nev. Gaming Regs. 5.225(18)(a). Licensees must also "conspicuously display" the

State's responsible gambling helpline and website, directing bettors to resources and treatment options. *See id.* at 5.225(18)(b); Nevada Council on Problem Gambling, *Home*, perma.cc/LXZ8-6E4H (last visited Oct. 15, 2025). To State Defendants' knowledge, Kalshi does not offer its users the ability to set deposit limits and does not make any disclosures relating to responsible gaming. Maintaining the injunction thus continues to deprive Nevada residents of these important protections—protections that the State determined are essential for the public welfare.

Finally, maintaining the preliminary injunction would damage the State's economy and impair one of the State's most important revenue streams. "[L]icensed gambling is indispensable to Nevada's economy," and licensing fees are vital to the public fisc. *Sacco v. State*, 105 Nev. 844, 847 (1989); *see* NRS § 463.370(1). Last year alone, Nevada collected $1.2 billion in gaming and live entertainment taxes—revenues that finance indispensable state functions, from schools to highways. *See* Am. Gaming Ass'n, *State of the States 2025*, at 85 (May 13, 2025), perma.cc/J27S-WLSB. Unlicensed gaming accordingly "represents a serious threat to the state's economic base," both because it is not subject to licensing fees and because it diverts revenue from gaming operators that do pay those fees. *Sacco*, 105 Nev. at 847; *see Kent v. Mindlin*, 52 F.3d 333, 1995 WL 236248, at *2–3 (9th Cir. 1995) (table) ("Unlicensed gambling is obviously deleterious to Nevada's economy, because it goes untaxed . . . [and] deleterious to Nevada's public welfare, because it tends to attract crime."). The injunction allows Kalshi to avoid its licensing obligations, directly shorting the public fisc by millions of dollars.

Every day that Kalshi keeps operating in violation of Nevada law, it harms the State, its residents, and the gaming industry. The Court should dissolve the preliminary injunction.

## CONCLUSION

The Court should dissolve the preliminary injunction.

1      DATED this 17th day of October, 2025.

2                                        By: /s/ *Jessica E. Whelan*

3                                        AARON D. FORD
                                            Attorney General
4
                                         Jessica E. Whelan (Bar No. 14781)
5                                           Chief Deputy Solicitor General—Litigation
                                         Sabrena K. Clinton (Bar No. 6499)
6                                           Senior Deputy Attorney General
                                         State of Nevada
7                                        Office of the Attorney General
                                         1 State of Nevada Way, Suite 100
8                                        Las Vegas, NV 89119
                                         (702) 486-3420 (phone)
9                                        (702) 486-3773 (fax)
                                         jwhelan@ag.nv.gov
10                                       sclinton@ag.nv.gov

11                                       Nicole A. Saharsky (*pro hac vice*)
                                         Minh Nguyen-Dang (*pro hac vice*)
12                                       Mayer Brown LLP
                                         1999 K Street, NW
13                                       Washington, D.C. 20006
                                         (202) 263-3000 (phone)
14                                       nsaharsky@mayerbrown.com
                                         mnguyen-dang@mayerbrown.com
15
                                         Rory K. Schneider (*pro hac vice*)
16                                       Mayer Brown LLP
                                         1221 Avenue of the Americas
17                                       New York, NY 10020
                                         (212) 506-2500 (phone)
18                                       rschneider@mayerbrown.com

19                                       *Attorneys for Mike Dreitzer, George Assad, Chan-*
                                         *deni K. Sendall, The Nevada Gaming Control*
20                                       *Board, Jennifer Togliatti, Rosa Solis-Rainey, Brian*
                                         *Krolicki, George Markantonis, Abbi Silver, The*
21                                       *Nevada Gaming Commission, and Aaron D. Ford*

22

23

24

25

26

27

28