Adam Hosmer-Henner (NSBN 12779)
A.G. Burnett (NSBN 5895)
Jane Susskind (NSBN 15099)
Katrina Weil (NSBN 16152)
Thaddeus C. Houston (NSBN 17215)
**McDONALD CARANO LLP**
100 West Liberty Street, 10th Floor
Reno, NV 89501
Telephone: (775) 788-200
ahosmerhenner@mcdonaldcarano.com
agburnett@mcdonaldcarano.com
jsusskind@mcdonaldcarano.com
kweil@mcdonaldcarano.com
thouston@mcdonaldcarano.com

*Attorneys for Intervenor Defendant
Nevada Resort Association*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| KALSHIEX, LLC,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in his official capacity as a Member of the Nevada Gaming Control Board; CHANDENI K. SENDALL, in her official capacity as a Member of the Nevada Gaming Control Board; NEVADA GAMING CONTROL BOARD; JENNIFER TOGLIATTI, in her official capacity as Chair of the Nevada Gaming Commission; ROSA SOLIS-RAINEY, in her official capacity as a Member of the Nevada Gaming Commission; BRIAN KROLICKI, in his official capacity as a Member of the Nevada Gaming Commission; GEORGE MARKANTONIS, in his official capacity as a Member of the Nevada Gaming Commission; NEVADA GAMING COMMISSION; AARON D. FORD, in his official capacity as Attorney General of Nevada,<br><br>　　　　　　　Defendants.<br><br>vs.<br><br>NEVADA RESORT ASSOCIATION,<br><br>　　　　　　　Intervenor-Defendant. | Case No.: 2:25-cv-00575-APG-BNW<br><br>**NEVADA RESORT ASSOCIATION'S JOINDER TO STATE DEFENDANTS' MOTION TO DISSOLVE INJUNCTION (ECF No. 142.)** |

Intervenor-Defendant Nevada Resort Association ("NRA") joins in full the *State Defendants' Motion To Dissolve Injunction* ("Motion to Dissolve") (ECF No. 142), filed October 17, 2025. NRA writes separately to address the balance of hardships and public interest factors based on the facts that have changed significantly since the Court issued the injunction in this case. *See* ECF No. 45 at 17 (enjoining State Defendants from enforcing Nevada law, civilly or criminally, against Plaintiff KalshiEX LLC ("Kalshi")). This joinder is supported by the declaration of Dan Reaser ("Reaser Decl."), an individual the NRA intends to proffer as an expert should this case proceed further,[1] attached as **Exhibit 1**, and the exhibits attached thereto. As this matter is scheduled for a hearing on November 14, 2025, the NRA is willing to waive any reply in connection with this joinder so that Kalshi, should it choose to submit a separate response to this joinder, can receive the standard briefing schedule without affecting the scheduled hearing date.

In its initial motion for preliminary injunction, ECF No. 18, Kalshi gave short shrift to the balance of hardships and public interest factors as it relied on a putative general interest created by the Supremacy Clause and the preemption analysis. Since then, this Court has determined that the event contracts offered by Kalshi likely are not "swaps" under the Commodity Exchange Act ("CEA") and are therefore regulated by the States and not by the Commodity Futures Trading Commission ("CFTC"). *See, e.g.*, *N. Am. Derivatives Exch.*, *v. Nevada*, Case No. 2:25-cv-978-APG-BNW, ECF No. 105 (D. Nev. Oct. 14, 2025). Another federal district court has held that Kalshi is unlikely to succeed on the merits of its argument that its sports-based event contracts are subject to

---

[1] The NRA has retained an expert on Nevada's gaming laws and regulations, along with their development over time, and intends to proffer this expert along with an expert report in the future. The NRA's retained expert, Dan Reaser, is a Director and Shareholder at Fennemore, Craig P.C. with significant experience in private practice, along with experience focused on gaming at the Nevada Attorney General's office before that. *See* Reaser Decl. While expert discovery is still in its early stages, and as such Mr. Reaser has not finished drafting his report, Mr. Reaser has already compiled information the Court may find useful in ruling on State Defendants' Motion to Dissolve regarding the public policy behind Nevada gaming laws and regulations, the patron protections embedded in them, and the feasibility of using geofencing technology to comply with them. *See id.* For example, Nevada gaming laws and regulations protect consumers by requiring a 'front loaded' licensing process for prospective gaming licensees, limiting participation in gaming to those twenty-one years of age and older, requiring compliance with the Bank Secrecy Act, mitigating problem gambling, protecting against improper betting practices, and requiring strict oversight of the technology used in conducting gaming activities. *See id.* ¶¶ 7-16. Without waiving any privilege or other protections, the NRA submits this initial information from Mr. Reaser as helpful to the Court at this procedural stage.

the CFTC's exclusive jurisdiction. *See KalshiEx LLC v. Martin*, No. 25-cv-1283, 2025 WL 2194908 (D. Md. Aug. 1, 2025).

