# EXHIBIT 1

**DECLARATION OF DAN R. REASER, ESQ. IN SUPPORT OF NRA'S JOINDER TO STATE DEFENDANTS' MOTION TO DISSOLVE INJUNCTION**

Adam Hosmer-Henner (NSBN 12779)
A.G. Burnett (NSBN 5895)
Jane Susskind (NSBN 15099)
Katrina Weil (NSBN 16152)
Thaddeus C. Houston (NSBN 17215)
**McDONALD CARANO LLP**
100 West Liberty Street, 10th Floor
Reno, NV 89501
Telephone: (775) 788-200
ahosmerhenner@mcdonaldcarano.com
agburnett@mcdonaldcarano.com
jsusskind@mcdonaldcarano.com
kweil@mcdonaldcarano.com
thouston@mcdonaldcarano.com

*Attorneys for Intervenor Defendant
Nevada Resort Association*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| KALSHIEX, LLC,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in his official capacity as a Member of the Nevada Gaming Control Board; CHANDENI K. SENDALL, in her official capacity as a Member of the Nevada Gaming Control Board; NEVADA GAMING CONTROL BOARD; JENNIFER TOGLIATTI, in her official capacity as Chair of the Nevada Gaming Commission; ROSA SOLIS-RAINEY, in her official capacity as a Member of the Nevada Gaming Commission; BRIAN KROLICKI, in his official capacity as a Member of the Nevada Gaming Commission; GEORGE MARKANTONIS, in his official capacity as a Member of the Nevada Gaming Commission; NEVADA GAMING COMMISSION; AARON D. FORD, in his official capacity as Attorney General of Nevada,<br><br>　　　　　　　　　Defendants.<br>　vs.<br><br>NEVADA RESORT ASSOCIATION,<br>　　　　　　　　　Intervenor-Defendant. | Case No.: 2:25-cv-00575-APG-BNW<br><br>**DECLARATION OF DAN R. REASER, ESQ. IN SUPPORT OF NRA'S JOINDER TO STATE DEFENDANTS' MOTION TO DISSOLVE INJUNCTION** |

I, Dan R. Reaser, hereby declare under penalty of perjury:

1. I am over the age of 18 years and a resident of Washoe County, Nevada. I make this declaration based upon personal knowledge, except where stated to be upon information and belief, and as to that information, I believe it to be true. If called upon to testify as to the contents of this declaration, I am legally competent to testify to the contents of this declaration in a court of law.

2. I am a Director and Shareholder of Fennemore Craig, P.C. and my resident office is at 7800 Rancharrah Parkway, Reno, Nevada 89511.

3. I make this declaration in support of the Nevada Resort Association ("NRA")'s joinder to the State Defendants' motion to dissolve the preliminary injunction in the above captioned case initiated by Plaintiff KalshiEX, LLC ("Kalshi").

4. Accompanying this declaration as **Exhibit A** is my resume. By way of summary, I completed by Juris Doctor at California Western School of Law in 1980. In 1977, I graduated with a Bachelor of Arts in Business Administration with a concentration in Economics and major in Political Science from California State University, Fullerton. I was admitted to the State Bar of California on December 16, 1980, and the State Bar of Nevada on September 29, 1981.

5. I have been in the private practice of law since February 1, 1990. My practice concentrates on supporting companies in the commercial gaming, financial services and public utility sectors. Prior to entering private law practice, I served in the Office of the Attorney General for Nevada as Chief Deputy for the Gaming Division, representing the Nevada Gaming Commission ("NGC") and the Nevada Gaming Control Board ("NGCB"). During my tenure with the Nevada Attorney General, I was Chief Counsel to the Nevada Department of Transportation and counsel to the Nevada Commissions on Economic Development, Tourism, and Environmental Protection, and the State Departments of Agriculture, Corrections, Minerals and Wildlife. My career in the Nevada Attorney General's office began as a prosecutor.

6. My professional experiences over the course of my career have made me knowledgeable about Nevada's gaming laws and regulations, along with the history of their development. Moreover, my experience in private practice has given me valuable insight into how gaming companies comply with Nevada's gaming laws and regulations. And as an active

1  participant in the gaming industry, I monitor developments in Nevada gaming law and how
2  regulated entities comply with them as they evolve.

3        7.      In legalizing and licensing commercial gaming including sports and event wagering, the Nevada Legislature has explicitly declared the public policy of Nevada in Section 463.0129 of the Nevada Revised Statutes (the "NRS"). Attributes of this public policy include maintaining public confidence and trust that regulated gaming is conducted honestly and competitively, that gaming is free from criminal and corruptive elements, and that there is "strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments" to "protect the public health, safety, morals, good order and general welfare of the inhabitants of the State, to foster the stability and success of gaming and to preserve the competitive economy and policies of free competition of the State of Nevada." In support of this goal, Nevada employs a 'front loaded' licensing process that ensures any potential gaming licensee undergoes an in-depth investigation before receiving a license. *See* NRS §§ 463.170, 463.530, 463.5735.

