1   DENNIS L. KENNEDY
    NEVADA BAR NO. 1462
2   PAUL C. WILLIAMS
    NEVADA BAR NO. 12524
3   **BAILEY❖KENNEDY**
    8984 SPANISH RIDGE AVENUE
4   LAS VEGAS, NEVADA 89148-1302
    TELEPHONE: 702.562.8820
5   FACSIMILE: 702.562.8821
    DKennedy@BaileyKennedy.com
6   PWilliams@BaileyKennedy.com

7   NEAL KUMAR KATYAL                    GRANT R. MAINLAND
    (ADMITTED *PRO HAC VICE*)            (ADMITTED *PRO HAC VICE*)
8   JOSHUA B. STERLING                   ANDREW L. PORTER
    (ADMITTED *PRO HAC VICE*)            (ADMITTED *PRO HAC VICE*)
9   WILLIAM E. HAVEMANN                   NICOLE D. VALENTE
    (ADMITTED *PRO HAC VICE*)            (*PRO HAC VICE* PENDING)
10  **MILBANK LLP**                       KATIE CASSIDY-GINSBERG
    1101 NEW YORK AVENUE NW               (ADMITTED *PRO HAC VICE*)
11  WASHINGTON, D.C. 20005               VICTOR HOLLENBERG
    TELEPHONE: 202.835.7500              (ADMITTED *PRO HAC VICE*)
12  FACSIMILE: 202.263.7586              **MILBANK LLP**
                                         55 HUDSON YARDS
13  *Attorneys for Plaintiff KalshiEX, LLC*   NEW YORK, NY 10001
                                         TELEPHONE: 212.530.5000
14                                       FACSIMILE: 212.530.5219

15              **UNITED STATES DISTRICT COURT**
                     **DISTRICT OF NEVADA**
16

17   KALSHIEX, LLC,                        Case No.  2:25-cv-00575-APG-BNW

18              Plaintiff,

19       vs.                               **PLAINTIFF'S RESPONSE IN
                                           OPPOSITION TO STATE
20   KIRK D. HENDRICK, in his official capacity as   DEFENDANTS' EMERGENCY
     Chairman of the Nevada Gaming Control Board,   MOTION TO DISSOLVE THE
21   et al.,                               PRELIMINARY INJUNCTION
                                           ENTERED ON APRIL 9, 2025**
22              Defendants,

23       vs.                               **REDACTED**

24   NEVADA RESORT ASSOCIATION,

25              Intervenor-Defendant.

26

27

28

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

LEGAL STANDARD......................................................................................................... 3

ARGUMENT ..................................................................................................................... 3

    I.      Defendants Provide No Basis to Revisit the Preliminary Injunction........................... 3

            A.      Defendants Do Not Identify a Significant Change in the Law. ...................... 4

            B.      Defendants Do Not Identify a Significant Change in the Facts....................... 5

            C.      Defendants' Arguments Should be Raised in a Motion for Summary
                 Judgment. ....................................................................................................... 6

    II.     Even if the Court Revisits the Injunction, It Should Deny the Motion to
         Dissolve. ........................................................................................................................ 6

            A.      Kalshi Remains Likely to Succeed on the Merits. ........................................... 7

                 1.      Defendants' Argument That Kalshi's Contracts are Not Swaps
                     is Unavailing. ..................................................................................... 7

                 2.      Defendants Provide No Basis for the Court to Revisit
                     Preemption. ...................................................................................... 16

            B.      Kalshi Will Face Irreparable Harm if the Injunction is Dissolved. ............... 18

            C.      The Balance of Harms and Public Interest Support Preserving the
                 Injunction. ..................................................................................................... 21

    III.    If the Court Dissolves the Preliminary Injunction, It Should Stay Its Decision
         or Grant an Injunction Pending Appeal. ................................................................... 22

CONCLUSION ............................................................................................................... 24

1

**INTRODUCTION**

2      Defendants' motion to dissolve the preliminary injunction ("PI") is procedurally improper and

3  lacks substantive merit.  It should be denied for numerous independent reasons.[1]

4      *First*, a motion to dissolve must turn on a "significant change in the facts or the law," *Sharp v.*

5  *Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000)—*i.e.*, "grounds that could not have been raised before,"

6  *Alto v. Black*, 738 F.3d 1111, 1120 (9th Cir. 2013).  Defendants rely primarily on this Court's recent

7  decision in *North American Derivatives Exchange Inc. v. Nevada* ("*Crypto*"), 2025 WL 2916151, at

8  *9 (Oct. 14, 2025), but that decision did not change the law.  It is a non-final decision construing

9  statutory language enacted 15 years before this lawsuit commenced.  Defendants also highlight new

10  contracts Kalshi has certified since the PI was granted, but Defendants do not explain how those new

11  contracts bear on their categorical position that none of Kalshi's contracts is subject to the CFTC's

12  jurisdiction.  If Defendants believe they are entitled to judgment as a matter of law, the proper way to

13  pursue that relief is not via a second bite at the PI apple, but rather a motion for summary judgment.

14      *Second*, if the Court reaches the question, Defendants have not met their burden to justify

15  dissolving the PI.  As this Court previously noted, the "plain and unambiguous" text of the CEA

16  preempts state regulation of trading on DCMs.  ECF No. 45 at 11.  Relying on this Court's *Crypto*

17  decision, Defendants argue Kalshi's contracts are not swaps, but we respectfully submit that further

18  briefing will cast doubt on *Crypto*.  This case—involving a collateral attack on a company offering

19  contracts that the CFTC has permitted—is not a proper vehicle for addressing whether Kalshi's

20  contracts are swaps, which should instead be raised in an action against the CFTC under the

21  Administrative Procedure Act ("APA").  In any event, Kalshi's contracts are swaps because they are

22  based on events associated with (at the very least) potential financial consequences.  Dictionaries and

23  common usage confirm that the terms "event" and "contingency" comfortably encompass outcomes.

24  A contrary conclusion would make the definition of swap—and the CFTC's jurisdiction—rise and fall

25  from contract to contract based on semantics, as almost any event could be characterized as merely

26  the outcome of some other event.  Nor will Congress's broad definition of swap make the CFTC the

27

28

---

[1] Intervenor-Defendant Nevada Resort Association ("NRA") filed a "joinder" to this motion two days before Kalshi's response was due.  Kalshi will respond to that "joinder" separately.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

nation's sole gambling regulator.  The CEA preempts state regulation of *on-exchange* trading, but leaves states free to regulate *off-exchange* transactions like run-of-the-mill sports bets.

*Third*, the balance of harms and public interest favor preserving the PI.  Immediate compliance with Nevada law is not technically feasible and would require Kalshi to violate the CFTC's Core Principles, jeopardizing its DCM status.  It would also disrupt traders with positions on Kalshi, in Nevada and elsewhere.  By contrast, especially as this case is ripe for summary judgment, Defendants will suffer minimal harm from keeping the PI in place pending final resolution.

Kalshi respectfully requests that the Court preserve the status quo by denying Defendants' motion.  If, however, the Court grants the motion, we request that the Court stay dissolution pending appeal to prevent irreparable harm to Kalshi pending appeal to the Ninth Circuit.

## **BACKGROUND**

On April 9, 2025, this Court granted Kalshi a PI that enjoined Defendants from enforcing Nevada's gambling laws against sports- and political-event contracts offered by Kalshi.  The Court explained that the CEA preempts the field of trading on DCMs. ECF No. 45 at 13.  Defendants opted not to appeal that decision.  In the meantime, this Court denied Defendants' motion to dismiss Kalshi's complaint, *see* ECF No. 72, and Kalshi filed a motion for summary judgment.  Kalshi's position throughout has been that the case presents a legal issue that should be resolved on summary judgment without the need for discovery.  The Court suggested this very approach early on. ECF No. 46 at 44:9-16.  Defendants, however, filed a motion to prevent this Court from considering Kalshi's pending summary judgment motion until discovery is complete. *See* ECF Nos. 129, 138.  This Court recently denied Defendant's motion, and their opposition to Kalshi's motion for summary judgment is due on November 21, 2025.

On October 14, 2025, this Court issued an order declining to grant a PI in favor of a different DCM in a separate proceeding raising similar questions. *Crypto*, 2025 WL 2916151, at *4.  The Court's decision focused on the meaning of the word "swap," a term the CEA defines in subsections (i) through (vi) of Section 1a(47)(A).  The Court interpreted subsection (ii)'s definition—which includes contracts based on "the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," 7 U.S.C.

1   § 1a(47)(ii)—to exclude sports-event contracts. *Crypto*, 2025 WL 2916151, at *6-9. The Court held
2   that those contracts were based on outcomes of sporting events rather than on the occurrence of the
3   sporting events, and thus were not swaps. *Id.* at *9. But the Court reaffirmed that the CEA preempts
4   states from regulating swaps on DCMs. *Id.* at *5. Defendants then moved to dissolve Kalshi's PI.

