DENNIS L. KENNEDY
NEVADA BAR NO. 1462
PAUL C. WILLIAMS
NEVADA BAR NO. 12524
**BAILEY❖KENNEDY**
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NV 89148
TELEPHONE: 702.562.8820
FACSIMILE: 702.562.8821
DKennedy@BaileyKennedy.com
PWilliams@BaileyKennedy.com

NEAL KUMAR KATYAL
(ADMITTED *PRO HAC VICE*)
JOSHUA B. STERLING
(ADMITTED *PRO HAC VICE*)
WILLIAM E. HAVEMANN
(ADMITTED *PRO HAC VICE*)
**MILBANK LLP**
1101 NEW YORK AVENUE NW
WASHINGTON, DC 20005
TELEPHONE: 202.835.7500
FACSIMILE: 202.263.7586

*Attorneys for Plaintiff KalshiEX, LLC*

GRANT R. MAINLAND
(ADMITTED *PRO HAC VICE*)
ANDREW L. PORTER
(ADMITTED *PRO HAC VICE*)
NICOLE D. VALENTE
(ADMITTED *PRO HAC VICE*)
KATRIN CASSIDY-GINSBERG
(ADMITTED *PRO HAC VICE*)
VICTOR HOLLENBERG
(ADMITTED *PRO HAC VICE*)
**MILBANK LLP**
55 HUDSON YARDS
NEW YORK, NY 10001
TELEPHONE: 212.530.5000
FACSIMILE: 212.530.5219

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

|  |  |
|---|---|
| KALSHIEX, LLC, | Case No. 2:25-cv-00575-APG-BNW |
| Plaintiff, | |
| vs. | **PLAINTIFF'S EMERGENCY MOTION FOR A STAY PENDING APPEAL OF ORDER GRANTING MOTION TO DISSOLVE PRELIMINARY INJUNCTION** |
| KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board, et al., | |
| Defendants, | |
| vs. | |
| NEVADA RESORT ASSOCIATION, | |
| Intervenor-Defendant. | |

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

**INTRODUCTION**

Earlier today, the Court dissolved Kalshi's PI.[1]  ECF No. 237 ("Dissolution Order").  Kalshi has not yet had an opportunity to carefully review the Dissolution Order.  With the PI no longer in effect, however, Kalshi faces a threat of imminent criminal enforcement by Nevada authorities.  Accordingly, Kalshi respectfully requests, by this motion, a stay of the Dissolution Order pending appeal.  Kalshi further requests that the Court immediately issue an administrative stay of the Dissolution Order while it considers this motion, or alternatively, while Kalshi seeks a stay from the Ninth Circuit.  Kalshi intends to file a notice of appeal from the Dissolution Order to the Ninth Circuit later today.  In the event the Court does not issue an administrative stay by the close of business on November 26, 2025, Kalshi intends to seek a stay from the Ninth Circuit promptly thereafter.  Given the exigent circumstances, Kalshi requests that the Court hear this motion on an emergency basis.  Pursuant to Local Rule 7-4(a), Kalshi is submitting the declaration of Andrew L. Porter as Exhibit 1 in support of its request.[2]

\*     \*     \*

This case presents complex legal issues that have divided courts across the country.  As this Court recognized, multiple appeals concerning these issues are already pending, both in the Ninth Circuit and other Circuits.  These appellate proceedings will resolve the question of whether states may ban Kalshi's event contracts even though they are overseen by the CFTC.  And the issues raised, both here and elsewhere, are "serious legal questions" of the sort that merit a stay.  *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008) (citation omitted); Dissolution Order at 24.

Defendants have nonetheless made clear that, with the PI dissolved, they intend to bring criminal or civil enforcement proceedings against Kalshi in state court unless the Dissolution Order is stayed pending appeal.  They rejected a request (identical to one that state officials in Maryland accepted in similar circumstances) to withhold enforcement against Kalshi pending appeal.  Indeed,

---

[1] Capitalized terms that are not otherwise defined have the meaning given to them in Plaintiff's Response in Opposition to State Defendants' Emergency Motion to Dissolve the Preliminary Injunction Entered on April 9, 2025.  ECF No. 183.

[2] Kalshi will submit the exhibits to this motion, including the declaration, later today.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

Defendants would not commit to non-enforcement even for a short period *pending the Court's res-olution of any motion for a stay*.  In effect, Defendants intend to initiate a criminal prosecution against Kalshi even as this Court considers a request for a stay.  To minimize the risk that Defendants will prosecute Kalshi before this Court can consider Kalshi's request for a stay, Kalshi files this motion now.

A stay is warranted given the irreparable harm Kalshi will face without one.  Defendants have demanded that Kalshi employ geofencing technology to stop offering sports and election contracts in Nevada.  They have suggested, as an alternative arrangement pending appeal, an agreement whereby Kalshi would stop offering those event contracts to Nevada residents—even those located outside of Nevada—but not to residents of other states—even those located in Nevada.  Each option is untenable for Kalshi.  Each would require Kalshi to take down election contracts that the District Court for the District of Columbia found could permissibly be traded nationwide, and each would require Kalshi to close current open positions, exposing Kalshi to severe financial and reputational harm.

As for geofencing specifically, it is undisputed that Kalshi currently lacks a mechanism to stand up a geofencing regime in a quick or cost-free manner.  It would take months, and cost millions of dollars, which Defendants do not contend Kalshi could recover.  Defendants have left little doubt that they would bring criminal charges against Kalshi absent a stay.  But even if Kalshi could avoid prosecution by taking expeditious steps to geofence, Kalshi would face severe irreparable harm from shuttering existing contracts for users in Nevada.  Users in other states who have transacted with Nevada users would also suffer harm, even if located in a state where Kalshi has obtained a prelim-inary injunction or a non-enforcement agreement.  And Kalshi would face the "existential" risk that imposing geographical limitations on its DCM would bring Kalshi out of compliance with CFTC Core Principles—a harm that other regulated entities such as FCMs, which are not subject to the impartial-access obligation, do not share.  *See* ECF No. 45 at 15-16.  No federal court has allowed states to enforce their gambling laws against Kalshi, and if this Court does not grant a stay, Kalshi's efforts to preserve the status quo elsewhere would be for naught.

Shuttering contracts for Nevada residents, as Crypto did, would be just as harmful to Kalshi

as geofencing, and for many of the same reasons.  Cutting off access and closing out positions for Nevada residents would be highly disruptive and very likely violate CFTC Core Principles.  It would also require Kalshi to block Nevada residents from trading sports-event contracts in other states— including New Jersey, where Kalshi has obtained a PI.  A residency-based restriction is also mean-ingfully different from geofencing in a way that calls into serious doubt Defendants' claims of harm.  Under Crypto's arrangement, Nevada's millions and millions of out-of-state visitors, who vastly out-number Nevada residents, are free to trade sports-event contracts on Crypto every day, with Defend-ants' consent.

