AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General—
  Litigation
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
State of Nevada,
  Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3773 (fax)
jwhelan@ag.nv.gov
sclinton@ag.nv.gov

Nicole A. Saharsky (*pro hac vice*)
Minh Nguyen-Dang (*pro hac vice*)
Mayer Brown LLP
1999 K Street, NW
Washington, D.C. 20006
(202) 263-3000 (phone)
nsaharsky@mayerbrown.com
mnguyen-dang@mayerbrown.com

Rory K. Schneider (*pro hac vice*)
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500 (phone)
rschneider@mayerbrown.com

*Attorneys for Mike Dreitzer, George Assad, Chandeni K. Sendall,*
*The Nevada Gaming Control Board, Jennifer Togliatti, Rosa Solis-Rainey, Brian Krolicki,*
*George Markantonis, Abbi Silver, The Nevada Gaming Commission, and Aaron D. Ford*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| KALSHIEX, LLC,<br><br>              Plaintiff,<br><br>v.<br><br>KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board, et al.,<br><br>              Defendants,<br><br>v.<br><br>NEVADA RESORT ASSOCIATION,<br><br>              Intervenor-Defendant. | Case No.: 2:25-cv-00575-APG-BNW<br><br><br>**STATE DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A STAY PENDING APPEAL** |

1

**INTRODUCTION**

2     Plaintiff KalshiEX, LLC (Kalshi) asks the Court to revive the injunction the Court just dis-

3   solved, so that Kalshi can continue operating and expanding its unlicensed gaming business in Ne-

4   vada while it appeals the Court's decision. To obtain that extraordinary relief, Kalshi would have

5   to show not only that the case raises serious legal questions, but also that the balance of the equities

6   tips sharply in its favor. As the Court just determined, the equities here do not tip sharply in Kalshi's

7   favor—indeed, they do not tip in its favor at all.

8     Every day, Kalshi profits by engaging in sports gambling without complying with Nevada

9   law. It has made millions of dollars in the short time that it has offered sports event contracts within

10  the State. Yet it refuses to follow the same rules as its competitors in the gaming industry. Kalshi's

11  conduct irreparably harms the State's gaming industry, other gaming licensees, and the public.

12    Kalshi's supposed equities are that it wants to keep profiting off its unlicensed sports gam-

13  bling. Kalshi cannot claim irreparable injury when all of its harms are self-inflicted. That is espe-

14  cially true because this Court and the CFTC warned Kalshi of the risks of expanding its business,

15  and Kalshi went ahead and did it anyway. Notably, Kalshi does not cite a single decision where a

16  court enjoined a State from enforcing a presumptively valid law so that a private business could

17  continue profiting from its violations of that law.

18    Kalshi has refused to make any good-faith effort to even attempt to comply with Nevada

19  law. In contrast to Crypto.com and Robinhood, which entered into agreements with State Defend-

20  ants to prevent enforcement, Kalshi flatly refused every option that State Defendants suggested,

21  refused to propose any alternatives, and demanded that State Defendants stand down while it con-

22  tinues to aggressively expand its business.

23    Kalshi claims that its motion simply seeks to maintain the status quo, but nothing could be

24  further from the truth. As the Ninth Circuit has made clear, the status quo is the decades of state

25  regulation of gambling before Kalshi decided to ignore state law and offer unlicensed sports betting.

26  Entering an injunction pending appeal would not maintain the status quo; it would give Kalshi an

27  unfair advantage in the market and would allow it to continue growing its operations despite the

28  Court's conclusion that it is not likely to succeed on the merits.

1    Kalshi makes a variety of arguments about the supposed harms it faces without an injunc-
2  tion, but this Court already has rejected them, and Kalshi has no response. Kalshi says that it cannot
3  easily geofence, yet all of its competitors in the industry do. Kalshi says that if it stops operating in
4  Nevada, it would risk losing its CFTC designation, but Crypto.com has stopped offering sports
5  event contracts without that happening. And Kalshi says that it would be unfair to make it face a
6  state enforcement action—but an enforcement action is just a proceeding to obtain an order direct-
7  ing Kalshi to stop violating the law, where Kalshi could present any defense. Kalshi cannot credibly
8  say that its business would collapse from an enforcement action when it already faces such an action
9  in Massachusetts. And of course, Kalshi could eliminate any risk of enforcement by engaging in
10  good faith with State Defendants and taking reasonable steps to comply with Nevada gaming law.

11    At bottom, Kalshi's motion just repeats arguments the Court already rejected and provides
12  no compelling reason to allow it to continue profiting from unlicensed gambling, at the expense of
13  the State, the gaming industry, and the public interest. The Court should deny the motion.

**BACKGROUND**

15    As "everyone who sees them knows," Kalshi offers sports wagers in Nevada, despite not
16  possessing a Nevada gaming license. ECF No. 237 (Order) 16. Kalshi filed this lawsuit to enjoin
17  State Defendants from enforcing Nevada gaming law, arguing that its wagers actually are "swaps"
18  that only can be regulated by the CFTC under the CEA. *See* ECF No. 1, ¶¶ 14-24.

19    In an expedited proceeding, the Court originally granted Kalshi a preliminary injunction,
20  holding that the CEA likely preempts state gaming law as to event contracts traded on a CFTC-
21  designated contract market. ECF No. 45. But even as it did so, the Court warned that Kalshi was
22  "proceeding at its own risk and creating its own harms." *Id.* at 16. Despite that warning, Kalshi
23  "greatly expanded its offerings," Order 26, so that its sports offerings now are indistinguishable
24  from those of traditional sportsbooks. Although Kalshi initially told the Court it only offers win/loss
25  contracts on sporting events, Kalshi now offers the full panoply of sports bets, including props (bets
26  on things that happen during a game)[1] and parlays (linked bets on multiple outcomes).[2] Order 3–4.

---

27  [1]  *E.g.*, Kalshi, *Pittsburgh at Cincinnati*, perma.cc/KAD9-KVE7 (last visited Oct. 16, 2025).
28  [2]  *See* Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays for Monday Night Football Games*, Event Horizon (Sept. 30, 2025), perma.cc/8TA8-QCHN; ECF No. 138-12.

It also has expanded its non-sports offerings to topics as diverse as who will win an Oscar[3] and whether a particular person will say a particular word on an upcoming episode of a television show.[4]

On November 25, 2025, the Court dissolved the preliminary injunction. Order 28. The Court focused on a threshold issue it had not addressed in its initial decision: whether Kalshi's event contracts are "swaps" under the CEA. The Court concluded that it has the authority to decide that threshold statutory-construction issue, *id.* at 6–11, and that Kalshi is not likely to succeed in showing that its event contracts are swaps or other derivatives under the CEA, *id.* at 11–24. The Court explained that Kalshi's interpretation would "require all sports betting across the country to come within the jurisdiction of the CFTC rather than the states and Indian tribes," which would "upset[] decades of federalism regarding gaming regulation." *Id.* at 1.