The Court could end its analysis there and dissolve the preliminary injunction on the basis that Kalshi is not likely to succeed on the merits. The balance of hardships and public interest factors though, which were not addressed in detail previously, would also strongly support dissolving the preliminary injunction. For the following additional reasons, the NRA submits that it would contravene the public interest for the Court to allow Kalshi, and other similar companies, to continue to reap profits in Nevada from unlicensed gaming during the pendency of this litigation. Nevada has exercised regulatory authority over gaming for more than one hundred and fifty years, including over seventy-five years of regulated sports betting in Nevada. Especially at the preliminary stage prior to a final judgment, the Court should uphold that longstanding tradition rather than upend it.

First, the public's interest in stopping unregulated gaming is clear from the legislative history at both the federal and state level. The CFTC has *already* made a public interest determination on a blanket basis that DCMs should not list any "swap based upon an excluded commodity . . . that 'involves, relates to, or references . . . gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1); *see also* 17 C.F.R. § 40.11(a)(2) (authorizing the Commission to determine "by rule or regulation" that a swap "which involves, relates to, or references an activity that is similar to [gaming]" is contrary to the public interest). There cannot be a persuasive public interest in allowing Kalshi to continue offering its gaming contracts under the auspices of the CFTC when that agency itself is bound by statute and regulation to exclude gaming contracts as contrary to the public interest.

The State of Nevada is also clear in its preexisting determination that unregulated gaming is contrary to the public interest. In the 2025 Legislative Session, the Legislature heard Senate Bill 256, ultimately signed into law, which proposed increasing the penalties for illegal online gaming operations. Testimony presented on behalf of the bill's sponsor was that the "bad actors" engaged in illegal online gaming "undermine [Nevada's] legal gaming industry" and "also put consumers at risk." Hr'g Mar. 12, 2025 (Senate Committee on the Judiciary, testimony by J. Wong), *available at* https://fastdemocracy.com/bill-search/nv/83/bills/NVB00008810/. Allowing Kalshi to operate in

Nevada without a license would create the same negative consequences "that affects not only the credibility of [Nevada's] gaming regulations but also consumer protections and State revenues" that would be created by any other unlicensed gaming operator. Furthermore, Trey Delap, the Executive Director of the Nevada Council on Problem Gambling, testified in support of Senate Bill 256 because while "licensed, regulated gaming operators distribute problem gambling information to their patrons . . . There is no confidence at all that illegal, unlicensed regulated gaming operators are distributing problem gambling information to their patrons." *Id.* (testimony of T. Delap). This concern is exacerbated by the nature of Kalshi's advertising, which goes so far as to describe their event contracts as "kind of addicting." *See* Dustin Gouker, *Kalshi Says It's 'Kind Of Addicting' in Instagram Post*, EVENT HORIZON (Oct. 21, 2025); https://perma.cc/U5AH-GJ8P ("Near the end of the post, the narrator says Kalshi is "Simple, regulated, and kind of addicting[;]"' "Earlier this year, the prediction market routinely used "betting" terminology but has since moved away from that kind of marketing.") (hyperlink omitted).

Second, since the injunction was issued, Kalshi's operations have expanded rapidly both in terms of overall handle and revenue—and in terms of types of offerings. Kalshi posted a press release on its website on October 10, 2025, stating that it raised $300 million in a series D funding round valuing Kalshi at $5 billion. *See* Kalshi, ANNOUNCEMENTS, *Kalshi hits $5 billion valuation amid international expansion* (last visited October 29, 2025); https://perma.cc/KDV9-UYK2, attached as Exhibit ("Ex.") C to Reaser Decl. In that same press release, Kalshi also announced that it has now launched in 140 countries. *See id.* Kalshi then goes on to describe how quickly it has grown. "In the past year alone, trading volume has grown 200× and the user base has grown 20×." *Id.* And Kalshi also included in the press release a screenshot of a post by Tarek Mansour (Kalshi's CEO) stating that Kalshi has hit $50B of annualized volume and become the largest prediction market in the world. *See id.* Kalshi concludes by noting it will continue "pushing the limits of what can be traded." *Id.*

While Kalshi offers event contracts outside of sports, its advertising and offerings are increasingly focused on sports event contracts. "In September, with the N.F.L. season underway, more than $2.5 billion of sports contracts were traded on Kalshi[.]" Ben Blatt and Amy Fan (TheUpshot), *Is Sports Betting Illegal in Your State? Not if You Call It a 'Prediction Market.'* (N.Y. Times Oct. 5,

2025), Reaser Decl. Ex. D. This reflects a significant change in the pertinent facts. Kalshi only started to emphasize sports in its product design and advertising this year. *See id.* And in 2025, "sports-related contracts have accounted for 77 percent of the money wagered on Kalshi." *Id.* The growth is striking plotted on a graph:



*Id.* (citing data sourced from Kalshi).