      8.      The operation of a "sports pool" is a form of commercial gaming in Nevada subject to licensing and regulation. If unlicensed, conducting a sports pool in Nevada is a crime punished as a felony. A "sports pool" is defined by NRS § 463.0193 as the "business of accepting wagers on sporting events or other events by any system or method of wagering." And a "wager" under NRS § 463.01962 is nothing more than a "sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." A sports pool operation can include either: (a) a wagering contract directly between the patron and the licensee on the outcome of a sporting or other event; or (b) wagers in a pari-mutuel method of wagering, which is one where wagers with respect to the outcome of a race, sporting event or other event are placed in a wagering pool conducted by the licensee in which the patrons are wagering with and against each other and not against the licensee. In a pari-mutuel wagering system, the licensee receives a commission deducted from the pari-mutuel wagering pool. Nevada law protects the patrons participating in pari-mutuel wagering pool by restricting the amount of commission paid to the licensee to no more than eighteen percent (18%).

///

9. In furtherance of the state public policy described above, Nevada's gaming laws incorporate a panoply of other protections for patrons of licensed gaming establishments and the public.

10. These include the requirement that individuals must be age twenty-one or older to participate in any form of gaming activities, including sports betting. Licensees who violate this requirement face significant sanctions. Similarly, patrons that violate this age requirement face forfeiture of any financial benefits they received from the prohibited wagering, as well as potential criminal liability.

11. Moreover, nonrestricted gaming establishments, meaning casinos or resort hotels, are regulated under the Bank Secrecy Act (the "BSA"), like banks and other financial institutions. Nevada's gaming laws and regulations protect the public and to seek to prevent criminal activities associated with licensed commercial gaming operations in part by ensuring that gaming licensees strictly comply with the BSA as well as all other federal laws. Under these gaming regulations, nonrestricted gaming licensees are required to comply with federal know-your-customer requirements, must enforce federal anti-money laundering rules, and are responsible for submitting both suspicious activity reports and currency transaction reports—just like banks, credit unions and other financial institutions.

12. Nevada law also explicitly provides for the mitigation of problem gambling. *See* Nev. Gaming Comm'n Reg. 5.170. The applicable measures require conspicuous posting at gaming establishments of written disclosures about the nature and symptoms of problem gambling, along with toll-free telephone number access to information and referral services for patrons in need of intervention. Regulations of the NGC also impose requirements upon all licensees for specified, approved training of employees, and procedures for employees to assist patrons in obtaining problem gaming information. Every licensee must also incorporate in the credit and payment procedures it uses, and in direct mail or advertising, procedures for patrons to self-limit their access to these procedures or direct mail or communications. The minimum elements of the program required of licensees must include: (a) development of written materials for dissemination to patrons explaining the program; (b) development of written forms allowing patrons to participate

in the program; (c) standards and procedures that allow a patron to be prohibited from access to check cashing, the issuance of credit, and the participation in direct mail marketing of gaming opportunities; (d) standards and procedures that allow a patron to be removed from the licensee's direct mailing and other direct marketing regarding gaming opportunities at that licensee's location; and (e) procedures and forms requiring the patron to notify a designated office of the licensee within 10 days of the patron's receipt of any financial gaming privilege, material or promotion covered by the program.

13. Other regulations that the NGC has promulgated in implementing Nevada's declared public policy include prohibitions on allowing intoxicated customers to engage in gaming activities, the regulation of advertising and public relations activities by gaming licensees, standards governing patrons' use of credit to make wagers, proscriptions on owners, officers, directors, and executive employees from making wagers on games conducted by a licensee (and any person or company affiliated with the licensee), and oversight of and sanctions for anti-competitive conduct by licensees.

14. Nevada law also includes various safeguards to protect against improper betting practices, including improper wagers on sports. *See, e.g.*, NRS §§ 465.092-.094; Nev. Gaming Comm'n Regs. 22.010(14), 22.060-.063, 22.080(1); *cf.* NRS §§ 463.362-.3668 (detailing Nevada's dispute resolution process). Of particular note here, Nevada prohibits sports wagers by game officials, owners, coaches, players, or other team staff. *See* Nev. Gaming Comm'n Reg. 22.1205. Further, Nevada requires that those facilitating sports betting report suspicious activity. *See* Nev. Gaming Comm'n Reg. 22.121.

15. In addition, the NGC is charged by statute with protecting the public by performing strict oversight of technology used in conducting gaming activities, including the internal operational characteristics and functions of the games, the accounting and information systems used for monetary transactions with patrons, the reporting of revenue generated from licensed gaming, the software, hardware and firmware used for patron wagering accounts and the required cashless wagering systems, and the use of geolocation technology to restrict where gaming activities using mobile and Internet technology may occur.

16. As it relates to sports wagering in particular, Nevada's protection of patrons and game integrity also includes licensing and regulatory oversight of the technology used in the sports wagering process, the licensing and regulation of the individuals and the technology that furnish information used to place and determine outcomes for sports and event wagering, including those persons providing advice, estimates or predictions regarding the outcome of events or engaged in the use of communications technology for the purpose of providing the management, or consultation or instruction in the management, of wagering pools and the transmission of information relating to wagering pools or other similar information for sports pools.