## LEGAL STANDARD

6   Defendants "bear[] the burden of establishing that a significant change in facts or law warrants
7   revision or dissolution of the injunction." *Sharp*, 233 F.3d at 1170. Where a "party could have
8   appealed" the PI "but chose not to do so," a "subsequent challenge to the injunctive relief must rest on
9   grounds *that could not have been raised before*." *Alto*, 738 F.3d at 1120 (emphasis added). After
10  establishing a "significant[]" change, the moving party must show "that in light of that change,"
11  dissolution is warranted "under the same legal standard that governed the previously entered
12  injunction." *Apr. in Paris v. Bonta*, 659 F. Supp. 3d 1114, 1124 (E.D. Cal. 2023). Here, that standard
13  requires considering whether: (1) the plaintiff has made "a sufficient showing of a likelihood of
14  success on the merits;" (2) the plaintiff "will be irreparably harmed absent interim relief;" (3) a PI
15  "will substantially injure other parties;" and (4) the "public interest" favors a PI. *Karnoski v. Trump*,
16  926 F.3d 1180, 1202 (9th Cir. 2019). Where "the balance of hardships tips sharply in the plaintiff's
17  favor," the plaintiff can show a likelihood of success by raising "serious questions going to the merits."
18  *hiQ Labs, Inc. v. Linkedin Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (quotation omitted).

## ARGUMENT

20  **I.    Defendants Provide No Basis to Revisit the Preliminary Injunction.**

21  Defendants style their motion as one for dissolution of the PI, but in substance it is an untimely
22  motion for reconsideration of the Court's PI ruling. A motion for dissolution may be brought at any
23  time, but it must be based on "a significant change in facts or law." *Sharp*, 233 F.3d at 1170. A
24  motion for reconsideration, by contrast, must be brought within 28 days of the initial ruling. Fed. R.
25  Civ. P. 59(e); *see Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005)
26  (Rule 59(e) applies to motions for reconsideration of PI orders). Because their motion is half a year
27  too late to be timely under Rule 59(e), Defendants maintain that "changes" warrant revisiting the PI.
28  But Defendants simply press arguments that they could have made—but chose not to—when the Court

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

first considered the PI, or else they rehash arguments this Court already considered and rejected.

## A.  Defendants Do Not Identify a Significant Change in the Law.

Defendants cite this Court's decision in *Crypto* and a decision by the District of Maryland denying Kalshi a PI in another matter.  But those decisions are non-final, non-binding, and do not change any law.  Defendants cite no case dissolving a PI based on such non-binding precedent.  Cases finding a "significant change" typically involve a new statute, *see The Ecology Ctr. v. Castaneda*, 426 F.3d 1144, 1147-48 (9th Cir. 2005), or new authoritative precedent, *Eliason v. Clark County*, 2021 WL 810410, at *3 (D. Nev. Mar. 3, 2021).  Nor do Defendants make arguments "that could not have been raised before," as needed to support dissolution.  *Alto*, 738 F.3d at 1120.

*First*, Defendants rely on *Crypto*, where this Court declined to grant a different DCM a PI, holding that sports-event contracts "are not swaps" because they are based on "outcome[s]" of events. 2025 WL 2916151, at *9.  Defendants claim (at 2) that Kalshi's sports-event contracts are similarly not swaps, and (at 9) that they make may this argument now because this Court "presumed without addressing that Kalshi's event contracts are swaps" in granting Kalshi a PI.  Not so.

The oral argument transcript makes clear that the Court considered whether Kalshi's contracts qualify as swaps before granting the PI.  ECF No. 46 at 5-8, 16-17, 46.  Regardless, Defendants could have made the argument at that time, so their motion does not rest "on grounds that could not have been raised before."  *Alto*, 738 F.3d at 1120.  Defendants ignore this requirement and do not claim to have met it.  Indeed, they note (at 2) that "Kalshi's allegations make clear" that its contracts are based on "*outcomes*."  *See* ECF No. 1 ("Compl.") ¶¶ 5, 42-44.  Defendants in both Maryland and New Jersey disputed whether Kalshi's contracts are swaps in opposing preliminary relief, underscoring that Defendants here could have made the argument as well.  *See* ECF No. 28 at 13, *KalshiEX LLC v. Martin*, No. 25-cv-01283 (May 12, 2025) (arguing that "the outcome of a sporting event" cannot form the basis for a swap); ECF No. 15 at 15-16, *KalshiEX LLC v. Flaherty*, No. 25-cv-02152 (Apr. 18, 2025) (arguing that Kalshi's event contracts are not swaps).

Other courts in the Ninth Circuit have declined to dissolve PIs in similar cases.  In one case, movants "didn't appeal the order granting the" PI and instead left it in effect for "months," then hired "new counsel" and "filed a motion to dissolve" the PI by offering arguments "which weren't advanced

by their previous counsel" but could have been. *FTC v. Noland*, 2020 WL 6292863, at *1-4 (D. Ariz. Oct. 27, 2020); *see also United States v. Bus. Recovery Servs., LLC*, 2011 WL 4915192, at *5 (D. Ariz. Oct. 17, 2011) (modification inappropriate because the legal rule at issue "existed when the Court held the hearing on the Motion for Preliminary Injunction"). The same reasoning applies here.

*Second*, the District of Maryland's decision in *Martin* likewise provides no basis for dissolution. For one thing, it is almost three months old. If *Martin* significantly changed the law, Defendants should have moved to dissolve the PI promptly. Instead, Defendants use *Martin* to bolster arguments they previously made regarding the scope of preemption under the CEA—arguments the Court rejected in this case and again in *Crypto*. Indeed, they admit (at 16) they ask this Court to "revisit" an issue it previously addressed and rejected. Defendants may not use a motion to dissolve to "relitigate the issues" this Court previously decided. *Grunwald*, 400 F.3d at 1124.

## B. Defendants Do Not Identify a Significant Change in the Facts.

No new facts warrant dissolution either. Defendants principally note (at 11) that Kalshi now offers new types of contracts. But these new contracts have no bearing on Defendants' merits arguments. Relying on *Crypto*, Defendants argue (at 14) that Kalshi's contracts are not swaps because they are based on outcomes. Yet *Crypto* appears to apply to sports-event contracts categorically, including contracts based on the *outcome* of sports events, which Kalshi has offered from the outset of this litigation. In fact, under *Crypto*, many of Kalshi's newer contracts have a stronger claim to being swaps than Kalshi's earlier contracts, because their underlying events cannot be characterized as outcomes. For example, as *Crypto* suggests, Kalshi's contract on the number of World Series Games played[2] is a swap because it turns on the "extent of an occurrence." *See* 2025 WL 2916151, at *8 (a contract on the number of rounds in a boxing match involves the "extent of an occurrence"). Contracts on whether the NBA will add a new team before 2030 or whether LeBron James will retire before next season are similar.[3]

---

[2] Kalshi, *Pro Baseball Championship: Series Total Games Played*, https://kalshi.com/markets/kxmlbseriesgametotal/professional-baseball-series-total-games/kxmlbseriesgametotal-25torlad (last accessed Oct. 31, 2025).

[3] Kalshi, *Add new team before 2030?*, https://kalshi.com/markets/kxnbateam/nba-team/kxnbateam-30 (last accessed Oct. 31, 2025); Kalshi, *LeBron James announces retirement before the 2026-27 season?*, https://kalshi.com/markets/kxlbjretire/lbj-retire/kxlbjretire-26 (last accessed Oct. 31, 2025).

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

Nor does the unsubstantiated "alleg[ation]" (at 11) that "a Kalshi affiliate *is* the counterparty to many event contracts on its DCM" justify dissolution. An allegation made by a different party in a different case is not a change in the facts. And the allegation is false. Kalshi, like other DCMs, has an affiliated market maker as a separate corporate entity to promote liquidity on its exchange, but nothing about that commonplace arrangement allows Kalshi to set the price of its contracts or gives the exchange any means or incentive to set prices to benefit itself and harm traders.

### C. Defendants' Arguments Should be Raised in a Motion for Summary Judgment.

Defendants maintain (at 13) it is "clear" that "Kalshi's contracts are not swaps." They also maintain (at 16) that Kalshi is "wrong" as a matter of law that "the CEA preempts" state gaming laws as to trading on DCMs. The proper vehicle for these arguments is a motion for summary judgment.