Kalshi is thus left with the prospect of imminent criminal prosecution in Nevada state court.  Such a prosecution, especially when the issue is subject to appeal in multiple Circuits, would result in chaos.  It would lead to parallel state and federal proceedings addressing the exact same legal questions; raise the possibility of conflicting state and federal decisions as to the same parties; effec-tively nullify Kalshi's pre-enforcement challenge under *Ex parte Young*; unnecessarily tax the re-sources of both state and federal courts; constrain Kalshi's conduct outside of Nevada, even in juris-dictions where other courts have deemed Kalshi's conduct lawful; and subject Kalshi to the extensive and irreparable harms attendant to defending itself from the accusation of criminal wrongdoing.  These circumstances make this a quintessential case warranting a stay pending appeal.

A stay is especially warranted given that, as the Court has recognized, this case presents complex legal issues that have divided the courts.  ECF No. 219 at 111; Dissolution Order at 2-3.  The Court has dissolved the injunction on the grounds that Kalshi's contracts are not swaps or other derivatives subject to the CFTC's exclusive jurisdiction, Dissolution Order at 11-24, but Kalshi re-spectfully submits that there is a substantial probability the Ninth Circuit's views will differ from this Court's on key issues—including whether Defendants mount an improper collateral challenge to the CFTC's decision to permit Kalshi's contracts, whether Kalshi's contracts are swaps under the CEA, and whether Kalshi's contracts are "contracts of sale of a commodity for future delivery"  or "option[s]" subject to the CFTC's exclusive jurisdiction.  7 U.S.C. § 2(a)(1)(A).  The Ninth Circuit could disagree with this Court on any one of those issues, and Kalshi has raised "serious questions" as to each one.  Dissolution Order at 24; *Golden Gate Rest. Ass'n*, 512 F.3d at 1116.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1    Defendants, by contrast, identify only reparable harms.  While they would not be able to

2    enforce against Kalshi now, if they ultimately prevail on appeal, they could do so later.  In the mean-

3    time, though Kalshi will not be regulated by Nevada gaming regulators, it must comply with the

4    CEA and extensive CFTC regulations that protect the integrity of trading on its DCM.  Thus, even if

5    a stay is granted, if Defendants prevail on final judgment, the only harm they will have suffered is

6    delay.  The same cannot be said for Kalshi, whose business could be threatened absent a stay.

7    In light of the dissolution of the PI, Kalshi respectfully requests that this Court follow this

8    orderly approach and stay the Dissolution Order pending appeal.  Kalshi further requests that the

9    Court grant an administrative stay pending its resolution of this Motion, or alternatively during the

10    pendency of any application for a stay from the Ninth Circuit.

11    **BACKGROUND**

12    On March 4, 2025, the NGCB sent a cease-and-desist letter to Kalshi.  ECF No. 1-2.  The

13    cease-and-desist letter threatened Kalshi with both criminal and civil penalties and stated that

14    Kalshi's offering of event contracts constitutes a category B felony under NRS 463.360(3).  *Id*. at 2.

15    It further stated that "NGCB, as well as all state and local law enforcement and regulatory agencies

16    in Nevada, expressly reserve[d] all rights to pursue criminal and civil actions based on Kalshi's past

17    and future conduct within the state."  *Id*.

18    Kalshi filed this action in response, and shortly thereafter, the Court granted Kalshi a PI on

19    the ground that the "plain and unambiguous language" of the CEA "reflects congressional intent to

20    occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those

21    exchanges."  ECF 45 at 12.  Following this Court's decision in *North American Derivatives Ex-*

22    *change, Inc. v. Nevada* ("*Crypto*"), 2025 WL 2916151, at *9 (Oct. 14, 2025), Defendants moved to

23    dissolve the PI.  ECF No. 142.  On November 14, 2025, this Court heard argument on that motion.

24    At the conclusion of the hearing, the Court directed the parties to meet and confer to attempt to reach

25    an agreement that would obviate the need for a stay pending appeal in the event the PI is dissolved,

26    and to provide a report to the Court regarding whether the parties are able to reach such an agreement

27    by November 24, 2025.  ECF No. 219 at 110.

28    On Wednesday, November 19, 2025, the parties had a meet-and-confer call as directed by

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

the Court.  Ex. 1 ("Porter Decl.").  Kalshi inquired if, in the event the Court dissolved the PI, Defendants were willing to forgo enforcement pending appeal, as the state of Maryland had agreed to do in a similar case where Kalshi's request for a PI was denied.  *Id*.  Defendants said they were unlikely to agree, and they later confirmed that they would not agree to forgo enforcement pending appeal.  *Id*.  Defendants then said their initial proposal was for Kalshi to geofence, such that its election- and sports-event contracts were not available in Nevada.  *Id*.  Defendants also indicated openness to an arrangement under which Nevada residents would be barred from trading election- and sports-event contracts on Kalshi, and suggested this approach aligned with their agreement with Crypto.  *Id*.  With respect to existing contracts, Defendants stated they were willing to discuss mechanics, but their desire was for Kalshi to close out open positions involving Nevada users.  *Id*.  The parties agreed to confer with their clients and report back.  *Id*.

Two days later, on Friday, the parties exchanged emails.  *See* Ex. 2.  Kalshi informed Defendants that it could not agree to geofencing or imposing residency-based restrictions pending appeal and that it would thus seek a stay pending appeal.  *Id.*  Kalshi also asked whether Defendants would be willing to forgo enforcement while its stay motion is pending to allow the Court to consider that motion.  *Id.*  The following Monday, Defendants said that they "still are considering whether to agree to nonenforcement while Judge Gordon considers the motion for an injunction pending appeal."  *Id.*  Kalshi sent another email emphasizing the importance to Kalshi that Defendants agree not to initiate an enforcement action pending this Court's consideration of any stay motion, but Defendants indicated they required more time to consider whether they would agree.  *Id.*  Later that day, as requested by the Court, the parties filed their joint notice concerning their respective positions concerning non-enforcement pending appeal with the Court.  ECF No. 236.  Earlier today, the Court issued the Dissolution Order.  ECF No. 237.

## LEGAL STANDARD

Federal courts have "inherent power … to make whatever order is deemed necessary to preserve the status quo and to ensure the effectiveness of the eventual judgment."  *Tribal Vill. of Akutan v. Hodel*, 859 F.2d 662, 663 (9th Cir. 1988) (citation omitted).  A court may "suspend[] judicial alteration of the status quo" by granting a stay of its own order.  *Nken v. Holder*, 556 U.S. 418, 429

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1   (2009). Courts may likewise grant "injunctions pending appeal" in "cases presenting novel, difficult,

2   and important legal questions that warrant further consideration before the status quo is disrupted."

3   *Apache Stronghold v. United States*, 782 F. Supp. 3d 756, 770 (D. Ariz. 2025) (citation omitted). In

4   deciding whether to grant a stay, courts are guided by factors similar to the preliminary injunction

5   factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the

6   merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of

7   the stay will substantially injure the other parties interested in the proceeding; and (4) where the

8   public interest lies." *Nken*, 556 U.S. at 434. The standard may be satisfied where "the moving party

9   … demonstrate[s] that serious legal questions are raised and that the balance of hardships tips sharply

10  in its favor." *Golden Gate Rest. Ass'n*, 512 F.3d at 1116 (citation omitted).