The Court then addressed whether the equities tipped so sharply in Kalshi's favor that an injunction is warranted despite Kalshi having no likelihood of success on the merits. Order 24. The Court concluded that the equities do not tip in Kalshi's favor at all—rather, "the balance of hardships tips in favor of the Board, and the public interest favors dissolving the injunction." *Id.* at 5. The Court explained that Kalshi's claimed harms "are largely monetary"—"essentially that it will not be able to profit from [its] trades." *Id.* at 25. The Court explained that Kalshi could mitigate its financial harm through geofencing, "which regulated entities in this jurisdiction employ." *Id.* The Court rejected Kalshi's argument that restricting operations in Nevada would risk its DCM status, noting that Kalshi's competitors have restricted their operations without any repercussions from the CFTC. *Id.* The Court also rejected Kalshi's argument that restricting operations in Nevada would harm its customers, observing that the CFTC had directed Kalshi to warn its customers "about the various lawsuits and risks they pose." *Id.* at 26. "If customers continue trading in Kalshi's products," the Court explained, "they, like Kalshi, are proceeding at their own risk." *Id.*

The Court then found that State Defendants' harms from allowing Kalshi to continue operating are "substantial" and "irreparable," and they outweigh any harm claimed by Kalshi. Order 26–28. The Court explained that regulated gaming is vital to Nevada's economy and public welfare.

---

3   *E.g.*, Kalshi, *Oscar for Best Actor*, perma.cc/BW6D-ZGW8 (last visited Oct. 16, 2025).
4   *E.g.*, Kalshi, *What Will Jeff Probst Say During Survivor Episode 4?*, perma.cc/TD7C-Y4WY (last visited Oct. 17, 2025).

*Id.* at 26. The State thus is irreparably harmed when Kalshi operates without complying with Nevada's "rigorous" regulatory regime. *Id.* at 26–27. For example, the Court observed, Kalshi allows 18-year-olds to gamble and lacks the controls with respect to problem gambling that regulated operators must impose. *Id.* at 27.

The Court also explained that Kalshi's operations harm Nevada's regulated gaming industry. "Licensed gaming companies have invested millions of dollars to comply with state regulations," while Kalshi has not, giving Kalshi an unfair advantage over its competitors. Order 27. If Kalshi were allowed to continue, the Court explained, other sportsbooks might be tempted to follow suit, "unleashing even more unregulated gambling and devastating the Nevada economy and related tax revenues." *Id.* at 27–28. The Court thus held that Nevada's "considerable and longstanding" interest in regulating gaming "weigh heavily" against Kalshi's asserted harms. *Id.* at 28.

The parties were unable to reach agreement about enforcement pending Kalshi's anticipated appeal of the Court's decision. Counsel for State Defendants proposed various options that potentially could be sufficient interim measures for State Defendants to forgo enforcement pending appeal, though they explained that State Defendants would prefer for Kalshi to employ geofencing technology to stop offering contracts in Nevada and to close out existing contracts with Nevada users. Ex. 1 ¶¶ 4–5. Kalshi flatly refused every option that State Defendants suggested and did not make any proposal of its own, other than for it to continue its operations, unrestricted, throughout the entire appeal. *Id.* ¶¶ 6–7; *see* ECF No. 239-2, at 4. In the meantime, Crypto.com and Robinhood entered into agreements with State Defendants to temporarily prevent enforcement. Notice, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-cv-0978 (D. Nev. Oct. 24, 2025) (ECF No. 110); Notice, *Robinhood Derivatives, LLC v. Dreitzer*, No. 25-cv-1541 (D. Nev. Nov. 26, 2025) (ECF No. 91) (Robinhood Notice).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 62(d), the Court may grant an injunction or stay the dissolution of an injunction pending appeal. A party seeking "to justify a district court granting an injunction pending appeal after denying a preliminary injunction" must show circumstances of "unusual magnitude" to obtain that relief, *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1236 (N.D. Cal.

2025), because it is asking the court to "grant" the very "judicial intervention" that the Court just "withheld," *Nken v. Holder*, 556 U.S. 418, 429 (2009). In assessing the motion, the court gives "significant weight" to its denial of a preliminary injunction. *NetChoice*, 761 F. Supp. 3d at 1236.[5]

In general, to obtain injunctive relief, the movant must show that all four factors set out in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), are satisfied: (1) it is likely to succeed on the merits of its claim; (2) it will suffer irreparable harm absent an injunction; (3) the balance of equities weighs in its favor; and (4) an injunction is in the public interest. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024). But here, the Court already has determined that Kalshi is not likely to succeed on the merits, Order 5–24, and Kalshi does not contest that finding in its motion. Thus, Kalshi only could justify an injunction pending appeal by showing both that it has raised "serious questions" and that the balance of hardships "tips sharply" in its favor. *Flathead*, 98 F.4th at 1190 (internal quotation marks omitted).[6]

That standard is exceptionally demanding. It is reserved for the "rare cases" in which "the threat of irreparable harm may be so grave and the balance of equities may favor [the movant] so decisively" that relief pending appeal is warranted despite the lack of probable success on the merits. *MediNatura, Inc. v. FDA*, 2021 WL 1025835, at *6 (D.D.C. Mar. 16, 2021). That might happen if, without that relief, "the subject matter of the dispute will be destroyed . . . in a way that moots the pending appeal." *Id.* A mere "economic harm," even if "dire," is not enough—the non-movant's actions must "threaten[] immediately to moot the case." *Id.* at *7.

## ARGUMENT

The Court has held that Kalshi does not have a likelihood of success on the merits and that, although it has raised a serious question on the merits, the balance of equities does not tip sharply in its favor. *See* Order 24. Kalshi provides no reason for this Court to revisit those conclusions and does not identify any "circumstances . . . of unusual magnitude" justifying the requested relief.

---

[5]   Kalshi calls its request one for a "stay," ECF No. 238 (Mot.) 1, but what it really seeks is to enjoin the conduct of state officials, *Nken*, 556 U.S. at 429. Kalshi recognizes (Mot. 7) that its choice of terminology ultimately does not matter because the "stay" it seeks would "ha[ve] the same effect" as an injunction pending appeal.

[6]   The sliding-scale approach appears inconsistent with *Winter*, which requires showing a likelihood of success on the merits, not merely a serious question. *Flathead*, 98 F.4th at 1190 & n.12.

### A.    Kalshi Has Not Shown a Likelihood of Success or Raised Serious Questions

The Court held that Kalshi has not shown a likelihood of success because its interpretation of the CEA "has no limiting principle, has . . . semantic and superfluity problems . . . , and goes against congressional intent." Order 19. In its motion, Kalshi does not argue that it is likely to succeed on the merits.

Although the Court rejected Kalshi's merits position, it stated that Kalshi "has raised serious questions on the merits" because the issues are "complex, novel, and evolving." Order 24. State Defendants respectfully disagree. While recognizing that the Court may not wish to change its view, State Defendants address the merits briefly in order to respond to the arguments (including new arguments) in Kalshi's motion. *See* Mot. 7–16.

A "serious question" is one that is "substantial, difficult, and doubtful," and which "make[s] [for] a fair ground for litigation." *Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc) (internal quotation marks omitted). There must be a "fair chance of success on the merits," *id.* (internal quotation marks omitted); a merely "plausible" or novel argument is insufficient, *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 863 (9th Cir. 2022).

### 1.    Kalshi does not have a fair chance of success

Although Kalshi's arguments may be novel and may sound superficially plausible, at the end of the day Kalshi does not have a fair chance of success. That is because its position "has no limiting principle" and would lead to "absurd" results. Order 19–20. If Kalshi were right on the merits, then all sports wagers would be swaps, and "all sports wagering must be done on a DCM, and not at casinos," because the CEA requires all consumer swaps to be traded on DCMs. *Id.* at 17 (internal quotation marks omitted); *see* 7 U.S.C. § 2(e). That would mean every casino and race-track across the Nation must register as a DCM, and no State or Tribe may regulate them. Order 1.

Kalshi's position, if accepted, would represent an extraordinary intrusion on the States' police powers and work a complete overhaul of the law on sports betting. Order 16, 28. It would mean that when Congress added "swaps" to the CEA, it "intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator, without ever mentioning that was the goal." *Id.* at 20. There is no

1    indication that Congress intended that result; Congress does not "hide elephants in mouseholes."