In addition, on October 10, 2025, the New York Times ran an article reporting on the Kalshi press release described above. *See* Michael J. de la Merced (DealBook/Business and Policy), *Kalshi, a Prediction Market, Raises Funds and Expands Overseas* (N.Y. TIMES Oct. 10, 2025), Reaser Decl. Ex. E. The author noted, "Kalshi's recent growth has been powered by sports, especially after it began offering the kind of complex wagers known as parlays." *Id.* Kalshi's parlay offerings, essentially combination bets on multiple outcomes occurring such as both the Raiders and the Aces winning their respective games (or winning them by a particular number of points – i.e., "beating the spread"), not only bring Kalshi's sport events contracts entirely into the traditional sports betting context, but also further undermines any argument that these parlay bets are associated with a "potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

Third, the CFTC staff issued a letter on September 30, 2025, regarding sports-related event contracts. *See* Reaser Decl. Ex. F. The CFTC staff issued the letter so that market participants including Designated Contract Markets ("DCMs") like Kalshi would, "be prepared for all foreseeable conditions that may result from facilitating the trading and clearing of sports-related event contracts[.]" *Id.* at 1. The letter explains that the CFTC has never, "been requested to take or taken

any official action to approve the listing for trading of sports-related event contracts on any DCM pursuant to sections 5c(c)(4)-(5) of the CEA and Commission regulation 40.3." *Id.* at 2 n.4. "All sports-related event contracts that are currently listed for trading on DCMs have been listed pursuant to self-certifications filed by the relevant DCM pursuant to CEA section 5c(c)(1) and Commission regulation 40.2, 7 U.S.C. § 7a-2(c)(1).17 CFR 40.2, and the Commission has not, to date, made a determination regarding whether any such contracts involve an activity enumerated or prohibited under CEA section 5c(c)(5)(C)(i), 7 U.S.C. § 7a-2(c)(5)(C)(i), or Commission regulation 40.11(a), 17 CFR 40.11(a)." *Id.* The facts have accordingly also changed in that the CFTC has now signaled, publicly and recently, that it has not explicitly sanctioned the listing of sports events contracts on Kalshi and other DCMs. Said otherwise, this letter should render any argument to the effect that the CFTC has blessed self-certified event contracts through its silence less persuasive.

   Fourth, Kalshi has argued in this case that it is either technically impossible or financially infeasible to determine which of its customers are located in Nevada and to stop offering sports events contracts in Nevada. This contention is belied by recent guidance issued by the Nevada Gaming Control Board announcing that a prediction market company, which is in competition with Kalshi, agreed to withdraw from the Nevada market and agreed not to offer sports event contracts in the state until the lawsuit was resolved. *See* Howard Stutz, *As one prediction market leaves Nevada, others double down* (THE NEVADA INDEPENDENT Oct. 29, 2025 at 7:00 AM), https://perma.cc/9J7J-UWG9. And as Mr. Reaser explains in his declaration, Kalshi's position cannot be correct because gaming entities licensed in Nevada offer online or mobile gaming. *See id.* ¶ 19. To do so legally, they must use geolocation and geofencing technology. *See id.* And because other companies do it, there is there is no reason why Kalshi would be unable—either financially or technologically—to use geolocation and geofencing technology to ensure compliance with Nevada law. *See id.* ¶ 21. Indeed, "Sporttrade chief operating officer David Huffman said the cost of geolocation was 'not at all' financially crippling to his business and would still be 'quite useful" if the prediction market company transitions from a state licensed entity to one under CFTC oversight." Dan Bernstein, Eben Novy-Williams, Michael McCann, *Kalshi Puts Geolocation Tech Providers on Edge Amid Rapid Rise* (SPORTICO, THE BUSINESS OF SPORTS Oct. 16, 2025); https://perma.cc/5QPY-YZHW. *See also* Reaser Decl. ¶¶ 20 and

Ex. B. Kalshi's stated concerns about the technical or financial infeasibility of geofencing are inaccurate.

Since Kalshi could geofence if it wanted to, *see supra*, the primary irreparable harm Kalshi faces if the Court lifts the injunction is ceasing operations in Nevada, and losing out on the corresponding profits. But if Kalshi did this, it could presumably continue operating in other states as well as in the 139 other countries in which it now apparently operates. *See* Reaser Decl. Ex. C (stating Kalshi has launched in 140 countries). When Kalshi's pure profit motive is balanced against the harm suffered by State Defendants—their inability to enforce Nevada's longstanding regulatory scheme governing sports betting protecting Nevada residents and visitors interested in wagering on sports—the equities tip heavily in the State Defendants' favor.

In sum, and in the interest of judicial economy, the NRA joins the State Defendants' Motion to Dissolve, which accurately reflects the NRA's position as to dissolving the injunction currently in place. NRA further asks the Court to consider the above factual development since the injunction, which strongly supports dissolving the injunction as consistent with the public's best interest.

Dated: October 29, 2025.

McDONALD CARANO LLP

By: /s/ *Adam Hosmer-Henner*
Adam Hosmer-Henner (NSBN 12779)
A.G. Burnett (NSBN 5895)
Jane Susskind (NSBN 15099)
Katrina Weil (NSBN 16152)
Thaddeus C. Houston (NSBN 17215)
100 West Liberty Street, 10th Floor
Reno, NV 89501

*Attorneys for Intervenor Defendant Nevada Resort Association*

7