17. I understand one of the arguments that Kalshi has made in this action is that it would suffer irreparable harm if it was required to geolocate and geofence Nevada users to prevent them from wagering on the Kalshi platform.

18. But in my professional experience, it is neither too technically difficult nor prohibitively expensive for a company to geolocate (identify the location of the customer) or geofence (restrict offerings to customers in certain jurisdictions).

19. Some licensed entities offer online or mobile gaming in Nevada. As mentioned above, licensed entities that offer online or mobile gaming in Nevada must use geolocation and geofencing technology to operate legally. And indeed, companies offering online or mobile services use geolocation and geofencing technology in order to ensure that the laws of different jurisdictions are met, whether those laws are specific to gaming or to data privacy laws such as the General Data Protection Regulation of the European Union.

20. As just one example, "Sporttrade [which does not appear to operate in Nevada] chief operating officer David Huffman said the cost of geolocation was 'not at all' financially crippling to his business and would still be 'quite useful" if the prediction market company transitions from a state licensed entity to one under CFTC oversight." Dan Bernstein, Eben Novy-Williams, Michael McCann, *Kalshi Puts Geolocation Tech Providers on Edge Amid Rapid Rise* (SPORTICO, THE

BUSINESS OF SPORTS Oct. 16, 2025); https://perma.cc/5QPY-YZHW.[1]  A true and correct copy of this article which I downloaded in PDF format and read on October 24, 2025, is attached as **Exhibit B**.

21. More broadly, based on my experience, there is no reason why Kalshi would be unable—either financially or technologically—to use geolocation and geofencing technology to ensure compliance with Nevada law. Other companies do.

22. And as mentioned above, I keep up with news affecting the gaming industry. To that end, I visited Kalshi's website on October 24, 2025, and read its 'announcement' titled 'Kalshi hits $5 billion valuation amid international expansion.' A true and correct copy of this page on Kalshi's website as it appeared on October 24, 2025 is attached as **Exhibit C**.

23. Also on October 24, 2025, I read a New York Times article that discussed Kalshi and its growth. *See* Ben Blatt and Amy Fan (TheUpshot), *Is Sports Betting Illegal in Your State? Not if You Call It a 'Prediction Market.'* (N.Y. TIMES Oct. 5, 2025). Notably, the chart included in the article and excerpted in NRA's joinder to the Motion appears to have been generated using data from Kalshi itself. An attribution is visible in the bottom-left corner. A true and correct copy of that article is attached as **Exhibit D**.

24. I read a second New York Times article discussing Kalshi that same day. *See* Michael J. de la Merced (DealBook/Business and Policy), *Kalshi, a Prediction Market, Raises Funds and Expands Overseas* (N.Y. TIMES Oct. 10, 2025). A true and correct copy of that article is attached as **Exhibit E**.

25. In addition, the Commodity Futures Trading Commission ("CFTC") staff issued a letter on September 30, 2025 regarding sports-related event contracts. *See* CFTC, *CFTC Staff Issues Advisory on Certain Contract Markets* (Sept. 30, 2025), https://www.cftc.gov/PressRoom/PressReleases/9137-25. On October 24, 2025, I downloaded a

---

[1] Sporttrade's website notably discloses to the public that it is "regulated by the New Jersey Division of Gaming Enforcement as an Internet gaming operator in accordance with the Casino Control Act N.J.S.A. 5:12-1 and its implementing regulations" and is only available for use in Arizona, Colorado, Iowa New Jersey and Virginia. *See* Sporttrade at https://new.getsporttrade.com/ (Last Visited Oct. 24, 2025).

copy of that letter from the CFTC's website. A true and correct copy of that letter, which I downloaded in PDF format, is attached as **Exhibit F**.

26. I also read a post on Kalshi from the Substack 'Event Horizon' on October 29, 2025 on how Kalshi describes itself in its own advertising. *See* Dustin Gouker, *Kalshi Says It's 'Kind Of Addicting' in Instagram Post*, EVENT HORIZON (Oct. 21, 2025); https://perma.cc/U5AH-GJ8P ("Near the end of the post, the narrator says Kalshi is "Simple, regulated, and kind of addicting[;]"' "Earlier this year, the prediction market routinely used "betting" terminology but has since moved away from that kind of marketing.") (hyperlink omitted). A true and correct copy of this post is available at the Perma.cc link included above.

27. Finally, on October 29, 2025, I read an article in the Nevada Independent reporting on recent guidance issued by the NGCB on prediction markets. *See* Howard Stutz, *As one prediction market leaves Nevada, others double down* (THE NEVADA INDEPENDENT Oct. 29, 2025 at 7:00 AM), https://perma.cc/9J7J-UWG9. A true and correct copy of this post is available at the Perma.cc link included above.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 29, 2025

By: /s/ Dan R. Reaser
　　Dan R. Reaser