Kalshi has consistently maintained that preemption presents a legal question that can be resolved without factual development at summary judgment. Kalshi accordingly moved for summary judgment three months ago. But, after initially agreeing that the questions in the case were largely legal questions of statutory interpretation, ECF No. 46 at 69:4-5, Defendants have recently resisted summary judgment on the ground that, "to decide whether Nevada's gaming laws are preempted, the Court will need to know key facts about Kalshi's products" that can only be adduced through discovery, ECF No. 89 at 2, and that "it would be impossible for the Court to determine whether Kalshi's offerings fall within" the CFTC's "exclusive jurisdiction" without discovery, ECF No. 90 at 8. Defendants' motion contradicts those recent assertions. Defendants now agree that the Court can determine whether preemption applies as a matter of law. They may raise those arguments in a motion for summary judgment at any time, and Kalshi is prepared to brief summary judgment expeditiously.

### II. Even if the Court Revisits the Injunction, It Should Deny the Motion to Dissolve.

Should the Court reach the PI factors, it should deny the motion. As this Court correctly held (here, and in *Crypto*), the plain terms of the CEA preempt state regulation of derivatives, including swaps, traded on DCMs. Defendants argue that Kalshi's contracts are not swaps, but the CFTC has concluded otherwise, and this case is not a proper vehicle to challenge that determination. Regardless, Kalshi's sports- and political-event contracts qualify as swaps under the plain terms of the CEA. Kalshi recognizes that the Court reached a contrary conclusion in *Crypto*, but respectfully disagrees

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1    with that decision.

2         **A.  Kalshi Remains Likely to Succeed on the Merits.**

3         Defendants seek dissolution on two grounds.  First, they argue that Kalshi's contracts are not

4    swaps, relying heavily on *Crypto*.  Second, they ask this Court to reverse its determination, reaffirmed

5    in *Crypto*, that the CEA preempts state regulation of trading on DCMs.  Neither argument has merit.

6         **1.  Defendants' Argument That Kalshi's Contracts are Not Swaps is Unavailing.**

7         *This case is not a proper vehicle to determine whether Kalshi's contracts are swaps.*  In arguing

8    that Kalshi's contracts are not swaps, Defendants in substance challenge the CFTC's decision to permit

9    these contracts.  The proper forum for that claim is through an APA lawsuit against the CFTC, not an

10   action against Kalshi in which the CFTC is not a party.

11        Congress has delegated to the CFTC the authority to oversee the listing of contracts for trading

12   on DCMs.  A DCM may "elect to list for trading or accept for clearing any new contract" by providing

13   the CFTC with a "written certification that the new contract" complies with the CEA.  7 U.S.C. § 7a-

14   2(c)(1).  The CFTC reviews proposed contracts and may initiate review of any contract within 10 days

15   of receiving notice.  *Id.* § 7a-2(c)(2); 17 C.F.R. § 40.11(c).  Congress in the Special Rule expressly

16   granted the CFTC the discretion to determine that certain types of event contracts are contrary to the

17   public interest, and, if so, to prohibit them.  *See* 7 U.S.C. § 7a-2(c)(5)(C).  That statutory discretion to

18   deem a contract contrary to the public interest depends upon the CFTC having jurisdiction over the

19   contract in the first place.  The CFTC in turn has set out a process for CFTC review "on a case-by-

20   case basis" whether an event contract listed by a DCM is barred by the Special Rule.  CFTC,

21   *Provisions Common to Registered Entities*, 76 Fed. Reg. 44,776, 44,785-86 (July 27, 2011) (adopting

22   17 C.F.R. § 40.11).  When the review period in the self-certification process for a contract closes, the

23   CFTC decides either to object affirmatively to the listing of the new contract, *id.* § 7a-2(c)(3)(B)(ii),

24   or to permit the new contract to be listed by taking no action, *id.* §§ 7a-2(c)(2), (3)(B).

25        The CFTC has exercised jurisdiction over, and allowed, the contracts to which Defendants

26   object.  As to Kalshi's political-event contracts, the CFTC initially issued an order prohibiting Kalshi

27   from offering them on the asserted ground that they involved "gaming" and "unlawful" activity under

28   certain states' laws, and were contrary to the public interest.  The D.C. District Court disagreed,

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1    holding that they did not involve gaming or unlawful activity under the Special Rule, so federal law

2    *required* the CFTC to permit them to be traded.  *See KalshiEX LLC v. CFTC*, 2024 WL 4164694, at

3    *13 (D.D.C. Sept. 12, 2024).  After the D.C. Circuit denied a stay, the CFTC dismissed its appeal,

4    making the district court's decision final.  *See* No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7,

5    2025).  Kalshi has since been able to offer its political-event contracts.

6        Kalshi self-certified its first sports-event contracts and then listed them on January 24, 2025.

7    Compl. ¶ 53.  On January 31, 2025 the CFTC requested, ████████████████████████████

8    ████████████████████████████████████████████████████, and Kalshi responded

9    with ████████████████████████████████████████████████████████

10    ████████████.  Ex. 1.  Kalshi also provided the CFTC with ████████████████████

11    ████████████████████████████████████████████████████████████████

12    ████████████.  Ex. 2.  The CFTC took no further action with respect to Kalshi's self-

13    certifications of sports-event contracts.  Had the CFTC deemed Kalshi's contracts impermissible, it

14    would have had the responsibility to "object[]" to the contracts.  *Id.* § 7a-2(c)(3)(B)(ii).  But it did not.

15        Under this statutory regime, when the CFTC does not block a contract for listing on a DCM,

16    that is itself an agency action.  *See* 5 U.S.C. § 551(13) (APA defines "agency action" to include "failure

17    to act").  If Defendants object to the CFTC's action with respect to Kalshi, the APA permits them to

18    file suit against the agency on the ground that its action was contrary to law.  *See* 5 U.S.C. §§ 702,

19    706(2).  But Defendants may not "use a collateral proceeding to end-run the procedural requirements

20    governing appeals of administrative decisions."  *Big Lagoon Rancheria v. California*, 789 F.3d 947,

21    953 (9th Cir. 2015) (en banc) (quoting *United States v. Backlund*, 689 F.3d 986, 1000 (9th Cir. 2012)).[4]

22    Here, Defendants "necessarily argue[]" that the [CFTC] exceeded its authority when it" permitted

23    Kalshi to list its event contracts for trading on its DCM.  *Big Lagoon Rancheria*, 789 F.3d at 953.

24

25

26    ─────────────────
    [4] *See also Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1291 (11th Cir. 2015) ("collateral challenge"
27    to agency decision was inappropriate; the "proper vehicle … is an APA claim"); *City of Duluth v.
    Fond du Lac Band of Lake Superior Chippewa*, 702 F.3d 1147, 1153 (8th Cir. 2013) ("challenge[]" to
28    agency "determination" was "properly made under the Administrative Procedure Act," and "the
    review process established by Congress in the APA" could not "be circumvented").

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1   Permitting the state to "attack collaterally" the CFTC's decision "outside the APA would constitute
2   just the sort of end-run that" Congress prohibited.  *Id.* at 954.

3       The practical implications of allowing states to second-guess the CFTC's exercise of discretion
4   through this kind of collateral attack help explain why Congress prohibited it.  State regulators have
5   understandable incentives to expand their own regulatory authority by construing the CFTC's
6   jurisdiction narrowly.  If states may second-guess the CFTC's determination that a contract is a swap
7   properly traded on a DCM, it would mean that states could exercise jurisdiction over the exact same
8   contracts as the CFTC—in clear conflict with Congress's decision to entrust the CFTC with "exclusive
9   jurisdiction" in this field.  7 U.S.C. § 2(a)(1)(A).  That difficulty would be compounded 51-fold if each
10  state could press its own understanding of "swap."  And this difficulty would further be compounded
11  exponentially if states could scrutinize every contract offered on a DCM, contract-by-contract, to
12  determine whether any of tens of thousands of contracts may or may not be swaps—all with the
13  looming threat of criminal prosecution if the state concludes that any such contract is not a swap after
14  all.  This is not the regime Congress intended, and it would plainly "frustrate Congress' intent to bring
15  the markets under a uniform set of regulations." *Am. Agric. Movement, Inc. v. Bd. of Trade of City of*
16  *Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992).

17      This Court in *Crypto* noted that "[n]othing in the CEA takes statutory interpretation away from
18  courts."  2025 WL 2916151, at *6.  Kalshi agrees.  Federal courts may determine the meaning of the
19  terms of the CEA, including the term "swap."  The point is not that the CFTC alone is authorized to
20  determine what qualifies as a swap, but rather that a challenge to the CFTC's determination must be
21  brought against the CFTC itself in a decision that will ensure the CFTC regulates uniformly
22  nationwide—not through threats to criminally prosecute DCMs for offering event contracts that the
23  CFTC, exercising exclusive jurisdiction, has permitted.

24      *Kalshi's contracts are swaps or other CFTC-regulated derivatives.*  Where a statute "does not
25  define" a term, courts give the term its "ordinary meaning."  *EPA v. Calumet Shreveport Refining,*
26  *LLC*, 145 S. Ct. 1735, 1747 (2025).  The plain language of the CEA's definition of "swap" sweeps
27  broadly and covers Kalshi's sports-event and political-event contracts, which "provide[]" for payment
28  based on "the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency

1    associated with a potential financial, economic, or commercial consequence." 7 U.S.C.