11                                      **<u>ARGUMENT</u>**

12  **I.    The Court Should Issue An Administrative Stay Pending Consideration Of This Mo-
        tion, And If The Court Declines To Grant This Motion, It Should Issue An Administra-
13      tive Stay To Allow Kalshi To Seek A Stay From The Ninth Circuit.**

14          Kalshi intends to notice its appeal of the Dissolution Order to the Ninth Circuit later today.

15  Kalshi requests that the Court issue an administrative stay of the Dissolution Order pending resolu-

16  tion of this motion. In light of the exigent circumstances, if the Court does not grant this immediate-

17  run administrative stay by close of business on November 26, 2025, Kalshi intends to seek equivalent

18  relief from the Ninth Circuit.

19          Defendants—who were unwilling to agree to non-enforcement pending the Court's consideration

20  of this motion—have made clear that they are prepared to immediately bring an enforcement action

21  against Kalshi. In the event the Court declines to grant this motion, Kalshi intends to seek immediate

22  relief from the Ninth Circuit, and requests that the Court issue a shorter-term stay pending only the

23  Ninth Circuit's resolution of Kalshi's request for immediate relief. Administrative stays of this sort

24  are appropriate to minimize harm in circumstances such as these. *See United States v. Texas*, 144 S.

25  Ct. 797, 798-799 (2024) (Barrett, J., concurring) (describing this type of "administrative" relief as a

26  "flexible, short-term tool" designed "to minimize harm while an appellate court deliberates"); *John*

27  *Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 206-207 (D.D.C. 2017) (issuing administrative stay given

28  "novel legal question").

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

**II.    Kalshi Has Raised Serious Questions On The Merits.**

A court need not "decide that it was wrong before" to grant a stay. *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1235 (N.D. Cal. 2025). Rather, a court "may grant" relief "even though its own approach may be contrary to the requesting party's view of the merits." *US Bank, N.A. v. Renovista Ridge Master Prop. Owners Ass'n*, 2019 WL 8275339, at *3 (D. Nev. Mar. 27, 2019) (quotation omitted). Indeed, it is not uncommon for courts to grant injunctions pending appeal (which would have the same effect as staying dissolution, here) even after initially declining to issue preliminary injunctions. *See, e.g.*, *NetChoice*, 761 F. Supp. 3d at 1236 (granting injunction pending appeal after denying preliminary injunction); *Cigar Ass'n of Am. v. FDA*, 317 F. Supp. 3d 555, 557-558 (D.D.C. 2018) (same); *Ent. Prods., Inc. v. Shelby County*, No. 08-cv-2047, 2008 WL 11411138, at *2 (W.D. Tenn. Apr. 29, 2008) (same); *Native Ecosystems Council v. Kimbell*, No. 05-cv-110, 2005 WL 8167434, at *2 (D. Mont. Nov. 21, 2005) (same).

To grant a stay, this Court need only determine that Kalshi has "a probability of success" or raised "serious legal questions." *Leiva-Perez v. Holder*, 640 F.3d 962, 966-967 (9th Cir. 2011). The Court has found Kalshi has raised "serious questions" here. Dissolution Order at 24. These include: (1) whether this is a proper case for challenging the CFTC's determination that Kalshi's contracts are swaps or other tradeable derivatives, (2) whether Kalshi's contracts are swaps, and (3) if Kalshi's contracts are not swaps, whether they are other derivatives subject to the CFTC's exclusive jurisdiction. Courts in this Circuit frequently grant stays or injunctions pending appeal on far lesser showings of likelihood of success than Kalshi has made here. *See, e.g.*, *Sears Holdings Mgmt. Corp. v. M. Bros., Inc.*, 2017 WL 11427080, at *2 (C.D. Cal. May 1, 2017) (movant "raised colorable legal questions in its appeal, if barely"); *United States v. $4,931.23 in Bank Acct. Fund From Golden State Bank*, 2017 WL 11927475, at *3 (C.D. Cal. Mar. 21, 2017) (movant's "novel argument" was "not wholly outlandish"); *Davila v. County of San Joaquin*, 2008 WL 4426669, at *2 (E.D. Cal. Sept. 26, 2008) ("the evidence upon which" the court's ruling "was based was sufficiently sparse so as to create a fair possibility of reversal by the Court of Appeals").

**A.    Defendants Mount an Improper Collateral Attack on the CFTC's Oversight of a DCM.**

The en banc Ninth Circuit held in *Big Lagoon Rancheria v. California* that "[t]he proper vehicle to make" a "challenge" to an agency action "is a petition for review pursuant to the APA." 789 F.3d 947, 953 (9th Cir. 2015).  Here, that means Defendants must challenge the CFTC's exercise of exclusive jurisdiction over Kalshi's contracts through an APA action, not by threatening Kalshi with criminal charges for offering contracts that Kalshi's exclusive federal regulator has permitted. At argument, the Court questioned the applicability of *Big Lagoon Rancheria* on several grounds, but serious legal questions exist as to each one.

*First*, the Court suggested that, notwithstanding *Big Lagoon Rancheria*, it could decide the "threshold issue" of whether Kalshi's contracts are swaps.  ECF No. 219 at 67; *see also* Dissolution Order at 9-10.  But the Ninth Circuit could well decide that the threshold issue is not whether Kalshi's contracts are swaps, but whether the CFTC has exercised its exclusive jurisdiction over these contracts by allowing tens of thousands of them to be self-certified and traded without objection.  Allowing states to second-guess the CFTC's decision to permit such contracts via collateral attacks on DCMs would thwart Congress's purpose of subjecting DCMs to uniform rules.  "Congress recognized in enacting the 1974" amendments to the CEA that "a contract market could not operate efficiently" or "perhaps … at all, if varying and potentially contradictory legal standards governed its duties to investors."  *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992).  If Defendants are correct, by contrast, state officials could subject DCMs to state-court proceedings for offering contracts the CFTC has permitted.  That would allow states to exercise jurisdiction over the exact same instruments as the CFTC and raise the prospect of criminal liability for DCMs if any court, anywhere across the country, concludes that any of tens of thousands of contracts is not a swap after all.  Defendants cite no precedent to support that startling outcome, which is irreconcilable with Congress's intent to subject DCMs to the exclusive authority of the CFTC.  By contrast, channeling challenges to the CFTC's oversight through the APA ensures that courts rule on these questions with the benefit of the CFTC's expertise, and that any court judgment would bind the agency nationwide, ensuring uniformity and consistency.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1    Defendants have argued that the CFTC has no power to delist Kalshi's contracts on the

2    ground that they are not swaps, because instruments other than swaps trade on DCMs.  ECF No. 198

3    at 5; ECF No. 219 at 83.  Defendants are mistaken.  CFTC regulations only permit DCMs to self-

4    certify "futures, swaps and option products"—all of which are subject to the CFTC's exclusive ju-

5    risdiction, 7 U.S.C. § 2(a)(1)(A)—not any conceivable contract or instrument.  17 C.F.R. § 38.4.  If

6    Kalshi's contracts were not futures, swaps, or options, then Kalshi's self-certifications would not

7    comply with CFTC regulations, and the CFTC would have the authority to "stay the listing of"

8    Kalshi's contracts.  17 C.F.R. § 40.2(c).  As all acknowledge, the CFTC has not stayed Kalshi's

9    contracts, reflecting that it has not found Kalshi's self-certifications to violate the CEA or CFTC

10    regulations.

11    Defendants cite two purported examples of instruments that trade on DCMs despite not being

12    swaps, but the examples are misleading.  Defendants point to "security futures products" (ECF No.