2    *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

3    Kalshi has no answer to this fundamental problem with its position. It notes (Mot. 12) that

4    the CFTC could disallow an event contract under the special rule. But in that instance, the CFTC

5    still would be the Nation's sole gaming regulator; the question would just be whether it allows a

6    particular wager to go forward. The special rule permits the CFTC to disallow an event contract if

7    it is not in the public interest, but it does not authorize the CFTC to create a comprehensive gaming

8    regulatory scheme. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). Indeed, the CFTC has said that it "is not a

9    gaming regulator" and does not possess the "statutory mandate" or "specialized experience" needed

10   to oversee gaming. Order 20 n.7 (quoting Event Contracts, 89 Fed. Reg. 48968-01, 48982–83 (June

11   10, 2024)).[7] The special rule therefore provides no limit on, or support for, Kalshi's position.

12   Kalshi next argues (Mot. 12–13) that the CFTC would not be the Nation's sole gaming

13   regulator because it would only regulate sports betting that occurs on DCMs, and States and Indian

14   Tribes could regulate sports betting that occurs off DCMs. The problem with that is that under

15   Kalshi's position, there would not be any off-exchange sports betting: Section 2(e) "forbids nearly

16   all swap dealing and trading unless done on a DCM, except for certain market participants, none of

17   whom are casinos or the average sports bettor." *N. Am. Derivatives Exch., Inc. v. Nevada*, 2025

18   WL 2916151, at *9 (D. Nev. Oct. 14, 2025) (citing 7 U.S.C. § 2(e)). At the recent hearing, Kalshi

19   suggested that the savings clause in Section 2(a) somehow limits the effect of Section 2(e). ECF

20   No. 217, at 35–36, 100. But Section 2(e) is unambiguous in requiring all consumer swaps to be

21   traded on a DCM: It says that it "shall be unlawful" for a consumer swap to trade "unless" it is on

22   a DCM. 7 U.S.C. § 2(e). Nothing in Section 2(a) permits States to countermand that requirement.

23   Kalshi argues (Mot. 12–13) that it would make sense for its event contracts to be regulated

24   by the CFTC and traditional sports wagers to be regulated by the States and Indian Tribes, because

25   ─────────────

26   [7]   Kalshi's argument that CFTC could act as the Nation's sole gaming regulator is belied by its
      argument that the CFTC *cannot* use the special rule to disallow election event contracts. Mot. 12.

27   So Kalshi is saying in one breath that the CFTC would be the only regulator in the United States
      that could regulate gaming, but in the same breath saying that the CFTC could not prohibit a quin-

28   tessential form of gaming that most States long have prohibited. *See KalshiEX LLC v. CFTC*, 2024
      WL 4164694, at *6 (D.D.C. Sept. 12, 2024).

its event contracts are traded on DCMs and sports wagers are not. But that ignores the fact that under Kalshi's position, there would be no off-exchange sports betting. Order 17. Besides, Kalshi's event contracts "are sports wagers and everyone who sees them knows it"—including Kalshi itself, which advertises itself as offering "legal sports betting in all 50 States." *Id.* at 16 (quoting Ex. 2, at 3). So there is no basis, as a statutory matter or as a factual matter, for Kalshi's event contracts to be regulated differently from any other sports wagers. In Kalshi's view, only the CFTC could be that regulator—and there is absolutely no reason to believe Congress had that intent.

### 2. Kalshi's arguments lack merit

The rest of Kalshi's motion repeats arguments that this Court already has rejected: that this Court has no authority to decide whether Kalshi's event contracts are swaps (or futures or options) under the CEA, Mot 9–10, and that its event contracts are swaps, *id.* at 10–14, or contracts of sale "for future delivery" of, or options in, excluded commodities, *id.* at 14–16. State Defendants respond briefly to those arguments below. Kalshi does not renew its argument that the CEA preempts state gaming law, so rather than repeat their arguments here, State Defendants respectfully refer the Court to their motion to dissolve the preliminary injunction. *See* ECF No. 142, at 16–21.

***The Court has jurisdiction to decide whether the CEA applies.*** Kalshi's threshold argument (Mot. 8–10) is that the Court lacks the authority in this litigation to determine whether Kalshi's event contracts are swaps. It argues (*id.*) that the CFTC has "exercise[d] [its] exclusive jurisdiction" by permitting Kalshi to list its event contracts on its DCM, so State Defendants must sue the CFTC under the Administrative Procedure Act (APA) to challenge that decision. The Court correctly rejected this argument. Order 6–11.

Kalshi's argument depends on the premise that the CFTC has made a determination that its sports event contracts qualify as swaps. But the CFTC has not made any such determination: It "has not, to date, . . . taken any official action to approve the listing for trading of sports-related contracts on any DCM." ECF No. 178-7, at 2 n.4. All that has happened is that Kalshi has self-certified its event contracts and the CFTC has not delisted the contracts. Order 7–8.

Further, the CFTC's inaction is not a basis for a suit under the APA, because the APA only permits a suit based on inaction when there is "a specific, unequivocal command placed on the

agency to take a discrete agency action." *Plaskett v. Wormuth*, 18 F.4th 1072, 1082 (9th Cir. 2021) (internal quotation marks omitted); *see* 5 U.S.C. § 706(1). Here, nothing in the CEA unequivocally compels the CFTC to act on self-certifications. This Court explained all of this in its recent decision, Order 7–8, and Kalshi has no response.

Kalshi argues (Mot. 8) that the CFTC has exercised "exclusive jurisdiction" over Kalshi's event contracts by allowing them to trade on Kalshi's DCM. But the CFTC only has "exclusive jurisdiction" if the event contracts qualify as "swaps" or another derivative listed in 7 U.S.C. § 2(a)(1)(A)—which is the threshold question in this litigation. The mere fact that Kalshi's contracts trade on its DCM does not give the CFTC "exclusive jurisdiction," because the CFTC's authority to regulate DCMs stems from a different provision, Section 7(d)(1). Order 11.

Further, the fact that a contract is traded on a DCM does not mean it is a "swap" or other derivative, because nothing in the CEA restricts DCMs to those financial instruments. Indeed, as Kalshi acknowledges (Mot. 9 n.3), DCMs can list securities futures, which are regulated by the SEC. *See* 7 U.S.C. § 2(a)(1)(D). DCMs also can list spot contracts on foreign currencies that "are not regulated futures contracts" at all. *E.g.*, CME, Rulebook ch. 13, at 2, perma.cc/YW8G-D66W (CME Rulebook).[8] Further, the CEA does not permit, let alone require, the CFTC to order a contract delisted from a DCM solely because it is not a swap or other derivative listed in Section 2(a)(1)(A). *See* 7 U.S.C. § 7a-2(c)(1).[9] Thus, the fact that Kalshi's event contracts are traded on its DCMs does not reflect a CFTC decision that they are swaps (or another derivative) under Section 2(a)(1)(A).

Even if the CFTC had made that determination, State Defendants still would not need to bring an APA challenge. Nothing in the CEA grants the CFTC sole authority to determine whether a contract is a swap, future, or option in the first place. Order 9. That is a threshold statutory-interpretation question that this Court can decide. *See N. Am. Derivative Exch.*, 2025 WL 2916151,

---

[8]   Kalshi argues (Mot. 9) that the CME's spot contracts are not traded on the CME's DCM but on a separate spot market. While that is true for some of the CME's spot contracts, the spot contracts on foreign currencies trade on "FX Link," which is part of the CME's DCM, although they are not subject to the CME's rules "in its capacity" as a DCM. CME Rulebook 2–3.