2    § 1a(47)(A)(ii).  None of Defendants' arguments for adopting a limited reading of "swap" has merit.

3    *First*, contrary to Defendants' assertion (at 14), an "outcome" is a type of "event" or

4    "contingency" that can properly be the subject of a swap.  Dictionaries define "event" to include "the

5    *outcome*, issue, or result of anything."  *Event*, Random House Webster's Unabridged Dictionary (2d

6    ed. 2001) (emphasis added).  Though this Court in *Crypto* cited two dictionaries referring to "outcome"

7    as an archaic definition of "event," 2025 WL 2916151, at *7, many or most dictionaries do not treat

8    this definition as archaic.[5]  More generally, as this Court recognized, dictionaries define "event"

9    broadly to mean "[s]omething that happens."  *Event*, Random House Webster's Pocket Am. Dictionary

10   (5th ed. 2008).[6]  An outcome is quite naturally understood to be "something that happens."  Super

11   Bowl LIX happened, but so did the Eagles's win.  Similarly, "contingency" includes "something liable

12   to happen as an adjunct to *or result* of something else."  *Contingency*, Merriam-Webster's Collegiate

13   Dictionary (11th ed. 2003) (emphasis added).[7]  That definition comfortably encompasses outcomes.

14   While the Court did not resolve the meaning of "contingency" in *Crypto* because the parties did not

15   present the question, it provides an independent basis to hold that Kalshi's contracts are swaps.  The

16   Court in *Crypto* tentatively interpreted "contingency" to mean the same thing as "event," 2025 WL

17   2916151, at *8 n.9, but that would read "contingency" out of the statute.

18       Courts agree that contracts turning on outcomes are subject to the CFTC's jurisdiction.  The

19   first sentence of the D.D.C.'s decision upholding Kalshi's political-event contracts explains that "event

20   contracts" are "a type of derivative contract whose payoff is based on the *outcome* of a contingent

21   event."  *KalshiEX*, 2024 WL 4164694, at *1 (emphasis added); *see also CFTC v. Trade Exch. Network*

---

[5] *See Event*, Webster's Encyclopedic Unabridged Dictionary of the English Language: Deluxe Edition (1st ed. 2001) ("the outcome, issue, or result of anything"); *Event*, Webster's II New College Dictionary (3d ed. 2005) ("[t]he actual outcome or final result"); *Event*, Webster's II Dictionary: Office Ed. (3d ed. 2005) ("[a] final result : outcome").

[6] *See Event*, Longman Advanced Am. Dictionary (2d ed. 2007); *see also Event*, Oxford Am. Dictionary and Thesaurus (2d ed. 2009) ("a thing that happens or takes place").

[7] *See Contingency*, Webster's II New College Dictionary (3d ed. 2005) ("[s]omething incidental to something else"); *Contingency*, Random House Webster's Unabridged Dictionary (2d ed. 2001) ("something incidental to a thing"); *Contingency*, Webster's Encyclopedic Unabridged Dictionary of the English Language: Deluxe Edition (1st ed. 2001) (same); *Contingency*, Longman Advanced Am. Dictionary (2d ed. 2007) ("an event *or situation* that might happen in the future" (emphasis added)).

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

*Ltd.*, 117 F. Supp. 3d 29, 32, 35 (D.D.C. 2015) (CEA applies to contracts tied to "the outcome of real-world events").  More generally, courts have broadly recognized that an "event" is "the outcome or consequence of anything."  *Pub. Serv. Co. of Colorado v. Cont'l Cas. Co.*, 26 F.3d 1508, 1514-15 (10th Cir. 1994) (quoting *Event*, Webster's Third New Int'l Dictionary (1981)).[8]

The CFTC itself has concluded that swaps may be—and usually are—predicated on outcomes. In 2008, the CFTC explained that "event contracts may be based on eventualities" such as "the *outcome* of particular entertainment events."  *Concept Release*, 73 Fed. Reg. 25,669, 25,669 (May 7, 2008) (emphasis added)).  In a proposed rule just last year, the CFTC added that "event contracts are generally understood to be a type of derivative contract … based on the *outcome* of an underlying occurrence or event."  *Event Contracts*, 89 Fed. Reg. 48,968, 48,969 (June 10, 2024) (emphasis added). That proposed rule defined gaming-related swaps to include those on "the *outcome* of an awards contest" or "game in which one or more athletes compete."  *Id.* at 48,975 (emphasis added).  While the proposed rule would have prohibited gaming contracts as being contrary to the public interest, the rule clearly contemplated that outcome-based event contracts were swaps within the CFTC's jurisdiction.  The CFTC's position provides ample basis for this Court to revisit its conclusion in *Crypto*.  *See Crypto*, 2025 WL 2916151, at *6 ("I have been presented with no agency fact finding or reasoned interpretation regarding whether these contracts are swaps.").

A rule providing that event contracts may be based on events but not outcomes would yield intractable interpretive difficulties.  Almost any event can be recharacterized as the outcome of a different event.  Whether a World Series Game 7 takes place turns on the outcome of Game 6.  Outside the sports context, the passage of a law could be framed as the outcome of a legislative vote.  A rise in corn prices could be framed as the outcome of a drought.  The default underlying a credit default swap could be framed as the outcome of an economic downturn.  Construing the CFTC's exclusive jurisdiction to turn on the distinction between events and outcomes would call into question the

---

[8] *See Prysmian Cables & Sys. USA LLC v. ADT Com. LLC*, 665 F. Supp. 3d 236, 246 (D. Conn. 2023) ("'Event' … ordinarily refers to an 'outcome'" (quoting *Event*, Oxford English Dictionary (3d ed. 2018))); *St. Paul Fire & Marine Ins. Co. v. Keene Constr. Co. of Cent. Fla., Inc.*, 2006 WL 8439591, at *4 (M.D. Fla. Feb. 3, 2006) ("An 'event' is defined as 'something that takes place,' a 'significant occurrence or happening,' or 'the actual outcome or final result'" (citing Am. Heritage Dictionary of the English Language (4th ed. 2000), and Webster's II New Riverside Univ. Dictionary (1994))).

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1    validity of almost every conceivable event contract, resulting in uncertainty, litigation, and paralysis.

2    That uncertainty would be all the more problematic if, as discussed, states remain free to impose

3    criminal penalties directly on DCMs for offering contracts that, though permitted by the CFTC, are

4    deemed not to be swaps because a court later decides they turn on outcomes rather than events.  It

5    would also have far-reaching implications because of the sheer size of the swaps market:  Interest rate

6    derivatives traded notional "rose by 15.6% to $366.6 trillion in 2024 from $317.1 trillion in 2023."[9]

7        This Court in *Crypto* stated that a contrary interpretation would mean either that "the statutory

8    words either have no meaning or have such a broad meaning that they would render superfluous other

9    portions of the CEA's definition of a swap."  2025 WL 2916151, at *9.  To the contrary, Congress's

10   definition of "swap" is broad but not limitless—it requires an event associated with a potential

11   "financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).  Congress included

12   numerous exceptions to the definition of "swap," a further indication that unwritten exceptions should

13   not be implied.  *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001).  And while it is true that many of the

14   specific swaps listed in subsection (iii) would satisfy the definition in subsection (ii), overlap is not

15   the same as superfluity, and overlap is equally inevitable under Defendants' proposed reading, because

16   many if not all of the swaps listed in subsection (iii) are "inherently financial."  Indeed, subsection (iv)

17   eliminates all doubt that Congress intended the definitions of swap to overlap, because it defines

18   "swap" to include any "agreement, contract, transaction, *that is*, or in the future becomes, commonly

19   known to the trade as a swap"—a category that encompasses all of the swaps listed in subsection (iii).

20   *See* 7 U.S.C. § 1a(47)(A)(iv) (emphasis added); *cf.* H.R. Rep. No. 93-975, at 76 (1974) (noting

21   congressional purpose to ensure the CEA would cover "all futures trading that might now exist or

22   might develop in the future").  The broad overlapping definitions of swap show that Congress intended

23   to define swap broadly, and counsel strongly against any artificial narrowing.