13    198 at 5), but such products are futures and thus expressly permitted by the CEA and CFTC regula-

14    tions to be traded on DCMs.[3]  And Defendants' other example—spot transactions (ECF No. 198 at

15    5)—refutes their argument, as spot transactions do not take place on DCMs.[4]  Defendants pointed to

16    CME spot transactions to support their assertion that such transactions take place on DCMs, but

17    CME spot transactions take place "on the CME Spot Market," which "**IS NOT REGISTERED**

18    **WITH, DESIGNATED, RECOGNIZED, LICENSED OR APPROVED BY THE CFTC**."

19    CME Rulebook, Ch. 12 at 5, https://www.cmegroup.com/rulebook/CME/I/12.pdf (last accessed

20    Nov. 25, 2025) (all-caps and bold in original).  That is, the CME Spot Market is not a DCM at all.

21    Thus, contrary to Defendants' argument, the fact that the CFTC has allowed Kalshi's contracts to

22    trade reflects its implicit judgment that Kalshi's contracts may trade on Kalshi's DCM, which could

23    only be the case if they are swaps, futures, or options.

24    *Second*, the Court suggested that Defendants could not bring an APA claim because there has

---

25    [3] Security futures are an exception to the rule that DCM-traded instruments are regulated solely by
26    the CFTC, as the CEA specifically provides for joint SEC-CFTC jurisdiction over them, "[n]otwith-
      standing any other provision of this chapter."  7 U.S.C. § 2(a)(1)(D).

27    [4] Spot transactions that are leveraged, margined, or financed, on the other hand, *must* happen on
28    DCMs, because they are to be treated "as if" they were "contract[s] of sale of a commodity for future
      delivery."  7 U.S.C. §§ 2(c)(2)(D)(i), (iii).

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

not been any final agency action on the part of the CFTC.  ECF 219 at 7, 9; *see also* Dissolution Order at 8-9.  The Ninth Circuit could conclude otherwise.  Though the CFTC has not affirmatively acted to approve Kalshi's contracts, by allowing them to trade, it has exercised its jurisdiction over them, and that exercise of jurisdiction preempts Defendants from exercising jurisdiction.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (agency action was reviewable where it had "direct and appreciable legal consequences").  That is precisely Defendants' complaint—that the CFTC is permitting Kalshi's contracts to trade, thereby immunizing them from state law.  Moreover, if Defendants are right that Kalshi's contracts are not swaps (or futures or options), then Kalshi's self-certifications did not comply with CFTC regulations, which authorize self-certification only for swaps, futures, and options.  17 C.F.R. § 38.4.  And the CFTC may not allow contracts to trade where they "would violate" the CEA, "including regulations."  7 U.S.C. § 7a-2(c)(5)(B).  The proper remedy for Defendants' purported grievance is not to threaten Kalshi with enforcement actions, but to bring an action against the CFTC to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

*Third*, the Court suggested that, because Kalshi is the plaintiff here, the Court should be able to determine whether Kalshi's contracts are swaps in this case.  ECF No. 219 at 70.  But again, *Big Lagoon Rancheria* is to the contrary.  It involved an Indian tribe that brought suit to compel California to "negotiate in good faith under the" Indian Gaming Regulatory Act, and California asserted as a defense that the tribe was "not properly recognized as an Indian tribe."  789 F.3d at 952.  The problem was that the federal Bureau of Indian Affairs had recognized the tribe, and the proper vehicle for California to challenge that determination was an APA claim.  *Id.* at 954.  But the APA statute of limitations had already run, leaving California with no recourse.  *Id.*  That Kalshi seeks affirmative relief against Defendants thus is no bar to the application of *Big Lagoon Rancheria*.

**B.    Kalshi's Contracts Are Swaps.**

The Court's holding that Kalshi is unlikely to succeed on whether its contracts are swaps also is vulnerable on appeal.  Dissolution Order at 11-20.  The Court relied upon a distinction between an "event" or "contingency," on the one hand, and an "outcome," on the other.  *Crypto*, 2025 WL 2916151, at *8 & n.9; *see* Dissolution Order at 11.  Serious questions exist as to the aptness of that

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1 distinction.

2 *First*, the Ninth Circuit could well reject the Court's distinction between events or contingen-

3 cies and outcomes. Contemporaneous dictionaries define "event" to include an "outcome," as well

4 as broadly to include "something that happens." *Event*, Random House Webster's Unabridged Dic-

5 tionary (2d ed. 2001) ("the outcome, issue, or result of anything"); *Event*, Random House Webster's

6 Pocket Am. Dictionary (5th ed. 2008) ("something that happens"). No other court has distinguished

7 between events and outcomes as this Court has. *See KalshiEX, LLC v. CFTC*, No. 23-cv-03257,

8 2024 WL 4164964, at *1 (D.D.C. Sept. 12, 2024) ("event contracts" are "a type of derivative contract

9 whose payoff is based on the outcome of a contingent event"); *CFTC v. Trade Exch. Network Ltd.*,

10 117 F. Supp. 3d 29, 32, 35 (D.D.C. 2015) (CEA applies to contracts tied to "the outcome of real-

11 world events"). And neither has the CFTC, which (with the SEC) has authority to further define

12 "swap" under the CEA under Section 712(d) of the Dodd-Frank Act. 124 Stat. 1376, 1644 (2010);

13 *see Event Contracts*, 89 Fed. Reg. 48968, 48969 (June 10, 2024) ("[E]vent contracts are generally

14 understood to be a type of derivative contract … based on the *outcome* of an underlying occurrence

15 or event." (emphasis added)). Likewise, a "contingency" includes "something liable to happen as an

16 adjunct to or result of something else," which comfortably encompasses outcomes. *Contingency*,

17 Merriam-Webster's Collegiate Dictionary (11th ed. 2003).

18 *Second*, at argument, the Court acknowledged that its "interpretation of the statute[] isn't

19 perfect" but raised concerns that ruling for Kalshi would render the definition of "swap" broad

20 enough to encompass "pretty much anything." ECF No. 219 at 48. But Congress set out express

21 exclusions from the definition of swap, which necessarily limit the definition. *See* 7 U.S.C.

22 § 1a(47)(B). Aside from these exclusions, not all events or contingencies can be the basis for a

23 swap—only an event or contingency "associated with a potential financial, economic, or commercial

24 consequence" can. *Id.* § 1a(47)(A)(ii). As Kalshi has explained, it does not consider events without

25 extrinsic financial consequences—such as the outcome of a coin flip or a private contest—to qualify.[5]

26 _____

27 [5] The transcript of the hearing on the motion to dissolve reveals that Kalshi's counsel mistakenly stated that the outcome of the coin flip at a football game may affect the outcome of the game. ECF No. 219 at 20. That is of course not the case; the outcome of the coin flip has no effect on the

28 outcome of the game, which is why a contract on the outcome of the coin flip would not be a swap.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

During argument, the Court brought up an event contract Kalshi self-certified that would pay out based on whether two people hug by a given date, with the relevant people specified in any given contract that is listed. ECF No. 219 at 22. To clarify, Kalshi never listed this contract for trading. But gestures of affection between two important public figures are often the subject of intense media scrutiny and certainly may be associated with financial consequences.[6] Regardless, Defendants are demanding that Kalshi cease offering all event contracts in Nevada, including those based on the outcomes of major elections and of major sporting events like the Super Bowl or the World Series. There can be no serious dispute that the events underlying those contracts are "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). And the District Court for the District of Columbia has already held that Kalshi's election contracts are lawful and must be permitted to trade in an APA action Kalshi brought against the CFTC. *KalshiEX, LLC v. CFTC*, 2024 WL 4164964, at *1.