[9]   Kalshi says that CFTC could order a non-derivative delisted, but it relies only on regulations (Mot. 9-10), citing nothing in the CEA. And Kalshi is wrong about the regulations; they explain what a DCM must do to self-certify a swap, future, or option, but do not say that other contracts may not be certified or traded. *See* 17 C.F.R. §§ 38.4, 40.2.

1    at \*6 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024)).

2    Kalshi cites (Mot. 8) *Big Lagoon Rancheria v. California*, 789 F.3d 947 (9th Cir. 2015) (en
3    banc), but the Court correctly distinguished that case. *See* Order 8–9. There, California refused to
4    negotiate with an Indian Tribe about its plans to build a casino on lands that the BIA had taken into
5    trust for the Tribe. 789 F.3d at 951. California argued that the BIA lacked authority to take the land
6    into trust and had incorrectly designated the Tribe in the first instance. *Id.* at 952. But Congress
7    authorizes the BIA, and only the BIA, to designate Indian Tribes and to take land into trust for
8    Tribes. 25 U.S.C. §§ 5108, 5131; *see Haaland v. Brackeen*, 599 U.S. 255, 273 (2023). California
9    thus was challenging decisions that only the BIA could make. Here, the CEA does not grant the
10   CFTC sole authority to determine whether a contract is a swap, and the CFTC has not taken any
11   action to decide whether Kalshi's event contracts are swaps.

12   State Defendants do not seek to enforce the CEA—that is, they do not seek to have Kalshi's
13   event contracts delisted because they are not swaps or because they do not comply with the special
14   rule. State Defendants seek only to enforce Nevada gaming law. The question whether Kalshi's
15   event contracts are swaps (or futures or options) arises only because *Kalshi* asserts it as a basis for
16   federal preemption. It is well within the Court's purview to decide that question. Order 10.

17   ***Kalshi's event contracts are not swaps.*** Kalshi next argues (Mot. 10–14) that its event con-
18   tracts are swaps. The Court correctly rejected that argument as well, explaining that Kalshi's sports
19   event contracts fail to satisfy the statutory definition of "swap" in two respects: they are based on
20   outcomes of sporting events rather than the "event[s]" themselves, and they are not "associated
21   with a potential financial, economic, or commercial consequence" because they are not used to
22   hedge financial risk. Order 11-13 (quoting 7 U.S.C. § 1a(47)(A)(ii)). The Court noted that Kalshi's
23   definition of "swaps" "knows no limiting principle" and would include "everything anyone can
24   conjure up as a subject to bet on"—a result that cannot be squared with the "statutory text, legisla-
25   tive context, the CFTC's post-enactment guidance, and federalism principles." *Id.* at 12-13.

26   Kalshi rehashes its argument (Mot. 11) that "outcome" and "event" mean the same thing.
27   But, as this Court has explained, ordinary speakers of English generally distinguish between a
28   sporting event (such as the Kentucky Derby) and the outcome of that event (which horse wins).

1  Order 6. None of the cases that Kalshi cites addresses the statutory question whether a contract

2  referencing an outcome qualifies as a swap under Section 1a(47)(A)(ii). *See KalshiEX*, 2024 WL

3  4164694; *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29 (D.D.C. 2015).

4        Kalshi also argues (Mot. 11–12) that the Court's outcome/event distinction is unnecessary,

5  because the separate economic-consequences requirement limits the definition of "swap." But

6  Kalshi's sports event contracts do not satisfy that requirement, either. Order 12–13. Kalshi's view

7  of the economic-consequences requirement is so broad as to be meaningless; in Kalshi's view, bets

8  on hugs and coin tosses could qualify as swaps. *See* ECF No. 143-12 (hugs); ECF No. 219, at 19

9  (coin toss does qualify); *but see* Mot. 11 n.5 (coin toss does not qualify).[10] The economic-conse-

10  quences requirement is designed to encompass financial instruments used for hedging purposes.

11  *See* Order 15–16. Thus, as the Court explained, "the event or contingency must be inherently asso-

12  ciated with a potential financial consequence"; it is not enough "that the event or contingency may

13  have some potential downstream financial consequence." *Id.* at 14. Kalshi previously took the same

14  view: It told another court that events such as horse racing or boxing matches would not be the

15  types of financial instruments subject to regulation by the CFTC because they are "staged purely

16  for entertainment and to facilitate betting" and "their outcome carry no economic risks." Kalshi

17  Mot. for Summ. J. at 30, *KalshiEX LLC v. CFTC*, *supra* (ECF No. 17-1); *see* Order 14 n.3 (giving

18  other examples of similar representations).

19        Kalshi contends (Mot. 12) that *some* of its sports event contracts (such as a contract on the

20  outcome of the Super Bowl) may have sufficient potential economic consequences. But that just

21  confirms why the Court was correct to also distinguish between outcomes and events. A wager on

22  the winner of the Super Bowl is a paradigmatic example of a sports bet—and both Congress and

23  the CFTC have made clear that such a wager is not a legitimate financial instrument under the CEA.

---

24  [10]  Kalshi argues that "gestures of affection between two important public figures . . . may be as-

25  sociated with financial consequences." Mot. 12; *see* ECF No. 219, at 22. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ECF No. 143-12, at 8. Kalshi told the CFTC that

26  its hug event contract is associated with potential economic consequences because "▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" thereby "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.* at 11. In other words, Kalshi is saying ▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. That reasoning is "self-fulfilling [and] circular," and

would cause the economic-consequence requirement to "lose all meaning." Order 18–19.

*See* 7 U.S.C. § 7a-2(c)(5); 17 C.F.R. § 40.11(a); *see also* 156 Cong. Rec. S5907 (July 15, 2010) (statement of Sen. Lincoln) ("an 'event contract' around sporting events such as the Super Bowl" would "not serve any real commercial purpose" and instead "would be used solely for gambling"). Relatedly, Kalshi argues (Mot. 13) that its sports event contracts have a commercial hedging purpose. But the only commercial purpose Kalshi identifies (Mot. 13) is one sportsbook using its event contracts to manage its own betting risk. If the only risk that Kalshi's products hedge against is *gaming risk*, that confirms the risk comes from the betting itself, not from an external event that a party wishes to hedge against.

   ***Kalshi's event contracts are not futures or options.*** Kalshi next argues (Mot. 14–16) that its event contracts also are contracts for future delivery of, or options in, excluded commodities. As the Court noted, Kalshi has not explained how its contracts would qualify as either. Order 20 n.8.

   The relevant definition of "excluded commodity" requires an occurrence that is "associated with a financial, commercial, or economic consequence." Order 21–22 (quoting 7 U.S.C. § 1a(19)(iv)). This definition is more restrictive than the definition of "swap," since it requires an actual (rather than potential) financial consequence. Because sports event contracts do not satisfy the economic-consequence requirement in the "swaps" definition, they necessarily do not satisfy the more stringent requirement in the "excluded commodities" definition. *Id.* at 22.

   Further, Kalshi's event contracts are not options or futures on the supposed excluded commodities. Order 20 n.8. An "option" is a contract which "grants to the purchaser 'the right, for a specified period of time, to either buy or sell the subject of the option at a predetermined price.'" *CFTC v. White Pine Trading Corp.*, 574 F.3d 1219, 1226 (9th Cir. 2009) (quoting 1 *Derivatives Regulation* § 1.02[10]). Kalshi does not explain how its event contracts confer any such right, and they do not—the buyers of its contracts have no right to buy or sell the outcomes of the events that are the subject of those contracts. Kalshi likewise does not explain how its event contracts are "contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). They are not; they are wagers on the outcomes of events, not promises to deliver those outcomes. *See* Order 23–24.