24       *Second*, Defendants assert (at 14) that the event underlying a swap must be "inherently …

25   financial, economic, or commercial in nature."  Defendants made this argument in *Crypto* and the

26

27   ───────────────
     [9] "SwapsInfo Full Year 2024 and the Fourth Quarter of 2024," International Swaps and Derivatives
28   Association, at 3 (Feb. 2025), *available at* https://www.isda.org/a/jYNgE/SwapsInfo-Full-Year-2024-
     and-the-Fourth-Quarter-of-2024.pdf.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1   Court did not adopt it, no doubt because the statute imposes no such requirement.  Defendants'

2   interpretation would simply rewrite the definition of swap to include language that Congress did not

3   use.  It would also effectively rob subsection (ii) of any effect, as swaps based on *inherently* financial,

4   economic, or commercial events (such as changes in prices or price indexes, or events of default) are

5   already covered by subsection (iii).  And Defendants' proposed rewriting of the definition does not

6   gel with other portions of the CEA.  In particular, the Special Rule enumerates certain types of "swaps"

7   that cannot reasonably be deemed *inherently* financial, economic, or commercial but that nonetheless

8   fall within the CFTC's jurisdiction.  7 U.S.C. § 7a-2(c)(5)(C)(i).

9           To the extent Defendants argue that Kalshi's contracts are not swaps because their underlying

10  events have insufficient potential financial, economic, or commercial consequences, they are

11  mistaken.  The outcomes of elections have obvious financial consequences.  The outcomes of sporting

12  events likewise are associated with financial consequences—often significant ones—for a broad

13  ecosystem of stakeholders, including team sponsors, advertisers, television networks, franchises, local

14  communities, and more.  *See* ECF No. 143-13 at 2948-50.  They thus easily qualify as swaps, which

15  must be based on events associated with "potential" financial consequences.  Contrary to Defendants'

16  suggestion (at 14), sports events also have "direct economic consequences" for state-regulated

17  sportsbooks themselves, which face substantial financial risks associated with sports events (if their

18  customers win, they lose—providing a natural hedging need).  Some sportsbooks have turned to

19  Kalshi's contracts to hedge their financial risks accordingly.[10]

20          *Third*, Defendants err in stating (at 15) that "the CFTC itself has rejected a broad reading of

21  'swap' that would encompass gaming."  Defendants cite the 2024 CFTC proposed rule on event

22  contracts which, as explained above, acknowledges that event contracts subject to its jurisdiction may

23  turn on outcomes.  While the proposed rule would have determined that sports-event contracts are

24  contrary to the public interest,[11] it would *not* have excluded these contracts from the CFTC's definition

25  of swap.  Indeed, the very premise of the proposed rulemaking was that the Special Rule's reference

---

[10]  Brett Smiley, *Underdog Sports Preparing to Use Kalshi, Prediction Markets For Its Own Risk Management*, In Game, https://perma.cc/BT4A-BK8T (last accessed Oct. 30, 2025).

[11]  The CFTC never adopted that rulemaking, which predated the D.C. District Court's ruling that the CFTC could not prohibit trading of Kalshi's political event contracts.  *See supra*, at 8.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1    to "swap[s]" involving "gaming" included event contracts based on outcomes of sports-related events,

2    89 Fed. Reg. at 48,975, which is why they were subject to the Special Rule in the first place.[12]

3         Citing *Crypto*, Defendants argue (at 6) that the CFTC has determined "on a blanket basis" that

4    gaming contracts are contrary to the public interest, and thus accuse Kalshi of self-certifying its

5    contracts in violation federal law.  *See Crypto*, 2025 WL 2916151, at *10.  This argument does not

6    bear on the definition of swap, but Kalshi respectfully submits that it misreads Section 40.11. While

7    Section 40.11(a) generally bars DCMs from offering contracts involving "gaming," Section 40.11(c)

8    preserves the CFTC's discretion to permit such contracts case-by-case.  The rule adopting Section

9    40.11 explains that DCMs "may always" self-certify contracts notwithstanding Section 40.11, and

10   while it refers to Section 40.11 as a general "prohibition," it also recognizes that the regulation allows

11   review "on a case-by-case basis."  76 Fed. Reg. at 44,785-86.  The CFTC's recent proposed rule on

12   event contracts explained that if the CFTC "determines that the contract involves [an enumerated]

13   activity, the Commission *must assess whether the contract is contrary to the public interest*."  89 Fed.

14   Reg. at 48,971 (emphasis added).  That proposed rule—which would have categorically prohibited

15   gaming contracts—would have been unnecessary if Section 40.11 already accomplished that result.

16   And reading Section 40.11 as a blanket prohibition would run afoul of the CEA and APA, because

17   Section 40.11 contains no rationale for finding every conceivable gaming-related contract to be

18   contrary to the public interest.  While the Court in *Crypto* noted that "Crypto did not explain in its

19   self-certification" how its contracts comply with Section 40.11, 2025 WL 2916151, at *10 n.14,

20   Kalshi's response to the CFTC contained an ███████████████████████████████████████

21   ██, *see* Ex. 1 at 11-15.

22        *Finally*, even if the Court accepts Defendant's reading of "swap," the CFTC's exclusive

23   jurisdiction also extends to "future[s]" and "option[s]" on DCMs.  7 U.S.C. § 2(a)(1)(A).  The events

24   on which Kalshi's contracts are based fall within the definition of "excluded commodity," which

---

25   [12] Defendants likewise point to a CFTC regulation clarifying that certain kinds of "consumer and
26   commercial arrangements that historically have not been considered swaps" are not covered by the
     CEA.  CFTC, *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,246-48,248 (Aug. 13, 2012).
27   But Defendants omit a key part of the regulation, which distinguishes non-swap "consumer and
     commercial arrangements" from swaps in part based on whether the instruments are "traded on an
28   organized market."  *Id.* at 48,247.  Kalshi's contracts are, of course, traded on an organized market.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1   includes any "occurrence, extent of an occurrence, or contingency … that is … beyond the control of

2   the parties to the relevant contract, agreement, or transaction; and … associated with a financial,

3   commercial, or economic consequence." *Id.* § 1a(19)(iv).  Unlike the definition of "swap," this

4   definition does not contain the term "event," so *Crypto* provides no basis to exclude Kalshi's contracts

5   from CEA coverage.  Indeed, multiple courts have concluded that event contracts like those Kalshi

6   offers are covered by the CEA as transactions in excluded commodities.  *KalshiEX*, 2024 WL

7   4164694, at *2 ("Event contracts are subject to regulation under the CEA as 'excluded

8   commodities.'"); *Trade Exch. Network Ltd.*, 117 F. Supp. 3d at 37-38 (rejecting argument that event

9   contracts "did not involve a 'commodity' regulated under the CEA").

10          *Treating sports-event contracts as swaps would not make all sports wagering unlawful.*

11  Defendants accuse Kalshi (at 15) of taking the position that "nearly every sports bet is a swap," which

12  in turn would mean "that all sports wagering must be done on a DCM, and not at casinos."  But nothing

13  about Kalshi's position leads to that implausible result, for numerous reasons.

14          The CEA preempts state law as to on-DCM trading but leaves states free to regulate off-DCM

15  transactions like sports bets offered by sportsbooks.  As Defendants concede (at 18), the CEA contains

16  a savings clause making clear that, except as provided by the grant of exclusive jurisdiction to the

17  CFTC over *on-DCM* trading, "nothing" in the remainder of Section 2 shall "restrict" state authorities

18  "from carrying out their duties and responsibilities in accordance with [state] laws."  7 U.S.C. § 2(a);

19  *see id.* § 16(e)(1)(B)(i) ("[n]othing" in the CEA "shall supersede or preempt" state law applied to off-

20  exchange transactions).  That leaves states free to apply state laws to traditional sportsbooks.

21          Defendants are also mistaken that if sports-event contracts are swaps, then so are run-of-the-

22  mill sports bets.  Acting pursuant to an express delegation from Congress, the CFTC has explained

23  that swaps are instruments "*traded* on organized markets and over the counter."  77 Fed. Reg. at 48,217

24  (emphasis added).  But sports bets between a gambler and sportsbooks are not traded—once a gambler

25  places a bet with a sportsbook in Nevada, neither the gambler nor the sportsbook can sell that bet to

26  anyone else on any organized exchange.  The CFTC has further noted that "consumers enter into

27  various types of" transactions in their "personal lives that may have attributes that could be viewed as

28  falling within the swap" definition, but it does "not believe that Congress intended to include" these

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1  arrangements as swaps if "[t]hey are not traded on an organized market." *Id.* at 48,246-47. That

2  rationale applies to sports bets, but not sports-event contracts on DCMs.

3      Congress, too, has recognized that certain derivatives traded on DCMs may have attributes that

4  resemble gambling, and it intended the CFTC to regulate them while allowing the states to regulate

5  off DCMs. In the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"), Congress

6  generally adopted state-law definitions of "bet or wager" but expressly provided that "bet or wager"

7  "*does not include*" "any transaction conducted on or subject to the rules of a" DCM. 31 U.S.C.

8  § 5362(1)(E)(ii) (emphasis added). UIGEA confirms Congress's judgment that on-DCM transactions

9  should be regulated by the CFTC, while off-DCM transactions should be regulated by states.