*Third*, treating Kalshi's event contracts as swaps would not make the CFTC act beyond its competence as "the nation's gaming regulator." ECF No. 219 at 28. The CFTC always retains authority to disapprove contracts that involve gaming if it determines that they are contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(i). If the CFTC does not believe it can adequately regulate a contract that involves gaming, that provides ample basis to prevent that contract from trading. Indeed, that is why Congress created the Special Rule and granted the CFTC the ability to subject gaming-related contracts to additional scrutiny. *See* Cong. Rec. S5902, S5906 (July 15, 2010) (purpose of the Special Rule was to "restore *CFTC's authority* to prevent trading that is contrary to the public interest." (emphasis added)).

Nor does it follow from treating Kalshi's contracts as swaps that all sports bets are illegal off-exchange swaps—there is ample basis to distinguish between derivatives and sports bets. To start, when Congress has defined "bet" or "wager" in laws concerning gambling, it has defined those terms to exclude transactions on DCMs. 31 U.S.C. § 5362(1)(E)(ii). That alone justifies treating state-

---

[6] Samuel Chamberlain and Victor Nava, *Body language experts break down Trump-Putin handshake, greeting before and after high-stakes showdown*, N.Y. Post (Aug. 15, 2025), https://nypost.com/2025/08/15/us-news/body-language-experts-breaks-down-trump-putin-handshake-greeting-ahead-of-high-stakes-showdown/ (last accessed Nov. 25, 2025).

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

regulated sports bets differently from CFTC-regulated, DCM-traded event contracts. And there are numerous differences between sports bets and sports-event contracts that warrant different regulatory treatment. Whereas sports bets are offered by state-licensed sports books, sports-event contracts are offered by CFTC-regulated derivatives exchanges. Whereas gamblers make sports bets for entertainment purposes, traders may use sports-event contracts to hedge actual risk associated with outcomes of sporting events. *See* Brett Smiley, *Underdog Sports Preparing to Use Kalshi, Prediction Markets For Its Own Risk Management*, IN GAME, https://perma.cc/BT4A-BK8T (last accessed Oct. 30, 2025). And whereas sports-event contracts are traded, sports bets are not. And the CEA specifically preserves states' jurisdiction over transactions that take place off of DCMs, like sports bets. 7 U.S.C. § 2(a)(1)(A).

These distinctions are similar to ones the CFTC relies on to distinguish swaps from other kinds of transactions. Together with the SEC, the CFTC issued a regulation in 2012 further defining the term "swap." CFTC and SEC, *Further Definition of "Swap," Security-Based Swap," and "Security-Based Swap Agreement,"* 77 Fed. Reg. 48208 (Aug. 13, 2012). Under that regulation, consumer transactions entered "primarily for personal, family or household purposes" and that are not "are not traded on an organized market or over-the-counter" generally are not swaps. *Id.* at 48246-47. Likewise, the CFTC distinguishes swaps from insurance as follows: If a product is "not traded[] separately from the insured interest," and the provider of the agreement is subject to state or federal insurance regulation, then it is insurance, not a swap. *Id.* at 48212-13.

The CFTC has drawn similar distinctions in the past, too. A contract for "future delivery" of a commodity must be traded on a DCM, 7 U.S.C. § 6(a), but a "sale of any cash commodity for deferred shipment or delivery" need not be, *id.* § 1a(27). The CFTC has distinguished "future" delivery from "deferred" delivery by looking to the intent of the contracting parties: "[C]ontracts for sale which are entered into with the expectation that delivery of the actual commodity will eventually occur through performance on the contracts" need not take place on DCMs. William L. Stein, *The Exchange-Trading Requirement of the Commodity Exchange Act*, 41 Vand. L. Rev. 473, 491 (1988) (quoting *In re Stovall*, Comm. Fut. L. Rep. (CCH) ¶ 20,941, at 23,777 (C.F.T.C. Dec. 6, 1979)). Likewise, in the 1980s, to address concerns that over-the-counter swap transactions were actually

1   illegal off-exchange futures contracts, the CFTC issued no-action relief for swaps, concluding that

2   "most swap transactions, although possessing elements of futures or options contracts, are not ap-

3   propriately regulated as such under the [CEA] and regulations." CFTC, *Policy Statement Concern-*

4   *ing Swap Transactions*, 54 Fed. Reg. 30694, 30694 (July 21, 1989). Swaps were different from

5   futures because they had "tailored" terms, were not assignable or terminable without "consent of the

6   counterparty," and were not marketed to the public. *Id.* at 30696-97.

7        In short, the CFTC has had to draw lines to distinguish different kinds of instruments in the

8   past. In doing so, it has relied on various factors, such as the intent of the parties to a transaction,

9   whether an instrument is traded on an organized market, and whether another state or federal regu-

10  lator regulates the transaction. Application of the same type of reasoning here provides ample basis

11  for the CFTC to distinguish sports bets from sports-event contracts. A ruling for Kalshi in this case

12  thus does not imply that all sports bets are illegal off-exchange derivatives transactions.

13       **C.    Kalshi's Contracts are Futures or Options.**

14       The Court also expressed skepticism that Kalshi's contracts are futures or options in excluded

15  commodities subject to the CFTC's exclusive jurisdiction. ECF No. 219 at 46, 103. Kalshi has

16  raised serious questions on that point, too. The CEA does not define "contract[] of sale of a com-

17  modity for future delivery." 7 U.S.C. § 2(a)(1)(A). And it defines "option" to mean "an agreement,

18  contract, or transaction that is of the character of, or is commonly known to the trade as, an 'option.'"

19  *Id.* § 1a(36). The history of the CFTC's interpretation of these terms makes clear that they include

20  cash-settled derivatives based on financial indexes, benchmarks, and occurrences, including Kalshi's

21  event contracts.

22       Congress broadly defined "commodity" in the 1974 amendments to the CEA to include "all

23  services, rights, and interests … in which contracts for future delivery are presently or in the future

24  dealt in." 7 U.S.C. § 1a(9). Its "intent" was to "cover all futures trading that might now exist or

25  might develop in the future." H.R. Rep. No. 93-975, at 76 (1974). In the years that followed, it

26  became clear that the CFTC considered its regulatory mandate to include futures and options on

27  intangible indexes, benchmarks, and occurrences as well as physical commodities. In 1981, the

28  CFTC approved the listing of Eurodollar futures contracts on the Chicago Mercantile Exchange.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

CFTC, *History of the CFTC: CFTC History in the 1980s*, https://www.cftc.gov/About/HistoryoftheCFTC/history_1980s.html (last accessed Nov. 25, 2025). Eurodollar futures contracts were cash-settled based on the value of an interest rate benchmark—the London Interbank Offered Rate (LIBOR) on the settlement date. The CFTC approved various other cash-settled futures contracts based on intangible financial indexes in the 1980s. *See* Allen B. Paul, *The Role of Cash Settlement in Futures Contract Specification*, in FUTURES MARKETS, REGULATORY ISSUES 271, 280 (Anne. E. Peck ed. 1985). In the 1990s, the CFTC approved listing of cash-settled weather futures contracts, reflecting that even weather-related events can be the commodity underlying a futures contract or option. *See Weather Options Overview*, CME Group (Nov. 15, 2016), https://www.cme-group.com/education/articles-and-reports/weather-options-overview.html (last accessed Nov. 25, 2025).