   Kalshi suggests (Mot. 14–15) that any contract that is settled in cash and based on an excluded commodity must be either an option or future. It does not cite any authority for that

proposition. Its expansive view of options and futures cannot be correct, because it would make the definition of "swap" superfluous—if (as Kalshi argues) anything on which a person wishes to bet is an excluded commodity, and any contract based on that excluded commodity is an option or a future, then there would be no need to define swap, because everything already would qualify as an option or future. Thus, under Kalshi's view, Congress would not have needed to amend the CEA in 2010 to include swaps because they would have been under the CFTC's purview all along. And Kalshi's definition of option or future, like its definition of swap, would be near limitless.

The bottom line is that under Kalshi's view, "nearly every sports bet" would have to be traded on a DCM and would be subject to regulation only by the CFTC. Order 17. That would represent a "sea change" in the regulatory landscape and would "upset[] decades of federalism regarding gaming regulation." *Id.* at 1, 17 (internal quotation marks omitted). It cannot be correct.

## B.     Kalshi Would Not Be Irreparably Harmed Without an Injunction

Kalshi argues (Mot. 20) that it would face irreparable harm without an injunction pending appeal, whereas State Defendants would not be harmed. That has it exactly backwards: Kalshi has not shown any irreparable harm, whereas State Defendants would face substantial and irreparable harm if the Court were to grant an injunction.

Kalshi just wants to be able to continue to profit from sports betting without complying with Nevada gaming law. Being required to follow the law is not an irreparable harm. *See, e.g.*, *Goldman v. Newage Lake Las Vegas, LLC*, 2019 WL 13254890, at *1 (D. Nev. Oct. 23, 2019); *NAACP v. USPS*, 496 F. Supp. 3d 1, 20 (D.D.C. 2020). Notably, Kalshi identifies no case in which a court, having concluded that a state law is likely constitutional, nonetheless enjoined enforcement of that law so that a private business could continue to profit from its violations of that law. There is no reason for this Court to become the first.

### 1.     Kalshi's claimed harms are self-inflicted

Kalshi's claimed harms are "self-inflicted" and thus legally insufficient to support equitable relief. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020). For over 75 years, those seeking to operate sports pools in Nevada obtained licenses and complied with Nevada gaming law. Kalshi instead attempted to sidestep that settled regime based on a novel and expansive interpretation of

1   the CEA. When the Court granted the preliminary injunction, the Court warned that Kalshi was

2   "proceeding at its own risk and creating its own harms." ECF No. 45, at 16. The CFTC has issued

3   a similar warning, instructing DCMs to anticipate "State regulatory actions . . . including enforce-

4   ment actions," and to adopt "appropriate contingency planning, disclosures, and risk management."

5   ECF No. 178-7, at 2. Kalshi thus "could have"—and should have—"proceeded cautiously until this

6   and other lawsuits played out." Order 26.

7       Kalshi did not do that. It instead "greatly expanded its offerings," Order 26, seeking rapid

8   growth in a "regulatory gray area" to achieve "record trading volumes," Alexander Osipovich &

9   Roshan Fernandez, *Kalshi's Rise Shakes Up NFL Sunday*, Wall St. J. (Sep. 28, 2025), perma.cc/

10  8MQ6-ZL87; *see* Marina Temkin, *Source: Kalshi's valuation jumps to $11B after raising massive*

11  *$1B round*, TechCrunch (Nov. 20, 2025), perma.cc/CUB3-9XHC. It started offering its event con-

12  tracts in an increasing array of sports, political, and cultural events, as well as new categories of

13  products, including traditional sports bets such as props and parlays. *See* ECF No. 143-2. Its sports

14  event contracts now make up more than 90% of its trading volume. Lev Akabas, *Kalshi's Volume*

15  *Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025), perma.cc/278U-XT4V.

16  Kalshi did all of this in the face of a CFTC regulation that expressly prohibits it from listing con-

17  tracts involving gaming on its DCM. Order 18 (citing 17 C.F.R. § 40.11(a)).

18      Kalshi thus "created or amplified" its own claimed harms. Order 26. A party that knowingly

19  creates a harm without taking reasonable precautions cannot later demand protection from that

20  harm. *See Al Otro Lado*, 952 F.3d at 1008.

## 2.  Granting Kalshi an injunction would upset the status quo

22      Kalshi argues (Mot. 17) that an injunction would maintain the status quo. Its view of the

23  status quo is flat wrong. The status quo is not Kalshi operating in violation of state law; it is State

24  Defendants enforcing Nevada's gaming laws against anyone operating an unlicensed sports pool.

25      The Ninth Circuit has made just that point. It explained that the relevant status quo is not

26  the "situation before the filing of [the] lawsuit," but instead is the "last uncontested status which

27  preceded the pending controversy." *Flathead*, 98 F.4th at 1191 (internal quotation marks omitted).

28  Thus, for example, the status quo in a trademark-infringement suit is not the day before the lawsuit,

when the defendant already was allegedly infringing, but the time before the alleged infringement started. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000); *see, e.g.*, *Hubbard v. City of San Diego*, 139 F.4th 843, 853 n.10 (9th Cir. 2025); *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023).

Here, the "last uncontested status" that preceded this controversy was the many decades of state regulation of gambling. States' "traditional police powers" in regulating gambling are "considerable and longstanding"—particularly in Nevada, which "has led the nation in gaming regulation and enforcement for decades." Order 28. In January, Kalshi upset that status quo by attempting to evade state law even though its event contracts unquestionably are sports wagers; notably, Kalshi itself operated its DCM for nearly five years *without* offering those wagers. *See* ECF No. 1, ¶ 42. Thus, granting Kalshi relief pending appeal would not preserve the status quo, but instead would allow Kalshi to continue profiting at the expense of the State, its gaming industry, and the public.

**3.    None of Kalshi's claimed harms justifies an injunction pending appeal**

Kalshi claims a number of supposed harms, but none establishes an irreparable injury sufficient to justify an injunction pending appeal. Kalshi does not argue that any of the claimed harms will moot its appeal. Further, whether Kalshi incurs any of these harms is entirely within its control—Kalshi had the opportunity to avoid enforcement by reaching an agreement with State Defendants, as Crypto.com and Robinhood have, but it refused to do so.

***Cost of implementing geofencing.*** Kalshi cites (Br. 16–17) the costs of implementing geofencing technology as an irreparable injury. But that is just a cost of doing business when a company offers sports betting. As this Court recognized, geofencing technology is widely available, and all of Kalshi's licensed competitors use geofencing technology to ensure that they offer sports betting only where it is legal. Order 25; *see* Mot. 19 n.13 (Kalshi's recognition that FanDuel uses geolocation); Mackenzie Decl. ¶¶ 11–12, *Robinhood Derivatives*, *supra* (ECF No. 8) (explaining that Robinhood was able to block access to Kalshi's sports event contracts in Nevada). Indeed, Kalshi cannot credibly claim that it is unable to geolocate or geofence users when it already prevents users from certain countries from accessing its platform. *See* Kalshi, *Member Agreement* § VI (Oct. 12, 2025), perma.cc/PAF8-8WLD.