10      **2.  Defendants Provide No Basis for the Court to Revisit Preemption.**

11      This Court has rejected Defendants' preemption arguments twice—first, in granting Kalshi a

12  PI and then in denying a PI in *Crypto*. 2025 WL 2916151, at *5 (quoting ECF No. 45 at 11) ("Section

13  2's plain and unambiguous language" grants the CFTC exclusive jurisdiction over trading covered

14  instruments on DCMs, thereby "supersed[ing] … state regulatory authorities' jurisdiction.").

15  Defendants provide no basis to depart from those rulings.

16      *First*, Defendants argue (at 16) that the CEA does not expressly preempt state law. But Section

17  2's grant of "exclusive jurisdiction" to the CFTC expressly preempts the field of regulating trading on

18  DCMs. 7 U.S.C. § 2(a)(1)(A); *see Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*, 108

19  F.4th 144, 151-152 (3d Cir. 2024) (an "explicit statutory conferral of exclusive jurisdiction ... is a form

20  of express preemption"); *see Crosby v. Nat'l Foreign Tr. Council*, 530 U.S. 363, 372 n.6 (2000)

21  ("'*field*' preemption may fall into any of the categories of express, implied, or conflict preemption").

22  Regardless of the label, the CEA "reflects congressional intent to occupy the field of regulating CFTC-

23  designated exchanges and the transactions on those exchanges." ECF No. 45 at 12. The other "express

24  preemption provisions" that Defendants identify (at 16) support preemption rather than cut against it.

25  Section 16(h)(2) is not a preemption provision at all, but rather prohibits states from regulating any

26  swap, whether on- or off-exchange, "as an insurance contract." 7 U.S.C. § 16(h)(2). And Section

27  16(e)(2) preempts state gaming law as to certain types of *off-DCM* transactions—which are *not* subject

28  to the CFTC's exclusive jurisdiction. Specifying preemption of *on-DCM* transactions would have

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1    been confusing and unnecessary; that is what Section 2 already accomplished.  *Id.*  Indeed, when

2    Congress added Section 16(e)(2) to the CEA, it noted that "the current" CEA already "supersedes and

3    preempts" state law "in the case of transactions conducted on a registered entity" like a DCM, and the

4    new provision clarified that "the CEA supercedes and preempts State gaming and bucket shop laws"

5    as to only certain limited categories of off-DCM transactions.  H.R. Rep. No. 106-711, pt. 2, at 71

6    (2000).

7         *Second*, Defendants cannot overcome the overwhelming evidence of field preemption.  Section

8    2's language is "plain and unambiguous."  ECF No. 45 at 12.  The CEA also sets out a comprehensive

9    scheme governing DCMs, including which contracts a DCM may list for trading.  *See* ECF No. 45 at

10   7-8 (summarizing CEA provisions and CFTC regulations).  In 1974, Congress explained that the

11   statute was designed to "*preempt the field* insofar as futures regulation is concerned."  H.R. Rep. No.

12   93-1383 at 35 (emphasis added).  Of course, the CEA does not "occupy the field of gaming," but it

13   does occupy the field of regulating trading on DCMs.  ECF No. 45 at 12 n.5.

14        Recognizing the CEA's preemptive effect does not conflict with the Indian Gaming Regulatory

15   Act ("IGRA") or the Wire Act, as Defendants claim (at 19-20).  Defendants ignore UIGEA, which

16   shows that Congress does not consider DCM-traded instruments to be bets or wagers subject to state

17   or federal laws governing gambling.  *See* 31 U.S.C. § 5362(1)(E)(ii).  UIGEA postdates both IGRA

18   and the Wire Act, and its definition of "bet or wager" is "entitled to great weight" in resolving the

19   meaning of prior statutes addressing the same subject matter.  *Bob Jones Univ. v. United States*, 461

20   U.S. 574, 587 n.10 (1983) (quotation omitted).  Interpreting IGRA and the Wire Act to exclude trading

21   on DCMs would harmonize them with the CEA and UIGEA, fulfilling the obligation to interpret

22   "statues dealing with similar subjects … harmoniously." *James v. City of Costa Mesa*, 700 F.3d 394,

23   399 n.8 (9th Cir. 2012) (quotation omitted).  Defendants' approach, by contrast, would unnecessarily

24   read the statutes to conflict.

25        *Third*, Nevada's laws are conflict preempted.  Defendants claim (at 20) that "Kalshi does not

26   explain how conducting sports betting in accordance with Nevada law would require it to violate a

27   core principle."  But Nevada allows sports bets only by persons physically located in Nevada or

28   specified other states.  Nev. Reg. 22.140(1).  Other states impose similar requirements.  It would be

1    flatly impossible for Kalshi to operate a nationwide exchange and comply with its impartial access

2    obligations while adhering to individual state laws permitting trades only from within individual

3    states—not to mention the myriad other requirements that differ from state to state. And, as the

4    Seventh Circuit has held, "[w]hen application of state law would directly affect trading on or the

5    operation of a [DCM], it would stand 'as an obstacle to the accomplishment and execution of the full

6    purposes and objectives of Congress,' and hence is preempted." *Am. Agric.*, 977 F.2d at 1156-57

7    (citation omitted). There is no dispute that Defendants seek to directly affect trading on a DCM.

8    **B.  Kalshi Will Face Irreparable Harm if the Injunction is Dissolved.**

9        As when the Court granted the PI, Kalshi remains at risk of imminent civil and criminal

10   enforcement. ECF No. 45 at 14-15. Absent the PI, it confronts a "Hobson's choice," either facing

11   liability in state court, or the prospect of "substantial economic and reputational harm as well as the

12   potential existential threat of the CFTC taking action against it for violating the CFTC's Core

13   Principles if Kalshi disrupts contracts or geographically limits" access to "a national exchange."[13]

14   ECF No. 45 at 15. The "credible threat of prosecution" under a preempted state statute constitutes

15   "irreparable harm." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

16       Defendants do not contest the Court's finding that Kalshi presented "credible evidence that

17   even if it could implement geofencing at great expense, it could not do so immediately as the

18   defendants demanded," ECF No. 45 at 15—which remains true today, *see* Ex. 3 ("Sottile Decl.") ¶¶

19   5-7. Nor do Defendants dispute that Kalshi could not recover damages should it ultimately prevail

20   without a PI in place. *See* ECF No. 45 at 15. Instead, Defendants raise a new argument (at 21-22),

21   claiming that Kalshi can exclude "Nevada residents" from its exchange. But this is a rhetorical sleight-

22   of-hand. Defendants' cease-and-desist letter demanded that Kalshi "immediately cease and desist

23

---

24   [13] Case law cited by Defendants for the notion that "being required to follow the law is not a harm"
     (at 21) is inapposite, and none concerned preemption. *Goldman v. Newage Lake Las Vegas, LLC*
25   concerned an attempt to evade arbitration where movant did not address harm or even show it would
     be required to arbitrate the claim at issue. 2019 WL 13254890, at *1 (D. Nev. Oct. 23, 2019). In *John*
26   *Doe Co. v. CFPB*, movant did not contest the jurisdiction of the CFPB to bring the enforcement
     proceeding at issue (unlike Kalshi here) and presented only "incremental and conclusory" allegations
27   of harm "that may never come." 235 F. Supp. 3d 194, 202-205 (D.D.C. 2017). And in *O'Shea v.*
     *Littleton*, movants did not allege an actual case or controversy, but rather speculated about hypothetical
28   future prosecution. 414 U.S. 488, 493, 501-502 (1974).

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

from offering any event-based contracts" not for *Nevada residents*, but "*in Nevada*." ECF No. 1-2 at 1, 3 (emphases added). When Defendants opposed Kalshi's PI motion, they emphasized that it was "vital that all gaming activity which *takes place in Nevada*" be "strictly regulated and licensed." ECF No. 34 at 22 (emphasis added). This Court's PI decision addressed geofencing, which is the process necessary to prevent Kalshi from being available *in Nevada*.

Defendants' assertion that Kalshi could block Nevada residents based on residency information obtained at customer registration is entirely different. It would allow out-of-state visitors to trade on Kalshi in Nevada, while barring Nevada residents from trading anywhere.[14] *See* Sottile Decl. ¶ 10. There are a host of problems with this proposed solution. For one, it is inconsistent with the demand in Defendants' cease-and-desist letter that gave rise to this suit. For another, it would conflict with the law. If a DCM were to voluntarily exclude residents of particular states from accessing the exchange, it would risk violating the CFTC's Core Principles.[15] And a state could not *compel* a DCM to do so without violating the Commerce Clause, which "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (citation omitted); *see id.* at 337 ("[N]o State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another"). A state cannot regulate the activity of its residents in a separate state. *Bigelow v. Virginia*, 421 U.S. 809, 823 (1975). That is why a resident of Utah—which bans all casino gambling—can legally play blackjack in Las Vegas, but a Nevada resident cannot legally do the same in Salt Lake City.