Congress's subsequent actions have confirmed the CFTC's interpretation of "commodity." It amended the CEA in 1982 and 1992, but it did not revise the definition of "commodity" in those amendments or in any way disapprove of the CFTC's approval of cash-settled contracts based on intangibles. Then, in 2000, Congress added the term "excluded commodity" to the CEA and defined it to include "interest rate[s]," "commercial index[es]," and "occurrence[s]," among many other things. 7 U.S.C. § 1a(19). In doing so, Congress ratified the CFTC's interpretation of "commodity" and approval of contracts based on intangible commodities. Now, just as in the 1980s, a futures contract or option on an interest rate benchmark, a price index, or an occurrence, is a futures contract or option that must be traded on a DCM subject to the CFTC's exclusive jurisdiction. These contracts are, and long have been, commonplace—according to the CME, "the most actively traded futures contract in the world" is an interest rate futures contract. *SOFR futures and options*, CME Group, https://www.cmegroup.com/markets/interest-rates/secured-overnight-financing-rate.html (last accessed Nov. 25, 2025).

The Court questioned at argument whether contracts on excluded commodities were subject to the CFTC's exclusive jurisdiction, or whether instead Congress's use of the term "excluded" means that such contracts are not subject to the CFTC's exclusive jurisdiction. ECF No. 219 at 46; *see also* Dissolution Order at 23-24. The statutory history makes clear that excluded commodities

are a subset of commodities, and that contracts on excluded commodities are subject to the CFTC's exclusive jurisdiction. Congress added the definition of "excluded commodity" to the CEA in the Commodity Futures Modernization Act of 2000 ("CFMA"). 114 Stat. 2763, 2763A-371. As part of the CFMA, Congress exempted transactions in excluded commodities from most CEA provisions if (1) they were between "eligible contract participants"—*i.e.*, sophisticated counterparties—*and* (2) they did not take place "on a trading facility" such as a DCM. 114 Stat. 2763, 2763A-377; *see id.* at 2763A-367 (defining "board of trade" to mean "any organized exchange or other trading facility"); 2763A-374 (defining "registered entity" to include "a board of trade designated as a contract market"). In other words, the exemption—which, in any case, was repealed in 2010, *see* 124 Stat. at 1675—did not apply to transactions in excluded commodities on DCMs.

## III. Kalshi Will Suffer Irreparable Harm Absent A Stay.

As the Court recognized in granting Kalshi a preliminary injunction (ECF No. 45 at 15), Kalshi faces a "Hobson's choice" of "violat[ing]" state law and "expos[ing]" itself "to potentially huge liability," or "suffer[ing] the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans. World Airlines, Inc.*, 504 U.S. 374, 381 (1992). If Kalshi does not comply, the "credible threat of prosecution" under a preempted state statute constitutes "irreparable harm." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).[7] If it does attempt to comply, Kalshi will incur tens of millions of dollars in annual costs to implement geofencing. ECF No. 18-1 (Sottile Decl.) ¶ 21.

In seeking to dissolve the PI, Defendants did not contest the Court's prior finding that Kalshi presented "credible evidence that even if it could implement geofencing at great expense, it could not do so immediately as the defendants demanded," ECF No. 45 at 15, nor that this prospective irreparable harm remains as real today as it was in April, *see* ECF No. 183 at 18 (citing ECF No. 183-4 (Sottile Decl.) ¶¶ 5-7). And Defendants have abandoned their prior argument that those expenses may be recoverable through a damages action, making it undisputed that Kalshi could not

---

[7] As Kalshi has explained, the harm of any potential prosecution is compounded by the difficulty it has confronted in engaging Nevada gaming counsel to represent it in such proceedings. ECF No. 183-6 (Valente Decl.).

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

recoup the substantial costs of implementing geofencing if it complies temporarily only to prevail on appeal. *Id.* Such an economic injury is irreparable where a party cannot "recover monetary damages." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). While the Court suggested at argument that geofencing would not be "too expensive" for Kalshi, ECF No. 219 at 52, the (substantial) expenses Kalshi incurs to implement geofencing would be forever lost, making them irreparable. *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) ("The analysis focuses on irreparability, 'irrespective of the magnitude of the injury.'").

Attempting to geofence would further prejudice Kalshi because, as the Court recognized, if Kalshi were to attempt compliance, it would risk "the potential threat of the CFTC taking action against it for violating the CFTC's Core Principles if Kalshi disrupts contracts or geographically limits who can enter contracts on what is supposed to be a national exchange." ECF No. 45 at 15; *see* 17 C.F.R. § 38.151(b). Attempting to obtain a license in Nevada and comply with Nevada gaming regulations would also jeopardize Kalshi's compliance with its impartial-access obligation. For example, Nevada allows sports bets only by persons physically located in Nevada or specified other states. Nev. Reg. 22.140(1). Other states impose similar requirements. While Defendants have suggested that Kalshi could avoid harm by seeking a license, they have never explained how Kalshi could hope to operate a nationwide exchange and to comply with its impartial-access obligations while adhering to individual state laws permitting trades only from within individual states.

Geofencing would also have knock-on effects in Kalshi's other litigations. Though numerous additional states have threatened Kalshi with enforcement actions, Kalshi has thus far managed to preserve the status quo by obtaining non-enforcement agreements or preliminary injunctions. But there is an asymmetry between Kalshi and the states: Kalshi must win in *every* state to preserve the status quo. Denial of a stay here would effectively deprive Kalshi of the benefit of its non-enforcement agreements and preliminary injunctive relief in other states, too, given that halting contracts in Nevada will affect traders in other states as well. Absent a stay, dissolution threatens to short-circuit the judicial process in those states, as other state regulators would point to Kalshi's geofencing (compelled or otherwise) as evidence that Kalshi could simply cease operating in any state that brings suit. *Cf. City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020) (in discussing the propriety of

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

nationwide injunctions, noting concern about "truncat[ing] the process of judicial review," but also that "the possibility of a stay while seeking review in the court of appeals" mitigates this concern); *New York v. DHS*, 969 F.3d 42, 88 (2d Cir. 2020) (it is "unseemly" for a district court ruling to "in effect override contrary decisions from co-equal and appellate courts"). The Court may consider the "asymmetric" "stakes" in assessing the propriety of a stay. *DHS v. New York*, 589 U.S. 1173, 1176 (2020) (Gorsuch, J., concurring in grant of stay).