1    Further, the costs of geolocation and geofencing are modest compared with Kalshi's mas-

2    sive revenues from unlicensed gaming. Dan Bernstein et al., *Kalshi Puts Geolocation Tech Provid-*

3    *ers on Edge Amid Rapid Rise*, Sportico (Oct. 16, 2025), perma.cc/LHD2-BZL2 (Bernstein, *Geolo-*

4    *cation*); *see* Katherine Doherty & Bernard Goyder, *Prediction Markets to Rival Stocks Within*

5    *Years, Kalshi CEO Says*, Bloomberg (Nov. 18, 2025), perma.cc/7Z78-AXUL (Kalshi's CEO stat-

6    ing that "[p]rediction markets" are "starting to look like a trillion-dollar market"). And as this Court

7    explained, any of Kalshi's costs must be "weighed against the State of Nevada's financial interests

8    in tax revenues and Kalshi's competitors' financial interests in fair competition." Order 25.

9    Kalshi claims (Mot. 16) that it cannot "immediately" geolocate and geofence users. But

10   State Defendants have not demanded immediate compliance. Instead, they sought to engage with

11   Kalshi about steps it could take to come into compliance with state law pending appeal, and Kalshi

12   summarily rejected all of those options. Ex. 1, ¶¶ 4–7. For example, Kalshi acknowledges that it

13   collects residency information from its users, *see* Kalshi, *Privacy Policy* § 1(a) (Dec. 20, 2023),

14   perma.cc/5J26-354R, and Kalshi could use that information to stop entering into sports event con-

15   tracts with Nevada residents.[11] To be clear, that is not State Defendants' preferred resolution pend-

16   ing appeal; State Defendants requested that Kalshi use geofencing technology to stop offering event

17   contracts in Nevada. Ex. 1, ¶ 4. But the point is that there are reasonable, good-faith steps Kalshi

18   could take to stop creating harm pending appeal, and Kalshi refuses to take any of them.

19   ***Financial and reputational harm from closing existing positions.*** Kalshi also asserts (Mot.

20   18) that it would face financial and reputational harm from closing existing positions taken by

21   Nevada users. But the CFTC expressly directed DCMs offering sports-event contracts to adopt

22   contingency plans—including "liquidation or close-out policies and procedures"—in the event that

23   a State restricts their operations. ECF No. 178-7, at 2. Kalshi apparently chose to ignore that CFTC

24   guidance, but that is a problem of its own making. And as the Court has explained, if Kalshi's

25   customers continue to use Kalshi despite the CFTC's warnings, "they, like Kalshi, are proceeding

26

27   [11] Kalshi argues (Mot. 18) that a residency-based restriction would be insufficiently protective of the State's interests. Kalshi is hardly in a position to make that argument, when it has thumbed its

28   nose at the State's laws. Besides, it is State Defendants, not Kalshi, who are entrusted with regulating gaming in Nevada, which includes deciding how best to address legal violations.

at their own risk." Order 26. Notably, Kalshi has closed out open contracts before, apparently without suffering any harm. In September, it closed out and refunded all event contracts related to Charlie Kirk that were entered into after his death. *See* Alexander Osipovich, *Kalshi Shuts Down Bets Related to Charlie Kirk*, Wall St. J. (Sep. 12, 2025), perma.cc/UB88-PXTP. So Kalshi plainly can close out open contracts without compromising the operations of its DCM. Kalshi has never quantified what proportion of its contracts involve Nevada users or how much (if anything) it would cost Kalshi to close out and refund those contracts.

And again, State Defendants did not demand that Kalshi immediately close all open event contracts but instead sought to reach an agreement with Kalshi about winding up those contracts within a reasonable time. Notably, ███████████████████████████████████ ███████████████████████████. In particular, ████████████ ███████████████████████████████████████████ ███████████████████. Ex. 3. ████████ Robinhood agreed to "take reasonable action to explore unwinding longer-duration open sports-related event contracts in Nevada" in "cooperat[ion]" with State Defendants. Robinhood Notice 2. Again, this is a situation where Kalshi is creating its own supposed harms.

***Risk of losing its CFTC designation.*** Kalshi argues (Mot. 19–20) that limiting its operations in Nevada would run afoul of a CFTC core principle requiring "impartial access" and could lead to the CFTC revoking its status as a DCM. As the Court has explained, "there is no evidence . . . that the CFTC would take adverse action against Kalshi for complying with court orders and state law while the various lawsuits play out." Order 25–26.

Notably, the CFTC has not taken action against several Kalshi competitors that operate only in certain States, even though they all are subject to the impartial-access requirement. This includes Crypto.com, which stopped offering its event contracts to Nevada residents pending appeal, *see* Daniel O'Boyle, *Crypto.com Shuts Off Access to Sports Contracts in Nevada*, In Game (Nov. 3, 2025), perma.cc/KY76-Z3YX; Fanatics, which is in the process of launching a prediction market that will be available in only 24 States, *see* Laya Neelakandan, *Fanatics Launches Prediction Market in 24 States*, CNBC (Dec. 3, 2025), perma.cc/NU9W-P58Q; and FanDuel, which is launching

a prediction market in conjunction with the CME that will be available only in a dozen States, *see* Eben Novy-Williams, *FanDuel Leaving Las Vegas, Prepares to Cross Prediction-Market Rubicon*, Sportico (Nov. 12, 2025), perma.cc/7HZ6-KKHD.[12] As the CFTC has explained, the impartial-access requirement is aimed at preventing discriminatory membership or participation standards based on wealth or exclusivity. *See* Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 & n.51 (Dec. 22, 2010). That is, the CFTC takes the view that the "intent" of the impartial-access requirement is only to "prevent . . . exchanges from limiting usage based on economic class"—not to require DCMs to offer contracts in a State in violation of that State's laws. Dan Bernstein, *A Frequent Kalshi Claim Is Being Undermined By Nevada, CFTC*, Sportico (Nov. 12, 2025), perma.cc/S59S-F6F5.

Indeed, if anything the CFTC has made clear that it *expects* DCMs to restrict their activity in particular States depending on how the lawsuits in those States play out. As noted, the CFTC told DCMs to have policies to close out contracts in the event that particular States restrict their operations. ECF No 178-7, at 2. That confirms that the CFTC does not view the impartial-access requirement (or any other regulation) as requiring a DCM to offer all of its contracts in all States.

***Potential state enforcement.*** Kalshi cites (Mot. 16) a potential state enforcement action as an irreparable injury. But an enforcement action simply would seek a judicial order that requires Kalshi to comply with Nevada gaming law or to stop offering its sports and election event contracts in Nevada. That is, all the State would be trying to do is obtain compliance with Nevada law—the very law which the Court has determined Kalshi likely is required to follow, Order 24, and that State Defendants are statutorily charged with enforcing, *id.* at 26–27.

"[H]aving to submit oneself to an enforcement proceeding typically does not constitute irreparable harm." *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 203 (D.D.C. 2017). Kalshi complains that an enforcement proceeding would occur in state court, as opposed to federal court, but that is what Nevada law requires. *See* NRS § 463.343. And in that proceeding, Kalshi would have the opportunity to raise any potential defense. Kalshi acts as though an enforcement proceeding

---

[12]   Kalshi notes (Mot. 17 n.13) that FanDuel is an FCM not subject to the impartial-access requirement, but the CME is a DCM that is subject to that requirement. *See* CFTC, *Designated Contract Markets (DCM)*, bit.ly/44dJNyd (accessed Dec. 8, 2025).

would devastate its business, but that plainly is not true, as Kalshi already is subject to an enforcement proceeding in Massachusetts, *see Massachusetts v. KalshiEX LLC*, No. 2584CV02525 (Suffolk Cnty., Mass. Sup. Ct. filed Sept. 12, 2025), and regulators in at least five other States have sent cease-and-desist letters to begin enforcement proceedings, Mick Bransfield, *Summary of Legal Actions Involving Sports Event Contracts* (Dec. 3, 2025), perma.cc/AAY7-D873.