Defendants may cite their recent agreement with Crypto that "obviate[d] the need for interim relief regarding enforcement pending appeal." ECF No. 110, *Crypto*, No. 2:25-cv-978 (Oct. 24, 2025). The conditions of that agreement were not disclosed, but the NGCB has stated that Crypto "will not be offering sport event contracts *to Nevada residents*," without reference to activity *in Nevada*. Ex. 4

---

[14] This includes a Nevada resident visiting New Jersey, where Kalshi has obtained a preliminary injunction against substantially similar state laws.

[15] This appears to be what Robinhood did. Defendants claim (at 22) Robinhood "block[ed] access … in Nevada" but the cited declaration refers only to exclusion of "Nevada residents," not geofencing. ECF No. 8 ¶¶ 11-12, *Robinhood Derivatives LLC v. Dreitzer*, No. 25-cv-01541 (D. Nev. Aug. 19, 2025) ("Mackenzie Decl."). And Robinhood is not a DCM subject to impartial access obligations.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

at 1 (emphasis added). Crypto does not geofence.[16] It therefore appears that Defendants have only agreed to a residency restriction with Crypto, meaning that Crypto *continues to operate in Nevada* and to offer event contracts to Nevada's 52 million annual out-of-state visitors, a number that far outstrips Nevada's approximately 3.1 million residents.[17] Even so, it is far from clear whether this arrangement comports with Crypto's impartial-access requirements.

Cutting off access to Nevada residents would be extremely harmful to Kalshi. Unlike Crypto, for at least several months Kalshi has been partnering with multiple CFTC-regulated futures commission merchants ("FCM"), which permit their customers to trade on Kalshi's exchange; those FCM customers represent a substantial portion of Kalshi's business. Sottile Decl. ¶¶ 8, 16. While Kalshi has residency information for its direct customers, it lacks it for customers that transact through an FCM, because FCMs only provide Kalshi with an anonymized user ID representing the FCM's customers. *Id*. ¶ 12. Relief requiring Kalshi to cut off contracts offered through an FCM could impose substantial and myriad harms on Kalshi, and on its FCM partners. *Id*. ¶¶ 17-30. Kalshi also lacks a mechanism for disabling all sports or election contracts for users in a given state and would require substantial resources to create processes necessary to capture all future sports or political listings. *Id*. ¶ 15. Closing open positions poses even greater difficulty and harm. Kalshi has offered a contract on the 2026 Super Bowl champion since February 2025.[18] Traders in that market have been able to enter and exit positions for months, so if Kalshi were required to close out Nevada residents from their original positions (and thereby impact counterparties in other states), it could face massive financial consequences, for that and other markets, as detailed in the accompanying declaration.[19] Sottile Decl. ¶¶ 23-28. This would dramatically upset Kalshi's relationships with its essential FCM partners and invite future litigation, to say nothing of harm to Kalshi's customer relations. *Id*. ¶¶ 23-29.

---

[16] ECF No. 15-2 ¶¶ 12, 17, *Crypto*, No. 2:25-cv-978 (June 5, 2025).

[17] *Tourism in Nevada Means a Thriving Economy*, Travel Nevada Industry Partners (2025), https://perma.cc/Q2F2-2YAM (last accessed Oct. 31, 2025); *Population and Housing*, U.S. Census Bureau: NEVADA 2020 Census (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/nevada.html (last visited Oct. 31, 2025).

[18] *Pro Football Champion?*, Kalshi, https://kalshi.com/markets/kxsb/super-bowl/kxsb-26 (last accessed Oct. 31, 2025).

[19] Robinhood avoided this problem with its prior residency restriction since it occurred before it ever allowed Robinhood users to trade sports event contracts. Mackenzie Decl. ¶¶ 4, 11-12.

1    As such, even if Defendants demanded that Kalshi block trades for Nevada residents, Kalshi

2    would still face a Hobson's choice: either face state enforcement if it says no, or bar Nevada residents

3    from trading, which would harm its users; imperil its reputation; and render impossible compliance

4    with its "impartial access" obligations, 17 C.F.R. § 38.151(b), which this Court has recognized would

5    be an "existential threat," ECF No. 45 at 15, as well as Core Principles requiring open, competitive,

6    and efficient execution of transactions, the prevention of price distortions, and the financial integrity

7    of DCM transactions, 17 C.F.R. §§ 38.250, 38.500, 38.602.

8    **C.  The Balance of Harms and Public Interest Support Preserving the Injunction.**

9    Defendants' equities arguments (at 22) turn on their view that Kalshi no longer is likely to

10   succeed on the merits.  But as Kalshi's likelihood of success has not changed, the balance of harms

11   and public interest have not changed either.  As the Ninth Circuit has explained, "preventing a violation

12   of the Supremacy Clause serves the public interest." *United States v. California*, 921 F.3d 865, 893-

13   894 (9th Cir. 2019); *see also Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1060 (9th

14   Cir. 2009).  And Defendants' claim of irreparable harm from temporarily being unable to enforce

15   Nevada's gambling laws is undermined by their decision not to appeal the PI order six months ago.

16   As this Court previously explained, the public interest favors "preserv[ing] the status quo,

17   which is that these contracts are legal under federal law."  ECF No. 45 at 16.  That is especially true

18   because "third parties' contracts and investment expectations would be disrupted if Kalshi were forced

19   to terminate its existing contracts for Nevada-based users," which could "impact counterparties to

20   those contracts who are neither based in Nevada nor signed the event contracts while in Nevada." *Id.*

21   While Defendants tout the protections afforded by the state's licensing regime, Kalshi is subject to a

22   different set of regulations and imposes many of the same protections.  Minors are not permitted to

23   trade on Kalshi; Kalshi complies with know-your-customer requirements; and Kalshi has voluntary

24   opt-outs. *See* Sottile Decl. ¶¶ 9, 11.  Kalshi is also subject to a host of CFTC-imposed obligations to

25   ensure to ensure market stability, protect against manipulation, and ensure that users are free from

26   "abusive," "fraudulent," and "unfair" practices. *E.g.*, 17 C.F.R. §§ 38.651, 38.152.  The question is

27   not whether Kalshi should be regulated, but by whom.  Congress's clear answer is the CFTC.

28   The Court in *Crypto* concluded that the balance of the equities disfavored a PI.  Kalshi

BAILEY✷KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

respectfully disagrees, but in any event, that conclusion should not control here because the *Crypto* plaintiff bore the burden of proving entitlement to a PI, whereas the burden here is on Defendants. In addition, this case is closer to final judgment than *Crypto*. Kalshi moved for summary judgment months ago, Defendants' response is due on November 21, and Defendants may cross-move for summary judgment at any time. The equities strongly favor preserving "the relative positions of the parties" in the meantime. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). If the PI were dissolved but Kalshi prevailed either on final judgment or appeal, Kalshi would suffer catastrophic harms to its business and reputation. By contrast, if the PI is preserved but Defendants later prevail, the PI causes them minimal harm because they can seek to "prosecute Kalshi later for its conduct." ECF No. 45 at 15.

### III.    If the Court Dissolves the Preliminary Injunction, It Should Stay Its Decision or Grant an Injunction Pending Appeal.

If the Court grants dissolution, Kalshi intends to appeal. Until the Ninth Circuit resolves the "serious legal questions" raised by the appeal, Kalshi respectfully requests that the Court preserve the status quo by staying its dissolution order. *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008) (citation omitted). In addition, if the Court declines to grant relief for the full duration of the appeal, Kalshi will seek immediate relief from the Ninth Circuit, and requests that the Court issue a shorter-term stay pending only the Ninth Circuit's resolution of Kalshi's request for immediate relief. *See United States v. Texas*, 144 S. Ct. 797, 798-799 (2024) (Barrett, J., concurring) (describing this type of "administrative" relief as a "flexible, short-term tool" designed "to minimize harm while an appellate court deliberates"); *John Doe Co.*, 235 F. Supp. at 206-207 (issuing administrative stay given "novel legal question").

Federal courts have "inherent power … to make whatever order is deemed necessary to preserve the status quo and to ensure the effectiveness of the eventual judgment." *Tribal Vill. of Akutan v. Hodel*, 859 F.2d 662, 663 (9th Cir. 1988) (citation omitted). A court may "suspend[] judicial alteration of the status quo" by granting a stay of its own order. *Nken v. Holder*, 556 U.S. 418, 429 (2009). Courts may likewise grant "injunctions pending appeal" in "cases presenting novel, difficult, and important legal questions that warrant further consideration before the status quo is disrupted."

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

*Apache Stronghold v. United States*, 782 F. Supp. 3d 756, 770 (D. Ariz. 2025) (citation omitted). In deciding whether to grant a stay, courts are guided by factors similar to the PI factors. *See Nken*, 556 U.S. at 434. The standard may be satisfied where "the moving party … demonstrate[s] that serious legal questions are raised and that the balance of hardships tips sharply in its favor." *Golden Gate*, 512 F.3d at 1116 (citation omitted).