Defendants demanded in the cease-and-desist letter that Kalshi cut off all access to its contracts in Nevada. As Defendants acknowledged during the parties' recent meet-and-confer, compliance with that demand would require Kalshi to close out Nevada traders' existing positions. Porter Decl. That would harm both Kalshi—which would face substantial monetary and reputational harm—and Kalshi's users. ECF No. 183-4 (Sottile Decl.) ¶¶ 23-30. Compliance would also require Kalshi to stop offering election contracts, which the District Court for the District of Columbia has already ruled are lawful and can be listed for trading. *KalshiEX, LLC v. CFTC*, 2024 WL 4164694.

Defendants' recent non-enforcement agreement with Crypto does not change the calculus.[8] *See* ECF No. 110, *Crypto*, No. 2:25-cv-00978 (D. Nev. Oct. 24, 2025). Defendants do not claim that Crypto is geofencing, but instead concede it "has stopped offering sports event contracts to Nevada residents." ECF No. 198 at 15.[9] Crypto has confirmed as much in a filing to the Ninth Circuit.[10] As detailed in Kalshi's Response to the Motion to Dissolve (ECF No. 183 at 18-20), this is problematic for numerous reasons, including that it does not enforce Nevada law (which applies *in* Nevada) but rather places restrictions on Nevada *residents* wherever they may be. As such, Defendants have agreed to an arrangement that prohibits Crypto from offering event contracts to Nevada's 3.1 million

---

[8] On November 24, 2025, Robinhood announced (without details) that it had reached agreement with Defendants to avoid enforcement pending appeal. ECF No. 89, *Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-01541-APG-DJA (D. Nev. Nov. 24, 2025). Robinhood is an FCM, not a DCM, and thus is not required to comply with impartial access requirements.

[9] During the meet-and-confer process ahead of this motion, counsel for Defendants stated Defendants would be willing to explore this option as an alternative to geofencing, as they had with Crypto. Porter Decl.

[10] "[T]he parties have agreed that, pending appeal, ***CDNA will not offer sport event contracts to Nevada residents*** and Nevada thus will not enforce its gaming laws with respect to those contracts." ECF No. 6.1 at 3 ¶ 2, *North Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Nov. 24, 2025) (emphasis added).

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

residents but not its *52 million* annual out-of-state visitors.[11]  One of Kalshi's out-of-state counsel confirmed as much when he visited Nevada for the November 14, 2025 hearing[12] and purchased a contract on Crypto for the Las Vegas Raiders to win the following Monday's football game against the Dallas Cowboys.  *See* Porter Decl.  The inverse is equally troubling, as Crypto's agreement presumably restricts Nevada residents from trading anywhere, including Nevada residents physically located in New Jersey, where Kalshi has obtained a preliminary injunction against substantially similar state laws.

To Kalshi's knowledge, Crypto is the first DCM ever to restrict access to its platform for residents of particular states.  It is not yet clear what action the CFTC may take with respect to Crypto as a result of the agreement, as it is far from clear that preventing Nevada residents from trading on Crypto's DCM is consistent with Core Principles.  Crypto's decision to accept this risk when faced with a choice between two harmful outcomes does not call into question the harm Kalshi would incur if put to the same choice.[13]  This is particularly the case because Crypto and Kalshi are not similarly situated.  Crypto's primary business is its cryptocurrency exchange—its homepage describes itself as "America's Premier Crypto Trading Platform"—not its DCM.  *Crypto.com*, https://crypto.com/us

---

[11] *Tourism in Nevada Means a Thriving Economy*, Travel Nevada Industry Partners (2025), https://perma.cc/Q2F2-2YAM (last accessed Oct. 31, 2025); *Nevada Continued Double-Digit Population Growth*, U.S. Census Bureau: NEVADA 2020 Census (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/nevada.html (last accessed Nov. 25, 2025).

[12] Crypto's residency restriction went into place on November 3, 2025.  *Cyrpto.com Suspends Sports Events Contracts in Nevada Pending Legal Resolution*, Yahoo! Finance (Oct. 28, 2025), https://finance.yahoo.com/news/crypto-com-suspends-sports-events-131200079.html (last accessed Nov. 25, 2025).

[13] The Court also may be aware that CME and FanDuel have announced a joint prediction-markets venture, FanDuel Predicts.  *FanDuel and CME Group Unveil New Prediction Markets Platform to Launch in December*, CME Group (Nov. 12, 2025), https://www.cmegroup.com/media-room/press-releases/2025/11/12/fanduel_and_cme_groupunveilnewpredictionmarketsplatformtolaunchi.html (last accessed Nov. 25, 2025).  Sports-event contracts offered by FanDuel Predicts will not be available nationwide, but that is because FanDuel Predicts will operate as a futures commission merchant (not a DCM) without impartial-access obligations.  *CME Group and FanDuel Partner to Develop Innovative Event Contracts Platform*, CME Group (Aug. 20, 2025), https://www.cmegroup.com/media-room/press-releases/2025/8/20/cme_group_and_fanduelpartnertodevelopinnovativeeventcontractspla.html (last accessed Nov. 25, 2025).  Additionally, unlike Kalshi, FanDuel already has significant sportsbook business for which it geolocates, meaning it will not face the obstacles Kalshi would face in implementing such technology from scratch.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1  (last accessed Nov. 25, 2025).[14]  By contrast, Kalshi's DCM is at the core of its business, so the harm

2  of being forced out of compliance with the CFTC's Core Principles and losing the goodwill of its

3  DCM customers is far more significant for Kalshi than for Crypto.[15]

## IV.    The Equities Strongly Favor A Stay.

5        The balance of harms and public interest favor a stay.  As the Ninth Circuit has recognized,

6  "preventing a violation of the Supremacy Clause serves the public interest."  *United States v. Cali-*

7  *fornia*, 921 F.3d 865, 893-894 (9th Cir. 2019).  As detailed above, Kalshi would face severe and

8  irreparable harms, and numerous Kalshi users in Nevada and elsewhere would have their "contracts

9  and investment expectations … disrupted if Kalshi were forced to terminate its existing contracts,"

10  further weighing in favor of a stay.  ECF No. 45 at 16.  Plus, Kalshi would lose the benefit of its win

11  over the CFTC in *KalshiEX, LLC v. CFTC*, 2024 WL 4164964, at *1, and be harmed in its other

12  litigation efforts.

13        By contrast, Defendants have claimed irreparable harm from being temporarily unable to

14  enforce Nevada gaming laws against Kalshi.  But that claim is undermined by Defendants' decision

15  not to appeal the preliminary injunction in April.  It also is undermined by the fact that their non-

16  enforcement agreement with Crypto allows Nevada's tens of millions of out-of-state visitors to freely

17  to trade event contracts on Crypto, meaning they have consented to Kalshi's competitor offering,

18  within their jurisdiction, the same sort of offerings they seek to bar Kalshi from making available.

19  Porter Decl.; ECF No. 183 at 18-19.  Defendants also suffer minimal harm from the preliminary

20  injunction because, if they are right on the merits, they can seek to "prosecute Kalshi later for its

21  conduct" (as they have made clear they intend to, *see* ECF No. 1-2 at 2) and recoup any unpaid taxes.

22  ECF No. 45 at 15.  The harms that would befall Kalshi and its users, on the other hand, could not be

23  undone.  *See CFPB v. Great Plains Lending, LLC*, No. 14-cv-209, 2014 WL 12685941, at *19 (C.D.