Kalshi repeatedly raises (Mot. 3, 16) the possibility of a criminal enforcement proceeding. It cites *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013), for the proposition that the threat of criminal prosecution constitutes an irreparable harm. But in that case, the Ninth Circuit determined that the plaintiff was likely to succeed in showing that the challenged law is unconstitutional; the Court found a likelihood of irreparable harm from "the threat of state prosecution *for crimes that conflict with federal law*." *Id.* at 1029 (emphasis added; internal quotation marks omitted). Here, the Court has concluded that Kalshi is *not* likely to succeed in showing that Nevada gaming law is preempted, Order 24, so Kalshi cannot establish a likelihood of irreparable harm merely by citing the possibility of criminal prosecution.

Anyway, contrary to Kalshi's suggestion (Mot. 16), State Defendants cannot simply file a criminal proceeding willy nilly. A criminal proceeding requires a prosecutor (not the Board) to investigate and then independently decide to seek criminal charges. The prosecutor then would have to secure an indictment from a grand jury or file an information following a preliminary examination before a magistrate. NRS §§ 172.015, 173.035. And then the prosecutor would have to prove the charges beyond a reasonable doubt. *See Mathews v. State*, 424 P.3d 634, 638 (Nev. 2018). Further, Kalshi would be able to raise its preemption defense and would have all of the constitutional and statutory protections that apply to criminal proceedings. Those many protections undermine any claim of irreparable harm.

*Disrupting other litigations.* Finally, Kalshi analogizes (Mot. 17–18) the decision in this case to a nationwide injunction. In particular, it argues (*id.*) that limiting its operations in Nevada would deprive it of the effect of the preliminary injunction it secured in New Jersey, which allows it to continue operating in that State. Kalshi is wrong. The Court's order applies only to Nevada, and State Defendants seek to enforce Nevada's laws only in Nevada and are not seeking to enforce

1    them in New Jersey. Kalshi never explains how limiting its sports betting in Nevada would harm

2    its operations in New Jersey. There would be no such harm, because sports-betting companies rou-

3    tinely operate in one State but not another due to differing state laws. Bernstein, *Geolocation*.

4        Kalshi also argues (Mot. 17–18) that limiting its operations in Nevada would deprive it of

5    the benefit of the ruling about election contracts by the District Court for the District of Columbia.

6    But that court was only addressing the CFTC's powers under federal law (specifically, its ability to

7    delist election event contracts under the special rule), not Nevada's power to regulate gaming within

8    the State. *See KalshiEX*, 2024 WL 4164694, at *6. So there would not be any conflict.

9        More generally, Kalshi argues (Mot. 17–18) that limiting its operations in Nevada would

10   short circuit the judicial process that is playing out across the different courts. That has it back-

11   wards. Kalshi has sued multiple States in order to keep operating in each of those States. As each

12   court assesses the merits of Kalshi's arguments, each court should be able to give effect to its ruling.

13   It cannot be the case that this Court must stay its hand with respect to Nevada because another court

14   might come out differently with respect to a different State.

15       The bottom line is that Kalshi has not come close to showing the immense irreparable harm

16   that would be required to justify the extraordinary relief it seeks.

17           **C.    The Balance of Hardships and Public Interest Weigh Heavily Against an In-
                    junction Pending Appeal**

18       As this Court has recognized, every day that Kalshi operates without complying with Ne-

19   vada gaming law imposes "substantial irreparable harms to the Board, the State of Nevada, the

20   gaming industry in this state, and the public interest." Order 26. Indeed, State Defendants already

21   have been substantially and irreparably harmed by Kalshi's actions. The balance of equities thus

22   strongly favors State Defendants, not Kalshi.

23       ***Enforcement of state law.*** As the Supreme Court recently has made clear, a State "suffers

24   a form of irreparable injury" "[a]ny time" it is "enjoined by a court from effectuating statutes en-

25   acted by representatives of its people." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th

26   648, 656 (9th Cir. 2025) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 860–61 (2025)). The Ninth

27   Circuit has explained that "[d]uly elected branches" have a sovereign interest in ensuring that the

28   "policies of their choice" are enacted. *Immigrant Defs.' Law Ctr. v. Noem*, 145 F.4th 972, 994 (9th

Cir. 2025). Nevada also has a "public interest in the enforcement of its laws." *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 394 (9th Cir. 2016) (en banc) (internal quotation marks omitted). As the Court has recognized, State Defendants are statutorily charged with enforcing Nevada's gaming laws. Order 26. Preventing them from enforcing those laws poses an affront to Nevada's sovereignty and intrudes on the democratic will of the people, as expressed through the Legislature.

Kalshi contends (Mot. 20) that the fact that State Defendants did not immediately appeal the Court's initial preliminary-injunction decision somehow shows that they do not face real harm. But State Defendants consistently have sought to resolve this litigation as quickly as possible because of the many harms Kalshi's operations pose to the State. And this Court has recognized that State Defendants *are* being irreparably harmed, which warrants dissolving the preliminary injunction. Order 26. Besides, Kalshi's argument ignores that Kalshi has "greatly expanded" its operations since the Court's initial ruling. *Id.* The Ninth Circuit has explained that a delay in seeking "judicial protection," rarely if ever negates a showing of irreparable injury, especially "in the context of ongoing, worsening injuries," *Arc of Cal. v. Douglas*, 757 F.3d 975, 990-91 (9th Cir. 2014)—which is the situation here.

***Harm to Nevada users.*** An injunction would allow Kalshi to evade the state laws that protect minors and problem gamblers. Nevada law prohibits persons under 21 from placing sports wagers, NRS § 463.350(1)(a), and it enforces that prohibition through strict know-your-customer rules, including verification of the patron's date of birth. Nev. Gaming Regs. 5.225(2), (5)(a), 22.061. Regulators audit licensees to ensure compliance. *See* NRS § 463.310; *see also* Howard Stutz, *Caesars Fined for Under-21 Gambling*, L.V. Rev.-J. (July 26, 2012), bit.ly/4oebEFY. Kalshi, by contrast, allows anyone over eighteen to bet on its platform. Kalshi Help Center, *Signing Up as an Individual*, perma.cc/2F8Y-REBP; *see* Order 27.

Nevada law also protects those suffering from problem gaming. It requires licensees to offer deposit-limit tools, Nev. Gaming Reg. 5.225(18)(a), and to prominently display the State's responsible-gaming resources, *id.* at 5.225(18)(b); *see id.* at 5.17(2), (4). "[N]either DCMs nor the CFTC is equipped to address those issues the same way state gambling and licensed entities are." Order 27. Although Kalshi represents (Mot. 21) that it offers some voluntary consumer-protection efforts,

1   it has not shown that its protections are as stringent as those required by Nevada law, or even close.

2   Indeed, Kalshi's own social-media posts gleefully describe its platform as "kind of addicting."

3   Dustin Gouker, *Kalshi Says It's 'Kind of Addicting' In Instagram Post*, Event Horizon (Oct. 21,

4   2025), perma.cc/5DWW-4LKE. More importantly, Kalshi's efforts are voluntary—it could choose

5   to discontinue them at any time. The point of state regulation is that the State, not Kalshi, gets to

6   decide how best to regulate gaming in Nevada.