      *First*, Kalshi has established a sufficient likelihood of success to warrant relief pending appeal. A court need not "decide that it was wrong before" to grant a stay. *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1235 (N.D. Cal. 2025). Rather, a court "may grant" relief "even though its own approach may be contrary to the requesting party's view of the merits." *US Bank, N.A. v. Renovista Ridge Master Prop. Owners Ass'n*, 2019 WL 8275339, at *3 (D. Nev. Mar. 27, 2019) (quotation omitted). This Court need only determine that Kalshi has "a probability of success" or raised "serious legal questions." *Leiva-Perez v. Holder*, 640 F.3d 962, 966-967 (9th Cir. 2011). Kalshi clears that bar.

      This case presents novel and important legal questions that have divided courts. This Court and the District of New Jersey granted PIs to Kalshi on the ground that the CEA preempts application of state gambling laws to Kalshi's sports-event contracts. ECF No. 45 at 13; *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025). The District of Maryland came to the opposite conclusion and denied a PI. *Martin*, 2025 WL 2194908, at *5. This Court then denied a PI in *Crypto* on the ground that sports-event contracts are not swaps—an argument no other court has accepted. 2025 WL 2916151, at *11. That split alone shows that these legal questions are sufficiently serious to warrant relief pending appeal. *See NetChoice*, 761 F. Supp. 3d at 1236 (granting injunction pending appeal in light of "novel, difficult, and important" issues raised). This Court's *Crypto* decision "'chart[ed] a new and unexplored ground,'" and "appellate review" is warranted before altering the status quo. *Id.* Courts throughout the Ninth Circuit have granted relief pending appeal on lesser showings of likelihood of success.[20]

---

[20] *See, e.g.*, *Sears Holdings Mgmt. Corp. v. M. Bros., Inc.*, 2017 WL 11427080, at *2 (C.D. Cal. May 1, 2017) (movant "raised colorable legal questions in its appeal, if barely"); *United States v. $4,931.23 in Bank Acct. Fund From Golden State Bank*, 2017 WL 11927475, at *3 (C.D. Cal. Mar. 21, 2017) (movant's "novel argument" was "not wholly outlandish"); *Davila v. County of San Joaquin*, 2008 WL 4426669, at *2 (E.D. Cal. Sept. 26, 2008) ("the evidence upon which" the court's ruling "was based was sufficiently sparse so as to create a fair possibility of reversal by the Court of Appeals").

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

*Second*, for many of the reasons that the equities support maintaining the PI, they support issuance of relief pending appeal in the event the Court dissolves the PI.  And additional considerations would make the harms to Kalshi especially acute if it does not obtain relief pending appeal.  Absent an injunction, Defendants could immediately carry out their threat to bring an enforcement proceeding against Kalshi in Nevada state court, up to and including criminal charges.  NRS 463.360(3).  As soon as Defendants indicated they would move to dissolve the PI, Kalshi began searching for gaming counsel to represent it in such a Nevada proceeding.  Shortly after Kalshi began its search, the NRA filed on the public docket an unsolicited and untimely list of 71 "interested parties" in this case, representing the largest casinos and hotels in Nevada.  ECF No. 141.  Kalshi has made a diligent search for an unconflicted gaming lawyer able to represent it in a Nevada enforcement proceeding, but has not yet been able to engage such counsel.  Ex. 5 (Valente Decl.).  There is thus a risk that Kalshi would have to proceed without an experienced gaming lawyer to represent it in an enforcement proceeding.[21]

Conversely, relief pending appeal would merely require Defendants to wait for the Ninth Circuit's decision.  *See Apache Stronghold*, 782 F. Supp. 3d at 768 (granting injunction pending appeal where "[t]he public interests Defendants tout will … not be lost because of an injunction, but merely delayed").  Relief pending appeal is especially warranted given that similar questions are being addressed in multiple circuits, but enforcement of Nevada law could deprive Kalshi of the benefit of victories in other jurisdictions.

## CONCLUSION

Kalshi respectfully requests that the Court deny Defendants' motion.  If the Court grants dissolution, Kalshi requests that the Court stay dissolution or grant an injunction pending appeal.[22]

---

[21] Kalshi's current Nevada counsel lack experience in navigating enforcement actions brought by Defendants.

[22] If circumstances warrant, Kalshi may ultimately seek a stay of *ongoing proceedings* before this Court—as distinct from a stay of this Court's *judgment*—pending proceedings in the Ninth Circuit either in this case or the *Crypto* case.  Courts, including this Court, commonly grant such stays where "the Ninth Circuit may clarify" the applicable law.  *In re Ocwen Loan Servicing, LLC*, 2018 WL 10529509, at *2 (D. Nev. Feb. 6, 2018); *see U.S. Bank Nat'l Ass'n v. Antelope Canyon Homeowners Ass'n*, 2016 WL 5395267, at *2-3 (D. Nev. Sept. 26, 2016) ("[t]he Ninth Circuit's ultimate resolution of this issue [presented in summary judgment briefing] may have a dispositive effect upon this litigation," and waiting for that decision would "streamline and simplify the proceedings and minimize the unnecessary expenditure of the parties' and the Court's time and resources").

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

Dated this 31st day of October, 2025.

**BAILEY❖KENNEDY**


By: /s/ Paul C. Williams
    DENNIS L. KENNEDY
    Nevada Bar No. 1462
    PAUL C. WILLIAMS
    Nevada Bar No. 12524

    NEAL KUMAR KATYAL
    (ADMITTED *PRO HAC VICE*)
    JOSHUA B. STERLING
    (ADMITTED *PRO HAC VICE*)
    WILLIAM E. HAVEMANN
    (ADMITTED *PRO HAC VICE*)
    **MILBANK LLP**
    1101 New York Avenue NW
    Washington, D.C. 20005
    Telephone:  202.835.7500
    Facsimile:  202.263.7586

    GRANT R. MAINLAND
    (ADMITTED *PRO HAC VICE*)
    ANDREW L. PORTER
    (ADMITTED *PRO HAC VICE*)
    NICOLE D. VALENTE
    (*PRO HAC VICE* PENDING)
    KATIE CASSIDY-GINSBERG
    (ADMITTED *PRO HAC VICE*)
    VICTOR HOLLENBERG
    (ADMITTED *PRO HAC VICE*)
    **MILBANK LLP**
    55 Hudson Yards
    New York, N.Y. 10001
    Telephone:  212.530.5000
    Facsimile:  212.822.5251

    *Attorneys for Plaintiff KalshiEX, LLC*

## CERTIFICATE OF SERVICE

I certify that I am an employee of BAILEY❖KENNEDY and that on the 31st day of October, 2025, service of the foregoing was made by mandatory electronic service through the United States District Court's electronic filing system and/or by email or by depositing a true and correct copy in the U.S. Mail, first class postage prepaid, and addressed to the following at their last known address:

| | |
|---|---|
| JESSICA E. WHELAN<br>SABRENA K. CLINTON<br>DEVIN A. OLIVER<br>**STATE OF NEVADA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br>1 State of Nevada Way, Suite 100<br>Las Vegas, NV 89119 | Email:  jwhelan@ag.nv.gov<br>            sclinton@ag.nv.gov<br>            doliver@ag.nv.gov<br><br>*Attorneys for Defendants* |
| ADAM HOSMER-HENNER<br>A.G. BURNETT<br>JANE SUSSKIND<br>KATRINA WEIL<br>THADDEUS C. HOUSTON<br>**McDONALD CARANO LLP**<br>100 West Liberty Street, 10th Floor<br>Reno, NV 89501 | Email:<br>ahosmerhenner@mcdonaldcarrano.com<br>agburnett@mcdonaldcarano.com<br>jsusskind@mcdonaldcarano.com<br>kweil@mcdonaldcarano.com<br>thouston@mcdonaldcarano.com<br><br>*Attorneys for Intervenor*<br>*Nevada Resort Association* |
| RORY K. SCHNEIDER<br>**MAYER BROWN LLP**<br>1221 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10020 | Email:  rschneider@mayerbrown.com<br><br>*Attorneys for Defendants* |
| NICOLE A. SAHARSKY<br>MINH NGUYEN-DANG<br>**MAYER BROWN LLP**<br>1999 K STREET NW<br>WASHINGTON, DC 20006 | Email:<br>nsaharsky@mayerbrown.com<br>mnguyen-dang@mayerbrown.com<br><br>*Attorneys for Defendants* |

_/s/ Paul C. Williams_
Employee of BAILEY❖KENNEDY

BAILEY❖KENNEDY<br>8984 SPANISH RIDGE AVENUE<br>LAS VEGAS, NEVADA 89148-1302<br>702.562.8820