24  Cal. May 27, 2014), *aff'd*, 846 F.3d 1049 (9th Cir. 2017) (granting stay where enforcement against

---

25  [14] Crypto requires event contract traders to open a "USD Account" that allows users to trade both
26  event contracts and cryptocurrency.  *See Prediction Trading*, Crypto.com (2025),
   https://help.crypto.com/en/articles/11373970-prediction-trading (last accessed Nov. 25, 2025); Por-
27  ter Decl.  It is unclear how Crypto being compelled to geolocate would have impacted Crypto cus-
   tomers' ability to engage with Crypto's core cryptocurrency exchange business.

28  [15] Robinhood, like Crypto, is not primarily in the business of operating a DCM.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

movant was "a bell that cannot be unrung" and the government would "not be injured by the temporary delay in compliance"); *NetChoice*, 761 F. Supp. at 1236 (after initially denying a preliminary injunction, enjoining enforcement of state law pending appeal in light of "great harm" that would result to the plaintiff if the law were enforced).

Moreover, while Defendants have touted the protections afforded by Nevada's licensing regime, Kalshi imposes many of the same protections: Minors are not permitted to trade on Kalshi, Kalshi complies with know-your-customer requirements, and Kalshi has voluntary opt-outs. ECF No. 183-4 (Sottile Decl.) ¶¶ 9, 11. Kalshi is also subject to a host of CFTC-imposed obligations to ensure market stability, protect against manipulation, and ensure that users are free from "abusive," "fraudulent," and "unfair practices." *E.g.*, 17 C.F.R. §§ 38.651, 38.152. These measures minimize any harm to Defendants.

At argument, the Court suggested that the recent withdrawal of FanDuel's and DraftKings's Nevada gaming license applications evidenced harm to Defendants from Kalshi's continued operation in Nevada. ECF No. 219 at 105. But FanDuel and DraftKings withdrew their applications only after the NGCB took the position that seeking to "offer[] Sports and Other Event Contracts in another state" would raise suitability issues for a Nevada gaming licensee. Ex. 3 (Oct. 15, 2025 NGCB Notice). The applications were therefore withdrawn as the result of a threat against FanDuel and DraftKings regarding the conduct of their affiliates in other states. And the Board's November 12 notice concerning the withdrawal stated that FanDuel and DraftKings "intend[ed] to engage in unlawful activities related to sports event contracts," and that such "conduct is incompatible with their ability to participate in Nevada's gaming industry." Ex. 4 (Nov. 12, 2025 NGCB Notice). The NGCB has thus made a policy choice to bar any licensed entity from associating with an entity offering sports-event contracts. Had it made a different choice, FanDuel and DraftKings could have operated freely in Nevada as licensees. This is a quintessential self-inflicted harm, and it certainly is not caused by Kalshi's continued operation in Nevada.

In sum, the balance of the hardships "tips sharply in" Kalshi's favor, which, in a case where "serious legal questions are raised" is grounds for granting a stay. *Golden Gate Rest. Ass'n*, 512 F.3d at 1116 (citation omitted).

1                          *        *        *

2          The merits questions in this case have divided the federal courts, and Kalshi will suffer ex-

3    tensive and irreparable harm if Defendants commence a state-court prosecution against Kalshi even

4    as an appeal in this case proceeds.  Defendants' harms, by contrast, are reparable, as Defendants can

5    simply seek to enforce against Kalshi upon final judgment.  As the purpose of awarding interim relief

6    is to preserve "the relative positions of the parties," a stay pending appeal is warranted.  *Univ. of*

7    *Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

8                             **<u>CONCLUSION</u>**

9          The Court should issue an administrative stay of the Dissolution Order while it considers this

10   motion and stay the Dissolution Order pending appeal.

Dated this 25th day of November, 2025.

**BAILEY❖KENNEDY**

By: /s/ Paul C. Williams
    DENNIS L. KENNEDY
    Nevada Bar No. 1462
    PAUL C. WILLIAMS
    Nevada Bar No. 12524

    NEAL KUMAR KATYAL
    (ADMITTED *PRO HAC VICE*)
    JOSHUA B. STERLING
    (ADMITTED *PRO HAC VICE*)
    WILLIAM E. HAVEMANN
    (ADMITTED *PRO HAC VICE*)
    **MILBANK LLP**
    1101 New York Avenue NW
    Washington, DC 20005
    Telephone:  202.835.7500
    Facsimile:  202.263.7586

    GRANT R. MAINLAND
    (ADMITTED *PRO HAC VICE*)
    ANDREW L. PORTER
    (ADMITTED *PRO HAC VICE*)
    NICOLE D. VALENTE
    (ADMITTED *PRO HAC VICE*)
    KATRIN CASSIDY-GINSBERG
    (ADMITTED *PRO HAC VICE*)
    VICTOR HOLLENBERG
    (ADMITTED *PRO HAC VICE*)
    **MILBANK LLP**
    55 Hudson Yards
    New York, NY 10001
    Telephone:  212.530.5000
    Facsimile:  212.822.5251

    *Attorneys for Plaintiff KalshiEX, LLC*

## CERTIFICATE OF SERVICE

I certify that I am an employee of BAILEY❖KENNEDY and that on the 25th day of November, 2025, service of the foregoing was made by mandatory electronic service through the United States District Court's electronic filing system and/or by email or by depositing a true and correct copy in the U.S. Mail, first class postage prepaid, and addressed to the following at their last known

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

address:

| | |
|---|---|
| JESSICA E. WHELAN<br>SABRENA K. CLINTON<br>DEVIN A. OLIVER<br>**STATE OF NEVADA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br>1 State of Nevada Way, Suite 100<br>Las Vegas, NV 89119 | Email:  jwhelan@ag.nv.gov<br>sclinton@ag.nv.gov<br>doliver@ag.nv.gov<br><br>*Attorneys for Defendants* |
| ADAM HOSMER-HENNER<br>A.G. BURNETT<br>JANE SUSSKIND<br>KATRINA WEIL<br>THADDEUS C. HOUSTON<br>**McDONALD CARANO LLP**<br>100 West Liberty Street, 10th Floor<br>Reno, NV 89501 | Email:<br>ahosmerhenner@mcdon-<br>aldcarrano.com<br>agburnett@mcdon-<br>aldcarano.com<br>jsusskind@mcdon-<br>aldcarano.com<br>kweil@mcdonaldcarano.com<br>thouston@mcdon-<br>aldcarano.com<br><br>*Attorneys for Intervenor*<br>*Nevada Resort Association* |
| RORY K. SCHNEIDER<br>**MAYER BROWN LLP**<br>1221 Avenue of the Americas<br>New York, NY 10020 | Email:  rschneider@may-<br>erbrown.com<br><br>*Attorneys for Defendants* |
| NICOLE A. SAHARSKY<br>MINH NGUYEN-DANG<br>**MAYER BROWN LLP**<br>1999 K Street NW<br>Washington, DC 20006 | Email:<br>nsaharsky@mayerbrown.com<br>mnguyen-dang@may-<br>erbrown.com<br><br>*Attorneys for Defendants* |

　　　　　　　　　／s/ Paul C. Williams
　　　　　　Employee of BAILEY✥KENNEDY

BAILEY✥KENNEDY<br>8984 SPANISH RIDGE AVENUE<br>LAS VEGAS, NEVADA 89148-1302<br>702.562.8820