7        **Harm to Nevada's gaming industry.** An injunction pending appeal would impose acute

8   harms on Nevada's regulated gaming industry. As this Court has explained, the Nevada Legislature

9   has determined "the success of legal gaming is dependent on public confidence and trust, and that

10  public trust can be maintained only through strict regulation of those involved in the gaming indus-

11  try in this state." Order 26 (citing NRS § 463.0129(b)–(c)); *see Sports Form, Inc. v. Leroy's Horse

12  & Sports Place*, 108 Nev. 37, 41 (1992). The Legislature therefore has enacted "a 'comprehensive

13  regulatory structure, coupled with strict licensing standards'" to ensure the integrity of gaming

14  operations in the State. *Id.* (quoting NRS § 463.745).

15       Allowing Kalshi to bypass those requirements would give Kalshi a massive and unfair com-

16  petitive advantage over its competitors and would greatly disrupt the industry as a whole. *See* How-

17  ard Stutz, *Prediction Markets Weren't at G2E. Here's Why They Dominated Gaming Industry Dis-

18  cussions*, Nev. Indep. (Oct. 13, 2025), perma.cc/5XX7-URX8. That advantage would be both fi-

19  nancial, in that Kalshi would not need to spend the money its competitors need to spend on licensing

20  fees, taxes, and compliance, *see* Order 27–28, as well as competitive, in that Kalshi's products

21  would not be subject to the same requirements and restrictions as its competitors. As this Court has

22  recognized, Nevada has a sovereign interest in ensuring an even and competitive gaming industry,

23  and it suffers irreparable harm when Kalshi is able to distort the playing field. *Id.*; *see Hotel Emps.

24  & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1509 (9th Cir. 1993).

25       The harm substantially increases the longer Kalshi is allowed to operate unfettered. Kalshi's

26  ability to profit from unlicensed gaming will incentivize others to enter into prediction markets

27  instead of becoming (or remaining) licensed under by the State. *See* Dustin Gouker, *News: Fan-

28  Duel, DraftKings Leaving American Gaming Association*, The Closing Line(Nov. 17, 2025),

perma.cc/B3SK-MXH4 (explaining that other companies other may feel the need to enter the pre-diction-market space instead of "ced[ing] the market to Kalshi"). Indeed, as the Court observed, that already has started to happen—DraftKings and FanDuel have decided to forgo licensing in Nevada so that they can enter the prediction-markets business in other States. Order 28.

Kalshi's operations also threaten the integrity of the gaming industry. Nevada law only per-mits wagers when there are sufficient safeguards to ensure that wagering is fair. For example, a licensed sports book must follow strict protocols to ensure that a player in a game does not bet on that game. Nev. Gaming Reg. 22.1205. As the Court has observed, the recent scandals in profes-sional baseball and basketball "highlight[]" the importance of those safeguards. Order 20 n.7. Fur-ther, to offer wagers on events other than organized sporting contests, the sports book must prove that the event is "effectively supervised" and has "integrity safeguards." Nev. Gaming Reg. 22.1201(2)(c). Kalshi, in contrast, can self-certify event contracts without ensuring those safe-guards are in place—for which it has already drawn criticism from the NCAA. *See* Letter from Scott Bearby to Kalshi Inc. (Oct. 30, 2025), perma.cc/VH67-LN3C (questioning "Kalshi's com-mitment to contest integrity and the protection of contest participants").

Kalshi contends (Mot. 21) that the CFTC has regulations that protect against market manip-ulation. But the CFTC is not a gaming regulator, and it lacks the authority, institutional expertise, and capacity to assess the safeguards for each sports bet. The CEO of Coinbase vividly demon-strated the point when, at the end of a recent earnings call, he deliberately spoke five seemingly random words specifically to change the result of a Kalshi event contract about what he would say on the call. Emily Nicolle & Justina Lee, *Coinbase CEO Stunt Exposes Prediction Market Vulner-ability*, Bloomberg (Oct. 31, 2025), perma.cc/9S4K-Q2K8. Nevada law does not allow wagers on these types of unregulated "events" precisely because of the risk of manipulation and the corre-sponding threat to public confidence in gaming.

***Harm to the State's economy and fisc.*** Allowing Kalshi to continue to operate would dev-astate Nevada's economy and the State's fisc. The Nevada Legislature has determined that the "gaming industry is vitally important to the economy of the State and the general welfare of the inhabitants." Order 26 (quoting NRS § 463.0129(a)). Licensing fees are vital to the public fisc.

*Sacco v. State*, 105 Nev. 844, 847 (1989); *see* NRS § 463.370(1). Nevada collected $1.2 billion in gaming and live-entertainment taxes last year alone, revenue that funds core public services, from schools to highways. *See* Am. Gaming Ass'n, *State of the States 2025*, at 85 (May 13, 2025), perma.cc/J27S-WLSB.

Unlicensed gaming threatens that revenue in two ways: by evading licensing fees altogether and by diverting business from operators who pay those fees. *Sacco*, 105 Nev. at 847; *see Kent v. Mindlin*, 52 F.3d 333, 1995 WL 236248, at *2–3 (9th Cir. Apr. 21, 1995) (table).[13] An injunction pending appeal would enable Kalshi to avoid obligations that every lawful operator must bear, damaging the State's economy and impairing one of the State's most important revenue streams.

\* \* \* \* \*

Every day that Kalshi operates in Nevada without complying with Nevada law wreaks significant and irreparable harm to the State, its residents, its gaming industry, and its broader economy. There is no justification for allowing Kalshi to continue violating Nevada gaming law with impunity during the appeal.

**D.      If The Court Grants Relief, the Court Should Require Kalshi to Post Security**

If the Court grants Kalshi a stay or injunction pending appeal, the Court also should require Kalshi to post significant security. *See* Fed. R. Civ. P. 65(c). As the maximum administrative fine that can be imposed under Nevada law is $500,000, *see* NRS § 463.310(4)(d)(1), as amended by S.B. 45 (2025), the Court should require Kalshi to post security in that amount.

**CONCLUSION**

The Court should deny Kalshi's motion to stay the dissolution of the preliminary injunction pending appeal.

---

[13]   Contrary to Kalshi's suggestion (Mot. 20), it is far from clear that State Defendants could recoup unpaid taxes if they ultimately prevail in this litigation. Under Nevada law, only licensed entities pay taxes, and licensing is not retroactive. That said, a new provision effective on October 1, 2025, permits State Defendants to seek disgorgement of "profits, gain, gross receipts, or other benefit" from a violation of State law, NRS § 463.360(3), as amended by S.B. 256 (2025), and that provision may allow some recovery from Kalshi.

DATED this 8th day of December, 2025.

By: /s/ *Nicole A. Saharsky*

AARON D. FORD
  Attorney General

Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General—Litigation
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3773 (fax)
jwhelan@ag.nv.gov
sclinton@ag.nv.gov

Nicole A. Saharsky (*pro hac vice*)
Minh Nguyen-Dang (*pro hac vice*)
Mayer Brown LLP
1999 K Street, NW
Washington, D.C. 20006
(202) 263-3000 (phone)
nsaharsky@mayerbrown.com
mnguyen-dang@mayerbrown.com

Rory K. Schneider (*pro hac vice*)
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500 (phone)
rschneider@mayerbrown.com

*Attorneys for Mike Dreitzer, George Assad, Chan-*
*deni K. Sendall, The Nevada Gaming Control*
*Board, Jennifer Togliatti, Rosa Solis-Rainey, Brian*
*Krolicki, George Markantonis, Abbi Silver, The*
*Nevada Gaming Commission, and Aaron D. Ford*